**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE II

Plaintiffs

v.

ALBIN MARINE, INC.; STANDISH BOAT YARD, INC. and POINT JUDITH MARINA, LLC.

Defendants

CIVIL ACTION NO. 06-190-S

**POINT JUDITH MARINA'S PRETRIAL MEMORANDUM**

This matter involves the sinking of a boat called *Eveready II*, belonging to the plaintiff Picchione, on Monday, April 25, 2005. Point Judith Marina had launched the boat for the season just prior to the weekend, at the urging of the owner, and placed the boat at the disposal of the owner and in his custody, care, and control, in the slip that he had rented from them for the season. The owner had signed a slip rental contract that expressly provided that the marina had no responsibility to attend to boats that owners kept in its slips.

Before leaving the boat, Point Judith had ascertained that the boat was not taking on any water, and that it had an actively-functioning automatic bilge pump, although another of its three bilge pumps would not function automatically. The owner has testified that he was aboard his boat over the weekend, preparing it for the 2005 boating season. No one from the marina was on the boat after the owner was aboard.

When the boat was raised immediately following the sinking, the local harbormaster immediately went aboard it, and found that the power to all of the boat's bilge pumps was shut off.

Nearly 30 months after the sinking, after significant disassembly, a hole was discovered in one of the exhaust hoses. Plaintiff may seek to ascribe this hole as a source of water entering the hull of the boat. But this location was hidden behind a fuel tank. Not even the plaintiff's own surveyors, despite their long search for a source of water coming into the hull, were able to locate this hole until the fuel tank was removed. Point Judith had neither an opportunity nor a duty to have discovered this condition on plaintiff's ten-year old boat.

Pursuant to the slip agreement, Point Judith has an indemnity claim against plaintiff Picchione as to any liability assessed against it.

## I. DEFENDANT'S EVIDENCE

### 1. Don Vivenzio

Don Vivenzio is the general manager of the marina. He was familiar with work that had been done on the vessel in the past, and on Mr. Picchione's other boats, and knew that Mr. Picchione had signed slip rental agreements with the yard for many years previously. He was aware that Mr. Picchione's boat had been found with water in below-decks spaces on repeated occasions in the past, in particular following winter lay-up. The marina had found Mr. Picchione's boat on other occasions with important power switches in the "off" position.

Mr. Vivenzio will testify that the boat had been aground before on a breakwater. This opened the hull. In the course of bringing the boat ashore for repair, the engine room was flooded, and the engines nearly immersed. In addition, during the season of 2004, the owner had been having trouble with his engines, which Point Judith did not have the tools to repair. The engines had not yet been started up in 2005, and it is unknown whether they would have run properly.

In the previous boating season, Mr. Vivenzio had alerted the owner that the vessel appeared to be floating somewhat lower than normal. The owner did not elect to do anything about this.

Mr. Vivenzio participated in launching of the boat and in towing it to its slip. As is the marina's routine, he saw to it that the boat was not taking on water, and that it had at least one bilge pump functioning in the automatic mode. The owner had been anxious to get the boat into the water to allow his outside mechanic to perform some steps related to work on the engines that the latter was doing for Mr. Picchione. Because of the involvement of the outside mechanic (unaffiliated with Point Judith), Point Judith was not performing a sea trial of the boat on this occasion, nor having any involvement in starting the engines up for the season, following the work of an outsider. He observed Mr. Picchione on board the boat over the weekend that followed (the weekend of April 23-24, 2005).

He was directly involved in the response to the sinking, and observed the switches/breakers providing power to the bilge pumps in the "off" position at the time that the boat was raised from the water. He observed the condition and demeanor of Mr. Picchione when the latter arrived at the Marina after repeated calls following the sinking, and was present when Mr. Picchione told the Coast Guard that there had been no water in the boat on Sunday, April 24, 2005, the day before the sinking. He oversaw the actions of the yard to deal with the boat following its removal from the water, including "pickling" of its engines, etc.

He will testify that when Point Judith works on a customer's boat, the yard's people sometimes observe items that that the customer might wish to have serviced or repaired. Barring urgent circumstances, the marina's practice to alert the customer to such items (in the ordinary course of business, either by mail with the billing, or by

telephone) and not to proceed with work on such items until authorization is received, and the yard does not and did not undertake any greater obligation than this. The marina never undertook any responsibility to Mr. Picchione, or to any customer, to assure that a boat kept at its slips would not have problems. Likewise, it never took on a responsibility to repair automatically conditions it might find on board a customer's boat. Its undertaking in commissioning a boat did not include an obligation to detect every possible defect or shortcoming with a customer's vessel.

Mr. Vivenzio will also testify that when the yard performed work on the starboard transmission of the vessel, the exhaust system was not disconnected, nor make accessible or visible.

2. **Barry Ennis**

Barry Ennis was serving as the Harbormaster of Point Judith Harbor, and responded to the scene. He went aboard the vessel directly upon its being removed from the water, and discovered that all the switches to all the pumps were in the "off" position.

3. **David Clarke**

David Clarke was the owner of a boat moored in a nearby slip. He was walking with a friend past the *Eveready II* on his way to his own boat at about 10:00 pm on Sunday evening, April 24, 2005 — approximately ten hours before the vessel was discovered to be sunk. He pointed out the *Eveready II* to his friend — to the effect that she had been up on the rocks on the jetty some years before. He observed the vessel to be afloat normally at that time, on an even keel, floating at the level that he'd been accustomed to seeing her, with nothing appearing unusual.

4. **Joseph Stroker**

Joseph Stroker worked at the marina in 2005, and was assigned to perform the limited commissioning that applied for that year. Among other things, he noted that he was unable to make one of the bilge pumps operate in an automatic mode, but that another one just forward of it was working properly in the automatic position.

4. **Henry "Bud" Smedberg**

Bud Smedberg was an employee of Point Judith, who had worked on the vessel repeatedly over the course of the approximately 10 years that the owner had kept it there. He will testify that the boat was equipped with three bilge pumps.

5. **Nicholas Picchione II (plaintiff)**

Mr. Picchione will testify that he was aboard his boat during the weekend of April 23-24, 2005, preparing it for the forthcoming season, about his actions during

the days in question, the mechanical work on his engines, and the prior casualties of the boat, and its floating low on its lines, and otherwise as reflected in his deposition.

6. **Dennis Layfield (Expert and Fact Witness)**

Dennis Layfield was engaged as a surveyor on behalf of Point Judith. He will testify to the arrangement of the boat's components and the arrangement of its two bilge pumps in the engine room and separate bilge pump in the steering area. He will testify that the hole found in the starboard exhaust hose in October 2007 was not visible or accessible until the starboard fuel tank was removed, and that it was possible to remove the starboard transmission without disassembling the starboard exhaust line. He will , and that there was no shortcoming on the part of Point Judith in not having discovered the hole, or in any other aspect of its work. He will testify that the presence of water in the bilges of a boat newly launched following winter storage ashore is by no means an indication that the boat is leaking, but instead could reflect accumulation of seasonal snowmelt or rainwater.

He will testify to his opinion that the sinking would not have occurred if the power switches to the bilge pumps had not been shut off over the weekend of April 23-24, 2005, and that it cannot be determined with sufficient professional certainty that seawater entered the boat by way of the mufflers and the aforementioned hole in the starboard exhaust hose before the boat sank. He will testify that the owner had a duty to care for his boat properly, and that this included insuring that there was power to the automatic bilge pumping system before leaving it.

He will testify that the market value of the boat before the sinking — taking into account its history and condition — was approximately $93,000, as more fully detailed in his report, and that the boat did not lose all its value by reason of the sinking. Its diesel engines had been "pickled" by Point Judith immediately following the raising of the boat from the water, and reasonably prudent steps on the part of the plaintiffs in the immediate aftermath would more likely than not have enabled those engines to be restored to service. In any event, the vessel has a probable salvage value of approximately $25,000 even in its present unattractive condition, and probably more if the plaintiffs had exercised reasonable diligence with respect to the engines following the sinking.

He will otherwise testify consistently with his report.

## II. LEGAL MEMORANDUM

Regardless of how water may have come to enter the boat, the cause of the sinking of the vessel was the depowering of all of the bilge pumps on board the vessel, as found by the harbormaster and by Mr. Vivenzio when the boat was raised. This depowered the bilge pumping capability that the marina had undisputedly ascertained was operating when its people left the boat. This is a superseding cause, which in admiralty serves to place the responsibility for the loss on the party to whom

that cause is attributable, in this case, the owner. *Exxon Co., U. S. A., et al. v. Sofec, Inc., et al.*, 517 U.S. 830 (1996).

Point Judith owed no generalized duty to the owner with respect to his boat. It owed to him only performance that it agreed to carry out — in other words, only whatever duty arose under contract. The facts show this, and it is reinforced by the text of the slip rental agreement. Point Judith did what it agreed to do. Invocation of the warranty of workmanlike performance does not permit one party to impose terms that the other party never agreed to. *Federal Marine Terminals, Inc. v. Worcester Peat Company*, 262 F.3d 22, 29 (1st Cir. 2001).

Plaintiffs cannot establish causation, a key element of their case. Because it is undisputed that the vessel had working automatic bilge pumping capability when Point Judith left the vessel, the fact that one of its three bilge pumps would not function automatically made no difference. What did make a difference is that the plaintiff, who was on the boat last, failed to make sure the power to the bilge pumps was on when he left the boat.

There was no bailment, both on the bare facts, and as buttressed by the slip agreement. Mr. Picchione had complete possession, care, custody, and control of his boat certainly no later than Saturday, April 23, 2005. He was free to park it in the slip that he had rented, or to motor away with it, or tow it away.

Ordinary maritime principles of comparative fault and mitigation of damages apply.

## III. EXHIBITS

A. Slip Rental Agreements
B. Sales Literature and Specifications For Albin 35
C. Photographs of Vessel and components
E. Exhibits to Deposition of plaintiff
F. Exhibits to the Deposition of William Robbins
G. Exhibits to the Deposition of Kenneth Hilton
H. South Kingstown Police Report
I. Work Orders and Service Records of Pt. Judith
K. Plaintiffs Answers to Interrogatories
L. Point Judith's Requests For Admissions
M. Coast Guard pollution records
N. Any exhibits identified by other parties

## IV. MOTIONS TO DISMISS AND MOTIONS *IN LIMINE*

None anticipated at this time.

## V. JURY INSTRUCTIONS AND SPECIAL VERDICT FORM

N/A — bench trial

## VI. ANTICIPATED LENGTH OF TRIAL

Three full trial days.

## VII. ADDITIONAL MATTERS

None

Dated: April 25, 2008

**POINT JUDITH MARINA, INC.**
By its attorneys,
_/s/ Carl E. Fumarola_________________

Stephen T. Armato, R. I. Bar #6395
Michael Rauworth (pro hac vice)
Carl E. Fumarola, Esq., R.I. Bar #6980
Cetrulo & Capone LLP
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on this 25th day of April, 2008, I have served the above documents on the following counsel of record via ECF filing:

Frederick A. Lovejoy, Esq.
LOVEJOY & ASSOCIATES
276 Center Road
Easton, CT 06612-1604
LOVEJOYADM@aol.com

Robert Collins, Esq.
CLINTON & MUZYKA, P.C.
1 Washington Mall, Suite 1400
Boston, MA 02108
rcollins@clinmuzyka.com

_/s/ Carl E. Fumarola_________________
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth *(pro hac vice)*
Carl E. Fumarola, Esq., R.I. Bar #6980
**CETRULO & CAPONE LLP**
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com



02006-0045
1033971v1