UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE, II, Plaintiffs, | : | CA-06-190-S |
| v. | : | |
| ALBIN MANUFACTURING, INC., STANDISH BOAT YARD, INC., AND POINT JUDITH MARINA, LLC Defendants. | : | April 25, 2008 |

PLAINTIFF NORTHERN INSURANCE COMPANY OF NEW YORK'S
PRE-TRIAL MEMORANDUM

BACKGROUND

This case involves the sinking of a 1995 35' Albin vessel (hereinafter "M/V EVEREADY") on April 25, 2005. The M/V EVEREADY is a 35' pleasurecraft which Mr. Picchione purchased from Standish Boat Yard, Inc., for the predominate purpose of recreational fishing. It was the second vessel that Nicholas Picchione purchased from Standish Boat Yard, Inc.

The M/V EVEREADY was designed by defendant Albin Manufacturing Company, Inc. and sold to defendant Standish Boat Yard, Inc. Standish Boat Yard, Inc. in turn sold the vessel to Nicholas Picchione, II in 1996. On purchasing the vessel from defendant Standish Boat Yard, Inc., Mr. Picchione entered into a contract whereby Standish Boat Yard, Inc. was to install a tuna tower and a generator on the M/V EVEREADY. Prior to purchasing the 35' Albin, Mr. Picchione had ordered a 31' Albin, but when it could not be constructed within the time schedule agreed to, Standish Boat Yard, Inc. suggested that the prototype 35' Albin it possessed would be suitable for Nicholas Picchione's offshore fishing requirements (Standish Boat Yard, Inc. was

aware of Mr. Picchione's offshore fishing requirements because he had previously purchased a 28' Albin vessel from Standish which sank on one of those fishing trips). After the 1996 boating season, Mr. Picchione's first season of use, defendant Standish Boat Yard, Inc. installed ballast in the M/V EVEREADY to correct a listing problem.

At the time of installing the tuna tower and generator, Standish Boat Yard, Inc. installed the tuna tower and generator without performing any calculations as to how this additional equipment might affect the static waterline of the M/V EVEREADY. The same was true of the ballast installation.

At the time of sale, the M/V EVEREADY did not possess any anti-siphon loop/check valves on the hoses which were connected to thru-hull fittings, although the American Boating Yacht Council, Inc. and industry standards recommended such devices. Although defendant Standish Boat Yard, Inc. became aware that the thru-hull fittings for the bilge pumps and the exhaust ports were now below the vessel's waterline, as a result of its having added the tuna tower, generator and additional ballast, defendant Standish Boat Yard, Inc. did not add anti-siphon loops at that time nor did it relocate the position of the thru-hull fittings.

Additionally, the M/V EVEREADY had had its exhaust hoses installed through a sharp-edged, ¾" plywood bulkhead without any chafing gear and/or strain relief installed so as to prevent the exhaust hose from being cut/severed and, thus, resulting in water being able to enter the vessel's bilge.

A number of years after defendant Standish Boat Yard, Inc. had sold the M/V EVEREADY to Mr. Picchione, Standard Boat Yard, Inc. became aware that Albin Manufacturing, Inc. had begun to install anti-siphon loops/check valves on its subsequent year

Albin 35' vessels.[1] Moreover, Its Manager, Mr. Hilton, was aware of the reason for using anti-siphon loops.

Although, armed with this knowledge Standish Boat Yard, Inc. failed to issue a recall and/or send a notice to Mr. Picchione advising him that anti-siphon loops/check valves were now being installed on newer built 35' Albin vessels and that the M/V EVEREADY should be retrofitted. At no time did either Albin Manufacturing, Inc. and/or Standish Boat Yard, Inc. ever advise Mr. Picchione that the M/V EVEREADY exhaust hoses were installed through a sharp edged bulkhead without chafing gear and/or strain relief devices.

From the date that Mr. Picchione purchased the M/V EVEREADY, he rented a slip at defendant Point Judith Marina, LLC during the summer boating season. Commencing in 1998, he had the M/V EVEREADY stored on land at Point Judith Marina, LLC during the winter months.

In 1998, the M/V EVEREADY grounded and was required to be repaired. All of the repairs performed which resulted from the grounding were performed by defendant Point Judith Marina, LLC.

Those repairs required disconnecting both the port and starboard exhaust hoses; i.e., the port engine and the port and starboard transmissions were removed. As part of those repairs defendant Point Judith Marina, LLC replaced all of the bilge pumps on the M/V EVEREADY. (Additionally, any repairs performed on the vessel's bilge pumps between 1998 and April 25, 2005 were performed by defendant Point Judith Marina, LLC).

Defendant Point Judith Marina, LLC never obtained a copy of the ABYC requirements. Moreover, even though its technicians knew of the anti-siphon loop requirements, Point Judith

---

[1] Between 1995 to the present, defendant Standish Boat Yard, Inc. never obtained/used a copy of the ABYC Requirements.

Marina, LLC did not install anti-siphon loops when it replaced the M/V EVEREADY's bilge pumps in 1999 although required by good industry practice.

Additionally, from 1998 to the date of its sinking on April 25, 2005, Mr. Picchione relied on Point Judith Marina, LLC to keep his vessel seaworthy and, as such, had almost 100% of the service/repairs needed to be performed on the M/V EVEREADY performed by Point Judith Marina, LLC. Such work included, but was not limited to, the commissioning and decommissioning of the M/V EVEREADY at the beginning and end of every season from 1998 to 2005, performing service/repairs suggested by Point Judith Marina, LLC and performing service/repairs when equipment did not work or perform correctly.

Commissioning involved ensuring that the vessel's systems were properly working and examining the vessel's equipment to ensure that she was seaworthy for the coming season.

Additionally, in 2000, Point Judith Marina, LLC had occasion to replace the starboard transmission on the M/V EVEREADY, thus requiring it to disconnect the starboard exhaust hose and to observe its condition and placement.

Moreover, as part of its routine commissioning protocol, Point Judith Marina, LLC examined the hoses on the vessels it was commissioning.

In April 2005, Point Judith Marina, LLC was again retained by Nicholas Picchione, II to perform the commissioning of the M/V EVEREADY for the 2005 boating season. At the time defendant Point Judith Marina, LLC started the commissioning process on the M/V EVEREADY (on April 22, 2005), Mr. Joseph Stroker, a technician, found some water in the vessel's bilge, and a malfunctioning engine room bilge pump. Rather than replace the malfunctioning bilge pump, Mr. Stroker elected to turn what he believed to be that bilge pump; switch off. Moreover, neither Mr. Stroker nor anyone else at Point Judith Marina, LLC ever

advised Mr. Picchione prior to the sinking, or Mr. Picchione's underwriter or its agents following the sinking, that there had been a malfunctioning bilge pump found on the vessel shortly before her sinking and Mr. Stoker response to the problem.

On April 25, 2005, prior to completing the commissioning of the M/V EVEREADY, which would include performing a sea trial of the vessel, the M/V EVEREADY unexpectedly sank at her slip.

4.(A) Plaintiffs May Call All or Some of the Following Witnesses

1. Nicholas Picchione, II (fact witness)

Mr. Picchione will testify as to his purchase and ownership of the M/V EVEREADY, and the maintenance/service performed on the vessel from its purchase to the date of its sinking on or about April 25, 2005. He will further testify as to the commissioning and decommissioning of the M/V EVEREADY for each year he kept the vessel at Point Judith Marina, LLC.

2. Kenneth Hilton (fact and lay expert witness)

Mr. Hilton will testify in respect to the Albin 35 vessel that was purchased from defendant Standish Boat Yard, Inc. Mr. Hilton will testify that the M/V EVEREADY was not supplied with anti-siphon loops/check valves. That Standish Boat Yard, Inc. did not possess the ABYC manuals in 1995 nor does it possess the said manuals presently. Mr. Hilton will testify that at some time after Standish Boat Yard, Inc. sold the Albin 35 to Mr. Picchione, that Albin began installing anti-siphon loops/check valves on its 35 Albin vessels. Mr. Hilton will further testify that Standish Boat Yard, Inc. never recalled the Albin 35 sold to Mr. Picchione, nor did it advise Mr. Picchione of the change concerning anti-siphon loops/valves. Mr. Hilton will testify that Standish Boat Yard, Inc. installed a generator and a tuna tower on the M/V EVEREADY without determining how they affected the static waterline of the vessels and without making any changes to the vessel's thru hull fittings as a result thereof.

3. Mr. David Isabel

Mr. Isabel will testify as to the insurance contract entered into between Northern Insurance Company of New York and Nicholas Picchione, II. Mr. Isabel will further testify as to the monies paid out pursuant to the insurance contract and to any other monies paid out by Northern Insurance Company of New York as a result of the sinking, et cetera, of the M/V EVEREADY.

4. Mr. William Robbins (expert witness)

Mr. Robbins will testify with respect to the manufacturing defects/shortfalls of the M/V EVEREADY, and that the hoses on the M/V EVEREADY that were connected to thru hull fittings lacked anti-siphon loops/check valves, and that the exhaust hoses on the vessel lacked chafing gear/strain relief, all in contravention of established/recommended industry practices. He will further testify that defendant Point Judith Marina, LLC, which serviced the M/V EVEREADY for a number of years, including replacing the transmissions, should have observed the defective nature of the exhaust hoses and taken corrective action, and that anti-siphon loops should have been installed when Point Judith Marina, LLC replaced the M/V EVEREADY's bilge pumps. Additionally, Mr. Robbins will testify it was negligent for defendant Point Judith Marina, LLC to shut off the vessel's bilge pump switch without replacing a malfunctioning bilge pump, and without advising the owner of the condition of the bilge pumps or Point Judith Marina, LLC's actions.

Mr. Robbins will further testify that he thoroughly examined the M/V EVEREADY and has excluded all sources of water entry, save through the cut exhaust hose and by back flooding through the thru hull fittings.

Finally, Mr. Robbins will testify as to the fair market value of the M/V EVEREADY at the time of her sinking, and the reasonableness of the additional charges incurred by plaintiff Northern Insurance Company of New York following her sinking.

5. Mr. Bruce Pfund (expert witness)

Mr. Pfund will testify as to the tests and observations he performed on the M/V EVEREADY and of the cause of its sinking in April 2005.

6. Mr. Joseph Stroker

Mr. Stroker will testify as to the repairs he performed on the M/V EVEREADY, his training, experience and knowledge, and the requirements/protocol of defendant Point Judith Marina, LLC.

7. Mr. Don Vivenzio

Mr. Vivenzio will testify as to the work/services performed and equipment installed on the M/V EVEREADY between 1996 and 2005. He will further testify as to the procedure and protocol at defendant Point Judith Marina, LLC. Additionally, Mr. Vivenzio will testify as to the services and changes performed in respect to the M/V EVEREADY following her sinking on April 25, 2005.

8. Mr. Dennis Layfield

Mr. Layfield will testify as to his observations and knowledge of the M/V EVEREADY.

4.(B) CLAIMS AGAINST THE DEFENDANTS

BAILMENT:

Point Judith Marina, LLC was at all times relevant a bailee of the M/V EVEREADY.

First: The vessel had been entrusted to defendant Point Judith Marina, LLC for winter storage during the off-season of 2004-2005. Thereafter, in the spring of 2005, defendant Point Judith Marina, LLC was hired, as in past years, to commission the M/V EVEREADY for the 2005 season. Commissioning consisted of launching the vessel, performing maintenance service to the vessel in order to ensure that all of her systems were operating properly, and then taking her on a sea trial prior to returning the vessel to its owner. The M/V EVEREADY was launched on Thursday, April 21, 2005, and some preliminary work performed on her. During the servicing performed on Friday, April 22, 2005, Mr. Stroker, Point Judith Marina, LLC's mechanic, found a malfunctioning bilge pump and turned off the bilge pump switch(es) so that it would not continue to run. He, however, never advised Mr. Picchione of his actions. The M/V EVEREADY, however, 1) was not sea trialed, 2) her malfunctioning bilge pump was not replaced, and 3) other work requested was not performed prior to her sinking on Monday, April 25, 2005.

As such, the M/V EVEREADY had not redelivered to Mr. Picchione at the time of her sinking.

In New Hampshire Insurance Company v. Nicholas Dagnone, 2006 AMC 1920, 1922-23 (D. R.I. 2006), Judge Lisi set forth the law of bailment as it concerns a vessel delivered to a marina for storage, et cetera.

She stated:

> II. Bailment
>
> Plaintiff correctly contends that his delivery of the yacht to Hinckley for winter storage, in exchange for a fee, constitutes a bailment for hire. *Grabbert v. Marina Parks, Inc.*, 221 A.2d 455, 458 (R.I. 1966). And Defendant concedes that when a bailor shows delivery to the bailee and the bailee's failure to return the thing bailed in an undamaged condition, the bailor has made out a prima facie case of negligence against the bailee. *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 1991 AMC 1672, 1675, 924 F.2d 16, 18 (1 Cir. 1991). Where the bailor has made out a prima facie case, the bailee must come forward with evidence to rebut the presumption of negligence and explain its default by showing facts and circumstances sufficient in law to exonerate it. 1991 AMC at 1676, 924 F.2d at 18. (emphasis added)
>
> Defendant here argues that Plaintiff cannot take advantage of the presumption because its possession of the yacht was not exclusive of that of Plaintiff. Defendant cites to the trial testimony of Ted Beaumont, the captain hired by Dagnone to move and winterize the boat. Beaumont testified that he went to the boatyard three times after leaving the yacht at the work dock on November 22, and that he physically boarded the yacht on the last visit to check the condition of the bilge. Defendant argues that Beaumont's testimony shows Beaumont had "unfettered" control of the vessel and that, therefore, the basis for the presumption of negligence fails because "neither party was in a better position than the other to explain the cause of the damage."
>
> What Defendant ignores, however, is that on December 3, 2003, Defendant received the signed contract from Plaintiff (albeit a faxed copy) and on that same day, Kerr told Plaintiff in their phone conversation that his boat would be put "in queue" for out-hauling. Defendant further ignores the fact that it took the unilateral action of moving Plaintiff's vessel from the work dock area to Slip A-10, where Hinckley's employees tied Plaintiff's lines to the dock. At that point, Defendant knew Plaintiff was in Florida and that Beaumont was waiting for Defendant to out-haul the vessel so that he could put anti-freeze in the engines. Defendant was therefore on notice that Beaumont's only interest in the vessel was to complete the winterization process *once it was out of the water*. Given these facts, Defendant's argument as to the presumption of negligence fails.

Here, Picchione was awaiting the completion of the spring commissioning and sea trial by defendant Point Judith Marina, LLC prior to using the M/V EVEREADY.

WARRANTY OF WORKMANLIKE SERVICE

The defendant, Point Judith Marina, LLC, repeatedly breached warranty of workmanlike service that it owed to Nicholas Picchione, II when it performed the various repairs/services it performed on the M/V EVEREADY from 1998 to April, 2005.

From the time that Nicholas Picchione, II began to keep the M/V EVEREADY at Point Judith Marina, LLC, in 1998 he contracted with defendant Point Judith Marina, LLC to perform yearly commissioning and decommissioning of the M/V EVEREADY which, by defendant Point Judith Marina, LLC's own admission, included examining the hoses on the vessel to ensure that they were fit.

Apparently, at no time did defendant Point Judith Marina, LLC attempt to inspect the M/V EVEREADY's exhaust hoses even when it had to disconnect all the port and starboard exhaust hoses when it replaced the vessel's transmissions.

Additionally, defendant Point Judith Marina, LLC installed three new bilge pumps on the M/V EVEREADY in 1999, one without a float switch, and all three without anti-siphon loops as was the recognized standard within the industry at that time.

Moreover, when defendant Point Judith Marina, LLC launched the M/V EVEREADY in April 2005, Mr. Stroker a technician found one of the bilge pumps to be malfunctioning and shut off the bilge pump switch(es). The cost of a replacement pump is about $100.00 and the time to install such a pump is one hour.

In La Esperanza de P.R. Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10 (1st Cir. 1997), the First Circuit Court of Appeals held that a warranty of workmanlike service is implied in every maritime repair and/or service contract.

Moreover, liability for breach of the warranty of workmanlike service is struck irrespective of whether the contractor knew or should have known of the circumstances of the breach. Italia Societa v. Oregan Stevedoring Co., Inc., 376 U.S. 315 (1964)

In Parks v. U.S., 784 F.2d 20 (1st Cir. 1986), the First Circuit Court of Appeals imposed liability on a state maritime academy even though the academy's contract did not require them to inspect the vessel.

Here, the very purpose of the services/work performed by defendant Point Judith Marina, LLC was to properly inspect and to ensure that the M/V EVEREADY was seaworthy in all respects.

Likewise, Standish Boat Yard's, Inc. failure to install anti-siphon loops and/or move the thru-hull fittings on the M/V EVEREADY, once it installed the tuna tower, generator and added ballast, constitute a breach of the warranty of workmanlike performance which defendant Standish Boat Yard, Inc. owed to Nicholas Picchione II.

In Miller Industries v. Caterpillar Tractor Co., 733 F. 2d 813 (11th Cir. 1984) and in McConnell v. Caterpillar Tractor Co., 646 F. Supp. 1520 (D. N.J. 1986), those courts found that Caterpillar Tractor, which knew of the product's defect, was liable because it had failed to warn the purchaser of the defect that caused the loss. In this case defendant Standish Boat Yard, Inc., failed to warn Nicholas Picchione of the necessity of installing anti-siphon loops once Albin Manufacturing, Inc. began installing them. Moreover, it failed to warn Nicholas Picchione that the change in the static water line of the M/V EVERADY might result in flooding of the vessel or in respect to the other defects in the vessel.

Additionally, defendant Point Judith Marina, LLC breached its duty to warn Nicholas Picchione that the M/V EVEREADY had an inoperable bilge pump and that its technician had shut off what he believed to be its bilge pump switch.

In Ingram River Equipment, Inc. v. Pott Industries, Inc., 816 F. 2d 1231 (8th Cir. 1987) the Court of Appeals upheld the District Court's finding that a shipbuilder had breached an implied warranty of fitness for a particular purpose where the seller knew of the particular purpose for which the goods were required and the buyer relied on the seller's judgment in supplying suitable goods.

Here, Nicholas Picchione relied of defendant Standish Boat Yard's, Inc. skill and judgment in selecting a vessel which was seaworthy for the offshore fishing in which Standish Boat Yard, Inc. knew Picchione routinely engaged.

Additionally, Rhode Island law implies a warranty that the goods will be fit for the ordinary purpose for which such goods are used. Here, the M/V EVEREADY was not fit for its ordinary purpose because it was not seaworthy, as it was subject to sinking for various reasons stated above.

4.(C) Plaintiffs' List of Exhibits

1) Vessel Muffler
2) Rule Bilge Pump
3) American Boat and Yacht Council, Inc. Requirements ("ABYC")
4) BUC Book (excerpts)
5) Point Judith Marina, LLC's Repair Orders/Documentation
6) Stroker Notes 4/22/05
7) Point Judith Marina, LLC's Commissioning Lists

8) Standish Boat Yard, Inc.'s invoice(s)/documents

9) Bilge pump installation instructions

10) Point Judith Marina, LLC's Service Customer History

11) Photographs taken by Mr. Bruce Pfund

12) Photographs taken by Mr. William Robbins

13) Photographs taken by Mr. Dennis Layfield

14) Invoices submitted to Northern Insurance Company of New York

15) Checks of Northern Insurance Company of New York issued in payment of claims and/or services

16) Such additional exhibits as may be necessary

4.(D) <u>Motions In Limine</u>

The plaintiff anticipates filing motions in limine should either defendant attempt to disclose an expert witness at this late date, on a date set by the Court.

4.(E) <u>Jury Instructions</u>

Not applicable. Bench trial.

4.(F) <u>Length of Trial</u>

Plaintiff anticipates this matter will take 4 days to try.

4.(G) <u>Additional Matters</u>

None known to plaintiff at this time.

Dated: Providence, Rhode Island
April 25, 2008

Lovejoy & Associates
Attorneys for Plaintiffs
Northern Insurance Company of New York and
Nicholas Picchione, II

By: Frederick A. Lovejoy

Frederick A. Lovejoy (Bar No. 5313)
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 telefax

PicchioneNYPreTrial4-08.doc

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed on April 28, 2008, postage prepaid, to:

Robert E. Collins, Esq.
Clinton & Muzyka, P.C.
One Washington Mall
Suite 1400
Boston, Massachusetts 02108

Albin Manufacturing, Inc.,
Albin Marine, Inc.,
Fred W.A. Peters, Monica Peters
143 River Street
Cos Cob, Connecticut 06807

Michael J. Rauworth, Esq.
Cetrulo & Capone LLP
321 South Main Street
Providence, Rhode Island 02903

Frederick A. Lovejoy
FREDERICK A. LOVEJOY