TAUNTON OFFICE
128 Dean Street, Front, 1st Floor
Taunton, MA 02780-2762
Tel: 508-884-5055
Fax: 508-884-5056

MAINE/NH OFFICE
400 Commercial St., Suite 4
Portland, ME 04101-4660
Tel: 207-775-7933
Fax: 207-775-7471

**Marine Safety Consultants, Inc.**

Tel: (508) 996-4110)
Fax: (508 990-2094)
26 Water Street P.O. Box 615
Fairhaven, MA 02719-0615

April 30, 2008

Michael Rauworth, Esq
Cetrulo & Capone LLP
Two Seaport Lane
Boston, Massachusetts 02210

Re: **PICCHIONE v. ALBIN MARINE, ETC., USDC C.A. No. 06-**

Re: **DISCLOSURE REPORT OF DENNIS LAYFIELD PURSUANT TO RULE 26, FEDERAL RULES OF CML PROCEDURE.**

Dear Mr. Rauworth:

I transmit this to serve as my disclosure report pursuant to Rule 26 of the Federal Rules of Civil Procedure, organized in conformity with its provisions. I understand that this report is to be provided to opposing counsel.

*1. A complete statement of opinions to be expressed and the basis and reasons therefore*

Marine Safety Consultants, Inc. received this assignment on April 26, 2005 at which time I responded to Point Judith Marina the same day to investigate the circumstances surrounding the incident and the cause for the casualty as well as the extent of damage to the vessel.

Upon arrival at the marina I met with Mr. Vivenzio as a courtesy to inform him I was in his yard and that I would be the attending marine surveyor on behalf of Point Judith Marina's insurance company.

I interviewed Mr. Vivenzio as to the facts relevant to the vessel sinking as he knew them and learned **Eveready II** had been observed floating lower in the water than previously. As a courtesy Mr. Vivenzio stated he specifically reported this condition to Mr. Picchione during the 2004 season. It is not the responsibility of marina or boatyard personnel to aggressively pursue a vessel owner to correct what they perceive to be an anomaly.

Many times marinas and boatyards will mention their observations to the vessel owner to alert the owner in hopes their facility will be chosen by the owner to rectify the condition. Mr. Picchione did not choose to do anything about this condition.

Proceeding to the vessel we then observed the vessel's general condition. Visible on the exterior bottom hull starboard side were two (2) areas of wetness. This was interesting because the vessel had been hauled for several hours and the remaining exterior bottom hull was dry.

I then conducted a thorough sighting of the exterior bottom hull in an attempt to determine the cause for the vessel to have had such a significant ingress of seawater to cause the vessel to sink. I sighted all the through-hull fittings below the waterline for any evidence of compromise or failure. There were five (5) through-hull fittings on the starboard side and four (4) fittings on the portside.

The through-hull fittings were all found intact with no evidence of leaking, except for a three-quarter inch (¾") cast bronze fitting on the starboard side forward, just after a cast bronze sea strainer. We also observed small amount of wetness around both the port and starboard rudderposts and the starboard propeller shaft log. None of these matters contributed to the vessel sinking.

Marine surveyor Mr. William Robbins representing the vessel owner's insurance company and myself visited the vessel together on May 3, 2005 for the purpose of determining the cause for this loss. During our joint survey the vessel was launched for the purpose of finding the ingress of seawater. When the vessel was released from the travel lift slings the vessel came to rest well below its normal static position, that is, the waterline was several inches above the vessel's normal waterline and boot-top.

Investigating further inside the vessel we found a small trickle of water running down the interior hull on the starboard side. Interferences including the starboard fuel tank prevented us from viewing the actual area of origination. It should be noted this flowing water was in the general area of one (1) of the wet areas we mentioned above which we observed earlier. Neither I nor Mr. Robbins could verify the source for this flowing water at this time.

This water was flowing at a rate of approximately three (3) to four (4) gallons per hour. This amount of water would have easily been discharged by any one (1) of the electric bilge pumps onboard the vessel.

We subsequently returned to the vessel during October 2007 and observed both engine exhausts outlets covered with tape as well as remaining openings in the hull. We also observed the starboard exhaust assembly had been disassembled (muffler removed) between the exhaust hose exit at the stern and the main exhaust hose section.

We also found a hole in the main section of the exhaust hose approximately 1" x ½". It was located on the bottom of the hose, where the hose passes through a plywood bulkhead with the exhaust hose then extending aft to the muffler.

The vessel was launched with me and other parties of interest onboard for the purpose of once again searching for the location of the vessel taking on seawater. We could not find any water leaking into the vessel.

It is not possible to conclude with any professional certainty that the hole in the starboard exhaust hose was a source of water that sank the vessel. No one has calculated or otherwise determined that water would have risen far enough up this exhaust hose to reach the hole. The main exhaust hose slopes downward as it runs aft to the muffler. My impression is that the hole in the hose was at a point above the waterline, and probably would not allow seawater to enter the vessel.

Mr. Robbins and I returned to the vessel on Thursday, April 24, 2008 while the vessel was stored ashore at Certified Sales, Inc., Warwick, RI.

Here we observed an accumulation of bilge water which we attribute to rainwater and precipitation during the winter season. This is normal and to be expected when a vessel that has been left uncovered during the winter storage season is launched.

This accumulation of water does not mean the vessel's hull has been compromised. Vessel owners and boatyard personnel do not consider this unusual.

I found a total of three (3) electric bilge pumps onboard. Two (2) of the pumps are manufactured by Rule Industries and rated for fifteen hundred gallons per hour (1500 GPH) each. A smaller Rule bilge pump is located in the lazarette (steering compartment). Operation of any one (1) of the foregoing pumps would have easily discharged any seawater that might enter through the hole in the exhaust hose mentioned above, assuming of course, their switches were in the "on position".

I have learned that Mr. Joseph Stroker, an employee for Point Judith Marina, apparently found that one (1) of the two (2) electric bilge pumps in the engine compartment would not shut off when the automatic switch was switched on. Mr. Stroker switched this pump off. Mr. Stoker did exactly what a prudent marina employee would do.

The remaining forward bilge pump in the engine compartment remained operational in the automatic mode according to Mr. Stroker. It would easily discharge any water that would enter through the hole in the exhaust hose noted above.

The bilge pump shut down by Mr. Stroker is irrelevant and did not contribute to this casualty. I have reviewed South Kingstown, RI Police Department incident report number 05-325-OF prepared by Harbormaster Barry Ennis and learned Mr. Ennis found all bilge pump switches in the "off" position.

Regardless of how the water entered the vessel, the fact that the bilge pump switches were shut off and the vessel left unattended is the cause for the vessel sinking. Pt. Judith personnel left the vessel with at minimum one (1) operational automatic bilge pump in good working order in the engine compartment. The absence of only one (1) electric bilge pump out of service was not of consequence because Mr. Stroker confirmed the vessel remained with adequate bilge pumping capability.

It is my understanding Mr. Picchione was onboard the vessel during the weekend immediately preceding the sinking, giving him care, custody and control of the vessel. It was Mr. Picchione's responsibility to ensure his vessel was secured and the vessel had operational automatic bilge pumping capability before departing the vessel. Certainly if he had accomplished this routine practice and not shut off the switches providing electrical current to the bilge pumps the vessel would not have sunk.

Point Judith Marina personnel were not negligent and acted as common practice dictates for any marina or boatyard in this type scenario. There was no emergency situation regarding the bilge pump Mr. Stroker found malfunctioning. It would have been reasonable boatyard procedure to notify the owner by mail about this third bilge pump.

The hole in the starboard exhaust hose that we detected in October 2007 after the starboard fuel tank was removed was on the bottom of the exhaust hose. This hole was not visible until the fuel tank was removed. I attempted to see this hole by looking aft toward the exhaust hose from a position outboard of the starboard engine. I could see the top of the hose, but the bottom of it was not visible.

I understand that it has been claimed that Point Judith personnel should have discovered this hole. It was not possible to detect this hole without a focused effort of the kind that the surveyors hired for this case took on. Mr. Robbins has stated that this hole should have been detected in the course of work that Point Judith performed on the starboard transmission sometime before the year 2000. Mr. Vivenzio has informed me that this work did not involve any disassembly of the starboard exhaust system. I have examined the starboard engine and its arrangement in the vessel, and it is my opinion that it was possible to remove the starboard transmission, as Mr. Vivenzio reported, without disassembling of the exhaust system of that engine. In addition, there is no reason to believe that the starboard exhaust hose had a hole in it at the time of the work on the starboard transmission.

I have been told that it has been claimed that the hole in the starboard exhaust hose should have been detected at the time Point Judith did work to repair a hole in the hull of the vessel resulting from the grounding on the breakwater in approximately 1999. Mr. Vivenzio has reported that the hull repair work involved only the portside, and did not involve the starboard engine or its exhaust system.

I understand that it has been claimed that Point Judith had an obligation to modify Mr. Picchione's vessel so that its bilge discharge hoses had anti-siphon loops. I have not been made aware of any evidence that Point Judith was ever called upon to do any work on the bilge discharge hoses.

Point Judith had no responsibility to redesign or modify the bilge discharge hoses, or any other aspect of the **Eveready II**. By agreeing to perform some specified task for a customer, boatyards do not take on any obligation to identify ways that the design or construction of a customer's boat can be improved.

Based on my professional experience and judgment, it is my professional opinion that the loss of value of the *Eveready II* attributable to its sinking on April 25, 2005 was **$68,417.00**. I arrive at this result by subtracting the post-sinking value, **$25,000.00**, from the pre-sinking value **$93,417.00**.

I arrive at the pre-sinking value in the following way:

We conducted research and reviewed publications listing <u>current</u> values for such yachts as of 2005. These publications include the following:

1) BUC Research
1314 Northeast 17th Court
Fort Lauderdale, FL 33305
800-327 6929

The BUC publication determines <u>current</u> depreciation or appreciation using analysis of actual used boat sales.

2) ABOS Marine Blue Book
Primedia Business Directories & Books
9800 Metcalf Avenue
Overland Park, Kansas 66212
800-654-6776

ABOS Marine Blue Book was first published in 1949. The publisher reports that since their first book they have continually been refining their pricing methodology and incorporating the latest in statistical analysis. We referred to the 2005 publication which is an accumulation of over 50 years of marine valuation experience.

3) N.A.D. Marine Appraisal Guide
P.O. Box 7800
3186-K Airway Avenue
Costa Mesa, CA 92626
800-966-6232

The publisher states the market value results is the result of their in-depth research, market analysis and sales reporting network. This publication is updated three (3) times each year. We used the January through April 2005 edition in our research for this loss.

The 86th Edition (2005) of the BUC publication finds vessel values for vessels similar to a 1995 35' Albin Sedan to range from $148,500.00 to $163,500. We have chosen to take the average of these two (2) figures and arrived at **$156,000.00 for an average.**

The 2005 Edition of the ABOS Marine Blue Book also lists values for vessels similar to a 1995 35' Albin Sedan from $110,500.00 to $138,500.00. We have chosen to use the average of these two (2) figures and arrived at **$124,500.00 for an average.**

Lastly, the N.A.D.A. Marine Appraisal Guide offers values between $88,300.00 and $121,200.00. Again, we have chosen to use the average between these two (2) values and arrived at **$104,750.00 for an average.** The foregoing figures reflect the **average value** for a 1995 35' Albin Sedan. This is a vessel that has been maintained and requires no additional maintenance or repairs.

I have chosen to use the average of the three (3) foregoing averages **($128,417.00)** as the current fair market value for an average 1995 35' Albin Sedan in the market place as of April 25, 2005.

I consider the pre-sinking value to be **below average** because there is evidence this vessel had been observed riding low in the water for some time. This condition is most likely the result of wet core material. This vessel is constructed of composite construction consisting of a sandwich fiber reinforced plastic lay-up. Sandwich construction provides high strength and low weight. The term is derived from two (2) outer facing layers (fiberglass) and the ridged core material in between. I suspect this core material is balsa-core. My opinion is that this core material had become wet to the extent it had caused the vessel to ride low in the water. I estimate the cost to repair this core material will be **$20,000.00**.

The vessel's service history reveals the vessel sustained structural damage earlier from grounding on rocks. The engine room had been flooded while bringing the vessel ashore. In addition, immediately preceding the casualty the vessel owner had obtained the services of a diesel engine technician because at minimum one (1) of the propulsion engine's was experiencing problems. The engines had not been started in the 2005 season, and their reliability was unknown.

The history of this vessel preceding the casualty would be of considerable concern to any potential buyer. The previous two groundings and the flooding of the engine room would have to be disclosed to a buyer, and would reduce the price of the vessel. I have deducted an additional **$15,000.00** as an estimate of what a prudent buyer would most likely do, in light of the uncertainties related to these previous casualties.

For these reasons it is my opinion the fair market value of **Eveready II** immediately preceding the April 25, 2005 loss was **$93,417.00**, that is, **$128,417.00** minus **$35,000.00** that I just described.

I arrive at the post-sinking value in the following way.

I have arrived at the post-sinking value using my thirty eight (38) years of experience working on the waterfront including eighteen (18) years as a full time marine surveyor involved with losses of this type. Additionally, I learned this vessel is currently listed for sale as "insurance salvage" and therefore contacted Mr. Tim Blanchard, representing Certified Sales, Inc., Warwick, RI. Mr. Blanchard is the listing agent for the vessel. Mr. Blanchard reported he currently has two (2) bids for the vessel, one (1) bid for **$20,000.00** and one (1) bid for **$25,000.00**. Mr. Blanchard offered an opinion this vessel will most likely not sell for more than **$30,000.00**.

Based on my experience over the years I concur with Mr. Blanchard's opinion and estimate the post sinking value to be **$25,000.00**.

2. *The data or other information considered by the witness in forming the opinions*

I will be providing copies of documents to support my opinion in reaching the 2005 fair market value **($128,417.00)** for the average 1995 35' Albin Sedan.

I have reviewed the repair order written up by Mr. Stroker, the police report noted above, as well as expert reports of Mr. Robbins. I have also considered information provided by Mr. Vivenzio, and consulted testimony of the owner, Mr. Stroker, and Mr. Robbins, as well as manufacturer's data about the Albin 35.

3. *Any exhibits to be used as a summary of or support for the opinions*
I will be providing photos to support my opinions.

4. *The qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years*

My experience includes over eighteen (18) years as a full time marine surveyor with over ten years certification for surveying recreational yachts and commercial vessels under one hundred (100) gross tons for insurance companies and financial institutions. These marine surveys included pre-purchase surveys, insurance surveys, damage surveys and investigations into marine casualties. The attachments to this document contain my Curriculum Vitae. I have not authored or published in the last ten years.

5. *The compensation to be paid for the study and the testimony*

I will bill the defendant at the rate of **$85.00** per hour for my work in preparation for this testimony, and at the rate of **$100.00** for the time I spend testifying in the case.

6. *A listing of any other cases in which the witness has testified as an expert witness at trial or by deposition in the preceding four years*

I have testified as an expert witness as follows:

Date : May 25, 2005
Court : Superior Court, Providence, RI - Docket No.: PC-02-4544
Case : Lidia Grande vs Northern Insurance Company of New York
Client : Lovejoy & Associates

Very truly yours,

Dennis J. Layfield

Dennis J. Layfield, NAMS-CMS
Senior Marine Surveyor
Marine Safety Consultants, Inc.
26 Water Street - PO Box 615
Fairhaven, MA 02719-0615

DENNIS J. LAYFIELD
No.
121-61

\\server\mscdata\company\loss & damage\pt. judith marina rule 26 rpt 05-0433.doc