UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE II<br>Plaintiffs<br>v.<br>ALBIN MARINE, INC.; STANDISH BOAT YARD, INC. and POINT JUDITH MARINA, LLC.<br>Defendants | CIVIL ACTION NO. 06-190-S |

# MOTION OF DEFENDANT POINT JUDITH MARINA, LLC FOR JUDGMENT AS A MATTER OF LAW

Defendant, Point Judith Marina, LLC ("Point Judith"), hereby moves for judgment in its favor as a matter of law pursuant to Fed. R. Civ. P. 52(c), or other governing rule. As grounds for its motion, Point Judith submits that the plaintiffs have failed to introduce evidence sufficient to support a finding on necessary elements of their claims, and that judgment must therefore enter in favor of Point Judith accordingly.

## Bailment

Mr. Picchione admitted that he had custody of the vessel as of at least April 23, 2005. In addition, he admitted that he was at liberty to tow or motor his vessel away from his slip as of that time. As a result, the necessary element of exclusive custody and control on the part of the putative bailee, Point Judith, has not been established.

> Bailment relationships are often found when a boat is left with a marina for storage or repairs and the marina is given

> exclusive right to possession of the vessel. *See, e.g., Id.; In re Wechsler, 121 F. Supp.2d at 437-38; Commercial Union Ins. Co. v. Bohemia River Assocs., 855 F. Supp. 802, 805 (D. Md. 1991); Royal Ins. Co. v. Marina Indus., 34 Mass. App. Ct. 349, 611 N.E.2d 716, 717 (Mass. App. Ct. 1993).* But where, as here, the marina simply provides docking space to the boat owners and is not given the exclusive right to control the vessels, no bailment relationship is created. *Id.*

*In re Stanton*, No. Civ. 02-10408, 2005 WL 2035586, at *10 (D. Mass. Aug. 18, 2005).

**Breach of Contract**

There is no evidence that Point Judith undertook or agreed to inspect any hoses that were not visible without disassembly, even during a commissioning. As to times *other than* during spring commissioning (*e.g.*, during repairs), there was no undertaking to inspect anything, and no evidence that the hole in the exhaust hose even existed — much less that it would have come into view — during the course of any of the pre-2005 repair work addressed in the evidence. Point Judith did not undertake or agree to serve as Mr. Picchione's "consultant" to identify any "as-built" conditions of the vessel that Mr. Picchione might wish to alter or upgrade.

The fact that Point Judith agreed to do *certain* things with respect to the vessel does not mean that it had obligations to Mr. Picchione that it did not undertake in contract. *Malloy v. Doty Conveyor*, 820 F.Supp. 217 (E.D.Pa.1993) (ordinary negligence principles do not impose a duty on installer of conveyor belt to notify Federal Express of alleged defect in conveyor, even though installer may have had knowledge of conveyor belt's dangerous condition); *Barry v. Stevens Equipment Co.*, 176 Ga.App. 27,

335 S.E.2d 129 (1985) (repairer of shearing machine had no duty to correct safety defect, of which it had knowledge, or duty to warn of its danger with respect to any part of machine on which it did not do repair work); *Ayala v. V. & O Press Co.*, 126 A.D.2d 229, 512 N.Y.S.2d 704 (1987) (repairer of press not liable on negligence theory based on alleged failure to warn of design defect, where repairer did not agree to provide systematic maintenance to press); *Rolph v. EBI Companies*, 159 Wis.2d 518, 464 N.W.2d 667 (1991) (reconditioner of bending roll machine does not have duty under ordinary principles of negligence to bring it into compliance with applicable safety standards as long as it does not hold itself out as bringing machine into compliance with safety standards and is not requested to do so by machine's owner). *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531, 537 (D.S.C. 2007)(contractor providing limited service to engine did not have responsibilities to detect or deal with flaws in engine outside its undertaking).

With the foregoing principles of law applying to personal injury cases, there can be no greater liability applied to Point Judith with regard to harm to Mr. Picchone's own property.

**Warranty of Workmanlike Service**

Point Judith had not undertaken to repair any condition aboard the vessel without first consulting Mr. Picchione and obtaining authorization from him. It did *check* the bilge pumps, and there is no evidence that any bilge discharge *hoses* were in deteriorated condition, or that the condition of any bilge pump hoses brought about

the sinking. Point Judith did not undertake to report any shortcoming as to any single bilge pump on an emergency basis, and Mr. Picchione did not expect this.

None of the work that Point Judith carried out was defective, or fell below any agreed standard. The scope of Point Judith's obligations cannot be expanded by invocation of the warranty of workmanlike performance — this does not permit one party to impose terms that the other party never agreed to. *See Federal Marine Terminals, Inc. v. Worcester Peat Co.*, 262 F.3d 22, 29 (1st Cir. 2001); *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531, 537 (D.S.C. 2007)(contractor providing limited service to engine did not have responsibilities to detect or deal with flaws in engine outside its undertaking).

**Negligence/Failure to Warn**

There was no obligation in tort on the part of Point Judith to perform any services — inspection or otherwise — for Mr. Picchione. The parties expressly agreed in the slip agreement (Exhibit A) — which was applicable at the time — that Point Judith undertook no responsibility to assure the safety of the vessel. The did so in words that were upheld in the face of a similar challenge in *In re Stanton*, supra, at *8.

Point Judith was not a manufacturer or seller of goods (as Standish and Albin were), nor a landowner, and there is no personal injury involved here. Even if it had been a landowner, and if Mr. Picchione had suffered personal injury, there would have been no liability unless Point Judith had *known* about the hole in the exhaust hose, and

there is no evidence to that effect. *See, e.g., Bucki v. Hawkins*, 914 A.2D 491, 495 (R.I., 2007), citing *Mead v. Papa Razzi Restaurant*, 840 A.2d 1103 (R.I. 2004). Where there is no personal injury, but instead only harm to Mr. Picchione's own property, the liability certainly cannot be any greater.

The relationship of Point Judith to Mr. Picchione was solely in contract, and the plaintiffs are not permitted to get around the limits set by the scope of the contractual undertaking by pleading in tort — this is the "economic loss doctrine.". *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F.Supp. 380, 386 (D.Conn. 1994), citing *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471 (D.R.I. 1984).

As a result, there can be no recovery here in tort.

**Causation**

Plaintiffs have also failed to establish causation — a critical element in both tort and contract actions. *Wetmore v. MacDonald, Page, Schatz, Fletcher & Co., LLC*, 476 F.3d 1, 3 (1st Cir. 2007).

> The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment.

Wetmore, 476 F.3d at 4. This is not a *res ipsa loquitur* case. Plaintiffs have failed to establish how deep the vessel was in the water as of the weekend of April 23-24, 2005,

After the sinking, when the vessel was re-launched on May 3, 2005 for forensic purposes, it rode lower in the water than ever before. Even at this greater immersion, the vessel was artificially rolled to starboard by the travellift slings — thus lowering the starboard side and raising the port side — and *only* then did the vessel take on any water. And *before* the sinking (without the additional weight added by the event of the sinking,) there is no competent evidence that water would have entered the hull via the hole in the exhaust hose.

Joseph Stroker confirmed that the boat had the ability to pump itself out (triggered by an automatic bilge pump switch). But there is no evidence that the pumps still had electrical power by the time that Mr. Picchione left the vessel on Saturday, April 23rd, 2005. He testified at trial that he did not check and did not know the configuration of the bilge pumps switches when he left the boat that day, and it is undisputed that all switches necessary to bilge pump operation were found to be in the "off" position when the boat was raised from the bottom at its berth. There is no factual basis to attribute this post-sinking state of affairs to Point Judith — and in particular no evidence that anyone from Point Judith was aboard after Mr. Picchione was last aboard.

Moreover, plaintiffs have failed to establish that, even if Mr. Picchione had known about the content of Trial Exhibit 6, he would have arranged to have the condition rectified on or before April 25, 2005. Likewise if Picchione had been

expressly advised about any other *allegedly* improper condition of the vessel, there is no evidence he would have done anything about it before April 25, 2005.

Because the plaintiffs have not established causation, there can be no recovery in tort or in contract.

**Superceding Cause**

Following the sinking, the boat was found with all critical switches in the "off" position. This made it impossible for the boat to rid itself of water, as it was able to do when Mr. Stroker left the boat on Friday evening. He was the last Point Judith person to set foot aboard. Mr. Picchione — who was admittedly aboard as late as Saturday — is responsible for seeing to it that power continued to be supplied to the bilge pumps. His responsibility clearly extends to any conduct of his friends at the marina, who were admittedly at liberty to "visit" his boat, even on the day of the sinking.

The switching off of the power is a superseding event and superseding cause of the loss. It was utterly independent of anything else about the bilge pumps, and is the true proximate cause of the sinking. The Supreme Court has recently clarified that the doctrine of superseding cause applies with full vigor in admiralty. *Exxon Co., U. S. A., et al. v. Sofec, Inc., et al.*, 517 U.S. 830 (1996).

WHEREFORE, defendant Point Judith Marina respectfully urges judgment be entered in its favor as a matter of law.

Dated: May 15, 2008

**POINT JUDITH MARINA, LLC,**
By its attorneys,

Stephen T. Armato, R. I. Bar #6395
Michael Rauworth (pro hac vice)
Carl E. Fumarola, Esq., R.I. Bar #6980
Cetrulo & Capone LLP
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on this 15th day of May, 2008, I have served the above documents on the following counsel of record by hand:

Frederick A. Lovejoy, Esq.
LOVEJOY & ASSOCIATES
276 Center Road
Easton, CT 06612-1604
LOVEJOYADM@aol.com

Stephen T. Armato, R. I. Bar #6395
Michael Rauworth *(pro hac vice)*
Carl E. Fumarola, Esq., R.I. Bar #6980
**CETRULO & CAPONE LLP**
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com



02006-0045
1048678v1