IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| NORTHERN INSURANCE COMPANY, ET AL | 06-190 |
| | MAY 12, 2008 |
| VS. | VOLUME 1 |
| ALBIN MANUFACTURING, ET AL | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(BENCH TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: FREDERICK A. LOVEJOY, ESQ.
Lovejoy & Associates
1536 Westminster Street
Providence, RI 02909

FOR THE DEFENDANT: MICHAEL J. RAUWORTH, ESQ.
and CARL E. FUMAROLA, ESQ.
Cetrulo & Capone, LLP
Two Seaport Lane
Suite 1000
Boston, MA 02110

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| NICHOLAS PICCHIONE, II | |
| Direct Examination by Mr. Lovejoy: | 19 |
| Cross-Examination by Mr. Rauworth: | 47 |
| Redirect Examination by Mr. Lovejoy: | 143 |
| KENNETH HILTON | |
| Direct Examination by Mr. Lovejoy: | 149 |
| Cross-Examination by Mr. Rauworth: | 164 |
| Redirect Examination by Mr. Lovejoy: | 182 |
| Recross-Examination by Mr. Rauworth: | 185 |

PLAINTIFF'S EXHIBITS

| | | |
|---|---|---|
| 6 | - | 42 |
| 44 | - | 45 |
| 57 & 58 | - | 150 |

DEFENDANT'S EXHIBITS

| | | |
|---|---|---|
| G | - | 174 |
| TT & UU | - | 103 |
| KKK | - | 89 |
| KKK-1 | - | 95 |
| NNN | - | 172 |
| TTT | - | 57 |
| UUU | - | 88 |
| WWW | - | 184 |

THE COURT: Good morning. We're here in the matter of Northern Insurance Company versus Albin Manufacturing, Standish Boat and Point Judith Marina for a bench trial this morning.

Let's begin by having counsel identify themselves for the record.

MR. LOVEJOY: Frederick A. Lovejoy, Lovejoy and Associates, for the plaintiffs.

MR. RAUWORTH: Michael Rauworth, and with me is Carl Fumarola for the defendant, Point Judith Marina, LLC.

THE COURT: Very good. Now, I understand that some agreement has been reached with Standish; is that correct?

MR. RAUWORTH: Yes, your Honor.

THE COURT: So I received something this morning. Is that a dismissal or partial dismissal? What was it?

MR. LOVEJOY: I believe your clerk called Mr. Musyka. I was in a deposition with Mr. Rauworth.

THE COURT: Use the microphone.

MR. LOVEJOY: I believe your clerk contacted Mr. Musyka, wanted us to file a stipulation.

Mr. Rauworth and I were in a deposition. I okayed it, and I assume that's what he's filed with

your Honor.

THE COURT: So this completely disposes of Standish's involvement in this case; is that right?

MR. LOVEJOY: That's my understanding, your Honor.

THE COURT: Any disagreement with that?

MR. RAUWORTH: No, your Honor. Nothing to the contrary on that. I am in a bit of wonderment as to the status of the Albin defendants that were involved in the amended complaint that we discussed last Monday.

THE COURT: We're going to get to that in a moment. I'm going to enter this dismissal stipulation.

So you all received a decision from me on the duty to warn of the amended complaint? You got that?

MR. RAUWORTH: Yes, indeed, your Honor.

THE COURT: All right. And then the other issue was what you just mentioned, the issue of I guess some parties, Albin Marine individual parties. That's what you were inquiring about?

MR. RAUWORTH: That's correct, your Honor.

THE COURT: So Mr. Lovejoy, what's the status of that?

MR. LOVEJOY: Your Honor, you asked me -- I didn't elect to withdraw that part of the motion to amend. We left it I was supposed to contact the Court

if I wanted to withdraw that.
THE COURT: I'm having a hard time hearing you.
MR. LOVEJOY: I'm sorry. My understanding was if I wanted to remove them, I was to contact the Court, and I elected not to do that.
THE COURT: Well, is that in the motion to amend?
MR. LOVEJOY: Yes, it is, your Honor.
THE COURT: Okay.
MR. LOVEJOY: After we get finished with this, there's one other issue I'd like to discuss with the Court about the motion to amend.
THE COURT: Let's just deal with that. Okay. Let's talk about -- I don't have a copy of the motion to amend, I don't think, with me. Maybe we can get a copy of that.
Now, is there an objection to adding these various individuals?
MR. RAUWORTH: We had, your Honor, as had Standish while they were involved.
THE COURT: Say again. I'm sorry.
MR. RAUWORTH: We had done so. We had opposed the motion in that connection and I know Standish did as well, and I think that was the reason for the Court's call upon Mr. Lovejoy to, if you will, fish or

cut bait.

THE COURT: Did you file an opposition to this?

MR. RAUWORTH: We did, your Honor.

THE COURT: I guess I'm a little bit unclear here. If they're added to the complaint and the trial is starting today, how is this going to work?

MR. LOVEJOY: Well, when we were in chambers I had suggested that we bifurcate the trial. The claims against the three new defendants are basically piercing the corporate veil claims.

THE COURT: But they haven't been served with the complaint, have they?

MR. LOVEJOY: Well, yes, I have, but not by a process server. They were served with the motion, which included a copy of the complaint.

THE COURT: Why can't this be brought as a separate action? You have a default against Albin Marine, right?

MR. LOVEJOY: Not yet.

THE COURT: You haven't moved for default yet?

MR. LOVEJOY: No.

THE COURT: Okay. Well, assuming you get a default against Albin Marine, then why couldn't you just bring a separate action against these individuals based upon that default?

MR. LOVEJOY: My concern were statute of limitation problems. If I bring them in here, it relates back to the original claim.

THE COURT: Well, I don't know how we can amend the complaint on the, you know, eve of trial or on the day the trial begins and then expect these defendants to -- what do you expect them to do in response to this amended complaint? They're not going to show up here and defend the case that's going to trial. I've never seen this done.

MR. LOVEJOY: Well, as I said, your Honor, I would suggest that you bifurcate the claims that are going to be tried today and those against the three piercing the corporate veil defendants.

THE COURT: All right. Do you want to say anything in response to this?

MR. RAUWORTH: We're sort of in a position where we can't really tell if we're afoot or horseback. The addition of these parties might drive a situation where we would want to cross-claim against them, and those sorts of claims would naturally be dealt with in this kind of a -- in the trial, obviously. And so we're in a bit of a procedural conundrum, I guess I would say, Judge.

And then, of course, there's the possibility of

us encountering cross-claims from them, which would create a situation that with the merits of this matter having been adjudicated, we might have to start all over again. We've got comparative fault issues here that could come up and with these people being brought in, it just -- it seems very, very difficult to figure out how this could work without creating a situation of quite a raft of potentially unintended consequences, potentially prejudicial.

THE COURT: Well, all right. I'm going to deny the motion to amend the complaint for the same reasons that I stated in my order denying the motion to add the failure to warn count. It seems to me the same deficiencies apply to this motion, both in terms of the timing, the late timing, and there's just no information contained in the motion that really explains to me why this should be brought at this time on the eve of trial, and I think it makes this matter much more complicated and creates a whole number of issues that may end up delaying the trial, and I just don't see any justification for it.

So I'm going to deny that motion. You have a party here that appears to be defaulting, and that is Albin Marine, and you can certainly make your motion for default and, ultimately, assuming there's no

response to that, then you will move for default judgment. And once you presumably get that default judgment, based on what I've seen I can't imagine you're not going to get it because they seem to be not responding to anything, then you will have a default judgment which you can attempt to execute against these principals.

So I'm not sure how the statute of limitations applies to this, but it seems to me that you're going to have the ability to get the relief that you are seeking once you obtain that default judgment.

So for those reasons, I'm going to deny the motion to amend.

Now, that leaves us with -- did you say there was one other issue?

MR. LOVEJOY: Yes, your Honor.

THE COURT: What is that? Why don't you come on up to the podium.

MR. LOVEJOY: The other issue is when we were in chambers and discussing the motion, I thought there was an agreement between Point Judith and ourselves that the Court had suggested. There had been a motion in limine to strike their expert witness. You queried Mr. Rauworth about the motion to amend, and I thought the Court was going to let the plaintiffs amend the

complaint as to Point Judith. They were going to deny my motion in limine with respect to Mr. Layfield. And then Mr. Musyka brought up the issue of the duty to warn count again just against Standish and your Honor at that point said you'd look at that issue he raised.

My recollection and my notes is that there was an agreement that a motion to amend would be allowed as to Point Judith Marina.

THE COURT: The motion to amend as to Point Judith Marina? I thought your motions to amend dealt with the duty to warn --

MR. LOVEJOY: Yes. There was a count with respect to duty to warn as against Standish and as against Point Judith Marina. And there were also new allegations that are stated in the background part of the complaint, which are made parts of the count through reference, which I added.

It was my understanding that the Point Judith amendment was going to be allowed. That's what I thought the discussion was; I thought that's what Mr. Rauworth and I agreed to. There was a duty to warn based on a separate issue that came about through the deposition of Mr. Ken Hilton.

THE COURT: I don't have a recollection of that agreement, but if you all agreed to it --

MR. LOVEJOY: And just as further background, your Honor, the defendant responded to the amended complaint yesterday. I believe I got an electronic filing.

THE COURT: Mr. Rauworth?

MR. RAUWORTH: Your Honor, we submitted an answer out of an abundance of caution because we weren't sure exactly what was going on with the totality of things. We didn't know what was up with these new Albin-related defendants and so forth, and I was very concerned about coming to a trial and having it said that we had somehow not closed the loop vis-a-vis the proceedings. It is a very bizarre and difficult circumstance to find oneself where the -- we hadn't seen a docketing of the amended complaint itself but yet we were about to go to trial. So out of an abundance of caution, we put together an answer so that we couldn't be held to somehow have waived anything or prejudiced ourselves, but we said right in the text of it that it was as a protective measure and without prejudice.

My understanding about the duty to warn count is that it basically operates the same way across the board. And so I would respectfully suggest that we ought not to be prejudiced by taking a step with regard

to the answer where we were on the horns of a dilemma.

THE COURT: Well, I guess I'm still a little unclear. Did you agree with the plaintiff with respect to the amendment of the complaint against Point Judith?

MR. RAUWORTH: Well, I think, your Honor, we were -- there was a motion in limine regarding our expert, which we had responded to in full by pointing out that we designated the expert because we had -- it was in April that we got the very first expert designation that operated against us. And we made it very clear in the attachments to that opposition to the motion in limine that there wasn't any way to respond to expert allegations until you have them. There were earlier waives to the plaintiff's expert, but those to our knowledge operated against other parties.

So the Court made some commentary about how these interrelated, and I'm not really sure where that sorted out, but we are very concerned about getting our proper entitlement to use Mr. Layfield, but I think that the merits the Court has looked at vis-a-vis the amended complaint really stand on their own two feet. They are what they are, and the Court assessed those. And Mr. Layfield was designated. He's been deposed. We've provided an exhaustive statement of his opinions and we did it after the first time we could, basically,

after having learned of designations that operated against us.

THE COURT: This is starting to come back to me a little bit. This was the late filed expert opinion and expert report, right?

MR. RAUWORTH: Ours was responsive to one that was provided to us on April 3rd of 2003, just a little over a month ago, which was the first time that expert opinion had been rendered as against Point Judith. There had been earlier expert opinion that operated against the other defendants upon issues that operated principally against them.

THE COURT: But I think Mr. Lovejoy may be correct, that in the conference there seemed to be an agreement that you were going to -- he was going to drop his objection to that expert report, and you were not going to object to the amendment of the complaint as to these various individual parties.

MR. RAUWORTH: I remember specifically discussing that the various individual parties were a significant problem. I think that's when the Court indicated that Mr. Lovejoy needed to inform the Court promptly as to whether he was going to proceed against these newly-joined individuals. I think the Court said that if he didn't, the trial might not proceed and that

there might be the financial consequences for the preparation time involved in getting ready for a trial if he didn't come forward and indicate that those parties were going to be out of the proceedings.

THE COURT: Okay. So I guess if there was no agreement, then we've got to deal with this objection to your expert.

MR. LOVEJOY: Your Honor, if I might just add, there was an agreement. It didn't have anything to do with the other parties. You asked me to report back as to these three new Albin parties. My recollection is that Mr. Rauworth specifically agreed to allow the amendment against his client, Point Judith, and I was going to not pursue the motion in limine. And as a result of that agreement, I haven't filed a reply to their objection.

THE COURT: It wasn't as to the individuals, it was as to the failure to warn claim against Point Judith?

MR. LOVEJOY: Yes. You turned and you looked at Mr. Rauworth, you looked at us. We were kind of quiet for a minute, and you got an acknowledgment from both of us after we were quiet. And I proceeded on the assumption that I wasn't going to proceed on the motion in limine. I've never filed a reply to their objection

because I thought that issue was moot. And I thought the issue as to amending the complaint against Point Judith was moot also, by agreement.

THE COURT: Okay. I recall what you're talking about. I think he's right.

MR. RAUWORTH: We didn't come to any independent agreement. I think the Court was suggesting some possibilities, but I guess we'll be governed by the Court's recollection.

THE COURT: Let me just put it to you, if you want your expert, then that is my recollection, and I think that was what the substance of the chambers conference was. And if it's not agreeable, then I will go forward on the objection to the expert. I'll just hear it orally.

MR. RAUWORTH: I guess the simplest thing is not to get involved in -- we spent a bunch of money in getting Mr. Layfield ready and having him deposed. So if the Court thinks that's the appropriate resolution, we're prepared to go along with that.

THE COURT: Okay. So the motion to amend with respect to Point Judith on the failure to warn is allowed. And the motion in limine with respect to the expert, Mr. -- what was the name again?

MR. LOVEJOY: Layfield, your Honor.

THE COURT: -- Mr. Layfield is withdrawn as moot. Everybody agree with that?

MR. LOVEJOY: Fred Lovejoy for the plaintiff, yes.

MR. RAUWORTH: That's fine, your Honor.

THE COURT: So that resolves all of that. Now, what does that leave? Anything?

The only other thing I have on my list was that there's a possible Daubert motion with respect to Mr. Robbins, and I think I said that we could take that up and do the voir dire of Mr. Robbins at the time that he was put on as a witness.

MR. LOVEJOY: Well, that was a motion that Mr. Musyka contemplated. Mr. Rauworth never mentioned anything about making such a motion so I think that motion is moot at this point.

MR. RAUWORTH: I think that was Mr. Musyka's point, your Honor.

THE COURT: Okay. So that's resolved as well then.

MR. RAUWORTH: I would hasten to add that we're not necessarily concurring with what Mr. Robbins has to say, but it was Mr. Musyka who was pushing the Daubert point.

THE COURT: But you'll just deal with him on

cross-examination?

MR. RAUWORTH: Exactly.

THE COURT: Good. Anything else preliminarily that we need to take up?

MR. RAUWORTH: I'm not sure whether it ought to be preliminary or another way, I'm not sure how the Court wants to handle it. We've got a couple of sets of requests to admit that were not responded to, and I've got a package that deals with those. At whatever appropriate time the Court feels for submitting those, I'm happy to do it. It's basically my affidavit about the service of those and the lack of response.

THE COURT: Well, why don't you do that at the beginning of the presentation of your case. Does that make sense?

MR. RAUWORTH: Sure.

THE COURT: I mean, it's part of your case, right, those requests to admit?

MR. RAUWORTH: Sure. Absolutely.

THE COURT: All right. Then Mr. Lovejoy, are you ready to go forward?

MR. LOVEJOY: Yes, your Honor.

THE COURT: Do you want to give an opening statement?

MR. LOVEJOY: No, I'd like to waive it and give

a closing statement if I might, your Honor.

THE COURT: All right. Go ahead and call your first witness.

MR. LOVEJOY: Also, your Honor, I ask permission that I be allowed to sit at the table. I have a bad hip and actually a bad ankle. I have three binders so if you don't mind I'd rather sit at the table rather than go up to the podium, I'd appreciate it.

THE COURT: Why, again?

MR. LOVEJOY: I have a bad hip and a bad ankle and if I stand for a long period of time, I have pain. And I have three looseleaf binders here, also.

THE COURT: Okay. Are you going to be needing to go up and down to talk to the witness?

MR. LOVEJOY: I don't believe so. With this particular witness, I'm not going to have to get up very much at all.

THE COURT: Let's try it.

MR. LOVEJOY: I call Mr. Nicholas Picchione.

NICHOLAS PICCHIONE, II, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: My name is Nicholas Picchione, II. P-I-C-C-H-I-O-N-E.

THE COURT: Good morning, Mr. Picchione.
THE WITNESS: Good morning.
MR. LOVEJOY: Judge, may I proceed?
THE COURT: Yes.
MR. LOVEJOY: Thank you.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Picchione, can you describe your educational background to the Court, please, starting with high school and working forward.
A. Yeah. I graduated from Moses Brown High School. Went to the University of Denver, graduated with a bachelor of science business administration with a minor in accounting, 1978.
Q. And can you also describe your employment history for the Court starting with your graduation from college?
A. Yes. I went to work for my family business in 1978, and I've been there ever since.
Q. Can you tell us what your duties and responsibilities are today.
A. Today, I'm the chairman, president, CEO of all the various corporations that are held under family trust.
Q. And how long have you held those positions?
A. Approximately 1990.
Q. And can you just give us a quick background of --

you're employed by Dome Publishing, correct?
A. Correct.
Q. Can you just give us a quick background of what that corporation or corporations that you had do?
A. Yes. Manufacturing companies. They manufacture and market a line of office products, accounting-related blank books and so forth, which are sold throughout the country in retail outlets such as Office Depot, Office Max, Staples as well as, you know, Wal-Mart, K-Mart, Rite-Aid, various and sundry other large retailers, small retailers and independent dealers as well.
We have a second division that makes health and beauty care products. Mostly that involves tapes and braces. Mostly soft braces, not rigid braces, the type of brace you'd wear around a sprained ankle or a sprained knee as well as numerous different types of athletic and medical tapes. Your basic sports tape, cohesive compression bandages and tape. A million different tapes.
Q. Thank you. Have you ever taken any training or taken any courses in any sort of mechanical engineer or, you know, servicing engines or that type of course?
A. No.
Q. Can you tell the Court what knowledge, if any, you

have with respect to, you know, servicing engines or mechanical apparatus?
A. Very little. Very little. I mean, what experience I have was just whenever I had to -- well, growing up on the water, I had a lot small boats, a lot of sailboats. They have small two-stroke engines. You could dabble with those, but when it comes to four strokes and diesels I'm pretty clueless.
Q. Can you tell us what training you had on servicing -- strike that.
We're here in a case involving an Albin 35 vessel, correct?
A. Correct.
Q. And can you tell the Court what formal training or informal training you've had when it comes to servicing 35-foot motor yachts?
A. None.
Q. Would you be kind enough to go through your boating experience starting let's say when you were a teenager for the Court.
A. Yeah. I grew up sailing on a lot of small boats including, you know, a 13-foot Whaler and whatnot. I was pretty heavily into sailing in my teenage and high school years. We had numerous boats. Day-sailers. We have Javelins, Gammex, as well. As then my first cabin

boat was an English boat, an Alacrity 19-foot. And then a number of years later out of college, a 23-foot Catalina. And for the Catalina, I sold the Catalina and got a 26-foot Pearson, had that for a number of years and eventually traded it in for the Albin.
Q. And how did you -- did there come a time when you stopped purchasing sailboats and switched over to power boats, sir?
A. Pardon? I'm sorry.
Q. Did there come a time -- you mentioned you had a number sailboats. Did there come a time when you switched over to power boats?
A. Yes.
Q. And if so, why did you switch over?
A. I switched over because I got the fishing bug.
Q. Okay. And before the Albin 35, how many power boats did you own?
A. Just the one Whaler.
Q. Are all the -- strike that.
A. Wait a second. Before the 35?
Q. Yes.
A. Yes. I had a 28-foot Albin.
Q. And can you tell the Court how you came to purchase the 35-foot Albin vessel that's named the EVEREADY.

A. Yes. I purchased the 28-foot Albin a year before, and it sunk. When we were out fishing at the Dump, southwest corner, I believe, southeast or southwest corner of the Dump, about 200 feet of water approximately 65 miles off Point Judith. We had a good day of fishing. The boat sunk. They never discovered why the boat sunk. There were, obviously, numerous theories, but, you know, it was a brand new boat. As far as I was concerned, it shouldn't have sunk. So when I was at the boat show, obviously, I know the Albin dealer, the people, Ken Hilton, who was mentioned earlier. And the people down at Standish boatyard and I'm like, hey, guys. They said no problem. We'll get you hooked up with a 31 Albin. They come out with a 31 that was a brand new model that year. And what I liked about it was that it had decent cabin space, but it also had much better range, much better speed. The 28 was a single engine or single screw boat, and the 31 was a twin screw.

Q. But you did not purchase the 31 because --

A. The 31, they could not deliver the 31 it turned out. Obviously, I had my disagreements and arguments with the people at Albin. And Mr. Hilton and the people at Standish said -- made me a deal because the 35 was available, so they made me a deal on the 35.

Q. How did you pay for the 35-foot Albin which you named the EVEREADY?
A. I paid cash.
Q. And the 28-foot vessel that was also an Albin, how did you pay for that vessel?
A. I paid cash.
Q. And do you presently own another vessel that you purchased after the 35-foot Albin?
A. Yes, I did.
Q. What type of vessel was that?
A. That's an Ocean yacht.
Q. What length is that, sir?
A. Forty-eight-foot.
Q. How did you pay for that vessel?
A. I paid cash.
Q. When did you purchase the Ocean?
A. I purchased the Ocean shortly after the Albin went down. I believe it was May or June. The closing took place in May or June.
Q. Of 2005?
A. 2005, correct.
Q. Now, once you purchased the 35-foot Albin that you testified about, where did you dock it after purchase?
A. I docked it at Point Judith Marina.
Q. And what year did you start docking it at Point

Judith Marina?
A. The previous year when I bought the 28.
Q. Could you give us a numerical year?
A. This is 1995, when I bought the 28. And it was obviously '96 when I got the 35.
Q. So would it be fair to say that the Albin 35, which is the subject of this case, was docked at Point Judith Marina from 1996 through April 2005?
A. Yes.
Q. And once the vessel was at Point Judith, and I'm talking about the 35-footer again, who performed service and maintenance and any work that you needed to have done on that vessel?
A. Well, for the first year or two, Standish boatyard did the maintenance for the most part because they were -- it was under warranty. And when you're shaking down a new boat, there are numerous problems with things coming loose and whatnot. You know, once a boat is brand new and you take it out in the ocean, it starts getting bumped around a little bit. And there are, obviously, numerous issues that come up with respect to you name it.
Q. Am I correct that after the warranty was no longer in place that you had Point Judith work on the vessel between 1998 and 2005?

A. Yes. I would say probably possibly before that as well. Obviously, I'm not going to run all the way up the Bay or the Sakonnet River to Tiverton to have something minor checked out, which, you know, one of the reasons I liked the Point Judith Marina is the fact that they have mechanics on duty. And if you're experiencing a problem, they come down and check it out for you on the spot. You know, if it's recognized to be something major, well, sure, then I'd take the time to bring it up to the dealer.

Obviously, I wasn't going to spend the money to have any kind of big jobs done at Point Judith Marina at the time. Once it was out of warranty, Point Judith Marina pretty much, as far as I know, performed all the maintenance.

Q. That would be from 1998 to April of 2005, approximately?

A. Yes. Approximately.

Q. Mr. Picchione, are you familiar with the terms "commissioning" and "decommissioning"?

A. Yes.

Q. Can you describe for the Court what is involved in commissioning first and then decommissioning.

A. Well, I think it's easier to explain it the other way around. At the end of a season, the boat is

decommissioned. That means it's winterized. Usually, my understanding the oil's changed in the engines and whatnot so the engine doesn't sit all winter with old oil, which may carry harmful chemicals that could possibly hurt the engine.

The decommissioning process is, you know, when the boat is put up for the winter, it's laid up on dry dock. And like I say, the fresh water systems, the salt water systems are flushed. The salt and fresh water systems are flushed, and, basically, the batteries are disconnected. Basically, putting the boat to bed for the winter.

Then when it's recommissioned or commissioned in the spring and launched into the water, all the systems that had been decommissioned are recommissioned and there's a general all-around systems check, electronic, engine, water systems, everything else.

Q. And can you give us a little bit more detail what's done with the engines and the boat itself, or what was done?

A. Well, they're diesel engines so they're not subject to a tune-up like you might do on a gas engine, but, like I said, they usually, you know, change out fuel filters, go through everything. Startup the generator, make sure that's running. Make sure all the

pumps are running. Make sure the air-conditioning, heating units are running. It's pretty much make sure the radio is running. Make sure the electronics are in order.
Q. Are you familiar with the term called "a sea trial"?
A. Yes.
Q. Is that part of the commissioning that Point Judith would do on your behalf?
A. My understanding that it is, yes.
Q. Okay. And did you have Point Judith commission the -- I'm going to call it the EVEREADY even though I believe there's more than one.
A. Yes.
Q. Did you have Point Judith commission the EVEREADY each and every year between approximately 1998 and 2005?
A. Correct.
Q. And can you tell us how you went about requesting commissioning to be done every year?
A. Yes. It was a fairly simple process. They send you a mailing. I think it is sometimes before the boat's even decommissioned. I would say in November of the previous year. I usually get a package which is your -- which includes both your commissioning and your

docking contract. Now, the commissioning is basically it's a one or two-page, and it basically says -- asks you, okay, do you want us to paint your bottom, wax your hull. Do you want us to commission your engines. A lot of these are flat fee, you know. If you have twin diesels, it's going to be so much per engine. I think it's up to, I don't know, 450, 550, could be even as high as 650 today.

And then there's another flat fee for, like I said, waxing and everything else. Commission a generator, yes, question about the generator. Air-conditioning, heat units are dual units, yes. And general questions like that.

Q. Would you --
A. Gets mailed in with a check.
Q. You check off spots on the piece of paper and mail it back to Point Judith?
A. Yes. Of course.
Q. Would you check off all the spots that were appropriate for a diesel vessel such as yours?
A. Yes. All the spots that were relevant to my boat.
Q. And did you do that in the spring -- fall of 2004 or spring of 2005 with respect to the EVEREADY?
A. Yes, I did.
Q. And during the time that the EVEREADY was at Point

Judith, did you have any transmission or engine repairs or the such done on the vessel?
A. Yes.
Q. What did they do with respect to the engines and transmissions?
A. It's my recollection that -- well, I know the transmission had a problem early on that I don't believe Point Judith -- I'm not sure if Point Judith did that work. But I had a second -- that same transmission, I had a problem with that same transmission a second time. It was the port engine transmission. And it works on some sort of a -- well, part of the operations of the transmission is there's a friction type of device, which turns. And you know, somehow, I believe there was a problem with that. There was also a problem with the transmission controls.
Q. Okay. What about did Point Judith remove either of the two engines on your vessel while it was with them?
A. It's my understanding that they removed the port engine after a grounding. The only other engine work that I recall specific other than changing the oil and basic maintenance was when there was a cracked head.
Q. Did the EVEREADY go aground in 1998,

Mr. Picchione?
A. I believe it was '98.
Q. And who performed the repairs that emanated out of the 1998 grounding?
A. Point Judith Marina. Or their subcontractors.
Q. Okay. Returning to the spring of 2005, I believe your testimony is you signed and sent in the request to commission the vessel, correct?
A. Correct.
Q. Did you also request that Point Judith paint the bottom of your vessel?
A. 2005, I can't be sure, but I believe so.
Q. And it's painted with anti-fouling paint, correct?
A. Correct.
Q. Do you know what date and month your vessel was launched in 2005?
A. 2005? Yeah. Specific date? I would have to -- it's not like I studied the calendar. I believe it was Thursday. And I believe Thursday the 21st or 22nd.
Q. That's your best recollection?
A. That's my best recollection.
Q. During the off season of 2004 to 2005, did you have any work done on the diesel engines?
A. I did. I had someone come in and take a look at it. I had spoken to the people at the marina.

Q. What was the name of that person?
A. Who did the work?
Q. Yeah.
A. This guy named Dan.
Q. Okay. And when he did the work, was the EVEREADY up on what we called the hard? It hadn't gotten into the water yet, correct?
A. Correct. It was on dry dock.
Q. And would you tell the Court specifically what work he did on the engine, how much it cost, please.
A. Yes. He -- well, he came down and took a look at it. He was a friend of a friend. And I knew that he worked at a garage, worked on heavy equipment and was familiar with Caterpillar engines, and he offered to take a look at it because I told him, you know, I had some weird sounds and I talked to the guys at the marina and they said, well, you know, other than certain maintenance, we don't like to get inside Caterpillars for whatever reason. They don't have the proper certification or proper tools or whatever.
So they said, you know, you're going to have to talk with someone else about that. So when I was -- you know, I ran into this guy who was a friend of a gal I knew and we got to talking. He said, I'll come down and take a look at it. He did. He said, This is no

big deal. He said, You're lucky. If any of these things get sucked down through the piston, and it's a loose screw gets sucked down through the piston you would have been in deep trouble. He said, This is a simple fix. I can do it for you. He said, All I have to do is buy new bolts and nuts and lock washers and whatever the heck else, and put that head back and secure that head properly. While I'm at it, I'll check all the other heads. Didn't find any other heads loose.

Q. How much did the material cost, to the best of your recollection?

A. About 15, 17 dollars for the bolts, for the material.

Q. How much did I'll call him Dan, the mechanic, charge you?

A. I believe it was -- I can't recall for sure, but it was like 250 or 350. I'm not sure exactly how many hours he spent doing it, so I couldn't break it down per hour for you.

Q. I'm just asking for the total, sir.

A. Right.

Q. And did there come a time when you were advised by Point Judith Marina that they had launched your boat?

A. No.

Q. How did you find out your boat was in the water?
A. A friend of mine.
Q. And that was in April of 2005?
A. Correct.
Q. Okay. And do you remember what day you heard your vessel was in the water?
A. Yeah. I believe it was Thursday, the 21st or 22nd.
Q. Did you have an occasion to go down to the vessel after you found out it was launched?
A. Yeah. My friend had been down by the dock and whatnot and said, Your boat is in the water. I knew it was going to go in sometime that week, you know. At least that was the game plan. You never know for sure. So I said, Oh, good. Yeah. I swung by on the way back from work. I just walked down, took a look. Made sure everything was copacetic. This was Thursday after work. You know, everything looked fine. She was high and dry. You know, checked the bilge. Checked everything out. She looked fine.
Q. Did you go back on Friday?
A. Yes. I went down Friday before -- I have a standing golf date Friday afternoons. And before I went to the golf course, I stopped by the boat, went on with a pad and just did a little list for -- you know,

supply list. Grabbed some of the old linens, towels, sheets, whatnot from the bedding. Took that home to be laundered. Went through the food stuffs, see if there was anything -- sometimes, you know, canned goods and whatnot get left on board. Some stuff you have to throw away, but other stuff is good. Check your paper towels, check your boat racks, whatever. Just do the basic inventory and then left.
Q. Okay. Then did you return on Saturday?
A. Yeah.
Q. How long were you on the vessel on Saturday?
A. Not that long. I was down with my girlfriend. We went down. Of course, we brought the clean sheets and towels, blankets, everything else. Some clothes, you know, couple of pairs of shorts, T-shirts, sweatshirts, stashed them in the main cabin so you could have them on the boat. Rain gear, whatever else. Some food stuffs for the fridge and the freezer, whatnot. Basic stuff, paper towels, like I said. That was it.
Q. On Friday, how long were you down at the vessel?
A. On Friday, I was not there that long. I just went down, like I said, I stopped down and basically made a list.
Q. On Saturday when you were down there, did you see any evidence that a mechanic or whatever was onboard or

had been onboard your vessel?
A. Oh, yeah.
Q. What did you see that led you to believe that a mechanic was onboard your vessel?
A. Well, it's obvious that they were onboard. While I was there on Friday, there obviously was a mechanic there. Because when I got to the boat, I didn't see anyone to be honest with you. Sometime, you know, afternoon, usually tee off at 1:00 at Point Judith Country Club. It's about a ten minute ride from the marina, but the cabin door was open. The engine room light might have been on. There was one of those wheelie carts with tools in it down by the boat. So obviously there was a mechanic onboard, possibly taking a lunch break, possibly going for parts, possibly going for a tool that he didn't happen to have with him. That would be fairly standard. But there was someone onboard because the door was open. I don't recall if the engine room hatch was open at the time.
Q. Did you go down to the EVEREADY on Sunday?
A. No. I was not there Sunday.
Q. What were you doing Sunday?
A. Sunday, I had a golf date as well.
Q. Okay. And what happened on Monday, April 25th?
A. At some point in time, I got a phone call or I

answered one, woke up and answered one, and it was the marina. I don't recall. It may have been Don. He said, Hey, Nick, got some bad news. Your boat sunk. It's at the dock. I'm like, you're kidding me, right? No. Because I was down there Thursday, Friday, Saturday. She was high and dry.

I know all the guys who dock their boats near mine, and they said, those who were down there, you know, after the fact, those who were down there said she was high and dry on Sunday. In fact, somebody even said they were down there late Sunday. This is just recollection and hearsay, but they said they were down, they didn't get off the dock for whatever reason until like 9:00 p.m. and didn't notice anything wrong.

Q. Okay. Did you have any discussions with any employees at Point Judith on your trips down as to when your vessel commissioning would be complete and the vessel available to you?

A. Not that I recall, no. It usually takes -- you know, it takes a couple of days and -- you know, it was the weekend. They work pretty hard. They work a lot of hours that time of year, you know, trying to get all the boats in the water and ready to go in the water and whatnot, so they're a little jammed up.

You don't expect the boat to be put in on a

Friday and take off with it on Saturday. Plus, that time of year the water is still pretty cold. There's no fish around. There's no driving force to get out on the big boat. I have the Whaler. If I want to go out striper fishing I can take the Whaler around the pond and do that, go fluke fishing, winter flounder, whatever.

Q. So what about, do you know whether or not the sea trial was performed prior to the vessel sinking?

MR. RAUWORTH: Objection. Assumes facts not in evidence, that is that there was a sea trial that had been agreed to be done that year.

THE COURT: Well, okay. Let's -- I'll sustain the objection. You can lay a better foundation for the question.

Q. Mr. Picchione, you testified earlier you asked for the standard commissioning of the vessel in the spring of 2005, correct?

A. Correct.

Q. What was your understanding with respect to sea trials in the commissioning of your vessel?

MR. RAUWORTH: Objection.

THE COURT: What's the objection?

MR. RAUWORTH: The objection is that his understanding does not equate to an agreement. In

other words, there is still no foundation that there was an agreement for Point Judith to carry out a sea trial in 2005.

THE COURT: Well, I'll overrule that objection, and we'll see. Go ahead.

A. It is my understanding and I believe standard operating procedure over the years that the boat is sea-trialed after it is commissioned.

MR. RAUWORTH: Objection and motion to strike the commentary regarding the standard operating procedure as beyond the competence of the witness.

THE COURT: I'll grant that motion to strike. We just want testimony about what you recall your agreement was with the marina. So Mr. Lovejoy, reask the question.

Q. Was there a sea trial performed every year prior to 2005 that you were aware of?

A. Yes, to my knowledge. And also after any major surgery.

MR. RAUWORTH: I'm sorry. I didn't hear the last word after "major."

THE COURT: I didn't either.

A. Any major fix on the boat.

MR. RAUWORTH: Your Honor, might I ask that the witness be encouraged to move a little closer to the

microphone.

THE COURT: Yes. That's fine. Stay a little closer to the mike so that we all can hear you.

Q. In 2005, you again requested the standard commissioning of the EVEREADY, correct?

A. It's my understanding that the boat would be commissioned in the normal fashion.

Q. And that included a sea trial, correct, sir?

A. As far as I'm aware.

Q. Do you know whether the vessel was ever sea-trialed before it sank in April of 2005?

A. I do not, but I do not believe so. Obviously, it wasn't necessary after it sank.

Q. Subsequent to the sinking of your vessel, have you learned that one of the mechanics onboard that worked onboard your vessel found a bilge pump that was malfunctioning?

MR. RAUWORTH: Objection.

THE COURT: Grounds?

MR. RAUWORTH: What he has learned as to what someone has done -- well, there's no foundation that there was such act and his understanding is not relevant.

THE COURT: Why wouldn't it be relevant?

MR. RAUWORTH: What's important is what was done

or not done. I don't think his state of mind is pertinent to this issue.

THE COURT: Well, okay. I'd like you to ask these questions in a less leading fashion, if you could. So I'll sustain that objection. Ask you to ask a new question.

Q. Following the sinking -- have you obtained any new information concerning the status of the bilge pumps on your vessel following the sinking?

A. Yes.

Q. What information have you learned since the sinking of your vessel?

THE COURT: Sustained. Ask him how he obtained any information.

Q. How did you obtain the information?

A. I was shown a copy of a work order. I believe it would be called a work order or some sort of checklist, which was noted upon by a mechanic at the marina.

MR. LOVEJOY: May I approach the witness, your Honor?

THE COURT: Yes.

MR. LOVEJOY: Mr. Rauworth, do you have any objections to Exhibit 6?

MR. RAUWORTH: No objection, your Honor.

THE COURT: What number are we looking at?

MR. LOVEJOY: Exhibit 6, your Honor.

MR. RAUWORTH: Although I might note that that document appears to be a portion of a larger document, but I don't have any objection to the face of it being shown to the witness with that notation being observed.

THE COURT: Okay. Exhibit 6 will be full.

(Plaintiff's Exhibit 6 admitted full.)

MR. LOVEJOY: Thank you, your Honor.

Q. I'm going to hand you Exhibit 6 in evidence. Is that the document that you reviewed?

A. Yes.

Q. Can you tell us what you learned from reviewing that document that you didn't know prior to the sinking of the vessel?

A. Yes. First of all, that it took so long to commission a water system at certain dollars per hour. But to the relevant facts, I can only say a special note here because it's starred, highlighted. It says, Bilge pump switch on panel set to auto. Engine room pump will not stop running. Set switch to off. In parentheses, forward pump will work on float switch, close parentheses.

Q. And did anyone from Point Judith ever inform you that one of your bilge pumps was malfunctioning?

A. No.

Q. Did they ever inform you that they touched the bilge pump switches on your vessel?
A. No.
Q. Did you ever receive anything from them suggesting that you might want to take some action with respect to the malfunctioning bilge pump?
A. Not at that time. Not that I recall. Not at that time.
Q. Where did you use -- you said you went out to someplace you referred to as the Dump?
A. Yes.
Q. Where did you normally use this vessel?
A. Normally -- well, all over the place. I couldn't say normally. Probably our most regular stop would be Block Island. But other than that, we went just about everywhere, you know, out to the shelf or the canyons, as we refer to them as the canyons, had a continental shelf drops off.
Q. How many miles from shore is that area that you went to?
A. Anywhere from 85 to about 125. A hundred twenty-five miles is pretty much the limit out if you want to get back with fuel.
Q. Okay. Is it fair to say you normally used the vessel for these off-shore fishing trips that you refer

to?
A. Yes.
MR. RAUWORTH: Objection, your Honor, to the relevance of this line of questioning.
THE COURT: I understand, but I'm going to allow it. Overruled.
Q. Had you told Don Vivenzio or did they have knowledge that you were using this vessel extended miles off-shore?
A. Oh, yes. I'm sure they were quite aware of that.
Q. Once your vessel was sunk on the 25th of April, 2005, did you submit a claim to your insurance company?
A. I called my insurance agent. I'm sure he submitted a claim on my behalf.
Q. Okay. And when was that claim finally resolved, to the best of your knowledge?
A. Well, it took quite a while, as I recall. There were numerous requests from various surveyors. I know this because I had to sign releases so that they could go onboard and do their inspections. And the boat was sitting in the yard at the Point Judith Marina so, obviously, every time I was at the marina I saw the boat in the yard. The boat was in the yard until, as far as I know, November.
MR. LOVEJOY: May I approach the witness again,

your Honor?

THE COURT: Yes.

MR. LOVEJOY: I'm going to introduce 44, the check.

MR. RAUWORTH: No objection, your Honor.

THE COURT: This is Exhibit 44?

MR. LOVEJOY: Yes, your Honor.

THE COURT: 44 will be full.

(Plaintiff's Exhibit 44 admitted full.)

Q. Mr. Picchione, I'm going to show you 44 in evidence. Is that a copy of the check that you received from Northern Insurance Company or resort?

A. Sure looks like it.

Q. Does that document refresh your recollection as to when you were paid?

A. October 4th the check is dated. This says October 11th it was cleared.

Q. Thank you. Mr. Picchione, if you had been advised on April 22nd concerning the condition of the bilge pump, what would you have done, if anything?

MR. RAUWORTH: Objection. Calls for speculation.

THE COURT: Well, it does call for speculation but I think I will allow it so overruled. Go ahead.

A. Yeah. If you mean if I was aware that there was a

problem, obviously, I would have, A, probably gone down there and check it myself; or definitely, B, I would have called the marina, called Gary or at that time probably Don or Jeff to check it out or have it replaced.

Q. Have you in the past had bilge pumps that malfunctioned on the vessel?

A. Yes.

Q. What did you do when that happened in the past prior to April 2005?

A. Had them replaced.

MR. LOVEJOY: Your Honor, I'm going to pass the witness at this time.

THE COURT: All right. Why don't we take a brief break and come back and have cross-examination. All right. Did you want to say something?

MR. RAUWORTH: I didn't quite hear the last part. Did you mention an amount of time, your Honor?

THE COURT: Just about ten minutes.

MR. RAUWORTH: Thank you.

( Short recess.)

THE COURT: Mr. Rauworth, are you ready?

MR. RAUWORTH: Yes, your Honor. Thanks very much.

CROSS-EXAMINATION BY MR. RAUWORTH

Q. Good morning, Mr. Picchione.
A. Good morning.
Q. You've been a customer of Point Judith Marina since sometime in the early '90's, correct?
A. Correct. '95.
Q. Right. And you're still a customer of Point Judith Marina today?
A. Yes.
Q. In fact, you now have a boat called the WATERMARK V that you keep there?
A. Yes.
Q. And that's a bigger boat than the Albin, isn't it?
A. Correct.
Q. You keep a Boston Whaler there, too, correct?
A. Yes.
Q. But you have had experience with other marinas, haven't you?
A. Yes.
Q. You've kept boats at other marinas, correct?
A. Sailboats.
Q. Okay. Now, what does the term "back heavy" mean to you?
MR. LOVEJOY: Your Honor, I didn't hear the question. I apologize.

Q. What does the term "back heavy" mean to you?
A. It means back heavy. Refer to a lot of things, boats.
Q. With respect to your boat, to the Albin.
A. Yeah. It's an ambiguous question, but she seemed to lay a little bit heavy in the stern.
Q. Okay. When you say "heavy in the stern," you mean that the boat sat somewhat deeper in the water in the stern, correct?
A. Correct.
Q. Deeper than you'd expect?
A. Not necessarily, but -- I'm not sure how to explain this, but I never saw, for example, if the swim platform on the back of the boat was under water, yeah, that definitely would be a problem, but --
Q. That would be a good illustration of a boat that was back heavy, right?
A. Yes, it would.
Q. The swim platform is -- let me stop. I don't want to waste the Court's time with terms that are already well-known. I was going to explain it but --
THE COURT: It seems fairly obvious unless it has a special meaning in the context you're using it.
MR. RAUWORTH: No, it doesn't, your Honor, but sometimes maritime terms, people are not conversant

with.
Q. So if a boat's swim platform were submerged, that would be a fairly significant example of a boat being back heavy, right?
A. I would think so, yes.
Q. Okay. Your boat had a swim platform, right?
A. It did.
Q. You never saw it submerged, correct?
A. No.
Q. Okay. But you describe your own boat as having been back heavy before the sinking that you talked about when Mr. Lovejoy was asking you questions, correct?
A. Correct. It had that appearance because of the way the waterline was painted. Now, obviously, if that waterline was painted before the boat was commissioned as new, not commissioned as winter and spring commissioning, but when the boat was brand new and it was commissioned for the first time, put into the water for the first time, you know, we had a generator put onboard. We had a tuna tower put onboard. We had outriggers put onboard. We had various and sundry electronics and other equipment put onboard.
So I believe as a result of that, the waterline was never repainted and as a result of the various and

sundry equipment that was put onboard during the initial commissioning, that she always had the appearance of sitting heavy astern. Does that answer the question?
Q. That helps. So let's back up. A waterline is painted on a boat to give an indication of the way that she would normally ride, correct?
A. The way she'd sit in the water laid to. And not in motion.
Q. Sure. We're talking about a static situation rather than moving through the water, correct?
A. Absolutely.
Q. Now, when we're talking about a static situation, you would typically expect to see about the same amount of waterline on the boat pretty much around its perimeter, correct?
A. Yes.
Q. That's one of the functions of a waterline, to give you an idea of how the boat is sitting, correct?
A. If it has a function, that would be -- that's probably it.
Q. Okay. That's what you understood its function to be, correct?
A. Well, I don't understand it to have any kind of function at all, but it is an indicator. Not all boats

have waterlines.
Q. But in looking at the waterline, it seemed to you that your boat, the EVEREADY, the Albin 35, had been sitting somewhat lower in the water in the aft end than you thought would be indicated by the waterline?
A. Correct. Since the day it was commissioned, initially.
Q. Okay. And when it was commissioned, there was, around the time that you got it from Standish, you added a generator to it, correct?
A. Yes.
Q. Diesel generator, correct?
A. Correct.
Q. You also added something called a tuna tower, right?
A. Correct.
Q. And a tuna tower is a structure that goes over the deckhouse of the boat, stands above it?
A. Yeah. It goes over the bridge, the fly bridge.
Q. Something you can climb up on to drive the boat from?
A. Yes. Some you could drive from. That particular 35 you could drive from the bridge.
Q. In other words, you had a control station up there?

A. Correct.
Q. So the tuna tower is made out of pipe metal?
A. Aluminum, I believe.
Q. You had that fabricated specially?
A. Yes. I believe they're all custom-made.
Q. That was installed at Standish Marine before you ever brought the EVEREADY to Point Judith Marina, correct?
A. Yes, it was. It was Standish's subcontractor.
Q. Okay. So your view was that as a result of those things you saw more of the waterline submerged in the aft part of the vessel than you thought was to be expected?
MR. LOVEJOY: Objection. Mischaracterizes his testimony.
THE COURT: Overruled.
Q. You may answer, sir?
A. I'm not sure --
Q. Let me put it to you another way. As a result of those things, it seemed to you that the boat sat deeper in the water?
A. Yes.
Q. In the aft end?
A. Yes.
Q. Okay. Now, you know Mr. Don Vivenzio, correct?

A. Yes.
Q. He's the manager of Point Judith Marina, right?
A. Yes.
Q. He was the manager of Point Judith Marina all through the time that you've been a customer there, correct?
A. Yes.
Q. And he's sitting in the courtroom today, isn't he?
A. Yes.
Q. Now, you'd had discussions with Mr. Vivenzio about this condition of your boat being back heavy, correct?
A. Oh, yeah.
Q. Okay. And that went back to the season of 2004 and earlier, correct?
A. Oh, yeah. Over the years, yeah, we discussed it. In fact, obviously -- I pointed it out back at Standish and I believe, possibly, at that time, Kenny Hilton, you know, suggested possibly putting some weight forward to relieve the situation when, in fact, you know, obviously the displacement of weight changed with the commissioning. Why we never repainted the waterlines escapes me, but that was -- it was never done. And we decided in the end that it probably wasn't a good idea to add weight forward because, you know, you're adding weight and fuel and all, it could

possibly slow the boat down. So we, you know, I don't believe there was any weight added forward.
Q. Okay. So you had kind of come to accept this situation of the boat being back heavy as it was, right?
A. Yeah.
Q. Okay. And so you never decided to, as you just described, you never decided to do anything in order to remedy that or correct it, true?
A. Well, it's my understanding that there was no real -- there was no way to really relieve or aleve the situation as it was. But it always struck you and other people as funny, obviously. Don and other people who worked down there, and other boaters, friends of mine, they'd come by all the time and they'd say, Nick, gee, you seem to be a little low in the stern. That's why, you know, standard on my boat there's a hatch astern, standard I used to check, make sure there was no water down there and make sure she was dry in the bilge because it did have that look about it.
Q. Okay. And the people that you had discussed about whether it was a good idea to do something about this condition were people at Standish, Mr. Hilton?
A. Sure. With Hilton. I know I discussed it with Don numerous times, you know, over the course of the

years. Gee, you know, what do you think we should do, what do you think we should do? Or do you think there's anything wrong? And most of the times we'd look around, you know, sit there and go, no, not really. No one ever suggested, to be honest, repainting the waterline. It just became something that you accepted, you know.

Q. Okay. Now, let me get a document.

MR. RAUWORTH: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Mr. Picchione, I'm going to hand you a document that's been marked as Exhibit TTT, as in tango, tango, tango, for the defendant and ask you to take a look at that.

It's got a date, by the way, of September 30th, '03 and ask you first of all if you recognize your signature at the bottom.

A. That looks like my signature.

Q. All right. And then, likewise, Exhibit UUU, as in uniform three times, this one is dated 2005-2006. Do you recognize these two documents as winter storage agreements with Point Judith?

A. Um-hum. (Affirmative.)

Q. All right.

MR. RAUWORTH: One moment, please.

A. It's the winter storage agreement.

MR. LOVEJOY: Your Honor, I don't have any objection to triple U -- I mean triple T, but triple U has to do with another vessel and a date subsequent to the sinking of the vessel that's the issue in this case.

THE COURT: What's the relevance?

MR. RAUWORTH: Sure. It's to illustrate the interaction of the plaintiff and the defendant as to the various types of services that have been provided.

THE COURT: This is post-event.

MR. RAUWORTH: It is. Has to do with the ongoing relationship between them.

THE COURT: Well, I'll allow triple T.

MR. RAUWORTH: It's really for the purposes of illustrating the plaintiff's action in the two instances, your Honor.

THE COURT: I understand. But if it's after the event, I don't really think it has any -- it's the course of conduct prior to the event may be and probably is relevant. But the course of conduct after the event with respect to a different boat, I really don't see the relevance of that. I can let it in. You can argue to me what relevance it has, but I don't --

MR. RAUWORTH: It won't be a big point. I think it will resolve itself fairly quickly, your Honor.

THE COURT: All right.

MR. LOVEJOY: Well, your Honor, I still object to it because it has to do with an entirely different vessel and different systems and it occurred after the event we're here for.

THE COURT: I understand. It's a bench trial. I'll let it in. First of all, Exhibit TTT will be full without objection.

I'll allow some further inquiry of triple U and then I'll rule on its admissibility after that.

(Defendant's Exhibit TTT admitted full.)

Q. Do you have those two documents in front of you, Mr. Picchione?

A. Yes.

Q. Now, triple T relates to the EVEREADY, the boat we've been discussing this morning.

A. Correct.

Q. And by the way, just for clarification, the EVEREADY II that's noted on this sheet is the vessel that sank in April of 2005, correct?

A. Correct.

Q. You had another boat that you described earlier, which was an Albin 28. You also called that the

EVEREADY, correct?
A. Correct.
Q. And in both cases, there was no Roman numeral on the stern, both of them carried the name EVEREADY by itself, correct?
A. No. The first boat was just EVEREADY and the second one was EVEREADY II.
Q. We can come back to that with photos. All right. On exhibit triple T --
A. Triple T, yeah.
Q. Right. If you look down a little bit to the left of the exhibit sticker, there's a list of things. Do you see those list of tasks?
A. Yes.
Q. All right. And in this one, in the long list there you selected winterize head and winterize fresh water system, two units, correct?
A. Yes.
Q. You didn't elect to store batteries, correct?
A. No.
Q. It's not indicated, correct?
A. No. On triple T, no.
Q. All right. It is on triple U though, correct?
A. It is.
Q. Okay. On neither of them you elected to clean the

fuel tanks?
A. No.
Q. All right. On neither of them you elected to clean the bilge, correct?
A. No.
Q. So the scope of what Point Judith was supposed to do for you or that you were willing to pay for was limited to the things that you checked off on either of these forms, triple T or triple U, correct?
A. Correct. Well, for winter storage, correct.
Q. Now, you had described in your earlier testimony about the process -- strike that. Let me back up. Those two exhibits, triple T and triple U, had to do with the process of winterization, correct?
A. Correct.
Q. And I think you described the spring process commissioning as being, if you will, the mirror image of winterization, in other words, undoing the things that had been done for winterization?
A. Correct.
Q. Okay. And when you made arrangements for spring commissioning, then you had the option to select certain things that you wanted the yard to do or not do, correct?
A. Yes.

Q. All right. And --
A. It's a limited list.
Q. Okay. But it was -- that was a choice that you made each year, year by year, correct?
A. Yes.
Q. All right. And as a matter of fact, this year with your WATERMARK V boat, you were having people doing work on the exterior of the hull, people who are not connected with Point Judith, correct?
MR. LOVEJOY: Objection, your Honor. Again, we're talking about a vessel -- this is talking about 2008. It's a vessel that isn't the same vessel.
THE COURT: I understand, but I think I understand the context of this questioning. I'm going to allow it so the objection is overruled.
MR. RAUWORTH: You may answer, sir.
A. Yes.
Q. And what you're doing this year with the WATERMARK, that's a choice that you would have had available to you each year that you had commissioning done at Point Judith, correct?
A. I believe so.
Q. Okay. And there's no obligation on you to have Point Judith commission your boat, is there?
A. Not that I'm aware of, no.

Q. Okay. And, in fact, many of the customers of the marina elect not to have Point Judith commission their boat, correct?
A. That's correct.
Q. And likewise, some of them elect not to have Point Judith do any decommissioning, too, correct?
A. Correct. To my knowledge, some people do it themselves.
Q. Okay. Now, back to the EVEREADY, the Albin 35, you had had a problem with a turbo on the port engine of that boat several years before this sinking, correct?
A. That's true.
Q. And Point Judith had reported to you that the turbo was loose, right?
A. Yep.
Q. And you authorized them to investigate that, correct?
A. Yes.
Q. And they investigated it, and they told you that it seemed to be badly rusted, correct?
A. I don't recall exactly what they reported at that time.
Q. Okay. But you wouldn't be in a position to testify that that's wrong, correct?

A. No. I wouldn't be able to say it was right, either.
Q. Okay. And you paid for Point Judith to do that investigating, correct?
A. I'm sure I did.
Q. Okay. And they recommended that you replace that port turbo, correct?
A. Yeah. It was cooked from what I understand.
Q. And you asked them for prices to replace it?
A. I'm sure I did.
Q. Okay. When you got that information, then you told them to go ahead and replace it, correct?
A. Yes, to my recollection.
Q. Okay. In the season of 2004, once again with the EVEREADY, the Albin 35, you were having trouble with your port engine, right?
A. Yes.
Q. You mentioned this to Point Judith, correct?
A. Yes.
Q. And Point Judith reported that they found excessive blow-by, correct?
A. Blow-back, yeah. Blow-by, blow-back, whatever you want to call it.
Q. That was related to a condition of creating too much smoke on that engine, right?

A. Right. Not burning fuel efficiently.
Q. So you saw something in the exhaust that seemed to be not right to you, correct?
A. Yeah.
Q. And the engine wouldn't rev up the way it ought to?
A. It didn't torque up. Correct. Rev up is not the correct term but, yeah, it would not torque up correctly. The pressures were off. There was something wrong.
Q. Okay. In fact, they did a lubricating oil analysis that you had authorized, correct?
A. Yeah. That's standard.
Q. And the lubricating oil analysis came back and showed some area of concern?
A. Yeah. There was some metal, as I recall.
Q. Right. Lube oil analysis is a chemical analysis of the oil in the crank case of the engine, right?
A. That's my understanding.
Q. Okay. Now, when this condition was identified, people at Point Judith told you that they couldn't do the kind of work on this Caterpillar engine that it might need, correct?
A. I don't know where you're going with this. Yeah. That has -- that had nothing to do with the turbo

issue. The turbo issue was years ago.
Q. I'm not suggesting it had to do with the turbo issue. We're talking about 2004.
A. Yeah. That was towards the end of the season and -- yeah. I mean, it was obvious something was wrong there, and they said that they couldn't -- didn't do that type of work on Caterpillars. They can slap on a head; they can slap on a turbo, but they don't do surgery. They don't go inside the engines for whatever reason. I believe I stated that in my earlier testimony.
Q. Okay. And this is the point where you got in touch with Dan, the mechanic, right?
A. No. I eventually ran into Dan, the mechanic, and had him look into it.
Q. I'm sorry. I stated that poorly. It was in connection with this mechanical condition that you eventually got in touch with Dan, the mechanic, correct?
A. Correct.
Q. Okay. Now, I think you told us the amount that the parts cost that he worked with, correct?
A. Yes.
Q. And I think you told us the amount you paid him for labor, correct?

A. An approximation.
Q. Right. But you're not able to remember his last name?
A. I don't know his last name.
Q. Okay.
A. I didn't give him a check. I gave him cash.
Q. You didn't do any looking into what his credentials were, correct?
A. No.
Q. All right. Now, Dan, the mechanic, did some work on your port engine in response to this condition we've been talking about, right?
A. Yes.
Q. Okay. And since the time that he finished that work, that engine was never, ever started up again, correct?
A. Not in the water.
Q. Were you present when it was started somewhere else?
A. No. But it's my understanding that he turned it over, just dink, dink, dink on the starter to make sure that everything was copacetic.
Q. In other words, he rolled it over, correct?
A. Yeah.
Q. That's different from starting it up and letting

it run propelled by fuel, right?
A. Yeah. And cooled by water.
Q. When the vessel is on the hard, there wouldn't be any way to cool it by water, correct?
A. Correct.
Q. That's why you wouldn't startup a diesel like that when a boat is out of the water?
A. Correct.
Q. Because it would overheat, correct?
A. I would imagine.
Q. And it would not be healthy for that engine?
A. No, it would not.
Q. So it is correct that since the time that Dan, the mechanic, did that work that engine has never, ever been started up, correct?
A. Not to my knowledge.
Q. Okay. And likewise, since the end of the season of 2004, that starboard engine has never been started up, correct?
A. Not that I know of.
Q. Okay. Now, in other years, other than 2005 -- strike that. 2005 was the only -- let me back up.
The work we just described that you had Dan, the mechanic, do for you, that's the only diesel engine service that you had done on that boat other than by

Point Judith, at least since the time that you started keeping the boat there, correct?
A. Correct. Other than in the early years, as I stated earlier, when Standish --
Q. Right. But since the time that you brought the boat to keep it at Point Judith?
A. I was still going to Standish when I had the boat at Point Judith.
Q. I realize I've stated that badly. So let me just clarify it so we don't trip over ourselves.
In the years when the boat was under warranty, you had work on it done by Standish even though you stored it at Point Judith; is that right?
A. That's correct.
Q. But since that warranty period ran out and since the time thereafter that you've been keeping it at Point Judith, Point Judith has been the only one to do work on those diesel engines apart from this occasion with Dan, the mechanic?
A. Correct.
Q. Now, you mentioned that in other years since the warranty ran out, Point Judith had done spring commissioning for you, correct?
A. Correct.
Q. And as a part of that spring commissioning in the

other years, Point Judith had agreed to include -- well, to startup those diesels in the spring and do a sea trial, correct?
A. That's my understanding.
Q. Okay. Now, in the spring of 2005, you had a boat at Point Judith's facilities that had just undergone mechanical work by somebody that was unaffiliated with Point Judith, right?
A. Yes.
Q. Dan, the mechanic, had nothing to do with Point Judith, right?
A. Nothing.
Q. And Point Judith communicated to you that they were unwilling to be involved in starting up engines that had been worked on by somebody not under their control, correct?
A. No.
Q. Are you telling us that there was never any such discussion?
A. Not to my recollection.
Q. All right. Not that you can recall; is that right?
A. Not that I can recall. I don't believe that conversation ever took place.
Q. Okay. In the spring of 2005, you never had a

communication with Point Judith in which they agreed to startup your diesel engines in connection with the spring commissioning, true?

MR. LOVEJOY: Objection. Asked and answered.

THE COURT: Sorry. What was the objection?

MR. LOVEJOY: It's been asked and answered.

THE COURT: Overruled.

MR. RAUWORTH: You may answer, sir.

A. I forgot what the question was now. No, there was no communication about that, about the engines or starting them or not, other than, you know, I sent in the normal commissioning slip just like we were looking at the winterizing slips. I put in my regular commissioning slip whereby they would normally start the engines.

Q. Okay. So you sent in a piece of paper, correct?

A. Correct.

Q. Okay. But you never had a communication with Don in which he agreed that they would startup those engines that Dan, the mechanic, had worked on, true?

A. True. Not specifically.

Q. When you say "not specifically," is there something else you're referring to?

A. I'm referring to I see Don down at the dock all the time and we discuss any number of issues. But to

my knowledge and recollection, no one at Point Judith even knew that Dan touched those engines.
Q. All right. But you're not in a position to know what Point Judith knew about Dan, the mechanic, correct?
A. I am not.
Q. All right. You were not present at the marina every time Dan, the mechanic, to your knowledge, visited there, true?
A. To my knowledge, he only visited there twice, and I was there once.
Q. Okay. So you would agree with me that you were not there every time that he was there, correct?
A. I agree with that.
Q. All right. And if Point Judith personnel state that they were aware that Dan, the mechanic, was doing work on your boat, you would not be in the position to testify that that was wrong, true?
A. That's correct. But I'd be very surprised.
Q. Okay. You never had a communication with Don Vivenzio in which he agreed that Point Judith would do a sea trial for your boat in 2005, true?
A. I just answered that question. I said not specifically.
Q. Well, I'm sorry if I've confused you. My earlier

question had to do with starting up the engines. I was putting to you a slightly different question.
A. Correct. I don't understand the relevance of the sea trial issue.
Q. You were --
A. It was never sea-trialed.
Q. I'm sorry?
A. I said the boat was never sea-trialed that year. What relevance does a sea trial have on a boat that's sitting at the bottom at the dock.
THE COURT: Mr. Picchione, relevance issues are for me to decide, not for you to decide. If the lawyer has an objection, he'll object to the question. You're just to answer the questions that are put to you whether you think they're relevant or not. Go ahead.
THE WITNESS: Yes, your Honor.
MR. RAUWORTH: Thank you, your Honor.
Q. Now, that year you were urging Don to hurry up to get your boat in the water so that the engines could be tested in the water, could be started up in the water?
A. Not that I recall, but I'm sure -- you know, you always like to turn on the engines, make sure everything is copacetic. I don't recall any conversations to that effect.
Q. But you're not prepared to testify that that's

incorrect, true?
A. I am not.
Q. All right. And the boat had to be in the water in order to start and test those engines, correct?
A. Yes.
Q. And obviously, it had to be in the water to do a sea trial, right?
A. And it had to be in the water to test a lot of other systems as well.
Q. Okay. At the time your boat was launched -- I'm sorry. I think you mentioned this. In 2005 when your boat was launched, you were not there to see that happen, true?
A. Correct. I did not see the launching.
Q. Okay. And so you know how those boats again launched at Point Judith, right?
A. Yes.
Q. By means of a thing called a Travel Lift?
A. Yes.
Q. That's a device that runs on sort of wide tracks and can pick up a boat between its wheels?
A. Yes. I'm very familiar with it.
Q. Okay. So you wouldn't know how your boat got moved from the Travel Lift to your slip in the spring of 2005, correct?

A. Correct.
Q. And -- strike that.
So you went to your boat, I think you noted, on Thursday, which you think was the day it was launched, right?
A. Correct.
Q. All right. And if the day that she sank was Monday, the 25th, that would make Friday to be the 22nd, correct?
A. I'm following.
Q. Of April of 2005. Thursday, I think we can agree would be the 21st, right?
A. Um-hum. (Affirmative.)
Q. So on Thursday, the 21st, your recollection is you got down to your boat sometime after it was launched, correct?
A. Yes.
Q. All right. And you went aboard -- you brought some things down?
A. No. That was Saturday.
Q. On Thursday, you picked some things up and took them away?
A. Friday.
Q. All right. On Thursday -- Thursday you got a phone call from some friend in the marina, right?

A. Yeah. Someone called and said, Oh, they launched your boat. I said, They did. He said, Yeah, they did. I saw it down there.
Q. What was your objective in going down there that day?
A. Just swing by, take a look.
Q. Okay. Take a look in order to accomplish what?
A. To make sure, in fact, it was in the water.
Q. You mean to make sure your friend wasn't pulling your leg.
A. Something along those lines. Wouldn't be the first time.
Q. That was worth the trip?
A. I live five minutes away.
Q. Okay. So you didn't bring anything to the boat when you went down?
A. No.
Q. And you didn't take anything off of the boat when you left on Thursday, right?
A. No.
Q. Okay. When you went onboard, what did you do?
A. Nothing. Just looked around. See where everything was, what was there, and if I had to go looking for things. You know, just poke around.
Q. So when you got there, your boat was in its normal

slip, right?
A. Correct.
Q. Tied up stern in?
A. Correct.
Q. All right. And the -- when you went aboard, did you do anything to check on the security or seaworthiness of your boat?
A. I looked in the bilge, make sure there was no water there, and she was dry. You know, checked the engine room. Just poked around, made sure that the equipment that I had -- what equipment I had left onboard for the winter was still there.
Q. Make sure nothing was stolen?
A. Yeah. But I stopped by during the winter and checked on that periodically, so I wasn't really concerned with something being stolen. Just check out, you know, I keep a lot of gear. I have a lot of gear bags. I like to know what's onboard and possibly what's not onboard. Like I said, same thing I did on Saturday. Just inventory. I wasn't there for five minutes. Just checked it out. Lights on, bilge pumps on, electrical was pumped in to the power. Wanted to make sure the lines were good.
Q. Was the boat taking on any water?
A. Pardon?

Q. Was the boat taking on any water?
A. Not at that time.
Q. Okay. You saw it taking on water at a later time?
A. Not that I know of. It obviously took on some water somehow.
Q. All right. So how did you go about determining whether or not the boat was taking on water?
A. How did I or how would I?
Q. How did you?
A. I just checked the bilge. I checked the engine room. There was no water there. That's good enough for me.
Q. Let me ask you to move a little closer to the microphone, because as you speak clearly I'm starting to lose a little bit of your thread. Help me out with that again. You did what in order to determine the boat was not taking on water?
A. I checked the bilge. I assumed it had been in the water for at least a few hours. I just opened the hatch, looked down, there's no puddles, there's no water.
Q. All right. What was it that you opened to look into?
A. The hatch in the stern.
Q. This is a hatch that's very close to the transom?

A. Correct.
Q. And the transom is the extreme aft end of the boat?
A. Correct.
Q. As far away as you can get from the bow as possible?
A. Correct.
Q. So there was a hatch there in the cockpit that was close to the transom?
A. I just said that.
Q. Just work with me, Mr. Picchione, and we'll try to get through it constructively.
So there was a hatch there in the cockpit, and you opened that, correct?
A. Correct.
Q. And you looked in. You saw no water present, correct?
A. Correct.
Q. Did you look -- did you stick your head into that hatch?
A. Yeah. You don't have to necessarily stick your head in there. It's a big, wide hatch.
Q. Okay. You can see more of the boat if you put your head down into the hatch than if you look into the hatch from a standing up position, can't you?

A. That's true.
Q. Okay. So did you put your head down into the hatch to look around and look at places other than the center of the bilge to see if any water was coming in?
A. No. Because the center is the lowest part and if there was going to be any water, it would collect there.
Q. Okay. Now, did you get yourself access to the engine room?
A. I probably lifted the cover and checked it out.
Q. Okay. To get access to the engine room on that boat, you basically have to open up a structure, a hatch that is in the cabin of the boat, correct?
A. Correct.
Q. All right. And where that thing is opened, it creates a situation where somebody has to be careful not to step and fall into the engine room, right?
A. If it was fully opened, yeah.
Q. Okay. How did you -- I'm sorry. Let me back up. Did I understand correctly that you actually looked into the engine room bilge?
A. I looked into the engine room.
Q. Okay. Did you look into the engine room bilge?
A. I don't recall going down and pulling the grid, which would give you complete access to the bilge, but

the grid is a see-through type of aluminum grid which, on that boat, performed as a deck above the fiberglass in the bilge. Just lift the part, there was a two-piece hatch to the engine room. You get down to the galley, lift it, it's got gas pistons, go up about three, four feet, have the light on in the engine room, you can look down there. Everything was copacetic. I'm not going down there doing a test. You know, I was just going down to the boat to check it out, look at the gear, say, yeah --
Q. I'm not quite clear, Mr. Picchione. Were you able to see into the engine room bilge?
A. As well as I wanted to at the time. She seemed fine.
Q. Was there any water there?
A. No.
Q. When you say as well as you wanted to --
A. What I'm saying is I went down, I checked it out. I gave it the five minute walk-through. That's it. That's the extent of it. So I wasn't down there doing a litmus test. I was just down there verifying that, A, she had been launched; and B, there didn't seem to be any apparent problems that needed any type of immediate attention. That's it.
Q. Okay. You say you saw no water in the engine room

bilge, no water standing in the engine room bilge. Did you look to see if there was any water coming into the engine room bilge?
A. No.
Q. You didn't look?
A. No. I didn't look. I assume if there was water coming into the engine room bilge, there'd be water in the engine room bilge.
Q. And you have bilge pumps on that boat, right?
A. Correct.
Q. It's possible on a boat that water is entering it and it's being pumped out by bilge pumps, right?
A. Correct.
Q. All right. You didn't do anything to determine whether that was happening or not, true?
A. True.
Q. Okay. Now, after five or ten minutes, if I understand it correctly, you left the marina and went somewhere else on Thursday?
A. Correct.
Q. You came back on Friday?
A. Correct.
Q. And this is what time of day?
A. Noon.
Q. All right.

A. Noonish.
Q. All right. You came back with what objective in mind?
A. Just to do a quick inventory.
Q. Quick inventory of what kind of things?
A. Of hard goods, linens, dry goods.
Q. Okay.
A. Cleared off the linens and towels and rugs. Well, a rug in the bathroom. And just checked, paper towels, what was aboard, what was needed, type of stuff everyone keeps onboard their boat.
Q. Did you check the bilges that day?
A. No, I didn't. I didn't feel I had to. Apparently, there was someone onboard. There was a mechanic on duty.
Q. Well, you went aboard the boat, right?
A. I went aboard, correct.
Q. You didn't see anybody onboard?
A. I did not witness any particular person onboard.
Q. You saw a cart of tools on the dock, right?
A. Correct.
Q. All right. You saw a door open, correct?
A. Yes. My salon door was open and the engine hatch door and the engine hatch was half up. So I assumed he may have been down in the engine room, may have been

looking for a part or whatever, may have just knocked off for lunch. May have done whatever. There's a lot to do, as I said, when you're commissioning a boat and a lot of different systems to check. The fact that he might have been below decks, that was perfectly normal in my mind.

Q. How long did you spend aboard on this occasion?

A. Possibly a half an hour.

Q. Okay. And did you say in your direct testimony when Mr. Lovejoy was asking you questions, did I recall that you mentioned that there was someone with you on this occasion?

A. No. That was Saturday.

Q. Okay. So on this occasion, you were alone. You were aboard the boat for about a half an hour; is that right?

A. Correct.

Q. All right. Did you do anything to find out if there was actually anybody down below on your boat?

A. No. If anyone was down below, they would have said something. And quite normally, if someone was going to be down below, they would have the entire hatch open for light, ventilation, various and sundry reasons. I mean, I don't think anybody was down there. I didn't call out, hey, anybody home. No, I can't say

that I did that.
Q. Okay. What was the arrangement of the switches related to the bilge pumps when you came onboard on Friday?
A. I have no idea.
Q. What was the arrangement when you left?
A. When I left, auto was on; AC main is on; DC main is on.
Q. And had you changed anything?
A. No.
Q. All right. And when you say that you remember how things were when you left --
A. What do you mean? What did I say about how things were when I left? How things were when I left when?
Q. I'm sorry. I thought I heard you testify about how the switches were set up relating to the bilge pumps when you left the boat on Friday. Did I hear that wrong?
A. Correct. On Friday. I just didn't know what time you were referring to.
Q. So you made note of how the switches were set up when you left on Friday; is that right?
A. I made note of the fact that they were on, correct. There were various other things on as well, I'm sure. But the only ones I was really concerned

with were the mains and the bilge auto.
Q. Now, so you took note of how those were set up when you left and you hadn't changed anything, right?
A. No.
Q. Okay. I'm curious why you said you have no idea what the configuration was when you came aboard.
A. I don't know what you're referring to.
Q. When I asked you how the switches were set up when you came aboard on Friday, my recollection --
A. I didn't check the electrical panel.
Q. Okay. Just wanted to have an understanding of that. Now, you never saw anybody connected with Point Judith on your boat at any point on Friday, correct?
A. Not personally, no. No, I never did.
Q. Well, what do you mean by "not personally"?
A. I mean, not personally. I never saw anyone onboard.
Q. Did you see him any other way?
A. What are you referring to?
MR. LOVEJOY: Objection, your Honor.
MR. RAUWORTH: I'll withdraw the question. It isn't worth the trouble.
Q. Did you see anyone else onboard your boat on Friday when you were there?
A. No.

Q. Okay. Now, let's turn to Saturday. When did you come to the boat on Saturday? Now, we're talking about April 23rd.
A. Yes. I believe it was in the afternoon.
Q. How long did you stay?
A. Possibly 45 minutes, an hour at the outside.
Q. What was your objective when you came there that day?
A. To bring back the materials that I had brought home for cleaning and other materials down to stock the boat for the beginning of the season.
Q. Okay. Now, when you came on Saturday, there was nobody aboard the boat, correct?
A. Correct.
Q. All right. And no tool cart on the dock?
A. Not that I recall.
Q. Okay. And the boat was closed up, correct?
A. I believe so.
Q. Okay. You came to the boat on this occasion with someone else?
A. Yes.
Q. Okay. That person stayed with you the whole time?
A. Yes.
Q. Okay. Now, when you came aboard the boat on Saturday, what was the position or arrangement of any

of the switches that had to do with any of the bilge pumps?
A. I couldn't say. I don't recall.
Q. Okay. When you left the boat on Saturday, what was the position of any of the switches that had anything to do with any of the bilge pumps?
A. I don't recall.
Q. When you came -- well, at any time you were onboard the boat on Saturday, did you determine if any water was entering the boat?
A. I'm sure I -- yeah. I looked down the hatch in the rear, which I always do. And there was no water.
Q. This is the hatch by the transom we talked about earlier?
A. Correct. It's the transom hatch that we spoke of earlier.
Q. Right. How much water was there in the engine room bilge?
A. None that I'm aware of.
Q. Did you look to see if there was any water in the engine room bilge?
A. Not that I recall.
Q. Did you do anything else to determine if there was any water in the engine room bilge?
A. No.

Q. Okay. Did you do anything else to determine whether or not water was coming into the boat?
A. No.
Q. Okay. You never heard any bilge pumps running on any of the occasions that you were aboard on those three days?
A. No.
Q. You're agreeing with me that you did not?
A. I did not.
Q. You know what a bilge pump sounds like when it runs, right?
A. Yes, I do.
Q. This boat had three separate bilge pumps, correct?
A. That's my recollection.
Q. What's your recollection of where they were in the boat?
A. Fore, middle, aft. One amidships, one in the back of the boat, and one in the front of the boat.

MR. RAUWORTH: With the concurrence of Mr. Lovejoy, your Honor, I would move for exhibit full, which is KKK, which I just put on the display. It actually consists of two pages. The second one is something of a blow-up of the first image.

THE COURT: First we haven't finished dealing with triple U.

MR. RAUWORTH: Correct, your Honor. I apologize.

THE COURT: Are you done with all your questions regarding that document?

MR. RAUWORTH: Yes. With regard to that document, I've finished my questions.

THE COURT: All right.

MR. RAUWORTH: And I would ask that it be admitted in full.

THE COURT: Mr. Lovejoy?

MR. LOVEJOY: I still have the objection that it's irrelevant what happened before 2005. It's irrelevant what happened after in the separate and same type of vessel is irrelevant.

THE COURT: I understand your objection. I'm going to admit it in full. I think it does have some limited relevance so that will be full now.

(Defendant's Exhibit UUU admitted full.)

THE COURT: This is triple K that you're referring to now?

MR. RAUWORTH: That's correct, your Honor.

THE COURT: All right.

MR. LOVEJOY: Your Honor, with respect to that, I may or may not have an objection depending on what Mr. Rauworth is offering it for.

THE COURT: It will be ID only for now. Go ahead.
Q. Mr. Picchione, you recognize this as an image of the switch panel on your Albin 35, the EVEREADY?
A. It appears to be. Looks like it. Similar, if not the actual thing.
MR. RAUWORTH: With that identification, your Honor, I would ask that we proceed with admission.
THE COURT: Objections or not?
MR. LOVEJOY: Well, I don't have any objection to it just being offered to show the panel. If he's offering it for some other evidentiary value, I still have or will have an objection.
THE COURT: Well, I'm not sure I understand what you're getting at but I'm going to admit it. Triple K will be full. Go ahead.
(Defendant's Exhibit KKK admitted full.)
MR. RAUWORTH: Thank you, your Honor.
Q. Let me move this a little bit so we can see more of it. All right, sir.
Now, you had mentioned earlier switches that you saw to be energized, I think, when you visited the boat on Thursday?
A. Correct.
Q. All right. Now, can you remind me of the names

you gave the switches you'd referred to.
A. Yeah. The AC main, and the DC main, and the auto bilge.
Q. Okay. And can you give us a verbal description of where the AC main is on this panel?
A. A verbal description?
Q. Can you describe it --
THE COURT: If you just point to it on the screen, it will make a mark.
Q. Can you put your finger onto the screen at the place where the AC main is?
A. I believe it's here. Over here.
Q. Okay. And then can you make a mark with your finger -- one second. Can you make a mark with your finger where the DC main is?
A. I believe this is the one here.
Q. Okay. And then you mentioned a third switch?
A. Yes.
Q. What was that called again?
A. Auto. Auto bilge.
Q. All right. And can you make a mark with your finger where that is?
A. Yes. Right here.
Q. Okay. And why is it that -- strike that. When the switches are in those positions, what's your

understanding of how this system works to make your bilge pumps operate?
A. Well, you have your AC main -- your DC main on because you're plugged into shore power, and you don't want to be working off your batteries and battery charger constantly. So obviously, if you're getting shore power, shore power isn't always reliable. Fuses have been known to blow, so forth, so you always keep your DC on as well as backup in case something happens to your shore power.
With respect to the bilge pumps, the auto has to be on in order for the bilge pumps to work.
Q. Okay. And so if any of those three switches is off, then the bilge pumps won't work?
A. If the auto is off, the bilge pumps will not work. That's my understanding. And that's the understanding that Mr. Hilton made sure I understood quite thoroughly.
Q. And have you -- when is the most recent time you have spoken to Mr. Hilton?
A. Probably at a boat show about three years ago. Well, actually, maybe this year at the boat show but --
Q. All right. So what about the effect of the other switches you described? What about the effect of the AC main? If that had been off, what would that mean to

you?
A. The AC main, well, theoretically, to my understanding, if we're ashore, plugged in, or if the generator is running when we're not ashore, then you wouldn't -- it really wouldn't mean anything unless there's something specific, a sump pump or something else that's running off your AC panel that you'd want to use. But I mean, with respect to the bilge pumps, that should be drawing from the DC power, if you're getting your DC power.
Q. Okay. So if the AC main switch had been off, would that have made any difference?
A. No. Only in the fact that, as I believe I mentioned, if you lost power, if your generator refused to work or your shore power failed, then that's why you want to have your DC available as back-up.
Q. Maybe I confused you. My question wasn't about the DC. We'll take that up separately. I was trying to ask you about what difference it would make if the AC main had not been switched on as you described it?
A. No difference. With respect to the bilge pumps, no difference as long as the DC main was on.
Q. Okay. And what difference does it make in terms of functioning of the bilge pumps that the DC main is on or off?

A. None.
Q. Okay. So the bilge pumps do fine whether the DC main is on or off?
A. Unless your batteries are dead.
Q. Okay. So those are the switches that you were concerned about on Thursday, when you were aboard the boat?
A. Yeah. Those are the three switches that you want to have on. If you're plugged in and your DC is not lit up, you have to scratch your head and say, gee, why is that. Then do you normally go to the dock and check to make sure a fuse hasn't flicked or circuit breaker hasn't flicked or whatnot. Check and make sure you have good connection on both ends of your cable. I wouldn't be comfortable, necessarily, if it were off because then your batteries wouldn't be charging. And then you can only rely on your batteries for so long.
Q. All right. Is there anything else that is essential in order to make sure that the bilge pumps work on this boat or have power to work on this boat?
A. Not that I'm aware of. Not as long as, like I say, your AC is on. I mean, yeah, I mean, as long as you have your battery backup on, you should be okay. At least for a certain length of time. I mean, I don't know how long it would take to kill the batteries with

just the bilge pump because you don't know if the bilge is running or not. There's a master switch where you switch over from AC to DC, and, obviously, you would check that switch as well to make sure that -- well, you switch from shore power to generator, in other words. So you check that as well. If for whatever reason your DC wasn't lit up, make sure it had been switched to shore if you're at shore and generator if you were off shore. Other than that, no. I don't know. You ask the same questions so many times I'm not sure I know what question I'm answering. But my understanding is that bilge pumps will work with AC power only, and as long as your auto is on, your auto bilge switch is on.

Q. Okay. Well, I've gotten a little confused myself, but I was just trying to make sure we haven't overlooked anything. There's nothing else that is necessary in order to make sure you have bilge pumps that will function in the automatic mode?

A. No.

Q. Okay.

A. Assuming the bilge pumps work.

Q. Right.

MR. RAUWORTH: Your Honor, I understand that the clerk has a function that allows the screen image to be

saved and printed. I wonder if I could ask that that be done.

THE COURT: Yes. That's fine.

MR. RAUWORTH: And if you let me know when it's captured it, then I can move this thing without -- and at some appropriate time, I'll ask the protocol for marking this sort of a derivative image.

THE COURT: We can do it now. We'll call it KKK-1, this document that's printing.

(Defendant's Exhibit KKK-1 admitted full.)

MR. RAUWORTH: Thank you.

Q. This bilge pump set up is actually a fairly confusing arrangement, isn't it, Mr. Picchione?

A. It was to a certain extent. I mean, not confusing but I often wondered well, gee, why do you have the manual overrides. But then float switches do fail and so I'm sure that's why they had the manual switches.

Q. Float switches do fail?

A. Yeah.

Q. Okay. You've had that experience?

A. Yes.

Q. Okay. And what's the significance of it to you if a float switch fails?

A. Well, depends on how it fails. Sometimes they don't float, in which case your bilge pump isn't going

to work. It's not going to turn on if you start taking on water. Obviously, that's a concern. On the other hand, debris, boat rags, whatever else which one can often find floating around in the bilge can get jammed under a float switch, which will turn the pump on and keep the pump running even when it's dry. That can cook the pump in which case you don't have a workable pump and, obviously, that's a concern as well.
Q. I put that question to you in a bad sequence. Let me come at this another way. What's a float switch?
A. A float switch is a device on a bilge pump that -- it's slow. It's an air pocket. It's a floatable device. And as water gets under it, it floats the switch. As the switch floats up, it turns the pump on.
Q. Okay. Why are these used in connection with bilge pumps, to your understanding?
A. So you can regulate the -- so that the level of water in your bilges is regulated so it doesn't get too high. And if you're taking on water, it will pump out the water.
Q. It allows the bilge pumps to function without human interference, correct?
A. Right. It allows the bilge pump to function automatically.
Q. Okay. That's the idea anyway, right?

A. That's the idea.
Q. Okay. Now, your experience with boats is such that you were aware of the phenomenon that float switches fail sometimes, right?
A. Yes.
Q. Okay. During the three days that we've been talking about, you never did anything to test, to see if the float switches on your boat were functioning correctly, true?
A. Correct.
Q. That's important, isn't it?
A. It is. But we tend to make a lot of assumptions. And I assumed as they were working at the end of last season, they would still be working at the beginning of the following season.
Q. I'm sorry. You said you assumed that?
A. Yes.
Q. Okay. Did you ever do anything to find out if the bilge pumps were working at all?
A. Well, working at all? Yeah. You can flip the manuals and listen for the little sound. Other than that, no.
Q. All right. But you didn't do that during these three days in April of 2005?
A. No.

Q. All right. The reason you checked the arrangement of the bilge pump switches when you went aboard on the Thursday was so that you could have some confidence that those pumps would have electrical power to them, correct?
A. Yes.
Q. Okay. And that was important, right?
A. Yes. What was important was that the auto was on.
Q. Okay.
A. And that the little green light was -- or little red light, or whatever color light it was, was on.
Q. That light indicates that there's power to the circuit, correct?
A. Correct.
Q. All right. Doesn't tell you whether or not the pump itself is functioning correctly, true?
A. I'm not an electrician. That's an assumption on my part.
Q. Okay. And it doesn't tell you if any of the float switches are working correctly or not, true?
A. True.
Q. Okay. It was -- you mentioned that it was important to you on Thursday to see that those switches were in the correct configuration. It was just as important to do that on Saturday, wasn't it?

A. No. Not quite as important. I mean, you know, on a certain level, absolutely it was. On another level, I mean, if it was working Friday, there was a mechanic onboard Friday. Everything seemed to be in order on Thursday. I hadn't seen any indication of any water anywhere onboard or in the bilges.

So, you know, we tend to take things for granted, as I said, and make assumptions. But, you know, at the time I was there, the boat was high and dry. There were lots of people around the dock.

Q. Okay. It's real easy to check how those switches are set up, isn't it?

A. Yeah.

Q. All you have to do is look at them, right?

A. Correct.

Q. That's what you did on Thursday, right?

A. Correct. I made a point of looking at them on Thursday. I was probably a little distracted on Saturday. My girlfriend was with me. She likes to make the bed, da-da, da-da, da-da. Hey, did you get this, did you check that, did you do this, did you do that. I wasn't thinking about bilge pumps at the time.

Q. Well --

A. Did I check it on my way out the door? I couldn't say for sure. Certainly, if I noticed if the auto was

off, that little red light or green light or whatever it was wasn't on, I probably would have noticed. But I can't say for sure, so --

Q. That was up to you to check, right?

A. I don't know. I guess. I don't know.

MR. LOVEJOY: Your Honor, I object. We went over and over and over the switches and what he did.

THE COURT: Right. I understand. I think we've covered this.

Q. Let's switch to another topic.

THE COURT: How much more do you have?

MR. RAUWORTH: I would say we ought to be able to wrap up in half an hour, your Honor.

THE COURT: All right. Why don't we take our lunch break now then, and reconvene at 1:30. All right?

(Lunch recess.)

THE COURT: Ready to go forward with your cross-examination.

MR. RAUWORTH: Yes, your Honor, if I may.

THE COURT: Yes, go ahead.

BY MR. RAUWORTH: (Continuing)

Q. Mr. Picchione, is it fair to say that Point Judith Marina had very competent technicians and that the repairs they performed on your vessel were done to your

satisfaction, correct?
A. As far as I can recall.
Q. You're agreeing with me?
A. Yeah. For the most part, yeah.
Q. Good. Now, the EVEREADY, the Albin 35, had been aground once near Block Island, correct?
A. Correct.
Q. And on that occasion, you didn't have to abandon the vessel. You were pulled off of the shoal; is that correct?
A. Right.
Q. And then a couple of years later in 1998, there was a grounding on the jetty on the way back into Point Judith harbor?
A. Correct.
MR. LOVEJOY: Your Honor, I've seen these. I don't know what relevance they have.
MR. RAUWORTH: These are photos of that grounding, your Honor.
MR. LOVEJOY: 1998 grounding.
MR. RAUWORTH: Correct. The one that was just addressed.
THE COURT: Why don't you address the relevance of the grounding issue to the present matter.
MR. RAUWORTH: Sure. It has do with the

calculation of damages, the pre-incident value.

THE COURT: Okay.

MR. RAUWORTH: If I may approach the witness, your Honor, I'll be providing him with the originals of double T and double U, two photos. I'll put them up on the scanner.

This appears to become distorted.

THE COURT: I have it in front of me and the witness has it, so I think we're okay.

MR. RAUWORTH: Okay. Thank you.

Q. Mr. Picchione, in front of you is Exhibit Double T, tango, tango. Do you see that?

A. Yes.

Q. And that's a photo of your boat aground on the jetty that is on the way into Point Judith, correct?

A. Correct.

Q. And the other one, double U, is a photo of the same incident from another angle, correct?

A. Correct.

MR. RAUWORTH: All right. Your Honor, I move those be admitted in full.

THE COURT: Any objection?

MR. LOVEJOY: No, your Honor.

THE COURT: All right. TT and double U will be full.

(Defendant's Exhibits TT and UU admitted full.)
MR. RAUWORTH: Thank you.
Q. Now, Mr. Picchione, on this occasion, the EVEREADY, the Albin 35, occurred a hole in the hull on the port side on the bottom, correct?
A. Correct.
Q. And you can see it in these photos leaning over on the port side, correct?
A. These were heeling to -- yeah. Correct.
Q. Port is left, starboard right?
A. Yes.
Q. Now, after this incident on the jetty, the main engines were not changed out, true?
A. True.
Q. All right. And there was a salvage firm that you retained to bring the vessel off of the strand here and take it back to Point Judith Marina's facilities, correct?
A. I didn't arrange it. I'm sure the insurance company -- someone arranged it. I certainly didn't.
Q. But those arrangements were not made by Point Judith Marina?
A. Like I say, I don't know who made the arrangements.
Q. Okay. And during the movement of this vessel from

this position on the rocks back to Point Judith, the engine room of the boat filled with seawater, correct?
A. I wouldn't know. I wasn't onboard. I was there when they hauled it. There was some water coming out. I don't know if the engine room, the engine compartment was completely flooded or not. I'd have no way of knowing.
Q. Okay. Now, the EVEREADY was repaired to your satisfaction and put back in service, correct?
A. I don't know if that's a trick question, but it seemed fine. There were -- you know, I believe there were a few issues as we took it out and got back underway, which, to my recollection, and some of the bills and notes I went over, there were certain things that they corrected at the yard, Point Judith Marina, at no charge because they were supposed to have been done or --
Q. Just to simplify, the end result was okay with you?
A. The end result was fine, yeah.
Q. And you weren't paying the bills, correct?
A. Pardon?
Q. You were not paying the bills, true?
A. I was paying the bills, yes.
Q. The bills were paid by your insurance company,

weren't they?
A. Well, the insurance company paid me a certain amount of money based on an estimate, and, yeah. I wrote the checks to the marina. They weren't being written by the insurance company.
Q. Okay. But the money that you paid to Point Judith was coming to you from an insurance company?
A. Yeah. Yeah.
Q. Now, the boat you currently have, the WATERMARK, is an Ocean 48; is that right?
A. Correct.
Q. You bought that used, correct?
A. Yes.
Q. And what did you pay for it?
A. I believe 435.
Q. Right. And according to your understanding, that was a boat with a good track record?
A. Right. Correct.
Q. Now, if you were to learn that that boat had had an incident of this kind, what's your best estimate of how that would change how much you would have been willing to pay for it?
MR. LOVEJOY: Objection. It's beyond the scope of direct to begin with, and irrelevant.
THE COURT: It's not irrelevant, but it may be

beyond the scope. But in addition to that, you haven't really established a foundation for how he would know that, whether he knows that sort of thing or not. First of all, address the fact that it does seem like this is beyond the scope of the direct.

MR. RAUWORTH: Well, I guess the question is a procedural one. Would that mean that I would need to, on a topic that was appropriate to elicit from the witness, that I would need to call him in my case-in-chief?

THE COURT: Well, that's really a question for Mr. Lovejoy, because if you're going to object to the scope of the examination, then that means that the plaintiff is going to need to be called again when the defense puts on its case. So is that how you want to handle it? It's in your court.

MR. LOVEJOY: Not really. Also, as the Court mentioned, there's a lack of foundation.

THE COURT: I'm dealing with one objection at a time. You objected to the scope so I'm giving you the opportunity to limit the scope of the examination if that's what you wish to do. But there's another side to that. If you want to waive that objection, that's fine, too.

MR. LOVEJOY: I'll waive that objection, your

Honor.

THE COURT: Now, although he didn't object on foundation, I do want you to lay a better foundation for this testimony. You have to establish that he would know, have a way of knowing about changes in value resulting from incidents and accidents like this one.

MR. RAUWORTH: If I may, your Honor, what I'm trying to establish is, if you will, his own personal value, his own bid in the same sense that an owner is regarded as competent to evaluate the stated value, to testify to the value of let's say his own real estate.

THE COURT: Okay. Then limit the question in that way and that's fine.

Q. Just to make clear, Mr. Picchione, I'm not suggesting that you function as a boat appraiser, if you will. Do you understand that?

A. Yeah.

Q. I'm asking you to think of yourself as someone, as a buyer of boats. Do you understand that?

A. All right.

Q. And you have been a buyer of boats on a number of occasions, right?

A. Correct.

Q. And when you've gone about buying boats, you've

compared the offerings in the market, correct?

MR. LOVEJOY: Your Honor, he said he was going to limit to this piece of property that Mr. Picchione owned. He's trying to make him into an expert witness as to all --

THE COURT: I think he's trying not to do that. I think he's trying to make it clear to the witness he's not asking him that. He's asking him his own evaluation. And I think he gets it, so do it.

Q. You've looked at various boats in the market yourself when you've been thinking about acquiring a new boat, correct?

A. Correct.

Q. And in fact, at the point that the EVEREADY itself had the incident in 2005, you had already been thinking about moving up to a bigger boat, correct?

A. I had been.

Q. Okay. And that involved looking at the kind of boats that were on offer, correct?

A. Correct.

Q. And you were certainly considering used boats as distinct from looking only at brand new boats, correct?

A. Most assuredly.

Q. I think you testified in your deposition at that point you were minded not to buy a new boat again?

A. Correct.
Q. So your focus was on used boats, if I've got it right?
A. Yes.
Q. All right. Now, thinking of the value of things to you, and taking into account the 435 that you paid for that Ocean 48, am I right or am I wrong when I assume that if you were ready to pay 435 for a boat with a good history, you wouldn't be willing to pay as much if you learned that that boat had had a grounding of the kind that we have depicted in these two exhibits?
A. I think I understand your question, if that was a question. I'm just -- yeah, obviously, if I knew, it's like buying a car. If you knew the car had been totaled, I think you'd think twice.
Q. Sure. And if you know a used car you're thinking about buying has been in an accident, that tends to make you not quite as interested in buying that car for a higher price, correct?
A. Correct.
Q. The same principal applies to boats, true?
A. Yes.
Q. In your mind , right?
A. Sure.

Q. Okay. So if you'd been ready to pay 435 for the Ocean without a grounding history, and suddenly you find out it's got a grounding history, what do you tell the seller that your bid has dropped to?

MR. LOVEJOY: Objection. He's already answered that he thinks it's worth less. He's going to make him an expert witness and ask him to put a percentage on --

THE COURT: I'm a little confused, frankly. You're asking about the Ocean 48. That's the boat that the witness bought to replace this boat, right?

MR. RAUWORTH: That's correct, your Honor. It's just because -- that is a used boat as opposed to a brand new boat and a brand new boat won't have a grounding history.

THE COURT: Well, isn't the issue the value or the reduction in value that results from the grounding to this boat?

MR. RAUWORTH: Yes, it is. So the number he provides is not going to be a direct translation. It's simply an indication of perception.

THE COURT: Why not just ask him in his opinion how much was the value of the EVEREADY reduced by the fact that it had this grounding and the damage that resulted.

MR. RAUWORTH: Sure. Let me frame it in those

terms.
Q. As the judge suggests, Mr. Picchione, let's shift gears here for a minute. A little before this incident where the EVEREADY sank, you were considering getting rid of the EVEREADY to get a bigger boat, correct?
A. Yes.
Q. And had you come to an idea of what you thought you could sell the EVEREADY for?
A. Yes.
Q. And what was your estimate of that?
A. My estimate -- well, I didn't have an estimate as to exactly what I'd sell, but I had an estimate as to what I'd ask. And then it would come down to be what I'd settle on, but I was going to ask, you know, in the range of 150,000.
Q. Okay. And the 150,000 was assuming that you would be telling a potential buyer about the grounding history or not?
A. Not.
Q. Okay.
A. I don't think they have full disclosure laws when it comes to selling a used boat.
Q. So if you found out, if you listed it for 150 and you found out that you had to go through a full disclosure and mention the grounding history , the

Block Island one and the jetty one here, what would you reckon that that would do to your asking price for this boat?
A. I don't know. I have no experience there, but all I can say is, you know, what I've been told. The engines -- you know, there's two basic --
Q. I'm sorry?
A. Two basic things, you know, you look at in a boat. That's the hull and the engines. Those are your two most expensive components for the most part. And you know, the engines, you know, they had the hours they had, what are the hours they had, you can't change that. But, obviously, there was some work done. I know the engines were, I'm not sure, but I have to assume if they were submerged that they were pickled and probably, you know, possibly rebuilt if there was that kind of damage.
If there wasn't -- I wasn't down there every day checking out every little thing they had done, but most of the people I had spoken to in relation to such matters, you know, they said the hull was stronger with the fixes than it was -- had been in original condition.
Q. Okay. But now we're talking about what you'd be able to sell the EVEREADY for, not counting the

incident when she sank at Point Judith. In other words, if we're talking about a week before this sinking on the morning of the 28th.
A. I would say the same thing.
Q. In other words, you reckon you'd be able to get as much for the EVEREADY in its pre-sinking condition if the buyer knew or didn't know about the history of the grounding on the jetty?
A. I don't know for sure, but, yeah, that's my opinion. You know, when the grounding occurs, you can see for yourself by the photo you submitted, that there doesn't seem to be a lot of structural damage other than, you know, along the bottom. It turned out, my recollection is, that the props and shafts and everything were fine and that, in fact, the majority of the damage to the hull had been done due to the back and forth action on the tides and the waves. I was there when they hauled it to Point Judith Marina. It certainly didn't sink. There were some of the salvage crew on the boat at the time. From this particular spot, the Point Judith Marina is probably less than half a mile, and they just floated it over and the boat was pulled.
Q. Okay. Thanks. So the bottom line is that you don't think the information about the grounding history

would make a difference in what kind of price you could get for the EVEREADY II the week before this sinking at the dock?

MR. LOVEJOY: Objection. I think it's been asked and responded to at least three times, your Honor.

THE COURT: Well, you may be right but I want to be clear on this, too, so is that correct?

THE WITNESS: It's correct that I don't think it would be significant. Perhaps it would be, you know. Again, my point being that the boat wasn't sunk.

THE COURT: I'm having a hard time understanding your answer as well. Do you think that this grounding had any effect on the price that you would get for the boat from a buyer who knew of the grounding, that is, comparing the price before the grounding to the price after the grounding, does the grounding have any impact?

THE WITNESS: I don't know. It's a two-sided -- it's a double-edge sword.

THE COURT: All right. He doesn't know.

THE WITNESS: It's been all redone. Now, you have new electronics. You have new this. Everything that's wet has been replaced. There's upgrades involved.

THE COURT: I understand.

MR. RAUWORTH: I'm not sure if I did it. I move these two exhibits in full.

THE COURT: Any objection to double T and double U?

MR. LOVEJOY: No objection, your Honor.

THE COURT: Those two will be full.

Q. Now, sir, you yourself, and I'm distinguishing this from an insurance company, but you yourself have never engaged the services of a marine surveyor, have you?

A. Yes.

Q. Yes?

A. Um-hum. (Affirmative.)

Q. What was that occasion?

A. When I was buying the WATERMARK.

Q. Okay. And why did you engage the services of a marine surveyor in buying the WATERMARK?

A. It was a used boat.

MR. LOVEJOY: Objection, your Honor. Relevancy, foundation.

THE COURT: Well, let's find out. I haven't heard enough to know.

A. It was a used boat. I wanted to make sure, obviously, that the hull was sound. I had the engine

surveyed as well. And they do the hull, and they survey all the systems, and they come up with a complete checklist of everything that has to be done. And if you're about to spend close to half a million dollars on a boat, to pay for the services of a surveyor is a cheap way to go.
Q. Okay. Marine surveyor is kind of like a home inspector for boats, right?
A. Yes.
Q. Very much analogous, right?
A. I would think so.
Q. Good. So that's somebody that you hired to give you a full picture of the condition of a boat?
A. Um-hum. (Affirmative.)
Q. If you're going to be a buyer?
A. Yeah. Correct.
Q. And one of the reasons is to allow you to decide how much money you might have to put into the boat if the surveyor finds some conditions that need some attention, correct?
A. Correct.
Q. And when you hire a surveyor, you're expecting the surveyor to take on digging into the boat to give you a real thorough view of what's going on with it, correct?
A. Yes.

Q. Okay. Because that's the key reason that you hire a surveyor is to get a more sophisticated look at the condition than you could get yourself, right?
A. Correct.
Q. Now, you never used the services of a marine surveyor with respect to the EVEREADY in terms of someone you hired yourself, correct?
A. No.
Q. Okay. You're aware that there has been an identification of an issue relating to a hole in a segment of the starboard exhaust system, section of a hose?
A. Yes.
Q. Okay. And you understand that hose to be a section of the exhaust system that ran along the starboard side of the boat outboard of the fuel tanks and just inside the hull, correct?
A. It was my understanding that there were holes in that particular exhaust pipe on both sides or holes on both sides. That's my recollection.
Q. Okay. But the hose sections that we're talking about run --
A. Yeah. From the manifold to the exhaust. That's my understanding.
Q. Okay. And the section that we're talking about

leads behind the fuel tanks, correct?
A. I don't know where it leads.
Q. Okay. In 2005, the EVEREADY was a ten-year-old year model boat?
A. Yes. Well -- yeah. I think we went over this. It was a 2005 year model boat. It was not commissioned until May of 2006.
Q. I think you may mean 1995 and 1996?
A. Right.
Q. So in terms of year models, it was a ten-year-old boat?
A. I guess. I don't know what point you're trying -- I don't know what you're saying. The boat was a brand new boat. I don't even believe it was in the water until '96. It was build in '95. It was a '95 model year.
Q. So in 2005, this was a boat that was ten model years old in 2005?
A. Correct.
Q. You had never hired anyone with an assignment of inspecting your exhaust hoses on the EVEREADY, correct?
A. Correct.
MR. LOVEJOY: Objection to the foundation that you hire marine surveyors, that you do this when you're using a marina.

THE COURT: I understand. That's argument, but I'm going to overrule the objection and allow the testimony. Just because it's true doesn't mean there was an obligation to do it, but you all can make argument over that. Go ahead.
Q. You never had approached anyone, even on a casual basis, to ask about preventive maintenance for your exhaust hoses on the EVEREADY, correct?
A. Correct.
Q. All right. And you had never authorized anyone to take the tanks out of your boat to check on the exhaust hoses?
A. Correct.
Q. You had a lot of friends around the marina, other boat owners there at Point Judith?
A. Sure.
Q. And you talked with them about boats and about fishing?
A. Yep. Yes.
Q. And you never had any conversation with any of those friends at the marina about how often you ought to consider renewing or inspecting your exhaust hoses, correct?
A. Correct.
Q. Now, your friends at the marina, there were folks

there that you had told where you hid a key to get into your boat?
A. Sure.
Q. And these were folks that had your permission to take the key out of the hiding place and use your boat when you were away?
A. Not take the boat to sea, but if they wanted to go down to the boat and hang around, have a beer, do whatever they're going to do, fine.
Q. Entertain friends?
A. No one took it out.
Q. I don't mean taking it out. I mean in the marina?
A. Yeah.
Q. And that was fine if they entertained friends down there?
A. It happened from time to time.
Q. All right. And in fact, you testified in your deposition that you suspected that it might have been someone who was actually using the -- visiting the WATERMARK in this way who might have turned off the battery charger on that boat with the result that some water accumulated in the engine room. Do you recall that?
MR. LOVEJOY: Objection. Relevance.
A. No. I do recall --

THE COURT: Wait a second. There's an objection pending. The WATERMARK is a different boat. That's his new boat, right?

MR. RAUWORTH: That is correct, your Honor.

THE COURT: So what's the relevance of whether somebody did that in the WATERMARK?

MR. RAUWORTH: Well, it illustrates the awareness of the plaintiff that people using his boats, EVEREADY or WATERMARK, with his permission, had the capability, presented the possibility, if you will, of changing things about the boat that might cause adverse consequences.

THE COURT: That may be true, but the key here is the EVEREADY. So let's focus on that.

MR. RAUWORTH: Sure.

Q. The folks that you allowed to use the EVEREADY or the WATERMARK were people that you had permitted to be aboard the boat in the marina even though you weren't there, correct?

A. Yes. But -- yeah. I would object to the term "allowed to use." Basically, certain people know where the key is so they can get on and off the boat. That includes the marina personnel; that includes numerous friends who go on and off the boat to, A, borrow a rod; B, drop something off. Hey, if you're going to be down

the boat, throw this on the boat for me. That type of thing. Not specifically for any other reason than that.

Q. I didn't mean specifically, but you testified that your friends in the marina you allowed to go aboard the boat for purposes of --

MR. LOVEJOY: Judge, there's no foundation. This boat was in the water. We're talking about a four-day period. There's absolutely no foundation for evidence that anybody else was on the boat other than Mr. Picchione, a girlfriend and the marina personnel working on it.

MR. RAUWORTH: Your Honor, if I may --

MR. LOVEJOY: There has to be a good faith basis for -- maybe it's relevant, but I object to it, your Honor.

MR. RAUWORTH: The witness testified in his deposition that he allowed people on the WATERMARK.

(Reading:) Now, I have friends who from time to time make little visits down to the boat. So I can't rule anything out to be a hundred percent honest.

What do the friends make visits to the boat for when you're not there?

I assume recreational activities.

Flesh that out a little bit.

Well, you know --

THE COURT: I understand. So he made those statements with respect to the WATERMARK, but that isn't the EVEREADY. So you need to ask him and you have asked him about this type of activity on the EVEREADY. He's answered that. You can follow-up with that last question and pin it down, if you wish. But you need to -- Mr. Lovejoy is correct. You need to zero in on the relevant time frame here for this to have any impact, and that time frame is the four days that the boat was in the water.

MR. RAUWORTH: Sure.

Q. Mr. Picchione, there wasn't any difference in the way that you managed access to the EVEREADY in the spring of 2005 as compared to any other time that you'd had the boat down at the marina, correct?

A. That would be correct.

Q. So during the weekend of August -- I'm sorry, April 23rd and 24th, 2005, there is no way to rule out that one or more of your friends -- I'm sorry. During that time period, the friends you had at the marina had the ability and your permission to come aboard your boat and visit it, correct?

MR. LOVEJOY: Judge, again, I object. There's no evidence that anybody -- no witnesses, no evidence

to that. We don't even have established whether any other boats were in the water at the marina.

THE COURT: I understand your objection, but it's overruled. You may answer that question.

A. What is the question?

THE COURT: It will be read back for you.

(Pending question read by the reporter.)

A. No. Not correct.

Q. What's not correct about that, sir?

A. It's not correct that they had my permission. If someone went on there because they knew where the key was, they did that on their own. They did that clandestinely.

Q. Well, you earlier today testified that your friends at the marina --

A. I testified to the fact that numerous --

THE COURT: You have to let him finish the question and then you answer it.

Q. Earlier today, I believe you testified that your friends at the marina with respect to the EVEREADY had your permission and knew where the key was and were able to visit the EVEREADY when you weren't there?

A. No, I didn't. I testified that they knew where the key was and were able to visit the boat when I was not there, but not that they had my permission per se.

And to clarify the situation, at least in my mind, as I said, numerous people know where I keep the key. It is expedient and necessary, sometimes, for these people to know where that key is in order to do me favors, pick up something on the boat. Hey, I left my cellphone down on the boat. Hey, I left my sunglasses down at the boat. If you're at the dock, why don't you pick them up. You know, this type of thing.

Now, I am aware that from time to time people have gone down to the boat, not with my permission, not asking and not telling, just because when I show up at the boat, I find a barrette on the couch or a piece of clothing that doesn't belong there. It's not like an open-door policy per se.

Q. Well, they had your permission as to the WATERMARK. Are you saying that it was different as to the EVEREADY?

MR. LOVEJOY: Judge, we're back on the WATERMARK, and I object to --

THE COURT: I really think this has been covered. I understand the testimony. Let's move on.

MR. RAUWORTH: Sure.

Q. You had a battery charger on the EVEREADY, didn't you, Mr. Picchione?

A. A couple of them.

Q. Okay. And what was their function?
A. To charge the batteries.
Q. Okay. And what difference did it make with respect to the ability of the bilge pumps to operate depending on whether the battery charger was switched on or off?
A. None that I know of.
Q. As of at least as early as Saturday, the 23rd of April, 2005, two days before the sinking, are you with me on the time frame?
A. Um-hum. (Affirmative.)
Q. Okay. As of at least that early, if you had gotten the urge, you could have stoked up the engines on the EVEREADY and taken that boat out, correct?
A. Yes. Probably. I don't know for sure though. The fact that there was someone, at least, in my mind, I knew there was a mechanic that they were working on the boat Friday, and I know that there's numerous systems that have to be commissioned and checked out. So short of asking if they were done with everything, I wouldn't have done that. I wouldn't have done it. I would have assumed there was still work in process and I'd wait until I found out that, A, either they were going to take it out, or if not, that they were done, they had completed the commissioning before I would

have stoked up the engines.
Q. But you were free to do that, correct?
A. I guess I was free to.
Q. Your boat, right?
A. Yeah.
Q. And you could have decided to have it towed to another location if you wanted to, correct?
A. I imagine.
Q. Okay. And you were able to inquire as to whether there was any work that anybody thought was incomplete in terms of what Point Judith was doing, correct?
A. Correct.
Q. All you had to do is ask at the office, right?
A. Depending upon who was around. I don't know. If we go to the office and Don's not there, and Ann's not there, who am I going to ask, Mark? I don't think so. Maybe Gary might know. Maybe not. No. Besides, not for sure, at any given moment I wouldn't say, A and B, I had no burning desire to take the boat out right then. I was busy. Like I said, we were only down there for an hour or so. We had other things to do. It wasn't like I was about to take the boat out.
If I had known anything was complete, you know, I would have gotten to that certainly at some point in time that week if I hadn't gotten that phone call

Monday morning.
Q. You were completely free to spend the night on the boat, right?
A. I guess so, yes.
Q. You were completely free to have a barbecue on the boat with friends from around the marina, correct?
A. No. No barbecues on the dock.
Q. Okay. Put the barbecue out of it. You were completely free to have a cocktail party aboard the boat with friends around the marina, correct?
A. I imagine so.
Q. In fact, you did socialize quite actively with people around the marina, correct?
MR. LOVEJOY: Objection, your Honor. What relevance does his socialization habits have to April 21 to April 25, 2005?
THE COURT: I'm going to overrule the objection. Let's just not dwell on this. Keep moving through this.
MR. RAUWORTH: Sure.
Q. You had custody of that boat as of Saturday, April 23rd, isn't that correct, Mr. Picchione?
MR. LOVEJOY: Objection. It calls for a legal conclusion, your Honor.
THE COURT: What was the objection?

MR. LOVEJOY: He's asking for a legal conclusion.

THE COURT: Well, overruled. His understanding of possession.

A. I imagine so.

Q. Okay. On the morning of the sinking, you came down to the marina, correct?

A. I did.

Q. And there were several phone calls made to your phone number before you came to the marina, correct?

A. I have no idea. There was only one that I'm aware of.

Q. Okay. When you came to the marina, you met with a representative of the Coast Guard who was dealing with the pollution aspects of the case?

A. I don't recall. There were a lot of people down there. There were a lot of people, a lot of uniforms.

Q. All right. You were presented by the Coast Guard with an acknowledgment form that you were asked to sign, correct?

A. I don't recall. Quite possibly.

Q. But you're not able to say that that didn't happen, true?

A. It might have happened. I think there were a number of people who wanted me to sign things.

Q. And in the presence of Don Vivenzio, you told the Coast Guard representative that you had checked the bilges late Sunday and found no water in the boat, true?

A. Not that I know of. If I did, I misspoke myself, because I wasn't on the boat on Sunday so how could I have.

Q. So you are quite firm that you're denying that you said that in the presence of Don Vivenzio, have I got that right?

A. I'm saying -- I'm saying that if I did, I misspoke myself. The last time I checked the bilges I was on the boat was Saturday.

Q. You had had several drinks before you came to the marina that morning, hadn't you, sir?

MR. LOVEJOY: Objection.

A. No.

THE COURT: What's the objection?

MR. LOVEJOY: What relevance does this have to the sinking? Frankly, he's just trying to embarrass the witness at this point. It's been going on, actually, for a little while.

THE COURT: Well, it may be relevant. I'm going to overrule the objection. Go ahead. Did you say no? Did you answer that question?

THE WITNESS: I said no.
Q. When you testified in your deposition, you weren't able to be that sure, were you, sir?
A. Yeah. I'm not sure what I said on my deposition.
Q. You're not sure what? I didn't catch that last part.
A. I said I wasn't sure what I said at the deposition.
Q. So in your deposition, you said that you weren't in a position to rule that out, correct?
A. I'm not sure what I said at my deposition.
THE COURT: If you want to inquire about his deposition, just put his deposition testimony on the projector and show it to him.
Q. All right, sir. Can you see page 77 in front of you?
A. Yes.
Q. On that occasion -- strike that. Let me back up. You recall attending a deposition that you gave last year, correct, sir?
A. Yes.
Q. And that was September 26th, 2007, as distinct from the subsequent one you gave this year, correct?
A. Correct.
Q. On that occasion, you were placed under oath as

you were here earlier today?
A. Yes.
Q. And at that time, you swore to give true and honest testimony?
A. Yes.
Q. All right. And on that occasion, and I'm directing your attention to lines 3 through 8 --
A. Yes.
Q. -- and I'll read and ask you to follow along, sir.
Question: By the time you came down to the marina that day, on the day of the sinking, you had had at least several drink, correct?
Answer: I have no idea.
Question: Can't rule it out though, correct?
Answer: Can't rule it out.
Did I read that correctly, Mr. Picchione?
A. Yes, you did.
Q. We talked earlier today about the work that was done with respect to the turbo on the port engine. Do you recall that discussion?
A. Yes.
Q. And we talked about how the work was looked into and you had discussions with people at the marina in terms of deciding what to do and what you were willing to pay for, correct?

A. Correct. Although I doubt there was any discussion about what I was willing to pay for it.
Q. I'm not sure what you mean by that.
A. I mean by that is I'm sure I asked what it's going to cost. It's not a matter of what I'm going to pay for it.
Q. Okay. You were interested in the cost, number one, so you wouldn't be surprised, correct?
A. Correct.
Q. And you would have been interested in knowing about alternatives that might include using new parts or, for example, remanufactured parts, or, for example, salvaged parts, correct?
A. Correct.
Q. All right. And so you would have wanted to be presented with the opportunity to choose which way you wanted to go?
A. Yes.
Q. Okay. Now, you've had quite a number of items of work done on your boat at Point Judith, correct?
A. Yes.
Q. All right. And you've repeatedly had this experience of finding out that there was something that might want to be attended to on your boat and being asked whether you wanted to have somebody deal with it,

fix it, replace it, et cetera?
A. Yes.
Q. And sometimes you did, correct?
A. Most times I did. Unless it was something cosmetic or whatever.
Q. Okay. And if you approved the work, then commonly, Point Judith would make arrangements to get the parts, if necessary, and schedule the labor necessary to get the work done, correct?
A. For the most part.
Q. Okay. And depending on work schedule, availability and so forth, the process might take a few days to a few weeks?
A. Yes.
Q. Okay. And earlier when you talked about having authorized a replacement of bilge pumps on your boat in the past, the same process was employed, correct?
A. Yes. However, you know, you wouldn't bother pricing out a bilge pump. I wouldn't bother pricing out a bilge pump. Same process. I don't know how far you're going back in the process. Replacing a turbo or replacing a bilge pump is two different ball games.
Q. Sure. They're different cost items, aren't they?
A. Yes, they are. And it's my understanding, because I know people in the business, that turbos are rebuilt.

I've never heard of anyone using a salvaged turbo. And I found out basically enough that, with the smaller turbos, they are not rebuilt as airplane turbines are rebuilt and larger turbines are resurfaced.
Q. All right. But the general process of dealing with the repairs is as we've described, correct?
A. Yes. The general process is contacting someone at the yard or the shop and saying, hey, guys, this isn't working, please check it out. And if you have to replace it, replace it. I mean, you know, no one is going to argue about a bilge pump.
Q. Okay. And you've never -- strike that. Let me back up.
Immediately after this boat sank, there was some work done on pickling the engines, correct?
A. Correct.
Q. And pickling the engines is a process that's intended to reduce the chance that engines that have been submersed in salt water will end up being damaged by corrosion, am I correct?
A. That's my understanding.
Q. That's the process to try to save engines that are in boats that have sunk, correct?
A. Correct. That's my understanding.
Q. You were familiar with that back on the EVEREADY,

correct?
A. Correct.
Q. Now, that was work that was done on a very time-sensitive basis right after your boat was brought up from the slip where it had sunk, correct?
A. It didn't sink at a slip. But, yeah, it was done. I wasn't in charge of that.
Q. You say your boat didn't sink in a slip?
A. No. It didn't. Are you talking about the original -- the EVEREADY I or the EVEREADY II? Which one are we talking about?
Q. Talking about the one that sank at Point Judith on the 28th.
A. EVEREADY II. Yeah. What's the question?
Q. Has to do with pickling the engines.
A. What's the question?
Q. Point Judith did the pickling, right?
A. Correct.
Q. They handled that on a priority basis, taking people from other jobs so they could get right on the pickling?
A. I have no idea.
Q. That's what you would have expected to happen, correct?
A. That is.

Q. Putting that work to one side and out of your mind, that's the only work that you ever had done on the EVEREADY on an emergency basis, correct?
A. I don't know what you're referring to. I had some work done on the cracked head one time. They had promised the work to be done. They had promised the part was ordered. They had promised, promised, promised. And I had a very important tournament down in Montauk, New York. I had already spent a lot of money on entrance fees and prepaid dockage and tournament wages. And when I got down there at the end of the week and they said, sorry, it's not going to be done on time, because they screwed up and sent the wrong part or da-da, da-da, da-da and da-da, da-da, da-da, and I absolutely had a fit. I said I'll get the part. You get me someone who is willing to work some overtime and get it done, and I'll get the part.
We called around, got the part. I sent an employee to pick it up. They picked it up within hours of that conversation. Drove it back down to the dock and Gary stayed late and I stayed with him and replaced the head for me.
Now, you know, I call that emergency. I don't think they'd call that an emergency. I don't know.
Q. Fair enough. Let's count that one as well. So

there's the head work that you just described. And we'll count the pickling work that I mentioned to you earlier. Let's put those to one side. Those two are the only items of work that you can recall that you ever had Point Judith do on an emergency basis, true?
A. True. But I didn't have the pickling done on an emergency basis. I mean, they just knew. In fact, Don called me. I figured they would have had the engines pickled by the time Don called me, and said, you know, we better pickle these engines. And I said, yeah, you better.
Q. I'm sorry. I wasn't meaning to ask you about the pickling. I'm asking you to put those to one side. Put the pickling off the table and put the cracked head off the table, and now we're thinking about all the rest of the work that Point Judith did for you. There's nothing else that Point Judith did for you on an emergency basis, correct?
A. Not that I can think of offhand.
Q. Okay. And you've never had a bilge pump replaced on an emergency basis, correct?
A. Not that I'm aware of, no.
Q. Okay. When you had the trip out to the Dump that Mr. Lovejoy asked you about on the EVEREADY I, do you recall talking about that?

A. Yes.
Q. Okay. When that boat was recovered and brought ashore, you saw the hull of it?
A. Yes, I did.
Q. And there weren't any holes in the hull, correct?
A. No.
Q. You had -- that was a brand new boat, correct?
MR. LOVEJOY: Judge, again, I object to relevancy. It's another boat. I didn't ask him about taking that boat out to the Dump. I asked him where he used the EVEREADY II. Again, I don't think the --
THE COURT: I don't remember many questions about the EVEREADY I, actually.
MR. RAUWORTH: He actually described it at significant length, your Honor. This will be very quick.
MR. LOVEJOY: Again, I object. It's irrelevant to this second vessel that sank in the four or five day --
THE COURT: You opened the door to it. This will only take a minute. Let's get to it.
Q. That was a brand new boat, sir, correct?
A. Correct.
Q. You had that less than three months, correct?
A. Around three months.

Q. You first learned that the boat was taking on water when a friend of yours discovered two inches of water in the main cabin, correct?
A. Correct.
Q. And that water was up above the engines, correct?
A. Yeah. It was around the top of the engines.
Q. You didn't have the bilge pumps going on that boat, did you?
A. Yeah. They were all going.
Q. And you never understood how that boat sank, correct?
A. Correct.
Q. You were responsible for the safety of the people you had with you on that boat that day, correct?
MR. LOVEJOY: Again, objection, your Honor.
A. Yes.
THE COURT: Wait a second. When there's an objection, you have to stop. Overrule the objection. Go ahead.
MR. RAUWORTH: Sorry, your Honor.
Q. And likewise, when the EVEREADY went aground at Block Island, correct, you were the captain of the boat, right?
A. Yes.
Q. And the owner, correct?

A. Yes.
Q. So you were responsible for the safety of those people, correct?
A. In a sense, yes.
Q. And for the safety of the vessel itself, correct?
A. Correct.
Q. Including its seaworthiness, right?
A. Yes.
Q. And the same thing applies when the EVEREADY II went up on the jetty as was shown in the pictures we looked at a little while ago, correct?
A. Yes.
Q. And when the EVEREADY is back at the slip at Point Judith, you're still responsible as the captain and the owner, correct?
A. I believe so.
MR. RAUWORTH: Thank you, your Honor.
A. To an extent.
Q. Sorry?
A. To an extent.
Q. To an extent?
A. Yeah.
Q. Well, maybe you could explain to me what you mean by that.
A. Yeah. You know, there's a responsibility there.

I believe there are other responsible parties as well. I mean, you know --
Q. Who else?
A. Who else? You know, the marina and their personnel, whoever is in charge of the docks. They have responsibilities as well, you know, to maintain a safe dock, don't they?
Q. There was nothing wrong with the dock when the EVEREADY sank, correct?
A. I'm not saying there was.
Q. We're talking about the boat, not the dock. Do you have that in your mind?
A. Yes.
Q. All right. You were the captain, the owner when the EVEREADY was at the dock just as it was at sea, true?
A. That's true.
Q. And you were responsible for the boat in the slip just as you were at sea, true?
A. I imagine, yes.
MR. RAUWORTH: Thank you, your Honor. That's all the questions I have for this witness at this time.
THE COURT: Okay. Do you have any redirect, Mr. Lovejoy?
MR. LOVEJOY: I do, your Honor.

THE COURT: How long do you think?
MR. LOVEJOY: I think 15 or 20 minutes.
THE COURT: All right. Why don't we take our break now. Take about a ten-minute break.
(Short recess.)
THE COURT: Okay. Mr. Lovejoy, you may commence your redirect.
MR. LOVEJOY: Thank you, your Honor.

REDIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Picchione, Mr. Rauworth was asking you about being the captain and owner of your vessel. Do you remember those questions recently?
A. Yes.
Q. With respect to repairs, you hired someone to do those for you, correct?
A. Correct.
Q. And you did that consistently for a period of approximately seven years when it came to the EVEREADY?
MR. RAUWORTH: Objection. Leading.
THE COURT: Try not to lead the witness. He is your witness.
A. Yeah. With respect to your question, I -- yeah. Point Judith has done all the work on the boat.
Q. If you were told a bilge pump wasn't working, who would you go to, to replace the bilge pump?

A. I'd go to the marina.
Q. Is it fair to say when some item wasn't functioning or could you tell us who you would go to when any item wasn't functioning on your boat at the time you kept it at the Point Judith Marina?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
THE COURT: You all have to use the microphones. You're all fading out.
MR. RAUWORTH: I apologize. Objection. Assumes facts not in evidence, the assumption that all circumstances would be the same.
THE COURT: Reask your question. I'm not sure I even understood the question so go ahead and reask it.
Q. You went to Dan, the mechanic, on one occasion, correct?
A. Correct.
Q. Did you go to any other outside contractor between 1998 and 2005 with respect to the EVEREADY?
A. No.
Q. You ever receive anything in -- any communications -- strike that.
What was your assumption as to when the EVEREADY was going to be finished being commissioned in April of 2002, if any?

MR. RAUWORTH: Objection as to relevance of what his assumption might be.

THE COURT: Well, I'll allow it. Overruled.

A. I assumed on Monday was my assumption.

Q. You never got any phone calls from Mr. Vivenzio about sea trials, correct?

A. Correct.

Q. Now, when the EVEREADY was repaired in -- strike that. When it went aground in 1998, what did your insurance company contemplate doing with it initially?

A. They were going to total it.

Q. And you -- and what was your --

A. My reaction was that -- I said, well, you know, why would you total it? I said, you know, all things considered, after it had been hauled and initially inspected by Don and others, they felt that -- although the damage, you know, was significant, that it could be fixed.

And further to that, the insurance company had an adjustor there who looked it over. And I believe their major concern at the time was sogging of the hole or the core of the hull, which is typical of boats that sink, go -- or submersed under water for any period of time. The water pressure forces -- it seems to force water into the core of the hull.

So I mean, the insurance company, the adjustor, they cut a bunch of sample core holes all around the hull, didn't find any evidence of that being the case and said, okay, you know, go ahead and fix it. Obviously --

MR. RAUWORTH: Objection and motion to strike, your Honor. Narrative answer, non-responsive. Hearsay commentary on the mental state of others and expert testimony without foundation.

THE COURT: Anything else? All right. I'll grant the motion and strike the portion of the answer after the second sentence having to do with his reaction.

Q. Did Mr. Vivenzio make any representations to you about the repairs that were going to be performed by Point Judith?

A. I don't understand.

Q. Did he tell you -- you had a discussion with him about repairing the EVEREADY in 1998, correct?

A. Correct.

Q. What did he tell you that Point Judith was going to do for you?

A. It was my understanding that they were going to set everything straight. I know that they used -- you know, John does the glass work. There were various

subcontractors involved.

MR. RAUWORTH: Motion to strike the portion after the first sentence, your Honor, as non-responsive.

THE COURT: All right. I'll grant that motion to strike. Go ahead.

MR. LOVEJOY: I don't have anything further, your Honor.

THE COURT: Recross?

MR. RAUWORTH: No further questions, your Honor. Thank you.

THE COURT: All right. Mr. Picchione, your testimony is complete. You may step down. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Next witness.

MR. LOVEJOY: Mr. Kenneth Hilton, please. May the witness be excused, your Honor?

THE COURT: Is he a party or not a party?

MR. LOVEJOY: He's not a party.

MR. RAUWORTH: Mr. Picchione?

MR. LOVEJOY: He was dropped as a party on the motion to amend. Turned out we originally thought he had some unpaid bills, but they were all subrogated bills to the underwriter.

THE COURT: You have to use the mike. It's really hard to hear you.

MR. LOVEJOY: There's no claims that he has as a plaintiff.

MR. RAUWORTH: I guess that's a question of ownership of the claim and that's news to me. I'm not -- I guess I'm not sure if I understand it, how an amended complaint by one party necessarily does away with an original complaint that's in the name of two, but I guess it doesn't really matter that much. Oh, that's right. He is still a party. We have a counterclaim against him.

THE COURT: Well, it's sort of unusual to not have all of the parties present for a trial, but if you're -- I mean, it's not absolutely essential that he be here if -- I suppose he's subject to being called by the defendants in their case-in-chief, so subject to that, I think it's probably your call. If you don't wish to have him present, then I'm not going to force him to be present.

MR. LOVEJOY: You know --

THE COURT: So it's up to you.

MR. LOVEJOY: I'm going to ask him to --

MR. RAUWORTH: I would simply ask, your Honor, that comparable mercies be extended to the witnesses on

my side with scheduling.

THE COURT: That's fine.

All right. Let's get the witness sworn.

KENNETH HILTON, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Kenneth R. Hilton, III.

THE CLERK: Spell your last name.

THE WITNESS: H-I-L-T-O-N.

THE COURT: Good afternoon, Mr. Hilton.

THE WITNESS: Good afternoon.

THE COURT: You may proceed, Mr. Lovejoy.

MR. LOVEJOY: Thank you, your Honor.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Hilton, can you tell the Court, please, who you're employed by?

A. Standish Boat Yard, Incorporated.

Q. What does Standish Boat Yard do, please.

A. We sell Albin Marines. We're a full-service boatyard. We have docks, moorings, maintain boats, haul and store, and then recommission come springtime.

Q. And how long have you been in that business?

A. Approximately 35 years.

Q. Okay. How long has Standish sold Albin vessels?

A. Since 1993.
Q. And did you sell the Albin 35, which is the subject of this litigation, to Mr. Picchione?
A. Yes.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
MR. LOVEJOY: Thank you. Your Honor, Mr. Rauworth has told me Plaintiff's 57 and 58 may be made full exhibits.
THE COURT: All right. 57 and 58 will be full without objection.
(Plaintiff's Exhibits 57 and 58 admitted full.)
Q. Do you recognize the vessel that's in Trial Exhibit 57, Mr. Hilton?
A. Yes, I do.
Q. What is it?
A. That's Mr. Picchione's 35 Albin.
Q. What about the vessel that's in Trial Exhibit 58?
A. The same boat.
Q. And do you see there's a waterline in Exhibit 58 on the starboard side?
A. Yes, sir.
Q. Is that where the waterline was at the time that the vessel was sold to Mr. Picchione?

MR. RAUWORTH: Objection. I'm not clear, your Honor, if we're talking about a painted waterline or --

THE COURT: Right. I understand. I'll sustain the objection. Be a little more specific.

Q. The vessel is in a Travel Lift, is it not?

A. Correct.

Q. I'm going to ask you to look at the bottom. That's brown in color, is it not?

A. I believe it was red, but --

Q. With respect to the port exhaust in Trial Exhibit 58, is the anti-fouling paint line in the same position as when the vessel left Standish Boat Works in 1996?

A. The starboard side appears that it is. On the transom, the bottom paint was brought up to the top of the boot top. The port side is not visible.

MR. RAUWORTH: Your Honor, could we ask that this exhibit in color be displayed.

THE COURT: Yes. I think that would be helpful. Could we put the color exhibit on the projector.

Q. Can you indicate on your screen the waterline, the painted waterline that you referred to earlier in your testimony?

A. On the transom itself, sir?

Q. No. On the starboard waterline.

A. That is right below the off-white waterline.

MR. LOVEJOY: I was trying to have him mark it as we did with the previous exhibit.

THE COURT: I'm unclear -- what are you asking him? What are you saying? Let me just try to straighten this out. There's a brown section of hull, and then there's a white stripe, and then there's red. What is it that you refer to as the waterline?

THE WITNESS: The waterline is actually the bottom of the white stripe that's called the boot top and that should be close to where the waterline is established.

THE COURT: Okay.

Q. And that's in the same position as it was when the vessel left Standish, correct?

A. All except on this transom of it, the bottom paint was painted over the boot top.

Q. And you see there's a tuna tower or the bottom of it that's visible in Trial Exhibit 58, sir?

MR. RAUWORTH: Objection, your Honor. I'm really not understanding the relevance of this inquiry especially in light of the content of the pretrial memoranda which lists testimony by Mr. Hilton which apparently would -- is being described as going against Standish as a party. Standish is no longer a party. And I don't see that anything that we're doing here is,

A, disclosed by the pretrial memorandum; or, B, relevant to any of the claims that we're pursuing in the two -- the plaintiff versus defendant case.

THE COURT: All right. Well, Mr. Lovejoy, generally speaking, what's the purpose of this witness?

MR. LOVEJOY: It has to do with the tuna tower, the installation of -- Mr. Rauworth was discussing the fact that the vessel sits at the back end. I had intended to ask Mr. Hilton question about the --

THE COURT: That's fine. You can ask him. Let's go ahead.

Q. You can see in the Exhibit 58 the bottom part of the tuna tower on the EVEREADY, correct?

A. Yes.

Q. Okay. And what was installed in way of extras by Standish before the vessel was delivered to Mr. Picchione?

A. Generator, air-conditioning, all the optional electronics and the tuna tower.

Q. Okay.

A. Plus thighs and glass around the tuna tower.

Q. Are the tuna tower and generator standard options which one can put on the Albin 35?

A. The generator is available as a factory option, which we installed. The tuna tower is not a factory

option. That's an after-market option.
Q. And prior to having it installed on the EVEREADY, did you check with Albin about the propriety of putting a tuna tower on that vessel?
A. No, I did not.
Q. Did you determine it was safe to have such a tower on the vessel?
A. We had subbed it out to marine fabricators, that was their line of work, that was their expertise level, and we assumed that they knew where to place it, weights and weight distribution.
Q. And did you have any discussions with Mr. Picchione after he purchased the EVEREADY about the way it sat in the water?
A. Not that I can recollect, sir.
Q. Did you, Standish, add any material to the vessel after it was purchased?
A. To the best of my recollection, on the starboard aft corner we added lead ballasts per Albin's request.
Q. What was the purpose of the lead ballasts?
A. To straighten out the listing problem.
Q. And did that correct the listing problem you referred to?
A. Not totally. I believe we had added approximately 200 pounds of lead ballast. It straightened it out to

a certain extent, but not totally.
Q. Okay. And that ballast was to counter-balance the generator?
A. I'm not a hundred percent sure of whether it was to counter-balance the generator, but you'd have to assume so because the generator was added after the fact, but it was in the same location that Albin typically installs the generator.
Q. And besides selling vessels, what other business does Standish Boat Yard conduct, if any?
A. We maintain boats. We have fuel. We have slips, and we also have moorings. We do service work on moorings, make up new moorings, install those.
Q. And you said -- do you service vessels that are moored or docked at Standish Boat Yard?
A. Yes, sir.
Q. As part of servicing them, do you examine their exhaust hoses periodically?
A. Periodically, if they are visible, we do inspect them as much as possible.
MR. RAUWORTH: Objection, your Honor. Motion to strike. This is beyond the scope of the pretrial memorandum disclosure.
THE COURT: That's not one hundred percent binding on either party. I never treat it that way.

That's mostly for my information. So that's denied.
Q. How often do you at Standish inspect exhaust hoses?
A. Basically, every year on -- if we've been commissioned to commission the engine, that's part of the startup, make sure there's no leaks, there's no exhaust leaks, hoses are in good shape, hose clamps, no checking on hoses from heat.
Q. Mr. Hilton, are you familiar with the bilge pump switch setup on the EVEREADY?
A. Yes, I am.
Q. Can you explain your understanding of it to the Court, please.
A. Well, there was three different switches. The very top switch was to activate the automatic floats both on the forward, mid and aft bilge pump. Then there were, for each bilge pump, a manual switch so that you could bypass automatic and turn on just the manual.
Q. Would one switch override the other?
A. If you had the automatic switch off, none of the bilge pumps would operate in the automatic. The manuals were just set up for each individual bilge pump. There would be a forward bilge pump switch, a mid bilge pump switch, and an aft bilge pump switch all

manual.
Q. Okay. And could those switches be put in an off position?
A. No. There was only a two-position switch. When you turned it to the right, it would spring load it and it would return back to the idle position.
Q. And in order for the bilge pumps to operate on the auto switch, would they require a float switch?
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained. Try not to lead the witness, please.
Q. What would be required for one of the bilge pumps on the EVEREADY to work if the switch was in the auto position?
A. Could you reask that question again? I'm not sure I understood it completely.
Q. I think your testimony is if the auto switch is in the on position, the bilge pumps would work automatically?
A. Yes, sir. Through the automatic floats. And if that switch was disabled and shut off, the automatics would not work.
Q. What would happen if one of the floats wasn't present?
A. That individual, whatever float switch it was for,

if it was for the forward, mid or aft, that bilge pump would not operate. But the others would operate independently.

Q. And based on your experience with exhaust hoses, do you know what their life expectancy is generally as a result of your 30 years or so in the marine business?

MR. RAUWORTH: Objection. Assumes facts not in evidence that all exhaust hoses are all the same.

THE COURT: All right. Well, you can focus the question a little bit better. So I'll sustain that objection.

Q. Are you familiar with the type of exhaust hoses that were on the EVEREADY?

A. Yes, sir.

Q. Based on your 30 years of experience in the boatyard business, did you come to have an understanding as to what the life expectancy of such exhaust hoses is?

A. It's different in every boat. Every application is different. There's no one set thing that you can say that that hose will last five years and in another boat it may last ten years, or in a certain boat parts of that hose may only last three years. Every boat is a little bit different as far as how long it will last, how it's installed, where it's installed.

Q. Is one of the variables how often the boat is used?

MR. RAUWORTH: Objection.

Q. Tell me what the variables are if you would, Mr. Hilton.

A. Well, you have heat factor. You have chafing that may be going on. You have potential low spots where water will sit; and also when it sits, it's generating heat because it's hot exhaust, so you could end up with hot spots in the exhaust hose. When it's hot, it expands. It becomes softer, and it reduces the length of the usefulness.

Q. If the exhaust hose was sitting on a bulkhead thru-hull, how would that affect the life expectancy?

A. It would wear quicker there because that's a high vibration point as opposed to if it was free-standing.

Q. Okay. In your experience as a boatyard operator, have any vessel owners that keep their vessels docked at your marina gone to outside surveyors to inspect their vessels to see if the appurtenances are maintained properly?

MR. RAUWORTH: Objection. This has no bearing on the ability of anyone to go to a surveyor, and what individuals might do really has no bearing on the allegation of Point Judith in this matter. So what's

being called for is anecdotal evidence, essentially.

THE COURT: Well, I think the issue is what the obligations of Mr. Picchione would be. You made an issue of this in your examination of him.

MR. RAUWORTH: Well, I raised it as being an opportunity for him to do that.

THE COURT: Well, if all you're suggesting is the opportunity existed without the obligation, then, okay, I'll sustain the objection if that's what your position is.

MR. RAUWORTH: I guess I would withdraw the objection.

THE COURT: Why don't you reask your question.

Q. What's your understanding of the practice of vessel owners going to outside surveyors to examine their vessels for standard or regular maintenance issues while the vessel is at Standish Boat Yard?

MR. RAUWORTH: I have a separate objection, your Honor, and that is that we're doing expert testimony here, and there was no expert disclosure as to Mr. Hilton as an expert.

THE COURT: Well, I think it's more in the line of lay opinion testimony. I don't think he's tried to or has suggested that he is an expert. So let me hear the -- let's hear the testimony.

A. I would say --

THE COURT: Do you have in mind the question? Do you understand the question?

THE WITNESS: Yes, I do.

THE COURT: All right. Go ahead and answer it.

A. I would say that's never occurred at Standish Boat Yard where an individual owner has hired a surveyor to check the quality or regard to the satisfaction of the work to make sure it was done in a professional manner, if that was the question.

Q. Okay. And typically, who do the boat owners that dock their vessels at Standish Boat look to perform, you know, commissioning and standard maintenance on their vessels?

A. Close to 90 percent of our customers look to us, Standish Boat Yard, to do the commissioning of their yachts.

Q. Can you tell us what commissioning comprises of at Standish Boat Yard?

MR. RAUWORTH: Objection. This has no relevance to the contractual relations between Point Judith and Mr. Picchione.

THE COURT: Well, if commissioning -- if there's a standard procedure for commissioning in the industry, then he can testify to it. If it's different in every

boatyard, from one boatyard to another then not. So you need to ask him that question first.
Q. Mr. Hilton, is there a standard in the marine industry for commissioning vessels such as 35-foot Albins?
MR. RAUWORTH: I object to that, your Honor, again, on the basis that it calls for expert testimony that has not been disclosed.
THE COURT: All right. Let me find out, first of all, you need to establish whether he has a knowledge of what the industry is and the industry standard, and then whether there's a standard practice within the industry, and then we'll see. Start over again.
Q. Are you familiar with the standard for performing commissioning on vessels such as pleasure craft like the EVEREADY in the area of Narragansett Bay, Rhode Island?
MR. RAUWORTH: Objection. Assumes facts not in evidence. It assumes the fundamental point that there is a standard.
THE COURT: I'll overrule that objection. Do you remember the question?
A. Basically, the commissioning of a boat, I guess, I'm assuming that most yards have their own

commissioning check list.

THE COURT: Let me stop you there. Here's the -- the question is this. Have you worked at other yards besides Standish?

THE WITNESS: No, sir.

THE COURT: You worked at Standish for your entire career?

THE WITNESS: Correct.

THE COURT: You're familiar with the process for commissioning boats that exist at Standish?

THE WITNESS: Yes.

THE COURT: Are you familiar with the process for commissioning boats that exists at other boatyards?

THE WITNESS: No, sir.

THE COURT: Do you know whether the practice with respect to how boats are commissioned is uniform from one boatyard to another boatyard?

THE WITNESS: I'm not familiar with whether it's a -- it's not like a uniform commercial --

THE COURT: You're only familiar with what goes on at Standish?

THE WITNESS: Yes, sir.

THE COURT: Okay.

MR. LOVEJOY: Can I ask a couple of follow-up questions, your Honor.

THE COURT: You can try, but he's only familiar with what the practice is at Standish, which is not really relevant or helpful to what goes on at Point Judith. But if you think you can make it relevant, I'll give you a chance.

MR. LOVEJOY: Thank you, your Honor.

Q. Are there publications that are circulated within the marine industry and in Rhode Island and in New England that contain commissioning lists and what yards should do in commissioning vessels?

A. I'm sure there are, but I'm unfamiliar with those.

MR. LOVEJOY: Thank you, your Honor.

THE COURT: Is that it?

MR. LOVEJOY: That's it, your Honor.

THE COURT: Is there any cross?

MR. RAUWORTH: Yes, there is, your Honor. Thank you.

CROSS-EXAMINATION BY MR. RAUWORTH

Q. Good afternoon, Mr. Hilton. My name is Mike Rauworth. I think we've met previously in this case.

You had your deposition taken earlier on in the case, correct?

A. Yes, sir.

Q. And Mr. Lovejoy and some others asked you questions about some of the issues in this case,

correct, sir?
A. Yes.
Q. That was at a time that Mr. Lipman was representing Standish, correct?
A. Correct.
Q. By the way -- strike that.
Actually, let me put this on the screen. You were asked some questions about inspecting hoses that are kept at Standish marina. Do you recall being asked about that at the deposition?
A. Yes.
MR. LOVEJOY: Your Honor, I object. The witness is here to answer questions.
THE COURT: Yes. That's true. That's not a proper way to use the deposition. You can cross-examine him on his testimony and use the deposition if necessary.
MR. RAUWORTH: Right.
Q. The fact is, Mr. Standish -- I'm sorry, Mr. Hilton, at Standish marina with respect to exhaust hoses for the Albin 35, it's Standish's practice to inspect those hoses if they're fully accessible, correct?
A. Correct.
Q. And in fact, on the model that's called the 35

Command Bridge, it was not possible to get access to view the exhaust hoses, the longest exhaust hose because of the fuel tanks or -- unless you took the deck off, correct?
A. A full inspection, that's correct.
Q. Okay. And you all at Standish have never conducted an examination of the section of Albin 35 exhaust hose that leads from the engine room bulkhead to the muffler under circumstances where the deck was in place and where the fuel tanks around it were in place, correct?
A. Correct.
Q. And earlier in this case, there was an attendance at the EVEREADY at Certified Sales in Warwick, correct?
A. Yes.
Q. And a number of parties gathered there in June of 2007, correct?
A. Yes.
Q. And you were there, right, sir?
A. No, sir. I was unable to attend.
Q. Okay. You were represented by somebody else from Albin?
A. Mr. Lipman. Also the Albin representative at the time was there. I believe the Albin lawyer. I'm not a hundred percent sure.

Q. Right, right. Okay. Let me withdraw that.
Now, you talked about the bilge switching system on the Albin 35. Do you recall that?
A. Yes.
Q. You mentioned that there was an automatic switch that controlled the automatic function for three pumps, correct?
A. Correct.
Q. And separate manual switches, one for each pump?
A. Yes, sir.
Q. For a total of four, correct?
A. Yes.
MR. RAUWORTH: May I approach the witness, your Honor?
THE COURT: Yes.
MR. RAUWORTH: I'm handing the witness Exhibit Triple L -- handing the witness an exhibit that's been marked as triple N.
Q. Mr. Hilton, you recognize Exhibit Triple N as a representation of the DC power center of the EVEREADY?
A. Yes, sir.
Q. Okay. That's a boat that you sold, correct?
A. Correct.
Q. And actually, that was the very first Albin 35 that was produced, correct?

A. I don't believe it was the first one that was produced.
Q. It was the first one you sold?
A. Yes, sir. First one.
Q. Okay. Now, take a look at Exhibit Triple N, bottom right. Are you with me there?
A. Yes.
Q. You see on the bottom right -- let me just place this before the -- the bottom right, you see a switch that's marked "bilge pump," correct?
A. Yes.
Q. And above that you see another switch that's marked "bilge pump," correct?
A. Yes.
Q. Okay. And above that, you see another switch that has its factory label covered over, correct?
A. Correct.
Q. Okay. Three switches, right?
A. Yes.
Q. You told us about four a moment ago.
A. I remember Nick mentioning that he had three bilge pumps. In this vintage, now that I'm looking at the panel, they only had a forward bilge pump and the mid bilge pump. It wasn't until proceeding years that they installed the third aft bilge pump. On the current

production model, that's the way it is. But on Nick's boat from the factory, it was set up exactly the way it's portrayed there.
Q. So you're saying that the EVEREADY as it stands today only has two bilge pumps?
A. That I'm not sure of. I've never inspected the boat after I serviced it in 1998.
Q. Okay.
A. It could be -- I don't know. From what I see there, there's just two bilge pumps.
Q. You assume there's two bilge pumps?
A. That's just an assumption, correct.
Q. Okay.
A. When it left our marina, there was only two bilge pumps, forward and mid, indicated by this panel.
Q. But you told us earlier that there were three bilge pumps and four switches.
A. I was mistaken.
Q. Okay. And you're not in a position to tell us if you're mistaken about the assumption of two bilge pumps, correct?
A. No. It either had the two, which in the earlier models of Albins they were only installing two in prior years. I'm not sure of the exact date they started, it was either in '99 or 2000, they started installing

three bilge pumps in the whole production line of Albins.
Q. Are you saying that from its inception, Mr. Picchione's boat was built with only two bilge pumps?
A. As factory standard, yes.
Q. But you don't -- you're assuming that from the time frame that it came out, correct?
A. Correct. From the time frame it came out of the factory to our place when Mr. Picchione took delivery of it and the subsequent years that we serviced it. After '98, I'm not sure what was added, whether Nick had added something else, but as this panel indicates, there's only two bilge pumps, one automatic to control the two bilge pumps.
Q. To say that there's only two bilge pumps is making some assumptions about the way that the thing is wired, correct?
A. To make an assumption to present day, yes.
Q. Well, as it stands right here, you're looking at a switch panel, correct?
A. Correct.
Q. You can't tell how many -- you can't tell how this is wired to bilge pumps, can you?
A. I know how it was wired from the factory. Can I

comment on today, the way it was wired? No.
Q. And you -- well, let me shift for a moment.
This third switch from the bottom, do you see that?
A. Correct.
Q. So what was the original label on that?
A. Just the -- it said, when it was delivered from the factory, it said three bilge pumps. So that Nick understood that he had to have that auto float switch on at all times to make the bilge pumps operate in the automatic mode, we labeled that, because Nick had confusion on that in the beginning. So I labeled it auto and he had to keep it on and that helped him remember the fact that that had to stay on and someone else would be able to identify it. But from the factory, it didn't have that label.
Q. Didn't have which label?
A. The automatic float.
Q. So coming out of the factory as you just mentioned, it had a label, you say that said three bilge pumps?
A. Correct. All three labels were bilge pumps.
Q. The top one says three bilge pumps auto and the other two say bilge pump?
A. No. All three switches were identical to the two

bottom switches. If you took the auto -- I can't make out what it says "auto" on. If you took that off, underneath that it would say bilge pump, looking exactly like the other two bottom labels.
Q. Right. You said that that third from the bottom switch controlled three bilge pump float switches?
A. Just two. I corrected myself now that I see the panel.
Q. Right.
MR. LOVEJOY: No objection, your Honor.
Q. Showing you Exhibit G. I'll put it on the screen.
THE COURT: Are you moving these triple N?
MR. RAUWORTH: Yes, your Honor. I apologize.
THE COURT: All right. That will be full without objection.
(Defendant's Exhibit NNN admitted full.)
THE COURT: Now we're on G?
MR. RAUWORTH: G as in golf.
THE COURT: Okay.
Q. Turning to the second page of Exhibit G, have you got that, Mr. Hilton?
A. Yes.
Q. All right. If you look at the two columns of text up at the top right, at the top of the right-hand column, there is a series of about eight items. Do you

see those?
A. Yes.
Q. And there's an inverse indent that says "Main salon galley area," do you see that?
A. Correct.
Q. Where my finger is. And just above that is an entry about auto bilge pumps, three?
A. Correct.
Q. Okay. This is the specs on the boat that your firm sold to Mr. Picchione, correct?
MR. LOVEJOY: Objection. There's been no foundation to that.
THE COURT: Well, you need to ask him if he recognizes this document, first of all.
Q. You recognize this document, correct, Mr. Hilton?
A. Yes.
Q. Right. This was, in fact, provided to your counsel in production, document production earlier in this case by Mr. Lovejoy, wasn't it?
A. I believe so.
Q. Okay. So that shows three auto bilge pumps, doesn't it?
A. It does, but one thing it doesn't show is the copyright of the Albin 35 convertible sedan. This could be a current brochure, whereas in the original

brochure it's stating something different. Also, there's a disclaimer that isn't visible. It says prices and specifications subject to change without notice. That's not appearing on there.

Q. And you see at the top -- see in the upper left-hand corner of the screen now, fax legend June 17th, '07?

A. Right.

Q. That's a fax to your firm, correct?

A. Yes.

Q. June 17th, '97. So that is a document that was obviously in existence June 17th, 1997, correct?

A. It appears that way, yes, sir.

Q. Right.

THE COURT: Are you moving this exhibit?

MR. RAUWORTH: Yes, I am, your Honor.

THE COURT: Is there an objection?

MR. LOVEJOY: No objection, your Honor.

THE COURT: All right. Exhibit G will be full.

(Defendant's Exhibit G admitted full.)

Q. Placing on the screen, Mr. Hilton, a Standish Boat Yard, Inc. invoice 00104.

MR. RAUWORTH: And your Honor, this was not included in our exhibit list. I was proceeding on the basis of the disclosure of Mr. Hilton's testimony,

which in no way mentions bilge pump wiring and was disclosed as testimony --

THE COURT: That's fine. Go ahead. So just mark this for identification as defendant's next in line, which would be triple Z. Or I'm sorry, triple W. Do you want to ask your question?

MR. RAUWORTH: I will. I'm just trying to get this.

Q. Mr. Hilton, can you see the item that's numbered 12 toward the bottom of the screen?

A. Yes.

Q. Okay. This, by the way, is an invoice from your firm, correct?

A. Yes, sir.

Q. Okay. And this says, "Install float switch forward bilge pump correctly," doesn't it?

A. Yes.

Q. Okay. Standish made changes in the original configuration of the bilge pumps on this boat, true?

A. No.

Q. And help me understand how it is you're able to say that with that much certainty.

A. Because we were just repositioning the float switch so it wouldn't cycle. What was happening, the float switch was staying on because Albin installed it

in the incorrect position so as a result when the boat was in the water, the bilge pump would recycle. It would come on through the float switch, then when it shut off the water would cycle back and keep operating the float switch and the bilge pump; so, therefore, we had to reposition the float switch so that it would be in proper alignment through a shim underneath the float switch. It's a common occurrence that does happen because all bilges aren't perfectly level. And it has to be level so the float switch and the automatic side of the pump come on at the correct time.

Q. All right. So if I'm understanding your most recent testimony correctly, contrary to what you said in your deposition, you're now saying that the EVEREADY, when your firm last worked on it, had only two bilge pumps; is that correct?

MR. LOVEJOY: Objection. He's asking him about --

THE COURT: All right. I will sustain the objection. It's an improper use of the deposition. If you want to impeach him, then just impeach him with the deposition.

MR. RAUWORTH: Fine, withdraw the question, your Honor.

THE COURT: If you don't understand his

testimony, you can ask him a follow-up question.
Q. Your testimony today is when you last worked on the EVEREADY, it had only two bilge pumps, correct?
A. To the best of my recollection, yes.
Q. Okay. That sounds like something less than completely certain. Have I got that right?
A. Well, through the exhibit that you had shown before, it indicates only two bilge pumps so it would have to be, from the evidence you displayed, it can only be two bilge pumps.
Q. And you are able to say that as a matter of inference, correct, not observation?
A. Based on evidence in that panel that you had, it would be definitely only two, unless there was another panel in another position that wasn't photographed.
THE COURT: The question -- let me just try to make this clear. The question is do you actually remember whether this particular boat had two bilge pumps, or are you making a conclusion based on the things you've seen today and the documents in evidence and so forth that leads you to a conclusion that it had two bilge pumps? That's really the distinction that counsel is trying to get at.
THE WITNESS: Okay. I'm making it from the conclusion of the panel that was up on the screen.

THE COURT: So you don't have any specific personal recollection of two bilge pumps being there, but you're concluding that it was two based on the panel or anything else. Nothing right or wrong on this. Just trying to be clear whether you have actual recollection or you're drawing a conclusion from something.

THE WITNESS: I would have to honestly say that it would be a guess because in the earlier years, there were only two. In the prior years, there were three so I'm not a hundred percent sure whether there was two or three.

THE COURT: Okay. I understand. Thank you.

THE WITNESS: You're welcome.

Q. And if there were -- if you were to go today to the EVEREADY and find three bilge pumps aboard and see the panel that we illustrated to you in that exhibit a few minutes ago, you would have to conclude that there's something non-standard about the way that installation is done, correct?

A. Correct.

Q. Okay. In other words, it wouldn't add up in terms of your own range of experience?

A. Correct.

Q. Okay. And looking at the -- do you still have

Exhibit NNN in front of you, Mr. Hilton?
A. Yes.
Q. Let me put it on the screen once again.
MR. RAUWORTH: I'm sorry for the annoyance here, Judge. The zoom function isn't working so I'm trying to get this lined up.
Q. So you have the original exhibit in front of you, don't you, Mr. Hilton?
A. Yes.
Q. And you can see that I've displayed a part of it with this viewer thing here. The breakers or the switches that you see in this illustration, Exhibit triple N, these all look the same, right?
A. Yes.
Q. Okay. And the ones in the upper range, the five top ones, those are for cabin lights, correct?
A. Yes.
Q. And you would not use a spring-loaded breaker for cabin lights on a boat, correct?
A. Correct.
Q. That would be bizarre marine practice, true?
A. True.
Q. Okay. And you don't know today what the wiring is of the EVEREADY as to bilge pumps, correct?
A. Correct.

Q. You've not been aboard the boat, correct?
A. Correct.
Q. And you don't know today what the characteristics are of the breakers that are illustrated in Exhibit triple N, correct?
A. Correct.
Q. All right.
MR. RAUWORTH: That's all I have for this witness, your Honor. Thank you.
THE COURT: Would you leave that up there for a moment.
MR. RAUWORTH: Oh, I beg your pardon.
THE COURT: Thank you. I want to ask you a couple of questions. Did you put that piece of tape on there that says auto on?
THE WITNESS: Yes.
THE COURT: Okay. And so you put that on when it was delivered?
THE WITNESS: When Nick, Mr. Picchione, accepted delivery, yes.
THE COURT: So does that mean that that switch is the switch that runs all the bilge pumps, how ever many there were, in an automatic fashion, that is with the floats?
THE WITNESS: Correct.

THE COURT: And you had done the work to fix up the floats so that they were operating correctly?

THE WITNESS: Just the forward one.

THE COURT: Just the forward one?

THE WITNESS: Yes.

THE COURT: Were there automatic switches on the other bilge pump or pumps?

THE WITNESS: They had one automatic switch, the one you see with the label that I made up.

THE COURT: I'm sorry. That was my fault. Were there floats on the other bilge pumps?

THE WITNESS: Yes, sir. And they were both controlled through this one switch that tied in both the floats through circuits on the one switch.

THE COURT: Did you do that, tying in those circuits on that switch or was that factory-installed?

THE WITNESS: Factory-installed.

THE COURT: Why did you need to put that piece of tape there? You said that he was having trouble with it?

THE WITNESS: That's part of it. And I can understand his trouble because now he has three labels that says bilge pump, where one, that one that we labeled was an automatic one. It wasn't actually a bilge pump. It was bilge pump float switch, sir. So

it was confusing from Albin.

THE COURT: Okay. Thank you.

THE WITNESS: You're welcome.

THE COURT: Redirect?

MR. LOVEJOY: Thank you, your Honor.

REDIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Hilton, you referred to bilge pumps recycling if the float switch wasn't in the proper position, correct?

A. Correct.

Q. What happens when a bilge pump continuously recycles?

A. The bilge pump comes on, goes off, comes on, goes off. It's irritating when you're trying to sleep and that was basically the problem because the bilge pump was in the forward locker or forward most sump, and the center line between berth was right there. So it would be very irritating if you were trying to sleep at night if it kept recycling.

Q. Is there anything else? What happens to the water if it goes out and it's discharged or there's no water in the line?

A. Some will discharge but it shuts off and it will be -- the bilge pump exit isn't a perfect straight run so it usually goes uphill above the waterline first and

then out the side of the hull. When the bilge pump shuts off, then the water that's left in there that couldn't exit out, drains back. That's where you'll get the recycling.

Q. Okay. If the thru-hull fitting is below the waterline, would it back-siphon?

A. Yes, it would.

Q. What does back-siphon mean, sir?

MR. RAUWORTH: Objection. This is beyond the scope of the cross.

THE COURT: Well, that's true. It is. So I'll sustain the objection. Please use the microphone. I can barely hear you.

MR. LOVEJOY: I think I'm discussing this recycling phenomena that the witness was responding to with Mr. Rauworth. I'm trying to get his complete testimony on the recycling aspect that was brought up on counsel's cross-examination.

MR. RAUWORTH: Your Honor, I simply asked him what they had done with that particular bilge pump. Now, we're getting into the theory of something completely different.

THE COURT: Well, you did raise the issue of recycling. That is correct. You did bring that up. You put the exhibit on the projector, which, by the

way, did you want to move that exhibit? I'm not sure that was ever moved.

MR. RAUWORTH: Yes, I'm sorry. I thought that was taken in.

THE COURT: Is there any objection to that?

MR. LOVEJOY: No, your Honor.

THE COURT: So triple W will be full.

(Defendant's Exhibit WWW admitted full.)

MR. RAUWORTH: If I may, your Honor, the inquiry I asked him to note simply says, "Install float switch forward bilge pump correctly."

THE COURT: Right. But he gave a description of why he had to do that work so I'm going to allow the question. So I'll overrule the objection. Go ahead and reask your question so the witness remembers what you're asking.

Q. Sir, if the thru-hull -- bilge line thru-hull fitting is below the waterline and this recycling occurs, what happens to the water that goes up and comes back?

A. Well, it's below the waterline and the hose is a direct shot down, probably will back-siphon, just act as a siphon, fill up the bilge and the bilge pump will continually be going.

Q. So in effect, it takes water into the vessel from

the --

MR. RAUWORTH: Objection. Leading.

THE COURT: I'll sustain the objection but you need to explain what you mean by back-siphon in this context.

Q. Can you do that, Mr. Hilton? Can you explain what back-siphoning is?

A. It's similar to when you -- something that everybody could relate to, I guess, is when you're siphoning out a gas tank, you create a draw and then it just continues to flow. Essentially, the theory is the same if the thru-hull is below the waterline, it will siphon through just as gasoline will siphon out of a tank.

Q. Okay. And in this case, it's going in the wrong direction, correct?

A. Correct.

MR. LOVEJOY: Okay. I don't have anything further, your Honor.

THE COURT: Any recross?

MR. RAUWORTH: Yes, your Honor.

RECROSS-EXAMINATION BY MR. RAUWORTH

Q. Mr. Hilton, the siphoning you just described when Mr. Lovejoy was asking you questions has nothing to do with the float switch work that you did that was on the

invoice that I showed you?

A. Correct.

MR. RAUWORTH: Thank you. If we may, your Honor, after the close of the proceedings, we'll put a marker or a sticker on this most recent exhibit and pass it to the clerk, and I understand that's been admitted in full.

THE COURT: All right. That's fine. I need to ask you a couple of follow-up questions. I'm not sure it matters, but I'm not sure that I fully understand the point about the back-siphoning.

And so are you saying that if the exhaust from the bilge pump is below the waterline, that's when this back-siphoning can occur? That's what you're saying?

THE WITNESS: Correct. The actual thru-hull, if that was submerged under water.

THE COURT: The thru-hull meaning that's where the pipe goes through the hull and distributes the water from the bilge?

THE WITNESS: Yes.

THE COURT: So if that were submerged and below the waterline, it would act as a siphon and pull water in instead of sending water out. That's what you're saying.

THE WITNESS: Correct.

THE COURT: And just to be clear, none of the work that you did with respect to these pumps and the automatic float was directed to correct that problem or to address such a problem on the EVEREADY; is that right?

THE WITNESS: That's correct. The thru-hull or the exit tube was not above -- excuse me, was not below the waterline. It wasn't submerged. It was above the waterline.

THE COURT: Okay. Very good. Thank you. You may step down. Your testimony is complete.

All right. I think we're going to call it a day. I have another matter at 4:30. So we will begin tomorrow at nine o'clock.

MR. RAUWORTH: Your Honor, we had discussed -- well, perhaps this is a matter of no controversy --

THE COURT: We can go off the record. I don't think we need to do scheduling on the record.

(Discussion off the record.)

(Court concluded at 4:30 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

MAY 29, 2008

________________________________________

Date