IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| NORTHERN INSURANCE COMPANY, ET AL | * 06-190 |
| | * MAY 13, 2008 |
| VS. | * VOLUME 2 |
| ALBIN MANUFACTURING, ET AL | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(BENCH TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: FREDERICK A. LOVEJOY, ESQ.
Lovejoy & Associates
1536 Westminster Street
Providence, RI 02909

FOR THE DEFENDANT: MICHAEL J. RAUWORTH, ESQ.
and CARL E. FUMAROLA, ESQ.
Cetrulo & Capone, LLP
Two Seaport Lane
Suite 1000
Boston, MA 02110

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

I N D E X

| WITNESS | PAGE |
|---|---|
| JOSEPH STROKER | |
| Direct Examination by Mr. Lovejoy: | 5 |
| Cross-Examination by Mr. Rauworth: | 37 |
| Redirect Examination by Mr. Lovejoy: | 45 |
| Recross-Examination by Mr. Rauworth: | 48 |
| HENRY SMEDBERG, III | |
| Direct Examination by Mr. Lovejoy: | 56 |
| Cross-Examination by Mr. Rauworth: | 63 |
| DON VIVENZIO | |
| Direct Examination by Mr. Lovejoy: | 65 |
| Cross-Examination by Mr. Rauworth: | 139 |
| Redirect Examination by Mr. Lovejoy: | 198 |
| Recross-Examination by Mr. Rauworth: | 201 |

PLAINTIFF'S EXHIBITS

| | | |
|---|---|---|
| 1 | - | 59 |
| 3 | - | 99 |
| 4 | - | 67 |
| 5 | - | 68 |
| 7 | - | 86 |
| 8-37 | - | 89 |
| 59 | - | 116 |
| 61 | - | 120 |
| 62 | - | 117 |

I N D E X (Continued) PAGE


| | | |
|---|---|---|
| 60 & 64 | - | 74 |
| 64A | - | 61 |
| 65 | - | 85 |
| 86, 87, 98, 100 & 101 | - | 79 |
| 91 | - | 198 |
| 104 | - | 89 |
| 118, 119, 120 | - | 90 |

DEFENDANT'S EXHIBITS

| | | |
|---|---|---|
| A | - | 194 |
| N | - | 182 |
| O | - | 186 |
| X | - | 187 |
| EEE | - | 152 |
| EEE-1 | - | 152 |


__________________________

THE COURT: Good morning. Are you ready to call your next witness, Mr. Lovejoy?

MR. LOVEJOY: Yes, I am, your Honor.

THE COURT: Okay.

MR. LOVEJOY: Mr. Joseph Stroker, please.

JOSEPH L. STROKER, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Joseph Lewis Stroker. S-T-R-O-K-E-R.

THE COURT: Good morning. How do you say your last name again?

THE WITNESS: Stroker.

THE COURT: Good morning. You may inquire, Mr. Lovejoy.

MR. LOVEJOY: First of all, your Honor, I'd ask this witness be treated as a hostile witness and that I be allowed to ask him leading questions.

THE COURT: Is there any objection?

MR. RAUWORTH: Well, your Honor, the witness is not presently an employee of Point Judith. He was at the time of the events.

THE COURT: Well, why don't you just begin your examination. If I think you've established a reason to

allow that, I will.

MR. LOVEJOY: Okay, your Honor. I'd like to make one other point. At the deposition of Mr. Stroker, Mr. Rauworth refused to produce certain documents based on attorney-client privilege. So whether he's no longer an employee or not, Mr. Rauworth represented that he was representing him as a client at that deposition.

MR. RAUWORTH: Your Honor, that was because I had spoken with Mr. Stroker, and he asked to have my help in speaking for his interests during the deposition. I agreed to do that. The only document that we were reluctant to provide at the time has since been provided to Mr. Lovejoy.

THE COURT: Okay. Very well. Proceed with your examination.

MR. LOVEJOY: Very well.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Stroker, can you tell the Court your educational background, starting with high school, please.

A. Yes. I attended Warwick Veterans Memorial High School. I also attended New England Tech.

Q. What year did you graduate from high school, please?

A. 1993.
Q. What year did you graduate, I heard the last part, technical school?
A. It was 2003.
Q. What courses did you take at the technical school, sir?
A. I took Marine Tech, associate program.
Q. And have you taken any additional training since going to the marine technical school?
A. I took some Mercury training and some Volvo and Yanmar training course.
Q. Okay. And all of those courses relate to working on those brand name engines that you referred to?
A. Yes.
Q. Besides those engine certification courses you took, have you taken any other training after marine tech?
A. No.
Q. Can you give us your work experience now, please.
A. I worked for Point Judith Marina for approximately three years.
Q. Excuse me. What three years are those, sir?
A. I believe it was 2002 to 2005, I believe. And from 2005 until the present, I'm employed for Brillo Yacht Yard.

Q. And what about the time prior to 2003?
A. I'm sorry?
Q. Were you employed prior to 2003 with Point Judith?
A. No. Not with Point Judith. I was employed but not in the marine engine repair field. Do you want to know -- I was employed by Winstead Marina before that from approximately '97 till 2002.
Q. What did your duties entail at Winstead Marine?
A. I worked on a pile driving barge and marina maintenance. Maintenance of all the plumbing and electrical at the marina.
Q. Any jobs prior to Winstead Marine?
A. Yeah. Now you're going back. I have to try and think about it. Yes. I worked for Standish Heating and Air-Conditioning for approximately a year-and-a-half. That was probably about 1995 to '96.
Q. Mr. Stroker, you're familiar with a 35-foot Albin called the EVEREADY, correct?
A. Yes.
Q. And it was owned by Mr. Picchione, correct?
A. Correct.
Q. And you had occasion to do spring commissioning on that vessel in April 2005, correct?
A. Correct.
Q. And you attended on the vessel and did that spring

commissioning on April 22nd, 2005, correct?

MR. RAUWORTH: Objection, your Honor. Ambiguous as to the particular meaning of the term "commissioning" in the context of this case.

THE COURT: Well, you did need to lay that out. I'll overrule the objection, but it is, I think, important that you get to the understanding of what commissioning is.

MR. LOVEJOY: Okay, your Honor. May I approach the witness, your Honor?

THE COURT: Do you want him to answer that last question? Do you want to withdraw it and --

Q. What comprises commissioning of a vessel at Point Judith Marina in the spring of 2005, Mr. Stroker?

MR. RAUWORTH: Objection. Because as to -- well, the question assumes facts not in evidence to the effect that all commissionings are the same, even in 2005. It's generic as to Point Judith across the board.

THE COURT: Well, I'm not sure I see that point, but why don't you take him back and start at the beginning with what he did for Point Judith, and then work from there. So I'll sustain the objection.

MR. LOVEJOY: May I approach the witness?

THE COURT: Yes.

Q. Mr. Stroker, I've handed you Trial Exhibit 6. Do you recognize the handwriting?
A. Yes. I saw this at the deposition, also.
Q. And that's a notation of what you did with respect to the EVEREADY in April 2005, correct?
A. Yes. That's correct.
Q. And when you went on --
MR. LOVEJOY: May I approach the witness again?
THE COURT: Yes.
Q. When you went on board the vessel in April 2006, you performed work on the bilge pumps, correct?
A. No. I didn't perform work on the bilge pumps.
Q. You looked to see if -- check if the bilge pumps were operational, correct?
A. According to my notes --
Q. My question is did you check to see if the engine room and the forward bilge pump were operational?
A. Yes.
Q. And did you examine the bilge pump switches on the vessel when you arrived?
A. I don't remember if I examined the bilge pump switches. It was three years ago, but I do remember from what I have written here on the work order that one of the pumps had a problem and wouldn't stop running. That pump --

Q. My question is did you at some point in time look at the position of the bilge pump switches on the panel?
A. I'm sure I did.
Q. And you adjusted the position of some of the switches on the panel, correct?
A. As I said, according to my notes, it looks like I turned off one of the pumps that wouldn't stop running.
Q. And did you leave the other two switches in the on position?
A. I'm not sure how the panel was set up, but I did have, from my notes, again, bilge pump was set to auto, and there was also another pump that was on a float switch. So there was one pump that I turned off, according to my notes here.
Q. I'm asking you to look at the exhibit in front of you, Triple N in evidence. Do you see the three switches, the three tags at the lower half of the exhibit?
A. Yes. This is from the EVEREADY, this panel?
Q. Do you recognize this as the bilge pump switches that you adjusted in April of 2005?
A. I work on a lot of boats. It's been three years. I can't be positive about this panel you're showing me. I mean, I can't remember this was on the EVEREADY or

not. How am I supposed to remember that from three years ago? You're just showing it to me now. So if you're saying this is from the boat, then it must be.
Q. But you don't know if this is from the EVEREADY or not as you sit here today?
A. No. I don't remember this panel, in particular.
Q. Do you remember how many bilge pump switches you saw on April 22, 2005?
A. I don't remember how many bilge pump switches I saw. I remember what I have from my notes, what I have written down, according to this, but to sit here and tell you that I remember everything about this panel from three years ago, I'd be lying to you.
Q. Well, you turned off -- do you remember how many switches were on the panel?
A. I just answered your question. I said I think there was three pumps, but I can't be positive how many switches there were on the panel.
Q. How are pumps normally wired? Are they --
MR. RAUWORTH: Objection.
THE COURT: Sustained.
Q. Your notes reveal that you turned one switch to the off position, correct?
A. Correct.
Q. And you turned the auto switch to the on position?

MR. RAUWORTH: Objection. The document speaks for itself, your Honor.

THE COURT: That's correct. If you're just going to go through the document, it speaks for itself, but you can certainly use the document to try to refresh his recollection of what he actually did. That's fine. If he doesn't remember, he doesn't remember. So you have to figure out whether he remembers or not.

Q. How many bilge pumps do you remember being on the EVEREADY?

A. I want to say three. I can't be a hundred percent positive.

Q. I'm going to represent to you that there's been testimony that this is the panel with the bilge pump switches for the EVEREADY. Now, you turned off one bilge pump switch. Do you remember whether it's the --

MR. RAUWORTH: Objection, your Honor. The witness is not competent to testify to something based on a representation of counsel.

THE COURT: Well, he may or may not be. I don't see that as a problem. Overruled. Do you understand the question?

THE WITNESS: Sorry. Can you repeat the question?

Q. There's an auto switch, do you see that on the right-hand side of the exhibit, Triple N?
A. Yes.
Q. There's a bilge pump switch directly below that, correct?
A. Correct. Two.
Q. And there's another bilge pump switch below that one, correct?
A. Yes.
Q. Can you tell us which bilge pump switch you turned off?
MR. RAUWORTH: Objection. Foundation. Assumes facts not in evidence that these amount to the only bilge pump switches with respect to the vessel.
THE COURT: Overruled.
A. I can't be positive which one I turned off. I have it written down that the engine room would not stop running and I set that particular switch to off, but I can't tell you which switch it was according to this panel. There's three there and none of them are labeled engine room, so --
Q. Would there be any reason for you to shut off the switch that went to the forward bilge pump?
A. Not if there was no problem with it.
Q. Did you remember finding a problem with the

forward bilge pump?
A. If I did, I would have had it written on this work order, so I would have to say no.
Q. Okay. You would have left the switch that went to the forward bilge pump in the on position?
MR. RAUWORTH: Objection. Calls for speculation, your Honor.
THE COURT: He does not know which switch he turned off.
MR. LOVEJOY: I understand that. But I think -- maybe I'll ask another question.
Q. One of these switches -- it was your understanding at the time that one of these switches went to the forward bilge pump and one of the bilge pump switches went to the engine room bilge pump?
MR. RAUWORTH: Objection, your Honor. Mischaracterizes the testimony.
THE COURT: Let's just ask him what he remembers as to how the bilge pumps were set up. He says he thinks there were three bilge pumps. Do you remember how they were set up in terms of the switches and the various bilge pumps?
THE WITNESS: I can't be positive how this thing was wired and which switches controlled which pumps according to this panel. As I said, it was a long time

ago. All I can tell you is what I have written down. If I would have found a problem with something, it would be on this work order. I wrote down everything that I found wrong with the vessel right here on this work order. I was very descriptive in my notes. To sit here and tell you which pump switch controlled which pump, it's not labeled on the panel so I can't tell you from three years ago which switch controlled which pump. It's impossible for me to do that.

Q. But in order to disable the engine room pump, you turned off the switch that at that time you found went to that pump, correct?

MR. RAUWORTH: Objection. That assumes facts relating to the wiring of this panel that has not been brought into evidence.

THE COURT: Overruled.

A. I would have turned off the switch that controlled that particular pump.

Q. Okay. That's because you wanted to stop it from operating, correct?

A. If it was continuously running, and it was going to run dry, yes, I would want to keep that from happening.

Q. It was malfunctioning, and you, at the time, located the switch that was associated with the engine

room bilge pump and turned it off, correct?
A. Yes. I believe so.
Q. Now, do you remember doing anything with the other bilge pump switch, whichever one it was that went to the forward bilge pump?
MR. RAUWORTH: Objection, again, your Honor. The question implies there was a choice between two and I believe --
THE COURT: No. The question was just whether he remembers doing anything with that bilge pump.
A. And I said I don't know if there was a switch for that forward bilge pump or which one it was for. I had one switch set to auto. From what I have written on my notes, I don't know if you want me to tell you this part of it --
Q. No. Would there be any reason for you to have switched the other bilge pump switch to off position unless some other bilge pump was malfunctioning?
A. I don't believe so, no.
Q. And you don't remember actually testing the forward bilge pump, do you, as you sit here today?
A. It does say that the forward bilge pump --
Q. I'm not asking you, sir, what this document says. Do you remember, as you sit here today, testing the forward bilge pump?

A. A hundred percent to be positive, I believe I verified that that pump was working.
Q. You're looking at your notes. As you sit here today, you can't remember which bilge pump switch you turned on or off, or which wire went to which bilge pump, but you're sitting here today and you remember actually testing the forward bilge pump?
A. I want to say I do remember lifting up the float switch to make sure that that pump ran. Now, that's different than asking me what wire went to what pump and what switch controlled which pump, but yes, I do remember lifting a float switch up, and according to my notes, it's what I did.
Q. Well, I've read your notes. It doesn't say anything about lifting a float switch, does it, sir?
A. Yes. It says forward pump will work on float switch, sir.
Q. It doesn't say that you actually tested the float switch, correct?
A. I didn't write down that I picked up the float switch, no.
Q. Okay. Did you have your deposition taken on March 27th, 2008?
A. Yes.
Q. And do you remember page 35, line 20 me asking

you: Did you test the forward pump to determine if it was working in April 2005? Do you remember me asking you that question?
A. Vaguely.
Q. And you answered: I don't recall, but from what I've written I verified the pump was working.
You didn't have any actual knowledge in March 27th about testing the pump, and you don't actually know whether you tested it as you sit here today, do you?
MR. RAUWORTH: Objection.
A. I can only go from what I'm reading on my work order, so if you're asking me by memory do I remember a hundred percent, I just remember what I already have written down here. That's all I can go by.
Q. Okay.
THE COURT: There was an objection. Are you withdrawing that objection?
MR. RAUWORTH: I am, your Honor.
THE COURT: All right.
Q. You testified there's three bilge pumps on this vessel, correct?
A. I believe there were three.
Q. You have no notation in here concerning checking a third bilge pump, do you?

A. I don't.
Q. And when you were on the EVEREADY, no one was onboard with you, correct?
A. I don't believe so.
Q. And you didn't see Mr. Picchione onboard the vessel, did you?
A. No.
Q. And you were on this vessel for a number of hours, correct?
A. Yes.
Q. On Exhibit 6, you've written down, I believe, 13.4 hours?
A. I don't think that's my writing, the 13.4. I didn't write that.
Q. Do you know what the purpose of the 13.4 is?
A. I assume that's for billing purposes.
Q. But were you on the vessel for 13.4 hours on April 22nd, 2005?
A. I don't recall if I was on the vessel for 13.4 hours. I think I was down there for a day. I can't be a hundred percent sure of the exact amount of hours.
Q. When you were on the EVEREADY, as part of your duties, did you inspect the hoses on the vessel?
MR. RAUWORTH: Objection. Ambiguous as to the extent of hoses that are involved in the question.

THE COURT: Overruled.
A. If I was on the vessel, I would have looked it over to make sure I didn't see any visible problems with any hoses or belts or things of that matter that were visibly available to me. That's what I normally do anytime I go down on a boat, so I would assume I used the same practice on this vessel.
Q. Now, you were trained to do that at a marine tech school. That's one of the things they taught you to do there, correct?
A. I don't know. I probably learned that long before I went to tech school. I worked on vehicles before that. I can't say that I learned that from New England Tech. It's just something that I do, and something that I probably did before I worked on boats working on my own vehicles.
Q. It's important to do that, correct? Check hoses, check belts, correct?
A. Yes. I think it is.
Q. And in the regular course of commissioning a vessel, you would have looked at hoses including exhaust hoses, correct?
A. As I said, if something was visible to me, I would look at it, visibly inspect it. Generally, yes.
Q. Do you remember whether you inspected the exhaust

hoses on the EVEREADY on April 22nd, 2005?
A. I don't.
Q. If you could not inspect one of these hoses or fan belts, would you make a notation on the work order noting that you weren't able to look at something?
A. No. No. I wouldn't.
Q. You would not make a notation that you weren't able to look at some device that you normally checked?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
THE COURT: Overruled.
A. I'm sorry. What was the question again? I got sidetracked there.
Q. Your testimony is that you would check exhaust hoses as your routine, correct?
A. No. My statement was that I would look at anything that was visible to me in the engine room to see if there was any problem with it. I wouldn't write down that I wasn't able to get at a particular item to look at it. I would only write down what I found wrong.
Q. Sir, my question is, do you normally look at exhaust hoses if you can examine them?
A. If I can see them, yes. I'd look at it and make sure everything is okay.

Q. Do you normally look at exhaust hoses if you can look at them?
A. If they're there, yes.
Q. You do that because exhaust hoses wear out, correct?
A. Yes.
Q. And when they wear out, a vessel can flood, correct?
A. I wouldn't want to speculate. Every vessel is different. But there could be a problem with water, yes.
Q. Another reason you look for the integrity of exhaust hoses is to prevent the occupants of a vessel from being poisoned by carbon monoxide poisoning, correct?
A. Yes.
Q. If you aren't able to look at hoses, or whatever else you look at when you commission a vessel, do you make a notation on the work order that you weren't able to see it, or you didn't do it for some reason?
MR. RAUWORTH: Objection. Asked and answered.
THE COURT: Overruled.
A. Not normally, no.
Q. How is the service manager, or the owner, supposed to know what you've looked at and what you haven't

looked at if you don't make a notation, Mr. Stroker?
A. I don't know.
Q. When you were onboard the EVEREADY in April of 2005, did you know that this was a ten-year-old vessel?
A. I knew it wasn't a new vessel. I wasn't sure of the age. I don't know. I'm not positive how old it was.
Q. Well, you knew it had, for lack of a better term, substantial age? It wasn't a new boat, was it?
A. Correct.
Q. And hoses fail after a number of years of use, correct?
A. I don't know how many years of use, but I'm sure they will eventually fail, yes.
Q. The reason you looked at them on your car is because hoses on your automobile fail, correct?
A. Correct.
Q. And you don't want to break down on the side of the road if a water hose fails on your car, correct?
A. Yes.
Q. And you check your car hoses at least annually, don't you, Mr. Stroker?
A. I guess so, yeah.
Q. You guess so. Do you personally check, you personally check your water hoses on your car on an

annual basis, correct?
A. I do general maintenance to my vehicle, and as I'm in there I must look over them. I don't make it a point to go once a year and look over every single hose, no.
Q. So you do it more often than once a year, correct?
A. Correct.
Q. And it would be just as important on a boat to check water and exhaust hoses, correct?
A. Yes.
Q. And these boats are going out into the Atlantic Ocean, correct?
A. I don't know where they're going.
Q. Well, you work on hundreds of boats a year, correct?
A. Correct.
Q. You assume that some of those boats go out into the Atlantic Ocean?
A. As I said, I can't assume where they're going. I know they're going out. They could be in the Bay; they could be the Salt Pond. I'm not going to assume they're going out to the ocean. I don't know where they're going.
Q. Well, do you treat vessels when you examine them any differently because you think they're going to the

Salt Pond or the Bay?
A. No. I treat them all the same.
Q. Now, in Trial Exhibit 6, you have a notation about the rear bilge being full of water, correct?
A. Exhibit 6. This? Yes.
Q. Okay. And did you determine how the water was in the rear bilge?
A. I don't have it written down here. A lot of times boats sit for the winter.
Q. The question is, did you determine how that water got there, Mr. Stroker?
A. I don't recall a hundred percent, no.
Q. You don't know whether that was fresh water or salt water, do you?
A. I can't say, no.
Q. And you pumped it out, correct?
A. Yes.
Q. And your notation in Exhibit 6 is, the rear bilge is full of water, correct?
A. Yes.
Q. That would mean a substantial amount of water, Mr. Stroker?
A. From what I remember, the bilge was full of water, yes.
Q. And when you're onboard the vessel, you didn't

hear the forward bilge pump operating, did you?
A. I don't recall. I don't recall hearing the bilge pump run.
Q. So on Friday -- I'm going to tell you that April 22nd, 2005 was a Friday, sir. It's your testimony, if I'm correct, that you were on the EVEREADY the entire day, correct?
A. Correct.
Q. And you were in the engine room for most of that period of time, correct?
A. Let me just look at this for a second. I would have been in the engine room for at least half of that time.
Q. At least half a day. Four or five hours, correct?
A. I would say so.
Q. Now, with respect to this bilge pump that you found malfunctioning, did you leave a note on the vessel to advise Mr. Picchione that he was down one bilge pump?
A. I don't remember leaving him a note.
Q. You did not leave him a note, correct?
A. I don't remember leaving him a note, no.
Q. Do you have cellphones or walkie-talkies on you when you're working in the yard?
A. Yes.

Q. And that's so you can contact Mr. Vivenzio or the other service manager?
A. Correct.
Q. And get assistance, right?
A. Yes.
Q. Did you call them on the walkie-talkie or cellphone and say to them, I've got one bilge pump that's malfunctioning on the EVEREADY?
A. Like I said, I don't remember if I called them or not. I'm sure I spoke to them. I don't know if I called them or I went up and talked to them in the office.
Q. Point Judith has bilge pumps such as the one on the EVEREADY in stock, correct?
A. I believe so.
Q. And it takes about an hour, does it not, to replace a bilge pump?
A. It could take an hour. It could take longer, depending on where the problem is.
Q. It's not a half-day job, correct?
A. Not normally.
Q. And did you actually sight the engine room bilge pump that you found malfunctioning?
A. Did I sight it?
Q. Did you determine where it was located on the

vessel?
A. I believe so.
Q. It's right in the engine room, correct?
A. Yes.
Q. It's between the two engines that you were working on for approximately four to five hours, correct?
A. Correct.
Q. You're familiar with anti-siphon loops, correct?
A. Yes.
Q. Check valves, correct?
A. Yes.
Q. You learned about those in the marine trade school?
MR. RAUWORTH: Objection, your Honor. I object to this entire line of questioning as being outside the pleadings. We had an amended complaint recently and there's been no allegation in the amended complaint with reference to anti-siphon loops as against Point Judith.
THE COURT: Mr. Lovejoy?
MR. LOVEJOY: I think there was Mr. Robbins' report back in June of 2007 that addressed the anti-siphon loop question. I asked this witness about anti-siphon loops, check valves at his deposition.
MR. RAUWORTH: Your Honor, this was at times

when, I mean, the reference to Mr. Robbins took place at a time that Albin and Standish were both active in the case. This question of anti-siphon loops was the thrust of his case against those defendants. There was nothing said, nothing asserted as against Point Judith with regard to anti-siphon loops or bilge discharge hoses at any point throughout the case, including in the amended complaint that Mr. Lovejoy recently caused us all to deal with.

So I submit this is not appropriate. It's not been leveled against my client, and it's excluded by the scope of the pleadings that Mr. Lovejoy wrote.

THE COURT: Well, I'm going to take the evidence in. You can argue about -- I'm not even clear for what purpose this evidence is being elicited. But there are, in my mind, several different purposes for which such evidence might be used, and some of them, I think, do relate directly to the pleadings. So I note your objection. It's overruled. I think you can reask your question so that the witness will remember it.

MR. LOVEJOY: Thank you, your Honor.

Q. Mr. Stroker, when you were at the marine trade school, you learned about the necessity of anti-siphon loops, right?

A. I think it was discussed, yes.

Q. And you've become familiar with them as a result of working for two large boat yards, correct?
A. Yes.
Q. And you're also familiar from marine trade school with respect to check valves, correct?
A. Yes.
Q. And as a result of working at these two large marinas, you further became knowledgeable with respect to check valves, correct?
A. Correct.
Q. Okay. Did the bilge pumps on the EVEREADY have anti-siphon loops or check valves?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
Q. Based on your observations?
THE COURT: Overruled. The objection is overruled. You may answer that question.
A. I don't recall if they had check valves or not.
THE COURT: It might be useful if you have the witness or somebody explain what an anti-siphon loop and what a check valve is.
MR. LOVEJOY: I was going to have another witness do it, but maybe it's better to do it --
THE COURT: All right.
MR. LOVEJOY: You're absolutely right. Maybe

it's better to do it sooner than later.
Q. Can you explain for the Court what the purpose of an anti-siphon loop is, Mr. Stroker.
A. An anti-siphon loop, from my experience, is used a lot in marine head systems where you have an underwater pickup. The anti-siphon loop is put up above the water line of the boat to prevent water from traveling and siphoning back into the vessel. It's an air brake, basically. It doesn't allow a vacuum to be created and water to come back to the vessel.
Q. That's called back-flooding?
A. Yes.
Q. And the water goes in the wrong direction, correct?
A. Yes.
Q. What's the purpose of a check valve? Is that an alternative to an anti-siphon loop?
A. A check valve is basically a valve that's put in a line to allow water to flow in one direction only.
Q. That's to prevent what you had explained back-flooding is, correct?
A. Just prevents water from coming back in a line in the direction you don't want it to.
Q. If a hose back-floods, it can sink a vessel, correct?

A. Yes.
Q. When you went to marine trade school, did you study what is referred to as the American Boat Yacht Council recommendations?
A. Yes.
Q. Do you know whether they have a provision that addresses anti-siphon loops or check valves?
A. I'm sure they do.
Q. As you sit here today, you don't know what provision it is, do you?
A. That book is so vast, and I couldn't sit here and tell you what their recommendations are a hundred percent. I just know, like I said, that I know that they used to keep water from coming back into the boat in certain applications.
Q. These anti-siphon loops or check valves are supposed to be installed on the hoses that run from the bilge pump through the thru-hull on a vessel, correct?
A. Sorry. Can you repeat that?
Q. The ABYC recommends that the anti-siphon loop or check valve be placed in a bilge discharge line, correct?
MR. RAUWORTH: Objection. Foundation.
THE COURT: Sustained.
Q. Based on your experience, Mr. Stroker, if you have

a straight run on a bilge pump discharge hose, will that allow water to come in if the thru-hull goes below the water level?
A. On a bilge discharge hose or a bilge pump?
Q. Yes.
A. If it was a straight run, would it allow water in? Yes. I would imagine if you're discharging below the waterline, but that's not how they're usually set up.
Q. If the vessel's waterline is lower because water enters the vessel from another source and the discharge thru-hull goes below the water level, it will back siphon, correct?
A. It could, yes.
Q. As part of your experience or training, have you installed Rule bilge pumps?
A. Yes.
Q. They have instructions contained within them for installation, correct?
A. Yes.
Q. Do you read those instructions prior to installing Rule bilge pumps?
A. I'm sure I have in the past.
Q. Their instructions state that the thru-hull on the discharge for their bilge pump should be at least 12 inches above the waterline, correct?

MR. RAUWORTH: Objection, foundation.
THE COURT: You can ask him if he remembers the instructions.
Q. Mr. Stroker, do you remember the instructions?
A. I can't tell you what their recommendation is for the height on a discharge, no.
Q. When you install a discharge on the bilge pump, how far above the waterline do you install it at?
MR. RAUWORTH: Objection. Foundation. This assumes the witness has installed anything on this boat, or that he's installed --
THE COURT: I understand. Sustained.
Q. Mr. Stroker, have you installed bilge pumps as part of your work routine at these two marinas that you've worked at?
A. Yes.
Q. How many bilge pumps have you installed over the last seven or eight years?
A. I couldn't tell you. Quite a few.
Q. When you install them, where do you place the thru-hull discharge fitting in respect to the waterline?
MR. RAUWORTH: Objection. The question assumes that the installer of the bilge pump has the ability to determine the location of the thru-hull fitting. I

really question the relevance of the inquiry to this witness about this subject, that he had anything to do with bilge pumps on this boat.

THE COURT: Okay. All right. I'll sustain the objection. You need to ask him more foundational questions before you ask him that question.

Q. Approximately how many bilge pumps have you -- bilge pumps thru-hull fittings have you installed over the last seven or eight years?

A. Not many. I don't usually install those when you replace a bilge pump. Thru-hull fittings, normally they're made through the manufacturer of the boat. You just replace the pump itself, two hoses. Or one hose, I'm sorry.

Q. The ones that you've replaced, are we talking 12 or more or 12 or less?

A. I'd say at least 12, yeah. Maybe more.

Q. Okay. And how do you determine where to place the thru-hull fitting for a bilge pump?

MR. RAUWORTH: Objection. Again, assumes facts --

THE COURT: Sustained. How many times have you installed the thru-hull fitting?

THE WITNESS: I don't think I've ever had to actually drill a hole through the boat to install a

thru-hull fitting for a bilge pump.

THE COURT: So every time you replaced a bilge pump, the thru-hull fitting has already been in the boat from the manufacturer?

THE WITNESS: Yes.

THE COURT: Thank you. Go ahead. Next question.

Q. Just so I'm clear, when you were on this vessel on April 22nd, 2005, you didn't see anybody else on the vessel during that entire day, correct?

A. I don't know if someone might have came down to the boat while I was working on it. That's possible. But I didn't go down to work on the boat with anyone, no.

Q. My question is, you don't remember seeing anyone else onboard the vessel, correct?

A. I could have. Somebody might have come down to the boat for a minute. It's possible.

Q. If it's somebody that was not associated with Point Judith, would you remember that?

A. Yeah. More than likely. Yes.

Q. And you don't remember seeing anybody not from Point Judith on that vessel on April 22nd, 2005, correct?

A. Correct.

Q. Did you work on the vessel, EVEREADY, on April 23rd, 2005?
A. I don't recall if I did or not. I know I was on it the 22nd, from my work order. I don't recall going back to the vessel.
Q. Okay. It's possible that you went back to the vessel, is it not?
MR. RAUWORTH: Objection. Calls for speculation.
THE COURT: He's stated he doesn't recall, so sustained.
MR. LOVEJOY: I'll pass the witness, your Honor.
THE COURT: All right.

CROSS-EXAMINATION BY MR. RAUWORTH

Q. Good morning, Mr. Stroker. Mr. Lovejoy was asking you a few questions about the entry you made regarding the water in one part of the boat, the aft bilge, do you recall that?
A. Yes.
Q. Now, up till the time that you were doing the work on the boat that's described in Exhibit 6, where had this boat been?
A. Before I worked on it on the 22nd, where had it been?
Q. Yes. Where had it been for the previous few

months?
A. On land, I believe.
Q. At Point Judith?
A. I believe so, yes.
Q. Okay. And the water that you pumped out, that went out through what kind of a pump?
A. A bilge pump.
Q. A bilge pump that was already there?
A. Yes.
Q. Okay. And the water that you saw, did you have -- when you saw it, what significance did that have to you, that there was water there?
A. Not much. I didn't worry about it too much. It could be normal for something like that over the winter when a boat is on land.
Q. And how would it come about that being on land would generate the kind of water that you saw?
A. When the boats are on land for the winter, usually the batteries are disconnected, and they're blocked in a fashion where they're down in the back, so any water that runs down would be at the back of the boat. When you put them in the water, the same thing. They sit lower in the back, usually. So that water would have stayed in the back of the boat.
Q. Okay. Now the area where you saw water in the

back of the boat, can you give us an idea of sort of the dimensions of this spot?
A. In the aft bilge, I would say maybe two by three. I can't be positive, but it's not a very big area.
Q. You mean feet?
A. Yes.
Q. Two feet by three feet?
A. Maybe at the most that I remember the bilge.
Q. And what's your recollection of the depth?
A. Maybe six inches, eight inches. Something like that.
Q. Okay. Did that take long to pump out?
A. I don't believe so. It's not a lot of water.
Q. Okay. Now, after that water was pumped out, was there any water entering the hull of the EVEREADY?
A. No.
Q. And you were -- you spent, if I understand it, pretty much the whole of that Friday onboard?
A. Correct.
Q. And did you have to do any other pumping that day?
A. I don't believe so, no.
Q. Okay. If you had seen water entering the boat when you were doing the work you've described, what would be the significance of that to you?
A. Well, if a boat was taking on water, we would

normally find the source. And if we weren't able to do that, we would probably take the boat out of the water.
Q. Okay. So if you observed water entering the boat, is that something that would be serious to you or not too serious?
A. Well, it depends on how much water was coming in. But I would take it to be pretty serious if a boat is taking on water, yes.
Q. And so if a boat is taking on water, and you're not able to -- well, strike that. I assume if you see a way to put that to a stop, you'd do something about that?
A. Yes.
Q. But if a boat continues to take on water, what are the kind of steps that you as a marine technician would take with respect to the marina's action?
A. As I said, if we were unable to stop water from coming in the boat and it was a problem we couldn't fix in the water, we would have to take the boat out of the water to find out what was going on with this thing and fix it.
Q. Okay. Taking the boat out of the water, is that something that you would handle by yourself?
A. No.
Q. How would that be done?

A. They have people to run the Travel Lift. I would go to my manager or supervisor and tell them of the situation, and we would handle it that way.
Q. Okay.
MR. RAUWORTH: Would it be useful, your Honor, to expand on what a Travel Lift is or --
THE COURT: I understand what that is.
MR. RAUWORTH: Okay.
Q. Now, what about a circumstance where you find that on a particular boat you're not able to ascertain that the boat has automatic bilge pumping capability, how significant is that to you as a marine technician?
A. If a boat is unable to pump water, that's a problem.
Q. And if you encounter that, what steps would occur to you to take in response to that?
A. Normally, you wouldn't leave a boat in the water that didn't have an operational bilge pump. That just wouldn't happen.
Q. I'm sorry. I didn't catch part of that. Normally you --
A. You would not leave a boat that wasn't able to pump water. You would either talk to the customer, have them install something. That's up to the service department, but I would definitely talk to my

supervisor to find out what our course of action would be on that.
Q. In order to achieve what?
A. To have a bilge pump that would be on an automatic switch.
Q. That worked?
A. Correct.
Q. Okay. And what about the use of the Travel Lift. Is that an option that could come into play if you couldn't establish automatic bilge pumping capability?
A. That would be up to my supervisor or service manager, but, you know, I would definitely let them know of the situation, and we would probably either install or talk to the customer right away about it and find out what they want to do.
Q. Now, the -- oh, in your past working career in the marine industry, have you ever come upon a situation before where -- let me back up. Are there many boats that have -- strike that. Let me put it another way.
Have you encountered boats in your past working career that have three bilge pumps?
A. Yes.
Q. Okay. And on the boats you've worked on that have three bilge pumps, have you had the experience in your past working career to discover that one of them, one

of those bilge pumps, for one reason or another, is not functioning correctly?
A. I may have, yes.
Q. Okay. And if in discovering a condition like that, is that a condition that you would normally be expected to report by use of a walkie-talkie?
A. I don't know that I would be expected to report it by use of a walkie-talkie. But you would be expected to report it, yes.
Q. Okay. And you would be expected to report conditions aboard boats you work on that seem to you to be out of order or needing attention in the same way?
A. Yes.
Q. The notation that you made on Exhibit 6 about the pump that wouldn't stop running, do you remember that?
A. Um-hum. (Affirmative.) Yes.
Q. Does that mean that the pump itself has something wrong with it?
A. It could be inside the pump. It could be the wiring. There's a few different reasons that could happen.
Q. Okay. So if you were to, for example, have authority and went and got a new pump and put it in, would you be able to be confident that putting in a new pump would solve that problem?

A. On this particular issue?
Q. Right.
A. I would think it would, but, like I said, if there was a problem with the wiring or with the switch somewhere, then it might not.
Q. Okay. When you discovered the pump that wouldn't shut off, you didn't -- did you detect anything about the pump itself that seemed to be malfunctioning?
A. I don't recall finding a direct problem. I just recall the pump wouldn't stop running so I shut the power to that particular pump.
Q. Okay. Now, Mr. Lovejoy asked you some questions about anti-siphon loops. Are you familiar with boats that you run into in your work, other than Albins, that have bilge lines without anti-siphon loops?
MR. LOVEJOY: Objection. Leading.
THE COURT: Overruled.
A. Yes.
Q. Okay. And I think there was a comment about engines. On the EVEREADY in 2005, and the work that you have noted on this sheet, did you start up the main diesel engines on this boat?
A. I don't believe so.
Q. Okay. And did you do a sea trial on this boat?
A. I don't think so, no.

MR. RAUWORTH: That's all I have for this witness at this time, your Honor.
THE COURT: Redirect?
MR. LOVEJOY: Thank you, your Honor.

REDIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Stroker, you just testified in response to Mr. Rauworth that there was not a lot of water in the stern bilge, correct?
A. I testified I don't recall there being a lot of water, that's correct.
Q. Okay. But in your contemporaneous notations of April 22nd, you made a notation of it, specifically, it states, pump rear bilge, full of water, correct?
A. Correct.
Q. You wouldn't have made a notation if there was not a lot of water in the bilge, correct? This was something you wrote down because it stuck out at you, right?
A. Yes.
Q. Okay. It stuck out just like the fact that one of the bilge pumps was malfunctioning and you made a notation of it, correct?
A. Correct.
Q. You don't make a notation of every vessel that has not a lot of water in it, do you?

A. If I find water in a bilge, I would normally make a note of it, yes.
Q. That's because you want to make sure that somebody determines where that water came from, correct?
A. I don't know if it's that I want someone to verify where the water came from. Just to note that there was water there, and if we go back down to the boat and we see it again, we know that there was water there before, also.
Q. Well, the purpose is to make sure that somebody's alerted to a possible problem, correct?
A. Correct.
Q. And that's why you did it. Do you know whether anybody read this and went back down to the boat to see where the possible water was coming from?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
THE COURT: Overruled.
A. I didn't see anyone look at the paperwork, but according to the notes on the bottom, somebody did review this. The hours are circled at the bottom, and there are some notes there that were written down that aren't in my writing.
Q. You don't know when that was added, do you?
A. I don't. No.

Q. Actually, you testified earlier that part of that, you believe, was for billing purposes, correct?
A. Correct.
Q. You didn't call anybody up on your walkie-talkie on the 22nd of April 2005 and said, hey, I found the rear bilge full of water, did you?
A. No.
Q. And it was a Friday, correct?
A. I believe so.
Q. And this is something you would have submitted on either Friday afternoon, after you finished working on the vessel, or Saturday or Monday, correct?
A. I would have turned it in at the end of the day on Friday, the 22nd, yes.
Q. Everybody goes home at five or six o'clock, correct?
A. Correct.
Q. Nobody would have looked at this until Monday?
A. Correct. Well, actually, Don is usually there later than everyone. So he may have. I can't say if he did or not.
Q. But nobody got back to you on Saturday, Sunday, or Monday, and said, well, I looked at your notations, what do you think this is about, did they?
A. Not that I recall.

MR. LOVEJOY: Thank you, your Honor.

THE COURT: Any recross?

MR. RAUWORTH: Yes, your Honor.

RECROSS EXAMINATION BY MR. RAUWORTH

Q. The water that Mr. Lovejoy was just asking you about, Mr. Stroker, I want to clarify with you the location that this was in the boat. If you were in the cockpit of this boat and you were back by the transom, is there any kind of an access point to look into the steering area of this boat?

A. From what I recall, I believe there's a panel in the floor that comes up. I believe that accesses the rear bilge.

Q. So opening the panel, if one did that, would somebody be able to see the location where the water was that you reported on this repair order?

A. Yes.

Q. Okay. And so if someone were checking through that panel, they'd be able to see whether water was in the area where you had pumped it out?

A. Correct.

Q. Okay. Now, by the time you left that day, had any water accumulated in the area that you had pumped out in the morning?

A. No.

Q. And if it had, would you have made a note of that?
A. Yes. If it was full of water again, I would have known there was a problem.
Q. And if it -- I'm sorry. Is that a problem of the kind that we talked about earlier?
A. Yes.
Q. Is the presence of water in the rear bilge area that you mentioned, the two- to three-foot area, is that something that you would consider to be an emergency as you found it when you began work that day?
A. I don't consider that to be an emergency, no.
Q. And a single bilge pump on a boat with three bilge pumps that seems not to function, is that a condition that you would consider to be an emergency?
A. In my opinion, no.
MR. RAUWORTH: That's all I have, your Honor. Thank you.
THE COURT: Okay. Thank you.
MR. LOVEJOY: Your Honor, may I ask a follow-up question, please, based on one of these questions?
THE COURT: I usually limit questioning to two rounds each but I have some questions. All right. So I'm going to address those to you.
Now, you don't specifically recall if this had three bilge pumps or two, or do you think it -- I think

you said you thought it had three. Is that your testimony?

THE WITNESS: Yes, your Honor. From reviewing the notes and from my memory, I want to say that I believe there were three pumps on the boat.

THE COURT: Okay. Now, do you remember how the below deck of the boat is structured in the sense of whether, when you talk about the rear bilge, are the bilges in these areas, are they interconnected? Is there a way that water flows from the front of the boat to the back, or from the middle to the back or the front.

THE WITNESS: I believe on that particular boat is a keel style boat and a lot of the water ends up towards the front of the boat, or the forward engine room. It's shaped kind of, you know, like a round type on the bottom of the boat, from what I remember.

THE COURT: All right. Now, your notes say that the engine room pump will not stop running, so you set the switch to off.

THE WITNESS: Correct.

THE COURT: So that's the bilge pump that's in the middle of the boat?

THE WITNESS: Correct.

THE COURT: Okay. And then you say in your

notes that "Forward pump will work on float switch," right?

THE WITNESS: Correct.

THE COURT: And I think you testified that you tested the -- you believe you tested the float switch by moving it up and down to see if it would work?

THE WITNESS: I believe so.

THE COURT: All right. Now, my question for you is, coming back to the question I asked you initially, if you remember, and I don't want you to speculate, I just want you to tell me if you know or if you remember, to what degree does the front bilge pump, is it able to address the accumulation of water in the engine room or in the center of the boat?

THE WITNESS: I believe it's somewhere forward of the engines. I don't remember exactly where it was located on the hull, but it's, I believe, it was in the forward part of the engine room. What is that, a 35-foot boat? I would say maybe, I would think, it's eight feet from the center pump. Six feet. Something like that, at the most.

THE COURT: Coming back to my original question, are these areas where the bilge pumps are located, are they interconnected or are these areas compartmentalized?

THE WITNESS: The center bilges, I believe it was all one area where the two pumps are located. It was one area connected. I mean, there was no bulkhead separating the two, from what I remember.

THE COURT: So essentially, your recollection is you had two pumps located in a single area, not separated by bulk heads, but one was more forward than the other?

THE WITNESS: I believe so, yes.

THE COURT: And it was the one forward that was operational, and the one that was in the middle or back a bit, eight feet or so, that was not operational, or that was shut off -- that was running constantly and that you shut off; is that right?

THE WITNESS: Yes.

THE COURT: Now, if you remember, was the front bilge pump, given the keel style of the boat, was the front bilge pump higher up than the mid-engine room bilge pump?

THE WITNESS: I believe it may be slightly higher because of the hull style.

THE COURT: Do you know how much?

THE WITNESS: I would say, you know -- I wouldn't want to speculate on that but it would be a little higher.

THE COURT: I don't want you to speculate. Now, I think you were asked some questions about whether you recall that bilge pump coming on during the day that you were working there most of the day, or half a day, I think you said.

Do you remember during the day that you were working when you turned off that switch, was that at the beginning of the day or the end of the day?

THE WITNESS: I would think it would have been at the beginning of the day. If the pump was constantly running, I wouldn't have let it run all day long. I would have done something about it right then and there, your Honor.

THE COURT: And if you remember, if you shut it off at the beginning of the day, while you were working during the day, did you notice any accumulation of water?

THE WITNESS: No, I didn't. I believe I would have wrote something down, or told someone about something like that, absolutely. And I don't recall that at all.

THE COURT: All right. That's all I have. You can step down. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Next witness.

Actually, maybe we should take our morning break. Let's go off the record.

(Discussion off the record.)

(Short recess.)

THE COURT: Mr. Lovejoy, your next witness.

MR. LOVEJOY: Thank you. Mr. Smedberg, please take the stand.

MR. RAUWORTH: Objection, your Honor. This witness was never disclosed in pretrial discovery or listed on the pretrial memorandum.

THE COURT: Okay. Seems like everything in this case is a problem. What's going on here?

MR. LOVEJOY: I thought I had listed him. If he's not on there, it's an oversight. I think he's on the list that the Court asked us to submit on Monday. He's listed as a witness for Point Judith.

THE COURT: Well, can you give me, just very briefly, you know, this is an employee of Point Judith?

MR. LOVEJOY: A present employee of Point Judith. He is the gentleman that painted the bottom of the vessel in April 2005.

THE COURT: Okay. Well, Mr. Rauworth, if this is just an oversight, I mean, are you saying that you've had no notice of this fellow as a potential witness?

MR. RAUWORTH: Well, he was not listed in the pretrial, your Honor, and he got a subpoena. I don't have a power to quash a subpoena, so I've not had any listing of what it is that he's expected to testify. I guess we just heard it represented, and I'm hearing it's a short amount of testimony. Can we get it on the record that that's what this is about?

THE COURT: Is that what it's about?

MR. LOVEJOY: Well, I was provided an affidavit of what he did, and he stated that all he did was painted the vessel. That's what I'm going to confirm. My questions are limited to what is in the affidavit that Mr. Rauworth provided me.

MR. RAUWORTH: If it's confirming the affidavit, I have no quarrel. And I should make clear, your Honor, the context of the affidavit was that Mr. Lovejoy observed a reference to the name Bud on what is Exhibit 6 that Mr. Stroker just testified about, and he wanted to have the deposition of Mr. Smedberg. We offered to make Mr. Smedberg available. We learned that his involvement had been limited to painting the hull during that ramp-up to launching the vessel. I offered, and Mr. Lovejoy told me he was only interested in the person who did the mechanical work, and I offered to provide him with an

affidavit as a comfort zone with respect to Mr. Smedberg, but we were ready to produce him as a deposition witness. With that background and on that basis, I withdraw my objection.

THE COURT: Okay. Put him on.

HENRY V. SMEDBERG, III, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Henry V. Smedberg, III. S-M-E-D-B-E-R-G. I'm also nicknamed Bud.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Smedberg, how long have you worked for Point Judith Marina?

A. I first was hired in April of 1991.

Q. And do you still work there as we sit here today?

A. Yes, I do.

Q. Are you familiar with the 36, or 35-foot Albin vessel owned by Mr. Picchione?

A. Yes.

Q. And in the spring of 2005, did you have occasion to do any work on that vessel?

A. Myself and one other worker painted the bottom of the vessel before launching.

MR. LOVEJOY: May I approach the witness, your

Honor?

THE COURT: Yes.

MR. RAUWORTH: I have an objection to proceeding. I understood that Mr. Lovejoy was going to examine the gentleman about his affidavit and what's stated in it. And now Mr. Lovejoy is not prepared to tell me what line of inquiry he is going to go forward here.

MR. LOVEJOY: I'm asking him to agree to the admission of a business record.

THE COURT: Just ask your questions. We'll take it one at a time. See what happens.

Q. Do you remember on what date --

THE COURT: Get to the microphone.

Q. -- approximately, you painted the vessel?

A. Sometime during that week before we had launched it.

Q. I'm going to show you what's been marked as Plaintiff's Exhibit 1 for identification, page 31. Do you have that in front of you, sir?

A. Yes.

Q. And this is a computer printout --

THE COURT: Is this necessary? This is a business record of the company. Are you objecting to the document?

MR. RAUWORTH: I'm objecting to the line of inquiry. The gentleman can't provide a foundation. My concern is that Mr. Lovejoy said that this inquiry was about the affidavit and about the painting.

THE COURT: I'm not asking you that. Are you objecting to this document?

MR. RAUWORTH: To its admission? No, your Honor.

THE COURT: Then why are we going through all this?

MR. LOVEJOY: I'm just trying to refresh his recollection as to when --

THE COURT: He hasn't said he doesn't recall anything yet. How can you refresh his recollection?

Q. Are you certain you painted the boat the week prior to April 22nd?

A. That is my best recollection.

Q. When you go to paint a boat, do you go up to the store and purchase paint, bottom paint at that time?

A. No. Our service writer gives us the supplies we need to go out and paint it.

Q. If there's an entry for epoxy plus paint entered on April 8, 2005, would that indicate to you the date when you actually got the materials and painted the boat?

A. No, it would not, sir.

MR. LOVEJOY: Thank you. Is Exhibit 1 in, your Honor?

THE COURT: Are you moving it?

MR. LOVEJOY: Yes, your Honor.

THE COURT: There's no objection, is that correct?

MR. RAUWORTH: That's correct, your Honor.

THE COURT: All right. Then Exhibit 1 will be full.

(Plaintiff's Exhibit 1 admitted full.)

THE COURT: Any further questions? Any cross?

MR. LOVEJOY: I'm not through with the questions, your Honor.

THE COURT: Oh, all right.

Q. Before you paint the bottom of a boat such as the EVEREADY, do you check it for cracks?

A. We sand the bottom of the boat, and as we're sanding we visually inspect anything that may seem abnormal.

Q. If there were cracks in the EVEREADY, you would have seen them?

A. Most likely, yes.

Q. If there was water weeping out of the hull, you would have seen that, too, correct?

A. Yes.
Q. Is it the practice of Point Judith to check for cracks and water weeping out of the hull before it paints the bottom of a boat?
A. It's at the discretion of whoever is painting it because generally we have different people that paint bottoms. Sometimes we have spring kids that do the painting, and they may not necessarily know what they're looking for. Generally, whoever the commissioning mechanic is does give a quick look-over.
Q. Do you remember giving a look-over of the EVEREADY prior to painting it yourself?
A. Yes. And it was fine other than some paint blistering off.
Q. You didn't see any water weeping out of the bottom in April of 2005, correct?
A. No, I did not. Correct.
Q. And you wouldn't paint the bottom of a boat that either had cracks in it or water weeping out of it, correct?
A. No, you would not. You would bring it to the attention of someone first.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.

MR. LOVEJOY: Mr. Rauworth has advised me that he has no objection to Plaintiff's Exhibit 64A. I move it be admitted as a full exhibit, your Honor.
THE COURT: 64A will be full.
MR. LOVEJOY: A as in apple, yes.
THE COURT: All right.
(Plaintiff's Exhibit 64A admitted full.)
Q. Mr. Smedberg, if you had seen weeping such as you see in Exhibit 64A on the EVEREADY, would you have painted the bottom of the boat and launched it?
MR. RAUWORTH: Objection. Assumes facts not in evidence. Counsel is testifying, your Honor.
THE COURT: First of all, could you put that on the projector? All I have is this black and white. Can't tell what it is. Now, you can ask him if he knows what this picture is. That would be a start.
Q. Do you know what this picture is, sir?
A. It appears to be the keel of a red-hulled boat.
Q. Okay. And that's why I asked you a general question. If you had seen weeping such as this -- you don't know whether this is the EVEREADY or not, correct?
A. Not by that picture.
Q. If you had seen weeping such as this on the EVEREADY, would you have painted the bottom or allowed

her to be launched?

MR. RAUWORTH: Same objection. Counsel is testifying. Assumes facts not in evidence.

THE COURT: Well, you're using a term "weeping." You haven't had the witness identify what that term is, what it means, what this is in the picture. So why don't you go through that.

MR. LOVEJOY: Okay. I apologize, your Honor.

Q. Can you describe to the Court what weeping is, Mr. Smedberg?

A. My interpretation of what weeping would be, would be water or a moisture coming from somewhere.

Q. Inside the hull and come through the gel coat?

A. If that's where the weeping is supposedly coming from.

Q. Can you explain to the Court what appears in Plaintiff's 64A, based on your knowledge.

MR. RAUWORTH: Objection. Foundation.

THE COURT: Overruled.

A. There appears to be a stain on this, whatever this hull is here that either moisture or something may have been coming out of.

Q. Okay. And would that indicate water weeping out of a vessel, based on your knowledge?

A. If the stain was there at the time, yes, probably.

Q. Okay. And if there was a stain like that on the EVEREADY, you would not have painted it or launched it, correct?
A. No. Most likely not.
Q. Okay. Thank you.
MR. LOVEJOY: Pass the witness, your Honor.
THE COURT: Okay.
CROSS-EXAMINATION BY MR. RAUWORTH
Q. Good morning, Mr. Smedberg. At the point that you did the painting work Mr. Lovejoy's just been asking you about -- I'm sorry, you said your best recollection was that it was at some point in which month of the year?
A. In April, or the week before that we had launched it, I believe. It was sometime during that week. I don't know the exact day or which number date.
Q. Okay.
A. But I know it was during that week that we had launched the vessel.
Q. All right. So you reckon sometime in April?
A. Yes.
Q. Okay. And before the time that you had worked on the painting, where had the boat been spending its time?
A. It was up on dry dock.

Q. Okay. And it was held up on land by what means?
A. By stands and blocks.
Q. Are those called jack stands?
A. Yes. Boat stands or jack stands.
Q. Okay. And that's -- the boat would have been in that location for approximately how long?
A. Since we hauled it out in the fall, which would have been somewhere around October, November area.
MR. RAUWORTH: That's all I have, your Honor. Thank you.
THE COURT: Thank you. Your testimony is complete. You can step down. Thank you.
THE WITNESS: Thank you.
THE COURT: Next witness, Mr. Lovejoy.
MR. LOVEJOY: Mr. Vivenzio, would you take the stand, please.
Your Honor, with your permission, I'd like to hand the original exhibit book to the witness.
THE COURT: Well, why do you want to do it that way?
MR. LOVEJOY: I intend to go through a number of exhibits that are in that book with him. I thought it would be better just to give him the whole book at one time. If you prefer that we take them out one at a time --

THE COURT: We can try it. Okay. Go ahead.

DON VIVENZIO, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Don Vivenzio. V-I-V-E-N-Z-I-O.

THE COURT: Good morning, Mr. Vivenzio.

THE WITNESS: Good morning, your Honor.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Vivenzio, can you tell the Court your educational background, please.

A. I graduated from high school in 1961, Cranston High School. I went to the University of Rhode Island, graduated from there in 1971 with a degree in geology.

MR. LOVEJOY: Excuse me. I didn't hear the last part of your answer, sir.

A. Graduated with a degree in geology.

Q. Okay. And did you obtain any other education after graduating from college?

A. No.

Q. Have you taken any courses or seminars since graduating from college?

A. Yes.

Q. What type of courses or seminars have you taken, sir?

A. I've taken seminars in various types of marine management and some courses in engine repairs.
Q. And how many such courses have you taken?
A. Numerous. Probably at least one a year.
Q. And that's over the last thirty something years?
A. Yes, sir.
Q. And would you be kind enough to tell the Court your employment background.
A. I've been involved with Point Judith Marina since we built the marina in 1978.
Q. Okay. And you're still there today, correct?
A. Yes.
Q. And what are your -- what were your duties in 2005, sir?
A. In 2005, I was general manager and service manager.
Q. Okay. I'm going to ask you to look at what is Exhibit 1 in evidence. Can you tell the Court what that document is, sir?
A. This is a printout from the computer of the history of the work we've done on the EVEREADY.
Q. And that runs for a period from 1998 through the middle of the year 2005?
A. Yes. It looks until October of '05.
Q. Thank you. Would it be fair to say that that's an

accurate history of virtually all the work that Point Judith has done on that vessel between 1998 and 2005?
A. Yes.
Q. Can you turn to Exhibit 2 for identification, which is going to be in the volume to your right, sir.
I'm sorry. Can you turn to Exhibit 4, sir?
A. Okay.
Q. Do you have that in front of you?
A. This is a check off list.
Q. Is that something that's -- is that a document that's kept in the regular course of business of Point Judith Marina?
A. We try to use this as often as we can.
MR. LOVEJOY: Okay. I'm going to move its admission unless Mr. Rauworth has --
MR. RAUWORTH: No objection, your Honor.
THE COURT: Without objection, Exhibit 4 is full.
(Plaintiff's Exhibit 4 admitted full.)
Q. Can you explain to the Court what the purpose of Exhibit 4 is, sir?
A. It's a check off list for the technician to make sure that he looks at the items on this list.
Q. Is this a complete commissioning check off list for what one of your technicians would do with respect

to the vessel at the beginning of the season?
A. If we're doing a full commissioning on the vessel, this would be the complete list.
Q. Okay. And this list is for the vessel EVEREADY, correct?
A. Yes.
Q. You don't know what year it is, do you?
A. No, we don't.
Q. Okay. And could you turn to Exhibit 5, sir.
A. Yes.
Q. Is that another commissioning list for the vessel EVEREADY.
A. Yes.
MR. LOVEJOY: Mr. Rauworth, do you have any --
MR. RAUWORTH: No objection, your Honor.
THE COURT: Exhibit 5 will be full.
(Plaintiff's Exhibit 5 admitted full.)
Q. And you don't know what year that's for, do you, sir?
A. No, we don't.
Q. But it's for a year prior to 2005, correct?
A. Yes.
Q. Do you see the notation about hoses?
A. Yes.
Q. And is this -- whenever this was, the technician

that commissioned the EVEREADY determined that there were hoses that were old, correct?
A. Correct.
Q. Okay. Is this a document that -- this is an internal document of Point Judith Marina, correct?
A. Correct.
Q. And how is this information about hoses being old conveyed to a customer at Point Judith?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
Q. If at all?
THE COURT: Well, I'll sustain the objection. You need to ask him a foundational question first about that.
Q. What do you do with the information -- strike that.
The form is blank when you give it to a technician?
A. Yes.
Q. With the exception of maybe the boat name?
A. Right.
Q. And then after he's done the work on the vessel, he returns it to the service manager?
A. Service manager or service writer.
Q. Okay. And what's done with it at that point in

time?
A. The information that's on there, some of it would be put onto the bill that would be sent to the customer.
Q. Now, is it part of the standard commissioning, in the spring, of Point Judith to examine hoses on a vessel?
A. Yes.
Q. And that includes exhaust hoses, correct?
A. If we can see them.
Q. Okay. If you can't see them -- strike that.
How do you know whether a technician was able to examine the exhaust hoses or not?
A. We don't. When the technician goes down to the boat to do a commissioning, he's there to do certain things on the engines and the related components and items on the boat, depending on what the customer requests. While he's in the engine room, he's supposed to look for any problems that might be standing out that could cause a problem. Many times, when you do a sea trial, these problems show up, and that's part of a full commissioning, and that's the notation at the end. We do bring the boat's engines up to full throttle under full load. Under these circumstances, you might find certain things will be spraying water or leaking

oil or whatever.
Q. My question to you is, how do you know that a technician has actually looked at the exhaust hoses on a vessel?
A. We don't.
Q. That's part of what they're supposed to do, correct?
A. They're supposed to give us some information related on things that they see.
Q. Well, one of the things they're supposed to examine on a vessel is exhaust hoses, correct?
A. Correct.
Q. And if they don't do it, or they can't see them, do you have -- you don't have any mechanism in place on your commission list to indicate that, do you?
A. No.
Q. And if they can't see them, is that something that -- strike that.
If they don't examine them or can't see them, is that something that would be important to make known to the owner?
A. If we can't see items, we can't do anything about them.
Q. That's not my question. Would you agree with me that if you haven't inspected an item that you do as a

routine part of your commissioning, or can't see it, that it would be prudent to let the owner know that you weren't able to do it?

MR. RAUWORTH: Objection. Assumes facts not in evidence.

THE COURT: Overruled.

A. It would be prudent.

Q. And it is not the practice of Point Judith to do that; is that correct?

A. We haven't done that.

Q. And it would be doubly or triply more important to notify an owner of a vessel that's ten years old, or older, that you haven't examined the exhaust hoses on the vessel, correct?

A. It would be.

Q. Basically, the older the vessel gets, the more important it becomes to notify an owner as to problems, correct?

A. Right. If you see the problems.

Q. Well, the older the vessel gets, it becomes more important to notify the owner of problems that you are not able to look at, correct?

A. There's a lot of things on a vessel that you won't see.

Q. My question to you, sir, is if you can't see it,

or the technician doesn't do it, it gets more and more important to let the owner know that it hasn't been done, the older the vessel gets, correct?
A. We're not saying that we're going to check all these things. It's important for the owner to know that, yes.
Q. And my question to you is, the older a vessel gets, the more important it becomes to either look at the object or, if you can't, to notify the owner that you've been unable to look at an exhaust hose, correct?
A. It seems like it would be.
Q. And during the seven-year work history that we have in Exhibit 1, Point Judith never advised Mr. Picchione at anytime that it was unable to look at exhaust hoses, correct?
A. Correct.
Q. And the purpose of examining exhaust hoses is for a number of reasons, correct?
A. Yes.
Q. To prevent a vessel from sinking, correct?
A. You can have water or exhaust coming into the boat, if you have an exhaust leak.
Q. Well, one of the reasons is to prevent seawater from coming into the vessel and sinking the vessel, correct?

A. That would depend on the location of the exhaust hose. Many of the exhaust hoses are above the waterline.
Q. Is the exhaust hose on this vessel above the waterline?
A. Some of it is below the waterline.
Q. So it would be important to let an owner know about -- or it's important to look at exhaust hoses to prevent the vessel from flooding or sinking, correct?
A. It is.
Q. It's important, also, to look at exhaust hoses to prevent carbon monoxide poisoning, correct?
A. In a gas engine.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
MR. LOVEJOY: Thank you. I understand Mr. Rauworth has no objection to Plaintiff's 60, and we'd move it into evidence. Also 64, your Honor.
THE COURT: 60 and 64 will be full.
(Plaintiff's Exhibits 60 and 64 admitted full.)
Q. Mr. Vivenzio, do you recognize the vessel that's in Trial Exhibit 60?
A. That appears to be the side of the EVEREADY.
Q. That would be the starboard side of the EVEREADY?

A. Yes.
Q. And the exhaust port on the EVEREADY, where is that located?
A. That's mostly into the anti-fouling area, some of it is in the boot stripe.
Q. That's the hole that appears at the lower left-hand corner of the photograph, correct?
A. Correct.
Q. And on the EVEREADY, most of that exhaust port is below the waterline, correct?
A. The actual water level is probably about half-way on that hole. Half of the exhaust port would be below the waterline, below the actual water level.
Q. So what you're telling us is that -- the red or brown paint is what's called bottom paint or anti-fouling paint?
A. Correct.
Q. What you're telling us is that the anti-fouling paint on this vessel is higher than the actual waterline?
A. Yes.
Q. I'm going to show you what's Exhibit 64 in evidence, Mr. Vivenzio. Do you recognize the vessel in that photograph?
A. It looks like the EVEREADY, again.

Q. Where is the -- that's the starboard side of the EVEREADY, again, correct?
A. Yes.
Q. Where is the exhaust port in that photograph?
A. You can't see it there. It's below the water.
Q. It's submerged, correct?
A. Yes.
Q. And were you present when this photograph was taken?
A. I don't recall. It looks like it was part of the salvage with the dirty stump along the side.
Q. As part of the work that was done on the EVEREADY during the seven-year period, you repaired it after it went up on a jetty, correct?
A. Yes.
Q. As part of that repair, you had to remove one or more of the engines?
A. We removed the port engine.
Q. Did you remove the sole of the vessel in way of the cabin?
A. Yes.
Q. So that would leave the engine compartment completely exposed for access, right?
A. Correct.
MR. RAUWORTH: Objection. Ambiguous.

THE COURT: I'm sorry. Objection what?
MR. RAUWORTH: Objection. Ambiguous.
THE COURT: Why don't you focus the question a little better.
MR. LOVEJOY: Yes, your Honor.
Q. Where are the engines located on the EVEREADY?
A. They're below the deck in the cabin.
Q. And can you tell us approximately the parameters in feet of that area?
A. The deck area is probably 12 feet, 11 to 12 feet wide, by maybe 7 feet fore and aft.
Q. By removing the sole in that area, you expose all of the propulsion equipment, correct?
MR. RAUWORTH: Objection. Ambiguous.
THE COURT: Overruled.
A. You expose the engines and the transmissions.
Q. The reason you did that in 1998 was to remove the engines of the vessel?
A. Remove the port engine so we could have access to repair the damage on the port side.
Q. Okay. And by doing that, you expose the aft engine room bulkhead, correct?
MR. RAUWORTH: Objection. Ambiguous.
THE COURT: Overruled.
A. We would have had access to the aft bulkhead.

Q. Okay. And that being said, you would have been able to see where the exhaust hose on the port engine passes through the three-quarter inch aft engine room bulkhead, correct?
A. Correct.
Q. And if you had seen that it was sitting on the bulkhead, what action should have been taken?
A. If it was sitting on the bulkhead, it should have some chafing gear on it.
Q. What is the purpose of chafing gear, Mr. Vivenzio?
A. Chafing gear is protection to keep whatever it's around from getting worn out with vibrations.
Q. Put another way, you don't want the exhaust hose to be severed, correct?
A. Correct.
MR. LOVEJOY: May I have one minute, your Honor, to find a photograph?
THE COURT: Yes.
MR. LOVEJOY: Thank you. Your Honor, Mr. Rauworth has no objections to Plaintiff's Exhibits 86, 87, 98, 100 and 101.
MR. RAUWORTH: Could you read those again?
MR. LOVEJOY: 86, 87, 98, 100 and 101.
THE COURT: All right. Those will be full, without objection.

(Plaintiff's Exhibits 86, 87, 98, 100 and 101 admitted full.)

Q. Mr. Vivenzio, did you recognize what's depicted in Trial Exhibit 86?

A. It's a hose going through a bulkhead.

Q. Okay. Have you been provided with any photographs of the EVEREADY exhaust hoses?

A. Yes.

Q. And do you recognize this as an EVEREADY exhaust hose?

A. That's not one of the pictures I have.

Q. Okay. Whatever vessel it's on, you'd agree with me that this would be a condition that would be inappropriate for the placement of an exhaust hose, correct?

A. It looks as if it's rubbing on the bottom end.

Q. Okay. If that was something that Point Judith could detect, you'd want to remedy that condition, correct?

A. Right.

Q. I'm going to show you Trial Exhibit 87 and represent that's a close-up shot of 86. And if you found that condition on the EVEREADY, that would be a condition that Point Judith would want to remedy, correct?

A. That's correct.
Q. I'm going to show you Trial Exhibit 98, Mr. Vivenzio. Do you recognize that photograph?
A. I've seen this photo, yes.
Q. And what do you recognize it to be?
A. That's the starboard exhaust hose going through the bulkhead into the engine compartment.
Q. That's looking aft forward?
A. That's looking from aft forward, yes.
Q. And can you describe the condition that you see with respect to the exhaust hose, vis-a-vis, the bulkhead?
A. The hose seems to have been deteriorated and there's some moisture, water coming through it and some rust.
Q. Is that a condition that one would not want on their vessel, correct?
A. Yes.
Q. And if Point Judith could -- strike that. If Point Judith knew about this condition, it would be something that it would want to rectify in the EVEREADY, correct?
A. We would notify the owner.
Q. That's because there's a cut in that hose, correct?

A. It appears to be, yes.
Q. And that would allow water from the outside of the vessel to enter into the vessel, correct?
A. If that part of the hose is below the waterline, yes.
Q. I show you Exhibit 101, sir, which is a close-up of Trial Exhibit 100. And have you seen that photograph before, sir?
A. No.
Q. Okay. What does that photograph indicate to you?
MR. RAUWORTH: Objection. Calls for expert testimony. Foundation.
THE COURT: Sustained. You can lay a better foundation. Sustained as to foundation. Not as to expert testimony.
Q. Can you describe for us, Mr. Vivenzio, the condition of the bulkhead, vis-a-vis, the exhaust hose?
A. The bulkhead?
MR. RAUWORTH: Objection. Foundation.
THE COURT: Why don't you just ask him if he recognizes what the photo is and what it shows.
Q. Do you recognize what this photo is, or shows, sir?
A. I assume it's an exhaust hose and you're telling me it's a blowup of the one I just looked at.

Q. What does the photograph show with respect to the condition of the exhaust hose?
A. Again, it looks like the exhaust hose is deteriorated just forward of that writing that's on the hose, and I can see some rust.
Q. What does the rust indicate to you that's on the bulkhead?
A. These hoses are reinforced with wire between the layers of the rubber. So the water going through that wire would cause a rust.
Q. Okay. When you say the water running through the wire, in order to stay in the bulkhead, the water would have to be coming out of the exhaust hose, correct?
A. It looks like it.
Q. And dripping down onto the bulkhead?
A. Right.
Q. That's not a condition one would want on a vessel, correct?
A. Correct.
Q. Mr. Vivenzio, are you familiar with a Dennis Layfield?
A. Yes.
Q. Mr. Robbins?
A. Yes.
Q. And did they conduct a joint survey of the

EVEREADY on or about May 3, 2005?
A. Yes.
Q. Did you assist them with placing that vessel back in the water.
A. Yes, I did.
Q. Were you present when they found that a stream of water coming down the inside of the hull in the way of the engine compartment?
A. Yes.
Q. Can you describe the stream of water that you observed on May 3, 2005?
A. We had relaunched the boat trying to determine where the water could have come in from. And as we twisted the boat from one side to the other while it was still in the straps, the water would come in and then it would not come in. So at that point, we couldn't determine exactly what was causing the water to come in. I tried to dry up the water on the sides thinking maybe it was dripping down from the sides of the boat because the boat was still kind of wet from when it was sunk, and we never really could determine where the water was coming from.
Q. But you dried the area -- it was -- strike that. The water was running down the inside of the hull in the engine compartment?

A. Yes.
Q. And you removed the water that you initially saw to see if more water would come, correct?
A. Correct.
Q. And water kept coming the entire time that the vessel was in the water, correct?
MR. RAUWORTH: Objection. Mischaracterizes the testimony.
THE COURT: Well, if that's true, he'll say it's true. If it's not, then he'll say so. So overruled.
A. No. It didn't continue to come in. As I said, when we moved the boat from one side to the other, the water stopped coming in. Then we set it back again.
Q. How long was the vessel in the water, sir?
A. Maybe half an hour.
Q. When you tipped the vessel to the starboard side, the water would come in, correct?
A. We actually had it leveled and water was dripping down. Then we rolled it from one side to the other, I don't remember how it stopped or started, but the water was coming in on the starboard side.
Q. Would it be fair to say that when you tipped the vessel to starboard, that's when the water came in, on the starboard?
A. Could have been.

Q. When you tipped the vessel in the opposite direction, the water stopped?

MR. RAUWORTH: Objection, foundation.

THE COURT: If he knows, he can answer.

A. When -- it seemed like the water did stop when we twisted the boat. The boat was floating in the water completely, so --

Q. So when you tilted or twisted the boat to port, the water would stop, right?

THE COURT: Did you answer that?

A. Yes, that's correct.

MR. LOVEJOY: Your Honor, Mr. Rauworth has no objection to the admission of Plaintiff's Exhibit 65.

THE COURT: All right. 65 will be full, without objection.

(Plaintiff's Exhibit 65 admitted full.)

Q. Mr. Vivenzio, do you recognize what's in Trial Exhibit 65?

A. That's the EVEREADY.

Q. She's up on the hard, and that's a view from the stern looking forward, correct?

A. Yes.

MR. LOVEJOY: Okay. Thank you.

Q. Mr. Vivenzio, can you turn to Exhibit 7, please. And that's in the three-ring binder that I gave you.

Do you see that, sir?
A. Yes.
MR. LOVEJOY: Move it as a full exhibit, your Honor.
THE COURT: Any objection?
MR. RAUWORTH: No objection, your Honor.
THE COURT: Exhibit 7 will be full.
(Plaintiff's Exhibit 7 admitted full.)
Q. And in Exhibit 7, Point Judith removed both transmissions on the EVEREADY, correct?
A. Yes.
Q. Disconnected the shaft couplings?
A. Yes.
Q. And having done, removed the transmissions, that would allow you greater access to look at the exhaust hoses as they go through the aft engine room bulkhead, correct?
A. You could have seen them, yes.
Q. And if you could see those hoses, you could see that they're resting on the bulkhead, correct?
A. From the engine room side? Perhaps.
Q. Well, sir, the hoses come through an opening that's in a three-quarter inch sheet of plywood, correct?
A. I believe so.

Q. And they come through basically at a flush angle, correct?
A. Yes.
Q. There's no turns in the exhaust hose at that point, correct?
A. It comes through straight, yes.
Q. And from where the elbow is all the way back to the muffler, we're referring to a straight piece of exhaust hose, correct?
A. I believe so.
Q. That exhaust hose is six inches in diameter, am I correct?
A. I think so.
MR. LOVEJOY: Judge, may I confer with my opposing counsel for one minute? Thank you.
Q. Can you turn to Exhibit 8, Mr. Vivenzio?
A. Okay.
Q. Actually, maybe I can streamline this. Can you look at Exhibits 8 through 37, please?
A. Okay.
Q. Are they all business records of Point Judith Marina?
A. Yes.
MR. LOVEJOY: I move that they be admitted, your Honor, Exhibits 8 through 37.

THE COURT: Any objection?

MR. RAUWORTH: I'm just getting through 16, your Honor.

MR. LOVEJOY: Your Honor, in the meantime, could I have the witness also look at Exhibits 104 through 120? Actually, that's not correct.

Q. 104, Mr. Vivenzio.
A. Yes.
Q. Is that a business record of Point Judith Marina?
A. Yes.
Q. That's for charges subsequent to the sinking?
A. Yes.
Q. That's with the vessel EVEREADY, correct?
A. Correct.
Q. 117, sir.

MR. LOVEJOY: Your Honor, I move 104 into evidence.

THE COURT: Give Mr. Rauworth a chance to catch up here. Do you intend to ask any more questions about these exhibits, or are you just trying to get them all in?

MR. LOVEJOY: Some of them, I will have questions for them. The majority I will not.

THE COURT: All right. Eight through 37, Mr. Rauworth, you just let me know when you get through

it, or you can get through it at lunch.

MR. RAUWORTH: I just finished that series through 37, your Honor, and the group that ends in 37, I don't have objection to, although I'd ask that Mr. Lovejoy remind me of the first number of the series.

MR. LOVEJOY: I think Exhibit 7 is a full exhibit, and I'm going 8 to 37 at this point.

MR. RAUWORTH: Eight to 37? Okay.

THE COURT: So 8 to 37 will be full, without objection.

(Plaintiff's Exhibit 8 to 37 admitted full.)

MR. LOVEJOY: Thank you, your Honor.

Q. Mr. Vivenzio, can you look at Plaintiff's Exhibit 104, 117 --

A. 104 and 117 seem to be duplicates.

MR. RAUWORTH: No objection to 104. 117 does appear to be an exact duplicate.

MR. LOVEJOY: Well, then, excuse me. I'll withdraw 117, your Honor.

THE COURT: All right. 104 will be full.

(Plaintiff's Exhibit 104 admitted full.)

MR. LOVEJOY: And there's 118, 119, 120.

MR. RAUWORTH: No objection to those, your Honor. Those three, 118, 19 and 20.

THE COURT: Without objection, 118, 19, and 20 will be full.

(Plaintiff's Exhibits 118, 119 and 120 admitted full.)

Q. Mr. Vivenzio, Exhibits 104, 118, 119 and 120 are all statements of Point Judith Marina for services it provided following the sinking of the EVEREADY on April 25, 2005?

A. Yes.

Q. And they were submitted to Mr. Picchione, or his underwriter, and paid, right?

A. Yes.

Q. Now, can you tell the Court what Point Judith charges, or charged, per foot to store the EVEREADY following sinking after it was removed from the water?

A. I think we were in the summer rates, and I don't remember what they are. But they're high.

Q. Excuse me?

A. Land storage in the summertime is higher than during the winter.

Q. Can you tell us what you charged to store the EVEREADY. You did it per foot, correct?

A. I don't recall.

Q. Can you look at your records?

THE COURT: Do you have a document or something

that might help refresh his recollection? Is there any dispute about what the storage rates are?

MR. LOVEJOY: I don't believe so.

THE COURT: Can you read the stipulation as to storage rates? Why is this taking so much time?

MR. LOVEJOY: I'll move on, your Honor. I'll talk about it with Mr. Rauworth during a break. I apologize.

Q. Do you have Exhibit 1 in front of you, sir?

A. Yes.

Q. And in the middle of page 1 of Exhibit 1, there's a reference to Rule 10 and Rule 35?

MR. RAUWORTH: What page of Exhibit 1?

MR. LOVEJOY: Page one of one.

A. There's a reference to what?

Q. Rule 10, and directly below it Rule 35?

A. Yes.

Q. Those are bilge pumps, sir?

A. One's a pump and one's a switch.

Q. Okay. That's a bilge pump you installed on the EVEREADY?

A. Yes.

Q. And are you familiar with anti-siphoning loops?

A. Yes.

Q. Check valves?

A. Yes.
Q. And you were familiar with them in 1998, correct?
MR. RAUWORTH: Once, again, your Honor, I would like to establish a continuing objection to this line of questioning, there having been no mention of it in the amended complaint. The question of bilge discharge lines and so forth has never been alleged against Point Judith.
THE COURT: I don't think I agree with that, so the objection is overruled.
Q. You're familiar with anti-siphon loops, and that's because you've read technical publications, sir?
A. Yes.
Q. Do you, or does Point Judith, belong to any marine associations?
A. Yes, we do.
Q. What are those, sir?
A. We belong to Rhode Island Marine Trade Association and the American Boat Builders and Repair Association.
Q. That's called ABBRA, I guess?
A. Yes, sir.
Q. They put out technical bulletins, correct?
A. Yes.
Q. You can remember seeing technical bulletins concerning anti-siphon valves or check valves prior to

1998, correct?
A. Probably.
Q. Are you familiar with the American Boat and Yacht Council?
A. Yes.
Q. How are you familiar with it, sir?
A. We subscribe to that.
Q. Okay. So you have their volume of recommendations, correct?
A. Yes, sir.
Q. And do they have a recommendation that addresses anti-siphon loops?
A. Yes, they do.
Q. Okay. And do they also have a recommendation that involves strain relief or chafing gear for exhaust hoses?
A. I don't recall.
Q. What knowledge did you have in between 1998 and the year 2005 concerning strain relief or chafing gear in respect to exhaust hoses?
A. I don't follow your question, but I'm aware that it is necessary.
Q. Excuse me?
A. I'm not sure of your question, but I am aware that it is necessary to have.

Q. And maybe I inarticulately asked the question. You're aware it's required, but how did you come of that knowledge?
A. Probably from reading manuals and just from discussions at various seminars.
Q. That's one of the seminars that you've attended on an annual basis over the last 30 something years?
A. Yes.
Q. It would also be common sense, correct?
A. Yes.
Q. On page three, towards the top, there's an entry that says "pulled generator," correct?
A. Yes.
Q. And if you were to pull a generator, would that allow you visual access to the rear side of the port engine room bulkhead in way of the exhaust hose?
A. I don't know. I don't think so.
Q. Down below there's an entry for removal of hull. What does that refer to? Is that for removal of the engine we discussed earlier?
A. Yes.
Q. If you go to page five, Exhibit 1, there's an entry towards the top that says 2.80, check both transmissions for damage?
A. Yes.

Q. Did you have to remove the transmissions at that point in time to check them for damage?
A. I don't remember.
Q. On page six, sir, go about three-quarters of the way down, there's an entry for reinstalling the port engine, correct?
A. Correct.
Q. That's the engine removal and installation we spoke of earlier?
A. Yes.
Q. And there's also an entry for reinstalling the transmission, correct?
A. Correct.
Q. Now, go to page seven of Exhibit 1, sir. Do you have page seven, sir?
A. Yes.
Q. About ten lines down on the right, there's reference to pump 1000 gallons?
A. Right.
Q. 1000 GPH, correct?
A. Correct.
Q. There's some other entries directly below it with respect to bilge pumps, correct?
A. Yes.
Q. Are those bilge pumps that were installed by Point

Judith?
A. Yes.
Q. When you installed those bilge pumps, did Point Judith install either check valves or anti-siphon loops on the discharge hoses at that time?
A. We replaced the items as we found them.
Q. But in 1999, you were aware of the ABYC requirement for anti-siphon loops on discharge hoses, correct?
A. I'm not sure if it's a requirement. It depends on how that hose is set up.
Q. Well --
A. Again, we didn't change the hoses. We only changed the electrical pieces.
Q. Components?
A. Components.
Q. I'm asking you, at this time you're aware of the recommendation of the ABYC for anti-siphon loops and discharge lines, correct?
A. I'm not sure.
Q. Now, sir, have you -- strike that.
When you purchase a bilge pump, it also comes with instructions for its installation from the manufacturer, correct?
A. Yes.

Q. And have you examined the -- these are what are called Rule, R-U-L-E, bilge pumps that you installed in 1999?
A. Yes.
Q. And they come with installation instructions, correct?
A. I believe so.
Q. And those instructions state that the thru-hull fitting to which the pump is connected by a discharge hose should be one foot or more above the waterline, correct?
MR. RAUWORTH: Objection. Foundation. The documents speak for themselves.
THE COURT: You can ask him if he's aware of those instructions, first of all.
Q. You got instructions with the bilge pumps, right?
A. Yes.
Q. Did you read the instructions?
A. I didn't install the bilge pumps.
Q. Did you ever read the installation instructions that come with any of the bilge pumps?
A. They mostly refer to how to secure the bilge pump to the bottom of the boat and how to secure the float switch and wire the two components together.
Q. Well, have you ever actually read the

instructions?
A. No more than that.
Q. Does Point Judith tell its technicians, or the persons installing the bilge pumps, to review the manufacturer's installation instructions?
MR. RAUWORTH: Objection. Ambiguous as to which document is he meaning discussed, your Honor.
THE COURT: Overruled.
A. We would give the bilge pumps to the technicians with the instructions in them.
Q. Yes. And would Point Judith, as a matter of procedure, instruct its technicians to read the installation instructions provided by the manufacturer with the bilge pump prior to installing them on a vessel?
A. Not necessarily.
Q. Do you give your technicians any sort of training at Point Judith?
A. We send them to various schools.
Q. Okay. You send them to engine schools, correct?
A. Yes.
Q. Are there any schools for the installation of bilge pumps that you send them to?
A. No.
Q. I'm correct, am I not, that you don't provide them

with any in-house training on how to install bilge pumps, correct?
A. No. We figure they've learned that with the other training they've had.
Q. And you have no manual or instruction sheet at Point Judith that directs your technicians to read the manufacturer's installation instructions prior to installing a bilge pump?
A. No.
Q. Can you go to Exhibit 3, sir.
A. Okay.
Q. Is it a business record of Point Judith, sir?
A. Yes.
MR. RAUWORTH: No objection, your Honor.
THE COURT: Exhibit 3 will be full.
(Plaintiff's Exhibit 3 admitted full.)
Q. And one of the items that was done by Point Judith -- and I can't read the year. Maybe you can help me out with the copy you have. Is it 2000?
A. I can't read it, either.
Q. Well, the promise date on mine, I can read, is 12/18/01; is that correct, sir?
A. Yes.
Q. In order to repair the starboard engine mount, you would have to be at the back of the vessel, back of the

starboard engine, correct?
A. I'm not sure which mount this is, forward or aft.
Q. That would put you down in the engine room, correct?
A. Yes.
MR. RAUWORTH: Objection. Ambiguous.
THE COURT: Overruled.
Q. Now, turning to 2004, 2005, you were here yesterday when Mr. Picchione testified, correct?
A. Yes.
Q. And he testified that Point Judith sends out commissioning requests either late 2004 -- I mean late part of every year or early part of the spring year, correct?
A. Yes.
Q. And did you do that with respect to Mr. Picchione and the Albin 35 in the fall of 2004?
A. Sometime over the winter, 2004 and '05.
Q. Did you get a filled out commissioning request from Mr. Picchione back?
A. I don't recall. I think we did.
Q. And he requested the standard commissioning, did he not, at that time?
A. Yes.
Q. And can you tell the Court what the standard

commissioning is -- strike that. Is the standard commissioning the items that are in Trial Exhibit 4 and 5?

MR. RAUWORTH: Objection. Assumes facts not in evidence, namely, that there is a specific standard commissioning, or that it was the same in this year.

THE COURT: What exhibit are you referring to?

MR. LOVEJOY: Exhibits 4 and 5, your Honor.

THE COURT: I'll sustain the objection. You just ask him if there's a standard protocol for commissioning boats.

Q. Is there a standard form request for commissioning vessels that you send out?

A. There is. Not this one.

Q. Does it have the same items that are listed in Exhibit 4 and 5?

A. Not all of them. It has many. Basically, when we're commissioning a boat, we ask the people if they want to do the engines, whether it's single or twin, gas or diesel. If they want us to commission the engines, then we will do a sea trial. The rest of these items are just to make notation as to whether they work or don't work.

Q. Okay. But if they ask for the engine -- if you commission the vessel, I think you already testified

that that includes looking at the hoses, correct?
A. Correct.
Q. Does it also include looking at the bilge pumps?
A. Yes. That's on the check off list, to look at the bilge pumps.
Q. And are you familiar with the bilge pump switches on the EVEREADY vessel?
A. Yes.
Q. Okay. How many are there?
A. From looking at all the pictures the past two days, there's three.
Q. Which -- do you know which bilge pump each one of those switches goes to?
A. No.
MR. RAUWORTH: Objection. Withdrawn.
MR. LOVEJOY: Your Honor, may I approach the witness, please?
THE COURT: Yes. How much more do you have with this witness?
MR. LOVEJOY: Probably 30 minutes, maybe 50 minutes. Before I review my notes, that's my best estimate.
THE COURT: Do a little more, then we'll take a break.
Q. I'm going to show you what's Triple N in evidence,

Mr. Vivenzio. Do you recognize what's in there?
A. Yes, sir.
Q. Is that the switch panel for the vessel, EVEREADY?
A. Yes.
Q. And in the lower right-hand corner there's two plates that say bilge pump, correct?
A. Correct.
Q. Do you know which bilge pump the lower-most one goes to?
MR. RAUWORTH: Objection. Assumes facts not in evidence as to the way this panel is wired.
THE COURT: Overruled.
A. I don't know.
Q. What about the bilge pump plate switch directly above that?
A. I don't know.
Q. And do you know what -- there's a tape label that says "auto on," do you see that?
A. Yes.
Q. And a switch to the left of it, correct?
A. Correct.
Q. Do you know what that goes to?
A. That supplies power to all the float switches.
Q. Okay. And does that switch have to be on to operate the bilge pumps?

A. For the bilge pumps to operate in automatic, that switch needs to be on.
Q. Okay. Now, you were here earlier when Mr. Stroker testified, correct?
A. Yes.
Q. And he testified that he turned one of the -- or the switch that went to the engine room bilge pump off, correct?
A. Correct.
Q. Do you know what the purpose of the two bilge pump switches are that are at the bottom of the Exhibit Triple N?
A. I believe they're manual override.
Q. So that would -- would it be fair to say that they're for turning the bilge pump on without relying on the auto switch?
A. Correct.
Q. And if it was in the -- if one of the switches was in the off position, it would just not be overriding the auto switch, correct?
A. Correct.
Q. Okay. So would you agree with me that the only way to shut off the bilge pump, if it was running and malfunctioning continuously, would be to shut off the auto switch?

A. No. Shut off the manual.
Q. The manual switches would not be normally kept in the on position, correct?
A. They shouldn't be. This is a very confusing system for bilge pumps, though.
Q. Okay. And tell us what -- this is not a standard bilge pump setup?
A. It's confusing, to have three bilge pumps and two manual overrides confusing you in the first place. To have three bilge pump switches all relying on one circuit breaker is kind of confusing, also.
Q. So are you telling us this is not the standard setup?
A. I guess it's standard for Albin.
Q. But it's not the standard for other manufacturers?
A. There's different ways to wire up bilge pumps, yes.
Q. So someone going on the vessel would have to know what they're doing in order to properly operate the bilge pump switch system on this vessel?
A. It would take a bit to figure it out, yes.
Q. Do you know how many times Mr. Stroker had been on the EVEREADY, ever?
A. He had been on there a couple of times.
Q. That's over a period of three years he was at

Point Judith Marina?
A. Yes.
Q. Can you return to Exhibit 1, sir, please?
A. Yes.
Q. Can you go to page ten?
A. Okay.
Q. And there's a written entry that says, engines, commission all systems and engines, correct?
A. Yes.
Q. That's something you did with respect to the EVEREADY in 1999, correct?
A. Correct.
Q. Did you do that with respect to the EVEREADY for each and every year between 1999 and 2005?
A. We didn't do it in 2005.
Q. But for 2000, 2001, 2002, 2003, 2004, you did a full commission on the EVEREADY each of those years, correct?
A. I would have to check the record, but I believe we did.
Q. And that included a sea trial each year, correct?
A. Yes.
Q. And that's what -- strike that. That's the same thing that Mr. Picchione requested by way of sending the commissioning list back to you in either late 2004

or early 2005, correct?
A. Yes.
Q. Can you turn to page 14 of Exhibit 1, please.
A. Okay.
Q. In the middle there's an entry that says, remove manifold. Do you see that?
A. Yes.
Q. And the manifold is connected to the exhaust hose, am I correct?
MR. RAUWORTH: Objection. Ambiguous, and assumes facts not in evidence in terms of the description of the exhaust system.
THE COURT: Overruled.
A. The manifold is eventually connected to an exhaust hose.
Q. And what's between the manifold and this straight piece of six-inch exhaust hose that we've been discussing?
A. There's a turbo, and then there's a section of hose off that. Probably some fiberglass exhaust pieces to make some elbows.
Q. You'd be down in the area of the exhaust hoses, correct, when you're doing this work?
MR. RAUWORTH: Objection. Ambiguous.
A. You have an exhaust hose --

THE COURT: Overruled. Go ahead.
A. You have an exhaust hose coming off the turbo.
Q. Can you turn to page 16, Mr. Vivenzio.
A. Okay.
Q. Towards the middle, it says, remove shafts from boat. Do you see that?
A. Yes.
Q. Right below that it says, remove stuffing boxes, exhaust hose, correct?
A. Yes.
Q. In 1999, Point Judith again was doing, or it did work on one of the exhaust hoses, correct?
A. Yes.
Q. From what I can tell, it doesn't indicate whether it's the port or the starboard one in here, does it?
A. No.
Q. That's the hose that goes through the three-quarter inch rear engine room bulkhead that we're discussing, correct?
A. Not necessarily.
Q. You would be in sight of that hose if you were working on any of these exhaust hoses, correct?
A. You'd be in the aft part of the engine room where the exhaust hoses are, yes.
Q. Where they go through this three-quarter inch

bulkhead that we're talking about, right?
A. Right.
Q. Can you go to page 18, sir.
A. Okay.
Q. There's a section entitled labor that starts at about 50 percent of the way down the page?
A. Yes.
Q. There's two entries. It says, repair starboard exhaust, 2.6 hours; is that correct?
A. Yes.
Q. The one below it, 1.4 hours, repair starboard exhausts?
A. Yes.
Q. Thank you. Turn to page 27, please, sir.
A. Okay.
Q. And this -- we're into the year 2003 at this point, are we not?
A. Yes.
Q. And do you see the written entry that says, disassemble and inspect turbo? Do you see that?
A. Yes.
Q. And below that it says, replace turbo, found exhaust elbow had a leak. Replace elbow, correct?
A. Correct.
Q. So at 2003, you're working on one of the exhaust

elbows, correct?
A. Yes.
Q. Can you tell me whether it's the starboard or the port side?
A. I can't other than above that it has port riser written down. So I would think that we were working on the port engine.
Q. Okay. Now, during the time that Mr. Picchione kept the 35-foot Albin at Point Judith, did he have it waxed regularly?
A. Yes.
Q. He tried to keep it in good-looking condition, correct?
A. Yes.
Q. And, in fact, on page 28 at the bottom, Point Judith charged him $360 to wax his hull?
A. Yes.
Q. Turning to page 29 at the bottom, there's a repair, high water alarm entry, correct?
A. Yes.
Q. That's something Point Judith did in July of 2004, correct?
A. Correct.
Q. What's the purpose of a high water alarm?
A. There's a sound mechanism on the bridge, usually,

that will alert the captain while he's running the boat that there's excess amount of water in the bilge. So usually it's hooked up to some type of float switch which activates the audio alarm.
Q. So that's so he actually does not have to open the engine room hatches while the vessel is underway?
A. Usually the alarm is set above the pumps. If the pumps aren't working and water gets above them, it's going to give them a warning.
Q. Can you explain to me, on the same page in the middle, it says 7/27/04, do you see that?
A. Yes.
Q. Repair order 8024, do you see that?
A. Yes.
Q. Now, does that go with the information that's directly above it until we find the next date of 6/29/04, or does that go with the information that's below it until we get to repair order 8001?
A. The information goes below it. So you got the date and the RO number, then you have parts and labor beneath that.
Q. So when I'm looking at 7/27/04, RO number 8024, $145, in order to find what comprises the $145, I go below it until I hit the next date and repair order number?

A. Yes.
Q. And the dates -- strike that. Mr. Stroker testified that he submitted the work order, I guess, back to the service manager, or the accounting department at Point Judith so they can do a bill, correct?
A. Probably brought back to the service desk at the end of the day.
Q. Okay. And do they immediately enter that information into the computer system so that it shows up on a sheet like Exhibit 1?
A. No.
Q. Does it get entered the next day?
A. It could be three or four days before they get to the billing part of it.
Q. Can you go to page 31, sir.
A. Okay.
Q. I guess you have to look at the bottom of page 30. There's an October 7, 2004 repair order, 8492, correct?
A. Um-hum. (Affirmative.)
Q. I'm going to look below that for the detailed information about what was done on the vessel, correct?
A. Yes.
Q. The last entry is 5.5 hours for repairing an engine, and Point Judith charged $467.50, correct?

MR. RAUWORTH: Where is this?
MR. LOVEJOY: Page 31.
A. Yes.
Q. Do you know what engine Point Judith spent five-and-a-half hours on?
A. No.
Q. But this is a Caterpillar engine, correct?
A. Yes.
Q. At the bottom of the page, there's an entry for April 8th, 2005, RO9185, do you see that?
A. Yes.
Q. And below it is the information that goes with that repair order, correct?
A. Correct.
Q. And you were here when Mr. Smedberg testified, correct?
A. Yes.
Q. And he testified that he believed he painted the bottom of the EVEREADY during the week preceding its launching, correct?
A. Right.
Q. Would this information indicate to you otherwise?
A. It would -- it would -- yes.
Q. So you said it may take a few days for the information to get into the computer which generates

Exhibit 1, correct?
A. Correct.
Q. And it was entered on April 8th, 2005, correct?
A. Correct.
Q. So that would indicate to you that the bottom was painted prior to April 8th, 2005?
A. Correct.
Q. That would either be two or three weeks before when the vessel was launched, correct?
A. Correct.
Q. Going to page 32, sir.
A. Okay.
Q. There's an entry for repair order 9186, do you see that?
A. Yes.
Q. And that's for April 23rd, 2005, correct?
A. Yes.
Q. And again, we have to look below it to determine what was done on the vessel, correct?
A. Correct.
Q. And down below, it shows that you commissioned the twin diesels on this vessel, correct?
A. Yes.
Q. Then the next entry is for 4/26/05, correct?
A. Right.

Q. That's work order 9334?
A. Yes.
Q. And that's for additional work that was done on the EVEREADY prior to April 26, 2005, correct?
A. I believe one of these bills was cancelled. They both do the same thing.
Q. They have different entries. There are some similar entries, but there's a charge in the 9186 RO for $525 for commissioning twin diesels, correct?
A. Correct. That work wasn't done. That's why that repair order got cancelled.
Q. Well, somebody entered it as if it had been done, correct?
A. Yes.
MR. LOVEJOY: Your Honor, I don't know whether it would be a good time to take a break now. I'd like to review some documents, if it's permissible.
THE COURT: That's fine. Why don't we take our lunch break now. We'll reconvene at two o'clock.
(Lunch recess.)
THE COURT: Are you ready to proceed, Mr. Lovejoy?
MR. LOVEJOY: Yes, your Honor. Thank you. One housekeeping item before I resume questioning. I had made a misstatement about the exhibits. I guess it was

8 through 37. There is no number 13. It was removed.

THE COURT: All right. No Exhibit 13.

MR. LOVEJOY: May I resume?

THE COURT: Yes.

MR. LOVEJOY: Thank you. And may I approach the witness?

THE COURT: Yes.

BY MR. LOVEJOY: (Continuing)

Q. I'm going to show you what's been marked for identification as Plaintiff's 63, Mr. Vivenzio. Do you recognize that photograph?

A. I can't tell you what that is.

Q. Were you present when Mr. Layfield and Mr. Robbins were taking photographs of the EVEREADY on May 3rd, 2005, when they performed a joint survey?

A. I wasn't on the boat with them the whole time.

Q. Okay. I'm going to show you what's been marked as 59 for identification. Do you recognize that, what's depicted in that photograph, sir?

A. Looks like the side of the boat.

Q. When you say "the boat," you're referring to the EVEREADY?

A. Yes.

MR. LOVEJOY: Your Honor, I move it be admitted as a full exhibit.

MR. RAUWORTH: No objection, your Honor.
THE COURT: 59 will be full.
(Plaintiff's Exhibit 59 admitted full.)
MR. LOVEJOY: Thank you, your Honor.
Q. Do you recognize what's depicted in Plaintiff's Exhibit 62, sir?
A. Yes.
Q. Is that --
A. Looks like the side of the EVEREADY.
Q. That would be the starboard side of the EVEREADY?
A. Starboard side.
MR. LOVEJOY: Move it be admitted in full, your Honor.
MR. RAUWORTH: No objection, your Honor.
THE COURT: No objection or objection?
MR. RAUWORTH: No objection. I apologize.
THE COURT: All right. 62 will be full.
(Plaintiff's Exhibit 62 admitted full.)
Q. And can you tell the Court what is -- I'm going to point to it, the white circular device that's at the top of the, what's called the boot stripe?
MR. RAUWORTH: Objection. Foundation -- you may answer.
MR. LOVEJOY: Withdrawn.
Q. What do you call the white line on the side of the

vessel in Exhibit 62, Mr. Vivenzio?
A. The white line is a boot stripe.
MR. RAUWORTH: Objection.
MR. LOVEJOY: There's an objection.
MR. RAUWORTH: I confused my answer, your Honor. Commonly in a deposition when I'm objecting I will make it clear that I'm not instructing the witness not to answer.
THE COURT: I understand that. Are you objecting or not?
MR. RAUWORTH: I am objecting.
THE COURT: What's the objection?
MR. RAUWORTH: Foundation.
THE COURT: Overruled. You can ask him if he knows what that is.
Q. The white line is what you've testified is called a boot stripe on a vessel, right?
A. Yes.
Q. Do you know what the circular device is that's bisected by the top edge of the boot stripe?
MR. RAUWORTH: This is the point at which I have an objection. Foundation.
THE COURT: All right. Do you know what that is, the round thing?
THE WITNESS: Yes, sir.

THE COURT: Then tell us.
THE WITNESS: It's a thru-hull.
MR. LOVEJOY: Thank you.
Q. I'm going to show you what's been marked for identification as Exhibit 61. Can you identify what's depicted in Exhibit 61, Mr. Vivenzio?
A. Yes.
MR. RAUWORTH: Objection.
THE COURT: Overruled.
Q. What is it? Is it the side of the EVEREADY?
A. It could be the side of the EVEREADY. And --
Q. Again, there's a white boot stripe, correct?
A. Yes.
Q. And bisected approximately half way through the top of the white boot stripe are two thru-hull fittings, correct?
A. Yes.
Q. And do you know what those two thru-hull fittings are connected to?
A. No.
Q. I'm going to show you --
THE COURT: Are you moving 61?
MR. LOVEJOY: Yes, your Honor, I apologize.
THE COURT: Is there an objection?
MR. RAUWORTH: There is, your Honor,

particularly with regard to the addition of this tape.

THE COURT: Overruled. 61 is full.

(Plaintiff's Exhibit 61 admitted full.)

Q. I'm going to show you again Trial Exhibit 59, sir. And in 59, there's a line that appears above the boot top. What do you recognize that to be, if anything?

A. It's hard to tell. Looks like a scuff mark.

MR. LOVEJOY: Can I hand the witness the original, your Honor?

THE COURT: Yes.

MR. LOVEJOY: Thank you.

A. We're looking at a line above the boot stripe, which looks like it was residue left over from where water had come up to, on the side of the boat.

Q. And is that line commonly referred to in the marine trade as a scum line?

A. Yes.

Q. And that would indicate where the vessel was sitting in respect to the water that it was floating in, correct?

MR. RAUWORTH: Objection, your Honor. There's no reference to time on this, or the circumstances of the vessel. We don't know what this depicts in terms of time, which is quite critical in this case.

THE COURT: Well, that's a valid point. I mean,

you can use this witness to tell us what it is, but you need to put this photo into some context.

MR. LOVEJOY: I'll do that, your Honor.

THE COURT: With another witness?

MR. LOVEJOY: Yes. I'll try to do it with this witness, but I can do it with Mr. --

THE COURT: Well, all right. I'm going to overrule the objection, but the point is a valid point, and that needs to be filled out.

MR. LOVEJOY: Yes, your Honor.

THE COURT: Go ahead.

MR. LOVEJOY: I don't think he answered the last question.

THE COURT: Do you remember the last question?

THE WITNESS: I believe it was asked if the scum line showed where the water level would be, and it's a close approximation.

THE COURT: Okay. Thank you.

Q. And am I correct the scum line indicates where the vessel had been sitting, correct?

MR. RAUWORTH: Objection. First of all, I can't hear what Mr. Lovejoy is saying, but again --

THE COURT: If you can't hear it, how can you object to it? So why don't you reask the question, then you'll hear it better.

Q. Mr. Vivenzio, the scum line indicates where the vessel had been sitting in the water, correct?

MR. RAUWORTH: Objection. Calls for speculation, and there's no reference to time.

THE COURT: All right. Overruled. Go ahead.

Q. Now, you hauled the EVEREADY on May 25th, correct?

THE COURT: Did he answer that last question? I don't think he did.

THE WITNESS: No.

THE COURT: Did you?

THE WITNESS: No.

THE COURT: Okay. Can you answer it?

A. The scum line would show where water was coming up to the side of the boat.

Q. Okay. In other words, where the vessel had been sitting relative to the water it was floating in, correct?

A. Correct.

Q. Now, am I correct that the EVEREADY sank either late on the evening of the 24th of April or early morning hours of the 25th of April, correct?

A. Correct.

Q. And when you arrived at work, did you get a phone call or some indication that this vessel had sunk?

A. Yes. A phone call.

Q. Okay. And you hauled the vessel out with the Travel Lift, correct?
A. Yes.
Q. And you put it on the hard, meaning up on land after you hauled it out on the 25th, correct?
A. Yes.
Q. And it sat on land from April 25th until May 3rd, 2005, when Mr. Layfield and Mr. Robbins conducted a joint survey, correct?
A. I'm not sure.
Q. Well, it sat on land from when you first hauled it out, correct, until you were asked to put it back in?
A. I think so.
Q. Okay. And you were present when it was placed back in the water, right?
A. Yes.
Q. And the purpose of that relaunching was to try to determine what caused the EVEREADY to sink, correct?
A. Correct.
Q. And do you remember these pictures or photographs being taken when the vessel was relaunched with Mr. Robbins and Mr. Layfield present?
MR. RAUWORTH: Objection. Foundation.
THE COURT: Overruled.
A. The ones we just looked at?

Q. Yes, sir.
A. I don't remember them being taken.
Q. I'm going to use the term "strong scum line." This is a scum line based on your experience that was created as a result of this vessel only being subject to water, which is in Exhibit 59, for a relatively short period of time, correct?
MR. RAUWORTH: Objection. Calls for speculation.
THE COURT: Overruled. If he knows. You can answer that question.
MR. RAUWORTH: Could we have this displayed on the screen, your Honor? I really can't tell what the point is of the question to the witness.
Q. Based on your experience, Mr. Vivenzio, being in the marine industry for 30 plus years, can you tell us approximately how long it took to create the scum line that's indicated in Trial Exhibit 59?
MR. RAUWORTH: Same objection.
THE COURT: Overruled.
A. I can't tell you how long that would have to be in the water to make that scum line. It depends on the quality of the water around the boat.
Q. Well, you agree these photographs were taken of the EVEREADY in 2005, correct?

A. Yes.

MR. RAUWORTH: Objection.

THE COURT: Is there an objection?

MR. RAUWORTH: Yes. To foundation.

THE COURT: All right. I'm going to sustain that objection. I think he testified he doesn't know when these photos were taken. But if you can clear that up, go ahead.

Q. Following the sinking of the EVEREADY on April 25th, how many times did Point Judith launch the vessel?

A. I believe once shortly after, and then later when the boat was -- when the boat left the yard permanently, which was maybe six months later.

Q. Mr. Vivenzio, could you turn to Exhibit 2, please, in the binder.

A. Okay.

Q. Do you recognize that document, sir?

A. Yes.

Q. What is it?

A. Instructions for installing a pump.

Q. Rule 1500/2000 bilge pump?

A. Yes.

Q. And is this the type of instructions that were received in the bilge pump packages that Point Judith

installs on vessels that are in its marina?

MR. RAUWORTH: Objection. Foundation.

THE COURT: Overruled.

A. Yes.

MR. LOVEJOY: I'd move that it be admitted as a full exhibit, your Honor.

THE COURT: Any objection?

MR. RAUWORTH: I don't believe there's any competent testimony as to the date of this thing, when it was made available, and when it was in effect.

MR. LOVEJOY: It's dated at the bottom as, I believe, 12/01, your Honor. That's in the middle of the first page. At the bottom of the printed material, it says M02C-055 then space 12/01.

THE COURT: All right. I see that.

MR. RAUWORTH: Or likewise that this particular document was provided to Point Judith at any time that it did any installation of a Rule pump. I think the only reference to that was in 1999.

MR. LOVEJOY: Well, your Honor, I'm going to stipulate that Mr. Vivenzio testified he recognizes it, that 12/01 can be the cutoff for its use.

THE COURT: Why don't you ask him a few more foundational questions, see if you can clear this up.

Q. Can you look through all the pages of Exhibit 2,

sir.
A. I have one page, right? This one.
Q. The copies have four. You have a two-sided document, correct?
A. Right.
Q. And did you have occasion to read Rule bilge pump instructions as bilge pumps were installed on vessels at Point Judith?
MR. RAUWORTH: Objection. Again, no reference as to time.
THE COURT: Sustained.
Q. Since December of 2001?
MR. RAUWORTH: Once, again, the objection is there's no showing that bilge pumps -- this model of bilge pump has been installed since the date that's shown on the document.
THE COURT: Okay. Sustained. Start from the beginning with respect to these bilge pumps and Point Judith.
Q. Since December 2001, Mr. Vivenzio, has Point Judith installed Rule 1500 or 2000 bilge pumps?
A. Yes.
Q. And with the Rule 1500 or 2000 bilge pumps, you received copies of installation instructions such as the one that has been marked as Exhibit 2, correct?

MR. RAUWORTH: Again, relevance. Your Honor, there's no showing that there was anything done on the EVEREADY.

THE COURT: Overruled.

MR. LOVEJOY: I don't think he's answered it.

THE COURT: Would you answer that?

A. Yes.

Q. And you reviewed the instructions that you received following December 2001 on occasion up until the time that the EVEREADY sank?

A. Have I reviewed these?

Q. Yes. On occasion, between December 2001 and April 2005?

A. I might have.

MR. LOVEJOY: I'll move that the Court accept it as a full exhibit.

MR. RAUWORTH: I object to the admission, your Honor, for the reasons stated, that there's been no showing that there was any installation of this model bilge pump on the EVEREADY at any time since the date of the document shown in Exhibit 2 and, therefore, there's no relevance to the document.

THE COURT: All right. Mr. Lovejoy, what are you trying to do with this? What's the point of this document, because I'm not -- it's not really clear to

me, and there's some validity to this objection.

MR. LOVEJOY: I mean, I want to use it for the manufacturer of the bilge pumps that were installed on the EVEREADY's instructions on how to install their bilge pump.

THE COURT: Are you representing that this is the type of bilge pump that was on the EVEREADY?

MR. LOVEJOY: The bilge pump that was on the EVEREADY that had the malfunction problem is sitting on the clerk's desk in front of your Honor.

THE COURT: Does this witness know that that was the bilge pump that was installed on the EVEREADY? You haven't established that.

Q. Well, do your records indicate that you installed a Rule 1500 bilge pump on the vessel at some point in time?

MR. RAUWORTH: Objection, your Honor. "At some point in time" begs the question.

THE COURT: Overruled.

A. We did replace bilge pumps, but I don't remember the dates.

Q. And you replaced a Rule 1500 bilge pump and a Rule 2000 bilge pump, correct?

A. I don't remember. I'd have to look at that bill to verify that.

Q. Do you have personal knowledge as to what the bilge pump manufacturers require in respect to how far the thru-hull fitting be placed above the waterline on their installations?

MR. RAUWORTH: Objection. Relevance again. There's no evidence that --

THE COURT: Overruled.

A. Yes.

Q. And what distance above the waterline do you understand Rule suggests that thru-hull fittings be placed?

THE COURT: You need to ask him how he knows, how he has that personal knowledge.

MR. LOVEJOY: I'm sorry, your Honor.

Q. How did you obtain that knowledge, sir?

A. I'm not sure.

Q. Did you obtain it through reading Rule installation instructions or from some of these professional organizations that you belong to in their circulars?

A. Could be either one.

Q. What do you remember the professional circulations indicating how far above the waterline a thru-hull fitting should be placed on a bilge pump installation?

MR. RAUWORTH: Your Honor, for the record, I'd

just like to make clear that I'm renewing my objection to this line of questioning. Again, there was no allegation in the pleadings that this party, that Point Judith Marina, did any new installation of bilge pumps, or created any thru-hull fittings, or that they did anything wrong about that. I don't believe that is found in the amended complaint.

THE COURT: I've already ruled on your objection in this regard. I've overruled this objection. This is notice pleading. There's enough in this complaint. I've reviewed the complaint. There's enough in this complaint to support this allegation of negligence. So your objection is overruled. Do you remember the last question?

THE WITNESS: I believe it was what height over the waterline the thru-hull should be, and I'm not sure. I thought it was someplace about six inches.

THE COURT: I didn't hear that. I'm sorry.

THE WITNESS: I thought it was someplace about six inches above the waterline.

MR. LOVEJOY: I'll move on, your Honor.

Q. You understood from the time that Mr. Picchione brought the EVEREADY to Point Judith that he did a lot of off-shore fishing, right?

A. Yes.

Q. And in fact, he was an avid off-shore fisher, correct?
A. Yes.
Q. And you knew that all along, correct?
A. Yes.
Q. And whenever Point Judith Marina suggested that his vessel required a repair, Mr. Picchione always agreed to it, correct?
A. He usually did.
Q. And you remember Exhibit 6, which is the --
MR. LOVEJOY: Maybe I better do this, your Honor. May I approach the witness?
THE COURT: Yes.
Q. Exhibit 6 in evidence, Mr. Vivenzio, are Mr. Stroker's handwritten notes from April 22, 2005?
A. Yes.
Q. And that's where he makes the notations as to the bilge pump malfunctioning, correct?
A. Correct.
Q. When did you learn about the bilge pump malfunctioning issue, if at all?
A. I don't think I learned about it until the following week.
Q. Okay. And once you learned about it, you knew that -- strike that. Who is Mr. Layfield?

A. He's a surveyor.
Q. And he was appointed to help determine the cause of the sinking, correct?
A. Correct.
Q. And you did not tell Mr. Layfield about this bilge pump malfunctioning issue, did you?
MR. RAUWORTH: Objection, your Honor. There's no relevance to this inquiry after the incident. What Mr. Layfield or Mr. Vivenzio knew after the sinking regarding the bilge pump has no bearing.
THE COURT: What's the relevance?
MR. LOVEJOY: I think it has to go to credibility, your Honor.
THE COURT: I'm not sure I understand what you're saying.
MR. LOVEJOY: Well, what I'm trying to get at is when Mr. Vivenzio found out about this information, he never made it known to the surveyor that was appointed by his company, he never made it known, as far as I can tell, to any of the authorities, he never made it known to the surveyors that conducted the joint survey.
THE COURT: All right. I'll let you -- I'll overrule the objection. Go ahead.
Q. Once you found out about this information on Exhibit 6, did you convey that to Mr. Layfield, who was

trying to determine a cause of the sinking for the vessel?
A. No.
Q. Did you convey it to the authorities who came around to try to determine the cause of the sinking of the vessel?
A. No.
Q. Did you convey it to Mr. Robbins when he appeared on May 3rd to conduct a joint survey with Mr. Layfield?
A. No.
Q. When did you first convey that information to somebody else outside of Point Judith, if at all?
A. I don't remember.
Q. Would you believe it important for somebody that was trying to determine the cause of the sinking to have knowledge that there was a malfunctioning bilge pump on this vessel?
A. There were two bilge pumps that were functioning, and we were looking for the source of water that came in. So with the bilge pump switches being in the off position when we hauled it, it just didn't seem that's something that was even going to come into play.
Q. Did you think it important to tell the authorities, or either one of these two marine surveyors, that Mr. Stroker had changed the position of

the bilge pump switches when he was on the EVEREADY?
A. I didn't realize what had happened on the positioning of the switches.
Q. You were here yesterday when Mr. Rauworth was questioning Mr. Picchione about using a marine surveyor to look at his vessel, correct?
A. Yes.
Q. Do you know of any instances where a marine surveyor has been used at Point Judith to look at a vessel for standard maintenance issues?
A. Not the standard maintenance. Usually, insurance companies call a surveyor --
Q. I'm asking you about standard maintenance issues or vessel commissioning, you know, annual vessel commissioning, not something outside of that.
A. Not for standard maintenance.
Q. And it would be correct to say -- strike that. Boaters rely on the marinas where they keep their boats for maintenance and service for the most part, correct?
MR. RAUWORTH: Objection. Calls for expert testimony about the state of the industry, and calls for commentary on the minds of others.
MR. LOVEJOY: I'll strike that. I mean I'll withdraw it. You get to strike it. I get to withdraw it. Sorry.

Q. With respect to vessel owners that moor or dock their vessels at Point Judith Marina, they, for the most part, rely on Point Judith to do service or repairs to their vessels, correct?

MR. RAUWORTH: Objection. Calls for the commentary and mental state of others.

THE COURT: All right. Overruled.

A. Some do.

Q. Well, would it be correct to say a majority do?

A. Fifty percent.

Q. Well, a majority, I think, would be 51 percent, Mr. Vivenzio.

A. Maybe.

Q. And on Exhibit 6, which is in front of you, it indicates 13.4 hours, correct?

A. Yes.

Q. That wasn't accomplished on April 22nd, to the best of your knowledge, was it?

A. No.

Q. It was accomplished over a two-day period?

A. Most likely.

Q. And there have been other occasions on -- strike that. Withdrawn. I apologize.

There have been other occasions at Point Judith where hoses have failed or ruptured and vessels sunk,

correct?

MR. RAUWORTH: Objection. That assumes that what was described happened here.

THE COURT: Overruled.

A. We've had hoses rupture and vessels take on water.

Q. And that occurred before the April 25th incident with the EVEREADY, correct?

A. Yes.

Q. Mr. Picchione relied on Point Judith to ensure his vessel was properly maintained, correct?

MR. RAUWORTH: Objection. Calls for commentary on the plaintiff, competence of the witness.

THE COURT: Overruled.

A. Mr. Picchione hired us to maintain certain things on his boat.

Q. Virtually everything on that boat, correct?

A. Not everything.

Q. Well, anytime he was apprised of a problem, he went to Point Judith, correct?

A. Not every time. We don't do all types of repairs.

Q. But you do repair exhaust hoses, correct?

A. We can replace exhaust hoses.

Q. You replace water hoses, correct?

A. Yes.

Q. You replace bilge hoses, correct?

A. We can.
Q. You replace thru-hull fittings on vessels, correct?
A. Yes.
Q. You can put anti-siphon loops and check valves on a vessel, correct?
A. We could.
Q. And it would be fair to say, would it not, that it would take about an hour or an hour-and-a-half to replace the bilge pump in the engine room on Mr. Picchione's vessel, correct?
A. Yes. To replace it, if that was the problem.
Q. And in dollars, what are we talking about for a bilge pump such as the one that's sitting up on the desk?
A. $80.
Q. And I think you answered this, but if I'm incorrect -- you have those, keep them in stock, correct?
A. At times we have it in stock, yes.
Q. If they're not in stock, you can get it the next day, correct?
A. Most of the time.
Q. How many vessels were in the water at Point Judith on April 25, 2005?

A. I'm not sure. Over 30.
Q. Well, you have what, 200 plus slips?
A. 120 slips.
Q. The people in April are what are referred to in your industry as early birds?
A. Yes.
Q. And between the date that the EVEREADY was launched and the date of its sinking, you saw Mr. Picchione on his vessel once, correct?
A. Yes.
Q. And between the same dates, you saw no other persons on his vessel, correct?
A. I don't recall seeing anyone else.
Q. And you saw Mr. Picchione on one instance, correct?
A. Yes.
Q. Okay. Point Judith personnel were on that vessel at least two times, based on your testimony as to Exhibit 6, correct?
A. Correct.
Q. And the only person that you are aware of that touched the bilge pump switches on the EVEREADY is Mr. Stroker, correct?
A. Correct.
Q. And there was testimony yesterday that the

EVEREADY sits low in the water, correct?

MR. RAUWORTH: Objection. Ambiguous in terms of the description of low in the water.

THE COURT: All right. He was here. He heard the testimony, so overruled.

A. Yes.

Q. And that vessel sat low in the water from the day it arrived at Point Judith in 1996 until the day it sank, correct?

A. Yes.

MR. LOVEJOY: I pass the witness, your Honor. Thank you.

THE COURT: All right. Mr. Rauworth.

CROSS-EXAMINATION BY MR. RAUWORTH

MR. RAUWORTH: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Mr. Vivenzio, placing before you what's been marked for identification as Exhibit JJJ, Triple J, do you recognize what's depicted in this photograph, sir?

A. This appears to be an exhaust elbow coming off the engine, off to the side of the boat, and probably running aft with an exhaust hose.

Q. Right. And --

MR. LOVEJOY: Your Honor, there's no foundation

as to what this photograph is of.
Q. And what boat is this on?
A. I'm not sure which boat it is, but --
MR. RAUWORTH: Your Honor, we'll have testimony from Mr. Layfield that this depicts the condition onboard the EVEREADY, and so I'd like to have further testimony taken de bene subject to foundation established by Mr. Layfield.
THE COURT: You can go ahead. If ultimately that foundation is established, the exhibit will be admitted. If not, then I'll strike the testimony. Go ahead.
Q. Mr. Vivenzio, on -- in this photo, can you recognize the gray structure that's right in the center bottom of this photograph?
A. Yes. That's an exhaust elbow coming off the turbo.
Q. Okay. And then in the flow of the exhaust, there's a component that is slightly to the right of that. Do you see that?
A. Hose clamp? You have a hose and a hose clamp?
Q. Right. So what's the description of this component that you just mentioned?
A. The hose? That would be part of your exhaust hose system.

Q. An exhaust hose?
A. Yes.
Q. The hose clamp attaches that to what?
A. It's an elbow.
Q. You see sort of a lighted area that includes a red wire slightly to the left of where we've been talking about?
A. Yes.
Q. Actually, let me touch the screen and see if I can mark that. Do you see the dot that I've placed on the screen?
A. Yes, sir.
Q. That's the red wire that we were just speaking of, right?
A. Yes.
Q. Okay. And what is it that's just underneath and to the left of that red wire?
A. That's more of the exhaust system. That's another elbow, again. From there, there's a hose section that goes up to the first elbow.
Q. Okay. So there's, between the spot where the flashlight is showing upstream in the exhaust slightly to the left, there's an elbow. Do I understand that correctly?
A. Yes.

Q. And then further upstream there's another section of hose that connects to the elbow that you mentioned a few moments earlier?
A. Yes.
Q. Okay. Now, again, referring back to that red wire where I placed the dot, do you see a structure that extends further to the right in this photograph?
A. Yes.
Q. Okay. And what's that?
A. Sort of a straight line coming down?
Q. Straight line leading to the upper right.
A. Yes. Some part of the boat. Probably the forward part of the cockpit area.
Q. Well, let me put a dot on that. Do you see the second dot I've just placed?
A. Yes.
Q. Okay. So this is a structure that is connected to the hose clamps that you mentioned that are shown and illuminated by the flashlight's beam?
A. Is this structure connected to the hose clamp? Is that your question?
Q. Is it?
A. I don't think so.
Q. From the hose clamp that's by the red wire, what happens to the exhaust after that?

A. The exhaust is going past that structure, then it goes through that bulkhead.
Q. Okay. And what is it that the exhaust runs through past that hose clamp area that's illuminated with the flashlight beam?
A. It's running through an open area of the engine room.
Q. What is the exhaust transmitted through? Let me back up and put it another way. From the hose clamp that you see being illuminated by the flashlight beam, how does the exhaust travel to get out of the boat?
A. It goes to the right, which is the aft part of the boat.
Q. What carries it?
A. The exhaust gases and water.
Q. What transmits the exhaust further aft?
A. It has to be a downward angle on the hose.
MR. LOVEJOY: Objection. Move to strike as unresponsive.
THE COURT: Overruled.
Q. After the downstream of the hose clamp that you see illuminated with the flashlight beam, are you with me there?
A. Yes.
Q. So downstream of that in the exhaust system,

what's the next component?
A. Probably a muffler.
Q. Okay. Is the muffler visible in this picture?
A. No.
Q. What connects the hose clamp shown by the flashlight to the muffler.
A. That hose.
Q. Okay. Can you reach up and put your finger onto the hose you just mentioned?
A. (Witness complies.)
Q. Okay. Now, what's the path of the hose that you just identified to get to the muffler?
A. The path?
Q. Actually, let me stop and back up. In what part of the EVEREADY is the muffler located? What do you call the space?
A. It's back underneath the cockpit deck, close to the transom.
Q. And in general, is there a name for that space?
A. It could be called a lazaret.
Q. So from the hose clamp shown in the flashlight beam, exhaust moves to the muffler by means of the hose you just identified with the dot?
A. Yes.
Q. The center dot there? Okay. And is there

anything between the location that we showed here and the lazaret in terms of structure of the boat?
A. The engine room bulkhead.
Q. Aft or forward?
A. The aft engine room bulkhead.
Q. All right. That would be the forward bulkhead of the lazaret?
A. Yes.
Q. Same structure?
A. Right.
Q. Okay. What's your estimate of the length of the hose that you've identified with the center white dot?
A. Six to eight feet.
Q. And the hose we're talking about here -- let me back up and put that to you another way.
In your earlier testimony when Mr. Lovejoy was asking you questions, there was a reference to Point Judith having changed an exhaust hose, or replaced an exhaust hose. Do you recall that reference?
A. Yes.
Q. Okay. Is that exhaust hose shown in this picture?
A. It would be that first section of hose coming off the metal piece.
Q. How about if you put a dot on that. All right. And then you mentioned an elbow that -- I'm sorry. You

were asked and spoke in your earlier testimony with Mr. Lovejoy about an elbow at Point Judith that was replaced at some point in your repair history. Do you recall that?
A. Yes.
Q. Can you put a dot that depicts that.
A. (Witness complies.)
Q. Now, in this photograph, are you able to see the engine room bulkhead that you mentioned just a moment ago?
A. No.
Q. And generally, where would it be in terms of what we're able to see here?
A. Well, it's probably another foot behind that corner.
Q. All right. And the corner you've mentioned, can you put a dot roughly at the top of that?
A. The top of the corner?
Q. Yeah. The structure that you're referring to as the corner.
A. Yeah. You can just about see it here.
Q. Let me put a dot --
A. I don't think that's it. I can't see it on this picture.
Q. You can't see the bulkhead?

A. No. I can see it here, but I can't see it here.
Q. Okay. I'm going to place a dot right now. Can you watch this?
A. Okay.
Q. What's that structure?
A. I believe that's a bulkhead from the lazaret, from the aft cockpit.
Q. Okay. And where does that bulkhead stand, fore or aft in comparison with the engine room bulkhead?
A. It appears to be more forward of the engine room bulkhead.
Q. All right. Now, in this picture, is it -- are you able to see the top of the long exhaust hose at the point that it passes through the aft bulkhead?
A. I can't see it in this picture.
Q. Okay. How would somebody have to maneuver their body in order to see the top of the exhaust hose from the engine room as it passes through the aft bulkhead of the engine room?
A. You would be standing in the engine room on the right side of this picture, and you'd have to lean over this exhaust elbow and stick your head down towards the side of the boat.
Q. Okay. And from that position, you think you might be able to see the top of the exhaust hose?

A. Yes.
Q. And from that position, would the bottom of the exhaust hose be visible?
MR. LOVEJOY: Your Honor, may I object to this line of questioning? There's no foundation that Mr. Vivenzio had ever done this or sighted this the way Mr. Rauworth is asking him with respect to this photograph. It's all speculation unless he's done it himself.
THE COURT: Sustained. You need to establish that.
Q. Mr. Vivenzio, have you endeavored to look, yourself, from the engine room to see the route of the long exhaust hose as it passes from the engine room into the lazaret?
A. Yes.
Q. As you did that, were you able to see the top of the exhaust hose?
A. Yes.
Q. And were you able to see the bottom of the exhaust hose?
A. Not too easily.
Q. Could you see the very bottom of it?
A. No.
MR. RAUWORTH: May I approach the witness, your

Honor?

THE COURT: Yes.

Q. Placing before you, Mr. Vivenzio, Exhibit Triple E.

A. Yes.

Q. Now, do you recognize what Exhibit Triple E -- sorry. Let me back up.

MR. RAUWORTH: Your Honor, I would move at this time the admission of Exhibit Triple J that we were just looking at pending the completion of the testimony that I mentioned de bene esse.

THE COURT: I will wait to admit it after you supply that foundational testimony. I'm going to leave it ID.

MR. RAUWORTH: Thank you, your Honor. So the motion will be held pending that?

THE COURT: Yes.

Q. Now, Mr. Vivenzio, what does this picture depict?

A. It's apparently the picture of the exhaust hose on the EVEREADY going through the aft bulkhead, the starboard exhaust hose.

Q. Now, as this picture -- strike that. In its normal configuration, would this view be available on the EVEREADY if you were in the lazaret?

A. Negative. There's a fuel tank that goes in this

void.
Q. And the fuel tank is there now or not?
A. No. It's not.
Q. Okay. Did Point Judith Marina ever have that fuel tank out of the boat?
A. No.
Q. Could you place a dot on this photograph that shows the bulkhead we were discussing earlier, the aft bulkhead of the engine room? And if you could place a dot just fairly close to the hoses depicted here.
A. (Witness complies.)
MR. RAUWORTH: Could we have a screen print of this exhibit, please, your Honor?
THE COURT: The screen -- the picture, at least that's on my screen, doesn't show much of anything. She can print it, but it's not a very good picture.
MR. RAUWORTH: We have some others that show things in greater close-up.
Q. The structure that's showing in black or gray that runs along the upper right-hand corner of the picture, do you see that?
A. Yes.
Q. It's to the right of the dot that you just put on the picture?
A. Yes.

Q. All right. And what is that object?
A. That's the exhaust hose.
Q. Okay. And the exhaust hose, if the picture were extended further to the right, where does it go to?
A. It would go into a muffler and then out the side of the boat.
Q. All right.
MR. RAUWORTH: Your Honor, at this time I'd move the admission of Exhibit Triple E.
THE COURT: Any objection?
MR. LOVEJOY: Can I just look at the original? On the screen, I can't see much of anything, your Honor.
No objection, your Honor.
THE COURT: All right. Triple E will be full.
(Defendant's Exhibit EEE admitted full.)
MR. RAUWORTH: If we may, your Honor, may we have the screen print identified, and I would move its admission.
THE COURT: All right. That will be Triple E-1.
(Defendant's Exhibit EEE-1 admitted full.)
Q. Let me go back to Exhibit Triple J. Now, Mr. Vivenzio, the pieces of the exhaust system that are visible in Exhibit Triple J -- strike that, and let me back up.

Mr. Lovejoy had asked you some questions about the transmission on this boat, correct?
A. Yes.
Q. And there was some point in the history of the work of Point Judith in which the starboard transmission was taken out of the boat?
A. I don't know if it was starboard or port.
Q. Okay. Let's assume it was starboard, just for simplicity. In order to take a starboard transmission out of the boat, is it necessary to disassemble the exhaust components that are shown in Exhibit Triple J?
A. No.
Q. Other than the two components we talked about the last time this was up on the screen, has Point Judith disassembled the starboard exhaust assembly any further downstream in the flow of the exhaust?
A. I don't think so.
Q. Actually, for purposes of a screen print, can you once again put a dot on the long section of hose that we were talking about earlier, the one that extends back into the lazaret? Thank you.
MR. LOVEJOY: Your Honor, I want to object to this because I can't see anything. At least in what I'm looking at, there's a black hole in this exhibit.
THE COURT: I think you need to look at -- the

exhibit book contains a photograph that's higher quality because, you're right, there's virtually no value to what's up on the screen.

MR. RAUWORTH: Can I just look at Mr. Lovejoy's screen for a moment? I think we have a contrast issue with this.

Your Honor, could we go forward with screen print?

THE COURT: Why don't you try and adjust the lights a little bit.

MR. RAUWORTH: I've moved this photo, so I'm going to need to erase this dot.

MR. LOVEJOY: Your Honor, I have the same objection. I thought the Court ruled you were waiting for connection. JJJ was going to be subject to the follow-up.

THE COURT: Yes. That's true. What's your objection?

MR. RAUWORTH: Your Honor, I would stipulate that the screen print would likewise be subject to the foundation to follow.

THE COURT: Right. I've just marked it as --

MR. LOVEJOY: I misunderstood. I just thought he said he wanted to move JJJ into evidence. I didn't realize --

THE COURT: I didn't hear that. If he said that, I didn't hear it.

MR. RAUWORTH: I'm not sure I did say that.

THE COURT: Okay. Let's move on.

MR. RAUWORTH: Sure.

Q. We had to change the dot, Mr. Vivenzio. Let me ask you to put a dot, before we do a screen print, onto the long hose that leads back into the lazaret.

A. (Witness complies.)

MR. RAUWORTH: That having been noted, may we now have a screen print?

THE COURT: You can have a screen print. My screen is just a big black hole, so -- I think you've established the point that there's a hose running -- the original picture is what's in evidence, not the screen print. There's a hose. I can see the hose. It runs through the bulkhead. I can see it in Triple E, as well. The amount of time you're spending on this, I just don't understand. Can we just move on?

MR. RAUWORTH: Okay. Sorry. Sure.

Q. Here's Exhibit 4, Mr. Vivenzio, that Mr. Lovejoy had been asking you about earlier. Do you recall looking at that?

A. Yes.

Q. And this document, as it's used by Point Judith,

is prepared by what kind of person?
A. The technician.
Q. And it is transmitted to whom?
A. Service writer.
Q. Okay. And does it go anywhere else?
A. Goes into the customer's file.
Q. Okay. Is this the kind of a document that is provided to the customer, ordinarily?
A. No.
Q. With respect to Exhibit 5 that Mr. Lovejoy had asked you about, is there any difference in the handling of this document compared to Exhibit 4?
A. It's the same document, similar document.
Q. And the way it's handled, how does that compare?
A. Same way.
Q. Has Point Judith, in the course of -- has Point Judith ever agreed with a customer to remove fuel tanks in order to examine the condition of an exhaust hose of the kind we saw in Exhibit Triple J?
MR. LOVEJOY: Objection. Foundation. It's irrelevant.
THE COURT: You asked these kinds of questions, too. Overruled.
Q. Would you like to have the question read back?
A. Say it again.

Q. Sure. Has Point Judith agreed with a customer to remove fuel tanks from a boat in order to examine an exhaust hose of the kind that we were looking at in Exhibit Triple J?

A. I don't recall that. If we have an occasion to remove a fuel tank where you get access to the hoses, then you might change those exhaust hoses at that point.

Q. Okay. What about removing fuel tanks for the purpose of inspecting an exhaust hose?

A. No.

Q. Has Point Judith ever agreed with customers to examine or inspect exhaust hoses that are run in the way that the main exhaust hose, the long exhaust hose, is run as shown in Exhibit Triple J?

MR. LOVEJOY: Objection. This is asking for a speculative answer of the witness, your Honor.

THE COURT: Overruled.

A. As far as inspecting hoses that are underneath the deck? Is that what you're asking?

Q. Let me back up. In order to inspect an exhaust hose like the one that was shown in Exhibit Triple J, as it runs into the lazaret, what would you have to do to perform that inspection?

A. You would have to pull the deck. And in this

case, empty the fuel out of the fuel tank and move the fuel tank.
Q. So you'd have to either take out the deck or take out the fuel tank, or both?
A. Both.
Q. And has Point Judith ever agreed with a customer to do any of those things in order to inspect the hose of the kind that was shown in Exhibit Triple J?
A. Not for inspection, no.
Q. Okay. For any other purpose apart from what you just testified to in terms of replacement?
A. In terms of replacement, if the customer has requested a replacement or checking because of exhaust fumes or whatever.
Q. Okay. On a diesel engine, if there were a significant hole in an exhaust hose, would there be some condition that would be likely to bring that to the attention of people running the boat?
A. Some of the exhaust gases would escape into the boat, and you'd see a slime and soot all over a lot of the things inside the boat.
Q. Okay. Things that would be visible without removing other objects?
A. That stuff sort of gets into the entire air compartment, and depending on where the engines are, it

could be sucked in towards the air filter of the engines.
Q. So the kind of residue that you mentioned that would deposit into what kinds of parts of the vessel?
A. You'd see it on the bulkhead, on the walls, on the engines.
Q. Does that smell?
A. Yes.
Q. And on a diesel, what does it smell like?
A. Smells like being behind one of the diesel buses. It's pretty noxious.
Q. Okay. I'm sorry. Just back to Triple J for a moment.
Come back to that. Oh, I'm sorry.
In this -- strike that. Mr. Lovejoy, in his questioning, referred to a component of the boat called the sole of the cabin, do you recall that mentioned?
A. Yes.
Q. Is that sole in place or removed as shown in Exhibit Triple J?
A. That's removed in this picture.
Q. Okay. So when Point Judith has occasion to change a bilge pump on a customer's boat -- strike that. Let me back up. That circumstance has come up from time to time, that Point Judith has been asked to change a

bilge pump in a customer's boat?
A. Yes.
Q. When a bilge pump needs to be changed, does Point Judith undertake to alter the arrangement or the installation of the bilge discharge hose?
A. No.
Q. When a bilge pump is changed, does Point Judith undertake to alter the location or provide a new thru-hull fitting for the bilge discharge hose?
A. No.
THE COURT: Let's take an afternoon break. Ten minutes.
(Short recess.)
THE COURT: Okay. Go ahead.
MR. LOVEJOY: May I bring up a procedural matter?
THE COURT: Yes.
MR. LOVEJOY: Mr. Rauworth has informed me that he's going to have Mr. Vivenzio on the stand for the rest of the day. I would like permission to have Mr. Robbins go, if that's the case.
THE COURT: We're going to go until about 4:45 or close to 5:00. So if he goes that long, that's fine. That's over an hour from now. Is that what your intention is?

MR. RAUWORTH: I think I might have that much with him, your Honor. We had understood that we would be stopping early today, but --

THE COURT: I changed my plans because you're going so slowly, I had to make modifications to my schedule. This trial is going way too slow. You need to speed it up. You're wasting an incredible amount of time. So I say no, you can't leave because I want this thing to move along. So let's go.

MR. LOVEJOY: That's fine, your Honor. Thank you.

MR. RAUWORTH: Sure. Thanks, your Honor.

BY MR. RAUWORTH: (Continuing)

Q. Mr. Vivenzio, I'm placing on the screen one of the sheets of Exhibit 2 that Mr. Lovejoy had introduced that you looked at earlier.

A. I can't see it.

Q. Let me help you out.

A. Okay.

Q. Can you look at step 7 on the bottom right.

A. Yes.

Q. What does this step 7 have to do with in terms of -- strike that. Does step 7 have any relevance to the replacing of an existing bilge pump?

A. Negative.

Q. What does it have to do with?
A. This is installing a new pump or install the entire thing with a hose and a thru-hull.
Q. Did Point Judith ever do that with respect to the EVEREADY?
A. No.
Q. Now, at the end of the season in 2004, you recall there was some testimony yesterday about a port engine issue?
A. Yes.
Q. Okay. And what do you recall was the problem as Point Judith heard about it?
A. There was what we figured was an internal engine problem, and we didn't want to go further with it.
Q. Have you ever heard of the term "blow-by"?
A. Yes.
Q. What's that?
A. Usually caused by poor rings or something wrong in the combustion chamber, which is forcing pressure up into the upper end of the engine. It will come out of the air filter and the breather.
Q. And what's scoring of a cylinder?
A. Usually caused by rubbing of the cylinder walls by the piston and the rings.
Q. Did Point Judith do any work in 2004 in terms of

diagnosing this problem?
A. We did.
Q. Okay. And when you had diagnosed it, what did you do with that information?
A. We told Mr. Picchione that there was a problem with the engine, and we recommended he go to a Caterpillar dealer to have it done.
Q. Why was it that you made that recommendation?
A. Because the technicians that would do the job felt they would probably need special tools to do that and Caterpillar is not one of our lines.
Q. One of the lines that you have training in?
A. Right. Dealerships and stuff.
Q. So following your conveying that information to Mr. Picchione, did Point Judith at that point, after that point, ever do any work with respect to the port engine before the boat sank?
A. No.
Q. Okay. Now --
A. Changing filters.
Q. Okay. Sorry. But in terms of mechanical work?
A. No.
Q. Now, after the sinking, Point Judith did certain work with respect to salvage, correct?
A. Yes.

Q. Okay. I'm putting that to one side. So following the diagnosis you just described, what, if anything, to your knowledge, took place with respect to the -- strike that.

Did Mr. Picchione tell you what he had in mind to do, if anything, with respect to his port engine?

A. No.

Q. Okay. Did -- when was the next time that the question of the port engine came up?

A. In the spring, when we were getting ready to launch the boat, or prior to that when he had asked to have the boat launched and commissioned, we talked about the fact that we wouldn't do a full startup on the engines because we hadn't done the work, and I told him he needed to have his mechanic do the startup.

Q. And the work you're referring to is what work?

A. The repair work on the port engine.

Q. The repair work was done by whom?

A. Apparently, Dan.

Q. Okay. This individual, Dan, was somebody that came into the yard during the off-season?

A. Yes.

Q. And did Point Judith have any affiliation with Dan?

A. No.

Q. Why is it that Point Judith was unwilling to start the engines in the spring of 2005?
A. That's a normal thing for us. We won't start an engine that we haven't worked on, whether it's been worked on by someone else or not. So we just felt it safer with somebody else having worked on the engine for us not to get involved.
Q. All right. And when you -- strike that. And the unwillingness to do the engine start, what effect does that have, if any, on Point Judith's willingness to perform a sea trial on a boat?
A. Well, we wouldn't have done a sea trial until after the engines had been tested by that outside mechanic.
Q. Okay. Now, in the weeks leading up to the actual launch, what did you and Mr. Picchione discuss regarding the schedule of the launch? This is, again, the spring of 2005.
A. I'm pretty sure it was the week that we launched the boat that he caught me in the yard and insisted that he have the boat in the water for Saturday because he was going to have Dan come down and start up the engines on Saturday.
Q. And did you attempt to accommodate his schedule request?

A. Yes.
Q. Okay. When a boat is launched by Point Judith, and Point Judith has agreed to do an engine startup and sea trial, what do you do in terms of moving the boat once it becomes afloat off the Travel Lift?
A. The commissioning technician would be onboard and we would fire up the engines and bring it to its slip, check out a few things, and then go for a sea trial.
Q. What happened with respect to Mr. Picchione's boat in the spring of 2005 in terms of moving it to its slip?
A. I towed it with the yard boat.
Q. And you towed it to where?
A. To his slip.
Q. All right. And when you got there, what, if anything, did you do with the boat before you left and went on to do something else?
A. Once we secured the lines, I plugged in the shore power, went into the cabin, turned on the AC main switch, the battery charger, the DC and the bilge pumps, and I checked the bilge.
Q. Okay. You checked the bilge for what purpose?
A. I checked the bilge when we launched the boat, and when I came up alongside it on a skiff, I jumped on the boat to make sure no water was coming in. When we got

it secured in the slip, which was probably 45 minutes later, once I plugged everything in, I checked it again.

Q. What did you find on those occasions with respect to water entering the boat?

A. I didn't see anything coming in.

Q. Okay. And at that point, a technician became involved?

A. I believe the technician was on the boat when we launched it.

Q. Okay. And did you leave the boat in the hands of your technician?

A. Yes.

Q. Okay. And the technician's charge, if you will, from Point Judith, was to do what at that point with the boat?

A. He was finishing up changing fuel filters and going through the rest of the stuff that was on that RO.

Q. Okay. And the RO was for the purpose of spring commissioning, correct?

A. Correct.

Q. Okay. And the spring commissioning on this occasion was the same as, or different than, what you'd done in previous years on this boat?

A. It was just slightly different.
Q. In what respect?
A. We didn't do a full commissioning on the engines.
Q. Okay. Now, what is the -- strike that.
At Mr. Picchione's slip, what is there in terms of power available?
A. There's 30 amp and 50 amp service.
Q. What, if anything, did you or the technician do with respect to the shore power?
A. We plugged them in.
Q. Now, after you left the EVEREADY II that day, were you in the marina afterwards between that time and the time the boat was discovered sunk?
A. Yes.
Q. And did you encounter Mr. Picchione in the marina?
A. I saw him on the boat on Saturday. I didn't talk to him.
Q. Okay. And do you know whether he was -- did you see him -- did you actually see him on the boat on Sunday?
A. I don't recall seeing him on Sunday.
Q. Okay. When was the -- I'm sorry. You were in the yard on Sunday?
A. Yes.
Q. Okay. After that, when was the next time that

your attention was drawn to the EVEREADY II?
A. Monday morning.
Q. And that was because of --
A. It was -- I got a phone call telling me to look at the EVEREADY. From the yard next door, they could see it, and it didn't look right.
Q. I'm sorry. It didn't --
A. It didn't look right to them.
Q. And you went to the boat and found?
A. It was sitting on the bottom.
Q. What did you do at that point?
A. Called all the -- I called Mr. Picchione. We called DEM, the Coast Guard.
Q. And you called Mr. Picchione and told him what?
A. We called him to tell him that his boat was sitting on the bottom.
Q. Okay. And you contacted, I'm sorry, you said the Coast Guard and who else?
A. DEM.
Q. Okay. Apart from those official bodies, did anybody else get involved in this response?
A. I called my insurance company and I called a salvage company.
Q. And what did the salvage company do?
A. They sent some divers down to put some lifting

balls on the boat to bring it to the surface.
Q. What eventually happened in terms of that salvage process?
A. We hauled the boat and then we had a cleanup to do, and we did pickle the engines.
Q. The boat was -- the salvage company took -- came to the boat as it was in the slip; is that right?
A. Yes.
Q. And did it move?
A. They raised the boat and then we used the yard skiff to tow it in.
Q. Tow it in to where?
A. To the Travel Lift bay.
Q. Were you present when the boat was hauled?
A. Yes.
Q. All right. In addition to the Coast Guard and the DEM, were there any other officials that responded to the situation?
A. The local harbormaster came down.
Q. Who's that?
A. Barry Ennis.
Q. And Mr. Ennis, you saw him at the yard?
A. Yes.
Q. Did Mr. Ennis go aboard the EVEREADY II?
A. Yes, he did.

Q. All right. And when was that in this process?
A. When the boat was being hauled with the Travel Lift.
Q. When it was being picked up on the Travel Lift?
A. Yes.
Q. All right. Did Mr. Ennis go aboard the boat before or after you did?
A. Before.
Q. And did Mr. Ennis have anything -- did he communicate anything to you while he was on the boat?
MR. LOVEJOY: Objection. Hearsay.
THE COURT: Sustained.
Q. Did Mr. Ennis call upon you to do anything while he was on the boat?
A. He told me to come and look at the circuit breaker panel because the bilge pumps were all off.
MR. LOVEJOY: Move to strike. It's hearsay.
THE COURT: Sustained.
Q. In terms of what he asked you to do, will you just limit your comment to that rather than what he reported to you. When Mr. Ennis was on the boat, did he call upon you to do anything?
A. He called upon me to come to the boat.
Q. And did you do that?
A. Yes.

Q. And did Mr. Ennis point anything out to you?
A. He pointed out the circuit breaker panel.
Q. Okay. Did you look at it?
A. Yes.
Q. And what did you find with regard to switches on the circuit breaker panel that had anything to do with the bilge pumps?
A. They were all off.
Q. And in the -- at that point, was the process for activating the bilge pumps something that you had had experience with?
A. Yes.
Q. All right. And as you saw the switches that Mr. Ennis pointed out to you, were they set up in a way that permitted electricity to flow to the bilge pumps?
A. No.
Q. Do you know if Mr. Ennis took any photographs at that point?
A. Yes, he did.
Q. All right. Do you know if Mr. Ennis prepared any kind of a report?
A. Yes, he did.
Q. You were asked earlier if you had mentioned that to Mr. Layfield, the notations that Mr. Stroker had made on the RO relating to the boat, do you recall

that?
A. Yes.
Q. And I think you told us that you didn't mention anything to Mr. Layfield about what Mr. Stroker had written on the RO, correct?
A. Correct.
Q. And did anyone ask you about the configuration of the bilge pump switches that your technician had arranged?
A. No.
Q. Did Mr. Robbins -- strike that.
You met with Mr. Robbins at some time shortly after the sinking?
A. Yes.
Q. Okay. Did Mr. Robbins make any inquiry about that?
A. No.
Q. Okay. Did anyone in 2005 ever make any inquiry about the configuration of switches that Point Judith had had any involvement in?
A. No.
Q. And what was the nature of the inquiry that you got from people who were attending with an interest in the cause of the sinking?
A. We were trying to determine where the water

entered the boat.
Q. Okay. Was that your choice or someone else's choice, or what?
A. No. That was the adjustors from the insurance companies, the surveyors.
Q. Okay. You use surveyors and adjustors, do you mean anybody other than Mr. Layfield and Mr. Robbins?
A. No. I think that was it.
Q. Okay. I want to take you back to some of the photos that Mr. Lovejoy had brought to your attention of the side of the boat and so forth. And that's just for frame of reference.
Well, sorry, let me back up.
After the boat had been hauled and its engines pickled, you've heard testimony that the boat was launched again within several days after the sinking, do you recall that?
A. Yes.
Q. And were you present when that happened?
A. Yes.
Q. Okay. Did you see the way that the boat was floating on that occasion?
A. Yes.
Q. And did you note where it was resting compared to the times you had seen it previously in terms of its

immersion, how deep it was?
A. It sat a lot lower in the water than normal.
Q. As you saw it, this launching that we've been talking about, that was the May 3rd event that you've heard discussed earlier?
A. Yes.
Q. As you saw that boat on May 3rd, had you ever seen it riding that low in the water before?
A. No.
Q. Between the time that you had launched the boat on April 22nd and the time that it was afloat again on May 3rd, what, if anything, had happened that would account for the depth at which the boat was that you saw it floating on May 3rd?
MR. LOVEJOY: Object. Calls for speculation, your Honor.
THE COURT: Well, he can answer it if he knows what the cause was.
Q. What had happened to the boat in the meantime?
A. With the sinking, the boat took on a lot of water.
Q. Okay. And what's the core in a boat like this?
A. I'm not sure what the core is on this boat.
Q. Not the material. Can you explain to us what it is?
A. It's usually a layer of wood or laminate in

between the fiberglass layers, one on the outside, one on the inside, to give additional strength to the boat.
Q. Between the inside and the outside of the hull?
A. Correct.
Q. So the core is not visible if you're inside the boat?
A. Right.
Q. And not visible from the outside of the boat.
A. Right.
Q. What happens to the core of a boat when it's been sunk as the EVEREADY was?
MR. LOVEJOY: Objection. Background.
THE COURT: You have to establish that he has a base of knowledge for that testimony.
MR. RAUWORTH: Sure.
Q. Mr. Layfield (sic), in your experience in the industry, have you had occasion to encounter a situation where a boat has been sunk?
A. Yes.
Q. Okay. And have you had occasion to experience what happens to the core of a boat that has been sunk?
A. The cores could absorb water.
Q. Absorb water as compared to what they would do without having been sunk?
A. Right.

Q. All right. And what effect does that have on the weight of the boat?
A. It's going to increase the weight.
Q. When the weight of the boat is increased, what does that do in terms of how it rides in the water?
A. It's going to ride lower in the water.
MR. LOVEJOY: Objection, your Honor. There's still no foundation he showed us how any of this water supposedly got there. He testified there's two layers and something in between.
THE COURT: You can ask him that question.
Q. When a boat such as this Albin 35 sinks, what is the mechanism through which water enters the core?
MR. LOVEJOY: Objection, again. What vessel are we talking about? Are we talking such as the EVEREADY or this particular vessel?
MR. RAUWORTH: I think I specified it in the question, but I'll be happy to do that.
THE COURT: Let's keep it simple. In your experience where water has entered the core, how does it happen?
THE WITNESS: The water will go in through areas that are open to the air. They're not covered by some kind of fiberglass epoxy end or something. So the edges of the hull could soak in the water. But

sections to the boat are now exposed to water pressures that normally aren't there once the boat is sunk.
Q. That's at a location where the edge of the deck meets the top of the hull?
A. That would be one of the places.
THE COURT: Just while you're on this topic though, I want to be clear, did you do any kind of examination or testing to determine whether water had entered the core of the EVEREADY?
THE WITNESS: I didn't do that myself.
THE COURT: Do you know if anybody did?
THE WITNESS: I believe the surveyors were doing that.
THE COURT: All right.
Q. After the boat was hauled following the sinking, did you see any conditions on the hull of the EVEREADY that had not been present before she sank?
MR. LOVEJOY: Objection. There's no foundation he looked at the bottom of the hull before it sank, your Honor.
MR. RAUWORTH: I'll put that question to him.
THE COURT: All right.
Q. When the vessel had been in your facility before it was launched, had you seen the hull of the vessel?
A. Yes.

Q. All right. And you saw the hull of the vessel after it was brought up after the sinking?
A. Yes.
Q. All right. Did you see any conditions on the hull of the vessel that caught your attention?
A. It took about a week, and then the surveyors pointed out to me that there was water weeping through the bottom of the boat on the starboard side.
Q. All right. Have you seen any pictures here today that reflect that condition?
A. Could have been the one they showed Bud this morning.
Q. The picture that had a chalk line drawn around a particular patch?
A. Yes.
Q. Did you see a condition of that kind after the boat was brought up after the sinking?
A. Yes.
Q. In the season of 2004, had you had any conversations with Mr. Picchione about the way that his boat was riding?
A. We talked about this on a couple of occasions while he had the boat.
Q. Okay. And what was it that you talked with him about?

A. The fact that the boat looked heavy in the stern.
Q. All right. And did Mr. Picchione ever ask Point Judith to do anything about that?
A. No.
Q. Did Mr. Picchione ever ask Point Judith to do anything with regard to determining the status of the exhaust hoses on the boat that were in the area that ran behind the fuel tanks?
A. No.
Q. Did Mr. Picchione ever ask you to do anything to the boat with regard to the discharge points for the engine room bilges that come out on either the starboard or the port side?
A. No.
Q. On boats like the EVEREADY II, did those boats have timing belts on their main engines?
A. Timing belts or gears.
Q. And are those things that fail from time to time?
A. Yes.
Q. And does the yard -- has the yard ever undertaken on a routine basis to do inspections of timing belts for customers in the absence of a specific request?
MR. LOVEJOY: Objection. What's the relevance of a timing belt to this, your Honor?
THE COURT: What is the relevance of this?

MR. RAUWORTH: Relates to the illustrating the procedures of the yard with respect to conditions that are not immediately visible.

THE COURT: I don't think this is relevant. Let's move on.

Q. Has the yard ever agreed or undertaken to, on a routine basis, to make inspections of areas of vessels that are not readily visible without disassembly?

A. No.

Q. When Point Judith, in working on customers' boats, observes a condition that might call for attention, does it have a practice in terms of how it proceeds with the owner in light of that information?

A. Either a note is put onto the bill or the customer is called by the service writer.

Q. Okay. And the purpose of those communications is what?

A. To let the customer know he's got some other problem.

Q. All right. And if the customer wants to have something done about a condition that is reported, what happens then?

A. We'll start another repair order to do that repair.

Q. Okay. Has that scenario come about in the past

with respect to the EVEREADY?
A. Yes.
Q. And on about how many occasions would you estimate?
A. On a number of occasions. At least one a year.
MR. RAUWORTH: If I may approach the witness, your Honor? These are Exhibits N as in November, O as in Oscar.
MR. LOVEJOY: N, O?
MR. RAUWORTH: N as in November, and O as in Oscar.
Q. Do you have Exhibit November handy to you, Mr. Vivenzio?
A. Yes.
Q. What is this?
A. This is the RO for doing the commissioning of the EVEREADY in the spring of '04.
MR. RAUWORTH: All right. I would move its admission.
THE COURT: Any objection?
MR. LOVEJOY: No, your Honor.
THE COURT: N will be full.
(Defendant's Exhibit N admitted full.)
Q. All right. And can you turn your attention to Exhibit O as in Oscar.

A. Yes.
Q. What is this?
A. These are repairs done on the EVEREADY in the month after the first RO.
Q. And how are the items on Exhibit Oscar related at all to things you see on Exhibit November, as in N, as in November?
A. Well, notations on the first RO, November, about certain things that didn't work. Apparently we called Mr. Picchione and he told us to fix certain things, and then another RO was put together to do that.
Q. And did Mr. Picchione pay you for both of these repair orders?
A. Yes.
Q. Is what we see here illustrated -- sorry. How does what's shown here relate to the yard's typical practice in terms of handling authorization for work? Is this typical for how you handle --
A. Yes.
Q. Thank you. Do you recall we talked about wet core?
A. Yes.
Q. And in order to remedy a condition of wet core, what is required in order to deal with that condition? In other words, to make it go away?

MR. LOVEJOY: Objection. There's no foundation to his expertise.

THE COURT: Sustained.

Q. Do you have any experience, Mr. Vivenzio, in terms of performing work to deal with the situation of a wet core on a boat?

A. Yes, sir.

Q. Okay. You've done that for customers' vessels in the past?

A. Yes.

Q. And you've arranged to have that work performed?

A. Yes.

Q. All right. What work is called for in order to deal with that?

MR. LOVEJOY: Your Honor, I object again about whether he has any personal knowledge of this, or whether he's arranged to have it done are two different --

THE COURT: I understand your objection. How many times have you seen this done?

THE WITNESS: We've done it three times.

THE COURT: That's in all the time you've worked there.

THE WITNESS: Yes.

THE COURT: What kinds of boats?

THE WITNESS: We had a Catalina sailboat, and I don't remember the other one. They were two power boats.

THE COURT: Well, you can ask him what in his experience occurred on those three occasions.

Q. Based on your experience for a boat like the EVEREADY II, in terms of a process to determine a -- to remedy a wet core, what would Point Judith charge for that work?

MR. LOVEJOY: Your Honor, there's no foundation that the vessels that he even referred to are the same construction as the EVEREADY.

THE COURT: He didn't ask that. He just asked what he would charge. He can testify to that, if he knows what they charge.

MR. LOVEJOY: Are we referring to a Catalina sailboat?

THE COURT: He said for the EVEREADY II.

MR. LOVEJOY: Well, there's no foundation he did any tests on it to determine what needed to be done to remedy the situation, if it existed. It's pure speculation.

THE COURT: He can testify to what he would charge. That much he can say. So what would you charge?

MR. LOVEJOY: But, your Honor, there's no --
THE COURT: I've ruled. I'm overruling the objection. He can testify to what he would charge. What would you charge?
THE WITNESS: You probably would be looking at $20,000.
THE COURT: Okay.
MR. RAUWORTH: Exhibit X.
If I may approach the witness, your Honor?
THE COURT: Yes.
MR. RAUWORTH: And, your Honor, I would move to admit Exhibit O in full.
THE COURT: Any objection to O?
MR. LOVEJOY: No, your Honor.
THE COURT: O will be full.
(Defendant's Exhibit O admitted full.)
MR. LOVEJOY: No objection to X either, if that's a help.
THE COURT: To X?
MR. LOVEJOY: He's going to ask him about Exhibit X.
THE COURT: I haven't heard that yet. Go ahead.
MR. RAUWORTH: Just to clear things up, let me move for the admission of Exhibit X in full.
THE COURT: All right. X will be full.

(Defendant's Exhibit X admitted full.)
MR. RAUWORTH: Thank you.
Q. What's Exhibit X, Mr. Vivenzio?
A. It's an invoice for, let's see, repairing a bilge pump problem.
Q. And what was the problem that was detected?
A. Bilge pump was running constantly and found a towel jammed underneath the float switch.
Q. How did you find out about the situation with the towel?
A. Upon inspection. It looks like the original part of the RO was to check why the generator didn't start. And no power to electronics.
Q. So part of your work involved dealing with the towel jammed under the float switch?
A. Yes.
Q. Now, when a customer has -- I'm done with that exhibit so we can put it to one side.
Point Judith offers services for launching and hauling boats?
A. Yes.
Q. That's what involves the Travel Lift, right?
A. Yes.
Q. And when a customer engages Point Judith to launch and haul a boat, does the customer necessarily store

the boat with Point Judith?
A. No.
Q. And what percentage of customers who have you launch and haul store their boat with Point Judith, approximately?
A. Eighty percent.
Q. Okay. Is launch and haul handled -- sorry. Is winter storage handled as the same cost item as launch and haul?
A. No.
Q. When a customer -- strike that. Does Point Judith undertake to store boats for the winter when Point Judith has not done the launch or haul?
MR. LOVEJOY: Relevancy, your Honor.
THE COURT: What's the relevance of all this?
MR. RAUWORTH: Just to illustrate that these are separate undertakings, your Honor.
THE COURT: I don't see the relevance of this. Let's try to move on.
MR. RAUWORTH: Sure.
Q. Did Point Judith undertake or agree with Mr. Picchione to see to it that nothing would go wrong with his boat?
A. No.
Q. And for -- strike that. After the launch,

Mr. Picchione's boat, over the weekend of the 23rd and the 24th, was in his normal summer slip, correct?
A. Yes.
Q. And as of the time when Mr. Stroker left the boat at the end of his work on Friday, the 22nd, was Point Judith finished with the work that it had agreed to do for the spring commissioning?
A. Yes.
Q. And as of that time, did Point Judith have any control over who came and went on Mr. Picchione's boat?
A. No.
Q. Was he at liberty to take the boat somewhere else?
A. Yes.
Q. And according to your dialogue with him, what did you anticipate was going to go on with respect to his boat after Mr. Stroker finished his work on the 22nd?
MR. LOVEJOY: Objection. It calls for speculation. There's no foundation.
THE COURT: Well, you need to find out, or ask him if he knows.
MR. RAUWORTH: Sure. I'll do it another way, your Honor. Thank you.
Q. As Mr. Picchione conveyed it to you, what was the reason, what was his reason for pushing the schedule of getting his boat launched?

A. To have Dan, the mechanic, come down on Saturday to start the engines.
Q. And that was your understanding as you did the launch and Mr. Stroker did his work?
A. Yes.
Q. After the boat had been found sunk on the Monday morning, you mentioned that you had made a call, among the first things, to Mr. Picchione, correct?
A. Yes.
Q. And did Mr. Picchione come to the marina immediately after that?
A. No.
MR. LOVEJOY: Objection. There's no foundation -- we don't even have any evidence that he spoke to Mr. Picchione at that phone call.
MR. RAUWORTH: I'll ask the question.
THE COURT: Sustain the objection.
Q. When you called Mr. Picchione the first occasion, did you reach him?
A. I didn't call him. I had Ann call him.
Q. Okay. And what did you learn as a result of that?
MR. LOVEJOY: Hearsay, your Honor.
THE COURT: Sustained.
Q. After that first call, did Mr. Picchione come immediately to the marina?

A. No.
Q. Okay. Were there other calls made to him?
A. Yes.
Q. Did you make any of them?
A. No.
Q. How many were made?
A. Three.
Q. Okay. And had you, in the meantime, had you been expecting Mr. Picchione to arrive at the yard?
A. Yes.
Q. When Mr. Picchione arrived at the yard, did you see him?
A. Yes.
Q. And did you talk to him?
A. Yes.
Q. Did you talk to him in the presence of anyone else?
A. We had a meeting in my office with the Coast Guard inspector.
Q. Okay. And the Coast Guard inspector -- strike that. Did Mr. Picchione make any statement to the Coast Guard with regard to his activities on the boat over the weekend? Strike that.
Did Mr. Picchione make any statement to the Coast Guard about the condition of the bilges over the

weekend?
A. Yes. Yes, he did.
Q. What did he say?
A. He said he checked the bilges on Saturday and Sunday and they were fine.
Q. And when you saw Mr. Picchione on that occasion with the Coast Guard individual that morning, did you make any observations about his demeanor?
A. Yes.
Q. Did you make any observations about relating to his consumption of alcohol?
A. Yes.
Q. What was that?
A. He seemed to be under the influence.
Q. Did the representative of the Coast Guard ask Mr. Picchione to do anything?
A. Yes. He did want him to sign a form.
MR. LOVEJOY: Objection. What relevance does this have to the sinking of the vessel, your Honor?
THE COURT: Overruled.
Q. And what was Mr. Picchione's response to that?
A. He refused to sign.
Q. What was the nature of the form?
A. It was something to do with the pollution liabilities and stuff.

Q. Okay. Was it a notice to Mr. Picchione?
A. It could have been.
Q. Okay. And what did Mr. Picchione do in response to the call from the Coast Guard individual? What did Mr. Picchione do with the form that the Coast Guard individual wanted him to sign?
A. He just refused to sign it.
Q. Did he say why?
A. He wouldn't sign anything without an attorney looking at it.
Q. Okay. And what ended up happening with that form?
A. It went back with the Coast Guard officer unsigned.
MR. RAUWORTH: If I may have just a moment, your Honor.
Q. Mr. Vivenzio, I'm placing on the screen a copy of Exhibit F. Do you recognize this?
A. Yes.
Q. What do you recognize it to be?
A. It's a summer dockage contract from the marina.
Q. All right. Is that the form that was in use with the marina in the season of 2004-2005?
A. I think so.
MR. RAUWORTH: I would move the admission of Exhibit F in full.

THE COURT: Any objection?

MR. LOVEJOY: Your Honor, it's an unsigned document. I don't know whether they have a signed document or --

MR. RAUWORTH: We do, your Honor. It's connected with the request to admit. I can get that out and do that, as well.

THE COURT: What's the relevance of the summer dockage contract?

MR. RAUWORTH: Well, it specifies the responsibility of the yard with regard to vessels that are in slips in the marina, as this boat was at that time.

THE COURT: All right. So if he has the signed document, and it's part of a request to admit, you haven't objected to it, do you have an objection to it now?

MR. LOVEJOY: Well, if there's another document that Mr. Picchione signed, that should be the document that goes into evidence.

THE COURT: That's what I'm talking about, the signed document.

MR. RAUWORTH: Sure. I'll get it in connection with the request to admit.

MR. LOVEJOY: I don't have an objection to the

one that he signed.

THE COURT: All right. So let's put that into evidence.

MR. RAUWORTH: I just have it stapled to the actual request.

THE COURT: The request to admit -- he's not objecting to the document, so just put the document into evidence.

MR. RAUWORTH: Certainly. Move the admission of Exhibit A, your Honor.

THE COURT: All right. A will be full, without objection.

MR. LOVEJOY: Is that the document or is that --

MR. RAUWORTH: It's the signed document.

THE COURT: Didn't you just look at it?

MR. LOVEJOY: Yes, your Honor. I apologize, but I think -- this is more than just the document. He's trying to put in the request to admit. I thought the Court said put in the document.

THE COURT: Just the document is what's coming in.

MR. LOVEJOY: Which are the last two pages.

THE COURT: That's all I'm admitting, just the document. That's A.

(Defendant's Exhibit A admitted full.)

MR. RAUWORTH: The purpose of Exhibit F, your Honor, is simply to provide this in its full format form. It's reduced in the copy to the request to admit. It's for purposes of legibility only. They're identical forms.

THE COURT: All right. That's fine. Just attach it to the exhibit, part of A.

Q. You heard some discussion earlier about water discovered in the aft bilge of the EVEREADY, do you recall that?

A. Yes.

Q. All right. And are you familiar with the area that you heard described with respect to that area? Are you familiar with that on the EVEREADY?

A. Yes.

Q. All right. In the past, upon spring launching, had the EVEREADY been discovered with water accumulated in that aft bilge area?

A. Yes.

Q. This is on occasions in the spring?

A. Yes.

Q. And prior to launch in the spring, the vessels are maintained up on jack stands in your yard?

A. Yes.

Q. All right. What's the significance of finding

water in that area to you on the occasion of a spring launch?
A. It means rain water got in there over the winter. Rain, snow, whatever, ice.
Q. Does that serve as -- does it have any significance with respect to the integrity of the hull in terms of keeping out seawater?
A. No.
Q. Mr. Vivenzio, does Point Judith take on any responsibilities with regard to boats belonging to its customers other than what it agrees to? You have repair order agreements, you have launch and haul agreements, you have winter storage agreements, you have summer storage agreements, right?
A. Right.
Q. Apart from what you undertake with respect to those agreements, does Point Judith assume any responsibility to customers' boats apart from what you take on in those agreements?
A. No.
MR. RAUWORTH: That's all I have at this time for this witness.
THE COURT: Thank you. Mr. Lovejoy, redirect?
MR. LOVEJOY: Thank you, your Honor.
Exhibit 91, Mr. Rauworth has agreed, may go in

as a full exhibit.

THE COURT: 91 may be full.

(Plaintiff's Exhibit 91 admitted full.)

MR. LOVEJOY: May I hand it to the witness, your Honor?

THE COURT: Yes.

REDIRECT EXAMINATION BY MR. LOVEJOY

Q. Is that a clearer or more distinct image of what appears in JJJ than you were looking at?

A. Yes.

Q. And in that photograph, you can see the starboard exhaust hose, correct?

A. Yes.

Q. And you can see it as it runs through the rear engine bulkhead, correct?

A. Yes.

Q. And also in that photograph, you can see a piece of yellow tape that's attached to the aft side of the engine room bulkhead, correct?

A. Yes.

Q. And this section here is the corner where the hull meets that aft engine room bulkhead, correct?

A. Yes.

Q. Now, you testified with respect to repairing saturated core, correct?

A. Yes.
Q. And you gave us a particular number, correct?
A. Yes.
Q. Now, in order to determine what area of a vessel would be required to be repaired, you would have to take moisture meter readings, correct?
A. Correct. Plus other things.
Q. There's a number of things you have to do. You never took any moisture metered readings of the EVEREADY, correct?
A. Correct.
Q. You didn't do the other things with respect to the EVEREADY because nobody ever asked you to perform that service, did they?
A. No.
Q. So the figure you came up with is pure speculation, correct?
A. Yes.
Q. The EVEREADY has a particular type of core, and the Catalina has a different type core, correct?
A. Yes.
Q. And the other two vessels you talked about have different types of cores than the EVEREADY, correct?
A. It could.
Q. And are there also a number of different ways to

repair suspected core damage?
A. Yes, there are.
Q. And Mr. Rauworth asked you questions about the undertakings that Point Judith took on with Mr. Picchione, correct?
A. Yes.
Q. One of the undertakings that you took on was to inspect exhaust hoses as part of your routine spring commissioning, correct?
A. Those that we could see.
Q. And those that you couldn't see, you testified that you didn't have a protocol for telling the owner that you hadn't been able to inspect it, correct?
A. Yes.
Q. And you also testified that you normally didn't take out fuel tanks, correct? Is that correct?
A. Right. For inspections.
Q. But if an owner came to you -- if you had told an owner, you know, you've got an old vessel and there's some exhaust hoses behind your fuel tank, and he said, I'll pay you to take them out, you'll do that, correct?
A. Yes.
Q. It's a way for Point Judith to earn money, right?
A. Right.
Q. You normally don't turn down jobs, do you?

A. Normally, we don't.
Q. And when did you first learn of the name Dan, the mechanic? Here in the courtroom?
A. I think so.
Q. Okay. So back in May of 2005, you don't know who Dan, the mechanic, is, do you?
A. I had no identification other than the fact that there was a mechanic working on the boat.
Q. Well, you never saw anybody except Mr. Picchione on the boat for a short period of time on Saturday, correct?
A. That's correct.
MR. LOVEJOY: May I have a moment, your Honor?
THE COURT: Yes.
MR. LOVEJOY: I don't have anything further, your Honor.
THE COURT: Recross.
MR. RAUWORTH: Yes, your Honor. Very briefly.

RECROSS EXAMINATION BY MR. RAUWORTH

Q. Mr. Lovejoy asked you about notifying customers about things that weren't accessible. Do you recall that just now?
A. Yes.
Q. You didn't notify customers about things in general that couldn't be accessed without further

disassembly such as belts on engines, correct? Timing belts. Sorry.
A. Timing belts. Correct.
Q. And likewise, you didn't undertake to provide any kind of preventive maintenance oversight or advice for customers, correct?
A. Correct.
Q. And about how many different makes of vessel do you deal with at Point Judith, including repair orders, summer storage, winter storage?
A. Couple hundred.
Q. Different makes and models?
A. Yes.
Q. And is there any -- strike that. Do some of those manufacturers have their own protocols, to your knowledge, for preventive maintenance?
A. Boat manufacturers?
Q. Yes.
A. I'm not sure.
THE COURT: You're outside the scope of the redirect.
MR. RAUWORTH: All right. Your Honor, I understood that to be within what Mr. Lovejoy had gone into. That's all I have for this witness, your Honor.
THE COURT: Thank you. I have a couple of

questions for you. You saw a number of pictures that depicted the thru-hull exhaust discharge points.

THE WITNESS: Yes.

THE COURT: Did Point Judith have anything to do with the installation of any of those?

THE WITNESS: No.

THE COURT: Those all came from the manufacturer or were added after-market?

THE WITNESS: Yes.

THE COURT: All right. Now, do you have any knowledge regarding those particular discharges, do you have any knowledge about whether those discharges, that it's critical that those be above waterline or below waterline? And if you don't know, just tell me you don't know.

THE WITNESS: They should be above waterline.

THE COURT: All right. Now, you have a number of -- I would assume you have a number of older boats in the marina; is that right?

THE WITNESS: Yes.

THE COURT: So the problems identified in some of these pictures, I mean, they must occur from time to time on older boats. Do customers ever engage you to take a really deep look into the boat to determine whether they have problems lurking in places that are

not easily accessible or not easy to see?

THE WITNESS: No.

THE COURT: Who do they engage for that type of thing, if anyone?

THE WITNESS: We would get into that once a customer had a problem. So if he blew an engine hose, he might say, okay, the engine is ten years old, replace all the engine hoses. If he had an exhaust leak in a twin engine boat, he would say, okay, fix this exhaust leak and, lo and behold, we have to do the whole thing. Once you do that, he'd say do both exhausts, or we would recommend it because of what had happened to the first one.

Normally, that stuff comes up with some type of failure.

THE COURT: Okay. So you wait for there to be a problem reported by a customer, then you respond to the problem, and then I suppose if anything else comes up during the course of responding to that problem, you look for it. And if you see something else, you make a recommendation. Is that a fair summary?

THE WITNESS: Yes, sir.

THE COURT: All right. But if a customer wanted to engage in a program of preventive maintenance, they wouldn't come to you for that?

THE WITNESS: I don't think we could do that on an entire boat.

THE COURT: It would just be too cost prohibitive, or time intensive, or what?

THE WITNESS: I believe so. Perhaps one particular customer. We'd have to set up a program and a certain time frame to do everything.

THE COURT: Okay. Now, are you familiar with this panel?

THE WITNESS: Yes.

THE COURT: So over the years that you've worked with Mr. Picchione, you've come to be familiar with that particular panel and the particular bilge pumps on this boat?

THE WITNESS: To a point, yes.

THE COURT: All right. Well, explain to me how that panel works, based on your understanding of it. If you don't know, I don't want you to testify about it. I don't want you to speculate or guess.

THE WITNESS: It's confusing. We know we have an automatic on switch, but I'm not sure how the three bilge pumps all get activated with the two remaining switches.

THE COURT: I thought I heard you say earlier, and maybe you didn't, and maybe I misunderstood your

testimony, but in connection with when the harbormaster pointed out the panel to you, I thought you said that you observed the automatic switch in an off position, and the other two bilge pump switches also in an off position.

THE WITNESS: Yes.

THE COURT: Now, I also thought I understood your testimony to be that if the auto switch was in an off position, the bilge pumps would not work with the floats.

THE WITNESS: That's correct.

THE COURT: Is that something that you know to be true? I mean, just based on your working with this boat over the years, do you know that's how that panel operates?

THE WITNESS: I didn't test it myself. I'm going by what my technicians tell me.

THE COURT: That's your understanding of how it works?

THE WITNESS: Yes.

THE COURT: Is there any other -- can you conceive of any other way that those switches would work?

THE WITNESS: You could have one switch for each pump, which would activate each pump separately in the

automatic mode. But then you would have no override for manual. There would have to be another switch someplace to put that pump on manual.

THE COURT: Taking that specific panel, if the auto switch was in the off position and one of the bilge pump switches below that, the lower two, if one of them was in the on position, what would happen?

THE WITNESS: That pump should run in manual until you turn that switch off.

THE COURT: So it would just run regardless of whether the float was up or down or whether there was water.

THE WITNESS: Right. You bypass the float switch. There's two separate electrical circuits.

THE COURT: So it's your understanding that the auto on switch is the switch that operates the floats.

THE WITNESS: Yes.

THE COURT: All right. And do you have any -- and it's your belief that, based on what you observed when the boat was taken out of the water, that all three switches were in the off position at the time when it came out of the water. Is that what I understand you to be saying?

THE WITNESS: Yes.

THE COURT: So one would assume they were in the

off position when it went into the water, when it sank?

THE WITNESS: Yes.

THE COURT: But you don't know of your own personal knowledge how those switches got into the off position?

THE WITNESS: No.

THE COURT: Okay. Your testimony is complete. You may step down. Thank you.

THE WITNESS: Thank you.

THE COURT: All right. I think that should do it for the day. Tomorrow we'll begin with whom?

MR. LOVEJOY: Mr. William Robbins.

THE COURT: Okay. We'll go off the record.

(Discussion off the record.)

(Court concluded at 4:50 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

MAY 29, 2008

________________________________________

Date