IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| NORTHERN INSURANCE COMPANY, ET AL | * 06-190 |
| | * MAY 14, 2008 |
| VS. | * VOLUME 3 |
| ALBIN MANUFACTURING, ET AL | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(BENCH TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: FREDERICK A. LOVEJOY, ESQ.
Lovejoy & Associates
1536 Westminster Street
Providence, RI 02909

FOR THE DEFENDANT: MICHAEL J. RAUWORTH, ESQ.
and CARL E. FUMAROLA, ESQ.
Cetrulo & Capone, LLP
Two Seaport Lane
Suite 1000
Boston, MA 02110

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| WILLIAM ROBBINS | |
| Direct Examination by Mr. Lovejoy: | 5 |
| Cross-Examination by Mr. Rauworth: | 90 |
| Continuation of Direct Examination by Mr. Lovejoy: | 91 |
| Continuation of Cross-Examination by Mr. Rauworth: | 94 |

PLAINTIFF'S EXHIBITS

| | | |
|---|---|---|
| 60A | - | 69 |
| 60B | - | 90 |
| 63 | - | 19 |
| 69 | - | 58 |
| 70 | - | 56 |
| 74 | - | 56 |
| 75 | - | 57 |
| 82 | - | 57 |
| 84 & 85 | - | 47 |
| 89 | - | 20 |
| 103 | - | 53 |
| 108 | - | 78 |
| 110 | - | 80 |
| 112, 114, 115, 116, 121, 122 & 123 | - | 82 |
| 113 | - | 83 |
| 117 | - | 83 |

I N D E X (Continued)

| | | ID | PAGE |
|---|---|---|---|
| 118 | - | | 83 |
| 124 | - | | 84 |
| 126 | - | | 85 |
| 129 | - | | 71 |
| 132 | - | | 59 |
| 133 | - | | 37 |
| 134 | - | | 8 |
| 155 | - | | 15 |
| DEFENDANT'S EXHIBITS | | ID | FULL |
| RR | - | 129 | |

______________________________

THE COURT: Good morning. Are you ready to call your next witness?

MR. LOVEJOY: Yes, your Honor.

THE COURT: Okay.

MR. LOVEJOY: Mr. Robbins, will you take the stand, please.

WILLIAM ROBBINS, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: William Robbins. R-O-B-B-I-N-S.

MR. LOVEJOY: Before we start questioning, I'd like to move Exhibit 2 into evidence, which is the Rule pump exhibit.

MR. RAUWORTH: I have only the objections that I stated at the time it was being discussed, your Honor, which I think the Court dealt with at that time, so I'll just renew those for the record.

THE COURT: Well, I dealt with some of your oral objections, but I don't think you laid a proper foundation for that exhibit. This is the instructions that go with that pump?

MR. LOVEJOY: Yes, your Honor.

THE COURT: So I'm not going to admit that document at this time. Okay. Go ahead.

DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Robbins, can you provide the Court with your educational background, please.

A. Yes. I have a bachelor's degree from Bryant College, Smithfield, Rhode Island. Graduated in 1977. My degree is in law enforcement. I also have some graduate studies from Quinnipiac University in Hamden, Connecticut.

Q. Mr. Robbins, beside the formal education that you've testified to, can you provide the Court with any additional training or seminars you've taken in your field?

A. Yes. On my resume, on the third page, there's a listing of professional education that I've taken in the last five years. Would you like me to review it?

Q. Could you tell the Court what the exhibit number is? Is it 134?

A. Yes, Exhibit 134. On page three, it's a listing of the professional seminars I've attended in the last five years.

Q. Do you belong to any -- why don't we drop back. Give us your employment history.

A. Yes. I'm self-employed as a marine surveyor. I have been since 1986. Prior to that, I was employed by an insurance adjusting firm in New Haven by the name of

Paul Higgins. I worked for them from 1982 to '86. Prior to that, I was manager of a marina in New Haven, Connecticut from 1980 to '86. I worked -- those jobs were concurrent. Prior to that, I was a police officer in the Town of Clinton, Connecticut from 1977 to 1982.
Q. Thank you. And do you belong to any professional associations?
A. Yes, I do. I belong to the Society of Accredited Marine Surveyors, and my designation in that society is accredited marine surveyor.
Q. Since when, sir?
A. Since 1986.
Q. Any other memberships that you have?
A. I belong to the Connecticut Marine Trade Association. I also belong to an association known as the American Boating Yacht Council.
Q. Can you describe for us what ABYC is, please.
A. American Boating Yacht Council is a group within the marine community, boat builders, various manufacturers, vendors of engines and of equipment that is used in boat building. Also, members are also marine surveyors and repair facilities. And the ABYC establishes standards for construction and maintenance of pleasure craft.
Q. Okay. And the Marine Surveyors Association that

you belong to, do they require any sort of continuing education?
A. Yes. Every five years, I'm required to accumulate at least 60 credit hours of continuing education, and I'm also required to attend at least one annual national conference.
Q. How many credit hours? I missed that.
A. Sixty. Six, zero.
Q. Thank you. And have you attended seminars and obtained the 60 credit hours since 1986 when you became a marine surveyor?
A. Yes, I have.
Q. And can you describe what type of work your company does presently, or what it's done since 1986.
A. I have a general marine survey practice. I generally do condition and value surveys for yachts. I do damage survey and claims adjustment for yachts and small commercial hulls. I currently don't do repurchase surveys but I have in the past.
The bulk of my practice in the last five years has been for damage surveys for yachts and small craft, and also marinas, property damage and liability.
Q. Thank you. And how many of those, as you call them, casualty surveys involve sinkings or vessels taking on water?

A. It varies from year to year. But generally, anywhere from 6 to 12 to 20 in a year. I normally do on an average maybe between 150 and 200 assignments a year.
Q. That's been so since 1986?
A. Generally, yes.
Q. In front of you, you have a CV, correct? It's Exhibit 134 for ID.
A. Yes.
Q. Does that contain all your employment history and professional background?
A. Since college, yes.
Q. Anything else that's in it that the Court should know about?
A. Well, prior to college, when I was in my first real job, when I was in high school, I worked at a marina as a dock boy and a yard person. I started at 16 in the business. I've been in it for most of my life since then.
MR. RAUWORTH: No objection to his resume as an exhibit, your Honor.
THE COURT: Exhibit 134 will be full.
(Plaintiff's Exhibit 134 admitted full.)
Q. Can you describe for the Court what type of sinkings you've been involved investigating in the last

few years?
A. There are numerous types. There are weather-related sinkings. There are sinkings that come from collisions. There are sinkings that come from failures of systems aboard the boat, hoses, machinery, et cetera. I have seen all types of them in the course of my practice.
Q. And do some of those sinkings involve failure of hoses?
A. Yes.
Q. Some of those sinkings involve -- or some of the casualties -- strike that.
Have you, as part of your work, become familiar with operation of bilge pump systems?
A. Yes.
Q. How many bilge pump systems have you looked at in the last 22 years?
A. Hundreds of them. I look at them when I conduct a value and condition survey, and I also look at them whenever there is a casualty involving a flooding.
Q. And what about the exhaust systems, have you had occasion to examine those over the last 22 years?
A. Yes, I have. They also are a part of the value and condition survey, or pre-purchase survey, and also there are casualties involving exhaust systems that

fail where an engine may become flooded with water or the boat may become flooded.
Q. You told the Court that you had actually worked at a marina, and I guess ran a marina for a few years; is that correct?
A. Yes.
Q. Besides doing that personally, have you become familiar with marina practice as a professional surveyor in the last 22 years?
A. Yes, I have.
Q. Can you tell the Court your experience in that regard, please.
A. Well, this is relating to exhaust systems?
Q. No. Relating to marina practices and procedures.
A. As a manager of a marina, I was responsible for it, in my own job. Also, as part of my practice, I am in marinas and boatyards on an everyday basis. I interact with service technicians, service managers, marina managers on an almost daily basis. I'm involved with specifying, making recommendations, for repairs that marinas would do. I'm involved with reviewing marina practices as far as installations and servicing of vessels, during the course of my practice.
Q. And can you explain for the Court, please, your experience with respect to commissioning and

decommissioning vessels, and servicing and repair of vessels.

A. Generally -- I'll start with commissioning of a vessel. Generally, it's a good practice to inspect the vessel prior to it being launched. A technician would go aboard, make sure all the -- that there are no anomalies. Make sure all that all hoses -- excuse me, all thru-hull fittings are checked and closed.

THE COURT: Wait a second. I think the question had to do with your experience with respect to that, not what you think the practice should be, or how it should be done.

A. Well, my experience is that I would -- many times when I would do a pre-purchase survey or value and condition survey, I would be present when a boat is being commissioned for a sea trial, and I would review, or I would basically -- I would just watch the technicians in operation. And in some cases, I would direct them to do certain things as far as commissioning.

Q. Okay. And you, I believe, said you worked in a marina and you managed a marina. Can you tell the Court your experience with respect to commissioning and decommissioning when you were actually working in a marina?

A. My position as manager of the marina, I personally did not do any of the work myself. I would oversee technicians that would do that, and I would give them a check list, or I would verbally give them instructions on how to commission engines and machinery and systems.
Q. Did you personally create or establish the check list which the technician would use to perform a commissioning that you referred to?
A. This was quite awhile ago. I recall it was something that was already established by the marina when I came in.
Q. Okay. As part of your work now, do you review repair bills and service charges of marinas?
A. Yes, I do.
Q. How often do you do that, sir?
A. On a very regular basis. Most of my files involve my review of marina bills, so I would say I would do it on an almost daily basis.
Q. Do you also, as part of your marine surveying business, have to review what a marina or a contractor proposes to do -- strike that.
As part of your business, daily business, do you have to approve repairs and servicing of damaged vessels?
A. Yes, I do.

MR. LOVEJOY: Your Honor, I'd move that the Court certify Mr. Robbins as an expert for purposes of this case.

MR. RAUWORTH: I object to the concept of certification.

THE COURT: We don't certify experts, so the question is, is defense counsel challenging the qualifications or the expertise of the witness?

MR. RAUWORTH: Your Honor, I think he certainly -- a foundation has been established for him to testify about certain things, some of which have been set forth in his disclosure report. Obviously, I don't know all of what Mr. Lovejoy is going to ask him today. So I'm not taking the position that he's across the board incompetent to testify. There may be some issues on which I would have specific challenges.

THE COURT: Well, he's issued a report in this case, right?

MR. RAUWORTH: That is correct.

THE COURT: So assuming his testimony is in the scope of what is in the report, which it must be, then do you object to his qualifications as an expert witness?

MR. RAUWORTH: Provided his testimony stays within the limits of his report, then I would not have

any objection.

THE COURT: It has to stay within the limits of his report. That's what the Rules require.

MR. RAUWORTH: I'm encouraged to hear that, your Honor. I was troubled by it when I saw the exhaust device over here which led me to suggest that something else might happen. Led me to believe, I'm sorry.

THE COURT: I'm going to take that to be no objection to the qualifications and expertise of the witness. So you don't need any certification of him. You just need to proceed with your inquiry.

MR. LOVEJOY: Thank you, your Honor.

Q. Mr. Robbins, are you familiar with the vessel called the EVEREADY, 35-foot Albin?

A. Yes.

Q. And what types of engines and exhaust systems does that vessel have?

A. That vessel is powered by two Caterpillar diesel engines. They're model 3116, which means it's a six-cylinder, straight six-cylinder configuration. It has what's called a wet exhaust system which draws in the seawater, cools the engine and the exhaust system, and discharges it.

MR. LOVEJOY: May I approach the witness, your Honor?

THE COURT: Yes.

MR. RAUWORTH: No objection to this exhibit, your Honor.

MR. LOVEJOY: Exhibit 135.

Q. What is Exhibit 135?

A. This is a copy from a book known as the Power Boat Guide. It's a description of the Albin 35.

MR. LOVEJOY: It's a new exhibit, your Honor.

THE COURT: It's not in here?

MR. LOVEJOY: That's correct. It's not in there.

THE COURT: Exhibit 135 will be full.

(Plaintiff's Exhibit 155 admitted full.)

THE COURT: Do you have a copy for me?

MR. LOVEJOY: I'm going to give you the original. It's one full color copy Mr. Robbins had.

THE COURT: When you have an exhibit, there should be an original that goes into the Court file, and then there should be a copy for me.

MR. RAUWORTH: May I offer a helpful suggestion? It's none of my business, but the problem might be solved if it were placed on a device and a screen copy made, for the short term.

THE COURT: I'm trying to tell you how I like things done in my courtroom. I don't like my -- that

printer is used to make copies. When you introduce an exhibit, have a copy, a bench copy, and have one for the court file. Is it properly marked?

MR. LOVEJOY: Yes, your Honor.

THE COURT: That will be full.

MR. LOVEJOY: I apologize. Mr. Robbins handed it to me out in the hallway. I thought it might aid the Court because it has a diagram of the configuration of the boat. We don't have an exhibit like that.

THE COURT: Are you going to use it in further examination of him?

MR. LOVEJOY: Yeah. I may.

THE COURT: Take it and put it on the projector when you use it.

Q. Mr. Robbins, can you tell the Court what is depicted at the bottom of 134, and what the purpose of it is?

A. This is a schematic of the layout of a typical Albin 35.

Q. And is it the same schematic as the EVEREADY?

A. Yes. It's the top one.

Q. Okay. It's an aerial view of the 35 Albin, and it also shows the salon, the lazaret and dimensions, correct?

A. Yes.

Q. Thank you. Mr. Robbins, you performed a survey, or a number of surveys, with respect to the EVEREADY, correct?
A. Yes.
Q. And did you examine the bilge pump system and the switching system on the vessel?
A. Yes, I did.
Q. What did you learn with respect to the bilge pumps that were on the vessel?
A. There are a total of three bilge pumps in the vessel. There's one that is forward that I believe is a Rule 1500. There is one that is in the engine compartment, mid-ships, which I believe is also a Rule 1500 or 2000, and there's a third bilge pump that is farther aft in what I would call the aft lazaret. I don't know the designation of the pump because it's quite difficult to see.
The pump farthest aft has a float switch attached to it, and the pump farthest forward has a float switch attached to it.
The pumps that are forward and mid-ships both discharge out to the starboard side of the vessel through inch and 1/8 lines, hoses. The aft bilge pump discharges out to the transom. I noticed that there is an anti-siphon loop in the aft bilge pump in the

mid-ships, and the forward bilge pumps there are no anti-siphon loops.

Regarding the switches on the electrical panel for the boat, there are what appear to be three switches that are related to the bilge pumping system. Two of them are marked bilge pump with no other designation. One of the other switches, the third switch, excuse me, is marked simply auto, and those are both -- all three of those switches are just two-way, off-on switches.

Q. Thank you. Did you attend the EVEREADY in April and May of 2005?

A. Yes, I did.

Q. And did you take photographs on one of those two visits?

A. Yes, I did.

Q. And, Mr. Robbins, do you recognize what's been marked for ID as Plaintiff's Exhibit 63?

A. Yes, I do.

Q. What is it, sir?

A. That is a photograph I took. It depicts the two discharge hoses from the forward pump, and the mid-ships pump from the EVEREADY.

Q. Those are the two black water hoses?

A. Yes.

Q. And the white devices, are they thru-hull fittings for the bilge pumps?
A. Yes. Those are plastic fittings that are attached to the hull, and the hoses are clamped onto them.
Q. Okay.
MR. RAUWORTH: No objection, your Honor.
THE COURT: All right. Exhibit 53 will be full.
MR. LOVEJOY: 63.
THE COURT: 63.
(Plaintiff's Exhibit 63 admitted full.)
Q. Mr. Robbins, I'm going to show you what's been marked as Plaintiff's 89 for ID. Do you recognize that photograph, sir?
A. Yes. That appears to be the starboard side of the EVEREADY showing -- those are the outside of the thru-hull fittings.
Q. You took that photograph on one of your visits to the EVEREADY?
A. I'm not sure if I took this photograph or not, but there are numerous photos that I took.
Q. Does it fairly and accurately depict the two bilge pump holes on the side of the EVEREADY?
A. Yes, it does.
MR. RAUWORTH: No objection.
THE COURT: Exhibit 89 will be full.

(Plaintiff's Exhibit 89 admitted full.)

Q. Mr. Robbins, I'm going to show you --

THE COURT: Has Exhibit 89 been marked?

MR. LOVEJOY: Yes, your Honor.

THE COURT: All right. Good.

Q. Mr. Robbins, I'm going to show you 57 in evidence. What is that photograph, and did you take it?

A. That's an overall picture of the EVEREADY taken as I found it at the Point Judith Marina.

Q. Thank you. And do you remember what day you took the photographs?

A. It would have been either the first day or the second day that I inspected it. I believe that was taken on May 5th, the day that -- I believe that's the correct date, May 5th, the day the boat was relaunched.

Q. What was the purpose of launching the boat -- I think it's May 3rd. Early May?

A. Excuse me. May 3rd is the correct day. We were unsure as to the cause of the sinking. And I arranged, or I was part of a joint survey to relaunch the vessel and investigate what the cause of the sinking was.

Q. I'm going to show you Exhibit 60 in evidence. And can you tell the Court why you took that particular photograph on May 3rd, 2005?

A. This is the starboard side of the EVEREADY, the

aft corner facing slightly forward. There is a scum line that is shown there that is part of my investigation, as you can see -- may I point to that?
Q. Yes.
A. The scum line over here to the right goes right up to the discharge fittings for the bilge pumps.
Q. Okay. And you obtained information from Mr. Vivenzio, the manager at Point Judith Marina, as part of your investigation prior to taking these photographs?
A. I interviewed him at some point. I don't recall if it was before or after.
Q. Okay. Did you interview him concerning the date of this sinking and what was done with the vessel afterwards?
A. Yes.
Q. And at this point in time, the vessel is up on the hard, correct?
A. Yes.
Q. And did he tell you that the vessel was hauled and put in this position?
A. I believe so, yes.
Q. Okay. Your understanding is it hadn't been put back in the water between the sinking on April 25 and the day you took these photographs and May 3rd?

A. Yes. That was my understanding.
Q. Can you tell the Court why the scum line was of significance to you?
A. The scum line indicates the level that the boat had been floating at, at one point. And it basically is a line --
Q. I put up on the screen, Mr. Robbins, Exhibit 59 in evidence. Did you take this photograph on May 3rd, 2005?
A. Yes, I did.
Q. What was the significance of you taking this photograph?
A. This is in the same area of the EVEREADY. It's the starboard aft quarter on the topside. Again, it shows a series of scum lines which indicated to me that the boat had been floating at that level at some point.
Q. And in order to create the scum line, it had to be floating down where the debris line is, so to speak?
A. Yes.
THE COURT: We're on the record here. I'd like to ask a couple of questions about those last couple of photos so that it's in the same place in the transcript. The photo that has the larger hole, discharge hole that was just on the screen --
MR. LOVEJOY: Exhibit 60, your Honor.

THE COURT: -- Exhibit 60, that looks different than the photos that show the two thru-hull discharges that I think you said come from the fore and the mid-bilge pumps; is that right?

THE WITNESS: That's correct.

THE COURT: So that larger hole, what is that discharging from?

THE WITNESS: That is farther aft on the starboard side, all the way aft on the starboard side. That is the exhaust discharge.

THE COURT: The term "exhaust" has been used here both for exhaust of water and exhaust of engine gases, right?

THE WITNESS: Yes.

THE COURT: The term is used interchangeably sometimes.

THE WITNESS: Yes. The exhaust mixture that comes from the engine is a combination of both gases and water that is mixed into it.

THE COURT: That's the seawater that's cooling?

THE WITNESS: Yes.

THE COURT: That's what the larger hole is, that type of exhaust. The smaller holes are the discharge?

THE WITNESS: Yes.

THE COURT: And they're both on the starboard

side?

THE WITNESS: Yes.

THE COURT: Go ahead, Mr. Lovejoy. Mr. Lovejoy, have you moved all of those exhibits?

MR. LOVEJOY: Yes, they're all --

THE COURT: I think you said 89 was for ID.

MR. LOVEJOY: There was one for ID. All the others are full exhibits.

THE COURT: Are you moving that?

MR. LOVEJOY: Yes. I think Mr. Rauworth agreed.

MR. RAUWORTH: Right. No objection, your Honor.

THE COURT: All right. 89 will be full.

BY MR. LOVEJOY: (Continuing)

Q. While we're on the subject of exhaust discharges, do you have any experience as to where they're placed with respect to the waterline on pleasure craft?

MR. RAUWORTH: Objection. Assumes facts not in evidence.

THE COURT: What was the objection?

MR. RAUWORTH: Assumes facts not in evidence.

THE COURT: Well, the question is very difficult to understand. So I'm going to sustain the objection. Try to ask a new question.

Q. Okay. Were you here yesterday when Mr. Vivenzio testified as to the uniqueness of the position of the

EVEREADY's exhaust discharge?
A. I was here for most of his testimony, yes.
Q. You surveyed hundreds of pleasure craft, correct?
A. Yes.
Q. Are you familiar with where exhaust discharges are placed on various pleasure craft?
A. Yes, I am.
Q. Can you tell the Court -- let me ask you this. Are all of them above waterline, below waterline, or something else in your experience?
A. It varies depending upon the design of the boat, and where the engine is placed in the boat. Some discharge at the waterline. Some discharge slightly above it. Some discharge below the waterline.
Q. So the fact that the EVEREADY's discharge mostly below the waterline isn't anything uncommon, correct?
A. No.
Q. Now, assume, having surveyed hundreds of vessels, you've gotten a fair amount of knowledge of scum lines, sir, correct?
A. Yes.
Q. And can you tell us, based on your experience, how long it took to form the scum line that is depicted in Exhibit 59?
A. It would -- a lot depends upon the debris that is

in the water at the time, also. But my best guesstimation that the scum line would take six to eight to ten hours or more.
MR. RAUWORTH: Objection, your Honor. I think I heard the word "guesstimation."
THE COURT: Did you say "estimation" or "guesstimation"?
THE WITNESS: Estimation, your Honor.
THE COURT: All right. Overruled.
Q. Based on your experience, when was this scum line that's depicted in both Exhibits 60 and 59 created?
A. Within 12 hours prior to the sinking.
Q. I'm going to show you 61 in evidence, sir.
MR. LOVEJOY: Your Honor, 61.
THE COURT: Okay. When you use an exhibit, would you please indicate whether it's full or ID?
MR. LOVEJOY: I apologize. I thought I did. 61 in evidence.
THE COURT: All right.
Q. What's depicted in 61 in evidence?
A. This is a close-up view of the starboard side, specifically at the two bilge pump discharge fittings. I am holding a tape measure even with one of the fittings, and this is to show the height above the chine of the boat, and also at five inches, at

approximately five inches on the tape measure there's a very faint scum line. And I believe that's where the boat had normally been sitting prior to the sinking.
Q. I'm going to show you 64 in evidence, sir. Why did you take that photograph, sir?
A. I took this photograph on May 3rd when the boat was relaunched to show its position in the water. This, again, is the starboard aft quarter of the EVEREADY.
Q. I believe it's your testimony that those are the two bilge pump discharges that you believe were sitting below the scum line that you cited in the other photograph?
A. No. I'm sorry. This depicts the exhaust discharge that is below water.
Q. Okay. That's the -- you took -- what was the reason you took that photograph? I apologize.
A. To show that the exhaust discharge was below the waterline.
Q. I'm going to show you 64A in evidence. What's the significance of the photograph?
A. This is a photograph of the underside of the EVEREADY on the starboard side on the keel. It shows two areas where water is weeping out of the hull.
Q. Okay. Thank you. And just so that the record is

clear --

THE COURT: Would you just hold that up so I can see it? Okay. Thank you.

Q. In 64 in evidence, there's a thru-hull with a black flap on it?

A. Yes.

Q. That is what?

A. That is known as a scupper or cockpit drain. It's at the aft or the transom of the boat. That is designed for water to be able to drain out of the cockpit of the boat.

Q. That's not the exhaust discharge that you testified to earlier, correct?

A. That's correct.

Q. The exhaust discharge is obscured by the, or below the water?

A. Yes, it is. It's below the waterline.

Q. What do the -- I think you called them weeping or -- why did you take 64A, to show the weeping from the hull of the vessel; is that correct?

A. Yes.

Q. What did that indicate to you?

A. It indicated to me that there was a -- first of all, it's an anomaly. Water should not be weeping out of a hull like that. It was possibly a source of water

intrusion into the boat.
Q. On May 3rd, can you describe to the Court what you did with respect to surveying the EVEREADY?
A. Yes. I arranged to have Mr. Layfield present also for a joint survey. We initially inspected the boat on the hard, as it was shown in the photograph there. And then I arranged for Point Judith to relaunch the boat for us so we could inspect it in the water, as it was shown in the photograph. Once it was in the water, I went through it, Mr. Layfield was present with me, too, and we -- I checked all of the thru-hull fittings. I checked for any obvious leaks in the boat to see where water was coming in from.
Q. Did you find a source of water during that survey?
A. Yes, I did.
Q. Did Mr. Layfield also sight that source?
A. I believe so, yes.
Q. Was Mr. Vivenzio with you during this survey?
A. I believe he was on the boat at some point. I don't recall specifically, but I'm quite sure that he was there.
Q. Can you describe the stream of water that you observed on May 3rd, 2005, specifically, where it was coming from and what it looked like?
A. Yes. It appeared to originate from behind the

starboard engine, in an area that was known as the shaft log. There was a stream of water that was coming from that area, and it would run forward alongside the engine stringer.

Q. When you sighted the stream of water with Mr. Layfield, was there a compartment that you were in at the time?

A. Yes. We were in the engine compartment at the time.

Q. That's in the center of the vessel, the enclosed --

A. Yes.

Q. Sorry. That's enclosed by the cabin?

A. Yes.

Q. It's not back exposed to the weather, correct?

A. That's correct.

Q. And can you describe the visibility or the rate of water that was in this stream that you and Mr. Layfield observed?

A. It was a -- I would just call it a steady stream. It was maybe -- there was some water that would accumulate around the shaft log and then it would run farther down towards the bilge of the boat. I would say it was maybe the size of a pencil stream.

Q. And is it fair to say it was clearly visible if

you were in the engine room?
A. Yes. Behind the starboard engine, yes.
Q. And although you found the stream of water on May 3rd, 2005, were you able to identify where or how it was coming into the vessel at that point in time?
A. No. I just knew that it was accumulating. There was water accumulating in the area of the shaft log, but we did not find the actual source of it.
Q. And did you make arrangements with Point Judith to attempt to determine the source of the stream?
A. Well, after the boat was hauled, I made arrangements to hire another gentleman by the name of Mr. Bruce Pfund to work with me in attempting to find the source.
Q. And after you did that, did you approach Point Judith about doing anything with respect to removing parts of the vessel or assisting you and Mr. Pfund?
A. Yes. I asked Mr. Vivenzio to make arrangements for some removals of the starboard shaft and the, I believe, the strut on the bottom of the boat, yes.
Q. And at that time, did they do everything you requested?
A. It was done at a point later, I believe, in June or July.
Q. Okay. And after that had been done, did you ask

Point Judith to do further tasks for you and Mr. Pfund?
A. We also asked them to remove some of the water and oil that had accumulated in the boat, and that was done at some point later.
Q. Mr. Robbins, you know, based on your experience as a manager of a marina, can you tell us what the industry practice is in respect to launching and inspecting vessels at the beginning of a season?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
THE COURT: You need to lay a better foundation before you ask that question.
Q. Mr. Robbins, are you familiar with the practice in the marine industry with respect to launching, and especially vessels at the beginning of a season otherwise known as commissioning?
MR. RAUWORTH: Objection. Assumes facts not in evidence.
MR. LOVEJOY: I'm trying to lay just a foundation question.
THE COURT: You have asked some questions with respect to his experience on commissioning boats, but what's in issue here, and what's unclear to me, is whether there's an industry practice. That's what you need to get a foundation on.

Q. Mr. Robbins, is there an industry practice with respect to commissioning vessels and launching them in the springtime?

A. There's no written standard, but there are general customs in boatyards, yes.

Q. Can you describe to the Court what those general customs in the boatyards are.

MR. RAUWORTH: Objection. This is beyond the scope of the disclosure.

THE COURT: Do you have a copy of the disclosure for me?

Now, Mr. Lovejoy, is this covered in his expert report?

MR. LOVEJOY: I don't believe so, but it's in response to, you know, Mr. Layfield testified last Friday on deposition, this witness was disclosed. I'm asking this information in response to some defenses that were raised in the last few weeks.

THE COURT: Well --

MR. RAUWORTH: Your Honor, Mr. Layfield's testimony includes things that were brought up in the amended complaint. And that actually took place after the disclosure report, the last, the fourth iteration of disclosure report of Mr. Robbins. And so I think that we're entitled to make a defense to matters that

are raised in an amended complaint that's filed on April 7th or April 9th where there's been no disclosure that this witness was going to be dealing with an industry practice with regard to commission. I took his deposition on the 24th of April, and I certainly wanted to know that, inquiring into that on the occasion of his deposition.

MR. LOVEJOY: On the 28th, your Honor, we got Mr. Layfield's disclosure, whatever last Friday was, we took his deposition. I can bring him back as a rebuttal witness because all this issue was raised --

THE COURT: Are you saying that Mr. Layfield is going to testify with respect to industry practice regarding commissioning?

MR. LOVEJOY: He testified, and my understanding is --

THE COURT: Let me ask Mr. Rauworth.

MR. RAUWORTH: In the amended complaint, there's allegations that basically what Mr. Stroker did was wrong. So he's going to provide the opinion that it was okay. He's not testifying about industry practices generally about commissioning.

THE COURT: I think you have to wait and see what the testimony is before I can allow you, possibly allow you to use Mr. Robbins as a rebuttal witness.

You're trying to rebut something now that was said in a deposition, anticipating that it will be -- the testimony here in court will be the same as what occurred in the deposition. It's really rebuttal testimony. If this isn't part of the disclosure, this should not come in on direct. So I'll sustain the objection.

Q. Did you examine the bilge pump system on the EVEREADY?

A. Yes.

Q. And what did you -- I believe you testified you found there's no anti-siphon loops or check valves, right?

A. On the forward pump and the mid-ships pumps, there are no anti-siphon loops.

Q. You had taken a photograph showing the position of the two bilge pump discharges, correct?

A. Yes.

Q. And you measured them. And what significance did you place on the position of the bilge pump discharge thru-hulls?

A. The position of the discharges was quite low in relation to the waterline.

Q. And did you form an opinion -- did you review any regulations or recommendations with respect to the

positioning of thru-hulls, or the use of some devices to prevent back-flooding?
A. Yes, I did.
Q. What did you review, sir?
A. I reviewed a standard that's published by the American Boating Yacht Council that concerns itself with the installation of bilge pumping systems.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
MR. RAUWORTH: Your Honor, in the interest of time, if I may note, probably the next question I'm going to object, or to the series of questions because there's been no disclosure that this witness has an opinion with regard to the propriety of anything that Point Judith did or did not do as regards to the installation of bilge discharge lines or the routing or the configuration.
THE COURT: So, Mr. Lovejoy?
MR. LOVEJOY: He provided an opinion, I believe it's in June, with respect to thru-hull fittings and anti-siphon loops on the vessel, period.
MR. RAUWORTH: And that was at a time when Albin and Standish were in the case. And there has never been a disclosure that this witness would have an

opinion that suggested that there was something that Point Judith did wrong in regard to this subject.

THE COURT: All right. Let's take the questions one at a time. It was disclosed, so it's a permissible subject matter, so ask your questions.

MR. LOVEJOY: Thank you.

Q. Mr. Robbins, I put in front of you Exhibit 133 for identification. Is that the ABYC recommendation that you relied on?

A. Yes, it is.

MR. LOVEJOY: Move that be a full exhibit, your Honor.

THE COURT: Any objection?

MR. RAUWORTH: I do, as to the pursuing this subject matter with this witness in light of the disclosure, your Honor. As to its authenticity, I have no objection.

THE COURT: All right. I'm going to take it as an exhibit subject to what rulings I might make with respect to further questions. Go ahead.

(Plaintiff's Exhibit 133 admitted full.)

Q. Did you review this ABYC recommendation in respect to how the bilge pumps and thru-hulls and hoses were set up in the EVEREADY?

A. Yes, I did.

THE COURT: Mr. Lovejoy, I have an Exhibit 132 that looks like an ABYC --

MR. LOVEJOY: Yes, your Honor. That's the exhaust ABYC recommendation. The following one should be the thru-hull or hose.

THE COURT: There's nothing in my book after that. I'll get it from the law clerk. All right. I have it.

Q. Mr. Robbins, can you tell us whether the bilge pump system on the EVEREADY complies with the ABYC standards that you reviewed? And if not, why not?

MR. RAUWORTH: Your Honor, may I just clarify that there's no need for me to repeat objections vis-a-vis the subject matter that the Court has taken my point about his testimony on the subject -- subject to a continuing objection?

THE COURT: No. You may not. I understand you're objecting to the line. What I have ruled is that this was part of his disclosure. He may testify about it. But I'm going to take it question by question. So if there's a -- whether the testimony is admitted may depend on how the question is phrased, and what exactly the opinion is that's being elicited.

MR. RAUWORTH: Understood. Thank you.

A. In my opinion, the pumping system did not comply

with, I'll refer to H22.7, location installation F. Generally F, that the discharge location shall be above the waterline created by maximum conditions of the boat's loading heel, trim and motion to stern, and there is an exception to that. Discharge may be located below the waterline if discharge line is provided with a vented loop to prevent siphoning into the boat. And a check valve shall not be used for this purpose.

Q. And the EVEREADY did not have anti-siphon loops, correct?

A. Correct.

MR. RAUWORTH: Objection. Mischaracterizes the testimony.

THE COURT: Sustained.

Q. What did you find with respect to anti-siphon loops on the engine and forward bilge pump lines in the EVEREADY?

A. They did not exist. There were none.

Q. And can you describe for the Court how the bilge discharge hose ran from the bilge pump to the thru-hull fitting?

MR. RAUWORTH: Objection. Ambiguous.

THE COURT: You've got to be more specific which bilge pumps you're talking about, so sustained.

Q. The engine room bilge pump, how did the discharge hose run from it to the thru-hull?
A. It ran from the pump outlet forward, and then it curved upward. There was a bulkhead in that area, and there was a hole drilled, and the hose went through the bulkhead, and then it continued up to the discharge outlet on the side of the boat.
Q. And no anti-siphon loop, correct?
A. Correct.
Q. Now, can you describe the discharge line, how it was set up on the forward bilge pump on the EVEREADY?
A. Yes. It was very similar. It ran from the pump forward, almost parallel with the other hose. It went through a bulkhead and went out, discharged on the side of the boat, adjacent fitting.
Q. Are you familiar with a -- strike that. What would result if the thru-hull fittings were submerged on the EVEREADY based on what you saw with respect to the discharge hoses on that vessel?
A. Seawater would back-flow down the hoses and into the pumps and ultimately into the bilge.
Q. And did you perform subsequent surveys on the EVEREADY at some point in time?
A. Yes, I did.
Q. When did you do the next survey after May 2005?

A. I believe it was in October of 2007.
Q. Okay. And was the purpose also to attempt to determine how the water got into the vessel that sank it?
A. Yes.
Q. What did you observe and discover in October 2007 with respect to the EVEREADY?
A. At that time, the boat was relaunched in Warwick, Rhode Island. And we, at that time, did not find any water coming into the boat. Ultimately, it was hauled again. Prior to this happening, there were some removals made of fuel tanks. There are three fuel tanks aboard the vessel. One of them was removed for access to the shaft log area. Subsequent to the launching, we removed another fuel tank, and at that point I found the source of the water that was coming into the boat.
Q. Okay. On this occasion, did you go down into the engine room compartment and see the same stream of water that had occurred when the vessel was launched on May 3rd, 2005?
A. No.
Q. And why was that, sir?
MR. RAUWORTH: Objection. Foundation.
THE COURT: Overruled.

A. The exhaust system had been disassembled and there was no way for -- there was no water in it.
Q. Did you locate what you believed to be the source of the ingress of the stream that you discovered on May 3, 2005 and in October of last year?
A. Yes, I did.
Q. And what did you find, Mr. Robbins?
A. The starboard exhaust hose, starboard engine exhaust hose, had a leak in it. There was -- it was resting on a bulkhead and it had chafed, and there was staining and evidence of water leakage from the leak in the hose.
Q. And did you perform -- did you put it back in what you believed to be the original position and perform tests?
A. Yes.
Q. And what tests did you perform, sir?
MR. RAUWORTH: Objection. This is as to the subject where there's been no disclosure. There's been no disclosure of any tests with regard to this exhaust system or reassembly.
THE COURT: Mr. Lovejoy.
MR. LOVEJOY: It was, your Honor. It was in his November report discussed the whole issue of strain relief, chafing devices, and what happened on October

18th, I believe.

THE COURT: So is it in this report you handed me?

MR. LOVEJOY: I don't know what Mr. Rauworth handed you. He issued, I think, four separate reports. This investigation ran over it.

MR. RAUWORTH: Your Honor, there may be an ambiguity. I'm referring -- what I thought I heard the witness say is that on the occasion of launching the boat, the exhaust system was reassembled on that day while the boat was in the water for purposes of testing, and I inquired about that in the deposition and got an answer to the contrary. So it was possible I misunderstood the thrust of the testimony.

THE COURT: I didn't understand that to be the question. Maybe you need to clarify your question.

Q. Did you decide to do a test to determine -- strike that.

You found that the exhaust hose had a hole in it, right?

A. Yes.

Q. The starboard exhaust hose. After you found that, did you perform a test by putting the exhaust hose back in the position you believed it was on the EVEREADY on April 25 and performed the test?

A. Yes, I did.
Q. Describe the test you performed for the Court, please.
A. Yes. I leveled the exhaust hose to the position that it would have been in, and I obtained bottled water and I poured it into the end of the hose, and it poured out through the hole.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
MR. LOVEJOY: Thank you.
Q. Did you also examine the port exhaust hose in October 2007?
A. Yes, I did.
Q. What did you find with the positioning of that exhaust hose vis-a-vis the rear engine room bulkhead?
A. It was a similar condition as to the starboard side. It was sitting on the bulkhead without chafe gear, and there was also staining coming from the hose.
Q. Okay. And I'm going to hand the witness Exhibit 86 and 87 for ID.
MR. LOVEJOY: Unfortunately, your Honor, these are small photographs.
THE COURT: Okay. I can see them.
Q. What is depicted in 86?

A. This is the port side exhaust hose as it goes through the bulkhead. And as you can see, there's a stain coming off the bottom of the hose and that is from leaking on the hose.

Q. And in your opinion or experience, what caused that stain that you refer to?

A. There's chafing between the hose and the bulkhead, and it wore a hole in it.

Q. Is that -- strike that. Can you go to the next exhibit --

MR. LOVEJOY: Move 86 and 87 as full exhibits, your Honor.

THE COURT: Any objection?

MR. RAUWORTH: No, your Honor.

THE CLERK: They're previously full.

THE COURT: I guess they're already full.

MR. LOVEJOY: I apologize. I've got some in here that aren't.

Q. What is in 87 in evidence?

A. This is a close-up picture of the same hose and bulkhead showing the bottom of the hose chafing against the bulkhead.

Q. When you say the same hose, you mean the port exhaust hose?

A. Yes. Same as in 86.

Q. I'm going to hand you Exhibit 98, 100 and 101 in evidence. Can you go through for the Court what's in each of those exhibits in reference to the exhibit, please.

A. One at a time? 98 is an overall view of the starboard exhaust hose on the EVEREADY as it passes through the same bulkhead. And again, the tape was put there by Mr. Bruce Pfund. Again, it depicts the hose as it's laying on top of the bulkhead, and there's stains coming from the bottom of it.

Q. Next exhibit, sir.

A. 100 is generally the same view from farther back showing a larger overview of the entire hose, or most of the hose in relationship to the bottom of the boat. And 101 is a very close-up of the hose as it's -- the actual hole in the hose where it is sitting on the bulkhead.

THE COURT: These are previously full, correct?

MR. LOVEJOY: Yes, your Honor.

THE COURT: Could you pass those up, please, so I can look at them.

MR. LOVEJOY: Certainly. I have 84 and 85 for ID, and Mr. Rauworth's informed he has no objection to either photo. I would move them as full exhibits.

MR. RAUWORTH: That's correct, your Honor.

THE COURT: All right. 84 and 85 will be full.

(Plaintiff's Exhibits 84 and 85 admitted full.)

Q. Mr. Robbins, can you describe for the Court what's depicted in 84 in evidence, please, and why the photo was taken? Is that a photo of the test that you conducted in October --

A. Yes, it is. I see it now, yes. Yes, it is. It's another angle from back looking at the hose, and there is a stream of water that is coming out of the hose.

MR. RAUWORTH: Your Honor, I object and move to strike. I've gone over these disclosure reports, I'm not finding any description of a test being conducted.

THE COURT: Mr. Lovejoy?

MR. LOVEJOY: I'd have to look. I mean, Mr. Layfield was there.

THE COURT: Let's take a morning break. Find it during the break. Show it to me when I come back.

(Short recess.)

THE COURT: All right. Let's go.

MR. LOVEJOY: There's a reference there was a steady stream of water passing through the hole. He doesn't specifically refer to this test. Mr. Layfield's hand -- Mr. Layfield was present. His hand -- Mr. Layfield helped do the test. He described the results.

THE COURT: Where is the reference to this in the report? That's what I'm asking.

MR. LOVEJOY: The report just says, as such, there was a steady stream of water.

THE COURT: What page?

MR. LOVEJOY: Page two.

THE COURT: The document I'm looking at is the May 13th document?

MR. RAUWORTH: That's a compendium, your Honor, of four of them. The second to the last one is from November 6th. That's the first one that occurred following the date of this visit to the vessel.

THE COURT: Where on page two of this?

MR. LOVEJOY: At the top where it says, "Steady stream of water." It does refer specifically to the test. It's like the fifth line, "As such, there was a steady stream of water."

THE COURT: Is this on the November 6th report on page two?

MR. LOVEJOY: Yes. At the top it says, "As such, there was a steady stream of water."

THE COURT: Okay.

MR. LOVEJOY: He does not refer specifically to the test in his report. I did not write the report for him.

THE COURT: Well, I don't think this really matters that much.

MR. LOVEJOY: Just so I can point out, your Honor, in Exhibit 84 for ID, there's a gentleman with green rubber gloves and a camera also taking a picture of this. Those are Mr. --

THE COURT: I don't want to spend a lot of time on this. I'll sustain the objection, but it's pretty apparent to me that there is a hose with a hole in it through which water was leaking. If the defendant is seriously contesting the fact that that hole is the source of a water leak, then I think you've got a long row to hoe to convince me of that.

Q. Did you, as part of that investigation, Mr. Robbins, determine the size of the hole?

A. It was approximately an inch to an inch-and-a-half long and one-half-inch wide.

Q. And you had been on this boat several times by that point, right?

A. Yes.

Q. And you knew the position of the exhaust hose on the inside, and you translated that to the outside of the vessel, correct?

A. Yes.

MR. RAUWORTH: Objection.

THE COURT: What's the objection?

MR. RAUWORTH: I asked the witness if he had done any kind of -- in his deposition if he had done any kind of calculations in terms of -- so I could know if he did anything to determine the comparative levels of these --

THE COURT: You can handle that on cross-examination then. Overruled.

Q. What did you determine with respect to the position of the starboard exhaust on the EVEREADY vis-a-vis the waterline that you saw after relaunching the vessel and what was indicated by the scum line in the photos you showed?

MR. RAUWORTH: Objection. Compound.

THE COURT: Sustained. Reask the question.

Q. What did you determine with respect to the position of the starboard exhaust hose on the interior vis-a-vis the scum line that you took photographs of?

MR. RAUWORTH: Your Honor, I'm sorry to be difficult, but I think it's ambiguous in terms of --

THE COURT: Overruled.

A. At some point subsequent to one of -- the survey in October, I returned to the boat and I took measurements using a tape measure on the outside of the boat, and I found that the -- using the chine over the

bottom edge of the boat as a reference, I found that the bottom of the exhaust hose was approximately six inches above it, and the top of the exhaust hose is approximately 12 inches above it.

THE COURT: I want to make sure I understand your testimony here. You're saying that you found that the bottom edge of the exhaust hose was six inches above the scum line and that the top edge was 12 inches above the scum line?

THE WITNESS: No, your Honor. Let me clarify. I didn't use the scum line as a reference. I used the chine as a reference which is the bottom edge of the boat before it turns downward into the bilge.

THE COURT: Are you talking about the inside or the outside of the hull?

THE WITNESS: On the outside.

THE COURT: Okay. Is there a picture that could allow you to point out what you were referring to as the chine?

MR. LOVEJOY: Yes, your Honor. Exhibit 58 in evidence.

THE COURT: Okay. Would you point to what you were saying the chine is?

THE WITNESS: Yes. Your Honor, the chine is the edge of the boat where it turns from the vertical and

turns down into the bilge.

THE COURT: Okay.

THE WITNESS: This edge.

Q. And that's close to being a 90-degree angle?

A. No. It's not 90 degrees.

Q. What degree angle do you think the chine is? It's the corner of the boat, correct?

A. Yes.

Q. I shouldn't say corner but the --

A. The inside angle would be greater than 90 degrees.

THE COURT: Let's put it this way. In the part of the boat that is painted red, which is the part that's below the waterline, there is a point at which the angle shifts, and that angle, point of that angle is what you're referring to as the chine?

THE WITNESS: Yes.

THE COURT: All right. Now, your testimony is that in reference to that point, the discharge hoses were what, six inches?

THE WITNESS: Yes, your Honor. The bottom of the discharge hose is approximately six inches from that point, and the top of the hose is approximately 12 inches from that point.

THE COURT: Okay. And we're now referring to the exhaust discharge?

THE WITNESS: Yes.

MR. LOVEJOY: Mr. Rauworth has agreed that 103 may go into evidence, your Honor. I think this may help.

THE COURT: 103 then will be full.

(Plaintiff's Exhibit 103 admitted full.)

Q. What is depicted in Exhibit 103 in evidence, Mr. Robbins? Also, can you hold it up so the Judge can see it, please.

A. Sure. This is the inside view of the hull where the exhaust line discharges. You can see the muffler on the left side that's currently disconnected at the time of the picture, but this is the end of the line, so to speak, of the exhaust before it leaves the boat.

THE COURT: Okay.

Q. And there's an elbow that's in that photo in 103, correct?

A. Yes.

Q. And is that elbow horizontal to the deck of the vessel or the bottom of the vessel?

A. Yes, it is.

Q. It turns, it makes an angle, but horizontally it's at the same level as the bottom of the boat or the deck, right?

A. Yes, it is.

MR. LOVEJOY: I'm going to go back to Exhibit 100, your Honor, in evidence.
Q. And is that where you took the other measurement from, Mr. Robbins?
A. Yes.
Q. Okay. That shows the forward part of the exhaust hose vis-a-vis the deck, right?
A. Yes. Not the deck. The chine.
Q. Okay. The chine. And as a result of looking at the two different ends of the exhaust hose, you determined that --
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained. Reask your question.
Q. As a result of taking those comparisons, did you reach a conclusion as to how the exhaust hose was positioned horizontally?
A. Yes. It is horizontal to the chine of the boat.
Q. Would "level" be an appropriate term also?
A. Yes.
Q. Thank you.
THE COURT: What number was that?
MR. LOVEJOY: That's 100, your Honor. I'll pass it up, if that's okay.
THE COURT: Are you saying that the exhaust hose here is running -- this is running alongside the hull

of the boat?

THE WITNESS: Yes.

THE COURT: And then the chine, in reference to this part of the hose, is where?

THE WITNESS: It's below it. You can see a small white hose that runs -- that's approximately where the angle of the chine is.

THE COURT: That's where the chine is, right there?

THE WITNESS: Yes, sir.

MR. LOVEJOY: Your Honor, since we don't have this electronic system, whether it would be appropriate for Mr. Robbins to mark on Exhibit 57 in evidence the position of the exhaust hose as it would line up on the outside of the vessel, would that be of assistance to the Court?

THE COURT: Let's do that. The power will come back on at some point. We'll have him do that at that time. I assume his examination will probably go through lunch, and I imagine they'll get this fixed by after lunch, I hope.

Q. I want to return back to Point Judith and May 2005 for one second. Did you request Point Judith to remove fuel tanks on the vessel?

A. I discussed it with Mr. Pfund, and I believe that

we did at some point. He may have done it, but we needed to remove them in order to gain access to the inner areas of the hull.
Q. Do you know whether Point Judith ever did that?
A. No, they did not.
Q. I'm going to show you Exhibit 74, which Mr. Rauworth has agreed may go in as full.
THE COURT: 74 will be full.
(Plaintiff's Exhibit 74 admitted full.)
Q. Could you tell the Court what is depicted in 74, sir. Why don't I hold off.
MR. LOVEJOY: Mr. Rauworth also agreed that Exhibit 70 may also go in as a full exhibit, your Honor.
THE COURT: Okay.
(Plaintiff's Exhibit 70 admitted full.)
Q. What's depicted in Exhibit 70 in evidence?
A. Exhibit 70 shows the starboard aft corner of the cockpit of the EVEREADY with the hatch open, and below it, visible underneath with the hatch open, is the starboard muffler.
Q. Okay. What is depicted in 74?
A. This is a different angle of the starboard muffler on the EVEREADY.
Q. Thank you. I show you what Mr. Rauworth has

agreed may go in as full, which is Exhibit 75, your Honor.

THE COURT: 75 will be full.

(Plaintiff's Exhibit 75 admitted full.)

A. This is a photograph of the bilge in the engine compartment of the EVEREADY.

THE COURT: Which is the top and which is the bottom?

THE WITNESS: The top of the photograph would be facing the bow, your Honor.

Q. That's looking down into the engine compartment bilge, right?

A. Yes.

Q. What's depicted in the bottom of the bilge in Exhibit 75?

A. That is the, what I refer to as the mid-ships bilge pump.

Q. Is that the bilge pump that you understand Mr. Stroker turned off?

A. Yes.

Q. I'm also going to hand to you 82 --

Mr. LOVEJOY: Which Mr. Rauworth agreed may go in full, your Honor.

THE COURT: All right. 82 will be full.

(Plaintiff's Exhibit 82 admitted full.)

MR. LOVEJOY: And 69, which he's agreed may go in full, also.

THE COURT: Okay.

(Plaintiff's Exhibit 69 admitted full.)

Q. And Mr. Robbins, what's depicted in 82?

A. This is the starboard exhaust hose as it goes through the bulkhead. This is -- the right side of the photograph is the starboard side of the boat, and this is facing forward. And it shows the cutout in the bulkhead.

Q. Thank you. What's depicted in 69 in evidence, sir?

A. This is a view of the bottom of the EVEREADY on the starboard side. I believe that this was the mid-ships, or forward showing water weeping out of the hull.

Q. And after you performed the joint survey in October of 2007, did you review the ABYC protocols concerning installation of exhaust stems?

A. Yes, I did.

MR. LOVEJOY: May I approach the witness, your Honor?

THE COURT: Yes.

Q. Can you look at Exhibit 132 for ID.

A. Yes.

Q. Can you tell us what Exhibit 132 for ID is?
A. This is the American Boat Yacht Council's standard entitled P1 which concerns itself with the installation of exhaust systems on vessels.
MR. RAUWORTH: No objection, your Honor.
THE COURT: 132 will be full.
(Plaintiff's Exhibit 132 admitted full.)
Q. What does the ABYC recommendations respecting exhaust, placement of exhaust hoses state, sir?
A. Just give me a minute to find the correct citation.
Section 1.54, all fittings, joints, clamps and supports of an exhaust system shall be accessible for inspection and repair. Section 1.56, exhaust system piping and components shall be independently supported to minimize failure from vibration, shock, expansion and contraction.
Q. Did you form an opinion after having done your survey -- strike that.
Did you examine additional documents that were provided to you in late March of 2008 with respect to Point Judith Marina?
A. Yes, I did.
Q. Okay. As a result of having conducted your surveys and reviewing the ABYC rules and looking at

these additional documents, did you form an opinion as to the actions or inactions of Point Judith with respect to the exhaust hoses on the vessel?

A. Yes, I did. The work orders that I saw indicated that they had done some work on the starboard exhaust system on the EVEREADY at some point. And it's my opinion that Point Judith should have seen the chafing issue with this exhaust line.

MR. RAUWORTH: Objection, your Honor. Motion to strike. The disclosure report does not make any statement with respect to work on the starboard exhaust system. This is -- the only place that would come close to that is in the April, I think, 2nd or 3rd letter, which is the last of the four that are stapled together that have been provided to the Bench. If it will help the Court, I can find that.

THE COURT: Well, I'm going to allow you to handle this in cross-examination. There certainly are references to work on the engine, and the likelihood of how that would put a mechanic in proximity to the exhaust system. I understand the potential discrepancy you're referring to, but it's proper subject of cross.

MR. RAUWORTH: Then if I may, your Honor, may I have a continuing objection to proceeding on this line of questioning based on the reference to work on the

exhaust hose or, I'm sorry, with reference to the witness dealing with the section of work on the exhaust system as distinct from the transmission, which was mentioned, and which I cross-examined him about.

THE COURT: Sure. You can have a continuing objection. What I'm saying to you is that --

MR. RAUWORTH: I'll certainly deal with it on cross.

THE COURT: You can deal with it on cross-examination. Go ahead.

Q. Did you form an opinion with respect to what a mechanic should be able to do with respect, or should have done with respect to the exhaust hose?

MR. RAUWORTH: Objection. Compound.

THE COURT: Just a moment. I'll sustain the objection. Reask the question.

Q. Did you form an opinion as to Point Judith's actions, or inactions, with respect to the exhaust hose?

A. Yes, I did.

Q. What's your opinion, sir?

A. It's my opinion that they were working in proximity to this area, the exhaust system, that they should have recognized that there was a chafing problem and taken action to either notify the owner and/or

correct it.
Q. Thank you. Now, you also formed an opinion in respect to the actions of Mr. Stroker and the bilge pump system, did you not?
A. I'm sorry. Can you --
Q. In your April 2nd, 2000 (sic) report, did you render an opinion as to water in the bilge and Mr. Stroker's actions with respect to the bilge pumps and determining sources of water on the vessel when it was launched?
A. Yes, I did. May I refer to that report?
Q. What was your opinion, or opinions, with respect to Mr. Stroker, or Point Judith's actions, in respect to water that was found in the vessel when it was launched and with respect to the bilge pump switch and the bilge pump itself?
MR. RAUWORTH: Objection. There's no disclosure with regard to bilge pump switches, or to bilge pumps -- to actions with regard to, or what should have been done vis-a-vis bilge pump switches.
THE COURT: Well, that wasn't what the question was. It wasn't what should have been done. It's what did occur. The opinion that's being requested, or asked about, is about what Mr. Stroker did with respect to the bilge pump switches. Are you saying that's not

in the disclosure?

MR. RAUWORTH: I have the disclosure that the finding of water on a certain part of the vessel should have caused investigation to take place as to the source of the water. That is quite distinct from anything being done with regard to the bilge pump or bilge pump switches. This is on the bottom paragraph on page 1 on the April 2nd letter.

THE COURT: Well, maybe the question is unclear, and maybe that's what Mr. Lovejoy is getting at. Why don't you try it again, Mr. Lovejoy.

Q. Do you have an opinion as to what Mr. Stroker and Point Judith did with respect to one of the bilge pumps not functioning and water in the bilge?

A. Yes, I did. If there is a considerable amount of water in the bilge, he should have taken action to investigate the source of the water. Regarding the bilge pump, if he found one of the bilge pumps not functioning properly, he took actions to correct it, or he should have also notified the owner.

MR. RAUWORTH: Objection. That's not disclosed at all, your Honor.

THE COURT: Mr. Lovejoy?

MR. LOVEJOY: I think he testified to that on his deposition. Again, I did not write Mr. Robbins'

disclosures for him.

THE COURT: You need to get to the microphone.

MR. LOVEJOY: The document refers to the bilge pump malfunctioning, and he had an opinion as to that. He also had an opinion as to what marinas should do with respect to finding water in the bilge. And these were --

THE COURT: The problem here is the disclosure relates to that it would have been standard practice to investigate the source of the water and take corrective action as necessary to prevent damage to the vessel. So that's fine. His opinion is well within the disclosure as far as that goes, but it says nothing about notifying the owner.

So I'm going to strike that portion of the opinion.

Q. What corrective action are you referring to with respect to the malfunctioning bilge pump, Mr. Robbins?

MR. RAUWORTH: Objection, your Honor. The disclosure has to do with the discovery of water in the bilge and the presence of water in the bilge as distinct from the non-functioning of a single bilge pump. His opinion has to do with what the presence of water ought to trigger a boatyard to do. And I asked him questions about that in his deposition.

THE COURT: That's correct. That's what the disclosure relates to. I'll sustain it.
Q. What's your opinion with respect to what should have been done with the water that was found in the bilge of the EVEREADY?
A. It should have been pumped out, of course. And further investigation should have been undertaken to determine the source of the water.
Q. And does that, in your opinion, include looking in the engine room, the forward compartment, and the rear compartments of the vessel?
A. Yes. It would involve looking throughout the entire vessel.
Q. And had that been done, do you have an opinion as to whether the stream of water should have been found that you and Mr. Layfield located on May 2005?
MR. RAUWORTH: Objection. That assumes facts not in evidence.
MR. LOVEJOY: He testified he found a stream --
THE COURT: Overruled.
A. Eventually, yes. If a thorough search of the engine compartment had been undertaken, the stream of water would have been found.
Q. And if you don't wait until you pump this large amount of water out to do your investigation, you're

not going to find anything, correct?
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained.
Q. What do you need to do with a large amount of water before you actually check for possible sources?
A. You need to discharge -- dewater the vessel as completely as possible first.
Q. And what's the purpose of examining the vessel after it's been launched and has been stored up on the hard for a number of months during the winter?
A. To make sure that there are no leaks. During the course of winter, there could be problems with frozen fittings, frozen hoses, frozen strainers that possibly froze and cracked during the winter and they're not readily visible until the boat is launched and water's put through them again.
Q. Is that -- based on your experience as a marine surveyor, operating a marina, is that a fairly common occurrence with vessels, water over a winter?
MR. RAUWORTH: Objection. Ambiguous.
THE COURT: Sustained.
Q. How often, or with what frequency, have you found failed devices such as you just mentioned in your testimony?
A. In my experience, at least in my own experience,

at least once a year in the springtime, I always have some sort of damage survey involving a boat that sank because of something that's frozen.

Q. Something that occurred over the winter months when the vessel was stored on land?

A. Yes.

MR. LOVEJOY: Your Honor, would it be an appropriate time to go back to the screen and have that exhibit marked?

THE COURT: Yes.

Q. Maybe Exhibit 64 would be a more appropriate exhibit to do it on but --

A. I don't have anything here.

Q. Do you have it on your screen?

A. Yes.

Q. And let me give you a pen without the ink.

THE COURT: No. No. You don't want him using that pen on that screen. No. Use your finger.

Q. We'll go back to Exhibit 64 now that -- Mr. Robbins, you determined where you transferred in your mind, based on your calculations, where the exhaust would run on the outside of the vessel, correct?

A. I'm sorry. Could you repeat that, please.

Q. You testified that you took the calculations on

what you saw on the inside of the vessel, and in your mind you transferred them to the outside of the vessel?
A. Yes.
Q. Vis-a-vis the exhaust discharge hole?
A. Yes.
Q. Can you mark on this exhibit where the exhaust line would be if we were to bring it through the side of the hull?
A. Yes.
Q. And if it's not a good photograph to do it, then we can try another one.
A. This point is the discharge, and it would run approximately at the same angle as the chine. This is not working. Should we get rid of these arrows?
THE COURT: Yes. Also, would you change the color. Instead of white, use blue or green or something.
Q. Is this a better photograph to do this exercise, Mr. Robbins?
A. Yes, it is.
MR. RAUWORTH: I'm sorry, which number is this, Mr. Lovejoy?
MR. LOVEJOY: 60 in evidence, six zero.
Q. Can you mark on Exhibit 60 in evidence where the exhaust hose would be if you transferred it to the

outside hull of the -- outside of the vessel and draw a line, continuous line, forward on the vessel?
A. Doesn't want to make a line.
Q. Thank you. Do I have to do anything to cast this in concrete?
THE COURT: Are you ready for that to be printed?
MR. LOVEJOY: Yes, your Honor. And may we mark it 60A, I would presume?
THE COURT: That's fine. That will be 60A. Is there any objection?
MR. RAUWORTH: This is to the screen print, your Honor?
THE COURT: Right.
MR. RAUWORTH: 60A, no objection.
THE COURT: That will be full.
(Plaintiff's Exhibit 60A admitted full.)
Q. What you've done in 60A, Mr. Robbins, is transfer or move the exhaust hose on the starboard side of the engine as you found it. It normally sat to the outside of the hull, so as an aid to the Court --
A. Yes.
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained. I understand what he's done.

Q. I ask you to look at Exhibit 129, which you don't have, your Honor. Did you remove that bilge pump from the --

THE COURT: Get to the microphone, please.

Q. I had you remove the bilge pump from the vessel, correct?

A. Yes.

Q. And where was the bilge pump located?

A. This is the bilge pump that was located in the engine compartment mid-ships.

Q. Do you understand that's the bilge pump, or did you identify it as the bilge pump that Mr. Stroker was referring to?

MR. RAUWORTH: Objection. Foundation.

THE COURT: Overruled.

A. Yes. To the best of my knowledge, this is the same bilge pump.

Q. You were provided with a copy of the work that Mr. Stroker had done on the vessel, correct?

A. Yes.

Q. And is Exhibit 6 in evidence what you reviewed?

A. Yes.

Q. Okay. And as a result of having examined Mr. Stroker's work record, I asked you to identify and remove the bilge pump that he refers to in that

document, correct?
A. Yes.
Q. You went to the vessel and removed what's been marked as Exhibit 129 for identification?
A. Yes.
MR. LOVEJOY: I'd move it in full, your Honor.
MR. RAUWORTH: I object to it for the reason previously stated, lack of foundation.
THE COURT: All right. Overruled. Exhibit 129 will be full.
(Plaintiff's Exhibit 129 admitted full.)
Q. Can you look at Exhibit 129 and just show the Judge where the discharge hose would be connected to that exhibit.
THE WITNESS: Right here, your Honor.
Q. That's the white piece of plastic on the side of the pump?
A. Yes.
Q. And you testified -- strike that. Once you found the cut in the exhaust hose, did you come to an opinion as to how the EVEREADY sank on or about May 25, 2005 (sic)?
A. I'm sorry. Could you repeat that again, please?
Q. Once you found this cut exhaust hose in October 2007, based on your observations of April and May 2005,

and any other observations of the vessel and documents that you reviewed, did you come to an opinion as to how that vessel sank in April of 2005?

A. Yes, I did.

Q. What's your opinion, sir, as to how the vessel sank?

A. Certainly. My opinion is that water began leaking into the boat from the cut in the exhaust hose, and it eventually found its way into the bilge of the boat. This happened over the course of some time. The boat, because of the weight of the water, the boat eventually dropped lower, and as evidenced by the scum line, at some point the water level became even with the boat's two bilge pump discharges on the starboard side and the water back-flowed, more water back-flowed into the vessel. That added more weight to it, and more water flowed into it, and eventually it sank.

Q. When you say it back-flowed through the two discharge lines, what was the inside diameter that you determined the inside of the bilge pump discharge lines to be?

A. One and 1/8 inch.

Q. When the water back-flows through the thru-hull and through the hose, can you show the Court where on Exhibit 129 it comes out into the vessel? Show the

Court first. It's coming back through that plastic outlet, right?
A. Yes.
THE WITNESS: Your Honor, the hose goes out to the side of the boat through here. The water would backflow then into the bottom of the pump. This is a base.
Q. Is the red portion of 129 called the pickup?
A. Yes. The base, or the pickup.
Q. The water goes through that round white plastic?
MR. RAUWORTH: Objection. Leading.
THE COURT: Overruled.
A. Flows through this hose and out through the bottom of the pump.
Q. And with respect to the bilge pump Mr. Stroker stated he had turned off, it would come through that bilge pump, right?
A. Yes.
Q. And the forward bilge pump, it would come through, would it not?
A. Yes.
MR. LOVEJOY: Your Honor, may I have a minute or two just to look through my notes? I think I'm almost done.
THE COURT: Go ahead.

BY MR. LOVEJOY: (Continuing:)
Q. Mr. Robbins, can you turn to Exhibit 108, please.
A. Yes.
Q. And I believe you earlier testified that part of what you do as a marine surveyor is to examine bills and make sure there are appropriate charges?
A. Yes.
Q. Do you have an understanding of what happened to the vessel after it left Point Judith Marina?
A. To the best of my knowledge, it was towed to Certified Sales in Warwick, Rhode Island and hauled out there.
Q. Is it still there, to the best of your knowledge?
A. Yes.
Q. And were there certain additional surveys or work that were done on behalf of the Northern Insurance Company?
A. Yes.
Q. Okay. Would you look at Exhibit 108. And based on your experience in reviewing charges for work done on boats and what have you, are the charges in 108 fair and reasonable?
MR. RAUWORTH: Objection. Foundation. There's no testimony at all about what this is.
MR. LOVEJOY: Well, your Honor --

THE COURT: Sustained.

MR. LOVEJOY: Excuse me?

THE COURT: Sustained.

MR. LOVEJOY: Your Honor, there was an agreement -- I had a witness that was going to come from Baltimore, Maryland with respect to these documents. I had an agreement with Mr. Musyka that they could come in as business records. Mr. Rauworth told me that was the same, and he was going to argue about relevancy, and I found out that now he's not going to agree to let these documents in.

MR. RAUWORTH: I beg to differ, your Honor. I've been e-mailed the documents what I agreed to with Mr. Lovejoy. After I consulted with Mr. Musyka as to what his agreement had been, I told him, which I documented in an e-mail, that I would not object, would not insist on a live witness to authenticate the documents that he had sent me. In other words, that the document is what it purports to be, and maybe we should get that e-mail. But it was not an agreement as to propriety of actions taken or what was done, why it was done, or anything else.

MR. LOVEJOY: The agreement was that he could argue that, you know, it wasn't relevant, or the charges weren't appropriate, but I specifically asked

him, and Mr. Musyka, do I need to bring a witness from Baltimore or Kansas City to get these --

THE COURT: I think you all are talking past each other. I don't understand the objection to be about the authenticity of the documents. You asked him a question about whether these charges were fair and reasonable. That's a very different thing. So I don't think Mr. Rauworth has contested that Exhibit 108 is an inauthentic document, but you need to lay a better foundation for testimony about whether the charges contained in here are fair and reasonable. That's the objection that I sustained.

MR. LOVEJOY: Okay.

Q. Can you look at Exhibit 108, sir?

A. Yes.

Q. And do you know what work Cove Haven Marina was requested to do?

A. Yes, I do.

Q. What was that, and when was that?

A. Mr. Pfund made arrangements for this work to be done. Part of it is to soda blast the bottom.

MR. RAUWORTH: Objection, your Honor. I think we're getting hearsay here.

THE COURT: Overruled.

A. Part of the work was to soda blast the bottom

paint from the EVEREADY so we could inspect the bottom without paint on it, and that was the sublet charges and the other labor charges where they sent a couple of technicians over. This was prior to the October joint survey, and they made arrangements for removals of the hatches in the cockpit and also the fuel tank.

Q. Did they also remove some fuel that was found to be left in the tanks in the vessel?

A. Yes.

Q. When the vessel was at Point Judith, did you request that they remove all fuel from the tanks?

A. I don't recall that. If I requested if it be removed from the tanks, I requested that they keep the bilges, or empty the bilges, and clean it.

Q. During the course of operating the marina and your business as a marine surveyor, have you had occasion to determine the fairness of charges for work such as done by Brewer Cove Haven Marina?

A. Yes, I have.

Q. After having reviewed these charges that are on 108, do you have an opinion as to whether they're fair and reasonable?

MR. RAUWORTH: Objection. I don't think there's a foundation of what Cove Haven Marina did.

THE COURT: I disagree. He just testified what

they did.

MR. RAUWORTH: Sorry. My memory was that Mr. Lovejoy was describing things. I don't think the witness testified as to what Cove Haven did as opposed to somebody else.

THE COURT: That's overruled. Go ahead.

Q. Do you have an opinion as to whether the charges are fair and reasonable?

A. Yes, I do. In my opinion, these charges are fair and reasonable for the work that they performed.

Q. And these were done -- this was done in connection with a joint survey that was performed in October 2007, correct?

A. Yes.

Q. Go to the next Exhibit, 109.

MR. LOVEJOY: I move that 108 be accepted as a full exhibit, your Honor.

MR. RAUWORTH: I object for the reasons said previously, identified.

THE COURT: All right. 108 will be full.

(Plaintiff's Exhibit 108 admitted full.)

MR. RAUWORTH: As to 109, your Honor, I have no objection to it coming in to reflect that a payment was made to Mr. Robbins' firm, but that is not an agreement as to its necessity --

THE COURT: Why do we need all this discussion? He hasn't even asked a question about this document yet.

MR. RAUWORTH: He asked me about my agreement.

THE COURT: Then talk to him. This is not the way you try cases. If you want to put a document in, ask him about the document. Then if there's an objection, you can object.

MR. LOVEJOY: Excuse me, your Honor. I was trying to see if we could streamline it by getting --

THE COURT: Well, it doesn't streamline it.

Q. Mr. Robbins, would you look at Exhibit 109, please?

A. Yes.

Q. What's Exhibit 109?

A. This is a service bill from me for the initial work on the survey for the EVEREADY.

Q. Can you describe for the Court what you did work-wise in order to --

A. Yes. This includes several trips from my office to Point Judith Marina to inspect the EVEREADY, report time, research time, mileage, et cetera.

Q. Based on your experience, you charged a fair and reasonable rate for what you did?

A. Yes.

MR. LOVEJOY: I move that it be accepted as a full exhibit, your Honor.

THE COURT: Any objection?

MR. RAUWORTH: I object to its relevance in that there's not a showing that this was something that was an appropriate element of damages, and otherwise it is irrelevant. My understanding is --

THE COURT: Overruled. You can argue that later. Overruled.

Q. Turn to Exhibit 110, Mr. Robbins, please.

A. Okay.

Q. Can you describe what it is, please, and what the charges were for?

A. Yes. This was billed from Point Judith Marina for environmental cleanup from the oil spill that was related to the sinking of the EVEREADY.

MR. RAUWORTH: If I may help, your Honor, I'll stipulate to the admissibility of this document.

THE COURT: All right. 110 will be full.

(Plaintiff's Exhibit 110 admitted full.)

Q. Can you turn to 111, Mr. Robbins.

A. Yes.

Q. Can you tell the Court what the charges of Certified Sales are for.

A. This is for the services provided by Certified

Sales for storage of the EVEREADY at their location in Warwick. That's based on standard fees.

Q. That's for a period of April 1, 2007 to June 30th, 2007?

A. Yes, it is.

Q. And based on your experience, are these charges fair and reasonable in the industry?

A. Yes, they are.

MR. LOVEJOY: I move that it be accepted as a full exhibit, your Honor.

MR. RAUWORTH: Your Honor, no objection to the rate. I object to its relevance in that it's not an item that represents damages attributable to this sinking. This storage during this period was only for forensic purposes.

THE COURT: Okay. Overruled.

Q. Turn to Exhibit 112 for ID, Mr. Robbins.

A. Yes.

Q. It's also a Certified Sales, Inc. --

MR. RAUWORTH: If I may assist, your Honor, with respect to these invoices from Certified Sales, with the exception of the first six months, I would have the same objection. So if that will expedite dealing with the Certified Sales receipts, I object to all the storage charges except for the first six months for the

reasons stated as to --

THE COURT: All right. Let's get them all into evidence. I'm going to overrule your objections. You can argue about what weight, if any, I should give them later. So what numbers are those?

MR. LOVEJOY: 112 -- we're just talking about Certified Sales, your Honor?

THE COURT: Apparently.

MR. LOVEJOY: 112, 114, 115, 116, 121, 122 and 123.

THE COURT: All right. All of those invoices can be full.

(Plaintiff's Exhibits 112, 114, 115, 116, 121, 122, and 123 admitted full.)

MR. LOVEJOY: Thank you, your Honor.

Q. Mr. Robbins, can you turn to 113.

A. Yes.

Q. What is that, sir?

A. This is another invoice from my office for services that I performed on this file. This was the second invoice, and it took -- it's for charges that occurred over the course from 2005 up until 2007.

MR. RAUWORTH: I understand Mr. Lovejoy is moving it into evidence, your Honor. I have no objection to its authenticity. I object to its

relevance in that it appears to be services that are forensic in nature and essentially parallel to legal fees and not damages attributable to the sinking.

THE COURT: All right. The objection is overruled. The document is full.

(Plaintiff's Exhibit 113 admitted full.)

Q. Turn to Exhibit 117 for ID, please.

MR. RAUWORTH: No objection to this exhibit, your Honor.

THE COURT: 117 will be full.

(Plaintiff's Exhibit 117 admitted full.)

Q. 118, Mr. Robbins, it's also a Point Judith Marina document.

MR. RAUWORTH: No objection to this exhibit, your Honor.

THE COURT: 118 will be full.

(Plaintiff's Exhibit 118 admitted full.)

MR. LOVEJOY: 119, another Point Judith Marina document.

A. I don't have 119.

Q. 119? 119?

A. No, I don't have it.

THE CLERK: It's already full.

Q. 120?

A. I don't have it.

THE CLERK: That's already full.
Q. 124, Mr. Robbins?
A. Yes, I have it.
MR. RAUWORTH: Same objections as to the other invoices from Mr. Robbins, your Honor.
THE COURT: Well, you need to ask him a few questions about what this represents.
MR. LOVEJOY: Okay.
Q. Can you describe the charges with this bill?
A. Yes. This is for my services, again -- excuse me. This the second invoice for my services from July through September of 2005 based on my hourly rate and mileage.
Q. And based on your experience, are the charges fair and reasonable in the marine industry?
A. Yes, it is.
MR. LOVEJOY: I move that be accepted as a full exhibit, your Honor.
THE COURT: All right. 124 will be full. Defendant's objection is noted.
(Plaintiff's Exhibit 124 admitted full.)
Q. Can you turn to Exhibit -- actually 125 and 126 should be together. And the page that's at 126 is the --
A. Yes, I have it.

Q. Is that a bill generated by Mr. Pfund?
A. Yes, it is.
Q. What did Mr. Pfund do with respect to the services that are listed in this invoice?
A. Well, I initially retained him, and this involves his time to meet with me at Point Judith at the EVEREADY on several occasions, and also some other meetings, and it's his professional time and travel expenses. And also this includes his reports.
Q. Okay. And based on your experience in the marine industry, are these charges fair and reasonable for the type of work that Mr. Pfund did with respect to the EVEREADY?
A. Yes.
MR. LOVEJOY: Your Honor, I move that -- I'll put them together but Exhibit 126 be accepted as a full exhibit.
THE COURT: Any objection?
MR. RAUWORTH: My objection is as before as to the relevance for these forensic expenses, your Honor.
THE COURT: Your objection is noted. Overruled. 126.
(Plaintiff's Exhibit 126 admitted full.)
MR. LOVEJOY: What we have to do is we have to fix it because part of --

THE COURT: I understand you'll put them together.

MR. LOVEJOY: I'm going to withdraw 125.

May I approach the bench?

THE COURT: Yes.

Q. Mr. Robbins, what is Exhibit 131 for identification?

A. This is a section of the hull of the EVEREADY that was taken out at Mr. Pfund's request. This was taken from an area of the hull on the bottom near the starboard shaft log.

Q. There's a plywood section, correct?

A. Yes.

Q. In your opinion, is there any rot or damage to the plywood that you have in Exhibit 131?

A. No.

Q. Thank you.

MR. LOVEJOY: I'm going to pass the witness, your Honor.

THE COURT: All right. Did you move 131?

MR. LOVEJOY: I thought I had, but if I hadn't, I move 131 into evidence.

THE COURT: All right. Objection?

MR. RAUWORTH: Objection. I don't understand the relevance of that particular item.

THE COURT: What is the relevance of it?

MR. LOVEJOY: There was testimony yesterday about core saturation and possible damage to this vessel, and this is a piece of demonstrative evidence that was taken from the vessel that indicates the condition of the plywood.

MR. RAUWORTH: Well, I object to it as being an isolated location in the vessel. It's demonstrative quality is limited to a few square inches.

THE COURT: Could I see the exhibit, please.

Mr. Lovejoy, is there going to be some testimony that explains to me about what I'm seeing in this core sample?

MR. LOVEJOY: If I may ask Mr. Robbins, I'll have him tell you what --

THE COURT: Well, I think you should do that. If you want this to mean anything to me, you should probably ask him some questions as to what it shows.

MR. LOVEJOY: I apologize. 60A, has that been printed and may I remove it?

THE CLERK: Yes. You can take that off.

Q. Can you tell the Court, Mr. Robbins, how the hull of the EVEREADY was constructed?

A. It's constructed of two thin fiberglass skins, one outer and one inner. And in between them there is what

is known as core material, which is, in this case it's -- this section is plywood, and we believe there are other sections that are balsa wood.
Q. On Exhibit 131, can you hold it up and demonstrate for the Court what is the outside skin of the vessel.
A. Yes. This is the outer skin, the gray area.
Q. And that would be the flat side of Exhibit 131?
A. That would be the irregular side -- excuse me.
Q. The irregular side is the --
A. Excuse me. I'm sorry. That would be -- you're correct. This would be the inside.
Q. I was asking you the flat side.
A. The flat side would be the outside of the vessel.
Q. That's where primer and bottom paint is applied?
A. Yes. In this case, the gel coat has been removed, but yes, this is where the bottom paint would be.
Q. So there's this fiberglass layer, gel coat and then bottom paint?
A. Yes.
Q. That would be red bottom paint, in this case?
A. Yes.
Q. Can you explain to the Court what the gray or rough side is?
A. This is the inner surface.
THE WITNESS: Your Honor, the inner skin is

here, and this is the gel coat. That would be on the inside to seal up the fiberglass.
Q. Again, you examined that. Is there any rot or damage to the plywood core in Exhibit 131?
A. No.
MR. LOVEJOY: Thank you. Move Exhibit 131 as a full exhibit, your Honor.
THE COURT: I think I already did admit 131, but I don't believe he has testified as to where on the hull of the boat this sample came from. I think that's important.
Q. Mr. Robbins, can you tell the Court where that core sample was removed from on the hull of the EVEREADY?
A. Yes. It was taken from the bottom of the vessel near or adjacent to the starboard shaft log on the inboard side of it, between the shaft log and the keel.
Q. As a reference point, let's use the transom of the vessel, and can you indicate on Exhibit 64 the transom of the EVEREADY?
A. This is the transom area.
Q. And on the side of Exhibit 60, can you mark how far forward that sample was removed?
A. It was approximately in this area on the bottom.
Q. On the bottom of the boat, the underwater portion

of the boat, right?
A. Yes.
MR. LOVEJOY: Your Honor, can we mark this as 60B?
THE COURT: Yes.
(Plaintiff's Exhibit 60B admitted full.)
Q. And approximately how many feet forward from the transom is that mark that you put on 60B?
A. I would say approximately six to eight feet.
Q. Thank you.
THE COURT: All right. Cross-examination?

CROSS-EXAMINATION BY MR. RAUWORTH

Q. Good morning, Mr. Robbins. The core sample that you just had in your hand, when was that taken?
A. I believe it was taken sometime in July of 2005, the summer of 2005.
Q. And between the time of the sinking and the time that core sample was taken, where had the vessel been?
A. It had been at Point Judith Marina.
Q. And afloat, ashore, or what?
A. Ashore. On the hard.
Q. And were you present when that sample was taken?
A. I believe so, yes.
Q. You're not sure?
A. No, I am sure. Yes, I was present.

Q. Okay.

THE COURT: I think we're getting it. Hold on. Okay? Now, we're back on the record, without power, but Mr. Lovejoy, you say you wanted to ask more questions?

MR. LOVEJOY: Yes, your Honor.

THE COURT: Mr. Rauworth, do you object?

MR. RAUWORTH: I guess I don't.

THE COURT: Okay.

MR. LOVEJOY: I apologize. I handed this document up to the witness.

CONTINUATION OF DIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Robbins, were you also asked to form an opinion as to the pre-casualty value of the EVEREADY?

A. Yes, I was.

Q. Okay. Can you tell the Court what you did in order to determine the fair market value of the EVEREADY as of May 2005?

A. Yes. I referred to a publication known as the Buc book, that's B-U-C, which is published, it's used widely in the marine industry that publishes market values of different boats. I went and I found the, I believe it was the 84th Edition which was published in the year prior to the casualty. I went to the section that shows Albins, and the listing that shows the 35,

this particular model. There are a number of them with different variations, with different engines. And I chose the one with the 300 horsepower Caterpillar engines. The Buc book gives what is called a retail low number and a retail high number, and there are also adjustments to be used in the beginning of the book depending on where the boat is and what condition it is found in. And I calculated that the pre- -- that the fair market value of the -- prior to the casualty was approximately 160,000.

Q. Let me cut you off there. Can you tell the Court what type of electronics and other devices are on this vessel?

A. Yes. The vessel has a fairly modern array of electronics including radar, autopilot, navigation equipment including a GPS, radios and such.

MR. RAUWORTH: Objection. The electronics matters, your Honor, are not covered in the disclosure report, equipment of the boat.

THE COURT: Well, are you saying that the electronics are part of the factoring in of the pre-incident value?

MR. LOVEJOY: Yes, sir. Yes.

THE COURT: Why wouldn't that be in the report?

MR. LOVEJOY: He listed the total value, and

when he explained how he got it on his deposition, he did a number of -- took in a number of considerations, like he said, the location, the condition of the vessel, so on and so forth.

THE COURT: I'm going to overrule the objection. You can ask him what the value was and how he calculated it. Go ahead.

Q. You looked at extras that were on the vessel, right?

MR. RAUWORTH: Objection. Leading.

THE COURT: Don't lead. This isn't that complicated. You want him to get the value. I'm giving you the --

MR. LOVEJOY: Okay.

THE COURT: Do it.

Q. Were there additional items onboard the vessel not on a standard Albin 35?

A. Yes, there was.

Q. What are those items?

A. There is what's referred to as a tuna tower or fishing tower. That's a stainless steel structure that's at the top of the vessel.

Q. Anything else?

A. The vessel had a generator, and it had two air-conditioning systems in it, also.

Q. Can you explain to the Court how you -- well, can you tell the Court your opinion as to the fair market value and explain how you came up with that value.
A. Yes. My opinion of the fair market value pre-casualty was $160,000. That was based on the formula in the Buc book that I used, taking into consideration the equipment that was aboard the vessel and it's pre-loss condition.
MR. LOVEJOY: Thank you, your Honor.
THE COURT: All right. Thank you. Let's get started with cross.
MR. RAUWORTH: Yes, your Honor. Thank you.

<u>CONTINUATION OF CROSS-EXAMINATION BY MR. RAUWORTH</u>

Q. Going to your valuation process, Mr. Robbins, you referred to a publication called the Buc book, correct?
A. Yes.
Q. And the Buc book lists a range of values for this particular vessel?
A. Yes.
Q. And it has certain factors to be used in adjusting the stated -- the tabular values in the book depending on certain factors, correct?
A. Yes.
Q. One of them is geography, true?
A. Yes.

Q. And for a boat in the New England area, there's a particular factor that applies to use to adjust the value for that geography, right?
A. Yes.
Q. So in that particular instance, there's no change because it's a hundred percent factor, correct?
A. Yes.
Q. Now, the particular items of the electronics, the air-conditioning, the generators, the tuna tower and so forth, that you mentioned, those are not items that you can plug into the process that's provided by the Buc book in order to come out with a value that they speak to, correct?
A. Yes.
Q. Now, you mentioned the tuna tower on this particular boat, right?
A. Yes.
Q. You didn't look into what the tuna tower cost, correct?
A. No.
Q. You're familiar with other Albins that are out in the fleet, if you will?
A. Yes.
Q. And approximately how many of them have you encountered that have a tuna tower?

A. None.
Q. This is the only one you're aware of?
A. Yes.
Q. All right. And you didn't -- well, it's fair to say then that amongst buyers of Albin yachts, tuna towers are not in high demand?
A. To the best of my knowledge, this was an after-market tower that was put on after the boat was sold.
Q. And you've never seen another one, true?
A. No.
Q. So you'd agree with me that tuna towers are not in high demand, correct?
A. Yes.
Q. And if an individual were interested in buying an Albin and had various used Albins available to him to contemplate, bid on, think about buying, you would expect that a buyer would say to himself, or herself, do I want a tuna tower on my boat, true?
A. Yes.
Q. And some owners wouldn't, correct?
A. Yes.
Q. Based on what we just discussed, that would be most of them, true?
A. That would be up to the individual buyers.

Q. Right. But your own experience that you've testified suggests that there's not that many people who find it attractive to have a tuna tower on an Albin, correct?
A. That's true.
Q. And a tuna tower has a fairly significant weight, doesn't it?
A. Yes, it does.
Q. And it's a weight that is fairly high up on the vessel?
A. Yes.
Q. And weight high up on the vessel has an effect on its stability, correct?
A. Yes.
Q. Has an effect on the draft of the vessel?
A. Yes.
Q. That is how deep it sits in the water?
A. Yes.
Q. And when a weight like a tuna tower is added, that can affect the ride of the vessel, correct?
A. Yes.
Q. Tends to make it slower to come back to upright because of the high weight, is that true?
A. Yes.
Q. Raises its center of gravity, in other words?

A. Yes.
Q. You're familiar with on inspected vessels the Coast Guard takes into account the center of gravity of vessels to determine whether they're safe to operate, correct?
MR. LOVEJOY: Objection. Relevance, your Honor.
THE COURT: Overruled.
Q. You may answer, sir.
A. I'm familiar with it, but I don't know how it's calculated.
Q. Okay. But it's a factor, correct?
A. Yes.
Q. All right. So it's a factor that, according to your experience in the marine industry, could have a bearing on safety, correct?
A. Yes.
Q. You don't know anything about how much effect there was on the stability of the EVEREADY by virtue of having the tuna tower on it, true?
A. No.
Q. Okay. So the presence of the tuna tower is not something that you could say that would necessarily make this boat more attractive, correct?
A. It could make it attractive to a buyer that wanted one.

Q. Correct. And if a buyer was not interested in having one, or indifferent, then that might be a negative in that buyer's mind, correct?
A. That's true.
Q. And when you calculate a fair market value of something like a vessel, you look at the extent of the demand for the vessel as it stands, correct?
A. Yes.
Q. So this one is, if you will, a one-off, correct?
A. Yes. It's unique, yes.
Q. And if someone wanted an Albin, and was prepared to consider one that was used, that buyer might well be told by a surveyor, let's say a colleague of yours, that if he or she didn't want the tuna tower they'd have to make arrangements to take it off and dispose of it, correct?
A. Correct.
Q. Disposing of it might be a significant undertaking, correct?
A. Yes.
Q. You'd have to have a crane to get it off, at minimum?
A. Yes. You'd need some sort of lifting mechanism, yes.
Q. And then you've got to find a way to dispose of it

legally?
A. Yes.
Q. Then you have to make modifications, adjustments to the vessel to deal with the places where the tuna tower was affixed, correct?
A. Yes.
Q. And changes to the control systems in light of the fact that the tuna tower had a steering station up on it, correct?
A. Yes.
Q. And an engine control station?
A. Yes.
Q. So all that would have to be undone if a buyer was not interested in a tuna tower?
A. Yes.
Q. Now, I think you told us in your deposition that until the time you discovered the hole in the exhaust hose that's been illustrated in some photos today, you were of the view that the EVEREADY had sunk because of some way that water came into the vessel passing through its hull, correct?
A. Yes.
Q. You had been of the belief that there was something about its hull that let water come in?
A. Yes.

Q. And you were never able to determine whether that's actually true or not, correct?
A. Correct.
Q. And having learned about the hole in the hose, you basically put alternative pathways of water ingress into the boat out of your consideration, correct?
A. Yes.
Q. If you were representing a buyer who was considering buying a boat like the EVEREADY, a buyer -- or you would advise a buyer that it would be of interest to him or her to know that a boat had been in a situation where other professionals had had significant questions, as you did, about whether or not the hull really had integrity to keep out water, correct?
A. If I were aware of that, yes.
Q. I understand. You functioned in one role with respect to this vessel, that was looking into why it sank. I'm asking you to put yourself -- let me back up. Sometimes you represent buyers of boats, correct?
A. Yes.
Q. They would want to know whether it's a good idea to buy a particular boat at a particular price, true?
A. Yes.
Q. You would advise the buyer that it's important for

them to know really as much as they can find out about what's up with this boat, right?
A. Pre-purchaser involves an inspection and a written report with my observations and recommendations that I have. I don't advise a buyer to buy one particular boat or another.
Q. All right. But you undertake, when you work as a surveyor for a buyer who is thinking about buying a boat, to let that buyer know everything that you think ought to be relevant to their decision to buy it at any particular price, correct?
A. Yes.
Q. If you were working for a potential buyer of this boat and had prepared such a report, and then afterwards learned that other professionals had had serious questions about whether that boat really had the ability to keep water out of the hull, you'd be concerned about that, correct?
A. Yes.
Q. And you'd want to make a supplemental report to your client about that, correct?
A. Yes.
Q. You wouldn't want to be in a position of having that information and sitting on it, correct?
A. Right.

Q. Now, your previous view about how this boat had sunk was based on your assessment that prior to the event in April of 2005, the EVEREADY had experienced wetting of its hull, correct? Wetting of the core of its hull, I'm sorry.

A. That's one of the considerations I had in my mind, yes.

Q. It's one of them that you were never able to rule out, correct?

A. Correct.

Q. As a matter of fact, you reported, and you were of the view, that the core of the vessel, prior to the events of April 2005, had become saturated with the result that over the winter water had frozen and disrupted the integrity of some part of the fiberglass of the hull, correct?

A. Yes. That was in my initial report, and I stated it as a theory.

Q. Okay. And you never did anything, if you will, to close the loop on that theory, correct?

A. At some point later down the road is when I retained Bruce Pfund.

Q. Okay. And Mr. Pfund took the core sample that we were looking at a little while ago, correct?

A. Yes.

Q. And it's a representative -- I'm sorry. It's a sample that tells you something about that particular locality on the boat, correct?
A. Yes.
Q. All right. It doesn't tell you anything about the condition of the core in other parts of the boat, correct?
A. Correct.
Q. All right. Based on your work with Mr. Pfund, you did not -- that did not result in you ruling out the possibility that the core previously had become saturated with later freezing and damage to the fiberglass, correct?
A. Correct.
Q. So that's actually still open as we stand here today, correct?
A. Once I found the hole in the hose, it's my opinion, it became my opinion that that was the cause of the sinking.
Q. Okay. You're not able to rule out that -- well, strike that.
Your conclusion that water may have entered through the exhaust hose doesn't rule out your earlier thinking that the hull had potentially been damaged due to previous conditions of the history of the boat,

correct?
A. I'm not sure I understand that question.
Q. Let me put it to you another way. You came to think that water may have entered the hull through the hole in the hose, true?
A. Yes.
Q. Okay. That didn't do anything to tell you anything about whether there was any other source of ingress or water into the hull, correct?
A. Correct.
THE COURT: Why don't we break for lunch. Hope that we get some power back. So let's reconvene at two o'clock. All right.
(Lunch recess.)
THE COURT: Go ahead.
BY MR. RAUWORTH: (Continuing)
Q. Mr. Robbins, in arriving at your value of the hull at $160,000, you made use of the Buc book you told us, B-U-C?
A. Yes.
Q. And that's one industry publication that's sort of analogous to the Blue Book as to cars, correct?
A. Yes.
Q. And there are other industry publications that use the same -- that do the same thing, basically, correct?

A. Yes.
Q. And one of them is -- well, what are the other ones you're aware of?
A. There are two others I'm aware of. One is entitled NADA, N-A-D-A, and the other one is entitled ABOS, A-B-O-S.
Q. Is there any reason you didn't consult those books in arriving at your valuation?
A. I did not subscribe to them. The reason being is that it's my opinion that they're geared more towards smaller boats whereas the Buc, B-U-C, book is geared more towards larger boats.
Q. Those other two books have listings of records of actual sales of Albins, correct?
A. I don't know what the exact listings are, but yes, they do.
Q. There would be no point in even considering them unless they showed some value with regard to the vessel that you're thinking about, true?
A. Yes.
Q. All right. So those are available on the market as to -- to be consulted with respect to an Albin 35, correct?
A. Yes.
Q. All right. Now, I think you told us in the

deposition that the Buc book stated a range of values of something like 148 to 163 for an Albin 35 of the age that this one was at the time of the sinking?
A. Yes, that's correct.
Q. And you told us that you selected a value of 160 because, as I understood it, that represented the point at which most of the sales changed hands or took place?
A. Yes.
Q. All right, sir. And this particular boat was not representative of most of the sales that took place because of that tuna tower, correct?
A. I don't know what the other boats are that they used to come to those numbers. I assume it's a compilation of all sales.
Q. You'd assume that it was a standard model boat unless it was indicated to the contrary, correct?
A. Yes.
Q. And if someone didn't -- might be interested in this Albin 35 but wasn't interested in the tuna tower, apart from disposing of it, they might try to sell it, right?
A. Yes.
Q. But these tuna tower type structures are custom-made for a particular kind of boat, right?
A. Generally, yes.

Q. So if you wanted to get rid of it, you might be stuck with it, be unable to sell it, correct?
A. It could be adopted to fit another boat.
Q. That would cost somebody something, right?
A. Yes.
Q. This particular Albin 35, the EVEREADY --
MR. RAUWORTH: And I'm referring, your Honor, to the photos, Exhibit TT and UU, double T and double U.
Q. The EVEREADY had experienced a serious grounding in its earlier life in the ownership of Mr. Picchione, correct?
A. Yes.
Q. That was something that you knew about in the course of this assignment for your insurance company client, correct?
A. Yes.
Q. All right. And in addition to putting a hole in that boat, in the hull of that boat, that grounding resulted in the engine room being flooded considerably, correct?
A. I don't know.
Q. Okay. You didn't determine -- well, did you determine whether or not the engines had been changed out on the occasion of that grounding?
A. No. I was not aware of any damage other than the

hull damage to the EVEREADY.
Q. Okay. So you didn't look into what were the consequences to the vessel other than the hull?
A. Correct.
Q. Now, when a vessel is holed in the way it is shown in that picture, then you would expect in your own experience that there would be some kind of other damage in addition to hull damage just because water would have to have gotten into the boat in the course of placing the boat up on those rocks, correct?
MR. LOVEJOY: Your Honor, he said he didn't know. It's going to be pure speculation what happened to this particular vessel. There's no foundation as to what happened to the vessel.
THE COURT: Well, he doesn't know what damage it was other than the hole.
MR. RAUWORTH: I'll put it to him another way, your Honor.
THE COURT: All right.
Q. In the course of a grounding of the kind depicted in those two photographs, you in your professional capacity would want to know whether there had been water infiltration into the hull, correct?
A. Yes.
Q. Because it's at least a possibility, correct?

A. Yes.
Q. And something that in your profession is significant in terms of your view of what's up with this boat?
A. Yes.
Q. All right. And I gather you didn't do anything to find out what components, if any, had been changed in the response -- what mechanical components, if any, had been changed in response to the grounding, true?
A. Yes.
Q. That is, you did not do anything to look into that, correct?
A. Correct. Yes.
Q. All right. And the engines on this vessel had not been started up in 2005, to your knowledge, correct?
A. Yes.
Q. You're agreeing?
A. Yes.
Q. In fact, you had been advised that there had been some engine work done by somebody other than Point Judith not long before this sinking in April 2005, true?
A. Yes. I was aware that some other work had been done but I didn't know exactly what.
Q. You didn't know whether or not that work had been

successful, true?
A. No.
Q. All right. And you didn't know whether or not it had been done by somebody who had the appropriate skills, tools, competence, et cetera, correct?
A. Correct.
Q. Those are significant, right?
A. Could be, yes.
Q. Well, they're important enough that they'd be things that you would want to find out about and take into account in your evaluation of a boat like this as of the day before it sank, correct?
A. Yes.
Q. In fact, you didn't have occasion to learn what it was that had brought this mechanic into the picture in the off-season preceding the sinking in 2005, correct?
A. Correct.
Q. So you don't know how serious the engine problem really was, correct?
A. Correct.
Q. All right. Now, the things that we've just discussed about the history of this boat are things that you would want to know about if you were asked to give a report to a client who was considering buying this boat, correct?

A. Yes.
Q. All right. And the ones we've been talking about do not factor into your opinion at $160,000, correct?
A. Sorry. Could you repeat that?
Q. The items we've been discussing, the grounding history, the possibility of water infiltration, and what it might have done to the engines, what other equipment might have been affected, replaced or not replaced, what may have happened to the balsa core of the vessel in the context of that grounding, none of those factor into the figure that you've assigned for the pre-sinking value, $160,000, true?
A. Correct.
Q. All right. You heard of the concept of a -- I'm sorry. You ever heard the phrase "Katrina car"?
A. Yes.
Q. You know that that's a car that got flooded during the hurricane a few years ago down in New Orleans?
A. Yes.
Q. Your understanding is that people these days buying used cars need to be careful that they don't end up with a Katrina car, right?
A. Correct.
Q. And the reason that that's a concern is that a car that had been through that sort of experience might

look good superficially but might be harboring problems that could crop up later once a buyer had written the check, true?

A. Correct.

Q. All right. This boat was a Katrina car, wasn't it?

MR. LOVEJOY: Objection.

THE COURT: Sustained.

Q. This boat had the kind of history that would make a buyer of boats as careful as someone would be who was shopping for a used car in the wake of Hurricane Katrina, correct?

A. All I can say is that it was known to have some previous damage.

Q. Damage that would be important to a buyer if that buyer were your client, correct?

A. Possibly.

Q. Possibly?

A. Yes.

Q. If you had that information, you wouldn't hold it back from a buyer/client, correct?

A. No. But if appropriate and competent repairs were done, then it would factor out.

Q. Okay. But you didn't do anything to determine what was the status with those items? In other words,

what had been done with respect to that event of sinking, correct?
A. Correct.
Q. All right. Now, this boat is currently at Certified Sales in Warwick, Rhode Island, correct?
A. Yes.
Q. And you and I, and Mr. Layfield, and Mr. Lovejoy, went down there on April 24th, after your deposition, correct?
A. Yes.
Q. When we got down there, we could approach the stern of the boat where you could climb onboard, correct?
A. Yes.
Q. And we did that. Now, on the transom, on the stern of the boat, Certified Sales had a sign, a for sale sign up, correct?
A. Yes.
Q. And the for sale sign said "Engine submerged," correct?
A. I believe so.
MR. LOVEJOY: Objection.
THE COURT: All right. There's an objection to the last question; is that correct?
MR. LOVEJOY: Yes.

THE COURT: What's the objection?

MR. LOVEJOY: May I have that question read back, your Honor?

(Pending question read by the reporter.)

MR. LOVEJOY: What relevance does that have to the valuation? He's asking questions about a pre-sinking valuation.

THE COURT: That's a good question. What does the post-sinking situation have on pre-sinking value?

MR. RAUWORTH: Pre-sinking value is -- is only a starting point. It has to be netted against the salvage value.

THE COURT: So you're trying to establish the salvage value, is that it?

MR. RAUWORTH: I'm dealing with questions as to the salvage value.

THE COURT: Well, it's probably relevant for that purpose, Mr. Lovejoy, so I'll allow the question.

Q. You saw that sign that said, "Engine submerged," correct?

A. Yes.

Q. And the engines on the EVEREADY, in the days immediately following the sinking, had been treated with a process called pickling, correct?

A. Yes.

Q. And Point Judith jumped on that immediately, even before you came into the picture, correct?
A. Yes.
Q. And pickling involves treating engines to remove water and salt and other things that are not good for marine engines, correct?
A. Yes.
Q. And commonly they're replaced with some sort of petroleum product, diesel fuel, or something like that?
A. Yes.
Q. And possibly flushed out, correct?
A. Yes.
Q. There's an immediate time urgent part of that which is displacing the water and salt with a petroleum product, correct?
A. I'm sorry?
Q. The first step of the process of proper pickling involves getting some kind of petroleum like diesel fuel into those engines very quickly, correct?
A. That would be the second step. The first step would be to remove any contaminated oil and water.
Q. Okay. But the purpose of doing that is so that you can, as quickly as possible, get as many of the metal surfaces of the engine into contact with petroleum and not water, correct?

A. Yes.
Q. And that had been done quite promptly, correct?
A. Yes.
Q. Now, the optimum -- I'm sorry. The purpose of doing that is in order to prevent the need to throw those engines away, correct?
A. Correct.
Q. All right. Now, once the steps we've just described have been done, it's important in pickling to proceed with the process in order to get the engines hot to try to drive out any, if you will, foreign liquids or substances that had not been displaced in the initial treatment of these with petroleum products, correct?
A. Yes.
Q. All right. And that wants to be done because heat is the best way to sort of complete the purification process, correct?
A. Yes.
Q. And that's a step that the insurance people that you work for did not call for, or authorize to be done with respect to the EVEREADY, true?
A. Yes.
Q. And, in fact, after the initial preservative steps that Point Judith had done in the very immediate time

right after the sinking, to your knowledge, there hasn't been anything else done with an eye to preventing further corrosion of the main diesel engines on the EVEREADY?
A. Yes. That's correct.
Q. And you view it as appropriate that the sign -- in other words, you didn't have any reason to complain that that sign that's up there says engine submerged, correct?
A. No.
Q. If somebody asked you about it, you'd have to tell them that's the truth?
A. Yes.
Q. All right. And if someone asked you, you wouldn't be able to tell them that the engines had undergone a full proper and complete pickling process, correct?
A. Correct.
Q. All right. The attractiveness of a boat, even following a casualty, will be affected by how thoroughly and completely steps of salvage of these kinds, of this kind have been accomplished, true?
A. Yes.
Q. Okay. The boat has been sitting at Certified Sales for -- well, since the time just a few months after the sinking, correct?

A. Yes.
Q. It was moved away from Point Judith within a couple of months after the sinking and put on land over at Certified Sales, correct?
A. Yes.
Q. Since then, the boat has had some significant removals, such as the fuel tanks?
A. Yes.
Q. Other components taken apart?
A. Yes.
Q. You wouldn't call it in showroom condition, correct?
A. No.
Q. Nobody's done anything by way of waxing, correct?
A. No.
Q. No kind of maintenance that would help its qualities of attractiveness?
A. No.
Q. All right. And in the -- you're aware that the boat is for sale. In other words, the insurance company is trying to sell it, correct?
A. Yes.
Q. And that's a prudent thing to do under the circumstances, correct?
A. Yes.

Q. Desirable and prudent to try to get the maximum price for that, correct?
A. Yes.
Q. And the steps involved in having completing -- the steps that would have been involved to complete that pickling process would not have been particularly expensive, that is, the running and further treatment with petroleum, correct?
A. That would be whatever the marina charged to do that.
Q. Okay. But it's the kind of charge that you would consider to be appropriate in terms of the ability to return those engines to service, correct?
A. Correct.
Q. Having not completed the process of pickling, the practical effect of that is the initial expense to try to pickle those engines has been lost, correct?
A. Not necessarily.
Q. The loop hasn't been closed about pickling, true?
A. The engines in their current state still do have some salvage value. They may not be able to be -- excuse me. They do have some salvage value. They have core or trading value.
Q. Not as much as if the process of pickling had been completed, correct?

A. Correct.
Q. What's your best estimate on how much difference that would have made?
A. It's unknown. I'd be speculating because if we don't know how much salt water entered the engines, we don't know if there was algae or marine life entering into the engines. In some cases, even if you do completely pickle them, sometimes they still have to be rebuilt.
Q. And we didn't do anything to find out any of those things, correct?
A. Correct.
Q. When I say "we," I mean your insurance company client didn't instruct you to have anybody do those things, correct?
A. Correct.
Q. I'm not meaning to blame you personally. Just so you understand.
A. I understand.
Q. Your $160,000 is meant to represent your estimate of the fair market value of this boat prior to sinking, correct?
A. Yes.
Q. In other words, the price at which the boat would change hands as between a willing buyer and a willing

seller each under no compulsion, true?
A. Yes.
Q. That's actually what the definition of fair market value is in your experience, true?
A. Yes.
Q. I take it that before rendering your opinion, you had not consulted Mr. Picchione in terms of his personal valuation of the vessel, correct?
A. No.
Q. All right. Have you heard anything about it since?
A. No.
Q. All right. That would be a factor to take into consideration, correct?
A. I'm sorry. I'm not sure I understand.
Q. How much Mr. Picchione would have taken to part with that vessel in the days before it actually sank?
A. It could have been factored, yes.
Q. Well, he would be a player in the market for a vessel like that, correct?
A. Yes.
Q. And so his view of what the boat ought to bring would be significant, correct?
A. It would be one factor.
Q. Okay. And if you had learned that he was minded

at that time to list the boat for sale at $150,000 with the expectation that he might or might not get that much, that would be something significant that you'd need to take into account, correct?
A. Again, it would be another factor in my thought process.
Q. Okay. But that information didn't come into your possession so as to become part of your opinion, correct?
A. Correct.
Q. All right. You ended up writing four different report letters, didn't you?
A. Yes.
Q. All right. Let me hand you a package of those four. And I'm looking at the third page. They're unnumbered, unfortunately. But this is your report to Mr. Brian Scott dated May 13th, 2005.
MR. RAUWORTH: I think the Court has a copy of that on the bench.
Q. Let me ask you to take a look at the section on that page that begins, "Cause of Lost." Make yourself familiar with that.
MR. RAUWORTH: May I approach the witness, your Honor?
THE COURT: Yes.

A. Yes. I'm ready.
Q. All right. You have that in front of you?
A. Yes, I do.
Q. All right. Then let me hand you -- actually, let me back up. In your file for this assignment, you have a copy that you obtained some time ago of the police report on this incident, correct?
A. Yes.
Q. And it was written up by the South Kingstown Police Department, the harbormaster there?
A. Yes.
Q. Did you ever actually speak to the harbormaster, or did you just get the report?
A. I did not speak with him.
Q. But you got a copy of the report?
A. Yes.
Q. All right.
MR. LOVEJOY: What's it being offered for, Mr. Rauworth?
MR. RAUWORTH: Sorry?
MR. LOVEJOY: I object to any hearsay portions of it, your Honor.
MR. RAUWORTH: I'll represent that this is something the witness consulted and relied upon, and either my first or second witness is a witness who

wrote this and who will be in a position to authenticate it.

THE COURT: What are you trying to do with this document?

MR. RAUWORTH: I'm sorry. This is the police report, Exhibit double R, Romeo, Romeo, written by the harbormaster who responded to the scene and is pertinent to the questions about Mr. Robbins' first report. If I may approach the witness, I'll place this before him.

THE COURT: Go ahead.

Q. Mr. Robbins, do you recognize that document as a police report that you have in your file?

A. Yes.

Q. Okay. That's the narrative part of the report that you have in your hand?

A. Yes.

Q. Okay. Now --

MR. LOVEJOY: Your Honor, again, I object on hearsay basis at this time.

THE COURT: Well, I haven't heard how this document is being used and it hasn't been offered yet. So I'll take it a question at a time. At the moment, your objection is premature.

Q. Your assignment, when you first became involved

with this file from your insurer client, was to sort out as best you could what caused this vessel to sink, correct?
A. Yes.
Q. And you spent the great bulk of your time on this file in activities trying to answer that question, correct?
A. Yes.
Q. All right. Now, when you first became involved in the incident, you went to the marina and looked at the vessel and did some inquiry, correct?
A. Yes.
Q. And you did some inquiry to try to satisfy your professional curiosity so that you could respond to your client, correct?
A. Yes.
Q. One of the things that you sought out and took into account was the report of the harbormaster that responded to the scene, correct?
A. Yes.
Q. That's what you have before you, correct?
A. Yes.
MR. RAUWORTH: Your Honor, I would move the admission of this document on that basis.
MR. LOVEJOY: Again, your Honor, it contains

hearsay.

MR. RAUWORTH: For simplicity, your Honor, I'd be content to have it admitted for the limited purpose of the witness having consulted it, and we can deal with its value in full when the harbormaster himself testifies.

THE COURT: Why would this be admissible when the harbormaster testifies?

MR. RAUWORTH: A, he's then subject to cross-examination. He can authenticate it as his writing, an official Government report.

THE COURT: But it's hearsay. If the witness is on the stand, he's testifying, why would you put a document in that is testimonial? Police reports are never introduced. In a criminal trial, for example, where the police officer is testifying, you don't introduce the police report, and that's because the police officer is here to testify. And if the harbormaster is going to be here to testify, why would you put his report on?

MR. RAUWORTH: Well, since he's available for cross-examination, the hearsay objection would seem to be no longer critical. That isn't a big deal for me, your Honor. I don't have the ability to gracefully get his testimony in cycle here. But since this witness

consulted it for purposes of his professional work, I think it's significant in that regard. He specifically indicated that he consulted it. He's testified to it, and he has it in his file, and he's made reference to it in his report.

MR. LOVEJOY: Which then makes it double hearsay, your Honor.

THE COURT: Well, are you saying that you're not putting it in for the truth of what is in here?

MR. RAUWORTH: I'm happy to offer it for the limited purpose of illustrating what Mr. Robbins had available to him as he was doing his professional work that's associated with the opinions that he's presented here.

MR. LOVEJOY: Your Honor, there's a federal statute doesn't address harbormaster reports but it prohibits Coast Guard reports going into evidence. You have to bring in the Coast Guard personnel to testify.

THE COURT: Let me ask you this, Mr. Lovejoy. What would be wrong with taking this document just for purposes of showing what he relied on for purposes of forming his opinion? That doesn't mean it's taken for the truth. And particularly, in a bench trial, where there's no risk of the jury mixing up those concepts. I mean, I understand that this document has no worth in

terms of what is asserted in the document, and I won't take it for any of that, but it might be valuable for purposes of the examination of the expert, for both sides.

MR. LOVEJOY: I still think it's hearsay and it shouldn't come in. I assume Mr. Rauworth is going to ask him if he relied on a certain part of it, and my understanding he's probably going to say yeah, and it turns out it's hearsay.

THE COURT: Why don't we deal with it this way. You go ahead and ask all your questions. I'll reserve my ruling with respect to the admissibility of it. It will be marked for identification at this point, Double R, and you can move it again when you're finished your examination.

(Defendant's Exhibit RR marked for ID.)

MR. RAUWORTH: Thank you, your Honor.

Q. All right. Mr. Robbins, under the section headed "Cause of Loss," are you with me there?

A. You're talking about my report?

Q. Yes. Your report. I want you to have that police report available to you. Down at the third paragraph -- do you have it in front of you? Let me just read it. You can tell me if I've read it correctly.

(Reading:) The vessel was launched and began taking on water on a slow trickle basis. It's most likely that the bilge pumps were on at that point. There were yard workers and the owner onboard. When Mr. Picchione left the boat, he may at some point have turned off the bilge pump switches unknowingly. Water then accumulated in the bilge, and at some point the water level reached the bilge pump discharge fittings and back-flowed. This would explain the sudden sinking between 10:00 p.m. Sunday night and early Monday morning.

Did I read that correctly, sir?

A. Yes.

MR. LOVEJOY: I object. It's hearsay, and there's no foundation as to where this came from.

THE COURT: All right. At the moment, it's only being used for identification to examine the witness. It hasn't been admitted. Go ahead.

MR. RAUWORTH: Thank you, your Honor.

Q. Now, Mr. Robbins, for the moment, I'd like you to put to one side the question of how it was -- let me back up. At the time you wrote this paragraph, your theory was that the way the water got into the hull was somehow by penetrating the hull in some way that hadn't been sorted out, correct?

A. Yes.
Q. I understand that you've since come to change that, do I have that right?
A. Yes.
Q. Change that view. But let's put that point to one side. Are you with me there?
A. Yes.
Q. Putting off the table for the moment the question of how the water entered the vessel, the paragraph I just read to you is an accurate statement of your conclusion of the mechanism for the vessel sinking, correct?
A. It's part of my theory as to how the vessel may have sunk.
Q. Okay. And the other part has to do with how the water got in?
A. Yes.
Q. Okay.
THE COURT: I'm a little confused. Are you still referring to RR?
MR. RAUWORTH: I beg your pardon, your Honor. I may have been going too quickly. RR, I wanted to make available to the witness. What I was reading from is the third full paragraph on the third page of his expert disclosure report of May 13th.

THE COURT: Okay. Hang on. I thought you were referring to the police report.

MR. RAUWORTH: Third page.

THE COURT: All right.

Q. Sir, it was significant to you that the -- strike that. You had formed the view that the vessel sank between Sunday night and Monday morning, correct?

A. Yes.

Q. All right. And you came to that conclusion by learning that, or by hearing that someone had observed it afloat on Sunday night; is that right?

A. Yes.

Q. And did you speak to that person, by the way?

A. No.

Q. But you heard about it somewhere?

A. I heard about it from Mr. Vivenzio.

Q. Okay. And you also learned, or came to be of the view, that when the vessel was raised all of its bilge pump switches were in the off position; is that right?

A. Yes.

Q. All right. And if I understand it correctly, what you've described here is your best assessment of how those facts fit together; is that right?

MR. LOVEJOY: Objection, again. It's based on hearsay and speculation. There's no foundation where

this came from. It's double hearsay in his report.

THE COURT: I'm going to overrule your objection. This is cross-examination on his expert reports. This is legitimate cross-examination, so overruled. Go ahead.

A. Could you repeat the question, please? I'm sorry.

MR. RAUWORTH: Sure. Could I trouble the stenographer to read it?

(Pending question read by the reporter.)

A. Yes.

Q. Okay. It was important to you to have an understanding that would explain how the vessel was able to be afloat on Friday and on Saturday and on most of Sunday and then sink suddenly overnight on Sunday, correct?

A. Yes.

Q. And what we've just read here is your best professional assessment of how those factual points fit together, correct?

A. Yes. That was with the information I had at the time.

Q. And you've not -- once again, not touching the question of how the water came to be in the hull, you haven't learned anything in the meantime that's at odds with your conclusion here, correct?

A. Yes. I learned that the yard had done some work on the bilge pumps in the days prior to the sinking.
Q. Well, that didn't have anything to do with the --
A. I wasn't aware of that at the time I wrote this report.
Q. You were aware of it by the time you testified in your deposition, correct?
A. Yes.
Q. Okay.
MR. RAUWORTH: May I approach the witness, your Honor?
THE COURT: Yes.
Q. So showing you page 22, lines 17 through 25, if you'll read along with me.
(Reading:) Okay. So in terms of the cause of the loss, the difference between the time of Exhibit 1 and today is that you believe the source of the water getting into the hull is through the hole --
THE COURT: What are you doing? You're reading the deposition?
MR. RAUWORTH: Yes, I am, because I'm understanding his testimony to be at odds with that.
THE COURT: All right. Do you have a copy of the deposition for me?
Before you read anything in from a deposition, I

want a reference to the page and line that you propose to introduce as the inconsistent statement. What page and line is it?

MR. RAUWORTH: Page 22, your Honor, line 17.

THE COURT: Through what?

MR. RAUWORTH: I beg your pardon, line 7.

MR. LOVEJOY: Page 17?

MR. RAUWORTH: I beg your pardon. Page 22, line 7, through page 23, line 2.

THE COURT: I don't see this testimony as inconsistent with the answer he just gave. His testimony has to do with the water getting into the hull, and the answer that he previously gave has to do with his learning of the work that Point Judith did on the bilge pumps.

MR. RAUWORTH: Well, my question was to him that he hadn't learned anything that had caused him to change his view since writing the entry in the disclosure report. And in his deposition, I believe he said that his view was the same even though he'd had the repair order from Mr. Stroker prior to his deposition.

THE COURT: Well, that's not what that piece you just gave me says.

MR. RAUWORTH: Exhibit 1 is the piece -- Exhibit

1 to the deposition is his disclosure report of May 13th, and I had just directed his attention to that paragraph.

THE COURT: What was Exhibit 1 to the deposition?

MR. RAUWORTH: It is the disclosure report of May 13th, 2005. And the reference I gave to him in the deposition was the top of page three under the heading, "Cause of loss."

THE COURT: At this point I don't see the inconsistency you're referring to, so move on to your next question.

Q. Mr. Robbins, your account in your disclosure report, the segment that I just read to you, describes your conclusion that, or your view that the vessel had capable, bilge pumping capability through the course of the weekend until Sunday night, correct?

A. That was part of my theory, yes.

Q. It was your belief, right?

A. Yes.

Q. It was your professional belief, correct?

A. Yes.

Q. And that's what you reported to your client, correct?

A. Yes.

Q. And so that recounted that your assessment was that water had been entering the bilge through the weekend, but had been occasionally pumped out because there was an active automatic bilge pumping capability in place, correct?
A. Yes.
Q. Until some point on Sunday night, correct?
A. Again, this is my theory. At some point, the pumping capacity ended.
Q. Right. And on Monday morning, the bilge pumps were all found in the off position, correct?
A. Yes.
Q. So that in your mind was the only way to account for the vessel sinking suddenly Sunday night, correct?
A. There is another possibility.
Q. I'm asking you about your professional opinion at that time.
A. At that time, yes.
Q. Okay. And that was something that you had arrived at based on performing your professional marine surveyor's due diligence, correct?
A. Yes.
Q. And doing so in light of your duty to your client, to help your client understand how this incident could have happened, correct?

MR. LOVEJOY: Objection, your Honor. This question about duty to his client really has nothing to do with his opinion.

THE COURT: Overruled.

Q. That's correct, isn't it, sir?

A. Yes.

Q. All right. And your belief then and now is that something was allowing water to come into the hull of the vessel during the course of Sunday night, correct?

A. Yes.

Q. All right. And that whatever that was, it was unable to sink the boat prior to Sunday night, correct?

A. Yes.

Q. All right. And your view was that the mechanism that prevented the boat from sinking up until Sunday night was the availability of automatic bilge pumping capability on that boat, true?

A. Yes.

Q. All right. And that's what you believed at the time that you wrote your May 13th disclosure report to your client, correct, or your May 13th report to your client, correct?

A. Yes.

Q. And it's what you believed when your deposition was taken about three weeks ago on April 24th, correct?

A. Could you repeat that, please.
Q. It's also what you believed when your deposition was taken three weeks ago on April 24th, correct?
A. Yes. I believe so.
Q. Okay.
MR. RAUWORTH: Your Honor, I would move the admission of the expert disclosure report at this point for purposes of illustrating the witness's testimony but not for any other purpose.
THE COURT: First of all, what document are you talking about?
MR. RAUWORTH: It is a --
THE COURT: Is this the document you've handed up to me that has not been marked?
MR. RAUWORTH: No. It has not been marked.
THE COURT: It needs to be marked for identification.
MR. RAUWORTH: Certainly, let me do that. I'll bring forward the document that's been marked in Mr. Robbins' exhibit as Robbins 1, which is a May 13th letter to Brian Scott.
THE COURT: Sorry. I don't know what you're talking about. Are you referring to a letter that he wrote or are you referring to his report?
MR. RAUWORTH: It is the letter dated May 13th.

THE COURT: So you want that marked, his letter of May 13th?

MR. RAUWORTH: Yes, your Honor.

THE COURT: All right. Let's mark that for identification.

THE CLERK: And that will be XXX.

THE COURT: Whatever is next in line.

THE CLERK: XXX.

THE COURT: How many pages is that?

MR. RAUWORTH: Actually, count them. What I've given you is a compendium that includes more. The part that I've just handed the clerk is simply that letter. What I've handed you has got further later letters.

THE COURT: I know. I'm trying to get that straight. So there's five pages in this letter?

THE CLERK: I have 16 pages on this.

THE COURT: Sixteen?

MR. RAUWORTH: Including there's some photos that follow with it.

THE COURT: What you gave me is not what you've given the clerk, right?

THE CLERK: Do you want to see what he gave me?

THE COURT: Yes. Okay. Now, the only thing you've used in this report is the one paragraph, and you've read that into the record. So why do you need

the whole report in evidence?

MR. RAUWORTH: I guess with the paragraph having been read in, that's a valid point. We don't need to proceed with that.

THE COURT: All right. So that's withdrawn then.

MR. RAUWORTH: I can withdraw that.

Q. Now, Mr. Robbins, from day one, your objective and your assignment for Foremost/Zurich Insurance has been to arrive at an explanation of how it was that water got into this vessel, correct?

A. Yes.

Q. And almost all of your efforts in one way or another have been directed at that purpose, correct?

A. Yes.

Q. And that includes your work in arranging to have the vessel launched on May 3rd, 2005?

A. Yes.

Q. That includes your retention of Mr. Pfund?

A. Yes.

Q. Okay. That includes the times you've been back several times this year to the vessel, correct?

A. Yes.

Q. And that includes the work that was done by way of taking various parts of the vessel apart, such as the

fuel tanks?
A. Yes.
Q. All right. And apart from that purpose, the only other significant thing you've done is review some of the items of expense that were sent your way in terms of other contractors, correct?
A. Yes. I also developed a rough estimate of the cost of repairs.
Q. Okay. How much of your time would you say was involved in developing the rough estimate of the cost of repairs?
A. I believe it was three or four hours.
Q. All right. And then monitoring the various expenses that were being submitted to the insurer, how much time would you estimate you had invested in that?
A. Probably another three to four, five hours.
Q. All right. So all the rest of your billings have been directed at this purpose of getting an answer, right?
A. Yes.
Q. Now, getting an answer is not something that was needed to do in order to care for the EVEREADY as a piece of property, correct?
A. Correct.
Q. And you didn't do anything, you didn't take any

steps or spend any time to try to make arrangements to protect or preserve or maintain the value of the EVEREADY since it's been brought out of the water, correct?
A. Correct.
Q. All right. And during all this time, your client controlled access to the EVEREADY, that is Foremost/Zurich Insurance?
A. Yes.
Q. You may have coordinated with Mr. Lovejoy on some things but the person calling the shots and writing whatever checks were necessary was Zurich Insurance, correct?
A. Yes.
Q. Your client. So you felt that you could get access to the vessel whenever you felt you needed it?
A. Yes.
Q. By the way, there was nothing that you ever asked Point Judith Marina to do with respect to this vessel that Point Judith ever refused to do, was there?
A. I don't believe so. I think possibly at one point we asked them to do some early removals early on and it wasn't done, and ultimately it was done at Certified Sales.
Q. But that was not a matter of refusal or

non-cooperation, was it?
A. I believe it was due to the fact that they probably wanted the boat to leave the yard and go elsewhere.
Q. Okay. Were you ever -- you weren't ever told that we're not going to -- we're refusing to do that work, correct?
A. I don't believe so. I don't recall that.
Q. Now, in addition to yourself, you had Mr. Bruce Pfund working with you?
A. Yes.
Q. And Mr. Pfund is somebody who is a well-known marine surveyor in New England?
A. Yes.
Q. And he has a particular area of practice relating to inquiry into fiberglass cores and so forth?
A. Yes.
Q. All right. And he's someone that you professionally respect, correct?
A. Yes.
Q. And he's been involved through much of this time, correct?
A. Yes.
Q. And the vessel has basically been available now for really three years or more ashore, correct?

A. Yes.
Q. All right. Now, during the bulk of that time, you were still seeking an answer to how this vessel sank, both you and Mr. Pfund, correct?
A. Yes.
Q. And from the time of the sinking up until October 17th, 2007, you had not come up with an answer that was satisfactory to either of you, correct?
A. Yes.
Q. That was a period of about two-and-a-half years, correct?
A. Yes.
Q. You had as much access to the vessel as you felt that you wanted, correct?
A. Yes.
Q. And it wasn't until that occasion that you made arrangements to have the fuel tanks out of the boat, correct?
A. Yes.
Q. Once the fuel tanks were out of the boat, you were able to look around all parts of the lazaret area, correct?
A. Yes.
Q. That's the area that's underneath the cockpit in the back of the boat, correct?

A. Yes.
Q. And it's below decks aft of the engine room, correct?
A. Yes.
Q. When you had a chance to look around in the lazaret area, you and Mr. Pfund discovered a hole in the exhaust hose, correct?
A. Yes.
Q. And at the time that happened, Mr. Layfield was there with you, correct?
A. Yes.
Q. Also Mr. Clarke, who was then representing Albin, correct?
A. Yes.
Q. And on that occasion, you discussed the matter amongst yourselves, the four of you, correct?
A. I believe so, yes.
Q. And you each agreed that the hole in the exhaust hose was not visible without removing the fuel tanks, correct?
A. Yes.
Q. All right. And all of the photos that have been shown to you today of the exhaust hose are photos that are taken from inside of the lazaret, correct?
A. Yes.

Q. And under circumstances where you had available to you all the light you could want, correct?
A. Yes.
Q. All right. And where there was no interferences of any kind in the way of seeing that exhaust hose, correct?
A. Yes.
Q. All right. That location of that cut in the exhaust hose was inaccessible until the fuel tanks came out, true?
A. Yes.
Q. Okay. You had spent plenty of time moving around inside the boat looking for things that might explain how the water could come into the boat, correct?
A. Yes.
Q. And you did that at a time earlier on when the fuel tanks were in the boat?
A. Yes.
Q. You searched high and low to try and find some way to explain how water could get into that boat?
A. Yes.
Q. All right, sir. You had the opportunity to look in every part of the bilges, correct?
A. Yes.
Q. You had the opportunity to look up forward,

correct?
A. Yes.
Q. You had the opportunity to look underneath the engines, right?
A. Yes.
Q. You had the opportunity to look outboard of the engines, correct?
A. There's not a lot of room there, but yes.
Q. Okay. Well, you had the opportunity to do enough to satisfy yourself that you had done a diligent search to try to find a source of water coming into that boat?
A. Yes.
Q. All right. And at no time in any of that effort was it possible for you to see the underside of the exhaust hose from a viewpoint, a vantage point, inside the engine room, correct?
A. You can see where the hose passes through the bulkhead from the forward side.
Q. Right. You can see where the hose passes through. You can see the bulkhead itself, correct?
A. Yes.
Q. You can see a hole cut in the plywood, correct?
A. Yes.
Q. And you can see the hose itself going through the plywood bulkhead, correct?

A. Yes.
Q. You can see the top of the hose, right?
A. Right.
Q. You cannot see the bottom of the hose, right?
A. Right.
Q. You didn't do anything to probe any further into the question of that -- into that location where the exhaust hose goes through the bulkhead before the time that you took out the fuel tanks, correct?
A. Correct.
Q. All right. You're no stranger to the possibility that exhaust hoses can fail over time, correct?
A. Yes.
Q. And you've had experience with Albins before?
A. I've surveyed Albins before, yes.
Q. You've certainly had experience with these kinds of Caterpillar engines, correct?
A. Yes.
Q. You've seen exhaust hoses of the kind that are installed on the EVEREADY?
A. Yes.
Q. You're familiar with their use in the marine industry, correct?
A. Yes.
Q. And you're aware that they have a life span of

some limited time, correct?
A. Yes.
Q. You knew that the engines in this boat might be as old as ten years, correct?
A. Yes.
Q. You didn't know anything to make you think they were less old than that, correct?
A. Yes.
Q. So you were in a position to consider whether the exhaust hoses might have come to a point of failure in that length of service, correct?
A. Yes.
Q. All right. That's something that is -- failure of exhaust hoses like that is something that you have come upon in your marine surveying career?
A. Yes.
Q. And failure of an exhaust hose is something that you certainly would consider as a possible source for water getting into a boat, correct?
A. Yes.
Q. You didn't feel it was necessary for you to do any disassembly of any part of the exhaust assembly on this engine or the port engine?
A. I'm sorry. Repeat that, please.
Q. You did not disassemble any part of either of the

engine's exhaust systems, correct?
A. No.
Q. You were free to do that, correct?
A. Yes.
Q. All right. It was easy enough for you to get somebody with tools to come down and take apart the various segments of hoses and elbows, et cetera, if you wanted to do that, correct?
A. Yes.
Q. Might even have been easier than taking out the fuel tanks, right?
A. At the time, we were looking for water coming through the hull, H-U-L-L, hull, and we thought it was coming through the hull near the shaft log. That's why we removed the fuel tanks.
Q. But there was no reason that you had to rule out the possibility of -- let me back up. In your investigation about the sinking of this vessel, you looked at all of the hoses that connected to all of the thru-hulls, didn't you?
A. Yes.
Q. That was important to you to check and see that there wasn't, let's say, a hose from a head, from a sink, from cooling water to air-conditioners, or whatever, that might have come loose or failed,

correct?
A. Correct.
Q. Because those are amongst the natural kinds of explanation that occur to somebody in your business when you're trying to explain a sinking, right?
A. Yes.
Q. So you satisfied yourself that none of those points where water can get into the vessel were the culprit, right?
A. Yes.
Q. But the exhaust discharge port is a thru-hull fitting, too, isn't it?
A. Yes.
Q. Equally worthy of your attention, correct?
A. Yes.
Q. All right. And you didn't pursue anything to test or inspect the integrity of those exhaust hoses, correct?
A. Correct.
Q. In your investigation of this incident, you didn't approach Mr. Vivenzio and ask to see any of the repair history or work history with regard to the EVEREADY, correct?
A. No.
Q. And Mr. Vivenzio always cooperated with you fully

in all of your efforts, correct?
A. Yes.
Q. And everything that you asked him to see or find out about, he helped you, or he cooperated with you about, correct?
A. Yes.
Q. You talked in your earlier testimony about a thing called a scum line, do you recall that?
A. Yes.
Q. And Mr. Lovejoy showed you some pictures, and you pointed out some features in some of the photos that you thought represented a scum line, correct?
A. Yes.
Q. At one point I heard you use the figure of six weeks in connection with the discussion of scum line, do you recall that?
A. I believe it was six hours.
Q. Six hours. Okay. What was it about six hours that was significant to you in connection with the scum lines you saw in those photos?
A. It was my estimation in the time it might take to form on the side of a boat.
Q. Okay. And for a scum line to form, what would need to be the -- what kind of conditions would there have to be in terms of the boat in the water?

A. It would just be floating at that level and the line that's referred to as the scum line that's left is just organic material that's in the water.
Q. Okay. And you identified a scum line that was showing in the green paint on the EVEREADY, correct?
A. Yes.
Q. And up above the red paint -- that red paint on the bottom is known as what?
A. Bottom paint or anti-fouling paint.
Q. The white paint that appears on these photos, just above the red paint, that's known at what?
A. It's known as the boot top.
Q. Sometimes also called the boot stripe?
A. Boot stripe.
Q. And then the area of green paint above that is known as what?
A. The topsides.
Q. You identified a line in a photo or two for Mr. Lovejoy that was horizontal and in the green paint, correct, in the topside paint?
A. Yes.
Q. That's at a location of that scum line that stands above all of the overboard discharge ports, or over discharge points for all the bilge pumps other than the aft-most one, correct?

A. The scum line went directly to the bilge pump discharges.
Q. Okay. But was high enough that you thought that water at that level could get access to the bilge discharge ports, correct?
A. Yes.
Q. So in order for a scum line to form, the water would have to be at the level of the line you pointed out for about six hours, do I have that right?
A. Yes.
Q. All right. And tell me again how it is that the circumstance that you think occurred, that generated a scum line, which you illustrated to Mr. Lovejoy.
A. I believe that water was entering the boat through the hole in the exhaust line, and the weight of that eventually brought the boat floating at a lower level. And once the water level reached, or was at that scum line for awhile, then at some point water would enter and backflow into the boat through the bilge pumps.
Q. Okay. Now, the hole that you saw in the exhaust hose was approximately an inch long by half-inch wide?
A. Approximately, yes.
Q. In other words, one-half square inch, correct?
A. Yes.
Q. All right. Did you ever, prior to doing your

expert disclosure report, did you ever do a calculation of at what rate water would flow through a hole that size at the surface?
A. No, I did not.
Q. Okay. There are professional manuals that allow someone to do that, correct?
A. Yes.
Q. And the rate of flow depends on the size of the opening, correct?
A. Yes.
Q. And it also depends on the depth that the opening is exposed to, correct?
A. Yes.
Q. So you couldn't give us a gallons per hour figure attributable to that hole, correct?
A. Correct.
Q. Now, when you were aboard the boat back on May 3rd, of 2005, following the sinking, it was put in the water by Mr. Vivenzio's Travel Lift, correct?
A. Yes.
Q. And on that day, you noticed some water entering from some point in the starboard side of the vessel, correct?
A. Yes.
Q. A point whose origin you could not determine,

correct?
A. Yes.
Q. And that was -- well, strike that.
Did you ever make an estimate of what rate of water that was coming in?
A. No, I did not.
Q. Okay. You don't know the volume of the inside of the hull of the EVEREADY?
A. No, I don't.
Q. So you don't know how many gallons it would take to -- strike that. Let me back up.
What's TPI?
A. I don't know.
Q. In marine parlance, the abbreviation, I think, stands for tons per inch immersion, does that help you?
A. No. I'm not familiar with it.
Q. Have you ever had any study of stability or buoyancy of vessels?
A. No.
Q. Okay. So you don't have any idea of how many gallons or pounds of water you'd have to put into the EVEREADY in order to make it sink an inch deeper in the water, correct?
A. No.
Q. And you haven't done any kinds of calculation of

how much water could flow back through the bilge pumps that you described, bilge pump overboard discharges through that inch and 1/8 hose through a bilge pump, correct?
A. Right.
Q. And if you had those tables we talked about that talk about the rate of flow of seawater through an opening, that would tell you how much water could flow through the overboard discharge if it were wide open, correct?
A. Yes.
Q. But it would be less than that if you had a hose attached to it of some length, correct?
A. Right. Well, the inter-diameter was an inch and 1/8 so we knew that.
Q. Right. Running through a long hose involves friction and that slows down the flow of water, right?
A. Right.
Q. When a hose is then connected to a bilge pump, that has to be accounted for, too, even if it's back-flowing, right?
A. Yes.
Q. It would not flow nearly as fast as if there were simply an open hole at the bilge discharge opening, correct?

A. Correct.
Q. You don't have any information about that, correct?
A. Correct.
Q. Now, as I understand your theory of how this worked out, the water was entering the hull through the hole in the bilge -- I'm sorry, in the exhaust hose, right?
A. Yes.
Q. And began to fill the vessel, correct?
A. Yes.
Q. And this is water that would have flowed into the engine room bilge, correct?
A. Yes.
Q. And in the engine room bilge, there is a -- well, there was, according to your testimony, the pump that's sitting on the witness stand in front of you, correct?
A. Yes.
Q. Also in that engine compartment there's another pump that's slightly forward and slightly above the one that's in front of you, correct?
A. Yes.
Q. The water that filled the engine room bilge could be reached by -- could be discharged by either of those pumps, correct?

A. Yes.
Q. Now, as I understand the mechanism that you believe of this event, water began to come in through the exhaust hose as we described and accumulate in the engine room bilge, right?
A. Yes.
Q. The reason that it accumulated is there wasn't any power to bilge pumps, either of them, to pump it over the side, correct?
A. Correct.
Q. If there had been power to either bilge pump, the bilge pump would have taken the water over the side, correct?
A. Yes.
Q. There's no doubt in your mind that the capacity of either of those bilge pumps would have been enough to stay ahead of water entering through a half-inch square hole, correct?
A. Yes. Correct.
Q. So, in other words, for this scenario to occur, those bilge pumps had to be without power, true?
A. Yes.
Q. So according to this scenario, the vessel is slowly sinking through a stream of water coming in through the half-inch hole, true?

A. Yes.
Q. We don't know how long it will take, right?
A. Don't know.
Q. As I understand it --
THE COURT: Mr. Rauworth, I'm going to cut you off here because it's clear to me this is going to take some time, and I'd rather start fresh with this rather than continue to build up to it. So we have to end because I have an injunction hearing starting in a couple of minutes. Let's go off the record.
(Discussion off the record.)
(Court concluded at 3:30 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

MAY 29, 2008

________________________________________

Date