IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| NORTHERN INSURANCE COMPANY, ET AL | 06-190 |
| | MAY 15, 2008 |
| VS. | VOLUME 4 |
| ALBIN MANUFACTURING, ET AL | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(BENCH TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: FREDERICK A. LOVEJOY, ESQ.
Lovejoy & Associates
1536 Westminster Street
Providence, RI 02909

FOR THE DEFENDANT: MICHAEL J. RAUWORTH, ESQ.
and CARL E. FUMAROLA, ESQ.
Cetrulo & Capone, LLP
Two Seaport Lane
Suite 1000
Boston, MA 02110

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| WILLIAM ROBBINS | |
| Continuation of Cross-Examination by Mr. Rauworth: | 3 |
| Redirect Examination by Mr. Lovejoy: | 71 |
| Recross-Examination by Mr. Rauworth: | 97 |
| DAVID CLARKE | |
| Direct Examination by Mr. Fumarola: | 108 |
| Cross-Examination by Mr. Lovejoy: | 116 |
| BARRY ENNIS | |
| Direct Examination by Mr. Rauworth: | 125 |
| Cross-Examination by Mr. Lovejoy: | 133 |
| Redirect Examination by Mr. Rauworth: | 142 |
| DENNIS LAYFIELD | |
| Direct Examination by Mr. Rauworth: | 143 |
| Cross-Examination by Mr. Lovejoy: | 158 |

PLAINTIFF'S EXHIBITS

| | |
|---|---|
| 136 - | 63 |

DEFENDANT'S EXHIBITS

| | |
|---|---|
| XX - | 22 |
| ZZ - | 22 |
| JJJ - | 80 |
| RRR - | 15 |
| YYY - | 60 |


_____________________________________

WILLIAM ROBBINS, resumes stand.

THE COURT: Good morning, everyone. Sorry for the late start. The matter preceding this just took a little longer than I expected.

So are you ready to go forward with your continued cross-examination?

MR. RAUWORTH: Yes, indeed, your Honor.

CONTINUATION OF CROSS-EXAMINATION BY MR. RAUWORTH

Q. Good morning, again, Mr. Robbins.

As we finished yesterday, I think we were talking about the scenario of filling of the hull of the boat with water that you had envisioned. Do you recall that?

A. Yes.

Q. All right. And you had described to us that it was your view that water began to enter the boat through the hole in the starboard exhaust hose; is that right?

A. Yes.

Q. And that that had the effect of causing the boat to sink somewhat lower in the water, correct?

A. Yes.

Q. And that at some point, in your view, the process we just described brought the point of the bilge discharge hose, overboard discharge ports, that is

ports -- let me back up.
You identified two openings in the side of the hull, the starboard hull where bilge pumps discharge, correct?
A. Yes.
Q. Those are discharge points for the two bilge pumps that are in the engine room, correct?
A. Yes.
Q. And that you described one of them was the one that was on the witness table yesterday and the other one was the one with the float switch, correct?
A. Yes.
Q. Both of them pumping from the main bilge compartment?
A. Yes.
Q. So as I understand it, your view was that as the boat began to take on some additional depth, those two overboard discharge openings came to be level with the surrounding water; is that right?
A. Yes.
Q. At that point, you believe the water began to back-fill through the pump that was physically here yesterday?
A. Yes.
Q. Now, what I'd like to do is that -- I'm sorry. At

that point, you believe the filling continued but perhaps at somewhat greater rate?
A. Yes. I also wanted to point out that the water back-flowed through the two bilge pumps in the main bilge, not just one but both of them.
Q. In your view, correct?
A. Yes.
Q. That was in your view, because there was no electrical power to the pump with the float switch, correct?
A. Yes.
Q. And had that pump with the float switch had electrical power to it, this scenario would have been avoided?
A. That pump would have operated had it had power.
Q. Right. But you stated in your first report of May 13th, 2005, if that pump had had power the boat would not have sunk?
A. The pump that was not operating would still continue to back flow. There would still be water entering, and only one pump would be operating.
Q. Let's take a moment with that. First of all, you didn't -- I don't believe you described that scenario in your report. Are you thinking that I've got that wrong?

A. No. I'm just responding to your questions now.
Q. Okay. We talked yesterday about the configuration of the pump that had no power to it, the one that's an exhibit in this case. You recall that?
A. Yes.
Q. And that is a -- we talked about the things that would cause water to flow more slowly in back filling than if it were the simple opening, correct?
A. Yes.
Q. All right. Now, the pump with the float switch, if that had had power, that had the ability to discharge out the same size hose as the one that had no power, correct?
A. Yes.
Q. Two separate hoses, true?
A. Yes.
Q. And the rate of back flow through the pump that's an exhibit in no way approximated 1500 gallons per hour, correct?
A. I don't believe so, no.
Q. You haven't calculated that but you don't believe it would be anything like that. So if the pump with the float switch had power, it would have been able to pump out faster than back flow through the pump that's an exhibit, true?

A. Yes.
Q. Okay. And if the pump with the float switch in the engine room hadn't been switched off, then the water that you believe entered in the beginning, before the boat came down on its lines, would have been pumped out to begin with, correct?
A. Yes.
Q. Therefore, the boat would never have sunken up in the water to get to the point of any back flow through any hull opening, correct?
A. Yes.
Q. All right. Now, let's again turn to the scenario that you've stated regarding first flooding through the hole in the exhaust hose and then going on to back flowing through those bilge pump discharges. The initial filling you thought would be just at the rate that could get through that half inch hole, correct?
A. Yes.
Q. And that's relatively slow because there wouldn't be any head behind that water flow, correct?
A. It had some head, it had several inches, maybe six inches of head.
Q. Well, it wouldn't have had six inches of head because it would have to start at the surface, correct?
A. But that point at the muffler, I believe, was

floating below the water line.
Q. You believe the place where the hole in the muffler was floating below the water line six inches?
A. Approximately.
Q. From the point that the vessel was launched?
A. Yes. That's based upon my observation of the way that the vessel sat the day we launched it.
Q. Okay.
THE COURT: You need to take a moment and explain to me what you mean by six inches of head. I don't understand the concept. So you need to ask him some questions that spell that out.
Q. Okay. Let's illustrate it another way. With the overboard discharge points, this is by way of illustration, your Honor, the overboard discharge ports at the point that you hypothesize that they got to the water level and water would be entering, just skimming off the surface, correct?
A. Yes.
Q. And there would be no pressure behind the water, correct?
A. Correct.
Q. Simply gravity tripping over the edge, correct?
A. Correct.
Q. Now, if the sinking then continued to the point

that those discharge ports were a foot below the water surface, are you with me there?
A. Yes.
Q. At that point, in marine parlance one would say that there was a foot of head behind the flow of water into those hoses; is that right?
A. Yes.
THE COURT: All right. I understand the concept. I just didn't understand the term.
MR. RAUWORTH: Sorry.
THE COURT: It's all right. I thought the head was a term for the bathroom.
MR. RAUWORTH: You're absolutely right, your Honor. But you can't trust mariners. They're all kind of slippery. And I'm one of them so I can say that.
Q. At the time that -- well, let me back up. You believe that at the time that the EVEREADY was launched, the hole we've described in the discharge hose sat at a point that was six inches below the level of the outside water?
A. Can you specify when the boat was launched? I'm referring to the time when I was there when the boat was relaunched.
Q. Okay. But we're talking about the scenario that sank the boat?

A. Yes.
Q. So I'm really trying to grasp the parameters of your own opinion about how the boat sank. Are you with me there?
A. Yes.
Q. Am I correct in understanding that at the time that the boat was launched a few days before it sank, she was sitting at a depth in the water such that the hole we've described in the exhaust hose stood at a point six inches below the surface of the outside water?
A. Yes. Approximately.
Q. Okay. Now, that, of course, would be a situation that you would then expect to have applied to the vessel in the season before, correct?
A. I can't render an opinion as to -- or I can't make an approximation of how the boat sat the season before.
Q. Well, you made an approximation as to how the boat sat a couple of weeks before May 3rd, correct?
A. Yes.
Q. All right. So if you've got the capability to do that, then isn't it a natural inference that the depth and the configuration of that boat as of the point that it was launched at the beginning of the spring season would be something like what it was during the previous

boating season?

A. It would be approximate. But there are many variables. There's how much fuel was aboard the boat and how much equipment was aboard the boat, and that changes.

Q. Okay. You've not heard of a fuel load on a boat like this, or equipment changes on a boat like this causing a change in draft of as much as six inches, have you?

A. Again, it would be totally an approximation of how much it would change the draft.

Q. Six inches is a lot of change, correct?

A. Yes, it is.

Q. Okay. On a boat like this?

A. Yes.

Q. That would take a lot of weight?

A. Yes.

Q. It's an amount of weight that you don't have the tools to calculate, correct?

A. Correct.

Q. All right. So you would have no basis to believe that there would be -- that the immersion of this hole that you've told us about would be significantly different in the boating season beforehand?

A. I'm sorry. Could you repeat that again?

Q. I'm going back to your point that the hole in the hose you said was six inches below the water line at the point that events started in this case, that the boat began to sink. Do you have that in mind?
A. If we --
Q. Or is that wrong?
A. I'm sorry. I'm a little confused here. If we could refer back to my -- the exhibit that we had up the other day where I drew the line where the muffler and the exhaust line was.
Q. Well, I'd like to stay with what you just told us. You just told us that at the point that this boat was launched for the beginning of the spring 2005 season, just a few days before it sank, this hole that we've talked about so much stood at a point that there was a six-inch head of water behind it. That's what you told us a moment ago. Are you saying that's not right?
A. No. That's what I believe. It's approximately six inches.
Q. All right. And there's no reason that you have to believe that that would be significantly different during the boating season of 2004, true?
A. No.
Q. All right. And six-inch head under the circumstances would have created a significant and

noticeable flow of water into this boat throughout that season then, correct?
A. Assuming it was occurring during that season, yes.
Q. Okay. And are you suggesting that -- why is it that you draw that distinction? Do think that the hole --
A. Because I don't know when the hole actually came about.
Q. Okay. And therefore, there's no way to tell how early it was capable of being discovered, correct?
A. Yeah. I just don't know when it reached the point where water was leaking through it.
Q. Okay. So assuming that the hole had not just happened, just before this launch in the spring, then that boat would have been taking on a noticeable amount of water with a six-inch head behind a half-square-inch hole, right?
A. Yes.
Q. All right. That's something that would have been coming to people's attention, correct?
A. Yes.
Q. Okay. You never heard anything to that effect from Mr. Picchione or anybody at the yard, correct?
A. I did not.
Q. Well, part of your challenge was to try to figure

out what sank this boat, right?
A. Yes.
Q. And another part of that challenge was to gather all the information that could help you explain how that thing could go down, right?
A. Yes.
Q. All right. So it would be important to know if this boat had had leaking problems in the past, wouldn't it?
A. Yes.
Q. And what we just described would be a pretty significant leaking problem?
A. Yes.
Q. Unlikely to escape the notice, even, of someone like Mr. Picchione?
A. I can't speak for him.
Q. Okay. If there's a significant leaking problem, that's the kind of thing that would come naturally to his attention and probably to the attention of the people that he often turned to for repair work, correct?
A. I can't speak for him, but yes.
Q. You would expect that?
A. Yes.
Q. That's why you would talk to folks like that to

find out about whether there was a leaking history with this boat, correct?
A. Yes.
Q. All right. Whatever the -- I'm going to touch back on something because I had not understood you to say before, just now, that you thought that there was a six-inch head on this hole.
In any event, whatever the positioning vertical of that hole, it's your belief that the water that entered the boat during the course of the sinking was capable of being discharged by that pump that had the float switch in the event it had power, correct?
A. Yes.
Q. And again, that's the only way to explain how the boat stayed afloat the whole weekend and then fairly abruptly sank between Sunday night and Monday morning, correct?
A. I believe so, yes.
Q. Going back, if you will, to the scenario of what happened between Sunday night and Monday morning, because there was no power to that float switch, you believe that slowly, if you will, gained weight by water flowing in to the point that the discharge ports reached the water level, then she went down faster, right?

A. Yes.
Q. What I'm trying to do is get an understanding of what point in that process you believe the scum line was created that you pointed out to us in the painted portion of the hull.
A. Well, as I said, the scum line could have been created over a period of six to eight to ten hours. Just because -- with the boat floating at that approximate level, eventually, it kept going lower and lower and lower, and then it reached a point of no return, so to speak, where the water started flowing continuously, back flowing continuously into the bilge pumps and then the boat went down totally.
Q. Right. But you told us earlier on that you thought that the scum line was created sometime during the course of the sinking process?
A. Yes.
Q. All right. At what point during the course of the sinking process?
A. I can't be any more specific.
Q. In order for the scum line to be created, the boat would have to be --
A. That level.
Q. -- at that level for a significant period of time?
A. Yes.

Q. So when was it during the course of the sinking that the boat decided that it would take a break for six hours, long enough for a scum line to be created, and then to begin sinking again?
A. I believe that the scum line was created, and it was sitting at that level for some time just below the discharge -- the bilge pump discharges.
Q. Why would its level in the water be stable for a period of six hours during the course of a period of about ten hours during which it sank?
A. I can't explain that.
Q. That's a pretty significant difficulty with your view of the significance of the scum line, isn't it?
A. I'm sorry. But I just can't explain it physically.
Q. Okay. Not all boats have scum lines, right?
A. Correct.
Q. And whether a boat has a scum line depends on a number of things about the condition of the water, for starters, correct?
A. Yes.
Q. Whether there are hydrocarbons or marine life like algae in the surrounding waters, correct?
A. Yes.
Q. Also would have a bearing on the extent of the

flow of the water in that particular area, correct?
A. Yes.
Q. There's a very considerable tidal flow in the basin where Point Judith Marina is located, correct?
A. There is but I don't know how to calculate it.
Q. Well, I didn't ask you to calculate it. There is quite a considerable one, correct?
A. There's a normal tidal flow there.
Q. Well, a lot of water moves in and out of there each tidal cycle, correct?
A. Yes.
Q. And that means there's a considerable tidal current that runs past Point Judith Marina during the course of a tide cycle, about 25 hours, correct?
A. Yes.
Q. That changes out the water around the boats in the marina, correct?
A. Yes.
Q. That's a condition that you would expect to be least likely to generate a scum line, correct?
A. Not necessarily. There's still, even though the water is flowing back and forth in different directions, there's still algae and still organic life in the water.
Q. Well, there's organic life in all water, right?

A. Yes.
Q. There's not scum lines on all boats, true?
A. True.
Q. Okay. So in a situation where there is a lot of tidal flow, you would expect it to be less likely that a boat would develop a scum line than a boat that was in a very sheltered area that had very little tidal influence, correct?
A. Possibly, yes.
Q. Okay. You didn't look to see whether the other boats at Point Judith Marina had a scum line, correct?
A. Correct.
Q. Okay. And you didn't do any testing of this scum line to see what it might be, correct?
A. Correct.
Q. All right. You paid bills relating to the -- I'm sorry. You approved for your insurance company client to pay bills for work that was done to raise the EVEREADY after the sinking, correct?
A. Yes.
Q. And there were salvage lift bags used in that process, correct?
A. Yes.
Q. There was people who were doing oil spill containment at the time that the Coast Guard reps and

the DEM reps were around, correct?
A. Yes.
Q. And you approved the payment of that, correct?
A. Yes.
Q. And you know what an oil boom is, correct?
A. Yes.
Q. Oil boom is a device that's meant to float on the top of the water and provide a barrier so the water floating on the top doesn't spread out, correct?
A. Correct.
Q. An oil boom was used around the EVEREADY, according to the billing statements that you saw, correct?
A. Yes.
Q. I gather you weren't there to see the oil boom around the EVEREADY itself, correct?
A. No, I did not.
Q. All right. So when the oil boom was around the EVEREADY, you're not in a position to rule out that there was a lot of scum and petroleum residue inside the oil boom around the EVEREADY, correct?
A. Correct.
Q. In a scenario like that, you'd expect it, correct?
A. I understand there was some oil discharged.
Q. Okay. And the oil that was discharged, if the

people who are doing this spill recovery are successful, is going to tend to be contained, and contained around where the boat is, true?
A. Yes.
Q. Because the boat might be leaking some more oil, correct?
A. Yes.
Q. So the objective of an oil boom is to create a good circle around that boat so the soil doesn't go elsewhere, correct?
A. Yes.
Q. And then remove the oil from the surface of the water?
A. Yes.
Q. So the phenomena of being involved in an oil spill is going to pit organic material, namely hydrocarbons, into the water, on the surface, around a boat like this, correct?
A. Yes.
Q. That is a very likely explanation for the scum line that you illustrated on the photo, correct?
A. It's possible.
Q. It's very likely, isn't it?
A. It's possible.
Q. You're not prepared to say whether that's likely

or not?
MR. RAUWORTH: I withdraw the question.
Q. And under those circumstances, you're not in a position to be confident that the scum line that you illustrated in the photo happened as the boat was on its way down as opposed to when the boat was on its way up, correct?
A. I would have expected to see more. If I can use your scenario, if oil was being entrapped around the boat, I would have expected to see it above the scum line and over the entire topsides.
Q. Part of the process of raising the boat is to capture and do away with as much of the petroleum products as possible, right?
A. Correct. But I would have expected to see it at a higher level. I would have expected to see it around the entire topsides of the boat.
Q. You would expect to see it at a point where the boat rode in the water at a time it was surrounded by an oil boom, correct?
A. Yes.
Q. And you don't know what level the boat was in the water at that time, correct?
A. Correct.
Q. Okay. In your April 2nd letter, you state an

opinion to the effect that the presence of water in a certain part of the EVEREADY, if I may paraphrase, should have caused the people at Point Judith Marina to take action on the assumption that the boat was taking on water, correct?
A. Yes.
Q. All right. And the water that you were referring to was water that was mentioned in the comments on the repair order that Mr. Stroker wrote on the 22nd of April, 2005, correct?
A. Yes.
Q. That's something that Mr. Lovejoy showed you during your direct testimony?
A. Yes.
Q. Now, the water in question is water that was described as being in the aft bilge, correct?
A. Yes.
Q. And this was at a moment when the boat was essentially in transition from having been in winter storage to going to its summer location in its slip, correct?
A. Yes.
MR. RAUWORTH: If I may approach the witness, your Honor? I'm going to hand him a copy of what's in evidence in full as Plaintiff's Exhibit 6. This is the

repair order.
THE COURT: That's fine.
Q. Can you find that entry about the rear bilge on there? I think it's the second or third line.
A. Yes.
Q. Okay. It says, "Pump rear bilge - full of water," right?
A. Yes.
Q. And that's, if you will, at the top of the various tasks that Mr. Stroker described that he did, correct?
A. Yes.
Q. Okay. And this is -- well, first of all, upon finding a boat that had a section of its bilge with water in it, it would be appropriate for a marina technician to get rid of that water, correct?
A. Yes.
Q. And that's fairly common in this industry, right?
A. Yes.
Q. All right. But as I understand it, you take the presence of that water as something that would say to a marina, in effect, oh, we may have a boat that's leaking here, right?
A. Yes.
Q. All right. And in order for the existence of water in the boat to indicate leaking from the sea, the

boat would need to have been in the water at the time that the water in the bilge accumulated, that is, been afloat when the water in the bilge accumulated, correct?
A. Yes.
Q. All right. You don't know if that is correct, right?
A. I'm sorry. I don't know if what is correct?
Q. As to the EVEREADY, on or about May 22nd, 2005, the water that Mr. Stroker notes as having pumped out there, you don't know whether that is water that came into the boat after it was launched right around that time, correct?
A. That's correct.
Q. Okay.
MR. RAUWORTH: Your Honor, if I may approach the witness again? I'm going to be bringing him Exhibit Triple R marked in that form for ID at this time.
Q. All right, sir. About -- I guess it was exactly three weeks ago you and I first met when we had your deposition in our offices on this case, correct?
A. Yes.
Q. And after we finished the deposition, you and I and Mr. Lovejoy went to the EVEREADY down at Certified Sales in Warwick, correct?

A. Yes.
Q. And there we met Mr. Layfield, true?
A. Yes.
Q. And we went aboard the EVEREADY and we opened up areas of the cockpit, correct?
A. Yes.
Q. And we looked in the cockpit, and at least he and I, and I assume you took some pictures that day, correct?
A. Yes.
Q. Okay. This is a view of the aft bilge with the cockpit open of the EVEREADY on that day when we went there, isn't it?
A. I believe so, yes.
Q. Okay. Do you remember when we opened the cockpit that there was an area just under the cockpit that was full of water, correct?
A. Yes.
Q. All right. And that's an area that conforms to the description in Exhibit 6 that Mr. Stroker wrote, correct?
A. Yes.
Q. In fact, that's an area that extends back to the transom, correct?
A. Yes.

Q. And it's roughly a square or triangular as we see here, correct?
A. Yes.
Q. And in that area on that day, we found water accumulated as is illustrated here, correct?
A. Yes.
MR. RAUWORTH: Your Honor, I would move the admission in full of Exhibit Triple R.
THE COURT: Any objection?
MR. LOVEJOY: No objection, your Honor.
THE COURT: Triple R will be full.
(Defendant's Exhibit RRR admitted full.)
Q. Actually, I omitted to mention that Mr. Lovejoy was with us that day, correct?
A. Yes.
Q. Now, at the time that we went there three weeks ago, the boat had been sitting on the hard, as we've said, at Certified Sales for about six months, correct?
A. Yes.
Q. And that means on stands, on land, correct?
A. Yes.
Q. And the last occasion that it had been in contact with salt water was the day in which you and Mr. Pfund were involved in doing a test launch of it on a Brownell trailer, correct?

A. Yes.
Q. And that's the day that we've heard discussed when you first saw behind the fuel tanks and saw the cut in the hose, correct?
A. Yes. That was in October of 2007.
Q. October 17th or 18th, approximately?
A. Yes.
Q. All right. So from that time, the boat had not been in contact with salt water, correct?
A. Correct.
Q. And when we went aboard her on April 23rd, we discovered what you see here in Triple R?
A. Yes.
Q. In your experience as a marine surveyor, the best explanation for the presence of this water is rain water, correct?
A. Yes. Rain and snow, yes.
Q. Okay. And this area -- well, let me actually describe this a little bit. You see where Mr. Layfield's foot is in the upper right portion of the photo?
A. Yes.
Q. There's a structure that appears to be kind of gray that runs horizontally across the frame to the left of his foot. Do you see that?

A. Yes.
Q. That actually is a -- I'm sorry. That's the aft end of where the generator sits?
A. Yes. That's a stringer, which is part of the structural frame of the boat.
Q. Okay. Then there's -- the thing that Mr. Layfield is standing on, where you can see his foot there, that's a fore and aft structure, correct?
A. The one at the top is fore and aft. The one that's vertical would be side to side.
Q. Okay. Maybe I misunderstood the orientation. So in your recollection, Mr. Layfield's foot is pointing to starboard, to the right side of the boat?
A. I believe it was pointing to port, but to be perfectly honest with you, I don't recall.
Q. All right. Well, we don't need to be too refined about that. The bottom line is the structure I was pointing out to you before that runs across the top of the frame, you reckon that that is a fore and aft structural member?
A. Yes.
Q. Some people call it a bearer, B-E-A-R-E-R, to bear the weight of the engines?
A. Yes.
Q. So it's one of the major structural pieces of the

boat that helps it be rigid, if you will?
A. Yes.
Q. Kind of like heavy components in the frame of a car, correct?
A. Yes.
Q. Now, there would be another one like the one close to Mr. Layfield's foot except it would be just to the bottom of the frame, correct?
A. Yes.
Q. So those components that we show here in the picture define a little basin there?
A. Yes.
Q. All right. If water were entering this boat from the cut -- I'm sorry, the hole in the exhaust hose, it would have to enter the right side of the lazaret, move across the boat, and then basically go up and over one of these stringer members to get into this place where we see the water accumulated here, correct?
A. Yes.
Q. Water typically does not do that, right?
A. Correct.
Q. Okay. So you can be confident that water that you would see accumulated in this portion of the bilge has nothing to do with water that could have entered through the holes in the hose, correct?

A. Yes.
Q. Therefore, the water reported by Mr. Stroker on Exhibit 6 really has no kind of alarm value, if you will, with respect to the condition that you believe sunk the boat, correct?
A. Correct.
Q. All right. All right. And it would be perfectly appropriate boatyard practice for someone in Mr. Stroker's position, as he's encountering a boat fresh off the winter storage season, to pump out an area like this aft bilge in Triple R and to assure himself that the boat was not -- didn't see water flowing into it anywhere else, correct?
A. Yes.
Q. And then to keep an eye on those spaces as he worked throughout the day, correct?
A. Yes.
Q. And if he did not see other water accumulating, that would be a good indication to you as a marine professional that the boat was not taking on water, correct?
A. Correct.
Q. All right. And you have no information to contradict the notion that Mr. Stroker did just that?
A. Correct.

Q. So as far as you know, he did the right thing in those regards, vis-a-vis the work surrounding the launch of this vessel?
A. Yes.
Q. Okay. In fact, water that might come into the boat in the lazaret area of it would flow into the well of the bilge to the engine room, correct?
A. There's a bulkhead in between it.
Q. Right. But it's not a watertight bulkhead, is it?
A. I'm not sure.
Q. Okay. You saw water collecting in the area of the shaft log, that was your first indication that led you eventually to pointing at the hole in the hose. And those shaft logs are visible and accessible from the engine room, correct?
A. Yes.
Q. So for water to get to a point that you could see it from the engine room, there had to be a path for that water to get into the engine room itself, correct?
A. Yes.
Q. So once again, water that could enter vis-a-vis the hole in this exhaust hose would naturally make its way where it could be picked up by the pump in the engine room that had the float switch, correct?
A. Yes.

Q. The one that Mr. Stroker described as having confirmed the activation of, correct?
A. Yes.
Q. The area where we see the water in Exhibit Triple R --
A. Yes.
Q. -- if that area on a boat like this were full, do you think you would be able to detect a change in the immersion of the boat?
A. This is a fairly -- the picture really doesn't give a perspective but this is a fairly large area, maybe three feet, four feet square. And with this amount of water, it could change the attitude of the boat.
Q. It wouldn't amount to more than let's say four cubic feet, correct?
A. Well, if it was three-by-three, it would be nine feet.
Q. Okay. Say nine cubic feet. A cubic foot of sea water is about 35 pounds, correct?
A. I believe, yes, approximately.
Q. So we're talking about a weight in the order of magnitude of 300 pounds, correct?
A. Yes.
Q. That's the weight of a healthy friend, right?

A. Yes.
Q. Okay. And this boat is designed to handle a number of healthy friends, correct?
A. Yes.
Q. Going back to the work on October 17th, the last year at Certified Sales, the time when the boat was test launched off of a Brownell trailer, correct?
A. Yes.
Q. As opposed to the Travel Lift where it was done on May 3rd of 2005?
A. Yes.
Q. At the time of that launch, one of your charges was to consider the significance of, or to determine, I guess, the condition and significance of a particular hose that fed one of the air-conditioning units, correct?
A. Yes.
Q. All right. That was a hose that was designed to accept -- to draw sea water from almost the very bottom of the boat and feed it into that air-conditioning system to basically take away heat, correct?
A. Yes.
Q. So there was a thru-hull fitting that connected to that hose, correct?
A. Yes.

Q. And am I recalling correctly that there was a valve on the thru-hull fitting?
A. Yes.
Q. And, so one of the reasons that you wanted to look into that, wanted to do the launch, in fact, was to see what was up with that particular hose, could it have contributed to the sinking, correct?
A. Yes.
Q. And one of the reasons for that is that surveyors had found some reason to call into question the condition of the hose we've just been describing?
MR. RAUWORTH: This is yet a new hose, your Honor. This one serves the air-conditioning unit.
Q. On a previous visit, correct?
A. Yes.
Q. And that visit was on June 25th, 2007, right?
A. I believe so. I wasn't present at the time.
Q. That's right. You were not there. Actually, you were writing a report to Mr. Lovejoy that day, correct? You've got a report dated June 25th, 2007, correct?
A. Maybe. Possibly, yes.
Q. Well, we can deal with it from other witnesses, but you learned that some surveyors related to this case visited the boat that day, correct?
A. Yes.

Q. In fact, when you did the test launch in October, you met with Kevin Clarke, correct?
A. Yes.
Q. And he had been there that day, correct?
A. Yes.
Q. Or at least he told you that?
A. Yes.
Q. All right. And he had told you about the circumstances that brought that hose to his attention, correct?
A. Yes.
Q. That was that in looking around -- let me back up. Your understanding was the June visit of 2007 was Mr. Clarke's first time onboard, correct?
A. To the best of my knowledge, yes.
Q. That's what you understood from him, correct?
A. Yes.
Q. So he recounted to you that he had gone aboard the boat that day, looked around, and discovered a knife in the bilges of the boat, correct?
A. Yes.
Q. Now, he also discovered some conditions of the hose that made him concerned that -- this is the air-conditioning hose now, that the air-conditioning hose might have been cut or otherwise damaged, correct?

A. Yes.
Q. All right. And so one of the objectives of the October gathering was to look into that situation, correct?
A. Yes.
Q. Now, you had a look at that air-conditioning hose, correct?
A. Yes.
Q. And you looked at it to sort of understand what it looked like, correct?
A. Yes.
Q. You didn't take it out of the boat, correct?
A. No.
Q. You never tested it, correct?
A. No.
Q. You never, if you will, probed it or closely examined it to determine whether its integrity had been breached, correct?
A. Other than just a close visual inspection, no.
Q. Okay. What you had in mind to do that day was to look into the situation about that hose another way, correct?
A. Yes.
Q. And that is by letting the boat float and seeing what happened?

A. Yes.
Q. All right. And so you did that on that day, correct?
A. Yes.
Q. You eased the boat in the water, or someone did for you, off of the Brownell trailer, until she was fully in the water and someone took a good picture of all you guys on board the swim platform, correct?
A. Yes.
Q. And my understanding from the various reports is that there was not a significant amount of water, in your view, coming in through that hole in the exhaust hose, correct?
A. There was none.
Q. Okay. You didn't detect any water there that was coming out of that exhaust -- I'm sorry, not exhaust hose. Let me not confuse that. Air-conditioning hose?
A. Yes. We opened the valve, and there was no significant water that leaked through that hose.
Q. Okay. So whatever leaked was only insignificant?
A. Yes.
Q. Now, for the reason you just described, you turned your attention away from that particular report, if you will, as an explainer of what happened with this boat?
A. Yes.

Q. Now, let me take you back to the point that before you actually did the launch that day. Somebody else made arrangements to get the EVEREADY onto the Brownell trailer?
A. Yes.
Q. And were you there when it was put onto the Brownell trailer?
A. Yes, I believe so. Yes.
Q. And then it went around to the ramp and eased the boat in the water?
A. Right.
Q. All right. Neither you nor Mr. Pfund went under the boat before it was, or under the EVEREADY, before it was launched, correct?
A. Yes.
Q. I'm sorry? You're agreeing with me?
A. Yes.
Q. And nobody took any steps to examine the condition of the exterior side of the thru-hull fitting that served the hose we've just been talking about, the air-conditioning hose, correct?
A. After launching, we did, but not prior to the launching.
Q. What did you do?
A. After the launching?

Q. Yes.
A. After the boat was back out of the water, we probed it to make sure there was no barnacles or any marine life in it that may have been blocking it. Mr. Clarke did that, and I was there with him.
Q. You inserted a probe?
A. Yes.
Q. Okay. Now, let me take you back to a little earlier, the time of the launch on May 3rd. May 3rd, 2005 was the occasion when you first detected a flow of water into the boat, correct?
A. Yes.
Q. And for that to happen, the boat was -- the EVEREADY was placed in the water by the use of a Travel Lift at Point Judith, correct?
A. Yes.
Q. You were there along with Mr. Layfield, correct?
A. Yes.
Q. Mr. Vivenzio was around?
A. Yes.
Q. No other surveyors, though, correct?
A. No.
Q. And no pesky lawyers, right?
A. No, that's right.
Q. That was earlier in the game. And your objective

there was to have an opportunity to see how this boat reacted once it was in sea water, correct?
A. Yes.
Q. All right. Now, during the -- strike that. Let me get some photos to work with.
THE COURT: How much longer do you think you have?
MR. RAUWORTH: I'd say 20 minutes.
THE COURT: I think I asked you yesterday and you said about a half hour. It's been about an hour now. You need to speed things up. You're spending a lot of time than necessary on these points.
Q. I'm putting before you, Mr. Robbins, Exhibit Double X for ID. That's a photo taken that day, correct?
A. Yes.
Q. Is Mr. Layfield in the photo?
A. Yes.
MR. RAUWORTH: Move the admission, your Honor, of Exhibit Double X.
THE COURT: Any objection?
MR. LOVEJOY: Yes, your Honor. This is a post-sinking photograph taken in October of 2007. Mr. Rauworth has already asked the witness the condition of the tanks that were removed. It's not

going to represent how it sat in 2005.
Q. Let me ask another question. Mr. Robbins, this photo was taken on May 3rd, 2005 when you and Mr. Layfield were aboard the boat when it was put in the water at Point Judith, correct?
A. Yes.
Q. That was within two weeks of that sinking, correct?
A. Yes.
MR. LOVEJOY: I have no objection, your Honor.
THE COURT: XX is full.
(Defendant's Exhibit XX admitted full.)
Q. Mr. Robbins, Exhibit ZZ for identification, it's another photo taken that day, correct?
A. Yes.
Q. Shows the starboard side of the EVEREADY?
A. Yes.
Q. Alongside the pilings?
MR. LOVEJOY: May I see those?
THE COURT: Any objection?
MR. LOVEJOY: No your Honor.
THE COURT: ZZ will be full.
(Defendant's Exhibit ZZ admitted full.)
MR. RAUWORTH: Thank you, your Honor.
Q. In this photo, Mr. Robbins, you can see here the

two openings that you've described as bilge discharge openings?
A. Yes.
Q. Okay. Exhibit YY, Yankee, Yankee, is another photo taken that day?
A. Yes.
Q. That depicts the starboard corner, aft starboard corner of the EVEREADY on May 3rd?
A. Yes.
MR. LOVEJOY: Your Honor, I have no objection, but I'd like to point out to the Court that this photo is already an exhibit in the trial.
THE COURT: If it's already in evidence, it's in evidence.
MR. RAUWORTH: Right.
Q. Now, on the occasion of this launch, your objective was to try to identify sources of water coming into the hull, correct?
A. Yes.
Q. And you saw, at some point in the day, water that was entering from a location you couldn't determine, correct?
A. Yes.
Q. And in the process of trying to investigate the situation, you had some assistance from the Travel

Lift, correct?
A. Yes.
Q. In fact, the Travel Lift was operated in such a way as to cause the boat to be tilted at one point in one direction, correct?
A. Yes.
Q. And at one point in another direction, correct?
A. Yes.
Q. And you all were looking to see if that -- if any of those maneuvers would cause something to change in terms of the buoyancy of the boat, correct?
A. Yes.
Q. So it was on this occasion that you saw this stream of water we talked about before, yes?
A. Yes.
Q. Okay. And it is possible that that -- strike that. That stream of water was not continuous and uniform, correct?
A. Correct. To the best of my knowledge, yes, that's correct.
Q. So you can't rule out that the stream of water entered the boat at a time that it was artificially rolled to starboard by the Travel Lift, correct?
A. Yes. Correct.
Q. All right. In the Exhibit YY that's on the

screen, this is what you -- the image you used before to point out that the exhaust discharge ports are below the water line?
A. Yes.
Q. And it is what you saw this day in this image that forms your conclusions about how the boat was sitting before she began to sink, correct?
A. Yes.
Q. And on this occasion, you were looking at a boat that had recently gained a considerable amount of weight, correct?
A. I'm not sure what you mean by that.
Q. Well, the EVEREADY on May 3rd, 2005, had sunk and spent a number of hours on the bottom before it was taken out for a brief storage before this relaunch less than two weeks later, correct?
A. Yes.
Q. In fact, as a result of that phenomenon, you observed water coming -- wet spots on the hull, correct?
A. Yes.
Q. That indicates the presence of water in the hull, correct?
A. Yes.
Q. All right. And it would be natural, in your

experience, that when a boat has been sunk and its deck immersed as happened to the EVEREADY on this occasion, that its hull would take water into the core of the boat, correct?
A. It's possible. It could have.
Q. It's certainly something that you would want to consider, correct?
A. Yes.
Q. And that additional weight has the result of causing the boat to sit lower in the water than it normally would, correct?
A. There's no way to calculate that weight, though.
Q. Fair enough. At least you didn't have that capability available to you, apparently. So you didn't undertake to do that, correct?
A. I didn't think it was significant.
Q. You didn't have a basis to tell whether it was significant or not, true?
A. Based on my prior experience and how I relaunched boats in the past for sinkings, generally, I don't take that into consideration because it's whatever weight is -- whatever little water may be remaining in there is not significant.
Q. Well, it was significant enough to be seen coming out of the hull, correct?

A. It was a small amount of water that was leaking out. A very small amount.
Q. You have no way to determine how much weight was involved and added to the EVEREADY by the time she was launched here, correct?
A. No.
Q. So your views about how that boat rode on the night before she sank are dependent on your assessment related to this photo, Exhibit YY, Double Y?
A. Yes.
Q. Okay. And if she wasn't riding that way before she sank, that would have an effect on your confidence in your opinions, correct?
A. Yes.
Q. Placing before you Exhibit 131, that's the core that was taken out of the boat, Mr. Robbins, correct?
A. Yes.
Q. Okay. When Mr. Lovejoy was asking you questions, you indicated that that core didn't reflect any rot, correct?
A. Yes.
Q. Nevertheless, you and Mr. Pfund came to the conclusion in your own examinations that the core of the boat was saturated with water, correct?
A. We came to the conclusion that there was some

water in the core.
Q. You used the word "saturated," did you not?
I'll move to another question.
MR. RAUWORTH: Your Honor, I'd like to use the drawing boards on the side, and obviously I won't have the microphone available.
THE COURT: We have a microphone. Are you drawing or the witness?
MR. RAUWORTH: We may do some of each. I was going to start out drawing.
THE COURT: I don't want you drawing pictures. If you want the witness to draw something, he can draw it.
MR. RAUWORTH: I was hoping to do that in the interest of time, but --
THE COURT: It's you testifying. I'm not going to have you testifying.
MR. RAUWORTH: It was to illustrate my question.
THE COURT: Tell me what it is you want to do.
MR. RAUWORTH: I want to sketch out what I believe he has testified to about the orientation and the various elevations in the exhaust system, and then ask him questions to confirm that that is what he said.
THE COURT: Have him do it. Then it's his testimony, not yours.

MR. RAUWORTH: Okay.
Q. Mr. Robbins, can you take this blue pen and draw us a line that reflects the chine of the EVEREADY on the starboard side so that you've got the ability to show both the exhaust port -- I would start a little lower if you wouldn't mind so you've got room to work above there.
A. I'll draw the transom. There is the chine.
Q. Can you carry that forward so you've got enough room to illustrate the bulkhead between the lazaret and the engine room?
A. This is not to scale, obviously.
Q. I would suggest you change the scale to make that a little further to the right so there's room to illustrate things. You can let the bow hang off the paper. First of all, why don't you put a circle that represents the location of the exhaust port. We're looking at the starboard side here, correct?
A. Yes.
Q. And then for scaling purposes, if you could put your illustration of the engine room bulkhead fairly far to the right in the picture just so we have enough room to work.
A. Far forward?
Q. Yes, please. And then can you give us an

illustration of the exhaust system as it passes through that engine room bulkhead and goes to the exhaust port. We understand this is a sketch.
A. This is the muffler over here. I'll fill this in. This is the hose.
Q. That's okay. Can you just label the muffler, please. Great. Then put an indicator on the top of that bulkhead, just "B" for bulkhead. Why don't you do that. And maybe carry the hose a little further to reflect where it enters the engine. That's good. That's great.
Now, the whole run of the exhaust system, except for the muffler in this lazaret area, is in this particular single section of hose that we've been talking about, correct?
A. Yes.
Q. The point where the hole was found was at the point where the hose passes through the bulkhead, correct?
A. Yes.
Q. All right. Now, there has never been a time that you personally have observed that exhaust system fully assembled, correct?
A. Yes. That's correct.
Q. All right. You saw it disassembled in October of

2007, correct?
A. Yes.
Q. And you saw it disassembled three weeks ago today on April 24th, correct?
A. Yes.
Q. All right. There's never been a time when you have had the exhaust system in view when the boat has been in the water, correct, the assembled exhaust system in view when the boat has been in the water, correct?
A. Yes. That's correct.
Q. When the boat was launched in May of 2005, all of what you've illustrated was invisible by reason of the fuel tanks, true?
A. The outside of the boat was visible and also the very aft end where the muffler was, was visible.
Q. My apologies. So the muffler was visible to you in May of 2005 but the run of the exhaust hose was not, correct?
A. Yes.
Q. Okay. When you did the float test in October, it was impossible for water to enter the boat from the location of the exhaust port, correct?
A. Yes.
Q. You're agreeing?

A. Repeat the question. I want to make sure.
Q. Sure. At the time of the float test at Certified Sales in October of 2007, the starboard exhaust port was taped over, correct?
A. Yes. That's correct.
Q. So no water could enter the boat that way, correct?
A. Correct.
Q. All right. Now, you told us yesterday that you had set up the disassembled hose in the lazaret before doing a test on it, correct?
A. Yes.
Q. Okay. And you set it up in a way that -- well, you determined, basically, how its path went, correct?
A. I leveled it so that it was horizontal with the chine.
Q. Okay. And when you performed this particular work, you're doing it so that you could make arrangements to pour water into the end of the hose, correct?
A. Yes.
Q. All right. Now, the water test that you're talking about is something that took place when the boat was back up on the trailer and out of the water, correct?

A. Yes.
Q. Okay. So --
A. Yes. It was back on the hard. It was not on the trailer. It was blocked on the hard.
Q. Okay. I'm going to let you take your seat for a moment.
You believe that the -- in fact, you testified that the point where the hose went through the bulkhead was six inches above the exhaust port, correct?
A. I believe I was asked that in my deposition, and I approximated that.
Q. Okay. So that means that the hose runs down from forward to aft, correct?
A. I was asked to approximate that, and I was incorrect.
Q. Well, the hose does run down from forward to aft, correct?
A. Yes.
Q. Okay. Yet in your test, you place it level with the chine, correct?
A. It runs fore and aft.
Q. Of course it runs fore and aft. The point is, it runs down as it runs from forward to aft?
A. No, it does not. It runs level with the chine. I was incorrect when I was asked to approximate it in my

deposition.

MR. RAUWORTH: Your Honor, if I may, I'll give you the witness's deposition. Page 104, counsel.

THE COURT: Could you pass up the copy of the deposition.

MR. RAUWORTH: I'm about to bring it to your Honor. This will be page 104, lines 15 to 23.

May I proceed, your Honor?

THE COURT: Yes. You can read lines 15 to 23.

Q. Can you see the screen okay, Mr. Robbins?

A. Yes. I'm not sure which lines you're at.

Q. It's the top right panel, and it's lines 15 to 23 where you see the yellow highlight.

A. Yes.

Q. (Reading:)

Question: Okay. Now, sir, in relation to the waterline, the normal waterline of the vessel, the bottom of that exhaust hose, that six- or eight-inch hose, that opening, is that above or below the water line?

Where it begins at the elbow it's, I believe, it's above the waterline. As it goes further aft towards the back end of the boat where it discharges, it drops in height.

Did I read that correctly, sir?

A. Yes.
Q. That was your testimony three weeks ago, correct?
A. Yes.
Q. And that was information based on application of your best professional skills, correct?
A. Yes.
Q. And do I understand you now to be stating that that is not correct?
A. That's correct.
Q. There has not been any supplemental or updated disclosure of your expert opinion that you participated in, correct?
A. No.
Q. Okay. Now --
MR. RAUWORTH: If I may, your Honor, page 108, lines 17 through page 109, line 6.
THE COURT: That's not inconsistent with the last answer. You can ask him a question about that.
Q. A little earlier you told us, Mr. Robbins, that you disagreed with the statement that the point of passing through the bulkhead was six inches above the exhaust port. Did I hear that correctly?
MR. LOVEJOY: Your Honor, I'm going to object. The testimony is talking about an elbow, not about where it passes through the bulkhead.

THE COURT: He's not referring to the deposition at the moment because I told him he cannot. He can ask him a new question.

MR. RAUWORTH: Sure. Let me do that.

Q. Pointing to the level where the hose comes through the bulkhead, I'll extend this here --

THE COURT: I told you I didn't want you writing on the board.

MR. RAUWORTH: I apologize, your Honor. I'm trying to illustrate it so it would be clearer to the witness.

Q. So from the point where the hose passes through the bulkhead, could you just point that out with your finger, please? All right. And the bottom of it. And that level is approximately six inches above the point where the bottom of the hose attaches to the discharge port, isn't it?

MR. LOVEJOY: I don't understand what he's referring to.

THE COURT: Do you understand the question?

THE WITNESS: Your Honor, when I was in my deposition, I was asked these questions, and to be perfectly frank --

THE COURT: No. The way this works is this, you're on the stand. You're not being asked about what

you did in your deposition. If you say something inconsistent with what you said in your deposition, counsel has a right to introduce what you said in your deposition. I will then assess all of that. All right? And Mr. Lovejoy will have a chance to address any inconsistencies on his redirect examination. For now, you need to just answer whatever question is put to you.

THE WITNESS: Yes, sir.

THE COURT: So do you want to ask your question again, please.

MR. RAUWORTH: Sure.

Q. The point where this hose passes through the engine room bulkhead -- the point where this hose, where the bottom of this hose passes through the engine room bulkhead is approximately six inches above the bottom of the exhaust discharge port, isn't it?

A. No. I believe it's quite -- it's almost at the same elevation.

MR. RAUWORTH: If I may proceed with the deposition, your Honor?

THE COURT: Yes.

Q. All right. Sir, on the screen in front of you, at the upper right-hand panel, as you can see it on your screen, line 17 through the panel below it, line 6,

reading:
Question: And you told me that the thru-hull opening was below the opening in the bulkhead, correct?
I believe so, yes.
What's the vertical difference between the thru-hull fitting and the opening in the bulkhead?
Answer: I don't know. I didn't measure it.
Question: You didn't measure it?
No.
What's your best estimate? Are we talking about an inch, three feet? What are we talking about?
Six inches, maybe.
Question: Six inches?
Answer: Maybe. I'm approximating.
Did I read that correctly, sir?
A. Yes.
Q. Now, you've come to have a change of view about these dimensions, did I understand that correctly?
A. Yes.
Q. You have not made any arrangements to provide a supplementation to your expert witness statement that clarifies that you now believe that this hose runs level with the chine, correct?
A. Correct.
Q. As a matter of fact, none of your expert

disclosure statements contains any disclosure regarding the comparative heights of different parts of this hose, do they?
A. That's correct.
Q. When you were testifying under questioning by Mr. Lovejoy, I think you said that you measured a distance from the bottom of the hose as it came through the bulkhead down to the bottom of the hull of the boat turns the chine, correct?
A. Yes. We did that after the deposition.
Q. And that measurement was not disclosed in any disclosure report, correct?
A. Correct.
Q. That happened after Mr. Layfield and I left the boat three weeks ago, correct?
A. Yes.
Q. And then you determined the height of the bottom of the exhaust port by measuring the exhaust port bottom lip down to the chine from a position -- we don't have the photo here, but basically from outside the boat?
A. Yes.
Q. Okay. So that's how you made a comparison of their relative positions; is that right?
A. Yes.

Q. Those don't account for the thickness of the boat, do they?
A. I'm not sure what you mean by the thickness of the boat.
Q. There's a thickness of the hull of the boat, correct?
A. Yes.
Q. So you measured from the inside of the hull of the boat when you were talking about the location up forward, and you measured from the outside of the boat to the turn of the chine as to the aft location where the exhaust exits, true?
A. Yes. I measured from approximately the same angle of the chine.
Q. Right. But you did not account for, your calculations did not account for the thickness of the hull of the boat, correct?
A. Correct.
Q. That would have been professionally appropriate to do, correct?
A. Yes.
Q. When I asked you in your deposition had you made any measurements with respect to your testimony in this case, you told me that the only measurements you had made were with respect to the level of the bilge

overboard discharges, correct?
A. Yes.
Q. Right. Now, when you did your test with pouring the water into the exhaust hose, the exhaust hose was supported in a way that you had determined, correct?
A. Yes.
Q. And it was not in its, if you will, installed natural configuration, correct?
A. Yes.
Q. All right. And you set that hose up in a way that was level with the horizontal, correct?
A. I set it up in a way that was parallel to the chine.
Q. Well --
A. As shown in this diagram.
Q. You actually set it up level with the horizontal, didn't you?
A. I'm sorry?
Q. You arranged the hose so that it was level with the horizontal, correct?
A. With the chine.
MR. RAUWORTH: If I may, your Honor, page 117, lines 16 through 25.
THE COURT: Fine. You may read it.
Q. Are you able to see that okay, Mr. Robbins, above

my finger?
A. Yes.
Q. From page 117, line 16. (Reading:)
Question: Tell me what you did.
Answer: We had a couple of buckets, several gallon buckets, utility buckets, and we got a hose and we filled them up, and I went to the aft end of the exhaust line and we leveled and it --
Question: Leveled the boat?
Answer: Leveled the exhaust line.
Question: Oh, leveled the exhaust line, okay. So that the line is totally horizontal, right?
Answer: Correct.
Did I read that correctly, sir?
A. Yes.
Q. Now, when you performed this water pouring test, and I'm sorry if I've confused this a little bit, the EVEREADY was back on a Brownell trailer up on land, correct?
A. It was off the trailer. It had been blocked on land.
Q. But it was no longer afloat, correct?
A. Correct.
Q. All right. So you didn't determine whether its -- strike that. Let me back up. Are you familiar with

the word "trim?"
A. Yes.
Q. Trim is a word that describes the tendency -- the extent to which a boat is somewhat heavier in the forward end or the after end, correct?
A. Yes.
Q. So we use the term "trim by the bow" to talk about a boat that is deeper in the bow, and "trim by the stern" we talk about a boat that's a little bit deeper in the stern, correct?
A. Yes.
Q. So you can either measure or determine the trim of any boat as it sits, correct?
A. Yes.
Q. And the -- strike that. Let me back up. As the boat sat on jack stands at Certified Sales, when you did this test, you didn't determine anything to tell that it was in a trim that compared to how it had just been floating, correct?
A. Correct.
Q. And you didn't determine anything -- you didn't do anything to determine what sort of trim it had with respect to the way it floated, for example, in May of 2003, correct?
A. Correct.

Q. Or how it floated at the point that it was launched, correct?
A. Correct.
Q. All right. The boot stripe of this vessel is white, correct?
A. Yes.
Q. Separating green and dark red areas of paint, correct?
A. Yes.
Q. The boot stripe is closer to the chine in the aft end of the boat than it is further forward, correct?
A. Yes.
Q. Okay. You didn't do anything to allow for that in your measurements, correct?
A. Correct.
MR. RAUWORTH: Your Honor, in light of the non-disclosure of this testimony, I would move that the testimony relating to this whole determination of the orientation of the exhaust hose and the test, and so forth, be stricken.
THE COURT: Why did you ask him all those questions if you wanted to move to strike it? You just spent 15 minutes on this. So it's overruled.
Q. All right. Sir, talk about the ABCC standards -- ABYC standards, I'm sorry.

A. Yes.
Q. Those are standards put out by a private organization, correct?
A. Yes.
Q. They are recommendations to manufacturers, correct?
A. Yes.
Q. And they're not binding on anybody, correct?
A. Correct.
Q. There's a number of manufacturers that don't use them, correct?
A. I'm not aware of that.
Q. You're familiar with the brand of Cape Dory?
A. Yes, they're no longer in business.
Q. Okay. But Cape Dory built boats that did not use anti-siphon loops on their bilge lines, correct?
A. I can't speak for that.
Q. You couldn't rule out as much as 49 percent of the recreational fleet does not use anti-siphon loops on those bilge lines?
MR. LOVEJOY: Objection.
THE COURT: One at a time. What's the objection?
MR. LOVEJOY: Mr. Rauworth is now testifying.
THE COURT: He can ask him if he agrees with

that fact or doesn't, or doesn't know. He's not testifying. It's only if the witness agrees with him.

Q. You couldn't rule out that as much as 49 percent of the recreational fleet has bilge lines that do not include an anti-siphon loop, true?

A. That's correct.

THE COURT: Wait a second. What's important is what you know. Do you know that to be true or not?

THE WITNESS: I don't, your Honor.

THE COURT: Do you know how much of the recreational fleet of boats have anti-siphon lines or do not have them?

THE WITNESS: No, I don't.

THE COURT: All right. Thank you.

Q. You testified you've been the manager of a marina for some time?

A. Yes.

Q. And in the course of that work, your operation has from time to time installed an anti-siphon loop in an overboard discharge line?

A. I personally did not do that, but I oversaw people that did that.

Q. Okay. So when you were doing that, when that was your profession, you were familiar with the phenomenon?

A. Yes.

Q. In your professional career, you've, let's say running a marina, you've worked on boats that did not have anti-siphon loops in their overboard discharge lines, correct?
A. Yes.
Q. And you didn't change out all of those discharge lines, did you, to have anti-siphon loops?
A. I didn't have occasion to do that.
Q. You didn't tell each and every one of those customers that they needed to change them to have anti-siphon loops, did you?
A. It was quite a long time ago, but I may have advised them to change them, yes.
Q. You didn't do it for every single one, did you?
A. If I saw a condition that was problematic, I would, yes.
Q. I'm asking you about anti-siphon loops. I'm asking you about boats that had their bilge discharge set up by the manufacturer without that. Do you follow me there?
A. I think so.
Q. Okay. You've indicated that you're aware that some manufacturers build boats without anti-siphon loops, correct?
A. Yes.

Q. And you've worked on some of those, correct?
A. Yes.
Q. So the existence of that has come to your attention when you were a marina manager, correct?
A. Yes.
Q. You didn't go to each and every one of your clients who had such a boat and tell them that they needed to change the original manufacturer's configuration to have an anti-siphon loop, did you?
A. I don't believe so, no.
Q. You've had occasion of running a marina to install replacement bilge pumps on boats where there was no anti-siphon loop, correct?
A. Again, I didn't do it personally. I had people that would do it for me.
Q. When your people were doing that, you did not insist that your people on every occasion change out the discharge lines so as to install an anti-siphon loop, correct?
A. I would instruct them to make sure that the installation was correct.
Q. So if all that was wrong was that a bilge pump needed to be changed, you would tell them to go ahead and remove what the manufacturer had put in and change out the discharge system?

A. No. If the installation was correct from the manufacturer, it wouldn't be changed. Just the pump would be changed.
Q. Okay. Correct in the sense of conforming to what the manufacturer had originally put in?
A. Correct to what I know that an anti-siphon loop was appropriate and necessary.
Q. Okay. So you're saying that when your people would change out a pump, like we have in the exhibits here, and that pump had a discharge hose without an anti-siphon loop, you would tell them that even though you're only changing a pump, you have to remove the discharge hose and install a new one with an anti-siphon loop. Do I have that right?
A. I would advise the owner of the boat that we found a situation and ask them if they would like us to do that.
Q. And you did that in every single occasion where you changed out a bilge pump?
A. I can't speak to that.
Q. So you may have done it, but you haven't necessarily done it universally?
A. Correct.
Q. Okay. And you wouldn't feel like you were financially responsible as a boatyard if there were an

occasion where you changed out a bilge pump and had not affirmatively changed out the discharge line, correct?
A. I felt obligated to notify the owner that there was a problem situation, if we saw this condition.
Q. But you didn't necessarily do that on every single occasion, correct?
MR. LOVEJOY: Asked and answered, your Honor, I think twice now.
THE COURT: Sustained.
Q. You didn't undertake to -- you didn't promise your clients that you would identify for them all the conditions on their boats that did not measure up, in your view, to some industry standard, correct?
A. That's correct.
THE COURT: Mr. Rauworth, you have 15 minutes to finish your cross-examination.
MR. RAUWORTH: I won't need it, your Honor. I apologize.
Q. The EVEREADY, since it's been sitting at Certified Sales, in your view, has diminished in value, correct?
A. Yes. Possibly.
Q. Okay. And you've not done anything to determine how much value it has lost, correct?
A. Correct.
MR. RAUWORTH: That's all I have, your Honor.

Thank you.

THE COURT: Thank you. Redirect?

REDIRECT EXAMINATION BY MR. LOVEJOY

Q. Mr. Robbins, Mr. Rauworth was just asking you questions about what you had testified to and read to you from page 104, lines 15 to 23. Do you see those?

A. Yes.

Q. And in there, you are referring -- the answer where it begins at "The elbow." What is the elbow?

A. The elbow is at the engine where the exhaust system begins. And it's forward of the bulkhead that's shown in the diagram.

Q. Okay. So that's not something that you drew on the chart, and it's not where the hose touches the plywood bulkhead, correct?

A. Correct.

Q. It's some distance forward of the plywood bulkhead, correct?

A. Yes.

Q. And when you went to the vessel with the surveyors in October of 2007, there was another surveyor there named Mr. Pfund?

A. Yes.

Q. He did all the measuring on that day, right?

A. Yes.

Q. And what you did on October 4 was you reconstructed, based on the position of the exhaust outlet and the part of the exhaust hose that went through the bulkhead, the position where the hoses would have lined when the vessel was in the water in April 2005, correct?

MR. RAUWORTH: Objection. Leading.

THE COURT: Overruled.

A. Yes.

Q. And you performed the test that Mr. Rauworth asked you about, and to the best of your ability, this hose was at a horizontal level to the, I call it deck, I guess you called it bottom before, correct?

A. Yes.

Q. When you poured water in the hose with that at horizontal position, it ran out of this cut, correct?

A. Yes.

Q. So when Mr. Rauworth was asking you about the hose having a six-inch differential, he's talking about apples here and you're talking about an elbow, right?

A. Yes.

Q. Now, Mr. Rauworth asked you about -- going back to the scum line issue, and he asked you about whether that scum line could have resulted from the booms, correct?

A. Yes.
Q. But you took the -- this scum line that's in Exhibit 59, can you tell us whether that entire line was created at one time, or is that something that was generated over a period of time?
A. No. This occurred -- this accumulated over the course of some time.
Q. And it isn't a coincidence that the scum line matches perfectly with where the vessel sat when you launched her on May 3, 2005, is it?
MR. RAUWORTH: Objection. Leading.
THE COURT: Well, I'll sustain that objection. You can ask him if it does match.
Q. Okay. Does the scum line in Exhibit 59 match where you found the vessel to float on May 3, 2005?
A. Yes. It was very close.
Q. So that's not a coincidence that the scum line matches where it floated on May 3rd, 2005, correct?
A. No, it's not.
Q. And if for some reason some of this oily debris that Mr. Rauworth referred to got on the vessel as it was being hauled out of the water, or raised out of the water with air bags on April 25, it would have been all over the side of the vessel. It wouldn't have ended up in a straight line, correct?

MR. RAUWORTH: Objection. Leading.
THE COURT: Overruled.
A. Yes, that's correct.
Q. So based on your professional experience, this scum line resulted between the date the vessel was launched on April 21 or 22 and the date that it sank, which is April 25, correct?
A. Yes.
Q. Now, Mr. Rauworth had --
MR. LOVEJOY: Sorry, your Honor.
Q. When you took this photo, Mr. Rauworth asked you questions about doing experiments by using the straps and the Travel Lift, correct?
A. Yes.
Q. When this photograph was taken, which is Exhibit 64, this vessel was floating free in the water, correct?
A. Yes, it was.
Q. So the questions about tilting the vessel in straps are irrelevant to how this vessel is sitting in Trial Exhibit 64, correct?
A. Yes.
Q. Just let me ask you this, Mr. Robbins. How often have you ever testified in court as an expert?
A. I don't believe I ever have, in this situation.

Q. Fair to say you're kind of nervous?
A. It's not the most comfortable position to be in.
Q. And in Trial Exhibit 64A, that depicts one of those areas where you, you know, found some water dripping or weeping out of the vessel after it had been hauled on the 25th of April, right?
A. Yes.
Q. Can you tell us, or describe, you know, how much water was coming out when you viewed the vessel up in the hard on the day or two after it was --
A. Sure. Out of this particular area, it was just dripping, you know, small drops. Maybe one every 10 or 20 seconds.
Q. So would it be fair to say that's an insignificant amount of water?
A. Yeah. Small amount of water.
Q. And Mr. Rauworth asked you some questions about how much water would come in through that hose cut, correct?
A. Yes.
Q. And what you saw -- actually, who saw this stream of water on May 3rd when you and Mr. Layfield were on the vessel, was it you or he first?
A. I believe -- well, I initiated the test to put water through it and --

Q. I'm talking about back in 2005, May 3rd.
A. I'm sorry. Excuse me.
Q. You put the vessel back in to see if you could identify the source of the leak, and you found a stream of water, but neither you or Mr. Layfield could actually identify how it was entering the vessel?
A. Yes. To the best of my recollection, I believe I found it first.
Q. Mr. Layfield looked at it and concurred that water was coming into the vessel in some manner, right?
A. Yes.
Q. And between May 3rd, 2005 and October 2007, you and Mr. Layfield both believed that the water had come in somehow through the skin of the vessel through one of these weeping leaks, correct?
A. Well, I did. I can't speak for him, but I did.
Q. Okay. You had -- you know, once you found that stream of water that was coming in on May 3rd, you stopped looking elsewhere, correct?
A. Yes.
Q. And until -- the purpose of having the tanks removed was in fact defined that water coming through -- you needed two sources of -- in order to get that water into the hull if it comes through the hull, you needed two openings, correct? You needed one in

the --

MR. LOVEJOY: May I approach the witness, your Honor?

THE COURT: Yes.

MR. LOVEJOY: Thank you.

Q. In Exhibit 131, the sample, you stated there's two layers of fiberglass, correct?

A. Yes.

Q. One on the hull side, which is the flat side of this exhibit, and one on the rough side, which is the interior hull side, correct?

A. Yes.

Q. In order for the water to get from the hull side into the vessel, there has to be a breach in the flat side, or the outside, correct?

A. Yes.

Q. And there has to be a breach on the inside skin, correct?

A. Yes.

Q. If there's not two breaches, then the water won't get into the bilge, correct?

A. Yes.

Q. That's what you were looking for -- that's what you assumed happened from the time that you did the launching on May 3rd, 2005 up until the time that the

vessel was relaunched in October 2007, correct?
A. Yes.
Q. Again, you stopped looking for anything else, correct?
A. Yes.
Q. And when you launched the vessel in October of 2007, you went in the water and, lo and behold, there's no stream of water coming into the engine compartment, correct?
A. Yes.
Q. And I think it was Mr. Pfund was looking around. He was the fiberglass expert who you were going to rely on with respect to the core issue. Mr. Pfund started looking around and found the cut in the exhaust hose?
A. Yes.
Q. And at that point, there were four surveyors on board, Mr. Pfund, yourself, Mr. Layfield and Mr. Clarke, who had been sent there by Albin, correct?
A. Yes.
Q. And at that point in time, you all agreed that the water could not have come through the hull or the core, correct?
A. Yes.
Q. And you thoroughly went through the boat with Mr. Layfield in May 2005, correct?

A. Yes.
Q. You thoroughly went through it on your own before that?
A. Yes.
Q. And you eliminated every possible means of ingress of water that you might think could come in and sink this vessel except for the coming through the core at that point in time, right?
A. Yes.
Q. And in your professional opinion, the water could not have, as of May 3rd, in your professional opinion, the water could only have come in through the core, correct?
A. Yes.
Q. That was your theory?
A. Yes.
Q. And you didn't have any proof of it, and that's why the vessel was relaunched in October?
A. Yes.
Q. Either for the better or the worse, the theory was disproven, correct?
A. Yes.
Q. But you did find, in your opinion, the way in which the water entered this vessel and sank it, correct?

A. Yes.
Q. Now, do you understand how the vessel got to Certified from Point Judith?
A. I believe so, yes.
Q. Was it towed up there?
A. Yes.
Q. It went by water, correct, because it had a tuna tower and couldn't be put on a trailer, right?
A. Yes.
Q. And had the air-conditioning hose been cut and the vessel traveled, or was towed from Point Judith to Certified Sales, one would have suspected the people towing it would have found a leak or water in the bilge, correct?
A. Yes.
Q. So besides the tests that you, Mr. Clarke, Mr. Layfield and Mr. Pfund did with respect to the AC hose, there was an inadvertent test done by the people that towed the vessel up to Certified, correct?
A. Yes.
Q. Now, the reason that the air-conditioning hose was a big issue was because Mr. Rauworth and Mr. Clarke, as of June 2007, were accusing Mr. Picchione of having scuttled the vessel, correct?
A. I believe so.

Q. Okay. And when it was launched in October, no water came in the hose that had been severed with this fishing knife that somebody located, correct?

A. Correct.

Q. And Mr. Clarke was able -- we allowed Mr. Clarke to do whatever he wanted with respect to the AC hose, correct?

A. Yes.

Q. And we also offered to let Mr. Layfield perform any additional tests that he or his clients might want to do in that vessel in October, correct?

A. Yes.

Q. And neither one of them elected to do any additional tests. Everybody agreed they were going to leave and we all went home, correct?

A. Yes.

Q. And after this scuttling theory came up, and Mr. Picchione was accused of that in June, you and Mr. Pfund went back through the photographs you had taken in April, May or June of 2005, correct?

A. Yes.

Q. And there was a photograph showing the area where the fishing knife was found in 2007, correct?

A. Yes.

Q. And in that photograph that was taken in 2005, lo

and behold, there's no fishing knife in the same position, correct?
A. Yes.
Q. So sometime between -- this was a boat that was used extensively for fishing, correct?
A. Yes. That's my understanding.
Q. And it sank, and when a vessel sinks, whatever is in it kind of goes all over the place, right?
A. Yes.
Q. So it wouldn't be unexpected that one might find a fishing knife in the bilge?
A. No.
Q. In your professional opinion -- we let Mr. Clarke -- there was a thru-hull with a strainer that protruded off the bottom of the boat, correct?
A. Yes.
Q. And we let Mr. Clarke -- first Mr. Clarke stuck a coat hanger or a welding rod up there and he said -- I think his response was, when we asked him if he found anything, he said he found thick air?
A. I don't recall that.
Q. He stated he didn't find anything, correct?
A. Yes.
Q. Then he asked to take the strainer off and he went to get a drill and couldn't get it off, correct?

A. Correct.
Q. And we let him chisel it off, correct?
A. Yes.
Q. And then he put more probes up into this hose and again reported to everybody that he hadn't found anything, correct?
MR. RAUWORTH: Objection. Hearsay.
Q. Did you watch what he did?
A. Yes, I did.
Q. He put a probe in and out of this hose and nothing came out, correct?
A. Right.
THE COURT: All right. Let's take our lunch break. Return at 1:30.
(Lunch recess.)
THE COURT: All right. We're starting ten minutes late so I'll give you ten minutes on the other end. 3:40. Go ahead.
BY MR. LOVEJOY: (Continuing)
Q. Mr. Robbins, I put Exhibit 1 in evidence in front of you.
A. Yes.
Q. And Mr. Rauworth asked you questions about how submersion of the vessel in 1998 where it appears the engine might affect the value, correct?

A. Yes.
Q. I want you to look at the repairs that were made by Point Judith in 1998 and 1999 after the grounding. Do you have those in front of you?
A. Yes.
Q. Any evidence there was any engine work done on this vessel?
A. One of the engines was removed and reinstalled.
Q. Okay. But that was -- any evidence of any submersion of the engines or actual engine work done on them as opposed to taking the engine out to allow access to the bottom of the hull?
A. No.
Q. And you were here yesterday when Mr. Vivenzio testified about how the bilge pump switches worked on the vessel?
A. Yes.
Q. And you looked at them yourself. And based on your testimony, was there any malfunctioning bilge pump in the engine room in this vessel?
A. No.
MR. RAUWORTH: Objection. Foundation.
THE COURT: He can testify if he knows.
Q. Well --
A. To the best of my knowledge, there was no

malfunctioning bilge pump.
Q. I'm going to hand you Triple N in evidence, sir. There are three bilge pump switches, correct?
A. Yes.
MR. RAUWORTH: Objection, your Honor. The bilge pump switches I would suggest is beyond the scope of the cross.
THE COURT: I don't recall any testimony on cross about the switches or the panels.
MR. LOVEJOY: I thought he asked about Mr. Stroker shutting off the bilge pump.
THE COURT: He asked about Mr. Stroker's work in pumping out the bilge.
MR. LOVEJOY: That was today. I thought yesterday he asked about the --
THE COURT: Just a moment. He testified about his theory about the possibility Mr. Picchione turned off the bilge pump.
MR. RAUWORTH: My point, your Honor, there was no examination about the functioning of the switches in the panel.
THE COURT: Ask your question.
Q. In Exhibit, I think it's Triple N, correct?
A. Yes.
Q. There's three switches, correct?

A. Yes.
Q. The top switch that says "auto on" operates all the bilge switches?
MR. RAUWORTH: Objection. Leading.
THE COURT: Overruled. Go ahead.
Q. If that switch is on, based on what you heard from Mr. Vivenzio and your understanding, all the bilge pump switches should operate, correct?
A. Yes.
Q. The only purpose for the lower two is, for lack of a better word, is override the automatic switch and allow the owner to turn a bilge pump on manually, correct?
MR. RAUWORTH: Objection. Foundation.
THE COURT: He testified about this on direct. There was not much about this on cross. I think this is outside the scope. Unless you can tie it back in. But he's already testified about this on direct. I asked him questions about this.
MR. LOVEJOY: I think it's important.
THE COURT: It doesn't need to be repeated, that's my point.
MR. LOVEJOY: Your Honor, based on the testimony of Mr. Vivenzio, and his understanding, there is no malfunctioning bilge pump on this boat because of the

way the switches are set up.

THE COURT: I think that's -- his testimony about the switches has been clear, and I don't think it's even been challenged, Mr. Robbins' testimony. You asked him questions about this on direct and then I asked him questions about this on direct.

MR. LOVEJOY: Mr. Rauworth asked him some questions. And the way the system is set up, I want him to clarify that no matter what Mr. Stroker may have thought or said, that the way this system is set up to his understanding or what Mr. Vivenzio said, there couldn't have been a malfunctioning bilge pump.

THE COURT: Could have or could not have?

MR. LOVEJOY: Could not have been.

THE COURT: Well, I'll allow you a couple more questions, see if you can bring this back within the scope of the cross.

Q. The bottom two switches that are in Exhibit Triple N are what are referred to as manual override switches, correct?

MR. RAUWORTH: Objection. Foundation. I believe the witness testified he didn't know how the panel was wired, your Honor.

THE COURT: Overruled. I'll give you a couple more questions. Go ahead.

A. Yes.
Q. If the switch, the manual switch that goes to the engine room bilge pump is on, what happens to that pump?
A. It would operate.
MR. RAUWORTH: Same objection.
MR. LOVEJOY: You're interrupting the question.
THE COURT: You're essentially going back over testimony that you went over in direct examination. I've heard all this testimony. I understand it. So I'm going to sustain the objection. Let's keep moving.
Q. And Mr. Rauworth asked you a bunch of questions about whether you could see the cut in the hose, correct?
A. Yes.
Q. And it's your opinion that you couldn't see the cut in the hose but that you could see that the exhaust hose was not providing any chafing gear, correct?
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained.
Q. What's your opinion as to what Point Judith should have been able to see?
A. Concerning the exhaust hose?
Q. Yes.
A. In my opinion, they should have been able to see

the fact that it passed through the bulkhead without any chafing gear.

Q. Thank you. And just, I want to make sure the record is clear, I want you to look at your report at the bottom of page two.

A. Yes.

Q. And having read that, does that refresh your recollection about whether or not the vessel was free in a float when you looked at the water line on it?

A. Yes, it was.

Q. Okay. And you're sure of that because you just confirmed it through your May 2005 report, right?

A. I'm sorry? The question again?

MR. RAUWORTH: Objection.

Q. You confirmed that because you just looked at your May 2005 report?

A. Yes.

Q. And, Mr. Robbins, had these anti-siphon loops been in place on the EVEREADY, how would that have affected the timing of the sinking of the EVEREADY?

MR. RAUWORTH: Objection. Beyond the scope.

THE COURT: Overruled.

A. It would have delayed the sinking.

Q. And that's because there would have been no back flooding through the bilge pump thru-hull fittings,

correct?

MR. RAUWORTH: Objection, your Honor. Counsel is testifying.

THE COURT: Well, it's leading.

MR. LOVEJOY: I'll just ask another question, if that will help.

THE COURT: I think you're just going back over testimony that he gave on direct. Trust me, this is a bench trial. I'm the one that has to make the decision. I can tell you what's important and what's not. You're just going over the ground. I've already got that point.

MR. LOVEJOY: I understand that, your Honor. But I didn't ask him about how it would affect the rate of the sinking because Mr. Rauworth asked him questions about, you know, it took on water and then all of a sudden it sunk. And I was trying to lay this extra piece of information before the Court that had these things been there, I mean, I'm just asking what they would have done if they had been present.

THE COURT: Okay.

Q. Mr. Robbins, if the anti-siphon loops had been present, how would that have affected the rate of sinking of the EVEREADY?

A. It would have delayed it for some time.

Q. And Mr. Rauworth asked you about what I'm going to call a subset of Albin fishing vessels yesterday. Do you remember that question?
A. Yes.
Q. How big is the Albin fleet?
A. I don't know exactly, but it's not a very large fleet.
Q. It's not a big manufacturer, correct?
A. No.
Q. There is a market for fishing vessels in the length category of the EVEREADY, correct?
A. Yes.
Q. And can you tell us what type of brands, you know, various vessels that are in that ballpark?
A. Luhrs, Bertram, Phoenix, Black Watch, Tiara.
Q. So there are people out there that are looking for boats with tuna towers on them, correct?
A. Yes.
Q. It's a fairly significant number of people. It's not the majority, but it's a large portion of boaters, right?
A. It would be people that are interested in fishing.
Q. I'm going to hand to you Exhibit 58 in evidence, sir.
A. Yes.

Q. And based from looking at that exhibit, can you tell us whether the distance between the bottom of the boot stripe and the chine was any different at where the aft engine room bulkhead is and compared to where the exhaust port is?
A. There's no appreciable difference.
Q. When you went to the boat in October 2007, you, for lack of a better term, took your bearings on the inside of the vessel with respect to the height of the hole where the exhaust hose came through the bulkhead, correct?
A. Yes.
Q. The height of the exhaust port on the inside?
A. Yes.
Q. And then you went outside the vessel and you transmitted them to the side of the hull, correct?
MR. RAUWORTH: Objection. Leading.
THE COURT: Sustained.
Q. You took -- Mr. Pfund took measurements. You took a visual count of the heights and the positions of the engine room bulkhead and the exhaust port on the inside of the vessel, correct?
A. Yes.
Q. And you went outside. What did you do with that information?

A. I just visually inspected it to sight it to see that it ran horizontally.
Q. And what you marked in 60A yesterday is what was represented -- so it's not leading. Again, what does what you marked in 60A represent with respect to what's on the inside of the vessel?
A. Yes. That blue line is approximately the same level as the exhaust hose on the inside.
Q. Okay. And again, what did you observe about the levelness or plane of the exhaust hose on the inside between the engine room bulkhead and the exhaust port?
A. That it was level.
Q. And the only -- where did it rise, where did it start to rise, if anywhere?
A. Forward of the bulkhead.
Q. That's between the rear of the engine compartment to the elbow that we talked about earlier?
A. Yes.
Q. Okay. In your May 2000 report, you have certain information you obtained, correct, that you used --
A. I'm sorry. Which report are you referring to?
Q. May 2005 report, your initial report.
A. Yes.
Q. Where did you get the information that you put in your report?

A. I interviewed Mr. Vivenzio.
Q. Okay. Did you speak to Mr. Picchione?
A. I spoke with him by phone.
Q. Okay. And did he have much information to give you?
A. No.
Q. So the information about the bilge pumps, the bilge pump switches, and that sort of stuff, that all came from Mr. Vivenzio, correct?
A. Mr. Vivenzio and the police report.
Q. Okay. And Mr. Picchione has never told you at anytime that he shut off bilge pump switches, correct?
A. Correct.
Q. Mr. Rauworth asked you questions about how the pedigree of a vessel having been repaired affects its price.
A. Yes.
Q. And what's your opinion whether repairs would affect the sales price?
A. In this case, the repairs were done by Point Judith. Presumably they were well done. They were done several years prior to this casualty, or this incident. And the boat has been in use since then. So I really don't think that they have a large impact.
Q. You said the boat has been used since?

A. Yes. The repairs had been done some years prior to all this happening.
Q. Okay. And if there was anything wrong with the engines as a result of the '98 grounding, would that have appeared between 1998 and 2004?
MR. RAUWORTH: Objection. Foundation. Calls for speculation.
THE COURT: Sustained.
Q. You've reviewed the Albin computer worksheet, correct, which is Exhibit 1?
A. Yes.
Q. It's something I provided to you?
A. Yes.
Q. And when you reviewed it, you didn't find any major engine work done between 19 -- did you find any major engine work done between 1998 and 2004?
MR. RAUWORTH: Objection. Relevance.
THE COURT: Overruled.
A. It appears to be just normal commissioning and winterizing and changing of filters and pumps and normal maintenance items.
Q. And if something had happened in 1998 that would affect the engines, what would have shown up in the six years?
A. Well, if Point Judith would have done the work,

yes, it would have been on this.
Q. Mr. Rauworth asked you questions about where you got the information again, and we just elicited that you got it from Mr. Vivenzio. But would you have liked to have known that an employee of Point Judith had adjusted the bilge pump switches on the vessel?
A. Yes.
Q. And if you had that information, would you have continued your investigation in a different line or ask more questions?
MR. RAUWORTH: Objection. Beyond the scope.
THE COURT: Overruled.
A. I would have asked for more information.
Q. And if you got that information contemporaneously, you might have been able to test whether Mr. Stroker, you know, knew what he was shutting off, correct?
A. Yes.
Q. And you were not provided that information in 2005?
A. No.
MR. LOVEJOY: Your Honor, I'm going to quit before the hour is over. Maybe I'll get Brownie points or something.
THE COURT: Maybe.
All right. Recross?

RECROSS EXAMINATION BY MR. RAUWORTH

Q. Mr. Robbins, Mr. Lovejoy just asked you some questions about the switch panel on this vessel, the photo he showed you there?
A. Yes.
Q. And you don't know how the switch panel is wired, correct?
A. Personally not. Only from what I've been told.
Q. But you don't know that personally. You never looked into it, correct?
A. Correct.
Q. All right. There's nothing that you ever asked for from Point Judith by way of information that you didn't get, correct?
A. Correct.
Q. Thank you. You said that if the anti-siphon loops had been present on this particular bilge discharge system, that would have delayed the sinking, correct?
A. Yes.
Q. You haven't determined how much difference that would make in time, correct?
A. Correct.
Q. You don't have the tools or information or equipment to do that in light of your inability to determine how quickly the vessel actually did sink,

correct?
A. Correct.
Q. Or how much water was necessary to drop it down by an inch or a foot, or whatever, correct?
A. Correct.
Q. Now, back to the question of the wiring of the bilge pump circuits, you've been made aware by Mr. Lovejoy since sometime early this year about the work that was done by Mr. Stroker that's been discussed here, correct?
A. Yes.
Q. And you had access to this vessel because your client is in control of it, correct?
A. Yes.
Q. And you never felt the need to go and do anything by way of looking into the way that it's wired, correct?
A. Yes.
Q. And you have continued up through the time of your deposition and today to be of the view that the thing that made the difference from Sunday night to Monday morning about sinking this vessel is the lack of power to the bilge pumping system altogether, correct?
A. Yes.
Q. In other words, the condition that was found by

the harbormaster when the vessel was raised, correct?
A. Yes.
Q. All right. I'm going to put on the viewer here Exhibit 91 that Mr. Lovejoy introduced. Are you able to see that, sir?
A. Yes.
Q. You took that picture, right?
A. I'm not sure. I don't know if I did or not.
Q. You recognize it as part of the engine exhaust system on the starboard side of the EVEREADY, correct?
A. Yes.
Q. All right. And back in the back extreme of this picture, you can see the bulkhead?
A. Yes.
Q. And actually, in the foreground, the lower left, you can see an elbow, correct?
A. Yes.
Q. Ninety degree elbow that turns the run of this exhaust from going outboard towards the starboard and then turning aft, correct?
A. Yes.
Q. And from the foreground to the background, that hose goes up, correct?
A. It's hard to tell from this angle. It appears to be relatively straight.

Q. You don't see it higher up at the bulkhead of the aft end than the forward end?
A. It's on an angle, but I can't tell you if it's an angle of the picture or actually going up.
Q. Okay. And you can't see the bottom of the exhaust hose here, correct?
A. Correct.
Q. So you're not able to tell from this picture whether there's anything underneath that hose in the way of chafing gear, correct?
A. Correct.
MR. RAUWORTH: That's all I have, your Honor. Thank you.
THE COURT: All right. Mr. Robbins, your testimony is complete. You may step down.
THE WITNESS: Thank you, your Honor.
THE COURT: Thank you.
Mr. Lovejoy, do you have any further witnesses?
MR. LOVEJOY: No, I don't. Your Honor, I'd like to, however, move to conform the pleadings to the proof of the case, then I rest.
THE COURT: All right. Anymore specifics about what you mean by conforming the pleadings to the proof?
MR. LOVEJOY: I'd like to conform the pleadings of any additional information that came in by way of

evidence in the trial that's considered by the Court in its decision.

THE COURT: I didn't make out everything that you said. Maybe you could come up to the podium and make your motions there.

MR. LOVEJOY: I want to move that the pleadings be conformed to the proof at trial. By that I mean that if there's any evidence that came in, in the trial, be considered by the Court in rendering its opinion.

THE COURT: All right. So you don't have anything specific in mind that you're attempting to -- you're not attempting to specifically amend the pleadings at this time to conform to some particular proof, or particular facts.

MR. LOVEJOY: No. If there's some evidence that came in that someone may object to as not having been alleged, then I want the Court to be able to consider it.

THE COURT: Okay.

MR. RAUWORTH: Your Honor, I would oppose that motion particularly in light of the number of objections that I made to proof that Mr. Lovejoy offered that I identified as being outside of the pleadings. In other words, the nature of his motion I

take to be a motion, essentially, claiming that certain issues were tried by consent notwithstanding the scope of the pleadings. And I'm just reiterating that there was no such consent, that I objected to a number of things that were, in my view, outside of the pleadings. And therefore, that is the basis for my objection, or opposition to the motion.

THE COURT: Well, I don't know if that's what he's arguing or not. I don't think that's what he's saying. Is that what you're saying, Mr. Lovejoy?

MR. LOVEJOY: By way of background, your Honor, I had a case where I was a defendant and the motion was made, actually the motion wasn't made and the court -- there was an issue after the trial whether the court, you know, should have rendered its opinion based on certain evidence. And admittedly, it was found that I didn't object to it, and the court had a right to rely on that evidence.

THE COURT: All right. So you're making a motion to conform the pleadings to the proof just in case there's some cause of action that you haven't thought of that accidentally got proven during the course of the trial?

MR. LOVEJOY: No. Some evidence that came in, in support of the causes of action.

THE COURT: Can you tell me what causes of action you're thinking about?

MR. LOVEJOY: I'm thinking about the causes of action alleged in the complaint.

THE COURT: They've been alleged, so the pleadings don't need to be conformed, right?

MR. LOVEJOY: I will respectfully disagree with your Honor.

THE COURT: I'm obviously missing something. I don't know if you're hiding the ball on me or what.

MR. LOVEJOY: I'm not trying to hide any balls or anything else, okay?

THE COURT: You have an amended complaint in this case. It has a number of counts in it. And now you're saying, if I understand you correctly, that something beyond those counts may have been proved up in the evidence.

MR. LOVEJOY: I'm talking about evidence that may support those counts.

THE COURT: There is or is not.

MR. LOVEJOY: There may have come in some evidence that supports those allegations.

THE COURT: Additional counts.

MR. LOVEJOY: Yes.

THE COURT: You don't know what those counts

are. I'm not trying to give you a bad time. I'm merely asking you a serious question. Do you know what causes of action that you think might have been proven that have not been alleged?

MR. LOVEJOY: I'm basically saying evidence to support the existing causes of action.

THE COURT: That's what we do at trial, isn't it, put on evidence to support existing --

MR. LOVEJOY: I understand that. Having gone through an experience and read some cases on it --

THE COURT: You feel the need to make this motion?

MR. LOVEJOY: I make this motion routinely. This is the first time, with all due respect, your Honor may -- I shouldn't say this, but your Honor may be more attuned than, you know, to ask questions about it. It's usually just been accepted, and I rest, you know.

THE COURT: All right. Well, you've made your motion and Mr. Rauworth has objected to it, and I recognize that you're not consenting to the trial of any causes of action that have not been alleged. That's what I understand your objection to be.

MR. RAUWORTH: That is correct, your Honor, and likewise with the reiteration of the objections I made

at the time as to specific items. Obviously, I can't object to items that came in that appear to be relevant to allegations that appear in the complaint but might later be claimed to prove something else. So I had to base my scope objections on what is alleged, and that was the best I could do, and I would object to anything that functionally deprived me of the opportunity to object to something that hadn't been laid out.

THE COURT: Very well. I'll just take all of that under advisement and let you try to explain it all to me in your post-trial briefs. Once you get the transcript, you can explain what it is you think you're talking about.

Plaintiff has rested. Defendant's case.

MR. RAUWORTH: So I understand your Honor, we have a motion.

THE COURT: You want to make a motion for judgment as a matter of law or judgment on partial findings; is that correct?

MR. RAUWORTH: Judgment on Rule 50(c) as a matter of law, your Honor. This actually may have been mislabeled as 52(c). It is 52(c). My error. So I'll hand that up.

THE COURT: Would you like to argue it?

MR. RAUWORTH: Sure, your Honor. There's

several counts here as to bailment. We think Mr. Picchione, his own testimony has established that he felt he was in control of the vessel, free to move it, free to take it out as of the time this vessel sank. That is likewise the effect of the testimony of Mr. Vivenzio.

As to breach of contract, there's been no proof that Point Judith undertook to do the activities in the nature of, if you will -- well, undertook to inspect anything that it did not inspect. There is no evidence of any particular scope of undertaking to inspect for things that are not visible; no evidence of any undertaking to seek out things that are not clearly obvious; no undertaking to do any disassembly to find conditions in connection with -- non-obvious conditions in connection with a commissioning, and certainly no undertaking to, if you will, serve as a consultant to someone like Mr. Picchione as to making modifications to as-built condition of the vessel. There's been no proof that Point Judith did anything, or that any of its actual work was defective.

As to the counts of negligence and failure to warn, failure to warn is the kind of a claim that applies to a manufacturer or seller of goods, or in some cases to a landowner. Clearly, Point Judith is

not in that category. There's been no showing that Point Judith was aware of the hole in the exhaust hose, or reasonably had an opportunity to become aware, or that that is its obligation to point out to somebody in the position of Picchione, Mr. Picchione.

We do have a number of cases that stand for the proposition that someone who is in a position of a repairer, if you will, does not require an obligation to serve, as you will, for conditions that are beyond the scope of its repair undertaking.

THE COURT: I think you fully argued this in your memoranda. I'm going to take it under advisement. I'm not going to rule on this motion at this time. I'm going to decline to rule as contemplated by Rule 52(c), and you can proceed with the presentation of your evidence.

MR. RAUWORTH: Thank you, your Honor. The defendant will be calling Mr. David Clarke, and I ask the Court's leave to allow that examination to be conducted by my colleague, Carl Fumarola.

MR. LOVEJOY: Your Honor, may Mr. Robbins have permission to leave the Court now that he's been dismissed as a witness?

THE COURT: Sure. He's not a party. He doesn't need permission. He can certainly go unless the

defendant intends to call him. I wouldn't imagine he would.

MR. RAUWORTH: You've got a very good instinct about that, Judge.

THE COURT: All right. So Mr. Robbins is free to go.

DAVID CLARKE, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: David Clarke,C-L-A-R-K-E.

THE COURT: Good afternoon, Mr. Clarke. You may proceed.

MR. FUMAROLA: Thank you, your Honor.

DIRECT EXAMINATION BY MR. FUMAROLA

Q. Mr. Clarke, you own a boat?

A. Yes.

Q. What kind of boat do you own?

A. A two-masted wooden schooner.

Q. I'm sorry. Could you repeat that?

A. A two-masted wooden schooner.

Q. Sir, what I'm placing on the screen here, do you recognize?

A. Yes. That is my boat.

Q. And how did you come to acquire this boat?

MR. LOVEJOY: Your Honor, I'm going to object. This has no relevance to the sinking of the EVEREADY.

THE COURT: Are you trying to establish his credentials in some fashion?

MR. FUMAROLA: I am, your Honor.

THE COURT: All right. Well, I'll allow a little leeway in terms of his credentials. Let's not dwell on the boat no matter -- it is a beautiful boat, but we don't need to hear a lot about it.

THE WITNESS: I built the boat.

Q. Could you describe for me in general your experience as a boat owner?

A. As a boat owner, I've been building boats since I was 13, and working on boats, including the one I built. I have pretty much my whole life been around boats.

Q. In fact, have you served in the military?

A. Yes. I was in the submarine service on an intelligence submarine.

Q. Do you know what it means for a boat to list?

A. Yes.

Q. Can you describe that, please?

A. A boat that is listing port to starboard, it's leaning, and sometimes the list is necessary, but when a boat is floating on its lines it is a neutral -- it's

on its waterline.
Q. What would cause a boat to list?
MR. LOVEJOY: Your Honor, I object if he's going to use this witness as an expert witness. He has not been disclosed as a witness.
MR. FUMAROLA: Your Honor, I was going to have him describe his personal knowledge. My next question was if he's ever seen a boat list.
THE COURT: So your objection is overruled. Go ahead.
Q. Have you ever seen a boat list?
A. Yes.
Q. Have you ever seen a boat take on water?
A. Yes.
Q. So you're familiar with what that looks like?
A. Yes, I am.
Q. Do you keep your boat docked in a marina?
A. Yes, I do.
Q. Which marina?
A. At the Point Judith Marina.
Q. How long have you kept your boat docked there?
A. Since I launched it in the year 2000.
Q. In your time at Point Judith Marina, have you seen the boat named the EVEREADY?
A. Yes, I have.

Q. How many times have you seen this boat?
A. Many times up until it sank.
Q. And during what time periods did you see it many times?
A. Quite often because I lived on my boat on occasion, and at one point, that particular time I was moored out past the EVEREADY, so I walked back two, three or four times a day anyway.
Q. So it's fair to say you've seen it hundreds of times?
A. Yes.
Q. Are you familiar with how the EVEREADY sits in the water?
A. Yes.
Q. When was the last time that you saw the EVEREADY?
A. The night before it sank, I was with a friend and it was just getting dark. The dock lights had come on and we had walked up the higher dock, the mid-dock, and we came back on the lower dock. And we happened to stop at the stern of that boat, and I made a quip that the boat was named after a battery, hence the reasoning for the lettering and the color. And at that time I observed that the EVEREADY was riding in the water with no distress, and that was my observation at the time.
Q. And which day of the week was this, when you saw

it?

A. Had to have been a Saturday evening, I believe.

Q. What, if anything, did you eventually learn happened to the EVEREADY?

A. When I awoke the next morning, I awoke to find the oil booms around the boat and to see that it had sunk, and it was on the bottom.

Q. So if the EVEREADY sunk, for example, on a Monday morning, you had seen it the night before?

A. Yes.

MR. LOVEJOY: Objection. Leading.

THE COURT: That's a pretty ironic objection, actually. You were pretty liberal with your last examination in terms of leading questions.

MR. LOVEJOY: I understand that, but --

THE COURT: I'll sustain the objection. Try not to lead the witness.

Q. So the last time, if I understand your testimony correctly, you said that the last time you saw the EVEREADY was the night before it had sunk; is that correct?

A. Right. Yes.

Q. And about what time of day was that?

A. It was about quarter past nine. The dock lights had come on, and I might have -- did I get the date

wrong? It was the night before it sank.
Q. What were you doing when you observed the EVEREADY at that time?
A. We just had paused. I was making comments on other boats. I had pointed out to my friend Mr. Vivenzio's boat on his berth, and we just walked along, and we stopped at the stern of the EVEREADY. And I've always learned to observe boats. I've been around boats. And after you've seen them for a while you can pick up quick whether they're taking on water, or a fender is not in place, or a line has come loose, and oft times I would just redo a line or put a fender back in the water, and the EVEREADY was showing no problems.
Q. When you observed the EVEREADY, what was your vantage point in relation to the boat at that time?
A. I was at the swim platform level.
Q. So you had a good look at it?
A. Yes, I did.
Q. And did she appear as you had been accustomed to seeing her?
A. She appeared in no distress.
Q. Do you know what exhaust ports are?
A. Yes.
Q. Can you describe to the Court what exhaust ports

are, briefly?
A. The engine exhaust at the stern or the aft end of the boat, port or starboard if it's a --
Q. Have you seen the exhaust ports on the EVEREADY?
A. Yes.
Q. Can you tell me where they normally sit in relation to the waterline?
A. They were -- the boot stripe came through the upper half of the exhaust port.
Q. And how was that in relation to the waterline?
A. On the EVEREADY, with that heavy tuna tower, primarily the boat had a way of sitting aft, low aft. But it -- I'd always known it that way. It did not look anything different that night than it had the previous two or more years I'd known it.
Q. So how far up did the water rise on the exhaust port?
A. Normal. About halfway up the exhaust port.
Q. And the last night that you saw her, was the water line -- where was the water line at the last time you saw her?
A. At that point, the exhaust pipe was about halfway out of the water.
Q. Why is it that you have a specific memory of taking note of the EVEREADY on that evening?

A. Probably just because of the facetious jocular comment that I had made about the boat. And the fact also that I'd seen the picture in the office in the marina showing the boat being on the rocks.
Q. You made note of that?
A. I made note of that to my friend, also.
Q. I'm going to show you what has been marked as Exhibit TT that's in evidence as full.
A. That is a picture --
MR. LOVEJOY: Your Honor, I'm sorry. What relevance does this have to the fact knowledge he might have about the boat on the evening --
THE COURT: Well, I understand the relevance. So your objection is overruled.
Q. Did you make reference to this incident that evening?
A. Yes, I did.
Q. Sir, you said the following day you learned that the EVEREADY had sunk; is that correct?
A. Learned? As soon as I came topside the next morning, I saw the boat had sunk and they were making efforts to raise it, or put the booms around it to contain the oil slick.
Q. And how did this strike you?
A. Odd, because it had happened so suddenly. The

boat was showing no signs of any problem the night before, and it had just quietly gone down during the night.

Q. Do you know who owns the EVEREADY?

A. Yes.

Q. Or who owned the EVEREADY at that time?

A. Nick Picchione.

Q. Have you met him?

A. I have met him on more than one occasion. Most times he was with other fishermen or other people. But on one occasion he invited me aboard and offered me a beer and said if I ever was thirsty for another beer that he always kept beer in his ice chest on the fish platform, the aft end of the boat. I never went back to get another beer, but I appreciated the offer.

Q. So you met him on that one occasion, and he invited you to help yourself to beer on his boat?

A. Yes.

MR. FUMAROLA: One moment please, your Honor.

THE COURT: Yes.

MR. FUMAROLA: I'm going to pass the witness at this time.

THE COURT: Thank you.

CROSS-EXAMINATION BY MR. LOVEJOY

Q. Mr. Clarke, tell us what type of slip the EVEREADY

is docked to, or was docked to.

A. It's a floating slip. It's at -- the docks float on plastic floats. They're about eight inches above the water.

Q. Okay. I guess what I'm looking for is, its what's referred to as a finger slip which has two fingers that run out from the main dock or was he moored side to a dock?

A. He's on a finger slip. Only one finger went out for his boat.

Q. So he's stern in?

A. He was stern in, yes, sir.

MR. LOVEJOY: Your Honor, may I approach the witness and the chart?

THE COURT: I'm glad you reminded me of that. Nobody made an offer to move that drawing as an exhibit.

MR. RAUWORTH: I would so move, your Honor.

MR. LOVEJOY: No objection, your Honor.

THE COURT: No objection. So that will be defendant's next in line, YYY.

(Defendant's Exhibit YYY admitted full.)

THE COURT: Do you wish to have Mr. Clarke mark on that?

MR. LOVEJOY: A slip drawing which is something

totally different.

THE COURT: A different drawing?

MR. LOVEJOY: Yes, please.

THE COURT: All right. You want to take that off then. Watch that microphone. All right.

Q. On the white sheet, I'd like you to draw the dock configuration where Mr. Picchione's boat was situated.

A. There was another boat in between Mr. Picchione -- this is the lower floating dock here. This is the gas dock. You went down here on a ramp, and there was another -- this is the upper dock.

Q. Where the ramp is, I want to give you an orange marker, just put some slashes crosswise, vertically, where the ramp is placed. On the dock with Mr. Picchione's boat not the other dock.

A. There was no ramp. This was tied flat.

Q. So how do you get from the upper ramp to the lower ramp?

A. Oh, there were, I think at that time, there were ladders that you could go down for safety reasons. I installed some of those. Otherwise you had to go up here, or go around and come down on the land side. But that night I walked up on the upper dock and came back on the lower dock, and we paused right there.

Q. Where were you headed?

A. Back to my boat, which is right here.
Q. So in the orange, in the middle of your boat, I don't know the name of it, let's find out the name.
A. The WINDFIELD LASH.
Q. Can you abbreviate it? I guess not. And the little circles you put out towards -- which way is north on this thing?
A. North would be basically that way. These are pilings.
Q. Why don't you take the red marker and circle the outside of the piling.
A. The outside?
Q. And there would be a line going from each of the two pilings -- hold on. Please don't write until I finish. There would be a line going through the pilings and each of the pilings directly in front of Mr. Picchione, which you haven't identified yet?
A. Yes.
Q. Could you put EVEREADY in the middle of the boat, which is Mr. Picchione's, please. And there were lines going from the bow of his boat to the two pilings directly in front of it; is that correct?
A. Yes.
Q. Thank you. And there would be spring lines going to the dock, correct?

A. There would be stern lines.
Q. Okay. Put the stern lines in.
A. They would have crossed. And spring lines would have come aft like that, and forward.
Q. That's a finger pier, correct?
A. Yes.
Q. Okay. Now, you walked down -- can you take the red marker that's down here, please.
A. Actually --
Q. Hold on a minute.
A. I was just going to correct myself a little.
Q. Is there something you want to change on it?
A. Well, these pilings, some of them are here and one -- there's one out here to tie, connect these boats. Some of the docks are different there, but this one would have tied here. On the A and B piers they're slightly different.
Q. Can you take the red pen and show us what you traversed on Sunday or Saturday evening?
A. I came up, and came up the high dock and came back the low dock, and stopped right here momentarily. And then I walked a little further and turned --
Q. You put -- can you darken the X where you stopped on -- that's where you stopped. You stopped directly astern of the vessel?

A. Yes.
Q. Now, Mr. Picchione's boat has a swim platform, correct?
A. Yes.
Q. If you'd draw the swim platform on the back of his boat.
A. Which color?
Q. Why don't we use green. How about green?
A. We don't have green.
Q. Down here, sir.
A. Oh. Swim platform is right there.
Q. And how far off the dock where you stopped is Mr. Picchione's, the edge of his platform?
A. His swim platform came within a foot of the dock.
Q. And how far off the finger pier is the boat when it's tied up?
A. There are fenders here, so it's maybe a foot off the dock.
Q. Okay. A foot not off the dock but between the dock?
A. Between, and the boat.
Q. You said you stopped where the X is, correct?
A. Yes.
Q. You could see the exhaust port from where you stopped?

A. No. As I approached it, you could see it. And as I walked by, I turned back and explained to the person that the boat had also been on the rocks.
Q. How high off the water are these floating docks?
A. About eight inches, maybe.
Q. The dock at Point Judith is eight inches off the water?
A. The floating docks are about eight inches. The main dock, this dock is probably -- depending on the tide. These floating docks float up and down with the tide.
Q. It's your testimony that for two years, including the night that you walked by the boat, that this vessel was sitting in the same position?
A. To my knowledge. It had never sunk before.
Q. I'm not asking you about sinking. Every time you walked by this boat, did you observe it?
A. It's one of those things you intuitively do. If you've been in the marine industry, you observe boats.
Q. It's your testimony that it was floating at the same level with respect to the exhaust port that it had been for two years, correct?
A. I'd say yes. I mean, it could have been off a half-an-inch, but I don't think --
Q. You'd been going up and down this dock for what,

eight years?
A. Pretty much, yes. I helped build the dock.
Q. Okay. Is it fair to say that where this vessel sat in the water was the same for the entire eight years that you used to go back and forth by it?
A. I don't know what you're getting at because --
Q. You said for two years you remember it sat in the water in the same position, correct?
A. Right.
Q. You were there for eight years. I'm interested in the --
A. It could have been longer. I just am remembering the boat.
Q. Do you think, sir, that it sat, with respect to where the water hit the exhaust port, at the same position for the eight years that you went back and forth past this vessel?
A. I'm certain it did. I mean, the boat had the knowledge that it was over-rigged, that it settled aft slightly. I always knew it that way.
Q. That's not my question. My question is, did where it sat in the water for a period of eight years remain constant, to the best of your knowledge?
A. To the best of my knowledge, it remained constant, yes, sir.

THE COURT: Do you need him to draw anymore?

MR. LOVEJOY: No, your Honor.

THE COURT: You can sit down.

MR. LOVEJOY: I guess we'll mark it as an exhibit, if we might, your Honor.

THE COURT: Yes. This will be plaintiff's next in line. Just put "Clarke" on that.

THE CLERK: 136.

(Plaintiff's Exhibit 136 admitted full.)

MR. LOVEJOY: He wants to know if he should sign it, your Honor.

THE COURT: You may, if you wish.

Q. You're not a member of the Dave Clark Five band, are you, sir?

A. No.

Q. I didn't have you do it, but you said there are lights on -- where are the lights?

MR. LOVEJOY: I guess we're going to take the exhibit back for one second.

Q. There were lights, you said, on the dock somewhere?

A. Right. They were up on this dock, the main dock. They're on light sensors, so when it gets dark they come on automatically. Then there are big lights here.

Q. My question is, were there any lights on the dock

where Mr. Picchione's boat was moored?
A. Not on his dock.
Q. On the upper dock?
A. On the upper dock there are lights. It was quite visible.
Q. My question was, were there any lights, sir, on his dock?
A. Not on his dock and not on the finger dock.
MR. LOVEJOY: Okay. Thank you, your Honor.
THE COURT: Redirect?
MR. FUMAROLA: No redirect, your Honor.
THE COURT: All right. Mr. Clarke, you may step down. Thank you very much.
MR. RAUWORTH: Your Honor, the defendant calls Mr. Barry Ennis.
BARRY ENNIS, first having been duly sworn, testified as follows:
THE CLERK: Please state your name and spell your last name for the record.
THE WITNESS: My name is Barry Lee Ennis, E-N-N-I-S.

DIRECT EXAMINATION BY MR. RAUWORTH

Q. Mr. Ennis, just try to pull that microphone close enough so you can get at it. Thanks. All right, sir.
Does the Town of South Kingstown, Rhode Island

have a harbormaster.
A. It does.
Q. And who is that?
A. I am the harbormaster for the Town of South Kingstown.
Q. I'm sorry. Who's the harbormaster?
A. I am the harbormaster.
Q. And were you the harbormaster for that locality in 2005?
A. Yes, I was.
Q. And does the geographical range of the South Kingstown harbormaster embrace Point Judith Marina?
A. It does.
Q. Now, sir, in late April of 2005, did you become involved in a boat sinking at Point Judith Marina?
A. I did.
Q. I'm sorry?
A. Yes, I did.
Q. Okay. And how did this situation come to your attention?
A. I was on routine patrol. And at the time, I was a police officer for the Town of South Kingstown, employed from 1973 until my retirement. I had the additional duties as harbormaster.
I received a call over the radio that there was

a reported vessel sinking at Point Judith Marina, and I responded there.
Q. You went to Point Judith Marina?
A. Correct.
Q. What did you find when you got there?
A. Upon arrival, I found that the vessel named the EVEREADY was sunken at its slip. There were containment booms around the vessel. And I spoke to the manager of the marina, Mr. Don Vivenzio.
Q. By the way, did you ever have any communication with Mr. Picchione himself?
A. I did not.
Q. Okay.
A. I apologize. I did. In 1998, I responded to him putting his vessel on the rocks at the jetty in Narragansett. That's the only time that I had ever spoken to Mr. Picchione.
Q. Okay. I'm sorry. I confused you. I meant in connection with this incident in 2005.
A. No, I did not.
Q. So when you arrived, was that the time you saw this situation you just described about the oil boom?
A. That is correct.
Q. When you got there, how was it that the oil boom was arrayed or deployed?

A. It was deployed around the vessel from the aft port around the forward part of the vessel and back to the finger pier.
Q. All right. And did you take note of the condition of the water surface inside that oil boom?
A. I did. It appeared to contain a little bit of diesel fuel, which is a light oil floating on the surface.
Q. Okay. And you observed the vessel in that situation -- how long did it stay at that location, approximately?
A. It stayed submerged, I believe --
Q. Sorry. From the time you first saw it inside the oil boom, how long did it stay there with the oil boom around it?
A. Until after 2:00 p.m. when I returned. Probably to about 2:30 p.m.
Q. So you first went there at some point in the morning?
A. Initial call was sometime between 8:30 and 9:00 a.m. When I arrived, I observed the vessel, spoke to Mr. Vivenzio. He relayed some information indicating that Mr. Clarke had at one point observed the vessel the night before. So over the next hour-and-a-half or two hours, I spoke to Mr. Vivenzio. I went and spoke

to Mr. Clarke to determine what he had observed. I spoke to an officer from the U.S. Coast Guard marine safety office who had responded down to make sure that the containment was correct, and I also spoke to a Rhode Island Department of Environmental Management officer who had responded.

Q. So from the time that you first arrived until after you returned in the afternoon, the vessel was in that location with the oil boom around it?

A. Correct.

Q. When you came back, did you stay around the marina for some time thereafter?

A. I returned at approximately 2:00 p.m.

They had pretty much gotten most of the boat dewatered. It was floating. It still had some lift bags on it. I stayed until they removed the lift bags. Photographed that. Mr. Vivenzio towing the vessel into the Travel Lift. Watched the vessel be lifted out of the water, and then waited until they had the vessel properly secured on land, and then boarded the vessel and --

Q. Okay. Now, the point where you boarded the vessel, this was after she was moved to the Travel Lift, correct?

A. After it was on land, sir, yes.

Q. So it was up to the point where it was safe to get aboard?
A. Correct. I took some photographs as it was being lifted by the Travel Lift. As soon as it was secured in the Travel Lift area, I obtained a stepladder and then went aboard her.
Q. Okay. And when you put up a stepladder, did anyone else go up ahead of you?
A. Not that I remember. There was probably one other crew member on board for the process of hauling the vessel.
Q. So you went aboard the vessel. And once you got aboard, were you taking steps in connection with your official duties?
A. I did a visual survey of the exterior and interior of the vessel, then I photographed what I thought would be appropriate to document at the time that the vessel had been removed from the water. At that time, I photographed a couple of spots of the interior of the vessel and the AC/DC control panel.
Q. Did you make any observations of the configurations on the AC/DC control panel?
A. I did. I observed that all of the switches appeared to be in the off position of the DC control panel.

MR. RAUWORTH: Does the clerk have Exhibit Triple K?
If I may approach the witness, your Honor.
THE COURT: Yes.
Q. Placing before you Exhibit Triple K, Mr. Ennis, do you recognize what this is a picture of?
A. This is a picture of the electrical distribution panel for the EVEREADY.
Q. Okay. And is this a picture that you took as part of your official duties?
A. That is correct.
Q. All right. And let me just note for clarification, on this particular image on the side there's some handwritten entries related to bilge, and I didn't mean to suggest that you had put those on there. They were done in later proceedings. Can you flip the page to the second page of that exhibit.
And is this a closer view of that same image that you took?
A. Yes, it is.
Q. All right, sir. And when you made note of the arrangement of the switches relating to the bilge pumps, did you do anything vis-a-vis the people at Point Judith? Did you bring this to anyone's attention?

A. I noted that they were all in the off position. That was one of the reasons I photographed the panel. I asked at a later time that day, I asked Mr. Vivenzio if any of his employees had turned off the switches and he said he did not believe they had.

Q. Right. And did you and he take a look at the panel as you -- after you saw it up on the boat?

A. I don't remember that, sir.

Q. Okay. And you made a report with regard to these events?

A. I did. I made a South Kingstown Police Department incident report.

MR. RAUWORTH: And Exhibit Double R for identification.

Q. Do you recognize that as the report that you wrote, sir?

A. I do.

MR. RAUWORTH: Your Honor, that was previously marked for identification and I believe it's been authenticated, and I would move its admission in full.

MR. LOVEJOY: I object, your Honor. He's here to testify live.

MR. RAUWORTH: Actually, in the interest of time, your Honor, I'll withdraw the motion. We don't need to pursue that.

THE COURT: Okay.
MR. RAUWORTH: Thank you, Mr. Ennis. Pass the witness, your Honor.

CROSS-EXAMINATION BY MR. LOVEJOY

Q. Good afternoon. Nice to see you again.
A. Good afternoon.
Q. How long were you a police officer?
A. Thirty-two years.
Q. And you were trained in conducting investigations, correct?
A. Correct.
Q. Conducted what, thousands of investigations?
A. No.
Q. Hundreds?
A. Well, possibly.
Q. Okay. A large number in that amount of time, correct?
A. Correct.
Q. And you're also the -- how long have you been the harbormaster?
A. Since 1991.
Q. And have you also conducted investigations as harbormaster?
A. I have.
Q. Hundreds?

A. No.
Q. Okay. Fair number?
A. Fair number.
Q. Okay. And you consider yourself a thorough and thoughtful investigator, correct?
A. I do.
Q. At least you'd like to be that way, correct?
A. I would.
Q. What time did you arrive at Point Judith Marina in the morning?
A. Between 8:30 and 9:00 a.m.
Q. At that point, you observed the vessel and she was in a sunken position, correct?
A. Correct.
Q. Which means the water was somewhere up around the tuna tower, correct?
A. Correct.
Q. At that point in time, you got called away to do some other business, correct?
A. At 11:00 a.m.
Q. When you left at 11:00 a.m., was she still submerged up to the tuna tower?
A. I believe she was, yes.
Q. Okay. So there was an oil boom around her, and she was submerged to the tuna tower, correct?

A. Correct.
Q. And an environmental company had placed an oil boom there, correct?
A. No. The marina placed the oil boom there.
Q. Okay. Did an environmental company show up at some point in time?
A. I don't believe so. I don't know.
Q. Okay. It's standard practice once you put these booms around for these pads to pick up any oil that's in the water, correct?
A. Correct.
Q. You don't just put the boom around, take the vessel up, take the boom away and let the oil go away to float off in the bay, right?
A. That's correct.
Q. Do you know whether, by the time you arrived in the morning, somebody had used absorbant pads to remove the diesel, whatever diesel fuel was in the water?
A. They had used oil pads to absorb some of the oil, yes.
Q. When you arrived, they were absorbing the oil with pads, correct?
A. There were oil absorbant pads in use, yes.
Q. When you left at 11:00, were they still using pads or were they still using oil absorbant pads?

A. There were still some oil absorbant pads there and the boom was still in place.
Q. By the time you left, had they removed most if not all the diesel fuel that was contained?
A. That couldn't be determined. The diesel tanks were still full and the vents were open.
Q. Did you see any additional oil coming --
A. I saw a sheen on the water. It was still there when I left.
Q. You left at 11:00, and you came back when, sir?
A. At 2:00 p.m.
Q. When you came back at 2:00 p.m., were they still collecting oil, or had they stopped with the oil absorbant pads?
A. They were still clearing the oil pads.
Q. When you came back, was the vessel submerged up to the tuna tower?
A. No. I believe at that point they had started to dewater the vessel and it was starting to rise.
Q. So tell us what point, when you get back at 2:00 p.m., what point is the water line on the vessel? Are we at the deck or are we someplace between the deck and the top of the tuna tower?
A. By the time I returned, the vessel was probably three-quarters dewatered, so it was pretty much almost

floating on its own. They were starting to remove the bags, the lift bags.
Q. So when you came back, the waterline of the vessel was still submerged, correct?
A. The starboard side of the vessel was down lower than the port side, and the starboard side of the vessel, the waterline was above the boot stripe.
Q. Okay.
A. I'm sorry. The boot top, or whatever you want to call it.
Q. Okay. Then they finished hauling the vessel out completely at some point in time?
A. They finished dewatering it so it was floating with a normal waterline. Removed the boom once they determined there was no more oil or anything in the area. Still had two float bags under the stern of the vessel because it was still heavy at the stern, and towed it over to the Travel Lift area and hauled it.
Q. Okay. And you first went aboard when it was on the hard?
A. Correct.
Q. So you were gone for a period of a number of hours when other people were around the vessel, correct?
A. Say again.
Q. You were gone for a number of hours when other

people were at the vessel, correct?
A. Correct.
Q. And by the time you got back, the position where the -- excuse me. I'm going to need that exhibit.
The panel that's depicted in Trial Exhibit KKK is where on the vessel?
A. It's in the main cabin, sir.
Q. And how many feet above the deck of the main cabin is it?
A. Two to three feet, I believe.
Q. If I'm correct, the floor is where the rug is --
A. The panel is right here.
Q. So you remember the panel being two feet above the carpet in the cabin, correct?
A. I believe so, sir. I haven't been in the vessel since 2005.
Q. But by the time you got back, I guess we'll call that the wheel house where this panel was located?
A. The main cabin.
Q. The main cabin. By the time you returned, the main cabin was above water, correct?
A. Correct.
Q. And you don't know whether anybody went into the main cabin before you returned, correct?
A. That's correct.

Q. And there were people all over that boat for a number of hours between the time you left and the time you returned, correct?
A. That's correct.
Q. So you don't know whether those switches that you took the photograph of were in the same position that they had been prior to the vessel sinking, correct?
A. That is correct. All I did was document the condition at the time I found it.
Q. That's fine. I'm not suggesting you switched them off, sir. Don't worry. But as I said, there was a number of people aboard the vessel when you weren't there and somebody else could have touched that panel when you weren't watching it, right?
A. That is correct.
Q. Did you ask Mr. Picchione -- you took this photo of the -- Triple N, I think it is in front of you, correct? Exhibit, what number is that? Help me out, sir. The one you just took off.
A. Oh, Triple K.
Q. Triple K. You took that photo of the panels because you thought it was important, correct?
A. Correct.
Q. You never asked Mr. Picchione at any time, Did you shut the bilge pump switches off, sir, did you?

A. I did not.
Q. And you got most of the information that you put in your report from Mr. Vivenzio, who is in the courtroom, correct?
A. A good portion of it, yes.
Q. You didn't get any of it from Mr. Picchione, correct?
A. Correct. Mr. Picchione did not respond down to the --
Q. Yes or no. Did you get any of the information you put in your report from Mr. Picchione, sir?
A. The report was completed that day. Mr. Picchione did not respond down the time that I was there, no.
Q. And even though Mr. Vivenzio gave you a lot of information, one piece of information he didn't give you, he didn't tell you that Mr. Stroker had adjusted the switches on the panel when he was working on the vessel on either Friday or Saturday prior to the sinking, correct?
A. That is correct.
Q. And I assume as a good investigator you would have liked to have known that somebody had touched that panel, as part of your investigation, correct?
A. Under Rhode Island General Law, the Rhode Island Department of Environmental Management is required to

do all boating accident and/or major loss investigations. As a local harbormaster, I am merely requested to do whatever information gathering I can at the initial contact with the incident. That is what I did. I did not do a complete investigation.
Q. Okay. But you would have liked to -- you were a police officer for thirty something years, right? And you want to be a thorough police officer, correct?
A. And I was thorough to the information I had.
Q. I'm asking you --
A. Yes.
Q. And Mr. Vivenzio did not tell you about an employee who touched the bilge switches one or two days before the sinking, correct? That's a yes or no question.
MR. RAUWORTH: Objection. Mischaracterizes the evidence.
THE COURT: Overruled.
A. Correct.
Q. Had he told you that information, you would have wanted to speak to Mr. Stroker, correct?
A. No. I would have just put it in my report.
Q. Okay. Did you call the -- strike that.
MR. LOVEJOY: I'm finished with the witness, your Honor.

THE COURT: Okay. Redirect?

REDIRECT EXAMINATION BY MR. RAUWORTH

Q. Just to clarify, Mr. Ennis, when you went into the main cabin and saw the switch panel, did you see any indication inside the cabin that the level of the water had risen to the point of being in contact with the panel?

A. Yes. The entire interior of the vessel was wet.

Q. And Mr. -- did Mr. Vivenzio give you all the information that you sought on that day?

A. Yes, he did.

Q. And in terms of anything else that related to the incident, was he cooperative with you?

A. Yes, he was.

Q. And did you get the information that you felt was called for in terms of your official duties?

A. Yes, I did.

MR. RAUWORTH: No further questions, your Honor.

THE COURT: Recross?

MR. LOVEJOY: Nothing further, your Honor.

THE COURT: Mr. Ennis, you may step down. Thank you very much.

THE WITNESS: Thank you, your Honor.

THE COURT: Next witness.

MR. RAUWORTH: The defense calls Mr. Dennis

Layfield.

DENNIS LAYFIELD, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: First name is Dennis with two N's, middle initial J, last name Layfield, L-A-Y-F-I-E-L-D.

DIRECT EXAMINATION BY MR. RAUWORTH

Q. Mr. Layfield, what kind of work do you do for a living?

A. I'm a full-time marine surveyor.

Q. All right, sir. And how long have you worked as a marine surveyor?

A. Over 18 years.

Q. And before you worked as a marine surveyor, what did you do by way of a living?

A. Well, I graduated from East Providence High School in 1959 and became a member of the U.S. Coast Guard. I was on active duty for four years as a damage control man and a shipfitter. In that capacity, I would lead repair parties into controlling damage aboard the ship whether it be a grounding, a fire, enemy fire. And so therefore, I had to be knowledgeable about pumps and audible pumps and fixed pumps and what have you. In 1963, September of '63, I was honorably discharged from

the Coast Guard and immediately was employed with D.N. Kelley and Son, Inc., a shipyard in Fairhaven, Mass. And I was employed as an operations manager responsible for 30 employees reporting directly to the president.

In that capacity, I oversaw the operation of a machine shop which was a Detroit diesel dealership, Northern Lights Generator dealership.

Q. You were talking about your experience in the Kelley shipyard?

A. Yes. I was the operations manager there. And in that facility was a, as I had just stated, a Detroit diesel repair facility, a Northern Lights repair facility. We had a fiberglass repair shop, a paint shop, a welding shop and a carpenter shop. And I remained with that firm for perhaps two, two-and-a-half years, at which time I decided to become a full-time marine surveyor. I had, by the way, just before -- I think I have things out of sequence.

So I left D.N. Kelley and I took a position with Marine Safety Consultants, Inc., in which I'm currently employed as a full-time surveyor. I remained with Marine Safety Consultants for almost seven years and then decided to leave the firm, and I started my own surveying firm, in which I was the president and the principal surveyor.

I operated that firm for almost eight years to the day at which time wanting to kind of semi-retire and slow down, Marine Safety Consultants, Inc., offered to purchase my business and I went back to work for them.

If I may, I left a big gaping hole there. When I left the Coast Guard in 1963, after fulfilling my four years active duty, I went to work for Pratt & Whitney Aircraft in East Hartford, Connecticut in their plant protection fire department. There, I was assigned to drive crash apparatus for their airport. They had their own airport facility. Again, it gave me exposure to pumps and pressures, and what have you. In July of '69, six years later, I decided to resume my Coast Guard career, and I reentered, and immediately was assigned to a large Coast Guard cutter, which we were deployed to Vietnam. And upon coming back, I was assigned to various Coast Guard stations, including Marine Safety Office, Boston, and I retired December 31st, 1985 as a Chief Warrant Officer.

Q. All right, sir. And your capacity with the Coast Guard the second time was still as a damage control specialist?

A. Well, it was a -- the proper title would be marine inspection officer or marine safety officer, if you

will.

Q. And in your capacity with the Coast Guard, did you have occasion to inspect various vessel casualties?

A. Absolutely. The Coast Guard marine safety office in Boston would rotate their personnel from the inspection department to licensing and to investigations. And as a marine inspection officer, we would inspect passenger carrying vessels, commercial vessels, if you will. My tour there included being the resident inspector in a Canadian shipyard during the early 1980's when they were building three offshore jack-up rigs for Global Marine Drilling in Houston, Texas. I've also worked as a full-time marine investigator for the Coast Guard and conducting those investigations relative to commercial vessels and operators. And when appropriate, presenting the case before an Administrative Law Judge.

Q. And in the course of your career, approximately how many casualties would you say you've been called upon to investigate, either as a Coast Guard officer or as a civilian marine surveyor? Just your best estimate.

A. I can say that at least in my marine surveying field, I would say 450 to 475. And, you know, maybe 25 or 30 as a marine investigator with the Coast Guard.

Q. All right. In the course of your civilian surveying work, you've had occasion to do surveys of vessels other than in a casualty situation; is that right?
A. That is correct.
Q. All right. And have you had occasion to conduct surveys of yachts, as well as commercial vessels?
A. Yes, I have.
Q. And can you give us a representative sample of the different types of clients that your work was done for as a marine surveyor when you've surveyed and evaluated yachts or commercial vessels?
A. Well, I've completed numerous condition and value surveys of yachts, a hundred gross tons or less, for clients with consideration to them purchasing them. I've done considerable insurance work, claims work. I've done investigations into casualties, fires, collisions, groundings.
Q. Let's put aside casualties for a moment and just talk about investigations of vessels that were let's say involved in a transaction. Have you done work for financial institutions as far as value of vessels?
A. I have, yes.
Q. How about for insurance companies?
A. I have.

Q. The purpose of a survey that's engaged by an insurance company when a vessel is not in a casualty situation, what usually are they looking for from you?
A. Well, they're looking for several things. They're looking -- usually, this requires a vessel that's several years old, say maybe eight to ten years old. There's different parameters for different insurance companies. But they're looking for whether the vessel is structurally intact and suitable for the service of the manufacturer, the intended service of the manufacturer. And, you know, simply is it a reasonable insurance risk.
Q. Okay. And how about value? Does that come into those kinds of surveys?
A. Absolutely.
Q. All right. And you presented opinions as to condition and value of various vessels for these sorts of clients; is that right?
A. That is correct.
Q. And you've been retained through the course of your career to do that kind of work, correct?
A. I'm sorry?
Q. You've been retained through the course of your career to do that kind of work, correct?
A. Yes, that's correct.

Q. Now, were you retained with regard to the EVEREADY incident?
A. Yes, I was.
Q. Did you attend the vessel on various occasions?
A. Yes, I did.
Q. Did you ever observe the vessel afloat on any particular occasions?
A. Yes, I did.
Q. Okay. Once or more than once?
A. More than once.
Q. All right. Were you asked to present any professional opinions in connection with this matter? In connection with the case that we have going on, were you asked to perform any professional opinions?
A. Our client, the insurance company for Point Judith, wished to know if there was any evidence on the part of Point Judith, which I concluded there wasn't.
Q. Okay. And what about -- and you reported that to the insurance company?
A. Yes, I did.
Q. And were you asked to prepare any professional opinions for use in the trial of this case?
A. From you.
Q. Right. And you did that?
A. Yes, I did.

Q. Did you form any opinions in respect of values of this vessel at various times?
A. Yes, I did.
Q. All right. Among those, did you work up an opinion of the value of the EVEREADY before it sank?
A. Yes, I did.
Q. And did you also work up an opinion of the value of the EVEREADY following the sinking?
A. Yes, I did.
Q. Okay. And have you compared -- well, strike that. What was the value -- what is your opinion of the value that the EVEREADY had, the fair market value of the EVEREADY before she sank?
A. The value of the vessel, in my opinion, before it sank was $128,417 before I made adjustments.
Q. And after you made the adjustments?
A. Just a minute, please. Immediately preceding the sinking, I arrived at $93,147.
Q. What was the value that you determined following the sinking?
A. Well, the value --
Q. Or should we call it the salvage value?
A. If you minus the salvage value --
Q. We need to know what the salvage value is before we do the math.

A. $25,000.
Q. All right. And then comparing the pre-sinking value to the salvage value, what value did you come up with that was attributable to the sinking?
A. $93,417.
Q. I'm sorry. Not the pre-sinking value. In other words, the difference between the pre-sinking value and the salvage value.
A. 128,000?
Q. No. I'm asking you, if you look on page five of your opinion, and what I'm asking you for is the difference between the pre-sinking value and the salvage value.
A. The difference between the pre-sinking value of 25,000 -- $68,417.
Q. What process did you go through to arrive at the pre-sinking value? Just briefly describe the steps.
A. I looked at the publications that have these values listed and also using my personal experience.
Q. Okay. How many publications did you consult?
A. I consulted three.
Q. All right. And what are the names of those?
A. Buc, B-U-C; Abos, A-B-O-S, and NADA, N-A-D-A.
Q. How did you consider, or what did you do with the information you got from those publications?

A. Well, I took the figures, or the values, if you will, from each publication, and took the average taking into consideration other variables.
Q. Okay. You mentioned some adjustments that you had made. Do you recall that?
A. Yes, I did.
Q. And what adjustments did you make from those values to get to your value of 93,000 and some dollars?
A. Well, I took the average of the three averages and I used that value, and then I included my opinion as to the guidelines in each of the publications. Some of the publications, the Buc book, for example, there are values that are published for the northeast. So there was no adjustment to be made there. But I also took into consideration, in my opinion, what was the condition of this vessel immediately preceding the loss. And you might think that, you know, the vessel was on the bottom. It was raised. It obviously was a mess on the inside. But nonetheless, I believe that you can determine whether this vessel was maintained in average condition, above average, or less than average. So I considered that. And I also considered all the equipment or upgrades, if you will, that the vessel would have, and what it would bring in the marketplace.
Q. Okay. Now, did you consider the condition of the

core of this vessel before the time that she sank in April of 2005?
A. Yes, I did.
Q. Okay. And what effect, if any, did the condition of the core of the vessel before the sinking in 2005 have on your opinion?
A. Well, it makes the vessel, you know, less than the average Albin 35. And I depreciated funds for that, what I thought would be the cost of repair looking at it visually without disassembling or getting into it.
Q. Okay. And did you consider the -- you've heard the term "pedigree" used. Did you consider the history that the vessel had gone through in its life before it sank at Point Judith?
A. Yes, I did.
Q. What factors in the history were significant to you?
A. Well, it was my understanding that the vessel had sustained some serious structural damage from grounding on some rocks at a jetty, I understand. I learned that there was an engine technician onboard immediately preceding the loss, and that he was working on the engine -- on at least one of the engines. And there was an uncertainty in my mind as to the condition of the engines.

And also, you know, with the boat not riding on its normal static position, riding low in the water, it's just well below average, in my opinion.

Q. And in terms of the salvage value, how did you arrive at the $25,000 figure?

A. Well, over the years, I concluded that, you know, vessels of this type, it's a supply and demand situation. And I also went to the broker. I learned that the broker -- the vessel was up for sale, and I visited the broker and learned that he had some offers of about $20,000. I think he said two. And it was his opinion that the vessel would not bring more than $30,000. So I just arbitrarily chose 25,000, in the middle.

Q. All right, sir. Now, let me draw your attention to the photo that's on the screen. Are you able to see that?

A. Yes, I can.

Q. And do you recognize this picture, Mr. Layfield?

A. Yes. It's a photograph that I took for you.

Q. Okay. And what is depicted in this photograph?

A. Well, what we're showing here is at the bottom left of the picture, just over to the corner there, you can see what is -- where the elbow attaches or connects into the engine, and it's an elbow leading aft, and

there's a rubber hose there that's secured to the elbow with a stainless steel clamp.
Q. What part of the vessel is it, just for context?
A. The starboard side of the vessel.
Q. What component of the vessel?
A. The exhaust system.
Q. Okay. Now, you've heard that there's been some claims that -- regarding removal of certain engine type components that may have taken place in the past with regard to this vessel. Do you have an opinion with regard to whether it would be possible to remove a transmission off of this engine without disassembling this exhaust system?
A. I do not think you have to disassemble the exhaust system. What you would need to do is to remove this hose from that elbow and then just lift the gear out. The transmission, just lift it out of the boat.
Q. That's the hose that's in the foreground of the picture?
A. Yes.
Q. Okay. And you see where the flashlight is showing on some hose clamps?
A. Yes. That's my flashlight.
Q. Okay. And in removing the transmission, do you have an opinion as to whether or not it would be

necessary to disassemble that far?
A. I don't think you would have to, no.
Q. And how about to take out an engine? Would it be necessary to disassemble that far down?
A. No, it wouldn't.
Q. Okay. Now, you've heard some discussion about actions that Mr. Joseph Stroker took when he was commissioning the vessel?
A. Yes, I have.
Q. Do you have an opinion as to whether or not Mr. Stroker acted prudently in the work that he did with regard to this vessel a few days before it sank?
A. Yes. I think he did act prudent.
Q. Okay. You were involved in attempting to find the source of the water that had sunk the vessel?
A. That is correct.
Q. You worked with Mr. Robbins?
A. On one occasion. May 3rd, 2005.
Q. And you dealt with him and other surveyors in the course of your work, correct?
A. Later on, yes.
Q. And do you have an opinion as to whether or not the hole that was eventually found in that exhaust hose was visible without disassembling portions of the exhaust system or the fuel tanks?

A. In no way was that hole visible.
Q. Okay. And once again, the same conditions, without disassembling the exhaust system or the fuel tanks, do you have an opinion as to whether or not it was possible to determine that there was an absence of chafing gear underneath that hose where it passed through the engine room bulkhead?
A. There was not.
Q. I'm sorry. The question is was there -- there was no way to determine whether there was chafing gear?
MR. LOVEJOY: Objection. Leading.
THE COURT: Overruled.
A. Well, if you're onboard the vessel and you're just, you know, in the normal business, you wouldn't see if there was any chafing gear. The only way you would do it is if you made removals and got in there.
Q. All right.
MR. RAUWORTH: Pass the witness, your Honor, in the interest of time. I'm sorry. Move the admission in full of Exhibit Triple J.
THE COURT: Any objection?
MR. LOVEJOY: I thought that was pending.
THE COURT: ID only.
MR. LOVEJOY: I probably had that one yesterday. It was the other witness.

THE COURT: Well, it's being moved for ID only. Do you object or not?

MR. LOVEJOY: No. Sorry.

THE COURT: All right. Triple J will be full.

(Defendant's Exhibit JJJ marked full.)

CROSS-EXAMINATION BY MR. LOVEJOY

Q. Hello, Mr. Layfield.
A. Good afternoon, Mr. Lovejoy.
Q. We know each other, don't we?
A. Yes, we do.
Q. You drafted an opinion in this case, right, for Mr. Rauworth?
A. I'm sorry?
Q. You drafted a paper opinion in this case for Mr. Rauworth, right?
A. Opinion relative to what?
Q. Your opinions in this case.
A. General opinions, yes.
Q. And that report was dated April 30, 2008, correct?
A. That is correct.
Q. And did you write the initial version of that report or was that written by Mr. Rauworth?
A. I wrote the initial. I was contacted by Mr. Rauworth --
Q. The question is just to -- I'm sorry to interrupt,

but did you write the initial report or was it written by Mr. Rauworth?

A. Yes, I did.

Q. Did Mr. Rauworth make additions of his own to that report?

A. No, he did not.

Q. And you got the valuation figures on your own; is that correct?

A. That is correct.

Q. I'm handing you what's marked for identification as Exhibit 137, Mr. Layfield. Do you have it?

A. Yes, I do.

Q. Okay. That is an e-mail from you to Mr. Rauworth dated April 26, 2008.

MR. LOVEJOY: I apologize, your Honor. I have an additional copy here.

THE COURT: I think what we ought to do is break at this time. I have lawyers waiting upstairs on another matter. How much more -- we can go off the record.

(Discussion off the record.)

(Court concluded at 3:50 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

Anne M. Clayton, RPR

MAY 29, 2008

Date