IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * CIVIL ACTION
NORTHERN INSURANCE    * 06-190
COMPANY, ET AL        *
                      * MAY 22, 2008
VS.                   * VOLUME 5
                      *
ALBIN MANUFACTURING,  *
ET AL                 * PROVIDENCE, RI
* * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(BENCH TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: FREDERICK A. LOVEJOY, ESQ.
Lovejoy & Associates
1536 Westminster Street
Providence, RI 02909

FOR THE DEFENDANT: MICHAEL J. RAUWORTH, ESQ.
and CARL E. FUMAROLA, ESQ.
Cetrulo & Capone, LLP
Two Seaport Lane
Suite 1000
Boston, MA 02110

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
| --- | --- |
| DENNIS LAYFIELD | |
| Continuation of Cross-Examination by Mr. Lovejoy: | 7 |
| Redirect Examination by Mr. Rauworth: | 41 |
| **PLAINTIFF'S EXHIBITS** | |
| 133 - | 7 |

THE COURT: Good morning. If I recall correctly, Mr. Layfield was still on the stand when we last were together; is that right?

MR. RAUWORTH: That's right, your Honor.

THE COURT: Mr. Layfield, let's get you back on the stand.

MR. RAUWORTH: Your Honor, a matter of procedure, if you will, before we proceed. During some of the examination toward the close of matters last week, Mr. Lovejoy was making allusions to the idea that I had accused Mr. Picchione of sinking his boat. I would respectfully request that there's no evidence to that effect. I think it's improper to make such allusions, and I would ask that that be prohibited from being repeated.

THE COURT: Well, I've sort of wondered whether that was your theory or not, and you're saying it's not your theory. So if you're --

MR. RAUWORTH: I'm saying I have made no such accusations. Evidence comes in as it is. Mr. Lovejoy made statements that I had accused Mr. Picchione of actively sinking his boat so that's my concern.

THE COURT: I assume that his statements to that effect -- I assumed that they related to conversations or discussions that you all may have had outside of

court. I've been waiting for you to either argue that or not and if you're telling me that that is not your argument, then, you know, I certainly will admonish Mr. Lovejoy to drop it and not talk about it. But if you're suggesting that it may be your argument, you're just not going to say it out loud, then I don't think Mr. Lovejoy should be restricted in sort of, you know, arguing his side of the case. You can't have it both ways is what I'm saying.

So you can decide whether that's your theory or not. If it's not your theory, then I'll certainly tell him to not discuss that.

MR. RAUWORTH: There are items of evidence that are out there. My point was simply that Mr. Lovejoy was representing that I had made an accusation that Mr. Picchione himself or the implication was that I had directly and factually accused Mr. Picchione himself of sinking his boat and that has not happened.

THE COURT: I take Mr. Lovejoy's comments to mean that either you said it explicitly at some point or you have been implying it in the course of this trial.

Frankly, I think you have sort of been implying that as your theory. So, you know, if you're implying that as the theory of your case, he's free to confront

that. He should be accurate in what he says. And I will just tell you, Mr. Lovejoy, if you're confronting an argument by implication, then, you know, you should state it as what the defendant is implying, but I'm not going to prohibit you from referring to the argument unless you're telling me you're not arguing it, and you don't seem to be saying that. So yes, Mr. Lovejoy?

MR. LOVEJOY: The only reason I brought it up was because Mr. Rauworth started asking questions about a fishing knife. And I have a letter from Mr. Rauworth that actually has accusations about Mr. Picchione cutting an air-conditioner hose.

MR. RAUWORTH: I can get the letter, your Honor, this is really my point. We went to the boat in June of last year with Mr. Lovejoy's permission. He decided not to attend. He had no representative there. On that occasion, a surveyor found a knife and found evidence there are cuts in a hose. At that point, because Mr. Lovejoy had elected not to attend, I called him up to let him know what we had found because I thought that was the responsible thing to do, later on followed up with a letter because he had abruptly discontinued that conversation. We simply reported what was there. That's different from an accusation.

THE COURT: Well, you know, I'm not going to

babysit this. You all should try to represent things as accurately as you can. That's all I'm going to say about it. Let's move on with the examination of Mr. Layfield.

MR. LOVEJOY: I have one housekeeping issue, your Honor. There's Exhibit 133, which is an ABYC recommendation involving bilge pump or anti-siphon loop installations, which the clerk has told me is not in full so I wanted to address that issue.

THE COURT: Well, has it been moved in full or not or what?

MR. LOVEJOY: Yeah. I move it into evidence. The Court allowed into evidence a similar ABYC recommendation, which deals with exhaust hoses, which I think is Exhibit 132.

THE COURT: Is there any objection to this?

MR. RAUWORTH: My recollection is -- well, I don't have the transcript in front of me, your Honor, of the proceedings at the time, but my recollection is our concern and the reason for the Court's holding off on admitting that exhibit in full was that Mr. Robbins' disclosure did not disclose anything with respect to Point Judith vis-a-vis the bilge discharge hoses.

MR. LOVEJOY: Your Honor, I would disagree. Mr. Robbins referred to his report that was aimed at

everybody with respect to the bilge pump, the anti-siphon loop installation.

MR. RAUWORTH: I would respectfully suggest that when he referred to anti-siphon loop issues, that was when Albin and Standish were in the case and there was no suggestion that Point Judith had any duty or responsibility in that regard.

THE COURT: I'm going to let it in, and you all can argue about the weight of it later. So 133 will be full.

(Plaintiff's Exhibit 133 admitted full.)

THE COURT: Now, let's move on with this examination and get this over with.

DENNIS LAYFIELD, resumes stand.

CONTINUATION OF CROSS-EXAMINATION BY MR. LOVEJOY

Q. Mr. Layfield, in front of you on the ledge is Exhibit 137 for ID. Do you have that?
A. Yes, I do.
Q. That's an April 26, 2008 e-mail from you to Mr. Rauworth, correct?
A. Yes, it is.
Q. At the end of the second -- excuse me, the second sentence of the end of the first paragraph you write, "Your thoughts at how I arrived at these figures would be appreciated," correct?

A. Yes, I did.

THE COURT: Use the microphone, Mr. Lovejoy.

MR. LOVEJOY: I'm sorry, your Honor.

Q. You wrote, "Your thoughts on how I arrived at these figures would be appreciated." Is that what you wrote on April 26?

A. Yes, I did.

MR. LOVEJOY: I'm going to move it be accepted as a full exhibit, your Honor.

THE COURT: Any objection?

MR. RAUWORTH: Objection as to relevance, your Honor.

THE COURT: Where is this exhibit? Do I have it? What number is this?

MR. LOVEJOY: 137. I handed up copies, but I have an extra copy I can hand your Honor, if I'm permitted.

THE COURT: Sure. Why don't you bring it up. I can't find it.

What's the relevance of this? Do you want to get what Mr. Rauworth's involvement was?

MR. LOVEJOY: Yes.

THE COURT: Just ask him some questions. We'll see about the exhibit. I'm not sure this is relevant yet.

BY MR. LOVEJOY: (Continuing)
Q. Mr. Layfield, you were asked to give an opinion, correct?
A. Yes, I was.
Q. And there were a number of exchanges where a lot of material was, in fact, written by Mr. Rauworth that went into that Rule 26 opinion that you disclosed, correct?
A. Well, it was my opinion. I mean, there was some exchanges back and forth, but I was the one that made the opinion.
Q. Well, do you have your April 27th e-mail?
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Do you have Mr. Rauworth's e-mail on April 27th, 2008, to you?
A. Yes, I do.
Q. Okay. And in the first sentence, or the first paragraph, second sentence, he writes you, "We made a lot of progress in terms of getting that into your own voice"?
A. Yes.
Q. And in this document, he has put in bold and, actually -- strike that, please.

This is the day prior to when you issued your opinion, correct?
A. I think I offered my opinion on April 30th.
Q. Okay. So this is a few days before you --
A. Yes.
Q. -- submitted the final opinion. And in this four-page document, Mr. Rauworth put a number of paragraphs that have substance in them that are in bold which he injected into your opinion as it existed as of the 27th of April, 2008, correct?
A. Yes.
Q. And out of the four pages, sir -- actually, it says one of four, but are there actually three pages?
A. Well, my copy it says page one of, and then it's blank. There's no number there. Page two of, and then it's blank. Page three looks like it may be page three of four. And then the last page, I really can't read what's up at the top.
Q. Well, isn't page four actually what's been marked as exhibit --
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Isn't Exhibit 137 in evidence actually page four of this document?

A. Yes.
Q. So your opinion at that point consists of approximately three pages, correct?
A. Yes.
Q. And if you look at the three pages with the bold insertions by Mr. Rauworth, do you see those?
A. In the bold?
Q. Yes.
A. Yes.
Q. If you add up the bold that's been inserted into your opinion, you get at least one full page out of that addition that was written by Mr. Rauworth, correct?
A. Yes.
Q. Now, in order to render your opinion, you relied on information you got from Mr. Vivenzio, correct?
A. On part of it, yes.
Q. Where did you get the rest of the information, Mr. Layfield?
A. From my own survey.
Q. Okay. And anywhere else?
A. Not that I can recall.
Q. When you did your surveys in April and May of 2005, Mr. Vivenzio had not told you about the malfunctioning bilge pump, correct?

A. I don't believe he did.
Q. Okay. And the first you ever heard of it, Mr. Layfield, is when it was mentioned in Mr. Robbins' supplemental expert report, correct?
A. I'm not sure of that.
Q. Well, was it within the last six months, sir?
A. Yes.
Q. It would have been important for you as a surveyor to have known in 2005 that there had been an issue with a malfunctioning bilge pump, correct, to do a thorough survey?
A. I would disagree with that.
Q. That's fine. You issued a report on April 30th, 2008, correct?
A. When?
Q. April 30th, 2008?
A. I'd have to see it.
Q. The date on your report is April 30th, 2008, sir, right?
A. Yes. It's my disclosure statement.
Q. And you put into this report either the information you had gotten from Mr. Vivenzio, correct?
A. Yes.
Q. Or information that Mr. Rauworth had written and sent to you, correct?

A. Not necessarily Mr. Rauworth, but the other documents that he had sent to me.
Q. Well, we just looked at an e-mail that you agreed had at least one full page of Mr. Rauworth's writings in it, correct?
A. Right.
Q. When you were going back and forth with -- strike that.
Before you issued this April 30th, 2008 report, it went back and forth with you and Mr. Rauworth a number of times, correct?
A. It went back and forth between Mr. Rauworth and myself because it was a working document.
Q. That's fine. But it went back and forth a number of times, right?
A. I wouldn't say a number of times. It went back and forth a few times, yes.
Q. Okay. And before it was sent out to me and the other lawyers, it had Mr. Rauworth's blessing, correct?
A. Yes. I didn't send it to you, so yes.
Q. I mean, he suggested you make changes to it before it went out, correct?
A. Well, let me testify, counselor. First of all --
Q. I'm asking you whatever you put in this report, you got the information either from Mr. Vivenzio,

correct, and when it was written, you had Mr. Rauworth check it out, right?

A. I strongly disagree with that. I got the information from Mr. Vivenzio and other sources, whether it be --

Q. Fine. That's not my question. I just want to know, before you sent out the final version, you had Mr. Rauworth look at it to make sure there was nothing amiss in it, correct?

A. He asked me to make a disclosure statement. I had never made a disclosure statement before. So we had the working document. And I would have just made the disclosure statement of my own. He assisted me in trying to streamline it and make it professional so that it would be easy for the Court.

Q. Okay. That's not my question, sir. With respect to the final document, you had Mr. Rauworth review it before it was sent out, correct?

A. I prepared it, and I sent it back to him.

MR. LOVEJOY: Your Honor --

THE COURT: Well, it's a yes or no question. Did you, as to the final document, all right, not the working drafts, but as to the final document, did you have Mr. Rauworth review it before it was sent out?

THE WITNESS: Yes. He saw the final draft, your

Honor, but he didn't approve it or, you know -- I mean, I concluded that.

THE COURT: Okay.

Q. And you were careful in preparing this document, correct?

A. I would hope so.

Q. Okay. And I'm going to read part of it to you. It's from page three, Mr. Layfield. You state -- are you at page three, sir?

A. Yes, I am.

Q. Towards the bottom. Third from the last paragraph. (Reading:) I have learned that Mr. Joseph Stroker, an employee of Point Judith Marina, apparently found that one of the two electric bilge pumps in the engine compartment would not shut off when the automatic switch was switched on. That's what you wrote, correct?

A. Yes.

Q. Okay. And the automatic switch that you're referring to is the switch that turns on or off all the bilge pumps, correct?

A. I don't know that.

Q. Well, you would have found that out before you put something like this that was so important in your report, Mr. Layfield, correct?

A. I believe I got that from another source.
Q. You got that from Mr. Vivenzio, correct?
A. I suspect I got this from Mr. Stroker's deposition.
Q. You got this from Mr. Stroker's deposition?
A. I think so.
Q. In any event, Mr. Layfield, you made sure what you wrote was correct before you put it in a document that is as important as this, correct?
A. I believe I took it from Mr. Stroker's deposition because he was onboard.
Q. That's not my question. My question is you're a very careful surveyor, and you would have made sure that what you put in this report was accurate, correct?
A. Well, I would hope it to be accurate.
Q. Now, back in 2005, you attended the vessel or at Point Judith at least two times, correct?
A. Yes.
Q. And at that time in 2005, you learned from Mr. Vivenzio that the vessel had been up on a jetty, correct?
A. Yes, I did.
Q. In fact, he gave you one of those famous photographs of the EVEREADY high and dry, correct?
A. No, he did not.

Q. And at that time, you suspected the vessel had some water in its core, correct?
A. Yes, I did.
Q. And at that time, you were told that Mr. Picchione had someone work on one of the engines over the winter?
A. Yes, I did.
Q. So you had those three pieces of information in April and May of 2005, correct?
A. Yes.
Q. Okay. And you wrote a report, did you not, on June 13th, 2005, to One Beacon Insurance Group.
A. Could I see the document?
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
A. This is my report.
Q. You wrote it on June 13th, 2005?
A. Yes, I did.
Q. Okay. And you had all that information I just discussed with you in your mind at the time that you wrote the report, correct?
A. Yes.
Q. And in this report, having all that information in mind, you state that the actual cash value of the vessel immediately preceding the loss is $135,000,

correct?
A. Yes.
Q. Now, Mr. Layfield, you also thought, as Mr. Robbins did, that the water entered -- this little stream of water that you both saw on May 3rd, 2005, was entering the vessel through the skin of the hull, correct?
A. We didn't know where it was coming from.
Q. But that's what you both suspected, right?
A. Maybe Mr. Robbins did. I didn't know where it was coming.
Q. What's down-flooding, Mr. Layfield?
A. Down-flooding would be a term used in the maritime industry in which a vessel would take on sufficient water to, let's say, flood a deck. And if the deck hatches weren't watertight, water would pour in. The example I could give is if this room started flooding and the water got up over this railing and started down-flooding, then you'd have a progressive flooding situation.
Q. Okay. And down-flooding would also be if the water that the EVEREADY was in had gotten to or above the bilge pump thru-hull fittings, correct?
A. Yes.
Q. The water would enter through these hoses,

correct?
A. Yes, it would.
Q. Because they didn't have any anti-siphon loops on this vessel, correct?
A. Yes.
MR. LOVEJOY: May I approach the witness, again, your Honor, please?
THE COURT: Yes.
Q. I'm going to show you your notes, Mr. Layfield, on your workings on this file. And on May 5th -- excuse me, May 4th, 2008, you have an entry -- why don't you read it, sir.
A. There's an entry on May 4th, preparation for trial, M/Rauworth, review 453 pages, five depositions.
Q. And that is the first time that you ever read the depositions in this case, correct?
A. I think so, but I cannot be sure. I would think so.
Q. Okay. Well, if you had read them before May 4th, 2008, you would have an entry in your notes, correct?
A. Not necessarily.
Q. But as you sit here today, you believe you first read them on May 4th, 2008, correct?
A. Yes.
Q. And that is some days after you issued your April

30th, 2008 report, correct?
A. Yes.
Q. So your opinion was based on information other than the deposition of Mr. Picchione, the deposition transcript of Mr. Stroker, the deposition transcript of Mr. Vivenzio, the deposition transcript of Mr. Hilton, correct?
A. Relative to what?
Q. You hadn't read these when you issued your opinion, correct?
MR. RAUWORTH: Objection. Mischaracterizes the testimony.
THE COURT: Overruled.
A. Yes.
Q. And isn't it true that the last person that touched the bilge pump switches on this vessel was Mr. Stroker?
A. No one knows that.
Q. Well, if you had read Mr. Picchione's deposition, you might have learned that he last checked them on Thursday before the sinking?
A. That's Mr. Picchione's statement. I can't verify that.
Q. So what you're telling us is you're going to rely on Mr. Stroker and not Mr. Picchione, correct?

A. I'm going to sit here and tell you that I don't know who last touched those switches.
Q. Now, back in April or May of 2005 --
MR. LOVEJOY: May I approach the witness, again, your Honor?
THE COURT: Yes.
MR. LOVEJOY: Thank you.
Q. You took notes when you did your survey of the EVEREADY, correct?
A. Yes, I did.
Q. In the margin of those notes, you made a note with an exclamation mark, correct?
A. Yes, I did.
Q. That's because it stuck out or bothered you, correct?
A. I don't know if it bothered me, but it stuck out to me, yes.
Q. It was of significance, correct?
A. Yes.
Q. Read what you wrote in the margin in April in your notes.
A. (Reading:) Starboard and port side exhausts, five inches times seven inches at or below the water line.
Q. And you wrote that because that was a place where water might have entered into the vessel, correct?

A. I'm not sure why I entered that.
Q. But you put it off in the margin and you put an exclamation mark on it because it really meant something to you, correct?
A. Yes.
Q. Now, Mr. Layfield, in your opinion to the Court, you referred to a Buc book, the NADA book, and one other price guide book, correct?
A. Yes, I did.
Q. And you attached to your report pages that you used from each of those books, correct?
A. Yes, I did.
Q. And the NADA book that you used, you took the pages out for -- that referenced an Albin 35 for 1995, correct?
A. Yes, I did.
Q. Okay. And you don't have any other pages from NADA attached to your report, correct?
A. No, I do not.
Q. Isn't the proper way to use the NADA book the same way that you use it with automobiles? They have a section of add-ons in the back that you're supposed to put onto the prices that are on the page for the particular vessel, correct?
A. I think all the publications have a scale or

adjustment scale.
Q. Well, the other books have adjustments for where the vessel is or condition, correct?
A. Yes.
Q. But the NADA book, as it is used with automobiles, too, requires you to add in items in order to determine a value, like mileage if it's a car, or if it has a sunroof or it has AC, correct?
A. That's correct.
Q. And you didn't look at or add in the pages from the NADA book that have items that would increase the price of the EVEREADY, did you?
A. No, I did not.
Q. If you turn to the back section of the book, they have a section called "Power Boat Optional Equipment" section, and it lists values to be added should a vessel have those items, correct?
A. Yes, it does.
Q. And you didn't do any additions to this vessel based on how the NADA book works, correct?
A. No, I did not.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Mr. Layfield, I take it you've never seen that

document before, correct?
A. No, I have not.
Q. It's not included in the file that you produced on the day of your deposition, correct?
A. No, it was not.
Q. You would have liked to have seen the complete repair or service history of this vessel in order to form an opinion in this case, correct?
A. In regards to what, value?
Q. No. You've made statements about what work was done after it was up on a jetty, its condition, whether employees of Point Judith should have been able to determine that there was no chafing or strain relief gear on the exhaust hoses, correct?
A. No. I wouldn't necessarily be interested in this document.
Q. Well, in your report, you had an opinion with respect to whether Point Judith should have been able to determine if there was chafing or strain relief on the exhaust hoses, correct?
A. I don't think I had an opinion in my report that they should have known that. I agree that it should have been there.
Q. Well, you address that issue in your report, correct?

A. Yes.
Q. You address the issue of anti-siphon loops in your report, correct?
MR. RAUWORTH: Objection. There was no testimony by Mr. Layfield regarding anti-siphon loops on direct is my recollection.
THE COURT: My notes indicate that the witness gave an opinion about valuation and he gave an opinion about whether the hole in the hose, Exhibit JJJ, whether that was visible without removing the engine, and you couldn't tell from simple observation whether the anti-chafing gear was present. I think that's as far as his opinions went. So he didn't give any opinions about propriety or impropriety or existence of anti-siphon loops.
MR. LOVEJOY: Well, I mean, he gave kind of a blanket opinion that Point Judith hadn't done -- you know, he reviewed these documents that Mr. Rauworth asked him about, and I remember him giving this carte blanche opinion saying, well, I didn't find anything wrong with what Point Judith had done.
MR. RAUWORTH: Your Honor, we were proceeding under a certain measure of urgency at that point, vis-a-vis the scheduling of the trial. So Mr. Layfield didn't necessarily testify on direct to everything that

was disclosed. Some of that was by reason of the fact that we'd covered some of those points to my satisfaction with Mr. Robbins or otherwise. So, obviously, he can be examined about every word in his disclosure report, but to the extent that that didn't become testimony on direct, I would suggest that it's not productive and not relevant.

THE COURT: I have only two opinions from him that I believe he gave. He may have given other opinions in the report, but that's not part of the evidence here in this case.

MR. LOVEJOY: I think it also goes to his credibility, your Honor.

THE COURT: How's that?

MR. LOVEJOY: If he's issuing reports and he doesn't have all the information he needs to do it, it casts a pale over what he's saying with respect to any --

THE COURT: I think you've made your point as to the issues that he has given an opinion on, but I don't want you going into other matters that he has not given an opinion on.

MR. LOVEJOY: I'll restrict myself to the exhaust hose then, if permissible, your Honor.

BY MR. LOVEJOY: (Continuing)

Q. Mr. Layfield, in order to determine what Point Judith could not or could see at any point in time that they had this vessel over a seven-year period, it would have been a useful tool for you to have the repair history, correct?
A. The repair history would be useful, but I don't see where I would need it.
Q. Well, you testified that you didn't think Point Judith would be able to see the cut exhaust hose, correct?
A. Yes, I did.
Q. Okay. But if you had this repair history that showed that they had taken out either both engines or one engine and the sole or what's called the floor of the cabin, they would be able to, in fact, see the engine room bulkhead where the exhaust hose has passed through it, correct?
A. No, they wouldn't. With the engine out, they would not be able to see that hole in the exhaust hose.
Q. Were you here when Mr. Vivenzio testified?
A. No, I wasn't.
Q. So did you ever ask Mr. Vivenzio what his opinion was and whether he could see the engine room bulkhead?
A. I never did, but I can tell you that --
Q. My question is did you ever ask him?

A. No, I did not.
Q. Would you be surprised to find out that he testified that with the engine out and the sole and the floor out of the vessel that you could see the exhaust hose passing through the bulkhead?
MR. RAUWORTH: Objection. Mischaracterizes the testimony.
Q. If he testified -- let me give you a hypothetical, Mr. Layfield. Hypothetically, if Mr. Layfield testified that with the sole of the cabin out, meaning the floor of the cabin, correct?
A. Yes.
Q. And one or both of the engines out that you could see where the exhaust hose passed through the engine bulkhead, that would be important to you, correct?
MR. RAUWORTH: Objection. Calls for speculation.
THE COURT: Overruled.
A. You could see --
Q. My question, it would be important to you to have that information in rendering an opinion, correct?
A. Not in the role that I'm in, no.
MR. LOVEJOY: May I approach the witness, your Honor?
THE COURT: Yes.

Q. On November 15th, 2007, you wrote an e-mail to Mr. Rauworth and Mr. Vivenzio, correct?
A. Yes, I did.
Q. And in paragraph three, you state, did you not, it should be confirmed that Point Judith Marina was not responsible -- let me read -- (Reading:) We refer your attention to Mr. Robbins' report, page one of his report, third paragraph where Mr. Robbins offers an opinion, fuel tank installation was poor for lack of insulation between tank and plywood sheets. It should be confirmed Point Judith was not responsible for this installation. If they did install the fuel tank, they may have installed the exhaust hose. Or if they did install the exhaust hose, marina personnel should have observed the chafing exhaust hose because it was accessible and visible adjacent to the fuel tank.
You wrote that on November 15th, 2007, sir, correct?
A. Yes. This is my e-mail.
Q. My question is you wrote this, right?
A. Yes.
Q. And it was important for you to know on November 15th, 2007, whether Point Judith personnel could see the exhaust hose where it passed through the engine room bulkhead from the rear of the vessel, correct?

MR. RAUWORTH: Objection, your Honor. I would suggest this is irrelevant because there's been no testimony that the fuel tanks were ever out or that Point Judith ever had accessibility behind them.

THE COURT: All right. Overruled.

Q. It was important for you to know what they could see with respect to the reverse side of the engine room bulkhead, Mr. Layfield, correct?

A. Yes.

Q. And you wrote that to Mr. Vivenzio and Mr. Rauworth so that you had that information, correct?

A. I had the information that they should look at it, look into it.

Q. You wanted to know, correct?

A. I didn't want to know. I just made it as a comment.

Q. You wrote this because you did not want to know?

A. I wrote it because -- I wrote it because I had reviewed Mr. Robbins' report and that was --

Q. You wanted to know whether the exhaust hose where it passed through the bulkhead from the rear was visible, correct?

A. Well, yes. Well, I think Point Judith -- it should be confirmed whether Point Judith knew that and that information should be relayed to Mr. Rauworth.

Q. If it was visible, if they had taken the fuel tanks out or worked on the fuel tanks, they should have been able to see where the hose went through the rear of the bulkhead, correct?
A. Would you ask me that again, please.
Q. If they had worked on the fuel tanks, as you were asking, they would have been able to see where the exhaust hose is passed through the bulkhead without any chafing gear, correct?
A. If they had removed the fuel tank, yes.
Q. It would be equally important for you to know, sir, whether they could see the same situation from the engine compartment, correct?
A. On the date of this --
Q. Mr. Layfield, it's a yes or no answer. It would be equally important for you to know whether Point Judith had been able to see at any time during the seven years that they had this vessel whether these hoses were chafing on the bulkhead from the engine room compartment, correct?
A. Yes.
Q. And you didn't get any information from Point Judith about what they had done with respect to removing the engines or removing the sole or the floor of this vessel, correct?

A. Yes.
Q. Would you agree with me, Mr. Layfield, that the switch, bilge pump switch configuration on this vessel was kind of quirky?
A. I can't address that because I didn't look at the switches or how it was wired or --
Q. Okay. So you've rendered an opinion in this case without looking at the bilge pump switches on the vessel, that's your testimony, correct?
A. I took photographs of it --
MR. RAUWORTH: Objection. There's been no opinion testified to with regard to the configuration of the bilge pumps.
THE COURT: He's rendered no opinion on the configuration issue.
MR. LOVEJOY: I think he just answered that he hadn't looked at them.
THE COURT: Right. But it's not relevant because he doesn't have an opinion on it. Again, the only thing he rendered an opinion on here is valuation and the anti-chafing gear or lack thereof on the hoses.
MR. LOVEJOY: Okay. I'll withdraw the question.
May I approach the witness, again, your Honor?
THE COURT: Yes.
Q. I've put in front of you , Mr. Layfield, an e-mail

from Mr. Rauworth to you dated April 28th, correct?
A. Yes.
Q. And can you read what Mr. Rauworth wrote you in the first line, please.
A. (Reading:) To make sure nothing gets overlooked, here's my best list of the things we've discussed, including the new points in Fred's latest.
Q. And Mr. Rauworth gives you one, two, three, four, five, six paragraphs of information to either discuss or insert in your April 30th opinion, correct?
A. Yes.
Q. The first paragraph is entitled hole in the exhaust, correct?
A. Yes.
Q. And Mr. Rauworth gives you six sentences about holes in the exhaust issues, correct?
A. Yes.
Q. Next paragraph, water in bilges and steering area. He gives you two lines under that paragraph, correct?
A. Yes.
Q. Next paragraph, floating low on her lines, he gives you two sentences in that paragraph, correct?
A. Yes.
Q. Then he has a paragraph called single malfunctioning bilge pump, and he gives you five

sentences, correct?
A. Yes.
Q. And then next paragraph says, lack of anti-siphon loops, and he gives you two sentences, correct?
A. Yes.
Q. And the last paragraph is entitled owner's responsibility, and he gives you one sentence with respect to that, correct?
A. Yes.
Q. And that's information you were sure you put into your report, correct, Mr. Layfield?
A. Yes.
Q. All received from Mr. Rauworth, correct?
A. I'm sorry?
Q. All received from Mr. Rauworth, correct?
A. Yes.
Q. Now, you talked earlier about some core saturation issues, correct?
A. Yes.
Q. You're not a core saturation specialist, correct?
A. I am not.
Q. In fact, in your report from 2005, you state that Mr. Pfund who was one of plaintiff's experts is, in fact, a core saturation expert, right?
MR. RAUWORTH: Objection as to involving

Mr. Pfund in this. He hasn't testified and anything he has done is not pertinent to this case.

MR. LOVEJOY: I'll withdraw the question, your Honor.

THE COURT: All right.

Q. And in your opinion as to value, you're talking about this core issue, correct?

A. Yes.

Q. Okay. And it's your opinion that the core issue existed prior to April 2005, correct?

A. Yes.

Q. And the cracks that were seen in some of the photographs would have existed prior to 2005, correct?

A. I don't recall seeing any cracks. I think that was Mr. Robbins' testimony.

MR. LOVEJOY: May I approach the witness, your Honor?

THE COURT: Yes.

Q. This is Exhibit 64A in evidence. When you went to the vessel in April and May of 2005, you found some -- a couple of areas that had stains on them, correct?

A. Yes. I think these -- do you want me to answer?

Q. Yes.

A. I think what I'm looking at here are the wet stains that I observed on the topsides, on the

starboard topsides of the vessel.
Q. When you say "the topsides," you mean --
A. Above the waterline.
Q. Above the waterline? Isn't this the bottom of the vessel, which is where the anti-fouling paint is?
A. I'm sorry. Yes.
Q. This is where you think the water may have gotten into the hull, correct?
A. I suspect that, yes.
Q. The water that was in the hull would have been something that was evident before the vessel was launched in 2005, correct?
A. You mean water in the bilge?
Q. No. This condition of water weeping out of the hull, if we had looked under the vessel before it was launched on Thursday, April 21st, you would have seen evidence of that problem, correct?
A. I don't know that. I mean, the only way I could confirm that is if I was there and looked at it.
Q. Well, if this condition existed before the vessel was launched, should it have been launched in the first place, Mr. Layfield?
A. I think further investigation would be needed, should be necessary.
Q. Now, when you went to the vessel on May 3rd, 2005,

you saw the stream of water, correct?
A. Yes.
Q. You just didn't know where it was coming from, correct?
A. Yes.
Q. And you've calculated that, you know, in your opinion, it came in at three or four gallons an hour; is that correct?
A. Yes.
Q. Now, in October, you took part in a test of the starboard exhaust hose, correct?
A. Yes, I did.
Q. In fact, in Exhibit 84 in evidence, you're shown taking a photograph, correct?
A. Yes.
Q. And in October when this test was conducted, you were present yourself, Mr. Clarke, Mr. Pfund and Mr. Robbins, correct?
A. Yes.
Q. And this exhaust hose that's in Exhibit 84 was put in a position that everyone believed was where it laid with the muffler present, correct?
MR. RAUWORTH: Objection. Calls for commentary on the mental state of others.
THE COURT: Well, I'll sustain that objection.

You can ask him what he understands they were doing here.

MR. LOVEJOY: Okay.

Q. What do you understand that the four of you were doing in Exhibit 84, sir?

A. What were we four surveyors doing?

Q. Yeah. With respect to this.

A. Well, I believe that photograph shows me taking a photograph of the hole in the bottom of the exhaust hose.

Q. There was a test performed in which you took part where there was water put in the rear of the exhaust hose, correct?

A. No. I wasn't there.

Q. You weren't there when water was put in the exhaust hose?

A. Absolutely not.

Q. Well, Mr. Layfield, in this photograph, I'll hand it to you, there's something coming out of the bottom of the exhaust hose, what I surmise to be clear liquid, correct?

A. Yes.

Q. That would be the water that was put in the back of the exhaust hose by Mr. Robbins when you all were conducting this water test on the starboard exhaust

hose, correct?
A. The photograph looks like there's water coming out of the bottom of the hose, but I don't recall Mr. Robbins putting the water in. I have no reason to believe otherwise. I just don't recall.
Q. And at no time when this test was being done did you ever object to what Mr. Robbins or Mr. Pfund or Mr. Clarke was doing with respect to the position of the hose or with respect to pouring water in the house, correct?
MR. RAUWORTH: Objection. Assumes facts not in evidence. Mischaracterizes the testimony.
THE COURT: Well, he said he didn't recall anyone pouring water into the exhaust hose, but you may ask him as to what he does recall and whether he objected to anything.
Q. Well, did you object to anything with respect to -- what do you recall being done with respect to water and the exhaust hose in October of 2007?
A. To be frank with you, I don't recall anything. I'm surprised to see that photograph because I really didn't think I was there. I was there for the floatation test, but I don't --
Q. Okay. But you were wearing a khaki suit and this is you, Mr. Layfield?

A. Yes. I agree that's me, yes.
Q. I'll go on to another photograph. Now, I'm going to show you 60A in evidence.
You see the blue line that's been added to Exhibit 60A, sir?
A. Yes, I do.
Q. That would be the path where the starboard exhaust hose travels on the EVEREADY, correct?
MR. RAUWORTH: Objection. Beyond the scope. Calls for speculation.
THE COURT: Again, how is this relevant to the opinions that he gave?
MR. LOVEJOY: I think he testified about the exhaust hose.
THE COURT: About the chafing gear on the exhaust hose. I don't think he gave any other opinions about the level of the exhaust hose or the --
MR. LOVEJOY: Okay. I'll withdraw that.
THE COURT: -- anything. It's only about the chafing gear. This was a very limited direct examination.
Q. Did you take any measurements in October of 2007?
A. No, I did not.
MR. LOVEJOY: Your Honor, may I have a couple of minutes? I think I'm just about done. Thank you.

May I continue, your Honor?
THE COURT: Yes.
MR. LOVEJOY: Thank you.
Q. Exhaust hoses should be inspected at least once a year in your opinion, correct?
MR. RAUWORTH: Objection.
THE COURT: What's the objection?
MR. RAUWORTH: Beyond the scope. There's no testimony about inspection of exhaust hoses.
THE COURT: I agree with that. Sustained.
MR. LOVEJOY: Your Honor, it has to do with the chafing issue, finding the chafing problem.
THE COURT: The only thing he testified to is the visibility of the chafing gear. There is no other opinion he has given about whether it's important to have it or not have it, about how often one should inspect. He just hasn't given an opinion on that.
MR. LOVEJOY: Okay. I have nothing further, your Honor.
THE COURT: All right. Is there redirect?
MR. RAUWORTH: Yes. Briefly, your Honor.

<u>REDIRECT EXAMINATION BY MR. RAUWORTH</u>

Q. Good morning, again, Mr. Layfield. Placing on the screen the photograph Mr. Lovejoy showed you a little while ago, this Exhibit 64A, this is a photo from the

time before or after the EVEREADY sank at Point Judith Marina?
A. This is -- are you asking me if this is before or after?
Q. Yes. Is this photo from a time before or after the EVEREADY sank at Point Judith Marina?
A. I believe it's before.
Q. Okay. And is this a photo that you were -- were you present when this photo was taken, or did you see this view?
A. That's difficult to say, but I'm going to say with the way that number 1 is made, it looks like my number 1. That's why I'm saying -- but I can't be sure of that. That's how I make my number 1's.
Q. Did you ever see the EVEREADY before it sank at Point Judith Marina?
A. No, I did not.
Q. So you believe that you were present then around the time or that you had a view of this scene that's depicted in this photograph?
A. Yes.
Q. Okay. And prior to the time that you first saw the EVEREADY, what, if anything, had happened to the EVEREADY in terms of -- well, strike that. Had anything happened to the EVEREADY, to your knowledge,

that would have an effect on how much water might be in its core?
A. I understand that she grounded twice, once on a jetty, I understand. And she put a hole in the bottom hull and she took on some water.
Q. Okay. And how about the incident that brings us here. What effect, if any, would that have had on the amount of water in the core of the EVEREADY sinking at Point Judith?
A. Well, it would have made the vessel much heavier.
Q. And that's because of?
A. That's because of the core being saturated from the earlier incidents.
Q. When you say the core would have become heavier, heavier compared to what?
A. It would be heavier, you know, prior to its original condition. Heavier than it was back in 2002, 2001.
Q. Okay. And how about as compared to what it was in 2004, what effect would the sinking have had on its weight?
A. It would have increased it significantly.
Q. And the sinking at Point Judith Marina, what effect would that have had on the amount of water in the core of the vessel compared to the 2004 season?

A. It would have increased.
Q. Okay. Now, on April 24th of this year, you went to the EVEREADY the most recent time, correct?
A. Yes.
Q. And who was there at the time that you went there this last time?
A. I believe Mr. Robbins was there, yourself was there, Mr. Lovejoy was there.
Q. Okay. During the time that you were there, you made certain photographs, correct?
A. On April 24th?
Q. Right.
A. Yes.
Q. Okay. And you've heard Mr. Robbins testify earlier about some measurements that he made on that day, do you recall that testimony?
MR. LOVEJOY: Objection. Beyond the scope of the cross.
THE COURT: I don't recall this being covered in the cross.
MR. RAUWORTH: Well, let me withdraw it. It's simpler to deal with it in another way.
Q. When you were -- let me take you back to last fall, October of 2007, when the EVEREADY was placed in the water the most recent time. Do you recall that?

A. Yes, I do.
Q. And you were there when the EVEREADY went in the water, correct?
A. Yes, I was.
Q. Okay. At that time, was the starboard exhaust system assembled or was it in pieces?
A. I believe it was in pieces.
Q. Okay. At that time, the starboard exhaust discharge port, was that open to the ocean or was it closed off in some way?

MR. LOVEJOY: Your Honor, again, this is beyond cross.

MR. RAUWORTH: With respect, your Honor, he was asked about aspects relating to Mr. Robbins' testimony, and, actually, it was in some regards over my objection. And he was asked about factual issues having to do with what went on on this occasion in October. So I believe the door has been open on that.

THE COURT: I just excluded the testimony, sustaining your objection about photograph 60A, I believe it was, showing the location of the exhaust pipe and so forth. So now you want to go down that road.

MR. RAUWORTH: He was asked about this business of pouring water in the hose. So this testimony

relates to that. And I believe he was allowed to be examined on the question of this so-called water-pour test.

THE COURT: He didn't recall any of the water pouring tests.

MR. RAUWORTH: But it was suggested that he was there and --

THE COURT: What does that have to do with when the boat was put back in the water?

MR. RAUWORTH: Because it took place the same day, and the significance of the test relates to the conditions of the test. In other words, Mr. Lovejoy is going to argue that this so-called water-pour test has some bearing on how the vessel would have performed at the time right before she sank.

THE COURT: But he didn't give any testimony on that. He testified that he didn't remember it, and it's not part of the opinions that you elicited from him.

MR. RAUWORTH: That is correct. It certainly is not part of the opinions I elicited from him. I'm responding to Mr. Lovejoy's cross. And Mr. Lovejoy, I read it to be, was trying to eliciting observations from Mr. Layfield about what was done on the occasion when these other gentlemen did this water test.

THE COURT: You can ask a few questions. I don't think it's relevant. Go ahead.

BY MR. RAUWORTH: (Continuing)

Q. The exhaust port on a vessel, where the starboard exhaust would come out of the vessel, was that closed off or was that open on the occasion of October 2007?

A. It was closed off.

Q. At any time, did you see anything done to that vessel to cause its trim to conform to the way that the vessel would -- I'm sorry. Yeah.

At any time, did you see anything done to that vessel on that day to cause its trim to conform to the trim that it would have had at the point before it sank in April of 2005?

THE COURT: Sustained.

MR. LOVEJOY: Objection.

MR. RAUWORTH: Your Honor, I don't want to belabor the point.

THE COURT: Sustained. Don't bother. There's so many things wrong with that question that it's hopeless.

Q. Did you see anything done with respect to the trim of -- to establishing any particular trim of the EVEREADY on that date in October of 2007?

A. No, I didn't.

MR. LOVEJOY: Objection, your Honor.

THE COURT: Sustained.

MR. RAUWORTH: Your Honor, I would make an offer of proof that if the witness were allowed to proceed, he would testify that there was no adjustments made to cause the trim to approximate the condition that the vessel was in when it was placed in the water prior to the sinking.

THE COURT: All right. Your offer of proof is noted, although there's no way for him to know what the trim would be prior to the sinking. He didn't testify that he knew about that. He never saw the boat prior to the sinking. Go ahead. Next question.

MR. RAUWORTH: Thank you.

Q. Mr. Layfield, the opinions that you've testified to here in the trial, are those -- to what extent are those opinions your professional opinions as opposed to those of someone else?

A. The opinions that I've issued to the Court are strictly my opinions. And it is true that you and I had some working documents relative to my disclosure, only because I had not completed a disclosure before, but the content of that disclosure is my opinion based on the facts that I observed over an extended period.

Q. And on a previous -- strike that. Have you ever

testified under engagement by Mr. Lovejoy?
MR. LOVEJOY: Objection. Relevance.
A. Yes, I have.
THE COURT: Wait a second. There's an objection.
MR. LOVEJOY: Beg your pardon.
THE COURT: Sustained.
MR. RAUWORTH: Your Honor, Mr. Lovejoy has impugned the process by which Mr. Layfield arrived at his opinion. I would respectfully suggest I'm entitled to compare what he did here versus what he did when he was under engagement by Mr. Lovejoy.
THE COURT: Why? How does that make it either proper or not?
MR. RAUWORTH: What's sauce for the goose is sauce for the gander.
THE COURT: Sustain the objection. It's not going to have any impact on what I do with it.
MR. RAUWORTH: Okay. That's all I have on redirect, your Honor.
THE COURT: Any recross?
MR. LOVEJOY: No, your Honor.
THE COURT: All right. You may step down, Mr. Layfield. Thank you.
As I understood it, that was your last -- only

and last witness; is that correct?

MR. RAUWORTH: That's our last live witness, your Honor. We have some requests to admit to provide and then there's some components of Mr. Picchione's deposition testimony we'd like to read into the record. Fairly brief.

THE COURT: Why do you need to read Mr. Picchione's deposition into the record? He was here as a live witness.

MR. RAUWORTH: Well, he was. But as a party, his testimony is admissible as part of our case-in-chief.

THE COURT: Why didn't you just examine him while he was here?

MR. RAUWORTH: Well, to some extent where it flowed, we did. But it's always been my understanding that testimony of a party is fundamentally admissible in the opponent's case-in-chief. We have his deposition testimony. So we've got some brief segments that we would like to -- I'm happy to submit them later if the Court is concerned about time.

THE COURT: They can just be submitted. I don't know why they need to be read into the record.

MR. RAUWORTH: That's fine. As a matter of time, certainly.

MR. LOVEJOY: I object to their submission. The rule is that -- I mean, one, my understanding was that his cross-claim was going to be dealt with while the witnesses were here so they wouldn't have to be brought back.

Second, I don't think there's any authority for putting in portions of a deposition transcript when the witness is within the jurisdiction. We had this agreement that everything would be done when the witness was here.

THE COURT: What rule of evidence covers this, Mr. Rauworth?

MR. RAUWORTH: The testimony of a party is an admission or an admission against interest. I don't happen to recall the rule, but we can certainly get it and submit it when we submit the segments of testimony. I've done this quite a number of times.

THE COURT: It's 804(b)(3). Is that what you're referring to, statement against interest?

MR. RAUWORTH: Or statement of a party. Actually, I think it's 801 or 802, statement of a party is not hearsay, and we would have been at liberty even to call Mr. Picchione in our own case.

THE COURT: 801(d)(2) is what you're referring to then.

All right. Well, the way we'll handle it is you can submit the deposition excerpts that you wish to admit and you supply the authority that allows you to do that in the context that you have here, which is where the witness was available as a live witness and that you've -- and if I agree with your authority, I'll take it in as part of the record.

MR. LOVEJOY: Again, can I just put on the record my objection. We had an agreement that the witnesses were here, all questions were going to be asked of the witnesses so Mr. Rauworth wasn't going to bring them back. So I think I'm prejudiced because I don't have any ability to rehabilitate Mr. Picchione if you let this piece of paper come in. He was here, and he could have asked the questions and I could have had follow-up.

THE COURT: You can put that in a written objection to his submission.

MR. RAUWORTH: I would suggest that there wasn't any agreement, that we proceeded with our case as it was.

THE COURT: All right. Then you all can deal with this in your written submissions, and then I'll either take it into the record or not based on what I see in your submissions.

Let's deal with your request for admission.

MR. RAUWORTH: Well, your Honor, I have my own declaration authenticating the two separate sets of requests to admit, and the request to admit and pertinent correspondence between counsel is attached.

Let me pass this up to the Court and then I have a further observation to make.

My covering declaration was prepared, I think, over the weekend. And then, I think, on Tuesday we were -- I was notified by somebody in my office that we had gotten something with Mr. Lovejoy purporting to relate to the more recent requests. And I got ahold of that, and it purports to be an objection dated May 8th and purports to have been mailed on May 8th, 2008, which was the day before Mr. Layfield testified in deposition in my office across the river in Providence.

Mr. Lovejoy and I were obviously together on May 9th. This purports to have been mailed on May 8th, but the envelope has a postmark of it on May 12th.

So to the extent that this seeks to prevent the use of the most recent requests to admit, I would suggest that it's untimely.

In addition, this is something that was mailed when it could have been handed to me, and over the past let's say five months, I counted up, I haven't gotten

anything else by mail from Mr. Lovejoy for quite a number of months. The most recent thing I got from him that wasn't by e-mail was a fax back in late January and I think I've gotten 34 various e-mail communications including notices of deposition, letters, various sorts of pleadings, all by e-mail. There was nothing said about this at the deposition, before the deposition, nothing sent by e-mail and so we have a late-submitted purported objection that is in an envelope that I'm happy to put in the record that has this May 12th stamp on it.

So for those reasons, we suggest that any response to that request to admit is untimely and not proper.

THE COURT: Mr. Lovejoy?

MR. LOVEJOY: Your Honor, it was mailed from Easton, Connecticut. It was mailed on time. And I send pleadings by mail. Plus the deadline for discovery was over. That's one of the objections in the thing, that the Court allowed me on a motion to take some additional depositions, period.

Mr. Rauworth never went to the Court and asked for leave to have the discovery schedule modified at all. And I objected to this in a timely manner, you know, put it in the mailbox on the evening of the 8th,

and it goes where it usually goes. It goes to a regional -- it's in Easton, Connecticut. It's a small town. It goes to a regional site. It got mailed and went to his office.

MR. RAUWORTH: We also got another pleading by e-mail the very same day on May 8th.

THE COURT: It doesn't matter whether other things have been done by e-mail. What's important is whether it's timely or not. First of all, whether your request for admission is timely; and secondly, if it is, is the objection timely. If the objection is timely -- I mean, it doesn't matter if he sent a hundred things by e-mail. He's entitled to mail his response, hand it to you, how ever he does it, that's not the issue. Then if the objection is timely, then presumably it's not admitted if it's objected to.

So I'll let you -- you've got a copy of what Mr. Rauworth just submitted. You can submit a response to that with the appropriate affidavits and exhibits to answer what it is he is asserting in his declaration and in these documents, and then I'll take it under advisement.

If I find that these admissions are admissions, then I'll make that part of the record. If not, I'll give you a ruling as part of the decision in the case.

MR. LOVEJOY: With respect to the first one, it dealt with a document that I agreed was authentic and agreed to come in.

THE COURT: Just put it all in your post-hearing submissions. So you need to deal with all this as part of your submissions. So in addition to proposed findings of fact and conclusions of law, you have to, either in the same document or a separate document, deal with this submission.

MR. LOVEJOY: Fine, your Honor.

THE COURT: Okay? So does that -- subject to ruling on those two matters, the deposition and the request for admissions, does that complete the presentation of evidence in this case?

MR. RAUWORTH: That does for the defendant, your Honor?

THE COURT: Is there any rebuttal by the plaintiff?

MR. LOVEJOY: No, your Honor.

THE COURT: All right. Then the record will be closed subject to ruling on those two items.

MR. RAUWORTH: As a matter of housekeeping, your Honor, we did just want to touch on the timing question.

As soon as we got back to the office last week,

Friday after the proceedings, we took steps to order the transcripts and learned that they might not be able to be produced in a time that fit within the time frame that had been discussed earlier. I think we made that known to the Court.

THE COURT: I got your letter to that effect. So if you get the transcripts on May 30th, I'll give you two weeks from that date to submit your briefs.

MR. RAUWORTH: Thank you, your Honor.

THE COURT: Now, I want to talk about something else here. I guess we can do this off the record. We don't need to do it on the record.

(Discussion off the record.)

(Court concluded at 11:15 a.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

MAY 29, 2008

______________________________________

Date