UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE II<br>Plaintiffs<br>v.<br>ALBIN MARINE, INC.; STANDISH BOAT YARD, INC. and POINT JUDITH MARINA, LLC.<br>Defendants | CIVIL ACTION NO. 06-190-S |

# DEFENDANT POINT JUDITH MARINA, LLC'S
# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Point Judith Marina, LLC ("Point Judith") hereby urges that the Court enter findings, rulings, and adjudications in accordance with its submissions herein, and in accordance with its accompanying Post-Trial Memorandum.

## I. CAUSATION

Mechanism of Sinking

**Not taking on water upon launch:**

1. Don Vivenzio checked the bilges of the *Eveready* (the "Vessel") for water leaking immediately upon launching and then after securing it in its slip, and no water was coming in. Testimony of Don Vivenzio, Tr. Vol. II, Page 166-67.

2. No water was entering the hull of the Vessel, and no other pumping was necessary. Testimony of Joseph Stroker, Tr. Vol. II, Page 39.

3. Mr. Stroker would not have left the Vessel in the water if it did not have an operational bilge pump that would function automatically. Testimony of Joseph Stroker, Tr. Vol. II, Page 41.

4. Plaintiff Nicholas Picchione II ("Picchione") confirmed that there was no water in the engine room bilges after the boat had been in the water for several hours. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 75, 76, 79.

5. Plaintiffs have no evidence that water entered the hull of the Vessel in any substantial amounts during the Events by reason of any act or omission attributable to the Proponent. Defendant's Request For Admission (dated

March 29, 2007), item No. 4, introduced through Declaration of Michael Rauworth, Docket No. 81.

**Forward engine-room bilge pump working on float switch:**

6. The Vessel had a total of three bilge pumps: (1) a Rule 1500 bilge pump forward-most; (2) a Rule 1500 or 2000 midships; and (3) a third bilge pump in the lazarette aft. The forward-most and aft-most of these had float switches attached to them. Testimony of William Robbins, Tr. Vol. III, Pages 17.

7. Joseph Stroker, a technician for Point Judith, checked the forward-most of the two engine room bilge pumps, and confirmed that it was functioning through actuation by a float switch. Trial Exhibit 6; Testimony of Joseph Stroker, Tr. Vol. II, Page 17; also page 51.

**Forward Bilge pump could have discharged flow into ER bilges:**

8. The forward engine-room pump was operational on a float switch and was slightly higher than the midships engine room bilge pump. They were not separated by a bulkhead. Testimony of Joseph Stroker, Tr. Vol. II, Page 52.

9. Any water that might enter by way of the hole in the exhaust hose could be discharged by either the midships bilge pump, or by the forward bilge pump, whose operation Mr. Stroker confirmed. Testimony of William Robbins, Tr. Vol. IV, Pages 32-33; also Pages 159-160.

10. This pump, actuated by a float switch, had adequate capacity to discharge the water that Mr. Robbins stated he observed entering the hull during the test on May 3, 2005, and that he surmised was the source of the sinking. Testimony of William Robbins, Tr. Vol. III, Pages 159.

**Floating normally as of Sunday night:**

11. The *Eveready II* (the "Vessel" or the "Eveready") was floating normally on Sunday evening, April 24, 2005 at about 9:15 p.m. Testimony of David Clarke, Tr. Vol. IV, Page 111, 113, 122.

12. At that time, its exhaust ports were halfway above the surface of the water. Testimony of David Clarke, Tr. Vol. IV, Page 114.

13. Nicholas Picchione II ("Picchione" or "Plaintiff") told the Coast Guard that he checked the bilges on Saturday and Sunday and they were fine. Testimony of Don Vivenzio, Tr. Vol. II, Page 192.

14. Mr. Picchione checked that the bilge pump switches were on when he visited the boat on Saturday, April 23, 2005. Deposition of Nicholas Picchione (Sept. 26, 2007), at 28-29.

**Bilge Pump Switches Were in the "Off" Position When Vessel Raised:**

15. When the Vessel was raised on April 25, 2005 following the sinking, all of the switches that could have provided power to any bilge pumps were found in the "off" position. Testimony of Don Vivenzio, Tr. Vol. II, Page 172; also Pages 207-8. Testimony of Barry Ennis, Tr. Vol. IV, Page 130.

**Robbins Theory:**

16. Assuming that water entered the Vessel (regardless of source), Plaintiff's only explanation of the mechanism of sinking of the Vessel is in the form of the opinion of William Robbins, as expressed in his report letter and testimony: "The vessel was launched and began leaking water on a slow trickle basis. It's most likely that the bilge pumps were on at that point. There were yard workers and the owner onboard. When Mr. Picchione left the boat, he may at some point have turned off the bilge pump switches unknowingly. Water then accumulated in the bilge, and at some point the water level reached the bilge pump discharge fittings and back-flowed. This would explain the sudden sinking between 10:00 p.m. Sunday night and early Monday morning." Testimony of William Robbins, Tr. Vol. III, Pages 130-33.

17. Mr. Robbins' explanation of the sinking is that bilge pumping capability was active throughout the weekend, and prevented the Vessel from sinking until Sunday night, April 24, 2005. Testimony of William Robbins, Tr. Vol. III, Pages 138-39.

18. Plaintiff's expert's own theory of the way in which the vessel sank is that this very pump was functioning with power up until sometime Sunday evening, April 24, 2005, and that it was shut off at that time. Testimony of William Robbins, Tr. Vol. III, Pages 130-138.

19. If the forward pump — with the float switch — had power to it, the sinking would have been avoided, because the Vessel would not have sunk far enough in the water to allow back flow through any hull opening. Testimony of William Robbins, Tr. Vol. IV, Pages 5-7.

20. The only way to explain the abrupt sinking over Sunday night was that there was power to the automatic bilge pump during the weekend, up until Sunday night. Testimony of William Robbins, Tr. Vol. IV, Pages 15.

21. There is no other basis to explain how the Vessel could have avoided sinking for 60 hours or more leading up to Sunday evening, April 24, 2005, when it was seen floating properly by David Clarke, before it abruptly sank. Testimony of William Robbins, Tr. Vol. IV, Page 15.

22. Even after becoming aware of the work described by Mr. Stroker in Exhibit 6, Mr. Robbins continues to be of the view that that the reason for the sudden sinking from Sunday night (April 24, 2005) to Monday morning (April 25, 2005) was that power to the bilge pumps was no longer available during that later time. Testimony of William Robbins, Tr. Vol. IV, Page 98.

23. Plaintiff has presented no evidence of the amount of water that was necessary to sink the vessel.

24. Plaintiff has failed to sustain his burden of proof that some act or omission of Point Judith caused the sinking.

## II. BAILMENT/CONTROL/RESPONSIBILITY:

25. Picchione was aboard the Vessel on Saturday, April 23, 2005. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 35, 37.

.

26. As of as early as Saturday, April 23, 2005, Picchione was free to start up his boat and take it out or to have it towed elsewhere. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 126-27.

27. Picchione was free as of that time to spend the night on the boat or have a party on board. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 128.

28. Picchione had custody of the Vessel as of Saturday, April 23, 2005. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 128-29.

29. Plaintiff Picchione had a mechanic, technician, or other contractor or vendor aboard the Vessel for several hours during the period following her launch in April 2005 and before her sinking. Defendant's Request For Admission (dated March 29, 2007), item No. 4, introduced through Declaration of Michael Rauworth, Docket No. 81.

30. Picchione was responsible for his boat as the captain and owner at the dock at Pt. Judith, just as when his boats were off-shore in previous casualties. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 140-42.

31. Picchione confirmed that his boat was dry after it was launched in April 2005, and stated that on Saturday, April 23, 2005, he checked that the bilge pumps were on. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 75.

32. Pt. Judith never communicated any agreement to do engine commissioning or a sea trial on the Vessel in the spring of 2005. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 69-70.

33. Pt. Judith did not perform a commissioning on the engines in 2005. Testimony of Don Vivenzio, Tr. Vol. II, Page 106.

34. Pt. Judith declined to perform an engine start-up or sea trial on the Vessel's engines in 2005 because they had been worked on by an outside mechanic. Testimony of Don Vivenzio, Tr. Vol. II, Page 164-65.

35. Pt. Judith had hastened its schedule for launching the Vessel in order to accommodate Mr. Picchione's expressed desire to have the boat ready for engine work by his own mechanic, Dan, to take place on Saturday, April 23, 2005. Testimony of Don Vivenzio, Tr. Vol. II, Page 189-90.

36. Following the completion of the work done by Mr. Stroker on Friday, April 22, 2005, the Vessel was in Mr. Picchione's normal summer slip. All of the work that Pt. Judith had agreed to do was complete. Pt. Judith had no control over who came and went on the Vessel. Mr. Picchione was free to take the Vessel somewhere else. Testimony of Don Vivenzio, Tr. Vol. II, Page 189.

37. There is no evidence that anyone from Pt. Judith was aboard the Vessel after Friday, April 22, 2005.

38. When the Vessel sank on April 25, 2005, Point Judith was only providing docking space to the Plaintiff and no bailment relationship existed.

39. Point Judith was not a bailee of the vessel at the time that it sank.

40. On September 29, 2004, Plaintiff signed a document entitled 2005 Summer Dockage/Rack Storage Contract (the "Slip Rental Contract") with Point Judith covering the period of April 15, 2005 to October 31, 2005. Trial Exhibit A.

41. Trial Exhibit A provides, in pertinent part, as follows:

> 4. Tenant acknowledges that he has inspected either the assigned slip or storage space and further acknowledges satisfaction therewith and acceptance "as is". Tenant acknowledges this agreement is not a bailment of Tenant's vessel but a lease of storage space or slip only and Marina's liability is limited solely to the maintenance and upkeep thereof.
>
> * * *
>
> 11. All reasonable precautions will be taken by the Marina to ensure the safety of the tenant's property. However, the Marina assumes no responsibility of the safety of any vessel docked in the Marina and it is expressly agreed that the Marina will not be liable for any loss due to fire, theft, collision, accident, vandalism, windstorm, high or low waters, hail, rain, ice or damage to said vessel or any act of God, its equipment or any property in or on said vessel however arising including the negligence of an employee of the Marina or of another patron. Tenant waives any and all claims for such loss or damage against the Marina, agrees to hold the Marina harmless from and against any such claim and to seek compensation from his own insurance policy for any such loss. Tenant agrees to have his vessel insured by complete marine coverage including liability. Each Tenant will be held responsible for damage caused by said Tenant or Tenant's vessel to other vessels in the Marina or to structures of facilities thereof.
>
> * * *
>
> 35. This agreement does not include the providing by the Marina of any type of watchman or security service other than the Town of South Kingstown police and fire department services. The Tenant agrees that the Marina shall not be liable to the Tenant by reason of intrusion, theft, vandalism, arson or other criminal activity of any kind or degree on or about the Tenant's vessel whether by land or water.

42. The slip rental provisions of Trial Exhibit A — agreed to in writing by the plaintiff — make clear that Point Judith undertook no obligation to prevent the Vessel from sinking.

43. Limitation of liability provisions in slip rental agreements are routinely enforceable in admiralty. *In Re Stanton*, 2005 WL 2035586, *8 (D.Mass. 2005) (citing *La Esperanza de Puerto Rico, Inc. v. Perez v Cia. De Puerto Rico, Inc.*, 124 F.3d 10, 16-17 (1st Cir. 1997). "[T] his is especially true in the relationship…[that involves] a marina and a boat owner contracting to rent a slip at the marina to dock a boat." *Sander v. Alexander Richardson Investments*, 334 F.3d 712, 719 (8th

Cir. 2003). Marinas merely leasing boat slips to vessel owners owe no duty as to the seaworthiness of the vessels. *See Travelers Indem. Co. v. Gulf Weighing Corp.*, 352 F.Supp. 335, 343 (D.La. 1972)

44. Because no bailment relationship existed when the Vessel sank on April 25, 2005, and because the slip rental contract expressly disclaimed liability on the part of the marina, Pt. Judith had no duty to prevent the sinking.

<u>Owner Allowed Others To Be Aboard Vessel In His Absence:</u>

45. Picchione allowed people to use the *Eveready* in the spring of 2005 in the same way as he allowed them to do at other times and with his other boats. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 123.

46. Picchione had told others where he hid the key to his boat, and knew that people came aboard his boat "to hang around, have a beer, do whatever they're going to do," and he knew that such people entertained friends on board. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 120.

47. By reason of finding a "barrette on the couch or a piece of clothing that doesn't belong there." Picchione was aware of people making use of his boat during his absence. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 125.

<u>Midships Bilge Pump:</u>

48. The Vessel had a total of three bilge pumps: (1) a Rule 1500 bilge pump forward-most; (2) a Rule 1500 or 2000 midships; and (3) a third bilge pump in the lazarette aft. The forward-most and aft-most of these had float switches attached to them. Testimony of William Robbins, Tr. Vol. III, Pages 17.

49. There is no basis to conclude that there was anything wrong with the midships bilge pump itself, as opposed to a wiring issue. Testimony of Joseph Stroker, Tr. Vol. II, Page 44.

50. Exhibit 129 is the midships bilge pump. Testimony of William Robbins, Tr. Vol. III, Pages 70.

51. The midships bilge pump of the Vessel, in its 2005 condition, was not controlled in any way by the switch with a taped-over label marked at "Auto."

Ability of Seawater to Enter the Vessel Through the Hole In the Exhaust Hose:

52. The Vessel was floating normally on Sunday evening, April 24, 2005 at about 9:15 p.m. Testimony of David Clarke, Tr. Vol. IV, Page 111, 113, 122.

53. At that time, its exhaust ports were halfway above the surface of the water. Testimony of David Clarke, Tr. Vol. IV, Page 114.

54. The testimony of David Clarke is the only direct evidence of the depth at which the Vessel was floating after the April 2005 launch, but before the sinking.

55. Exhibit 64, depicting the exhaust discharge port below the waterline, was taken on May 3, 2005, when the boat was relaunched following the sinking. Testimony of William Robbins, Tr. Vol. III, Pages 27.

56. The sinking of the Vessel on April 25, 2005 would have made it much heavier than beforehand because of water taken into the core of the vessel. Testimony of Dennis Layfield, Tr. Vol. V, Page 43.

57. When the Vessel was launched at the request of surveyors on May 3, 2005, it rode considerably lower in the water than it had ever ridden before, because of the sinking that had intervened on April 25, 2005. Testimony of Don Vivenzio, Tr. Vol. II, Page 174-178.

58. The exhaust ports, as shown in Exhibit YY, are fully submerged, reflecting that the Vessel was floating several inches deeper in the water on May 3, 2005 than she was floating on the evening before the sinking, that is, Sunday, April 24, 2005.

59. When the Vessel was launched on May 3, 2005 for the forensic test following the sinking, and was floating with her exhaust ports fully submerged as shown in Exhibit YY, water did not enter the hull continuously. Testimony of William Robbins, Tr. Vol. IV, Pages 44.

60. On that occasion, in order to determine whether a leak could be found, the Vessel was twisted in the straps of the Travelift while it was in the water. Testimony of Don Vivenzio, Tr. Vol. II, Page 83.

61. Water entered the Vessel intermittently when it was rolled from side to side in the straps of the Travelift on May 3, 2005. Testimony of Don Vivenzio, Tr. Vol. II, Page 85.

62. William Robbins did not determine the source of ingress of water into the Vessel on May 3, 2005, when he first observed it. Testimony of William Robbins, Tr. Vol. III, Pages 31.

63. Mr. Robbins first discovered the hole in the exhaust hose in October 2007, and drew the conclusion that it had been the source of the leak. Testimony of William Robbins, Tr. Vol. III, Page 42.

64. Mr. Robbins has never seen the starboard exhaust hose while the boat was actually floating in the water. Testimony of William Robbins, Tr. Vol. IV, Page 51.

65. Mr. Robbins testified that his test involving pouring water into the exhaust hose in October 2007 was done with the hose horizontal, and that in performing it, he did not account for the trim that the Vessel would have had while floating in the water. Testimony of William Robbins, Tr. Vol. IV, Pages 62-4.

66. No one ever performed a test that determined whether water could reach the hole in the exhaust hose while the Vessel was floating at the depth level that she had prior to the sinking.

67. Assuming that the water seen to be entering the hull on May 3, 2005, was entering by way of the hole in the exhaust hose, that water did not enter the Vessel continuously despite the fact that the Vessel was floating deeper on that date than it ever had done before.

68. Mr. Robbins' conclusion that water that sank the Vessel entered the hull by way of the hole in the exhaust hose is unsound. This is because it depends on the assumption that the Vessel — before the sinking — was floating as deeply as she was floating on May 3, 2005, despite the fact that the Vessel had never floated that deeply in the water at any time in the past.

69. The test conducted on October 17, 2007 — involving pouring water into the exhaust hose — was improper and unsound because the hose was arrayed horizontally, without any determination that this hose would have been horizontal when the Vessel was afloat before the sinking.

70. The test conducted on October 17, 2007 was improper and unsound because Mr. Robbins did not determine the angle that the exhaust hose would have had with respect to the horizontal while the Vessel was afloat before the sinking.

71. Mr. Robbins did not determine the height of the hole in the exhaust hose as compared to the level of the water outside the hull as the Vessel would have been floating before the sinking.

72. Mr. Robbins professional capabilities in this regard cannot be relied upon because he cannot explain how the Vessel would have remained at a stable depth in the water for six hours — long enough to form a scum line, as he claimed it would — during the ten-hour period in which it was sinking. Testimony of William Robbins, Tr. Vol. IV, Page 17.

73. Mr. Robbins testified in his deposition that the point where the exhaust hose passes through the engine room bulkhead was an estimated six inches above the level of the hose at the point of the exhaust's overboard discharge. Testimony of William Robbins, Tr. Vol. IV, Page 58.

74. Despite the foregoing, William Robbins asserted that the hole in the exhaust hose would have stood at a point six inches below the level of the outside water at the time when the boat was launched in April 2005. Testimony of William Robbins, Tr. Vol. IV, Page 10.

75. This conclusion depends on the assumption that before the sinking the Vessel was floating at the same depth that it was floating on May 3, 2005 is dependent on what is depicted in Exhibit YY, taken on May 3, 2005. Testimony of William Robbins, Tr. Vol. IV, Page 47.

76. This conclusion is unsound because the Vessel was floating considerably deeper on May 3, 2005 than on April 24, 2005, as observed by Mr. Clarke.

77. Exhibit YY is the same image as Exhibit 64.

78. Mr. Robbins' conclusions about the path of the water cannot be relied upon because of his unsound assumption that the vessel's draft was the same on April 24, 2005 as on May 3, 2005. Testimony of William Robbins, Tr. Vol. IV, Page 47.

79. Mr. Robbins did nothing to determine the rate of flow by which water could have entered the hull through the hole in the exhaust hose, or how much water would have been required to sink the Vessel by any amount. Testimony of William Robbins, Tr. Vol. III, Pages 155-157.

80. Mr. Robbins has given the professional opinion that in April, 2005, "[t]he vessel was launched and began leaking water on a slow trickle basis." Testimony of William Robbins, Tr. Vol. III, Pages 130-33.

81. Mr. Robbins did nothing to determine the rate of flow by which water could have entered the hull by back-flow through the bilge hose. Testimony of William Robbins, Tr. Vol. III, Pages 157-159.

82. Mr. Robbins did nothing to look into whether the Vessel had been actively taking on water during the previous boating season. Testimony of William Robbins, Tr. Vol. IV, Pages 14-15.

83. Mr. Robbins' measurements of the comparative height of the hole in the exhaust hose and the exhaust discharge port did not account for the thickness of the hull. Testimony of William Robbins, Tr. Vol. IV, Page 60.

84. Because a leaking condition was not continuous when the Vessel floated at an unnaturally deep draft on May 3, 2005 (following the sinking), it is an unsound to conclude that water would have entered the Vessel through the exhaust hose when the Vessel was floating several inches higher in the water during the weekend of April 23-24, 2005.

## III. WARRANTY OF WORKMANLIKE PERFORMANCE:

Scope of Marina's Work:

85. The scope of Point Judith's obligations cannot be expanded by invocation of the warranty of workmanlike performance — this does not permit one party to impose terms that the other party never agreed to. *See Federal Marine Terminals, Inc. v. Worcester Peat Co.*, 262 F.3d 22, 29 (1st Cir. 2001); *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531, 537 (D.S.C. 2007) (contractor providing limited service to engine did not have responsibilities to detect or deal with flaws in engine outside its undertaking).

86. Pt. Judith never undertook with Mr. Picchione to see to it that nothing would go wrong with his boat. Testimony of Don Vivenzio, Tr. Vol. II, Page 188.

87. Pt. Judith does not assume any responsibilities to its customers' boats apart from what it expressed in the specific service agreements it negotiates with them. Testimony of Don Vivenzio, Tr. Vol. II, Page 197.

88. Pt. Judith does not undertake to provide any kind of preventive maintenance oversight or advice to customers. Testimony of Don Vivenzio, Tr. Vol. II, Page 202-205.

<u>Further Steps as to Midships Bilge Pump</u>:

89. Picchione actively exercised approval/veto power over work to be done on his boat. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 133.

90. This same approval/veto process applied to work he had arranged to have done with respect to bilge pumps. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 134.

91. Picchione has never had a bilge pump replaced on an emergency basis. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 138.

92. Especially in light of his prior practice, there is no basis to conclude that Mr. Picchione would have taken any steps before the work week of April 25, 2005, to do anything about the midships bilge pump, even if he had seen the content of Trial Exhibit 6.

93. The scope of work as between Picchione and Pt. Judith was a matter of specific agreement between them, no greater than what the plaintiff agreed to pay for. Testimony of Nicholas Picchione II, Tr. Vol. I, Pages 58-60.

94. Pt. Judith sought Picchione's permission before doing work on his boat. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 62.

95. Pt. Judith requires the consent of the owner and a separate repair order in order to deal with any conditions that Pt. Judith brings to the customer's attention and that the customer wishes to have dealt with. Testimony of Don Vivenzio, Tr. Vol. II, Page 181-83.

96. Pt. Judith declined to do certain work on Picchione's boat, including the work on the port engine over the winter season of 2004-05. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 64.

97. Picchione has chosen to have people not connected with Pt. Judith do pre-launching work. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 61.

98. Pt. Judith never communicated any agreement to do engine commissioning or a sea trial on the Vessel in the spring of 2005. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 69-70.

Inspection of Exhaust Hoses:

99. Pt. Judith has never agreed or undertaken routinely to make inspections of areas not readily visible without disassembly. Testimony of Don Vivenzio, Tr. Vol. II, Page 181.

100. Mr. Picchione never engaged Pt. Judith to do anything to determine the status of the exhaust hoses on the Vessel. Testimony of Don Vivenzio, Tr. Vol. II, Page 180.

101. Pt. Judith has never agreed to do the disassembly necessary to view the exhaust hoses on this Vessel, or on any other vessel. Testimony of Don Vivenzio, Tr. Vol. II, Page 158.

102. All the surveyors agreed that the hole in the hose was not detectible without removing the tanks. Testimony of William Robbins, Tr. Vol. III, Pages 146.

103. It was not possible to see the bottom of the exhaust hose without taking out the fuel tanks. Testimony of William Robbins, Tr. Vol. III, Pages 149.

104. The bottom of the exhaust hose was not visible where it passed through the engine room bulkhead and entered the lazarette. Testimony of Don Vivenzio, Tr. Vol. II, Page 149.

105. Standish's practice is to inspect hoses only if they're fully accessible. Testimony of Ken Hilton, Tr. Vol. I, Page 165.

106. Standish has never inspected Albin 35 exhaust hoses when the deck was in place and the fuel tanks were in place. Testimony of Ken Hilton, Tr. Vol. I, Page 166.

No Showing of Violation of Any Duty By Pt. Judith:

107. Mr. Robbins admitted that the presence of water in the aft bilge area — that was pumped out by Mr. Stroker — did not function as an alarm that the Vessel was taking on water from the sea. Testimony of William Robbins, Tr. Vol. IV, Pages 23-31.

108. Mr. Stroker did the right thing with regard to his work surrounding the launch of the Vessel. Testimony of William Robbins, Tr. Vol. IV, Pages 32.

109. What Joseph Stroker did was proper. Testimony of Dennis Layfield, Tr. Vol. IV, Page 156.

110. There is no evidence that Pt. Judith's practices or actions fell below any standard of workmanlike performance.

## IV. Breach Of Contract:

111. To prove breach of contract, the plaintiff must show the existence of a valid, binding contract, that defendant breached the contract, and that the plaintiff sustained damages as a result. *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007).

112. Pt. Judith never undertook with Mr. Picchione to see to it that nothing would go wrong with his boat. Testimony of Don Vivenzio, Tr. Vol. II, Page 188.

113. Pt. Judith does not assume any responsibilities to its customers' boats apart from what it expressed in the specific service agreements it negotiates with them. Testimony of Don Vivenzio, Tr. Vol. II, Page 197.

114. Pt. Judith does not undertake to provide any kind of preventive maintenance oversight or advice to customers. Testimony of Don Vivenzio, Tr. Vol. II, Page 202-205.

115. Pt. Judith undertook no obligation in contract to prevent plaintiff's boat from taking on water.

116. Pt. Judith undertook no duty of inspection in connection with performing repair work.

117. Plaintiff has not established any contractual obligation taken on by Pt. Judith that it breached resulting in damage to the plaintiff.

## V. NEGLIGENCE/DUTY TO WARN:

118. To make out a case for negligence, a plaintiff must show by a preponderance of the evidence that: (1) defendant owes plaintiff a legal duty; (2) defendant breached that duty; (3) the breach was a proximate or legal cause; and (4) actual damage or injury. *Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515, 522 (1st Cir. 1990).

119. Plaintiffs have failed to show that the Vessel was damaged by any cause — for example, a fire on the dock caused by Pt. Judith — that a marina would have a common-law duty in tort to prevent.

120. Admiralty recognizes no duty in tort to protect the vessel of another from sinking or other harm due to an internal cause. A wharfinger is "not the guarantor of the safety of a ship coming to his wharf." *Old Park Inv., Inc. v. The Vessel "LEDA,"* 469 F.Supp.2d 1201, 1209 (S.D.Fla., 2006).

121. No extrinsic cause attributable to Pt. Judith played any role in the sinking of the Vessel.

122. Point Judith was not a seller of goods (as Standish was), nor a landowner, and there is no personal injury involved here. Even if it had been a landowner, and if Mr. Picchione had suffered personal injury, there would have been no liability in the nature of failure to warn, unless Point Judith had *known* about the hole in the exhaust hose, and there is no evidence to that effect. *See, e.g., Bucki v. Hawkins*, 914 A.2D 491, 495 (R.I., 2007), citing *Mead v. Papa Razzi Restaurant*, 840 A.2d 1103 (R.I. 2004). Where there is no personal injury, but instead only harm to Mr. Picchione's own property, the liability cannot be any greater.

Back-Heavy Condition:

123. During the season of 2004 or before, Mr. Vivenzio had several conversations with Mr. Picchione about the way that the stern of the Vessel seemed to ride lower in the water than would be expected, and Mr. Picchione declined to do anything about this. Testimony of Don Vivenzio, Tr. Vol. II, Page 179-80.

124. Picchione had known his boat was "back heavy" before the sinking, and never chose to do anything about this. Testimony of Picchione, Tr. Vol. I, Page 55.

125. Any effect of the so-called "back-heavy" condition of the Vessel prior to April 25, 2005 is attributable solely to Picchione.

Midships Bilge Pump:

126. Picchione actively exercised approval/veto power over work to be done on his boat. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 133.

127. This same approval/veto process applied to work he had arranged to have done with respect to bilge pumps. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 134.

128. Picchione has never had a bilge pump replaced on an emergency basis. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 138.

129. Especially in light of his prior practice, there is no basis to conclude that Mr. Picchione would have taken any steps before the work week of April 25, 2005, to do anything about the midships bilge pump, even if he had seen the content of Trial Exhibit 6.

Anti-Siphon Loops:

130. Mr. Robbins has no knowledge of the extent to which boats in existence comply with the ABYC standards regarding anti-siphon loops. Testimony of William Robbins, Tr. Vol. IV, Page 66.

131. Some manufacturers, in Mr. Robbins' experience, build boats without anti-siphon loops Testimony of William Robbins, Tr. Vol. IV, Page 67-68.

132. Mr. Robbins did not recommend to all of his customers whose boats lacked anti-siphon loops that they remove serviceable bilge pump hoses and replace them with hoses containing anti-siphon loops. Testimony of William Robbins, Tr. Vol. IV, Page 68.

133. On the occasion of replacing a bilge pump served by a discharge hose without an anti-siphon loop, Mr. Robbins may not have notified each owner

about the lack of such a loop. Testimony of William Robbins, Tr. Vol. IV, Page 69.

134. There are no facts supporting a widespread practice on the part of boatyards proactively to install bilge pump discharge hoses with anti-siphon loops when no work on the bilge discharge hose is otherwise called for.

135. There is no basis to conclude that there was any standard in the industry that called upon boatyards proactively to install bilge pump discharge hoses with anti-siphon loops when no work on the bilge discharge hose is otherwise called for.

136. Pt. Judith does not assume any responsibilities to its customers' boats apart from what it expressed in the specific service agreements it negotiates with them. Testimony of Don Vivenzio, Tr. Vol. II, Page 197.

137. Pt. Judith does not undertake to provide any kind of preventive maintenance oversight or advice to customers. Testimony of Don Vivenzio, Tr. Vol. II, Page 202-205.

138. There is no evidence that Pt. Judith agreed to provide preventive maintenance service or consultation to Mr. Picchione, much less as to bilge pump discharge hoses.

139. There are no facts supporting a widespread practice on the part of boatyards proactively to seek out or identify "as-built" conditions of customers' vessels that might warrant improvement and bring them to the attention of owners.

140. There is no basis to conclude that there was any standard in the industry that called upon boatyards proactively to seek out or identify "as-built" conditions of customers' vessels that might warrant improvement and bring them to the attention of owners.

141. Mr. Robbins, as a boatyard service manager, did not undertake to notify his clients of each condition on their boats that did not measure up to some industry standard. Testimony of William Robbins, Tr. Vol. IV, Page 70.

142. There is no basis in fact supporting any duty of Point Judith to warn Mr. Picchione about the manufacturer's failure to install anti-siphon loops on

certain bilge pump discharge hose on the Vessel, or to do anything else with regard to them.

Chafing Gear:

143. From a viewpoint in the engine room, looking aft at the starboard exhaust hose, Mr. Robbins is not able to see whether there is any chafing gear or not under the hose. Testimony of William Robbins, Tr. Vol. IV, Page 100.

144. The presence or absence of chafing gear could not be determined without making removals. Testimony of Dennis Layfield, Tr. Vol. IV, Page 157.

145. There are no facts supporting a widespread practice on the part of boatyards proactively to install chafing gear on exhaust hoses when no work on the exhaust hose is otherwise called for.

146. There is no basis to conclude that there was any standard in the industry that called upon boatyards proactively to install chafing gear on exhaust hoses when no work on the exhaust hose is otherwise called for

147. Pt. Judith does not assume any responsibilities to its customers' boats apart from what it expressed in the specific service agreements it negotiates with them. Testimony of Don Vivenzio, Tr. Vol. II, Page 197.

148. Pt. Judith does not undertake to provide any kind of preventive maintenance oversight or advice to customers. Testimony of Don Vivenzio, Tr. Vol. II, Page 202-205.

149. There is no evidence that Pt. Judith agreed to provide preventive maintenance service or consultation to Mr. Picchione..

150. There are no facts supporting a widespread practice on the part of boatyards proactively to seek out or identify "as-built" conditions of customers' vessels that might warrant improvement and bring them to the attention of owners.

151. There is no basis to conclude that there was any standard in the industry that called upon boatyards proactively to seek out or identify "as-built" conditions of customers' vessels that might warrant improvement and bring them to the attention of owners.

152. Mr. Robbins, as a boatyard service manager, did not undertake to notify his clients of each condition on their boats that did not measure up to some industry standard. Testimony of William Robbins, Tr. Vol. IV, Page 70.

153. There is no basis in fact supporting any duty of Point Judith to warn Mr. Picchione about the manufacturer's failure to install chafing gear on certain bilge pump discharge hose on the Vessel, or to do anything else with regard to them.

154. Pt. Judith undertook no duty of inspection in connection with performing repair work.

No Duty to Detect, Report, or Remedy Unfavorable Conditions:

155. The fact that Point Judith agreed to do *certain* things with respect to the vessel does not mean that it had any obligation, in tort or otherwise, to detect or report conditions outside of the scope of its work that were unsafe, or needed attention, or that Mr. Picchione might have wished to change. This is the case even where personal injury might result. *Malloy v. Doty Conveyor*, 820 F.Supp. 217 (E.D.Pa.1993); *Barry v. Stevens Equipment Co.*, 176 Ga.App. 27, 335 S.E.2d 129 (1985); *Ayala v. V. & O Press Co.*, 126 A.D.2d 229, 512 N.Y.S.2d 704 (1987); *Rolph v. EBI Companies*, 159 Wis.2d 518, 464 N.W.2d 667 (1991); *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531, 537 (D.S.C. 2007); *Byerly v. Connor*, 415 S.E.2d 796 (S.C. 1992); *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950 (5th Cir. 1979); *Wissman v. General Tire Co. of Philadelphia*, 192 A. 633 (Pa. 1937); *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, (Pa. 1989); *Menz v. New Holland North America, Inc.*, 440 F.3d 1002, (8th Cir. 2006); *Seo v. All-Makes Overhead Doors*, 97 Cal.App.4th 1193 (Cal.App. 2 Dist. 2002); *Sculles v. American Environmental Products, Inc.*, 592 N.E.2d 271 (Ill.App.1 Dist., 1992); *Spears v. Sanchez*, 207 So.2d 791 (La.Ct.App., 1968); *Risk v. Woeste Eastside Motors, Inc.*, 696 N.E.2d 283 (Ohio App., 1997).

Economic Loss Rule:

156. The relationship of Point Judith to Mr. Picchione was solely in contract, and the plaintiffs are not permitted to get around the limits set by the scope of the contractual undertaking by pleading in tort, by reason of the "economic loss doctrine," which applies to marine services contracts. *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F.Supp. 380, 386 (D.Conn. 1994), citing *East*

*River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471 (D.R.I. 1984).

Superseding Cause:

157. As to the proximate cause factor in a maritime context, "the common law is clear that certain intervening events — otherwise called 'superseding causes' —are sufficient to sever the causal nexus and cut off all liability." A*rcher v. Warner*, 538 U.S. 314, 326 (2003). "The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff….of a superseding cause of the injury renders the negligence of the defendant a remote cause of the injury, and he cannot be held liable." *Archer*, *supra*, at 326-327. See also, *Exxon Co., U. S. A., et al. v. Sofec, Inc., et al.*, 517 U.S. 830 (1996).

158. Point Judith bears no responsibility for the position of the bilge pump switches following the activities of the plaintiff on board the vessel over the weekend of April 23-24, 2005.

159. Plaintiff failed to insure that power was supplied to the bilge pumps on board the *Eveready*.

160. Whatever may have been the cause of ingress of water into the hull of the Vessel, the switching off of the bilge pumps was a superseding cause, which absolves Point Judith from any liability that might be alleged.

Negligence of Picchione:

161. In admiralty, the doctrine of comparative negligence applies and reduces the plaintiff's recovery in proportion to his or her negligence. *Wilson v. Maritime Overseas Corp.*, 150 F.3d 1, 11 (1st Cir. 1998). This operates as a complete defense, if plaintiff's own negligence was the sole proximate cause of the injuries. *Id.*

162. Picchione never tested his own float switches. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 97.

163. Picchione failed to confirm that the bilge pump switches were properly aligned when he left the boat on Saturday, and cannot recall having checked the engine room bilges that day. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 86.

164. It is very easy to check the position of bilge pump switches. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 99.

165. Picchione never engaged anyone to check the Vessel's exhaust hoses and never sought out any advice on preventive maintenance. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 118-19.

166. Mr. Picchione never sought to engage Pt. Judith to do anything to the bilge discharges on the Vessel. Testimony of Don Vivenzio, Tr. Vol. II, Page 180.

167. Mr. Picchione has no evidence at odds with the evidence that Joseph Stroker left the vessel on Friday, April 22, 2005, with at least one bilge pump functioning in the automatic mode.

168. Mr. Picchione bears total responsibility for seeing to it that the bilge pumps of the Vessel had power to them as of no later than Saturday, April 23, 2005, when he admits he was aboard.

169. Mr. Picchione failed to exercise due care for the protection of the Vessel as was his responsibility, and this caused her sinking.

## VI. Liability of Standish/Allocation of Responsibility:

170. Standish sold the Vessel to Mr. Picchione equipped with exhaust discharge hoses that were installed in a fashion that was at odds with ABYC recommendations (Exhibit 132). Testimony of William Robbins, Tr. Vol. III, Pages 59.

171. Standish sold the Vessel to Mr. Picchione equipped with bilge pump discharge hoses that were at odds with ABYC recommendations (Exhibit 133). Testimony of William Robbins, Tr. Vol. III, Pages 37-40.

172. The shortcomings in these installations were the reasons why the Vessel sank, according to the testimony of Mr. Robbins.

173. Standish, as the seller of the Vessel so equipped, is liable for the loss of the Vessel, and judgment should be entered assessing liability against it.

174. Standish's liability is to be compared with the negligence of the plaintiff and with any culpability assessed as against Pt. Judith, with the responsibility assessed according to comparative fault principles.

175. Comparative fault allocation is required in admiralty, even among settling defendants, and embraces the liability of the plaintiff and of any responsible party, regardless of the species of fault that created the damage, including culpability in contract.

176. When allocating the respective parties' percentage of fault for Plaintiffs' damages, the Court's allocations must include Standish Boat Yard, Inc., regardless of its pre-trial settlement and release with plaintiffs. *McDermott, Inc. v. AmClyde*, 515 U.S. 202, 208-12, 17 (the litigating defendant's percentage of fault is offset by the percentage of fault assessed against the released defendant)

177. In McDermott, Inc. v. AmClyde, 515 U.S. 202, 209, 217 (1994), the Supreme Court adopted the "proportionate share approach" that was identified as alternative three in Restatement (Second) Torts § 886A. This approach provides as follows:

> The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminished the claim that the injured party has against the other tortf3easors by the amount of the equitable share of the obligation of the released tortfeasor.

Id. at 209 (quoting Restatement (Second) Torts § 886A)

178. The proportionate share rule applies regardless of whether the theory of liability sounds in tort or contract, provided that their actions operated in concert to cause a single injury to the plaintiff. *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000).

## VII. QUANTUM OF DAMAGES/MITIGATION:

179. The pre-sinking value of the Vessel, taking into account the cost of dealing with repair of the core and considering a buyer's discount for the Vessel's grounding history, was $93,417. Testimony of Dennis Layfield, Tr. Vol. IV, Page 150.

180. Dennis Layfield estimated that the salvage sale price the Vessel would be $25,000. Testimony of Dennis Layfield, Tr. Vol. IV, Page 150.

181. The actual salvage sale price is $26,000, based on the salvage bid delivered to defendant by the plaintiff following the trial.

182. The loss of value resulting from the sinking was thus no more than $67,417.

183. William Robbins did not determine or take into account the salvage value of the Vessel in determining the loss associated with the sinking. Testimony of William Robbins, generally.

184. William Robbins did not do anything to rule out his original theory that water had entered the hull of the Vessel from some fault in her hull structure — and this possibility is something that would be important to a buyer. Testimony of William Robbins, Tr. Vol. III, Pages 100-105.

185. Neither of the Vessel's engines were ever started up following the 2004 season. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 66.

186. William Robbins not did determine or take into account the possibility that the Vessel's engines had been exposed to salt water flooding in connection with the pre-2005 grounding on the jetty. Testimony of William Robbins, Tr. Vol. III, Pages 108-110.

187. William Robbins did not determine or take into account that the engine work conducted over the 2004-2005 off-season might not have been successful; and these are important to a buyer. Testimony of William Robbins, Tr. Vol. III, Pages 110-114.

188. William Robbins did not take into account values drawn from other published price sources in arriving at his value of the Vessel. Testimony of William Robbins, Tr. Vol. III, Pages 105-06.

189. Pre-sinking, Picchione would have listed the Vessel for sale at $150,000, without accounting for her grounding history. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 111.

190. William Robbins did not determine or take into account Mr. Picchione's expectation of offering the Vessel for sale at $150,000 — without accounting for her grounding history. Testimony of William Robbins, Tr. Vol. III, Pages 122-123.

191. William Robbins did not determine the cost or value of the tuna tower in arriving at his value of the Vessel. Testimony of William Robbins, Tr. Vol. III, Pages 95.

192. William Robbins did not consider the disadvantages of a tuna tower, or that the tuna tower would not necessarily be desirable to a potential buyer, but instead might be an undesirable factor. Testimony of William Robbins, Tr. Vol. III, Pages 95-100. Also pages 107-108.

193. The plaintiffs did not complete the process of pickling the engines. Testimony of William Robbins, Tr. Vol. III, Pages 117-118. As a result, the original costs of pickling the engines was not a proper expenditure.

194. The plaintiffs did not do anything to optimize the resale/salvage value of the Vessel. Testimony of William Robbins, Tr. Vol. III, Pages 117-121

195. For the foregoing reasons, the damages testimony of Williams Robbins that the pre-casualty value of the vessel was $160,000 is not credible.

196. The plaintiffs allowed at least two and a half years to pass before taking out the tanks and locating the hole in the hull. Testimony of William Robbins, Tr. Vol. III, Pages 145.

197. Over the course of nearly 2½ years, the plaintiffs did nothing to remove the fuel tanks or to investigate the exhaust hoses as a source for water, from May 3, 2005 to October 17, 2005, when the hole in the exhaust hose was discovered. Testimony of William Robbins, Tr. Vol. III, Pages 147-152.

198. At most, only 8 hours of Mr. Robbins' time was devoted to a purpose *other than* determining why the Vessel sank, and the rest of his time was devoted to determining why the Vessel sank, and not caring for the Vessel. Testimony of William Robbins, Tr. Vol. III, Pages 141-43. Therefore, Exhibit 109 — which includes 24 hours of Mr. Robbins' time at $95.00 per hour — must be reduced by 16 hours (or $1,520) to allow for only 8 hours, and reduces the recoverable charges in Exhibit 109 to a total of $1,302.

199. The following items are not recoverable items of damages, inasmuch as they are not consequences of the loss but instead are expenses incurred only for the purposes of obtaining a recovery in the litigation:

a) Exhibit 108 (Invoice from Brewer Cove for soda blasting paint from the bottom of the vessel to inspect the hull)

b) Exhibit 109 ($1,520 worth of Mr. Robbins' time in this invoice must be excluded as litigation expenses)

c) Exhibits 113 and 124 (Invoices from New England Marine Survey LLC for Mr. Robbins' expert services for the plaintiff)

d) Exhibit 119 (Invoice for Point Judith pickling the engines) Plaintiff failed to complete the process, making this a wasteful and unreasonable expense

e) Exhibits 126/125 (Invoice for Bruce Pfund's expert witness consulting services and report that were performed in anticipation of litigation);

f) Exhibits 111, 112, 114, 115, 116, 121, (Invoices from Certified Sales for storing the vessel in the years 2007 and 2008, after reasonable time period ended)

g) Exhibit 122 ($5,555 must be excluded from this invoice as litigation expenses for storing the boat from Dec. 2005 to March 2007) The reasonable time period for storage was through Nov. 2005 and is represented in Exhibit 123.

## VIII. CREDIBILITY:

200. No one ever asked Don Vivenzio about anything Point Judith had done as regards the configuration of electrical switches when its people were last aboard. Testimony of Don Vivenzio, Tr. Vol. II, Page 173; Testimony of William Robbins, Tr. Vol. II, Page 157; Testimony of Barry Ennis, Tr. Vol. IV, Page 142.

201. Mr. Hilton testimony about the number of bilge pumps on the Vessel was based on inference and guesses. Testimony of Ken Hilton, Tr. Vol. I, Page 178.

202. Mr. Hilton was unsure of the bilge pump installation and panel wiring, and was able to make only assumptions. Testimony of Ken Hilton, Tr. Vol. I, Page 169-70.

203. Mr. Hilton admitted that he doesn't know about the wiring of the bilge pumps or the character of the breakers. Testimony of Ken Hilton, Tr. Vol. I, Page 179-80.

204. Mr. Hilton claimed there were three bilge pumps aboard the Vessel, and then claimed that there were only two, and this reflects that his testimony is not reliable. Testimony of Ken Hilton, Tr. Vol. I, Pages 167-69.

205. Contrary to the testimony of Mr. Hilton, Mr. Robbins found all three of the bilge pump switches on the panel are two-way, on-off switches, and not spring-loaded switches. Testimony of William Robbins, Tr. Vol. III, Page 18.

206. Hilton's testimony about the bilge pumps all having float switches is at odds with the testimony of Mr. Robbins, who, based on his 2005 examinations, he found that the midships bilge pump had no float switch. Testimony of Ken Hilton, Tr. Vol. I, Page 181. Testimony of William Robbins, Tr. Vol. III, Page 17.

207. Picchione cannot rule out that he had consumed several alcoholic drinks before coming down to the boat after being told about the sinking. Testimony of Nicholas Picchione II, Tr. Vol. I, Page 132.

208. Picchione was under the influence of alcohol when he came to the marina after being notified that his boat had been found sunk. Testimony of Don Vivenzio, Tr. Vol. II, Page 192.

## IX. DUTY TO INDEMNIFY:

209. On September 29, 2004, Plaintiff signed a document entitled 2005 Summer Dockage/Rack Storage Contract (the "Slip Rental Contract") with Point Judith covering the period of April 15, 2005 to October 31, 2005. Trial Exhibit A.

210. In pertinent part, the Slip Rental Contract provides:

> 18. Tenant hereby covenants, warrants, and agrees to indemnify and hold Marina harmless from any loss or injury, including death, to any person, including the Tenant, arising out of any incident occurring on or about the Tenant's vessel, a vessel of any patron of the Marina or on the premises of the Marina.

* * *

> 39. In the event that the Marina engages the services of an attorney to enforce any provision of this agreement or to secure payment of delinquent charges then the Tenant shall pay in addition to the payment of all sums agreed to herein, the Tenant shall pay for all reasonable attorney fees, costs, and expense of suit in the enforcement/collection of all sums due pursuant hereto.

211. By reason of Plaintiff's promise in the Slip Rental Contract, he is obliged to indemnify Point Judith for any amounts that Point Judith may eventually be adjudged liable to pay to the plaintiffs, together with any and all legal fees incurred in the defense of this matter, as well as any other costs.

## X. REQUESTS FOR ADMISSIONS:

212. On March 29, 2007, Point Judith served, by Federal Express, plaintiffs Nicholas Picchione II and Northern Insurance Company with a set of Requests for Admissions. Declaration of Michael Rauworth, Docket No. 81.

213. The Federal Express airbill receipt and tracking details confirm that plaintiffs counsel received the Requests for Admissions on March 30, 2007 Declaration of Michael Rauworth, Docket No. 81.

214. Plaintiffs did not respond to the Requests for Admissions (Declaration of Michael Rauworth, Docket No. 81) and, therefore, the matters therein are conclusively established.

215. The Requests for Admissions contain the following text:

> 4. Plaintiffs have no evidence that water entered the hull of the Vessel in any substantial amounts during the Events by reason of any act or omission attributable to the Proponent.
>
> 6. Plaintiff Picchione had a mechanic, technician, or other contractor or vendor aboard the Vessel for several hours during the period following her launch in April 2005 and before her sinking.

WHEREFORE, Point Judith respectfully requests that the Court enter the foregoing findings, rulings, and adjudications, and enter judgment for the defendant.

Dated: June 13, 2008

**POINT JUDITH MARINA, INC.**
By its attorneys,
_/s/ Carl E. Fumarola_________________
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth (pro hac vice)
Carl E. Fumarola, Esq., R.I. Bar #6980
Cetrulo & Capone LLP
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on this 13th day of June, 2008, I have served the above documents on the following counsel of record via ECF filing:

Frederick A. Lovejoy, Esq.
LOVEJOY & ASSOCIATES
276 Center Road
Easton, CT 06612-1604
LOVEJOYADM@aol.com

_/s/ Carl E. Fumarola_________________
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth *(pro hac vice)*
Carl E. Fumarola, Esq., R.I. Bar #6980
**CETRULO & CAPONE LLP**
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com