UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK, Plaintiff, | : | |
| v. | : | C.A. 06-190S |
| ALBIN MANUFACTURING, INC., STANDISH BOAT YARD, INC., AND POINT JUDITH MARINA, LLC Defendants. | : | June 16, 2008 |

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

LOVEJOY & ASSOCIATES
Attorneys for Plaintiff
Northern Insurance Company of New York
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 telefax

FREDERICK A. LOVEJOY
Of Counsel

# TABLE OF CONTENTS

| | Page |
|---|---|
| PROPOSED FINDINGS OF FACT | 1 |
| THE EVENTS OF APRIL 2005 | 4 |
| CONCLUSIONS OF LAW | 11 |
| POINT I | 11 |
| CLAIMS AGAINST POINT JUDITH MARINA, LLC | 11 |
| POINT II | 12 |
| DEFENDANT POINT JUDITH MARINA, LLC'S BREACH OF ITS DUTY TO WARN | 12 |
| POINT III | 15 |
| BREACH OF WARRANTY OF WORKMANLIKE PERFORMANCE | 15 |
| POINT IV | 18 |
| DEFENDANT POINT JUDITH MARINA, LLC BREACHED THE CONTRACTS IT ENTERED INTO WITH NICHOLAS PICCHIONE II | 18 |
| POINT V | 20 |
| DEFENDANT POINT JUDITH MARINA, LLC IS LIABLE IN TORT FOR THE DAMAGES SUSTAINED BY THE M/V EVEREADY | 20 |
| POINT VI | 21 |
| POINT JUDITH MARINA, LLC IS LIABLE FOR THE DAMAGES CAUSED TO THE M/V EVEREADY AS A BAILEE | 21 |
| POINT VII | 25 |
| PLAINTIFF'S DAMAGES | 25 |
| POINT VIII | 25 |
| PLAINTIFF IS ENTITLED TO PREJUDGMENT INTEREST | 25 |

POINT IX .......... 27

DEFENDANT POINT JUDITH MARINA, LLC HAS INTRODUCED NO EVIDENCE THAT NICHOLAS PICCHIONE II DID NOT ACT PROPERLY IN RESPECT TO THE M/V EVEREADY'S BILGE PUMP SWITCHES .......... 27

POINT X .......... 28

POINT JUDITH MARINA'S SPURIOUS AND ABERRANT CONTENTIONS .......... 28

POINT JUDITH MARINA, LLC'S SUPERSEDING CAUSE DEFENSE IS MISPLACED .......... 30

PLAINTIFF'S RESPONSE TO DEFENDANT POINT JUDITH MARINA, LLC'S COUNTERCLAIM AGAINST NICHOLAS PICCHIONE II .......... 30

CONCLUSION .......... 32

PicchioneTOC6-08.doc

# TABLE OF AUTHORITIES

**CASES:** **Page**


Alkmeon Naviera, S.A. v. The MARINA, 633 F.2d 789 (9th Cir. 1980) .......... 25

Atlantic Mutual Ins. Company v. Clearview Club, Inc., 264 F.Supp. 608 (E.D.N.Y. 1967).... 21

Broadley v. Mashpee Neck Marina, Inc., 471 F.3d 272 (1st Cir. 2006).......... 31

Bubla v. Bradshaw, 795 F.2d 349 (4th Cir. 1986) .......... 11,21

Cement Division National Gypsum Company v. City of Milwaukee, 515 U.S. 189 (1995).... 25

Exxon Co. USA v. Sofec, Inc., 517 U.S. 830 (1996).......... 30

Hardesty v. Larchmont Yacht Club, 1983 AMC 1059 (S.D.N.Y.) .......... 19

Harrison Brothers Drydock v. J.R. Atkins, 193 F.Supp. 386 (S.D. Ala. 1961).......... 23

Johnson's Branford Boatyard, Inc. v. The Yacht Altair, 260 F.Supp. 841 (D. Conn. 1966) .... 23

La Esperanza de P.R. Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10 (1st Cir. 1997)..... 11,16

McConnell v. Caterpillar Tractor Co., 646 F.Supp. 1520 (D. N.J. 1986).......... 14

Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813 (11th Cir. 1984) .......... 14

Monari v. Surfside Boat Club, 469 F.2d 9 (2d Cir. 1972) .......... 19

Muller Boat Works v. Unnamed 52' House Barge, 464 F.Supp. 2d 127 (E.D.N.Y. 2006)...... 16,24

New Hampshire Insurance Company v. Nicholas Dagnone, 2006 AMC 1920 (D. R.I. 2006) .......... 21

Pan-America Petroleum Transportation Co. v. Robbins Drydock & Repair Company, 281 F.97 (2d Cir. 1922) .......... 23

Parks v. U.S., 784 F.2d 20 (1st Cir. 1986) .......... 17

Self v. Great Lakes Dredge & Dock Company, 832 F.2d 1540 (11th Cir. 1987) .......... 25

The English Whipple Sailyard v. The Yard Ardent, 459 F.Supp. 866 (W.D. Pa. 1978).......... 23

U.S. v. Reliable Transfer Company, Inc., 421 U.S. 397 (1975) .......... 28

**TREATISES:**

Admiralty and Maritime Law, 4th Ed. (West Publishing) (2004) .......... 15

Benedict on Admiralty, Vol. 8, Chapter 19.05, pp. 19-38 and 19-39 (2006) .......... 20

**STATUTES:**

R.I. Gen. Laws § 9-21-10 .......... 26

PicchioneTOA6-08.doc

Now comes plaintiff, Northern Insurance Company of New York, and for its Proposed Findings of Fact and Conclusions of Law, states as follows:

## PROPOSED FINDINGS OF FACT

1. That plaintiff Nicholas Picchione II has been a boater since a teenager, and has owned various sail and power boats. (Nicholas Picchione II – Trial Transcript 5/12/08, pp. 21 & 22)

2. Nicholas Picchione II purchased a 35 foot Albin vessel from defendant Standish Boat Yard, Inc. in 1996, which he named the EVEREADY. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 24, ll. 1-3 & p. 25, ll. 4-5)

3. Nicholas Picchione II had no training in serving systems or vessels such as the M/V EVEREADY. (Nicholas Picchione II - Trial Transcript 5/12/08, p. 21, ll. 14-17)

4. That Albin Manufacturing, Inc. manufactured the EVEREADY without installing chafing gear/strain relief on the vessel's exhaust hoses which passed through and sat on the rear engine room bulkhead.

5. That Albin Manufacturing, Inc. installed the forward and engine room bilge pumps without anti-siphon loops or check valves in their discharge lines.

6. That from the date of its purchase, i.e., 1996, until the time it sank in April 2005, the EVEREADY was docked at defendant Point Judith Marina, LLC's facility during the boating season, and also hauled and dry stored (land) at Point Judith Marina, LLC. ((Nicholas Picchione II – Trial Transcript 5/12/08, p. 24, ll. 22-25, p. 25, ll. 1-25, p. 26, ll. 1-15)

7. That the M/V EVEREADY went aground on the Point Judith breakwater in 1998, and all the necessary repairs required as a result thereof were performed by defendant Point Judith Marina, LLC.(Trial Exhibit 1) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 30, l. 25, p. 31, ll. 1-5) (Donald Vivenzio – Trial Transcript 5/13/08, p. 76, ll. 12-15)

8. That as part of the 1998 breakwater repairs, defendant Point Judith Marina, LLC removed the sole/floor of the cabin. (Donald Vivenzio – Trial Transcript 5/13/08, p. 76, ll. 19-24)

9. That as part of the 1998 breakwater repairs, defendant Point Judith Marina, LLC removed the port engine and the port and starboard transmissions from the M/V EVEREADY. (Trial Exhibit 7) (Nicholas Picchione II - Trial Transcript, 5/12/08, p. 30, ll. 1-3, and ll. 18-22)

10. That all aspects as to how the vessel's port and starboard exhaust hoses passed through the rear engine bulkhead were visible to defendant Point Judith Marina, LLC's personnel in 1998 and in 2000 and should have been discovered by Point Judith Marina, LLC's personnel. (William Robbins – Trial Transcript 5/14/08, p. 59, ll. 24-25, p. 60, ll. 1-8, p. 61, ll. 17-25, & p. 62, l. 1) (Donald Vivenzio – Trial Transcript 5/13/08, p. 78, ll. 1-15, p. 86, ll. 9-21)

11. That when Point Judith Marina, LLC's personnel removed both the port and starboard transmissions, they would have been in the vicinity of and able to observe how the port and starboard exhaust hoses ran through and sat directly on the rear engine room bulkhead on the M/V EVEREADY. (Trial Exhibit 1, pp. 6, 7 & 10)

12. That each spring from 1998 to and including 2005, Point Judith Marina, LLC would commission the M/V EVEREADY. (Trial Exhibit 1) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 28, ll. 15-18) (Donald Vivenzio – Trial Transcript 5/13/08, p. 106, ll. 7-12, p.107, ll. 1-2)

13. That commissioning of the M/V EVEREADY included examining all of the vessel's hoses, including the port and starboard exhaust hoses. (Trial Exhibits 4 & 5) (Donald Vivenzio – Trial Transcript 5/13/08, p. 70, ll. 5-25, p. 71, ll. 1-16) (Joseph Stroker, Trial Transcript, 5/13/08, p. 20, ll. 11-24, p. 21, ll. 22-25, p. 22, ll. 1-11, p. 24, ll. 6-10)

14. That it is/was standard operating procedure for marinas commissioning vessels to examine the integrity of the subject vessel's exhaust hoses. (Kenneth Hilton, Trial Transcript 5/12/08, p. 155, ll. 17-20, p. 156, ll. 2-8) (Donald Vivenzio, Trial Transcript, 5/13/08, p. 70, ll. 5-14, p. 11, ll. 10-12) (William Robbins, Trial Transcript 5/14/08, p. 59, ll. 24-25; p. 60, ll. 1-8, p. 61, ll. 17-25, & p. 62, l. 1) (Joseph Stroker, Trial Transcript 5/13/08, p. 20, ll. 20-25, p. 21, ll. 1-6, p. 22, ll. 1-20)

15. Point Judith Marina, LLC, however, had no procedure in place in the spring of 2005 to ensure that its mechanics had inspected a vessel's exhaust hoses. (Donald Vivenzio – Trial Transcript 5/13/08, p. 70, ll. 12-14, p. 71, ll. 2-5 & 13-16)

16. Defendant Point Judith Marina, LLC had no system in place to notify and/or alert an owner that it had not been able to inspect/test an item that it was supposed to check/examine as part of the spring commissioning process/procedure. (Donald Vivenzio – Trial Transcript, 5/13/08, p. 71, ll. 24, p. 72, ll. 1-19, p. 73, ll. 1-11)

17. Point Judith Marina, LLC from 1998 to 2005 never advised Mr. Nicholas Picchione II that it might not have been able to inspect/examine the exhaust hoses on the M/V EVEREADY. (Donald Vivenzio – Trial Transcript 5/13/08, p. 73, ll. 12-22

18. That defendant Point Judith Marina, LLC had numerous opportunities from 1998 to 2005 to properly inspect the M/V EVEREADY's starboard and port exhaust hose situation but failed to do so as its personnel were about both of the vessel's engines during the vessel's spring commissioning each year from 1998 through 2005. (Donald Vivenzio – Trial Transcript 5/13/08, p. 149, ll. 12-22)

19. That the American Boat and Yacht Council Recommendations require that exhaust hoses be installed either with proper chafing gear and/or strain relief. (Defendant's Trial Exhibit 132) (William Robbins – Trial Transcript 5/14/08, p. 59, ll. 8-17)

20. That during 1996 and 1997, while the EVEREADY was under warranty, all major repairs were performed at defendant Standish Boat Yard, Inc., and only "minor" repairs were performed by defendant Point Judith Marina, LLC. (Trial Exhibit 1) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 25, ll. 10-25, p. 26 ll. 1-18)

21. That commencing in 1998, through and including April 2005, defendant Point Judith Marina, LLC performed virtually all major and minor repairs required on/to the M/V EVEREADY. (Trial Exhibit 1) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 26, ll. 13-18) (Donald Vivenzio – Trial Transcript 5/13/08, p. 66, ll. 17-23)

22. That Point Judith Marina, LLC had the opportunity to discover and correct the problems with the exhaust hoses and the bilge pump discharge lines for a period of seven years, i.e., 1998 to and including 2005. (Donald Vivenzio – Trial Transcript 5/13/08, p. 77, ll. 21-25, p. 78, ll. 1-15, p. 86, ll. 9-21, p. 198, ll. 11-23) (Trial Exhibit 1, pp. 1, 7, 8, 12, 27)

THE EVENTS OF APRIL 2005

23. Nicholas Picchione II filled out the 2005 commissioning form in late 2004 or early 2005 requesting the same standard commissioning he had during previous years. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 29, ll. 16-24, p. 40, ll. 4-7 and p. 69, ll. 9-15) (Donald Vivenzio – Trial Transcript 5/13/08, p. 100, ll. 11-24)

24. Nicholas Picchione II also understood that the 2005 commissioning would include the usual sea trial (Nicholas Picchione II – Trial Transcript 5/12/08, p. 40, ll. 8-9)

25. On or about April 8, 2005, defendant Point Judith Marina, LLC painted the bottom of the M/V EVEREADY (Trial Exhibit 1, p. 31)

26. At the time of sanding of the bottom of the M/V EVEREADY in April, 2005, Point Judith Marina, LLC found no cracks in the hull of the M/V EVEREADY (Henry Smedberg – Trial Transcript 5/13/08, pp. 59 & 60)

27. That following the painting and at the time of launching of the M/V EVEREADY, Point Judith Marina, LLC did not observe any weeping areas such as were found on the hull of the M/V EVEREADY on May 3, 2005. (Henry Smedberg – Trial Transcript 5/13/08, pp. 60-61)

28. Defendant Point Judith Marina, LLC launched the M/V EVEREADY on the afternoon of Thursday, April 21, 2005. (Nicholas Picchione II – Trial Transcript p. 73, ll. 14-17) (Trial Exhibit 1, p. 32)

29. Nicholas Picchione II went on board the M/V EVEREADY on Thursday, April 21, 2005 for approximately 5 minutes, at which time he checked the bilge pump switches to ensure that they were in the proper positions. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 75, ll. 20-24)

30. On April 22 and 23, 2005, Mr. Picchione visited the M/V EVEREADY for short periods of time for the limited purpose of checking on inventory, i.e., food supplies and bedding. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 81, ll. 2-6)

31. Mr. Picchione was on the M/V EVEREADY on Friday, April 22, 2005 for a total of 30 minutes. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 82, ll. 7-8 and 14-17)

32. On Saturday, April 23, 205, Mr. Picchione was on the M/V EVEREADY for approximately 45 minutes. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 85, ll. 1-11)

33. Mr. Picchione did not visit the M/V EVEREADY on Sunday, April 24, 2005, because he was golfing. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 36, ll. 20-23) (Donald Vivenzio – Trial Transcript 5/13/08, p. 168, ll. 18-21)

34. That no personnel from defendant Point Judith Marina, LLC saw Nicholas Picchione II on board the M/V EVEREADY on Sunday, April 24, 2005. (Donald Vivenzio – Trial Transcript 5/13/08, p. 168, ll. 18-21)

35. That no outside mechanics were seen on board the M/V EVEREADY between April 21 and April 25, 2005 by defendant Point Judith Marina, LLC personnel or by Mr. David Clarke another boat owner. (Donald Vivenzio – Trial Transcript 5/13/08, p. 201, ll. 9-12)

36. On Friday, April 22, 2005, and Saturday, April 23, 2005, Joseph Stroker, a mechanic employed by defendant Point Judith Marina, LLC, was engaged in commissioning the M/V EVEREADY for the 2005 boating season. (Trial Exhibit 6)

37. Mr. Stroker spent 13.4 hours working on the M/V EVEREADY on April 22 and 23, 2008. (Plaintiff's Trial Exhibit 6) (Plaintiff's Trial Exhibit 1, pp. 32 & 33) (Donald Vivenzio, Trial Transcript 5/13/08, p. 136, ll. 14-21 and p. 139, ll. 17-20)

38. Mr. Stroker believed that the engine room bilge pump on the M/V EVEREADY was malfunctioning. (Plaintiff's Trial Exhibit 6)

39. Mr. Stroker adjusted the bilge pump switches on the M/V EVEREADY so that the engine room bilge pump shut off. (Joseph Stroker – Trial Transcript 5/13/08, p. 10, ll. 11-15, p. 15, ll. 17-25, p. 16, ll. 1-2) However, he was not positive which bilge pump switch he actually turned off. (Joseph Stroker – Trial Transcript 5/13/08, p. 13, ll. 10-11 & 16, p. 14, ll. 23-25, p. 15, ll. 17-18)

40. Mr. Stroker, however, turned off the auto switch, which controlled (shut off) all three bilge pumps on board the M/V EVEREADY (Dennis Layfield – Trial Transcript 5/22/08, p.15, ll. 11-21) (Barry Ennis – Trial Transcript 5/15/08, p. 130, ll. 21-25)

41. It is not known whether Mr. Stroker or Mr. Picchione was the last person on board the M/V EVEREADY prior to her sinking during the early morning hours of Monday, April 25, 2005.

42. Mr. Stroker did not replace the engine room bilge pump that he believed was malfunctioning. (Joseph Stroker - Trial Transcript 5/13/08, p. 27, ll. 13-19)

43. Neither Mr. Stroker, nor anyone else from defendant Point Judith Marina, LLC, advised Mr. Picchione that he had a malfunctioning bilge pump on board the M/V EVEREADY. (Joseph Stroker - Trial Transcript 5/13/08, p. 26, ll. 16-22) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 42, ll. 23-25)

44. Mr. Stroker did not advise Mr. Picchione that he had changed the position of the bilge pump switches on board the M/V EVEREADY. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 43, ll. 1-8) (Joseph Stroker - Trial Transcript 5/13/08, p. 26, ll. 16-22)

45. When the M/V EVEREADY was raised on April 25, 2005, all of her bilge pump switches were found in their off positions. (Barry Ennis – Trial Transcript 5/15/08, p. 130, ll. 21-25) (Donald Vivenzio – Trial Transcript 5/13/08, p. 172, ll. 5-8) (Trial Exhibit NNN)

46. Mr. Picchione did not shut off the auto bilge switches on the M/V EVEREADY. (Nicholas Picchione – Trial Transcript 5/12/08, p. 83, ll. 7-10)

47. Mr. Picchione last checked the position of the bilge pump switches on Friday, April 22, 2005 and observed them in their proper positions. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 85, ll. 21-25, p. 86, l. 1)

48. Even though Donald Vivenzio learned about the "malfunctioning" bilge pump on the M/V EVEREADY about a week after its sinking, he never told the authorities who were investigating the cause of the sinking of the M/V EVEREADY that an employee of Point Judith Marina, LLC had allegedly found a malfunctioning bilge pump on the M/V EVEREADY and that he had repositioned the bilge pump switch settings (Donald Vivenzio – Trial Transcript 5/13/08, p. 132, ll. 14-23, p. 134, ll. 4-7) <u>even though</u> he had been specially asked that question by Harbormaster Barry Ennis on April 25, 2005. (Barry Ennis – Trial Transcript 5/15/08, p. 132, ll. 3-5)

49. That when Mr. Dennis Layfield and Mr. William Robbins visited the Point Judith Marina, LLC facility in April and May, 2005, defendant Point Judith Marina, LLC did not tell either of these marine surveyors, who were appointed by the parties' underwriters, that Mr. Stroker had allegedly found a malfunctioning bilge pump on board the M/V EVEREADY, and that he had repositioned the settings of the bilge pump switches on the vessel. (Donald Vivenzio – Trial Transcript 5/13/08, p. 133, ll. 24-25 p. 134, ll. 1-3 and 8-13)

50. That the M/V EVEREADY took on water which lowered her stated water line, and then because of the position of her thru hull discharge fittings back/down flooded and sank. (William Robbins – Trial Transcript 5/14/08, p. 72, ll. 5-17) (Dennis Layfield – Trial Transcript ______)

51. That the manner in which water initially entered the M/V EVEREADY was through a cut found in her starboard exhaust hose, and that because the bilge pumps had been turned off, the influx of water lowered her static water line. (William Robbins – Trial Transcript 5/14/08, pp. 29, 30, 41, 42, 43, ll. 19-21) (Trial Exhibit 82)

52. That defendant Point Judith Marina, LLC did not introduce any evidence at trial as to the reason for the M/V EVEREADY sinking on April 25, 2005.

53. That it was the standard in the marina industry to inspect exhaust hoses for damage. (Donald Vivenzio – Trial Transcript 5/13/08, p. 70, ll. 5-22, p. 71, ll. 2-16) (Kenneth Hilton – Trial Transcript 5/12/08, p. 155, ll. 14-20, p. 156, ll. 2-8) (Joseph Stroker – Trial Transcript 5/13/08, pp. 19, 20, 21, 22 & 23) (William Robbins – Trial Transcript 5/14/08, p. 61, ll. 17-25, p. 62, l. 1)

54. That it was the standard in the marine industry to install bilge pumps with anti-siphon loops or check valves to prevent back/down flooding. (Joseph Stroker – Trial Transcript 5/13/08, p. 29, ll. 22-25, p. 30, 31 & 32) (William Robbins – Trial Transcript 5/14/00, pp. 35, 36, 37, 38, l. 25, p. 39, 40)

55. That it was the standard in the marina industry to install exhaust hoses with chafing gear and/or strain relief (Trial Exhibit 132, Section 1.54)

56. That defendant Point Judith Marina, LLC was/is a member of the American Boat and Yacht Council and had a copy of its recommendations on hand at Point Judith Marina, LLC (Donald Vivenzio – Trial Transcript 5/13/08, p. 93, ll. 3-10)

57. That defendant Point Judith Marina, LLC's manager Donald Vivenzio was aware of the necessity for chafing gear/strain relief on exhaust hoses and for anti-siphon loops/check valves on bilge pump discharge lines. (Donald Vivenzio – Trial Transcript 5/13/08, p. 79, ll. 12-25, p. 80, ll. 1-7, p. 82, ll. 17-19, p. 91, ll. 23-25, p. 92, ll. 1-2, 11-25, p. 93, ll. 3-25, p. 94, ll. 1-10)

58. Defendant Point Judith Marina, LLC offered no evidence in support of its contention that Nicholas Picchione II should have examined the M/V EVEREADY bilge pump switches more often than twice if the vessel was not used.

59. That boat owners do not examine/check bilge pump switches unless they have used their vessel, i.e., disconnected the vessel from shore power and then reconnected it to ship power.

60. That defendant Point Judith Marina, LLC charged Nicholas Picchione II for commissioning the M/V EVEREADY's twin diesel engines and the vessel's generator. (Trial Exhibit 1, page 32 – RO# 9186)

61. The 2005 commissioning of the M/V EVEREADY was not yet completed on April 25, 2005 because defendant Point Judith Marina, LLC had not yet sea-trialed the vessel. (Donald Vivenzio – Trial Transcript 5/13/08, p. 165, ll. 12-14) (Nicholas Picchione II – Trial Transcript 5/12/08, p. 39, ll. 6-8, 16-19, p. 40, ll. 6-9, p. 69, ll. 9-15)

62. The American Boat and Yacht Council Recommendations require that bilge pump discharge hoses contain anti-siphon loop/check valves. (Trial Exhibit 133) (William Robbins – Trial Transcript 5/14/08, p. 37, ll. 22-25, p. 38, l. 25, p. 39, ll. 1-19)

63. Defendant Point Judith Marina, LLC installed a number of bilge pumps on the M/V EVEREADY between 1998 and 2005 (Donald Vivenzio – Trial Transcript 5/13/08, p. 91, ll. 16-25, p. 95, ll. 17-25, p. 96, ll. 1-2) (Trial Exhibit 1, p. 7)

64. Point Judith Marina, LLC's manager, Donald Vivenzio, was familiar with the necessity for anti-siphon loops and strain relief/chafing gear. (Donald Vivenzio – Trial Transcript, pp. 92-94)

65. Joseph Stroker, Point Judith Marina, LLC's mechanic, knew of the necessity of anti-siphon loops in bilge pump discharge hoses. (Joseph Stroker – Trial Transcript 5/13/08, p. 29, ll. 22-24, p. 30, ll. 1-18, p. 31, ll. 1-25, p. 32, ll. 1-8)

66. Point Judith Marina, LLC performed work on the starboard exhaust in May, 2000. (Trial Exhibit 1, p. 18, 11)

67. Point Judith Marina, LLC removed and reinstalled the starboard exhaust manifold on the M/V EVEREADY in May, 1999 (Trial Exhibit 1, p. 14) and the exhaust elbow in June, 2003. (Trial Exhibit 1, p. 27)

68. Nicholas Picchione II kept the M/V EVEREADY in good condition. (Donald Vivenzio – Trial Transcript 5/13/08, p. 110, ll. 8-23)

69. Anytime defendant Point Judith Marina, LLC suggested to Nicholas Picchione II that his vessel needed a repair, Mr. Picchione always agreed to have the repair performed. (Donald Vivenzio – Trial Transcript 5/13/08, p. 132, ll. 6-9)

70. The cost of replacing the engine room bilge pump was $80.00. (Donald Vivenzio – Trial Transcript 5/13/08, p. 138, ll. 13-16)

## CONCLUSIONS OF LAW

Plaintiffs have asserted five causes of action against defendant Point Judith Marina, LLC; i.e., 1) Failure to Warn (Count VII), 2) Breach of Warranty of Workmanlike Service (Count X), 3) Breach of Contract (Count XI), 4) Negligence (Count XI), and 5) Bailment (Count XII).

## POINT I

## CLAIMS AGAINST POINT JUDITH MARINA, LLC

In La Esperanza de P.R. Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10, 37 (1st Cir. 1997), the First Circuit Court of Appeals succinctly outlined the various claims that a vessel owner has against a service provider/repairer. It stated:

> We thus must evaluate the merits of the parties' claims against "substantive rules and precepts peculiar to the law of the sea." Schoenbaum, supra, at 156 (discussing cases). Under this body of law, a shipowner may sue in either tort or contract for negligent repairs to his vessel. See Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir. 1982); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967). A ship repairer potentially faces three sources of liability for

> repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124 (1956). See Alcoa S.S. Co. at 50; see also Employers Ins. Of Wausau v. Suwanee River Spa Lines, Inc., 866 F.2d 752, 763 n.17 (5th Cir. 1989). A ship repairer may also be liable for the maritime tort of negligence. See Alcoa S.S., 383 F.2d at 50. See generally Schoenbaum, supra, at 183-84 (collecting cases). Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. See Pope & Talbot, inc. v. Hawn, 346 U.S. 406, 408-09 (1953). Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to implied warranties in land-based contracts under the Uniform Commercial Code, see Employers Ins., 866 F.2d at 763 n. 17, "a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence." SS Amazonia v. New Jersey Expert Marine Carpenters, Inc., 564 F.2d 5, 8 (2d Cir. 1977) (citing Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 324 (1964) and Ryan, 350 U.S. at 133). Finally, federally developed maritime law applies both when a court construes the terms of a repair contract and when it construes the standard of performance due thereunder. See Alcoa S.S., 383 F.2d at 50 (citing Booth S.S. Co. v. Meier & Oelhof Co., 262 F.2d 310 (2d Cir. 1958) and Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947 (5th Cir. 1956)).

(emphasis added)

As such, this Court must apply federal admiralty/maritime law to this case and not common or state law principles.

## POINT II

## DEFENDANT POINT JUDITH MARINA, LLC'S BREACH OF ITS DUTY TO WARN

All of the testimony at trial revealed that defendant Point Judith Marina, LLC breached its duty to warn on a number of occasions.

As the Court will remember, Mr. Picchione did not have the necessary training to, himself, perform the maintenance, commissionings, decommissionings, et cetera, required of the M/V EVEREADY, even if he wished to, and like most boat owners, relied on his marina to properly perform those tasks.

More importantly, with the situation before this court, defendant Point Judith Marina, LLC did not perform services/repairs to the M/V EVEREADY on a one-time basis, but performed services/repairs on the M/V EVEREADY continuously from 1998 to 2005, a period of eight years. As such, defendant Point Judith Marina, LLC was intimately familiar with the M/V EVEREADY, its owner Mr. Picchione, and the use(s) to which he put his vessel. Significantly, not only did defendant Point Judith Marina, LLC perform the annual commissioning/decommissioning and routine repairs, but it also was called on to rebuild/repair the M/V EVEREADY after she sustained significant hull damage as a result of her 1998 grounding on the Point Judith breakwater.

On that occasion, defendant Point Judith Marina, LLC removed the cabin floor/sole of the M/V EVEREADY, its port engine, and the starboard and port transmissions, thus exposing to full view the exhaust hoses and how they were situated in respect to the rear engine room bulkhead. (Trial Exhibit 1) Additionally, at that time, defendant Point Judith Marina, LLC replaced both the engine room and forward bilge pumps.

Although defendant Point Judith Marina, LLC was/is a member of the American Boat and Yacht Council ("ABYC") and had its recommendations in hand: 1) concerning the use of chafing gear/strain relief in respect to the installation of exhaust hoses, and 2) concerning the installation of anti-siphon loops/check valves on bilge pump discharge lines, defendant Point Judith Marina, LLC chose to disregard these industry standards and reassembled the vessel's engine/exhaust hoses without installing either chafing gear/strain relief. (Trial Exhibits 132 and 133)

Additionally, it ignored the American Boat and Yacht Council anti-siphon loop/check valve recommendation and installed two new bilge pumps in the M/V EVEREADY without such safeguards.

Regrettably, defendant Point Judith Marina, LLC did not even advise Mr. Picchione: 1) that the American Boat and Yacht Council recommended chafing gear/strain relief for hoses and that his vessel's exhaust hoses were resting on the rear engine room bulkhead and were subject to chafing, allowing water to enter the M/V EVEREADY, and 2) that American Boat and Yacht Council Recommendation recommended anti-siphon loops be installed in discharge line and that his bilge pump discharge lines lacked anti-siphon loops/check valves and were thus subject to back/down flooding that could result in water damage to or the sinking of his vessel.

Additionally, if defendant Point Judith Marina, LLC could not examine the exhaust hoses during its annual commissionings of the M/V EVEREADY, as it seemed to sometimes contend during the trial, it breached its duty to warn/advise Mr. Picchione that it had not/could not examine the condition of his vessel's exhaust hoses. Donald Vivenzio, the manager of defendant Point Judith Marina, LLC, admitted that defendant Point Judith Marina, LLC did not even do that.

Finally, Point Judith Marina, LLC breached its duty to warn in April 2005, when it failed to advise Mr. Picchione that Mr. Joseph Stroker had allegedly found the engine room bilge pump to be malfunctioning and adjusted the bilge pump switches, yet never made Mr. Picchione aware of either of these facts.

In Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813 (11th Cir. 1984) and in McConnell v. Caterpillar Tractor Co., 646 F.Supp. 1520 (D. N.J. 1986), those courts found that Caterpillar Tractor, which knew of the product's defect, was liable because it had failed to warn the purchaser of the defect that caused the loss.

Moreover, in Bubla v. Bradshaw, 795 F.2d 349 (4th Cir. 1986), the Fourth Circuit Court of Appeals upheld the lower courts finding that a marina was liable when it failed to warn a vessel owner of miswired electrical receptacles.

The Court stated with respect to duty of care and failure to warn as follows:

> Hudgins Marine, however, breached its duty to Bubla because it knew or should have known of the dangerous conditions under its control, most notably the reversed polarity on the pier receptacle. Hudgins had worked around marinas for years, and testified that boat owners frequently reversed polarity on pier receptacles. "I worked at Narrows Marina years ago, and they were always changing them over there. If you go to a marina, you'll find half the plugs they plug into are burned. It just seems to be that way with boats." Aware that reversed polarity is, for whatever reason, not uncommon in the maritime context, marine owners concerned about its effects check their outlets with inexpensive polarity testers, according to testimony at trial. Such a test here would have revealed the condition to Hudgins Marina, as a post-accident check revealed. The failure either to correct or warn of this dangerous condition constituted a breach of Hudgins Marine's duty of ordinary care.

(emphasis added)

In this case, defendant Point Judith Marina, LLC failed to warn Nicholas Picchione of: 1) the necessity of installing anti-siphon loops when it installed bilge pumps on the M/V EVEREADY on numerous occasions, 2) failed to warn Mr. Picchione that the exhaust hoses on his vessel sat directly on the rear engine room bulkhead and did not have either chafing gear or strain relief devices, 3) failed to warn Mr. Picchione that it had not examined the exhaust hoses during the various spring commissionings it conducted, and 4) failed to warn Mr. Picchione about the allegedly malfunctioning bilge pump and Mr. Stroker's alteration of the bilge pump switch positions.

Thus, defendant Point Judith Marina, LLC is liable to plaintiff due to its breaches of its duty to warn.

## POINT III

## BREACH OF WARRANTY OF WORKMANLIKE PERFORMANCE

Professor Schoenbaum, in his treatise Admiralty and Maritime Law, 4th Ed. (West Publishing) (2004), best describes the warranty of workmanlike performance imposed in admiralty law. He states:

> **Contract Cases**
>
> As a contract doctrine, the WWLP is very much alive. Between parties to a maritime service contract there is generally an implied WWLP unless it is excluded by agreement. The courts have applied the doctrine to a wide variety of marine contracts to perform services without supervision or control by the shipowner, such as repairs, offshore service contracts, contracts to provide tug assistance, launch service contracts, and stevedoring contracts. The doctrine is not fully applicable to towing contracts, however, at least insofar as it conflicts with the admiralty rule imposing liability only for negligent conduct. Moreover, in order for the warranty to arise, the "putative warrantor must be performing some type of service for the party asserting the warranty claim." Thus the WWLP does not run to a third party unless it qualifies as a third party beneficiary.

Id. at Vol. I, Sect. 5-8, pp. 222-223 (emphasis added) (footnotes omitted)

In La Esperanza de P.R. Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10 (1st Cir. 1997), the First Circuit Court of Appeals held that the warranty of workmanlike performance is implied in every maritime repair or services contract.

Thus, in the instant case, in the spring of 2005, defendant Point Judith Marina, LLC: 1) had a duty to locate the stream of water that resulted from the cut in the starboard exhaust hose when it launched the M/V EVEREADY, 2) had a duty to not alter the positions of the bilge pump switches so as to shut off all of the bilge pumps on the M/V EVEREADY, thus leaving her with no pumping capacity, and 3) had a duty to detect that the starboard and port exhaust hoses were resting on the rear engine room bulkhead as part of its inspection of hoses supposed to be performed in commissioning the M/V EVEREADY.[1]

Additionally, defendant Point Judith Marina, LLC breached its warranty of workmanlike performance when it re-installed the engines and transmission and did not correct the exhaust hose problem so as to comply with the American Boat & Yacht Council Recommendation P-1 (Trial Exhibit 132) and accepted industry standards, and when it installed bilge pumps on the M/V EVEREADY and failed to ensure that they had anti-siphon loops/check valves as required by

American Boat & Yacht Council Recommendation H-22 (Trial Exhibit 133) and accepted industry standards.

More recently, in Muller Boat Works v. Unnamed 52' House Barge, 464 F.Supp. 2d 127 (E.D.N.Y. 2006) the court discussed a repairer/service providers obligations under the warranty of workmanlike performance doctrine. It stated:

> **1. Breach of Implied Warranty and Negligence**
>
> General maritime law requires that a contractor perform repairs in a skilled and workmanlike manner. *DeCarli v. Crusoe's Rivertown Motors, Inc.* 68 F.3d 474, 1995 WL 620964, at *4 (6th Cir. Oct. 19, 1995) (unpublished per curiam) (citing *Little Beaver Enter. V. Humphreys Ry., Inc.*, 719 F.2d 75, 77-78 (4th Cir. 1983)); *Messina v. Ocean Repair Service Co.*, 86 Civ. 7898, 1993 WL 427443, at *4 (S.D.N.Y. Oct. 19, 1993); *Union Marine & Gen. Ins. Co. v. American Export Lines, Inc.*, 274 F.Supp. 123, 128 (S.D.N.Y. 1956) (citations omitted). "This warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task." *See Coffman v. Hawkins & Hawkins Drilling Co., Inc.*, 594 F.2d 152 (5th Cir. 1979); *Tebbs v. Baker-Whiteley Towing Co.*, 407 F.2d 1055 (4th Cir. 1969). That an agreement to perform repairs is oral is immaterial to the existence of an implied warranty of workmanlike performance on the contract for repairs. *Booth Steamship Co.*, 262 F.2d at 313.
>
> The implied warranty of workmanlike performance has consistently been applied to find fault where repair work is improperly performed. *See, e.g., Booth Steamship Co.*, 262 F.2d 310; *Rivera-Domenech*, 254 F.Supp. 2d at 235. "While the warranty parallels a negligence standard, the owner of a vessel may be entitled to recover for breach of the warranty even if the repairs were performed without negligence." *Rivera-Domenech v. Perez*, 254 F.Supp. 2d 232, 236 (D.P.R. 2003) (citing *La Esperanza de Puerto Rico, Inc.*, 124 F.3d at 17). Because the warranty of workmanlike performance parallels a negligence standard, the Court will discuss defendants' claim of negligence within the context of the warranty of workmanlike performance.
>
> As stated above, the Court has found that the parties had a binding oral agreement that plaintiff would perform the repairs set forth in the Olsen survey, and that defendants would compensate plaintiff in the amount of the agreed-upon estimate. The Court has also found that plaintiff materially breached this agreement by not completing the agreed-upon repairs. Although plaintiff may have performed some of the repairs in a workmanlike manner, the Court finds that plaintiff did not

---

[1] Additionally, defendant Point Judith Marina, LLC breached its warranty of workmanlike performance in this regard in 1998, 1999, 2000, 2001, 2002, 2003 and 2004 when it failed to detect this problem during commissioning of the vessel.

> perform the repairs to the roof and to the heating and piping systems in a workmanlike manner, thereby breaching the contract's implied warranty of workmanlike performance.

(emphasis added)

Moreover, in Parks v. U.S., 784 F.2d 20 (1st Cir. 1986), the First Circuit Court of Appeals upheld the District Court's holding that the third-party defendant, Massachusetts Maritime Academy, was liable because it had breached its implied warranty of workmanlike service. Significantly, the Court held that the Academy was liable for not discovering a gap between a guard and the diesel machinery, even though it had not specifically agreed to look for such a gap.

Here, defendant Point Judith Marina, LLC breached its duties in 1) failing to discover the stream of water entering the M/V EVEREADY when it launched the M/V EVEREADY, 2) not discovering the condition of the exhaust hoses in relation to the engine room rear bulkhead, 3) replacing the vessel's bilge pumps on various occasions without installing anti-siphon loops, and 4) shutting off their bilge pump switches in April, 2005.

## POINT IV

## DEFENDANT POINT JUDITH MARINA, LLC BREACHED THE CONTRACTS IT ENTERED INTO WITH NICHOLAS PICCHIONE II

During the nine (9) years that Nicholas Picchione II kept the M/V EVEREADY, defendant Point Judith Marina, LLC and Nicholas Picchione II entered into a number of stand alone contracts for services and/or repairs to the M/V EVEREADY.

Each year from 1998 to 2005 Nicholas Picchione II was sent a commissioning contract that he filled out and return to defendant Point Judith Marina, LLC for the commissioning of his vessel each spring, and every year, including 2005, defendant Point Judith Marina, LLC commissioned the M/V EVEREADY pursuant to that contract. (See Trial Exhibit 1) The commissioning included the inspection of hoses such as the exhaust hoses. (Trial Exhibits 4 and 5)

Additionally, in April 2005, Nicholas Picchione II contracted with defendant Point Judith Marina, LLC to launch the M/V EVEREADY. As part of the launching process, defendant Point Judith Marina, LLC was to properly inspect the M/V EVEREADY for leaks and to ensure that it had adequate bilge pumping availability prior to tendering the vessel to its owner.

As part of the commissioning process, Point Judith Marina, LLC was supposed to adequately inspect all of a vessel's hoses, including its exhaust hoses. (See Trial Exhibits 4 and 5)

Moreover, it was well recognized within the marine industry that it was necessary and, in fact, imperative to inspect a vessel's exhaust hoses.

In fact, Donald Vivenzio testified that Point Judith Marina, LLC had experienced prior sinkings as a result of hose failures.

Alternatively, if defendant Point Judith Marina, LLC was not able to inspect the exhaust hoses or the M/V EVEREADY as it seems to have sometimes asserted at trial then it further breached its contract with Nicholas Picchione II in that it failed to alert/advise him that it had not performed these routine and necessary inspections. Moreover, it breached its commissioning contract with Nicholas Picchione II in that it left the M/V EVEREADY without a fully operating bilge pump system.

With respect to its contact to launch the M/V EVEREADY, defendant Point Judith Marina, LLC breached its contract in that it failed to properly and completely determine if the M/V EVEREADY was taking on any water as result of winter freezing, et cetera. It is axiomatic that the launching of a vessel included determining if she was taking on any water. See: Monari v. Surfside Boat Club, 469 F.2d 9 (2d Cir. 1972); Hardesty v. Larchmont Yacht Club, 1983 AMC 1059 (S.D.N.Y. 1983)

## POINT V

## DEFENDANT POINT JUDITH MARINA, LLC IS LIABLE IN TORT FOR THE DAMAGES SUSTAINED BY THE M/V EVEREADY

In Benedict on Admiralty, Vol. 8, Chapter 19.05, pp. 19-38 and 19-39 (2006) its authors state the standards to be applied to marina negligence.

> **§ 19.05 Tort Actions Against Marinas**
>
> A marina is liable for its torts – i.e., for negligence – in the same manner as any other party. It should be borne in mind that many actions can sound in tort, contract or bailment. Statute of Limitation considerations may play a role in determining which of the available causes of action is to be utilized. So, too, will the factual circumstances, as the lack of any evidence indicating negligence may force reliance on a contract or bailment theory. Thus, the owner of a vessel damaged either while moored at a marina or in lay-up or winter storage may proceed directly on a negligence theory, if proof of negligence is available, even though recovery under a bailment theory may be available as well. Proceeding on the basis of a negligence theory will be appropriate where the damage is caused by a lack of care on the part of the employees of the marina in attempting to assist in mooring, for example, or in other operations.
>
> So, too, a marina is liable in tort, as well as contract, in the event material or equipment supplied by the marina is negligently provided or provided in a defective condition. A marina may be held liable if it provides defective equipment to enable it to carry out a task such as the mooring of a vessel, which it has undertaken. A marina will be liable to the extent it is aware of dangerous underwater obstructions within the marina or the berths it provides and fails to eliminate those obstructions or give adequate warning of their existence.
>
> A marina will be held to a standard of due care. Such a standard is measured, in part, by (1) the customs and practices of other similarly situated marinas in the area, (2) the risk of harm, generally, as a function of the standard of care, (3) the value of the property damages as measured against the cost or difficulty of protective action, and (4) the general relationship between the parties and between the parties and type of damage sustained.
>
> A marina must make a reasonably diligent effort to ensure that moorings are fit and safe for their intended use. It has been held that reasonable diligence required a mooring and buoy to be pulled from the water and inspected at least every two years. The vessel owner provided with a mooring has a right to rely upon the marina's designation and implied_representation that the mooring is suitable for his vessel. Where the mooring fails under circumstances not amounting to an Act of God, i.e., under normal weather conditions, an inference arises of negligence on the part of the party providing the mooring. Where, however, the marina has satisfied its burden of proving the exercise of due care, there is no liability.

(emphasis added) (footnotes omitted)

Marinas have been held liable in tort for a variety of negligent acts. See: Atlantic Mutual Ins. Company v. Clearview Club, Inc., 264 F.Supp. 608 (E.D.N.Y. 1967) (marina liable for employee pumping gasoline into bilge instead of fuel tanks); Bubla v. Bradshaw, 795 F.2d 349 (4th Cir. 1986) (marina liable for improperly wired pier receptacles rewired by previous boat owner)

Here, defendant Point Judith Marina, LLC was negligent 1) in launching the M/V EVEREADY and failing to detect that she had a stream of water entering her from the rear area of the engine compartment; 2) in shutting off the bilge pumping system on the M/V EVEREADY; 3) in failing to notify Nicholas Picchione II that he had a "malfunctioning" bilge pump and that Joseph Stroker had altered the positions of the bilge pump switches, and 4) in failing to adequately inspect the exhaust hoses on the M/V EVEREADY so as to detect that they had no chafing and/or strain relief present.

## POINT VI

## POINT JUDITH MARINA, LLC IS LIABLE FOR THE DAMAGES CAUSED TO THE M/V EVEREADY AS A BAILEE

Here, Nicholas Picchione has contracted with defendant Point Judith Marina, LLC to store the M/V EVEREADY during the winter months of 2004-2005.

As had been his custom since 1996, he filled out the form sent to him by defendant Point Judith Marina, LLC requesting that it launch and commission the M/V EVEREADY for the 2005 boating season. However, defendant Point Judith Marina, LLC never fully completed the commissioning prior to the M/V EVEREADY sinking on April 25, 2005.

In New Hampshire Insurance Company v. Nicholas Dagnone, 2006 AMC 1920, 1922-23 (D. R.I. 2006), Judge Lisi set forth the law of bailment as it concerns a vessel delivered to a marina for storage, et cetera. She stated:

II. Bailment

Plaintiff correctly contends that his delivery of the yacht to Hinckley for winter storage, in exchange for a fee, constitutes a bailment for hire. *Grabbert v. Marina Parks, Inc.*, 221 A.2d 455, 458 (R.I. 1966). And Defendant concedes that when a bailor shows delivery to the bailee and the bailee's failure to return the thing bailed in an undamaged condition, the bailor has made out a prima facie case of negligence against the bailee. *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 1991 AMC 1672, 1675, 924 F.2d 16, 18 (1 Cir. 1991). Where the bailor has made out a prima facie case, the bailee must come forward with evidence to rebut the presumption of negligence and explain its default by showing facts and circumstances sufficient in law to exonerate it. 1991 AMC at 1676, 924 F.2d at 18. (emphasis added)

Defendant here argues that Plaintiff cannot take advantage of the presumption because its possession of the yacht was not exclusive of that of Plaintiff. Defendant cites to the trial testimony of Ted Beaumont, the captain hired by Dagnone to move and winterize the boat. Beaumont testified that he went to the boatyard three times after leaving the yacht at the work dock on November 22, and that he physically boarded the yacht on the last visit to check the condition of the bilge. Defendant argues that Beaumont's testimony shows Beaumont had "unfettered" control of the vessel and that, therefore, the basis for the presumption of negligence fails because "neither party was in a better position than the other to explain the cause of the damage."

What Defendant ignores, however, is that on December 3, 2003, Defendant received the signed contract from Plaintiff (albeit a faxed copy) and on that same day, Kerr told Plaintiff in their phone conversation that his boat would be put "in queue" for out-hauling. Defendant further ignores the fact that it took the unilateral action of moving Plaintiff's vessel from the work dock area to Slip A-10, where Hinckley's employees tied Plaintiff's lines to the dock. At that point, Defendant knew Plaintiff was in Florida and that Beaumont was waiting for Defendant to out-haul the vessel so that he could put anti-freeze in the engines. Defendant was therefore on notice that Beaumont's only interest in the vessel was to complete the winterization process *once it was out of the water*. Given these facts, Defendant's argument as to the presumption of negligence fails.

Here, Picchione was awaiting the completion of the spring commissioning and sea trial by defendant Point Judith Marina, LLC prior to using the M/V EVEREADY.

Since the defendant Point Judith Marina, LLC failed to come forward at trial with evidence to rebut the presumption of negligence against it and demonstrate how the M/V EVEREADY sank, this Court must find it liable for plaintiff's damages.

Defendant Point Judith Marina, LLC's contention that because Nicholas Picchione II had been on board the M/V EVEREADY for short periods of time on April 22, 23, and 24, 2005, for cursory visits, which totaled in all 120 minutes, to check on supplies such as food and bedding, it was relieved of its obligations as a bailee is not so.

The courts have long held that mere access to a vessel by the bailor does not affect the presumption. Here, it was defendant Point Judith Marina, LLC that was performing repairs/services to the M/V EVEREADY, i.e., the 2005 spring commissioning of the vessel, not Nicholas Picchione II. As testified to at trial, Nicholas Picchione II merely attended the M/V EVEREADY to check on the presence of fishing equipment, food stuffs, and supplies and bedding.

In Pan-America Petroleum Transportation Co. v. Robbins Drydock & Repair Company, 281 F.97 (2d Cir. 1922), the Second Circuit Court of Appeals held that even though the bailor himself was on board the vessel at the time the damages occurred, that fact did not change the fact that the bailee had exclusive possession of the vessel for purposes of making the repairs. See also: Harrison Brothers Drydock v. J.R. Atkins, 193 F.Supp. 386 (S.D. Ala. 1961)

Moreover, in The English Whipple Sailyard v. The Yard Ardent, 459 F.Supp. 866 (W.D. Pa. 1978), the court held that although the owner had slept on the vessel, that fact did not relieve the bailee of its duty to meet the presumption.

Additionally, in Johnson's Branford Boatyard, Inc. v. The Yacht Altair, 260 F.Supp. 841 (D. Conn. 1966), the court held that a bailment existed even though the owner had been on board the vessel the very day it was damaged.

In Muller Boat Works, Inc. v. Unnamed 52' House Barge, 464 F.Supp. 2d 127 (E.D.N.Y. 2006), the Court held:

> A bailor makes out a rebuttal presumption of negligence if the bailor proves that the bailed article was delivered in good condition and was returned damaged or not at all. *See Gelb v. Minneford Yacht Yard*, 108 F.Supp. 211, 214 (S.D.N.Y. 1952); *Commercial Union Ins. Co. v. Bohemia River Associates, Ltd.*, 855 F.Supp. 802, 805 (D.Md. 1991) (citation omitted). In the context of a bailment, "no inference of negligence arises if the bailee's custody or possession of the vessel was not exclusive of that of the bailor; that is, the possession or control exercised by the bailor would permit the trier of fact to rationally conclude that the bailor (or both parties, equally) might be in the best position to explain what actually happened." *Reel Therapy Charters*, 2003 WI, 23514559, at *7 (citations omitted); *United States v. Mowbray's Floating Equip. Exchange*, 601 F.2d 645, 647 (2d Cir. 1979)
>
> Because the Court has found the existence of an oral agreement between the parties for plaintiff to take custody of the vessel and perform work on the vessel at plaintiffs shipyard in accordance with the Olsen survey, the Court finds the existence of a bailment. The vessel was delivered by defendants to plaintiff for the specific purpose of repairing the vessel in accordance with the Olsen survey, the vessel was accepted by plaintiff, and there was an implied promise that the vessel would be returned to defendants upon completion of the repairs. *See Boudy & Stevens, Inc.*, 924 F.2d at 18 (defining bailment).

Since all of the evidence at trial demonstrates that the last person to touch the bilge pump switches was defendant Point Judith Marina, LLC employee Joseph Stroker, it is and can only be defendant Point Judith Marina, LLC that is in the best position to explain how the M/V EVEREADY sank.

Here, the M/V EVEREADY had been tendered to defendant Point Judith Marina, LLC with working bilge pumps in the fall of 2004, and not returned to Nicholas Picchione II in like condition and order. As a result thereof, this Court should find that defendant Point Judith Marina, LLC is liable in full in bailment for the damages sustained by the plaintiffs as a result of the vessel's April 25, 2005 sinking because it has failed to meet its burden to demonstrate how the M/V EVEREADY sank without any negligence of defendant Point Judith Marina, LLC.

## POINT VII

## PLAINTIFF'S DAMAGES

Following the sinking of the M/V EVEREADY on April 25, 2005, plaintiffs sustained damages in the amounts contained in the following Trial Exhibits: 35, 36, 37, 44[2], 104, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, and 126, all of which were foreseeable and necessary to the preservation of the M/V EVEREADY following her sinking and/or related to the sinking itself.

Moreover, defendant Point Judith Marina, LLC's objections that the storage charges incurred up to the time of the sale are not warranted should be rejected.

First: Those charges were necessary to preserve the M/V EVEREADY and protect the plaintiff from any claims of spoliation of evidence.

Second: When plaintiff announced that they wished to sell the M/V EVEREADY, defendant Point Judith Marina, LLC objected and plaintiffs were required to file a Motion (Docket No. 31) to obtain an Order allowing it to sell the vessel.

## POINT VIII

## PLAINTIFF IS ENTITLED TO PREJUDGMENT INTEREST

The Supreme Court of the United States long ago held that a plaintiff is entitled to receive prejudgment interest in a property damage case brought in admiralty. See: Cement Division National Gypsum Company v. City of Milwaukee, 515 U.S. 189 (1995)

---

[2] If the Court does not use the sum of $200,000.00 as damages for the loss of the M/V EVEREADY to plaintiff Northern Insurance Company of New York, then it should use the fair market value prior to sinking. Mr. William Robbins testified that the pre-sinking value was $160,000.00, (William Robbins – Trial Transcript 5/14/08, p. 91, ll. 13-25, p. 92, ll. 1-10) Mr. Picchione testified the pre-sinking value was $150,000.00, (Nicholas Picchione II – Trial Transcript 5/12/08, p. 111, ll. 11-15) and Dennis Layfield admitted that he had placed a fair market value of $135,000.00 when he wrote his opinion to Mr. Robert Wheeler of One Beacon on June 13, 2005. (Dennis Layfield – Trial Transcript 5/22/08, p. 17, ll. 7-25, p. 18, ll. 1-2)

Moreover, the courts have further held that it is an abuse of discretion for a trial court not to award prejudgment interest unless the trial court has found special circumstances to support such a denial. See: Alkmeon Naviera, S.A. v. The MARINA, 633 F.2d 789 (9th Cir. 1980) and Self v. Great Lakes Dredge & Dock Company, 832 F.2d 1540 (11th Cir. 1987)

As such, this Court should award plaintiff prejudgment interest from April 25, 2005 to the date that it issues judgment at the rate of 12% per annum, the statutory interest rate for civil action under Rhode Island law.

R.I. Gen. Laws § 9-21-10 states as follows:

> (a) In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of dames interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. Post-judgment interest shall be calculated at the rate of twelve percent (12%) per annum and accrue on both the principal amount of the judgment and the prejudgment interest entered therein. This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided.
>
> (b) Subsection (a) shall not apply in any action filed on or after January 1, 1987, for personal injury or wrongful death filed against a licensed physical, hospital, clinic, health maintenance organization, professional service corporation providing health care services, dentist, or dental hygienist based on professional negligence. In all such medical malpractice actions in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date of written notice of the claim by the claimant or his or her representative to the malpractice liability insurer, or to the medical or dental health care provider or the filing of the civil action, whichever first occurs.

(emphasis added)

Here, there exists no reason to deny the plaintiff prejudgment interest, as plaintiff filed this action on April 21, 2006, just short of the one year anniversary of the M/V EVEREADY's sinking, and it was tried within two years of its filing.

## POINT IX

## DEFENDANT POINT JUDITH MARINA, LLC HAS INTRODUCED NO EVIDENCE THAT NICHOLAS PICCHIONE II DID NOT ACT PROPERLY IN RESPECT TO THE M/V EVEREADY'S BILGE PUMP SWITCHES

Defendant Point Judith Marina, LLC's claim that Nicholas Picchione II somehow acted improperly in respect to the bilge pump switches, et cetera, is yet another smokescreen in an attempt to divert this Court away from Point Judith Marina, LLC's own actions/inactions.

Simply put, Point Judith Marina, LLC criticizes Nicholas Picchione II for only checking the bilge pump switch panel on Thursday, April 21 and Friday, April 22, 2005. However, defendant Point Judith Marina, LLC offered no testimony as to how often a vessel owner is to check bilge pump switches when he is not using/moving the vessel; i.e., disconnecting the shore power cord and switching the vessel's electrical system from AC to DC current.

Plaintiffs submit that vessel owners do not check bilge pump switches every time they come on board a vessel when there has been no change in the vessel's status/location. Here, Nicholas Picchione II checked the bilge pump switches on two out of three days, even though his vessel had not been moved. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 75, ll. 19-22, p. 83, ll. 21-25, & p. 84, l. 1)

Additionally, Nicholas Picchione checked the engine room bilge on Thursday, April 21, 2005 (Nicholas Picchione II – Trial Transcript 5/12/08, p. 78, ll. 20-25, p. 79, l. 14) but did not check it again on Friday, April 22, 2005, because there was evidence of a mechanic on board. (Nicholas Picchione II – Trial Transcript 5/12/08, p. 81, ll. 12-25) Mr. Picchione also checked the lazaretto bilge hatch.

Plaintiffs submit that it was defendant Point Judith Marina, LLC's obligation to ensure/advise Nicholas Picchione, II that it had altered the position of the bilge pump switches and that there was a malfunctioning bilge pump on the M/V EVEREADY.

To shift the burden to the vessel owner to go behind a trained mechanic and ensure that everything he did was correct would impose an insurmountable threshold on an owner.

While admiralty law adopted comparative fault in U.S. v. Reliable Transfer Company, Inc., 421 U.S. 397 (1975), plaintiffs submit that defendant Point Judith Marina, LLC has not offered any evidence to support its proposition that Nicholas Picchione II was negligent in any way.

Moreover, if Nicholas Picchione II was negligent to any degree, his proportion of negligence was diminimus compared to the negligence of defendant Point Judith Marina, LLC.

## POINT X

## POINT JUDITH MARINA'S SPURIOUS AND ABERRANT CONTENTIONS

Starting with the sinking of the M/V EVEREADY on April 25, 2005, and continuing through the trial of this matter, defendant Point Judith Marina, LLC has failed to come clean.

First, defendant Point Judith Marina, LLC never revealed to the investigating authorities, to the surveyors sent by the various underwriters, or to Nicholas Picchione II, that there had been a "malfunctioning" bilge pump on the M/V EVEREADY and that its mechanic, Joseph Stroker, had altered the position of the auto bilge pump switch.

Moreover, Point Judith Marina, LLC had allowed the Harbormaster Barry Ennis and the underwriter's surveyors Dennis Layfield and William Robbins to believe that the reason that all of the bilge pump switches were found in the off position was a result of Nicholas Picchione II's having shut them off even though it had no evidence of the same.

Second, during the course of discovery and again at trial, defendant Point Judith Marina, LLC suggested that Nicholas Picchione II had scuttled his vessel for purposes of obtaining insurance monies by cutting the air conditioner discharge hose with a fish knife (William Robbins – Trial Transcript 5/15/08, p. 80, ll. 21-25) even though defendant Point Judith Marina, LLC's scuttling theory had been disproved prior to trial. (William Robbins – Trial Transcript 5/15/08, p. 80, ll. 1-25, p. 81, ll. 1-25, p. 82, ll. 1-23)

Third, defendant Point Judith Marina, LLC's contention with respect to plaintiff's damages were equally disingenuous and not supported by any evidence.

Defendant Point Judith Marina, LLC attempts to reduce plaintiff's damages by claiming that the pre-sinking value of the M/V EVEREADY should be reduced because of core saturation. It, however, offers no proof to support its contention that the weeps depicted in Trial Exhibit 64A existed prior to the sinking, and were not a result of the sinking. As such, this Court should not reduce the pre-sinking value of the M/V EVEREADY by the $20,000.00, a sum which Mr. Vivenzio admitted was based on pure speculation. Moreover, Mr. David Clarke testified that he observed the M/V EVEREADY with the same water line for a period of eight years. (David Clarke – Trial Transcript 5/15/08, p. 123, ll. 21-25) Kenneth Hilton testified likewise. (Kenneth Hilton – Trial Transcript 5/12/08, p. 157, ll. 10-15, p. 152, ll. 8-16) Thus, the evidence indicates no core saturation prior to sinking.

Moreover, defendant Point Judith Marina, LLC's own employee, Mr. Henry Smedberg, who inspected, sanded and painted the bottom of the M/V EVEREADY, testified at trial that he observed no such water weeps prior to the launching of the M/V EVEREADY in April, 2005. (Henry Smedberg – Trial Transcript 5/13/08, p. 59, ll. 16-25, p. 6) With no evidence that the weeping condition found after the sinking was not caused by the sinking itself no set off should be

allowed for alleged core problems. (Defendant Point Judith Marina, LLC's argument is particularly odd in respect to the core allegation because if it was present prior to the sinking it would have resulted from Point Judith Marina, LLC's improper repairs to the M/V EVEREADY in repairing the 1998 grounding damages.

Fourth, defendant Point Judith Marina, LLC also claimed that the pre-sinking value of the M/V EVEREADY should be reduced because of the tuna tower and the 1998 grounding. As Mr. William Robbins testified, there is a market for 35 foot fishing vessels, and if repairs are performed properly, there should be no reduction in value due to a grounding.

POINT JUDITH MARINA, LLC'S SUPERSEDING CAUSE DEFENSE IS MISPLACED

While admiralty law now recognizes the superseding cause, it is inapplicable to the facts of this case. See Exxon Co. USA v. Sofec, Inc., 517 U.S. 830 (1996)

Simply put, the superseding cause doctrine is not applicable to the facts relating to the sinking of the M/V EVEREADY. For the superseding cause doctrine to apply, there first must be negligence on the part of a defendant, the negligence removed, and then a subsequent act of the plaintiff which causes the ultimate loss. Here, defendant Point Judith Marina, LLC's argument fails because there is no evidence of a superseding act of the plaintiff; i.e., shutting off the bilge pumps. Moreover, there is no evidence that the plaintiff, Nicholas Picchione II, was on the vessel after Point Judith Marina, LLC's employee, Joseph Stroker, left it on Saturday, April 23, 2005.

What is clear, however, is that Nicholas Picchione II checked the M/V EVEREADY's bilge pump switches on Thursday, April 21, 2005, and that, thereafter, on either April 22 or 23, 2005, Joseph Stroker changed their positions.

As such, plaintiffs assert that the superseding cause doctrine is not applicable herein.

PLAINTIFF'S RESPONSE TO DEFENDANT POINT JUDITH MARINA, LLC'S
COUNTERCLAIM AGAINST NICHOLAS PICCHIONE II

Simply put, defendant Point Judith Marina, LLC's counterclaim is disingenuous.

Defendant Point Judith Marina, LLC's claim that the 2005 Summer Dockage Agreement (Trial Exhibit A) entered into between defendant Point Judith Marina, LLC and Nicholas Picchione II somehow relieves defendant Point Judith Marina, LLC of its liability based on: 1) Failure to Warn, 2) Breach of the Warranty of Workmanlike Service, 3) Breach of Contract, 4) Negligence, and 5) Bailment is baseless.

Simply put, a reading of the Summer Dockage Agreement demonstrates that it does not cover: 1) the commissioning of the M/V EVEREADY, 2) the launching of the M/V EVEREADY, 3) the failure of defendant Point Judith Marina, LLC to either install chafing gear/strain relief devices on the vessel's exhaust hoses, and/or to install anti-siphon loops/check valves on the M/V EVEREADY's bilge discharge hoses, or to warn Mr. Picchione of the lack of same, 4) the failure of defendant Point Judith Marina, LLC to ensure that all of the bilge pumps on the M/V EVEREADY were operational and/or to warn Mr. Picchione that it had changed the position of his bilge pump switches, and 5) the failure of defendant Point Judith Marina, LLC to properly inspect the M/V EVEREADY's exhaust hoses.

First, a reading of the 2005 Summer Dockage/Rack Storage Agreement at paragraph 11, which defendant Point Judith Marina, LLC contends holds it harmless herein, indicates that it is so ambiguous that it is unclear just what and whom Mr. Picchione was to hold defendant Point Judith Marina, LLC harmless for. Moreover, the impact of paragraph 11 appears to be that defendant Point Judith Marina, LLC will not be held liable for Acts of God.

Second, a reading of paragraph 18 of Defendant's Trial Exhibit A clearly indicates that that paragraph applies to personal injury claims only. As such, it cannot be applied to this action which involves property and related losses/damages.

Additionally, assuming, arguendo, that the Summer Storage Agreement covers this case, the First Circuit Court of Appeals ruled in Broadley v. Mashpee Neck Marina, Inc., 471 F.3d 272 (1st Cir. 2006) that hold harmless and indemnity agreements are not to be upheld if they are vague and ambiguous. A reading of the agreement herein demonstrates that it is unclear, ambiguous and vague.

## CONCLUSION[3]

Based on the foregoing and the evidence introduced at the trial of this matter, this Court should find that defendant Point Judith Marina, LLC is liable to plaintiff on Counts VII, X, XI, and XII of the Amended Complaint and should award plaintiff its damages in full, and interest thereon.

Additionally, this Court should deny/dismiss defendant Point Judith Marina, LLC's Counterclaim.

Dated: Providence, Rhode Island
June 16, 2008

Lovejoy & Associates
Attorneys for Plaintiff
Northern Insurance Company of New York

By: /s/ Frederick A. Lovejoy

Frederick A. Lovejoy (Bar No. 5313)
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 telefax

PicchioneFindings6-08.doc

[3] Plaintiff's Proposed Findings of Fact and Conclusions of Law are also submitted as Plaintiff's Objection to Motion of Defendant Point Judith Marina, LLC For Judgment As A Matter Of Law.

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed on June 16, 2008, postage prepaid, to:

Robert E. Collins, Esq.
Clinton & Muzyka, P.C.
One Washington Mall
Suite 1400
Boston, Massachusetts 02108

Albin Manufacturing, Inc.,
Albin Marine, Inc.,
Fred W.A. Peters, Monica Peters
143 River Street
Cos Cob, Connecticut 06807

Michael J. Rauworth, Esq.
Cetrulo & Capone LLP
321 South Main Street
Providence, Rhode Island 02903

/s/ Frederick A. Lovejoy
FREDERICK A. LOVEJOY