UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE II<br>Plaintiffs<br>v.<br>ALBIN MARINE, INC.; STANDISH BOAT YARD, INC. and POINT JUDITH MARINA, LLC.<br>Defendants | CIVIL ACTION NO. 06-190-S |

# DEFENDANT'S POST-TRIAL MEMORANDUM

Defendant Point Judith Marina, LLC ("Point Judith") submits this memorandum of points and authorities to accompany its requests under Fed. R. Civ. P. 52, for findings and rulings, which it incorporates by reference herein, together with the points and authorities in its motion for judgment as a matter of law at the close of plaintiffs' evidence.

Briefly, there is no basis to conclude that Pt. Judith did anything with regard to the bilge pumps that contributed to the sinking of the Vessel, much less anything that was wrong — it is undisputed that the float-switch-activated forward bilge pump was powered on, and confirmed to be in working order, when the last Pt. Judith personnel left the Vessel. Later, the bilge pumps *all* somehow came to be depowered, but this cannot be attributed to Pt. Judith. What happened to the boat over the weekend is the sole responsibility of the plaintiff, Nicholas Picchione, who has admitted that he had custody of and responsibility for the Vessel. In particular, the status of the midships bilge pump made no difference as to what happened to this boat.

The hole in the exhaust hose was utterly undetectable without removal of the fuel tanks — even the plaintiff's own surveyors failed to detect it for some 2½ years, despite their pointed efforts to figure out a source for water entering the hull.

The same thing applies to the question of chafing gear — even the plaintiff's own expert agrees that he could not see whether the exhaust hose had chafing gear from a vantage point in the engine room. But more than this, there was simply no legal duty on the part of Pt. Judith — as a repairer — to have detected or done anything this shortcoming in manufacture. It also applies to the question of anti-siphon loops in bilge discharge hoses. Plaintiff's expert is not even certain that *he* always made an issue of lack of anti-siphon loops with his own customers, when he was in Pt. Judith's shoes.

But these manufacturing shortcomings do make out a case against Standish, who sold the Vessel to Picchione, and who thus has culpability for the lack of anti-siphon loops and lack of chafing gear on the exhaust hoses. The responsibility of the plaintiff is clear from his own testimony, and his negligence is very considerable. Were any liability to be found against Pt. Judith, the culpability of the plaintiff must be added to that of Standish (notwithstanding its settlement with the plaintiff) in a comparative fault analysis, and any damages reduced in the amount of this combined percentage.

The damages are modest indeed, and cannot include the plaintiff's forensic expenses of discovering the hole, or storing the Vessel while this process went on.

And in addition, plaintiff Picchione is liable to Pt. Judith pursuant to an indemnity agreement as to any amount of damages.

## I. POINT JUDITH DID THE RIGHT THING WITH REGARD TO THE BILGE PUMPS

### A. MR. STROKER CONFIRMED THAT THE FORWARD BILGE PUMP WAS WORKING ON THE FLOAT SWITCH, AND PLAINTIFFS' THEORY OF CAUSATION RELIES UPON THIS

The *Eveready* (the "Vessel") had three bilge pumps as of the time of this incident. This is the testimony of the plaintiff and of all the witnesses that dealt with the Vessel in 2004 and 2005.

Mr. Robbins clearly testified that the forward one and the aft one were equipped with float switches, but not the midships one (that eventually became Exhibit 129).

Not surprisingly, then, Mr. Stroker was unable to get the midships pump to work on automatic. But his notes (Trial Exhibit 6) and his testimony both clearly reflect that he was able to get the forward pump to work on the float switch.

Mr. Robbins testified that this forward pump was able to reach — and discharge — any water that could have entered the boat by way of the hole in the exhaust hose. And it had plenty of capacity to discharge any amount that could have entered by this means. There is no evidence to the contrary.

Mr. Robbins' testimony represents plaintiff's only theory of how the Vessel could have sunk by means of the hole in the exhaust hose. Mr. Picchione told the

Coast Guard that the boat was doing fine on Saturday on Sunday, and his own testimony is that he found no water accumulating when he was aboard on Saturday.

Mr. Clarke testified that he found the boat floating normally when he walked by it about 9:15 on Sunday evening, and there is no evidence to the contrary. Indeed, he saw that the Vessel floated so that the exhaust discharge ports were halfway out of the water as of that time — floating considerably higher out of the water than the level observed when the Vessel was relaunched for forensic purposes on May 3, 2005, as reflected in the photo taken that day that shows the exhaust ports under water. Yet the boat was found to be sunken the next morning.

Plaintiff's only theory of the mechanism of this loss is that something changed Sunday evening. It comes through Mr. Robbins' opinion that automatic bilge pumping was active throughout the weekend up until that time, and they stopped working around that time, allowing water to accumulate inside and causing the boat to sink lower in the water.

Without Mr. Robbins' theory, which relies on Mr. Stroker having confirmed on Friday that the forward bilge pump was actuated by the float switch, the plaintiffs are utterly unable to explain why the Vessel did not sink on Friday night, or on Saturday night, or at sometime in between — instead of on Sunday night, as actually happened.

Based on his investigation, Mr. Robbins' opinion was that the bilge pumps were switched off at that time. He repeatedly affirmed that this is the only explanation for how the boat could have floated normally throughout the weekend,

and then could have suddenly sunk over the night of April 24-25, 2005 — and how the switches could have been found to be in the "off" position when the boat was raised.

The plaintiffs' own theory of causation cannot explain how the Vessel stayed afloat throughout the weekend, until Sunday night, except by way of the float-switch-operated bilge pump, that Mr. Stroker confirmed was properly activated by the float switch. Thus, Mr. Robbins' testimony about the mechanism of the sinking — the plaintiff's sole theory — is thus consistent with the evidence that Mr. Stroker left the boat on Friday, April 22, 2005, with the forward bilge pump working properly on its float switch.

### B. MR. PICCHIONE WAS LEGALLY RESPONSIBLE FOR THE VESSEL — AND FOR WHAT HAPPENED TO IT OVER THE WEEKEND

The boat was at Mr. Picchione's disposal over the whole of the weekend, as he has admitted, and he was responsible for its custody and care, as he has also admitted.

This is particularly so because of facts that are conclusively established by Pt. Judith's March 2007 requests to admit:

> 4. Plaintiffs have no evidence that water entered the hull of the Vessel in any substantial amounts during the Events by reason of any act or omission attributable to the Proponent.
> 6. Plaintiff Picchione had a mechanic, technician, or other contractor or vendor aboard the Vessel for several hours during the period following her launch in April 2005 and before her sinking.

Mr. Picchione's trial testimony makes it clear that he was at best only "loosely" attentive to proper care of his boat. He clearly had a responsibility to see to it that he

his automatic bilge pumping capacity had power to it when he last left the boat during that weekend. Obviously, somehow or other, this did not happen — the boat sank, which could not have happened if the power had remained on over Sunday night, serving the float switch on the forward bilge pump, and the switches were all found in the "off" position when the boat was raised on Monday morning.

Not only was he inconsistent and cavalier about his attention to proper care to keeping water pumped out of the boat, he invited (or at knowing least tolerated) a situation where his marina friends would "hang around, have a beer, do whatever they're going to do," and he knew that such people entertained "friends on board." Testimony of Nicholas Picchione II, Tr. Vol. I, Page 120. Apart from whatever Mr. Picchione might have done to the switches, this afforded a significant opportunity for someone else to have manipulated the switches on his boat — even inadvertently — or done something else that he might not even have known about.

But whatever happened over the weekend, Mr. Picchione was fully responsible for it. There is no evidence that Pt. Judith retained any kind of control over the Vessel over the weekend, and Mr. Picchione has admitted facts that show that the Vessel was fully at his disposal — and that he was responsible for it. There was clearly no bailment, and no basis for imposing responsibility upon Pt. Judith to keep the Vessel afloat:

> Bailment relationships are often found when a boat is left with a marina for storage or repairs and the marina is given exclusive right to possession of the vessel. *See, e.g., Id.; In re*

> *Wechsler*, *121 F. Supp.2d at 437-38; Commercial Union Ins. Co. v. Bohemia River Assocs., 855 F. Supp. 802, 805 (D. Md. 1991); Royal Ins. Co. v. Marina Indus., 34 Mass. App. Ct. 349, 611 N.E.2d 716, 717 (Mass. App. Ct. 1993).* But where, as here, the marina simply provides docking space to the boat owners and is not given the exclusive right to control the vessels, no bailment relationship is created. *Id.*

*In re Stanton*, No. Civ. 02-10408, 2005 WL 2035586, at *10 (D. Mass. Aug. 18, 2005).

Even the Slip Rental Agreement makes clear that Mr. Picchione was fully responsible. Thus there is no basis to attribute to Pt. Judith anything that changed on Sunday night to allow this boat to begin to sink into the water. And it is not Pt. Judith's burden to explain what happened to change things on Sunday night — instead, that is plaintiff's burden as to proving causation.

### C. THE MIDSHIPS BILGE PUMP HAD NO ROLE AT ALL

According to Mr. Robbins' percipient testimony, after many examinations aboard the Vessel, the midships bilge pump — the one that Mr. Stroker switched off — simply *had* no float switch, and thus had no automatic capability in *any* event.

Because of this, the midships bilge pump could never have contributed to discharging water from the Vessel *automatically* over the weekend. It could only be activated by a manual switch, which meant that it would only have pumped water out of the Vessel if someone had been on board to activate it manually, turning it on and off as needed. This explains why it would only run continuously (not automatically) when its switch was thrown — because it was only wired manually, there being no float switch to begin with. It is a completely supportable inference that Mr. Stroker,

simply misunderstood the confusing wiring and inadequate labeling and arrangement of the switches — that he supposed that the switch to the midships bilge pump was meant to set it on automatic, whereas it actually was simply a manual switch. Given only the choice between leaving it running constantly (which would have been wrong) and turning it off, he quite properly did the latter, and wrote this up on the Repair Order, Trial Exhibit 6. In fact, both Mr. Robbins and Mr. Layfield agreed that he had done the right thing regarding the bilge pumps —he made sure that the forward bilge pump was properly actuated by the float switch, as reflected both in his testimony and in Trial Exhibit 6.

This means that the midships bilge pump simply had no role in the fate of the Vessel. Nobody was capable of making it work automatically. If it had been taken off the boat for investigation on Friday, this would have made no difference. The automatic bilge pumping capability was provided by the forward pump, whose functioning, as triggered by the float switch, Mr. Stroker confirmed on that Friday — and made a specific note of. And according to the plaintiff's theory of causation (through Mr. Robbins' testimony) it did its automatic duty over most of the weekend, until Sunday night.

Moreover, Mr. Picchione clearly knew that his boat had three bilge pumps. He testified that he had never had any bilge pump work done on his boat on an emergency basis. Thus, there is no reason to believe — even assuming he knew about the content of Exhibit 6 on Friday, April 22, 2005 — that he would have done

anything about the situation before the following work week. That would have been too late, but it is quite consistent with the pattern of Picchione's interaction with Pt. Judith for as long as he had been a customer there. Even if he had claimed that he would have insisted that something be done about the midships bilge pump over the weekend of April 23-24, 2005, this would be so out of character as to be incredible.

But the forward bilge pump was operating on a float switch in any event. This means that anything that hypothetically might have been done over the weekend as regards the midships bilge pump — even on an *emergency* basis — would have made no difference. This forward bilge pump was enough to dewater the boat, and Mr. Robbins makes clear that its output alone would have been enough to prevent the Vessel from accumulating any water — thus matters would never have reached the point of back-flow through any hoses.

### D. THE IDEA THAT WATER ENTERED VIA THE EXHAUST HOSE STANDS AT ODDS WITH THE FACTS

It is undisputed that the Vessel floated lower in the water on May 3, 2005, during the forensic test, than ever before. On that day, the exhaust ports were considerably submerged, as shown in photos of that day, even though Mr. David Clarke saw them halfway above the surface on the night before the sinking. This means that the Vessel floated considerably higher in the water before she sank on April 25th, 2005 than on the date of the forensic test on May 3, 2005.

And even on May 3, when the forensic test was conducted, boat did not leak consistently, but only intermittently when it was rolled in the straps.

This means that there is no basis to conclude that water could actually leak into the hull through the exhaust hose over the weekend of April 23-24, 2005. Mr. Robbins failed to take into account the considerable change in draft between these two dates. Mr. Robbins has acknowledged that his opinions about the source of the water entering the hull is based on the *assumption* that the draft before the sinking was the same as on May 3, 2005. This is obviously an unsound assumption, and it poisons the effect of his opinions about how the Vessel could have sunk.

His conclusions about how water entered the hull are equally tainted by his other lapses in logic. For example, he never took into account the trim of the Vessel as it would have been floating on the night before the sinking — instead, he artificially set up the exhaust hose level with the horizontal, which is utterly without justification. No one knows whether the exhaust hose would have been horizontal as the boat floated before the sinking. Indeed, even Mr. Picchione himself had long noted that the boat was "back-heavy," in other words, that she floated lower in the stern than seemed to be natural.

Moreover, Mr. Robbins sought to explain part of his thinking by reference to a "scum line," which he said would have taken some six hours at a constant level in the water to form. But he was forced to admit that he couldn't explain how this could have happened while the Vessel — on his theory — was actively filling with water.

There is no way that the boat would have stopped filling, and hovered at a constant draft for six hours, and then begun — on its own — begun to sink again.

Yet further, his calculations about the relative positions of the hole in the exhaust hose and the exhaust ports failed to take into account the thickness of the hull.

In addition, Mr. Robbins originally claimed that the water in the aft bilge that Mr. Stroker pointed out was a "red flag" indicating that the boat was taking on water. But he was forced to admit that water entering through the exhaust hose would have had to flow uphill in order to reach the location where the water had accumulated in the aft bilge. He eventually admitted that this water was the result of rainwater accumulation over the long winter storage on land, and did not serve as an alarm as regards salt water entering through the exhaust hose.

Anyone whose logic has this many holes cannot be relied upon to support a conclusion that the water entered the hull through the exhaust hose. His opinion is not professionally sound, and amounts to no more than speculation.

## II. THE PLAINTIFFS ALWAYS HAVE THE BURDEN OF PROVING CAUSATION

The idea that the hole in the exhaust hose was the source of the water is alluring, especially since there has been little evidence of an alternative mechanism — although Mr. Robbins simply abandoned his original theory of water leaking through the hull itself, rather than doing anything to rule it out. But the fact that plaintiff has *posited* a scenario by which the Vessel may have sunk is not a substitute for proper,

non-speculative, competent *proof* of causation. A plausible-sounding scenario does not shift the burden to the defendant to explain how the loss occurred. A mystery as to how the sinking occurred does not make this into a case of *res ipsa loquitur*. — in particular, because the Vessel was not under the exclusive control of the defendant. *Van Carpals v. S. S. American Harvester*, 297 F.2d 9, 11 (2d Cir. 1962).

Instead, it means that the plaintiff's case fails as to the element of causation. This principle applies even as to a seaman's personal injury case, where — unlike here — the plaintiff's burden of showing causation is exceptionally light as a matter of law. Even there, where the plaintiff does not have evidence that establishes the cause of the loss, then as a matter of law the plaintiff simply cannot recover. *Poulis-Minott, v. Smith*, 388 F.3d 354, 366 (1st Cir. 2004)("While a plaintiff need not prove negligence to recover under the general maritime law theory of unseaworthiness, an unseaworthy condition that is the proximate cause of the injury sustained must be shown."). Causation is a critical element in both tort and contract actions. *Wetmore v. MacDonald, Page, Schatz, Fletcher & Co., LLC*, 476 F.3d 1, 3 (1st Cir. 2007).

Plaintiffs have proved that there was a hole in the exhaust hose, and that the Vessel filled with water. But they have failed to provide competent evidence that the first was the cause of the second. This is a plaintiff's burden. The fact that there is no evidence that the Vessel sank by some specific *other* means does not satisfy this burden. The burden never shifts to the defendant.

The testimony of Mr. Robbins likewise does not satisfy the burden. His logic is flawed, and it utterly depends on an unsound assumption that the draft on the night before the sinking was as deep as the draft when the forensic test took place on May 3, 2005 — an assumption that is rebutted by undisputed evidence.

Even if some earlier event was posited as a source of liability, the switching off of the power to the forward bilge pump — the condition found to exist when the Vessel was raised — functioned as a superseding cause. This event, for which Mr. Picchione bears responsibility, serves to cut off liability of a defendant for any earlier cause. The Supreme Court has made clear that the doctrine of superseding cause applies with full vigor in admiralty. *Exxon Co., U. S. A., et al. v. Sofec, Inc., et al.*, 517 U.S. 830 (1996).

## III. THERE IS NO LIABILITY AS TO THE HOLE IN THE EXHAUST HOSE

### A. THE SURVEYORS ALL CONCUR THAT THE HOLE IN THE HOSE COULD NOT BE FOUND WITHOUT REMOVING THE FUEL TANKS

Mr. Robbins made clear that the hole in the exhaust hose was not visible without removal of the fuel tanks. This especially highlighted by the fact that four marine surveyors had been diligently searching, high and low, for a source of the water ingress, for some 2½ years before the fuel tanks were eventually removed in October 2007. This was the chief focus of their work, and their combined professional efforts could not detect this until that time. It strains credulity for plaintiffs to suggest that a condition that was concealed this well should somehow be

detected by someone who undertook only to check conditions that were visible — without disassembly — during a commissioning.

There was no evidence that suggested that there was even a frequent practice among marinas generally to go beyond the review of the readily visible in a commissioning. Point Judith certainly made no such undertaking. This is undisputed.

Accordingly, Pt. Judith cannot be culpable with respect to this condition that for some 2½ years eluded a veritable army of professional marine surveyors dedicated to finding a source for a leak.

### B. THERE WAS NO EVIDENCE OF ANY REPAIR WORK THAT WOULD HAVE REVEALED THIS CONDITION

There is no evidence that there was any problem with the exhaust hose at any particular point in time when Pt. Judith did any mechanical work on the Vessel. If there is nothing to detect, it is obviously impossible for Pt. Judith to have detected it. To suppose that there was a condition to be detected years before this failure would be speculation, and there was not even any expert testimony that such a condition would have existed at any particular point in time.

In addition, Mr. Layfield made clear that there was no need to disassemble the exhaust system anywhere near the rear engine bulkhead in order to remove an engine or a transmission, or do any of the other work that was alluded to, and Mr. Vivenzio testified that there was no work on the hose in question. The port engine was

removed and reinstalled following the grounding on the jetty, but this work happened no later than 1999, and the port exhaust was not the problem in any event.

In addition, there's no evidence of any work having been done on the particular section of hose in question. And when simply performing repairs on *other* parts of the boat, there's no evidence that Pt. Judith ever undertook to inspect anything at all, but instead, only undertook to carry out the work in question. As expanded upon more fully in the next section, there is no general obligation on the part of a contractor to detect or report conditions that might be a safety hazard, or of interest to the owner.

## IV. THERE WAS NO DUTY TO DETECT, CORRECT, ALTER, OR REPORT "AS-BUILT" CONDITIONS OUTSIDE THE SCOPE OF PT. JUDITH'S WORK

Plaintiffs have suggested that there was a duty on the part of Pt. Judith to have detected certain "as-built" conditions of the Vessel in the course of earlier work on it — conditions that were at odds with, for example, certain parts of ABYC standards. In particular, plaintiff has made an issue of the question of chafing gear as to the exhaust hoses, and anti-siphon loops in bilge discharge hoses.

The lack of these items are the responsibility of Standish, of course, since Standish sold the Vessel to Mr. Picchione.

But there is no evidence that Pt. Judith ever did any work on the exhaust hose in question, or on the bilge discharge hoses. Therefore, Pt. Judith had no responsibility for whatever condition these were in as of the time that the Vessel was launched in April 2005.

Plaintiffs' allegation seems to be that Pt. Judith somehow had a responsibility to have detected conditions that did not conform to the ABYC standards, and to have either corrected them, or brought them to the attention of the owner. The simple fact is that a contractor in the position of Pt. Judith owes no such duty.

First, as noted elsewhere, there was no duty arising from providing slip space to Mr. Picchione, or from the Slip Rental Agreement. That document made clear that there was no such undertaking, and in general, someone who merely rents dock space owes no such duty. *In re Stanton*, No. Civ. 02-10408, 2005 WL 2035586, at *10 (D. Mass. Aug. 18, 2005).

The limited commissioning work also imposed no such duty. Even the plaintiffs' own surveyor and expert witness, Mr. William Robbins, agrees that the hole in the exhaust hose was not detectable without disassembly — which did not occur during the April 2005 spring commissioning. The bilge discharge hoses were not deteriorated, and there is no contention that they leaked. And Pt. Judith never agreed with Mr. Picchione to function as a marine surveyor might have done — to detect and report "as-built," factory-original conditions that might have fallen short of a standard such as the ABYC standards.

Plaintiff also seems to suggest that prior repair work that Pt. Judith had done on various parts of the Vessel imposed an obligation with regard to the failure of the manufacturer to have installed chafing gear for the exhaust hoses or anti-siphon loops as to the bilge discharge hoses. The idea of such a duty has been raised and rejected,

again and again, in numerous contexts. It frequently arises when a third party has been injured or killed by the condition in question — a context far more compelling than the facts here — that is, where the complaining party, Mr. Picchione, himself was responsible for the condition of his own boat.

But even where an innocent third party could be at risk of serious personal injury or even death, the law is that the repairer — standing in the position occupied by Pt. Judith here — has no duty of the kind advanced by the plaintiffs in this case. There is compelling public policy logic behind this conclusion:

> Imposition of a duty on repairers to warn of design defects or incur liability to third parties injured by those defects would impose a substantial additional burden on repairers and those who hire them. No repairer could be hired simply to repair a single defect in a mechanical device without the repairer potentially incurring liability to anyone who might use the device. The cost of simple repairs would increase significantly, as every repairer would factor into the charge for a service call the additional cost of inspection, advisement, insurance, and liability. An automobile mechanic could not perform a simple oil change without a complete inspection for any design defect of the automobile and the preparation of a complete advisement of defects to the owner. A plumber could not fix a leaky faucet without inspecting the entire fixture and advising the owner of any ways in which the fixture might be defective. It is possible that repairs of certain high-risk mechanical devices could not be obtained in light of the increased potential for liability on the part of the repairer. Thus, the creation of a new category of special relationship for repairers and third parties injured by the equipment in order to create a duty for nonfeasance does not appear to be based on sound public policy.
>
> This conclusion is buttressed by the fact that every other jurisdiction that has considered the question has found no special relationship and no duty. (*Barry v. Stevens Equipment Company* (1985) 176 Ga.App. 27, 335 S.E.2d 129, 131-132 [independent contractor repairer who was not retained to modify shear machine had no duty to correct or warn of a defect of the machine based on superior knowledge alone]; *Sculles v. American Environmental Products, Inc.* (1992) 227 Ill.App.3d 741, 169 Ill.Dec. 784, 592 N.E.2d 271, 273 [as-needed repair service company had no duty to warn of potential hazards of commercial baler when it had not contracted to look for safety hazards]; *Spears v. Sanchez* (La.Ct.App.1968) 207 So.2d 791, 793 [no duty imposed on service station hired to change the oil in an automobile to warn the owner of a defect of the car's hood]; *Ayala v. V & O Press Company* (N.Y.App.Div.1987) 126 A.D.2d 229, 512 N.Y.S.2d 704, 705 ["in the absence of any contractual duty to service a given product on a continual or periodic basis, a repairer should not be subjected to liability based on the failure to warn of a design defect"]; *Risk v. Woeste*

> *Eastside Motors, Inc.* (1997) 119 Ohio App.3d 761, 696 N.E.2d 283 [mechanic's scheduled 90,000 mile service of a car does not include the duty to inform driver of other recommended services] .)

*Seo v. All-Makes Overhead Doors*, 97 Cal.App.4th 1193, 119 Cal.Rptr.2d 160, 02 Cal. Daily Op. Serv. 3605, 2002 Daily Journal D.A.R. 4535 (Cal.App.2nd Dist., 2002)

Decisions to the same effect are legion. *Malloy v. Doty Conveyor*, 820 F.Supp. 217 (E.D.Pa.1993) (ordinary negligence principles do not impose a duty on installer of conveyor belt to notify Federal Express of alleged defect in conveyor, even though installer may have had knowledge of conveyor belt's dangerous condition); *Barry v. Stevens Equipment Co.*, 176 Ga.App. 27, 335 S.E.2d 129 (1985) (repairer of shearing machine had no duty to correct safety defect, of which it had knowledge, or duty to warn of its danger with respect to any part of machine on which it did not do repair work); *Ayala v. V. & O Press Co.*, 126 A.D.2d 229, 512 N.Y.S.2d 704 (1987) (repairer of press not liable on negligence theory based on alleged failure to warn of design defect, where repairer did not agree to provide systematic maintenance to press); *Rolph v. EBI Companies*, 159 Wis.2d 518, 464 N.W.2d 667 (1991) (reconditioner of bending roll machine does not have duty under ordinary principles of negligence to bring it into compliance with applicable safety standards as long as it does not hold itself out as bringing machine into compliance with safety standards and is not requested to do so by machine's owner). *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531, 537 (D.S.C. 2007)(contractor providing limited service to engine did not have responsibilities to detect or deal with flaws in engine outside its undertaking);

*Byerly v. Connor*, 415 S.E.2d 796 (S.C. 1992) (owner's limited undertaking to inspect a dock for structural conformity did not include a duty to inspect, discover, or warn of a latent hazardous electrical condition); *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950 (5th Cir. 1979) (furnisher of services not strictly liable for defects neither created nor aggravated by it or for failure to warn customers of patent dangers neither created nor aggravated by the services provided and not within the scope of the work contracted for); *Wissman v. General Tire Co. of Philadelphia*, 192 A. 633 (Pa. 1937) (it may well be that a contractor employed to make repairs is under no duty to inform his customer of a dangerous condition, which he has not been employed to repair, but which he discovers in the course of the making of the repairs agreed upon); *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, (Pa. 1989) (common law has for centuries accepted the fundamental premise that mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act); *Menz v. New Holland North America, Inc.*, 440 F.3d 1002, (8th Cir. 2006) (court refused to expand the duty of a repairer to include the duty to warn of general dangers associated with a product unrelated to the specific repair work performed); *Seo v. All-Makes Overhead Doors*, 97 Cal.App.4th 1193 (Cal.App. 2 Dist. 2002) (any duty of the repairer arises out of its contract with the owner to repair the equipment for a specified fee and no justification exists to extend that contractual duty beyond the intent of the contracting parties); *Sculles v. American Environmental Products, Inc.*, 592 N.E.2d 271 (Ill.App.1 Dist., 1992) (as-needed repair service company

had no duty to warn of potential hazards of commercial baler when it had not contracted to look for safety hazards); *Spears v. Sanchez*, 207 So.2d 791 (La.Ct.App., 1968) (no duty imposed on service station hired to change the oil in an automobile to warn the owner of a defect of the car's hood); *Risk v. Woeste Eastside Motors, Inc.*, 696 N.E.2d 283 (Ohio App., 1997) (mechanic's scheduled 90,000 mile service of a car does not include the duty to inform driver of other recommended services).

The simple bottom line is that Pt. Judith had no duty to detect — or do anything at all — with respect to the "as-built" conditions of the exhaust hose (as lacking chafing gear) or the bilge discharge hoses.

## IV. THE LAPSES OF STANDISH — TOGETHER WITH PLAINTIFF'S OWN NEGLIGENCE — MEAN THAT THEY MUST BE HELD CULPABLE

### A. STANDISH BEARS LEGAL RESPONSIBILITY FOR THE SINKING, BY REASON OF THE LACK OF CHAFING GEAR AND LACK OF ANTI-SIPHON LOOPS, NOTWITHSTANDING ITS SETTLEMENT

The evidence from Ken Hilton is clear that Standish placed the Vessel into the stream of commerce by selling it to Mr. Picchione. As sold, the Vessel contained the "as-built" shortcomings identified above — there was no chafing gear underneath the exhaust hoses, and the bilge discharge hoses that served the forward and mid-ships bilge pumps in the engine room did not have anti-siphon loops.

The testimony of Mr. Robbins as to the mechanism of the sinking makes clear that both of these shortcomings contributed to the sinking. To the extent that any aspect of the sinking is attributed to Pt. Judith, this can only be by reason of these two

structural shortcomings — plaintiffs' whole concept of how the Vessel sank is premised on the hole in the exhaust hose, attributable to the lack of chafing gear, and to the lack of anti-siphon loops in the bilge discharge hoses described above. A repairer such as Pt. Judith cannot be held responsible for these conditions. By contrast, they are utterly attributable to Standish, as a merchant engaged in business selling such vessels. As a participant in the chain of events that placed the Vessel into the stream of commerce and into the hands of Mr. Picchione, Standish is legally responsible for these shortcomings. Based on the uncontradicted evidence of its liability, should the Court find any basis for liability as against Pt. Judith, the Court must assess fault against Standish, and allocate an appropriate portion of the fault in the case to it.

This is so, notwithstanding the Standish pre-trial settlement and release with plaintiffs. *See McDermott, Inc. v. AmClyde*, 515 U.S. 202,208-12, 17 (the litigating defendant's percentage of fault is offset by the percentage of fault assessed against the released defendant).

In *McDermott, Inc. v. AmClyde*, 515 U.S. 202, 209, 217 (1994), the Supreme Court adopted the "proportionate share approach" for allocation of damages that was identified as Alternative Three in Restatement (Second) Torts § 886A. The practical effect is that — by reason of its settlement with Standish — the plaintiffs have already been "paid in full" as regards the liability of Standish. In the event that the Court should find any liability as against Pt. Judith, the Court must assess the liability of

Standish — notwithstanding the settlement — and reduce any recovery on the part of the Plaintiffs by that percentage.

The proportionate share rule applies regardless of whether the theory of liability sounds in tort or contract, provided that their actions operated in concert to cause a single injury to the plaintiff. *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000), citing *Jovovich v. Desco Marine, Inc.,* 809 F.2d 1529, 1530 (11th Cir.1987) (holding that nonsettling party benefits from proportionate share rule for "all theories of maritime liability apportionment").

In its position as a retailer, of course, Standish had an obligation to consider all the safety aspects of any boat that it planned to sell — the responsibility of a retailer was certainly well known in law by 1995. It was certainly at liberty to elect not to sell boats that were not manufactured according to ABYC standards, and it would have been easy to determine whether this was so or not — probably as quickly as a with a simple telephone call to the manufacturer. Standish needed to be in a position to make knowing and honest representations to potential buyers, so it had an obligation to become familiar with the details of a particular make of boat that it planned to sell — including by way of visits to the manufacturer's facilities, not far away in Connecticut. There, Standish would have been able to see the Albins in all stages of fabrication — and thereby detect the lack of chafing gear on the exhaust hoses — to examine the plans used in building the boat, so that its salespeople could have the knowledge needed to sell these boats honestly to retail buyers. As a retailer, it also

was taking on the obligation of carrying out warranty work, which also imposed upon it a particular opportunity and obligation to get to know the Albin 35, inside and out, including how it stacked up against pertinent standards.

As a result, Standish had the ready opportunity, the occasion, and the responsibility to look into the way these boats were constructed. Given these opportunities, it would have been easy to detect the lack of anti-siphon loops, and the lack of chafing gear under the exhaust hoses. Indeed, Standish could have used the ABYC standards like a check-off list, going over the Albin for compliance before it first tried to make a juicy commission on selling one to a member of the public.

Ultimately, of course, Standish had to make a decision about whether or not to sell the Albin line of boats, and chose to do so. This choice carries all the standard legal consequences for Standish's liability, precisely as plaintiffs' complaint alleges.

### B. MR. PICCHIONE'S OWN NEGLIGENCE MUST LIKEWISE SERVE AS AN OFFSET AGAINST ANY AWARD OF DAMAGES

In admiralty, the doctrine of comparative negligence applies and reduces the plaintiff's recovery in proportion to his or her negligence. *Wilson v. Maritime Overseas Corp.*, 150 F.3d 1, 11 (1st Cir. 1998). This operates as a complete defense, if plaintiff's own negligence was the sole proximate cause of the injuries.

As of as early as Saturday, April 23, 2005, Mr. Picchione was free to start up his boat and take it out or to have it towed elsewhere and was free as of that time to spend the night on the boat or even have a party on board. Mr. Picchione

acknowledged that he was responsible for his boat as the captain and owner while at the dock at Pt. Judith, just as when his boats were off-shore at the time of previous casualties. He admitted that he had a mechanic, technician, or other contractor or vendor aboard the Vessel for several hours during the period following her launch in April 2005 and before her sinking. This means that he had full accountability for the safety and security of his own boat.

Mr. Picchione's own admissions show that he failed to exercise due care for the protection of the Vessel as was his responsibility, and this caused her sinking. For example, Mr. Picchione never tested his own float switches. He testified that he failed to confirm that the bilge pump switches were properly aligned when he left the boat on Saturday — even though it is very easy to check the position of bilge pump switches — and testified that he cannot recall having checked the engine room bilges that day. Despite his complete responsibility for the care of his own boat, somehow those switches came to be switched off, so that there was no power to the bilge pumps, as the Vessel was found upon being raised from the bottom. Obviously, somehow, Mr. Picchione failed in his responsibility to see to it that those switches were not switched "off."

By reason of finding a "barrette on the couch or a piece of clothing that doesn't belong there," Mr. Picchione was aware of people making use of his boat during his absence. He had told others where he hid the key to his boat, and knew that people came aboard his boat "to hang around, have a beer, do whatever they're

going to do," and he knew that such people entertained "friends" on board. In fact, he allowed people to use the *Eveready* in the spring of 2005 in the same way as he allowed them to do at other times and with his other boats. This provided more than enough opportunity for "friends" to flip switches — perhaps even after a number of beers — or do other things that Mr. Picchione might have prevented or remedied if he had been on board his boat at the time, or even soon afterwards.

It would have been simple enough to have changed the lock to the Vessel, or simply have taken the key with him, and this would have removed the possibility of irresponsible conduct on the part of people who had become accustomed to partying on board. It is obvious that Mr. Picchione alone is responsible for allowing unknown persons to be aboard his boat, "to hang around, have a beer, do whatever they're going to do," an obvious failure to enforce security as to his own boat. Not only did he fail to insure that power continued to be provided to the forward bilge pump — activated by a float switch — he failed to provide the security necessary to insure that no one *else* could switch the power off.

In addition, Mr. Picchione never sought to engage anyone to look into the correctness of the installation of his bilge discharges or to check the Vessel's exhaust hoses, and never sought out any advice on preventive maintenance.

Plaintiffs' own expert, William Robbins, testified repeatedly that the lack of power to the automatic bilge pumps on Sunday night were what sank the Vessel. Therefore, Mr. Picchione's own negligence, in failing to ensure that the bilge pumps

continued to have power to them — and in failing to see to proper preventive maintenance — was the cause of the sinking.

The rule of *McDermott v. AmClyde,* and *Central States, supra,* requires that Mr. Picchione's negligence serve as an offset against any liability that might be adjudged as against Pt. Judith.

## V. BECAUSE OF THE ECONOMIC LOSS RULE, THERE CAN BE NO RECOVERY IN TORT

The relationship of Point Judith to Mr. Picchione was solely as a result of contractual undertakings between them — the harm to the Vessel was as a result of an "intrinsic" condition aboard it, not an extrinsic condition, such as, for example a fire on the docks that Pt. Judith hypothetically might have had a power to prevent. As a result, plaintiffs are not permitted to get around the limits set by the scope of the contractual undertaking by pleading in tort — this is the "economic loss doctrine." *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F.Supp. 380, 386 (D.Conn. 1994), citing *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471 (D.R.I. 1984).

Because the relationship of the parties as to this loss was solely as a matter of contract, the economic loss rule bars any recovery by the plaintiffs in tort. They cannot recover absent a showing of a contractual undertaking to prevent this sinking, or a breach of some other contractual duty that brought it about.

## VI. Plaintiffs' Claimed Damages Are Inflated

Plaintiffs' sole damages witness, Mr. Robbins, estimated the pre-sinking value of the Vessel at $163,000, based solely on published figures in the so-called "BUC book." But this loss amount failed to take into account:

a. Any amount by way of salvage value;

b. The value compilations published in alternative market report books (simply because he did not subscribe to them);

c. The costs of correcting the problem of water in the core of the Vessel's hull before the sinking — water that Mr. Robbins *originally* believed had been able to freeze, expand, and crack the hull of the Vessel, thus allowing the sinking to occur on April 25, 2005 (a theory that he never even ruled out, once he discovered the hole in the exhaust hose);

d. A buyer's natural tendency to place a discount on the attractiveness of a Vessel that had an adverse history, having experienced a major grounding on the Jetty — a market discount that Mr. Picchione himself acknowledged;

e. Mr. Picchione's own statement that he would have offered the Vessel for sale (before the sinking) at $150,000, *without* disclosing that the Vessel had a checkered history including having been aground and holed on the Jetty:

f. The possibility that buyers would find this Vessel unattractive by reason of the "tuna tower," its weight and adverse stability effects, and the cost of getting rid of it and restoring the boat to its "pre-tower" condition.

By contrast, Mr. Layfield did properly account for these phenomena, and his objective averaging of published price data yielded a starting point ($128,417) that was consistent with his estimate early in his engagement, which took place before he had the information about the grounding history, etc. Mr. Layfield properly accounted for costs for correcting the wet core problem that Mr. Robbins had identified, and for the

loss of confidence that buyers would have in a Vessel, once they knew — as they should be allowed to know — that the Vessel had had a hole punched into its hull when it sank on the Jetty, and that the engines in the Vessel were the same as those that were in the boat at the time. He also made an appropriate accounting for the salvage value of the hull at $25,000 — remarkably close to the actual salvage bid of $26,000 produced by the plaintiffs after the taking of evidence closed.

Mr. Layfield's assessment of the loss of value to the Vessel in connection with the sinking is thus the more professional, reliable, and credible, and stands at $67,417, after accounting for all the proper factors.

Separately, plaintiffs have sought to obtain recovery for amounts invoiced by from their expert witnesses, and for some three years of storage of the Vessel. These are improper.

Mr. Robbins testified that no more than eight hours of his time was devoted to purposes *other than* trying to determine the cause of the loss. There is no evidence that the work of Mr. Pfund was for any other purpose — he testified in deposition as an expert witness. There is no evidence that these expenses were incurred for any purpose other than in an effort to shift the blame for the loss to others through this litigation. Plaintiffs' "expense of *prosecuting* the action is not deemed to be part of the damage caused by the defendant." *Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 653 F.Supp. 451, 462 (D.Mass. 1986) (emphasis in original). "[A]n attorney's fee and other expenses incurred in prosecuting an action are considered an incident of

litigation and, unless authorized by statute, court rule, or written agreement of the parties, are not recoverable." *Panish v. Panish*, 24 A.D.3d 642, 643-644 (N.Y.A.D. 2005). Restatement (Second) of Torts § 914(1) ("A party's damages do not include compensation for either attorneys' fees or other expenses of litigation"). Just as a plaintiff may not recover legal fees in the absence of a statute, his expenses of litigation are not recoverable. And it is plaintiffs' burden to show that any expense is a consequence of the wrongdoing of the defendant — rather than of the plaintiffs' election to litigate. There has been no such showing as to the charges of Mr. Pfund at all, or as to Mr. Robbins (with the sole exception of 8 hours). Therefore, these charges are unrecoverable.

A similar analysis applies to the charges for storage of the Vessel. By their own admission, plaintiffs' did *nothing whatsoever* to trace the source of leakage — from May 3, 2005 to October 17, 2007. Mr. Robbins knew of May 3, 2005, that water was emerging from a location behind the fuel tanks, and yet these were never removed — obviously, a necessary measure, to trace the source — until October 17, 2007. This was a needless expense, and a waste of money. What was done on October 17, 2007 could easily have been done two years or more earlier, and the Vessel could then have been sold at salvage, with proper notice to all parties — as was eventually done post-trial. This would have yielded a better salvage value, because of less deterioration, and would have spared many months of wasted storage charge.

These facts show that plaintiffs failed to mitigate their damages as regards the storage of the Vessel. Everything that was done over the course of 3 years, could have been readily been done in six months. Accordingly, no more than 6 months worth of storage charges are recoverable.

A similar analysis applies to charges of pickling the engines. Mr. Robbins' testified that his clients at Zurich did not authorize him to take the steps necessary to complete a proper pickling of the engines, which would have added value to them. As a result, the initial charges for beginning this process of pickling were useless, and did not permit the boat to be presented to a salvage bidder as having received proper pickling treatment. Therefore, there should be no recovery for those expenses, amounting to $2295.00.

As a result, the damages may not properly be awarded in an amount greater than $68,417 for the loss of value of the hull, plus $30,107 for expense of response distinct from those identified above as improper, for an aggregate total of $98,524.

## VII. PICCHIONE IS OBLIGED TO INDEMNIFY PT. JUDITH AS TO ANY LIABILITY ASSESSED

It is undisputed that Mr. Picchione executed Pt. Judith's Slip Rental Contract, and that it contained a provision in which he promised to indemnify the marina as to any loss occurring to him, "arising out of any incident occurring on or about the Tenant's vessel, a vessel of any patron of the Marina or on the premises of the Marina." The events here clearly represent a loss "occurring on or about the

Tenant's vessel" and therefore Mr. Picchione is obliged to indemnify Pt. Judith in the amount of any liability that might be assessed against it.

In addition, as reflected in Pt. Judith's Rule 52 requests, he agreed to be responsible for Pt. Judith's legal fees, etc., involved in enforcing rights under the Slip Rental Contract." Pt. Judith hereby moves for leave to supplement the record with an accounting of legal fees, once the case is resolved and they cease to increase.

## VIII. CONCLUSION

Mr. Stroker affirmatively made sure that the forward bilge pump was working on its float switch, and he and Mr. Vivenzio checked to make sure the boat was not taking on water. Mr. Picchione said the same thing. There is no evidence that this automatic bilge pump did not work throughout the weekend, and in fact, plaintiffs' own expert's sole explanation of the mechanism of the loss depends on this. Since the Vessel undisputedly sank in the course of about ten hours over the night of April 24-25, 2005, the Vessel clearly would have sunk much sooner if the plaintiffs' proposed explanation were otherwise correct, but the forward bilge pump had not been functioning. Even the plaintiff's expert agreed that Mr. Stroker had done the right thing.

The midships bilge pump — which Mr. Stroker made sure *not* to leave running constantly — had no float switch, and thus could only be controlled by a manual switch. It made no difference to keeping the boat afloat, and the same would have been true if a new pump had been installed in its place. Moreover, there's no basis to

believe Picchione would have taken any kind of action with regard to the midships pump before the work week of April 25, 2005, even if he had read Trial Exhibit 6.

Pt. Judith had finished all the work that it had agreed to do as of Friday, April 22, 2005. There is no evidence that anyone from Pt. Judith set foot on the boat after that. Mr. Picchione readily admitted that he had custody of the boat over that weekend, and could have taken it out, towed it away, or had a party on it. He is fully responsible for what happened to it over that weekend — including the utter absence of security for the boat because of the freedom of his friends to "hang around, have a beer, do whatever they're going to do."

The hole in the exhaust hose was undetectable, and there was no legal duty on the part of Pt. Judith to detect the hole, or the "as-built conditions" regarding anti-siphon loops or chafing gear during the course of repairs.

The real cause of the loss was the negligence of the plaintiff himself, coupled with — assuming plaintiff's theory of the mechanism — the lapses of Standish in selling the boat with the above "as-built" conditions. Both of these count as offsets against any damages assessed, even though Standish has settled.

The economic loss rule bars any recovery in tort, and Pt. Judith never undertook to do anything other than what it did.

The damages in any event do not exceed about $98,000, before application of comparative fault allocation principles, and any liability found must be assessed against Mr. Picchione pursuant to his indemnity obligation.

Mr. Robbins' conclusion that the boat flooded through the hole in the exhaust hose is fatally flawed — it hinges fundamentally on Mr. Robbins' groundless assumption that the draft of the Vessel on April 24, 2005 was as deep as it was when the boat was relaunched for a forensic test on May 3, 2005. There is no evidence that supports this, and all evidence against it. Even on the latter occasion, the boat did not leak consistently, but had to be rolled in the Travelift slings to achieve this — there would be no need to roll the hull if the hull were leaking on an even keel to begin with. Mr. Robbins' opinions are generally quite befuddled, as was the whole of Mr. Picchione's testimony.

The existence of the hole in the exhaust hose by no means proves how the Vessel sank, even when coupled with Mr. Robbins' views — these have been shown to be unreliable, and no basis for supportable conclusions. The plaintiffs cannot be saddled with a burden of coming up with proof of an alternative scenario, merely because the plaintiffs have established some facts that *look like* they are probably connected. The Vessel could have been the victim of vengeance or vandalism, even without leaving any evidence of the same, especially in light of the lack of security that Mr. Picchione maintained. Press reports show that this certainly happens to dwellings, after all, and such conduct does not always leave collectible evidence.

Plaintiffs have simply failed to come up with evidence that proves how this boat sank. Mr. Robbins' unsupportable conclusions do not establish that the exhaust hole flooded this boat — he has basically jumped to that conclusion. And Robbins'

own best effort cannot explain how the boat could have stayed afloat until Sunday night, except by agreeing that the forward bilge pump was working on its float switch, just as Mr. Stroker wrote.

Mr. Robbins himself agreed that Mr. Stroker had done the right thing as to the bilge pumps. At the end of the day, plaintiffs cannot show any duty to the plaintiff that Pt. Judith violated — resulting in harm to Mr. Picchione. The result is that findings, rulings, and judgment should enter in favor of Pt. Judith.

WHEREFORE, Point Judith respectfully requests that the Court enter the foregoing findings, rulings and adjudications, and enter judgment for the defendant.

Dated: June 17, 2008

**POINT JUDITH MARINA, INC.**
By its attorneys,
_/s/ Carl E. Fumarola_________________
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth (pro hac vice)
Carl E. Fumarola, Esq., R.I. Bar #6980
Cetrulo & Capone LLP
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on this 17th day of June, 2008, I have served the above documents on the following counsel of record via ECF filing:

Frederick A. Lovejoy, Esq.
LOVEJOY & ASSOCIATES
276 Center Road
Easton, CT 06612-1604
LOVEJOYADM@aol.com

_/s/ Carl E. Fumarola_________________
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth *(pro hac vice)*
Carl E. Fumarola, Esq., R.I. Bar #6980
**CETRULO & CAPONE LLP**
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com



02006-0045
1046631v1