**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK AND NICHOLAS PICCHIONE II<br>Plaintiffs<br>v.<br>ALBIN MARINE, INC.; STANDISH BOAT YARD, INC. and POINT JUDITH MARINA, LLC.<br>Defendants | CIVIL ACTION NO. 06-190-S |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S POST-TRIAL MEMORANDUM**

Plaintiff's Post-Trial Memorandum sets forth numerous propositions of law and fact that are without support, and that present the risk of leading the Court into conclusions on unsupportable foundations. Accordingly, Point Judith Marina, LLC ("Point Judith") submits this memorandum to respond to the points in question.

## I. PLAINTIFFS' LEGAL CITATIONS DO NOT SUPPORT THE PROPOSITIONS ATTRIBUTED TO THEM

### A. PLAINTIFFS' CITATION ARE NO AUTHORITY AT ALL TO REBUT THE LACK OF DUTY ON THE PART OF PT. JUDITH TO DISCOVER, MODIFY, CORRECT, OR REPORT "AS-BUILT" CONDITIONS SUCH AS THE LACK OF CHAFING GEAR OR THE LACK OF ANTI-SIPHON LOOPS, OR THE HOLE IN THE EXHAUST HOSE

Pt. Judith's post-trial submissions have provided the Court with abundant authority for the proposition that as repairer of the *Eveready* (the "Vessel"), it had no responsibility to do anything with regard to the "as-built" condition of the Vessel, most particularly relating to the lack of chafing gear under the exhaust hose, and the lack of anti-siphon loops in certain bilge discharge hoses. These authorities also apply with equal force as to the hole in the exhaust hose. There is no evidence that Pt. Judith replaced or did any work on those features or locations of the Vessel.

Plaintiffs offer four cases presumably to rebut the large body of law that Pt. Judith cited as to a repairer's lack of duty. None of them have anything to do with a defendant in the position that Pt. Judith occupied as to the chafing gear and anti-siphon loops.

In *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813 (11th Cir. 1984), the defendants were the manufacturer and seller of faulty equipment, not repairers. In *McConnell v. Caterpillar Tractor Co.*, 646 F.Supp. 1520 (D.N.J. 1986), the defendants were the manufacturer, distributor, and installer of a defective piece of equipment.

In *Parks v. United States*, 784 F.2d 20 (1st Cir. 1986), the Massachusetts Maritime Academy was the operator of the vessel on which the plaintiff suffered personal injury, and thus had the traditional obligations of a shipowner or charterer. The ship "was in the control and custody of the Academy at the time of the accident," and in additional to the traditional duties of the operator of a ship, there were "duties and obligations imposed upon the Academy by statute, regulation and written agreement." *Parks, supra*, at 22.

In *Bubla v. Bradshaw*, 795 F.2d 349 (4th Cir. 1986), the defective condition was improper wiring on an electrical receptacle box. The only defendant found liable was the corporation that *operated* the marina and its facilities, Hudgins Marine. The court made clear that Hudgins "was clearly responsible for maintenance of the boxes and should have been aware of the condition when the accident occurred." *Bubla, supra*, at 354 and fn3.

None of these cases speak in any way to the duty of a *repairer*, and thus none of them are authority whatever with respect to the liability of Pt. Judith, which was solely a boat repairer. Certainly none of them suggests that there is a rule of law in admiralty that differs from the authorities Pt. Judith has already provided to the Court. Indeed, admiralty courts have ruled quite consistently with the authorities Pt. Judith has offered to the Court — to the effect that a repairer has no duty beyond what it has contracted to do in taking on a repair task. *See, e.g.*, *Cunningham v.*

*Rendezvous, Inc.*, 699 F.2d 676, 679 (4th Cir. 1983)("We note further that to the extent the court's ruling was predicated on the fact that the shipyards did only that work they were directed to do, the court's ruling was not erroneous."); *Elmwood Dry Dock and Repair v. International Building Systems*, 1994 WL 715991 (E.D.La. 1994)("The Court finds that Elmwood's contract with IBS was to perform the work specifically requested and authorized by Mr. Pinder, as reflected in Elmwood's final invoice to IBS. The contract did not include an obligation on Elmwood's part to make the barge seaworthy for a transatlantic tow.").

None of plaintiffs' cases in any way rebuts the authority that Pt. Judith has cited — showing no duty as to the as-built condition of the anti-siphon loops and the chafing gear, or to have discovered a flaw — the hole in the exhaust hose — as to a part of the Vessel on which it had done no work.

The claims relating to the exhaust hose and the bilge discharge hoses must accordingly fail.

### B. PLAINTIFFS' CITATIONS FAIL TO SUSTAIN A BAILMENT CASE

Plaintiffs' citations regarding bailment all "orbit around" *Goudy & Stevens, Inc. v.Cable Marine, Inc.*, 924 F.2d 16 (1st Cir. 1991), either in that they cite it, or are cited by it. But plaintiffs fail to point out that the yard prevailed completely in *Goudy*. The ruling of the First Circuit expressly endorsed the holding of the trial court there, to the effect that — *despite* the finding of a bailment — the lack of exclusive control meant no presumption in favor of the vessel owner, and thus no evidentiary burden on the shipyard. The judgment in the trial court and in the First Circuit was for the yard, because the owner had the burden of establishing wrongdoing on the part of the yard, and failed to carry the burden.

> [P]ossession and control must be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better, or sole, position to explain what actually happened. The trial court found that, since both parties had equally unrestricted access to the vessel at all times, there was no basis for an inference of negligence and consequently put appellants to their proof.

*Goudy, supra*, 924 F.2d at 19. Clearly, in light of the admittedly free access of Mr. Picchione to the Vessel, and his admitted custody and control, no presumption can operate in favor of the plaintiffs' and Pt. Judith has no burden of explaining the reason for the sinking here, just as in *Goudy* — in which the sinking was utterly mysterious.

In *New Hampshire Insurance Company v. Dagnone*, 2006 AMC 1920, the court's judgment was for the defendant boatyard, adjudging it free of fault. Thus, any conclusions contained in the case regarding bailment are dictum. In any event, the facts were that the boatyard had accepted responsibility to haul the boat, and had accordingly relocated it, on its own, to a location it considered "safer," where it was in queue for being hauled out of the water. This is completely the opposite of the situation here, where the boat had been launched at Mr. Picchione's request, placed at his complete disposal in his standard summer slip, and where Pt. Judith had completed all the work that it had agreed with Mr. Picchione to do. Mr. Picchione admitted that he was completely free to do as he wanted with the boat, and that he was responsible for it. Pt. Judith never undertook to "mind" the Vessel in the owner's slip following the launch, and completed all its work on Friday, April 22, 2005. Even if it had agreed to perform additional tasks for Mr. Picchione — as it had done on numerous occasions in the past while his boat was in its slip — any such repair undertaking would not amount to an agreement to see to its care, and does not make it a bailee of the Vessel, even if its people were occasionally aboard for purposes of performing work on the Vessel. There is simply no evidence that Pt. Judith accepted custody of any customer's boat while performing repair tasks in the customer's own slip.

In *Pan-American v. Robins Dry Dock*, 281 F. 97 (2nd Cir. 1922), the yard admitted without qualification in its pleadings that it had received possession of the vessel for purposes of major repairs — thus there was no dispute as to the existence of the facts supporting a bailment. In addition, the defect in question was in the engine control mechanism that the yard had overhauled.

This distinguishes this case from the modern authorities to the effect that a boat in the owner's slip is not the subject of a bailment.

In *Harrison Brothers Drydock & Repair Yard, Inc. v. Atkins*, 193 F.Supp. 386 (D. Ala. 1961), the yard took on custody of the vessel for repairs in a written agreement, agreed in writing to be responsible for any damage to the vessel while undergoing repairs, placed the vessel in drydock, and removed the vessel from drydock and placed it in another afloat berth of its own choosing, a berth that it controlled. The vessel was damaged by an underwater obstruction in the yard's berth. The court found that the yard was negligent in so doing, as it would have been even if had invited the vessel into that berth without having first taken custody of it, as it admittedly did. The crew remained aboard not to exercise any dominion over the vessel (as they would have done at sea), but only for the convenience of providing them with a place to sleep without incurring immigration issues. For this reason, their presence had no bearing on the yard's obvious control over the fate of the vessel, as established by the other facts.

In *English Whipple Sailyard, Ltd. v. Yawl Ardent*, 459 F.Supp. 866 (W.D. Pa. 1978), the yard was the seller of the boat, and was responsible to the owner in warranty. The boat spent a brief time at the owner's yacht club in the fall of 1974, but had been transferred to the seller's yard by mid-November of 1974 (459 F.Supp. at 871), so that the seller could perform work to complete the installation of equipment that was part of the original sale package. Thus the boat had been in the seller's yard for some three months for purposes of doing the installation work by the time she sank in February 1975. There was no evidence that anyone other than the seller's yard had had access during that time. It was undisputed that the yard had not completed its work and delivered the boat to the owner even by months later, in June 1975. This is in dramatic contrast to Pt. Judith's having already completed all the work it had agreed to perform.

In *Johnson's Branford Boatyard, Inc. v. the Yacht Altair*, 260 F.Supp. 841 (D.Conn. 1966), the yacht was damaged when it fell after the cradle supporting it collapsed. The cradle had been constructed by the yard alone. It does not appear that the question of the exclusivity of its control was even contested — it was obviously responsible for the cradle, and was liable for that reason alone.

In *Muller Boat Works, Inc. v. Unnamed 52' House Barge, et al.*, 464 F.Supp.2d 127 (E.D.N.Y. 2006), there was a finding that the parties had agreed that the yard would take the vessel *into its custody* in connection with a major program of repairs. Since there is no evidence here that Pt. Judith agreed to have custody of the Vessel, this case has no bearing on the resolution of this case.

In this case, there was not even proof of a bailment during the winter storage during the preceding 2004-2005 winter season — and it is undisputed that Mr. Picchione had all the access he needed to bring in his own outside engine mechanic, Dan, during that time. But even if a bailment during that time were hypothetically *assumed*, Pt. Judith's relationship to the Vessel as to winter storage came to an end when the Vessel was launched and placed in his slip the week before the sinking — all at the owner's instructions. Thereafter, the Vessel's status was governed by the Slip Rental Agreement. There is no evidence that Pt. Judith took — or agreed to take — possession of the *Eveready*, or of *any* customers' vessels, when it did repair or commissioning work on them while afloat in the customers' own slips. In any event, Pt. Judith had completed all of the work that the undisputed evidence showed that it had agreed to do as of the point that Mr. Stroker left the Vessel on Friday, April 22, 2005. Mr. Picchione admitted that Pt. Judith never communicated any agreement to start up engines or conduct a sea trial, and thus the testimony of Mr. Vivenzio that there was no such agreement is undisputed. Mr. Picchione's confused belief to the contrary is not evidence of an agreement, but is instead simply confusion. And finally, the facts, as in *Goudy, supra*, do not warrant any inference in favor of the plaintiffs.

## II. PLAINTIFFS' PROPOSED FINDINGS ARE LARGELY AT ODDS WITH THE EVIDENCE

**Plaintiffs' Proposed Finding No. 10**: Plaintiffs assert that Pt. Judith had an obligation and the ability to discover the hole in the exhaust hose in the course of previous work in the engine room. There is no evidence that Pt. Judith performed any work on the exhaust hose in which the hole was discovered. During the course of repair work, Pt. Judith made no undertaking to inspect, detect, alter, or report any other conditions. Thus the legal authorities that Pt. Judith has cited as regard to the anti-siphon loops and the chafing gear applies equally to this contention. Moreover, Mr. Robbins acknowledged that the bottom of the exhaust hose was not visible from the engine room without disassembly of other parts of the Vessel, and there is no evidence that any disassembly that ever was done was sufficient to reveal the hole in the hose — this was never visible to anyone until Mr. Robbins arranged for removal of the fuel tanks in October 2007, more than two years after the sinking in April 2005. And at the time of doing any of the prior mechanical work, there is no evidence that there was any hole in or problem with the exhaust hose capable of being detected.

**Plaintiffs' Proposed Finding Nos. 14-17:** The testimony of Mr. Vivenzio and Mr. Stroker testimony makes clear that Pt. Judith's practice and undertaking was only to inspect those hose that were visible. The same is true of the testimony of Mr. Hilton as to Standish. The cited testimony of Mr. Robbins testimony says nothing at all about the procedures of marinas in general. There was no testimony that established in any way the general practices of marinas in general suggesting inspection of exhaust hoses beyond what was readily visible, much less that Pt. Judith had a duty to inspect beyond what was visible.

There was also no evidence that Pt. Judith ever undertook to remind owners that the marina did not undertake to disassemble components of customers' vessels in order to seek out concealed

problems with hoses, or with any other concealed portion of customers' vessels. There was also no evidence that to do so was in any way a general practice of other marinas.

**Plaintiffs' Proposed Finding No. 36:** There is no content in Trial Exhibit 6 that reflects any presence of any Pt. Judith personnel on board the Vessel on Saturday, April 23, 2005.

**Plaintiffs' Proposed Finding No. 37:** There was no testimony that any Pt. Judith personnel were aboard the Vessel on Saturday, April 23, 2005. The testimony of Mr. Vivenzio does not remotely state or even suggest this. To the contrary, the only evidence is that Mr. Stroker was aboard on Thursday, April 21st and Friday, April, 22nd, 2005 — Mr. Vivenzio affirmatively testified that he turned the Vessel over to the technician on that Thursday, immediately following the launch. Testimony of Don Vivenzio, Vol. II, page 167. This fully accounts for the hours noted on Trial Exhibit 6. The billing summary, Trial Exhibit 1, is not to the contrary. Instead, it reflects the date of *entry* into the office computer of charges drawn from other documents, and does not purport to reflect the performance of any work on Saturday, April 23. Mr. Vivenzio testified that the billing for such work orders are not immediately entered into the computer system so the billing date may appear days later. Testimony of Don Vivenzio, Tr. Vol. II, Pages 111-12. This is amply illustrated by the entry in Trial Exhibit 1, at page 33, that under date of 5/19/05 reflects charges for raising the vessel from 15 feet of water. But the evidence clearly established that the Vessel was, in fact, raised on the date that it sank — April 25, 2005 — and not more than three weeks later, the date of entry of that work into Trial Exhibit 1.

**Plaintiffs' Proposed Finding No. 40:** This proposed finding is exceptionally improper. The testimony of Barry Ennis says nothing whatsoever about who switched off the bilge pump switches. Even in the testimony cited by the plaintiffs', Dennis Layfield made clear that he did not know which switches Mr. Stroker had placed in what positions. Testimony of Dennis Layfield, Vol. V, Page 15, line 22. He also testified affirmatively that he did not know who switched

off the bilge pump switches. Testimony of Dennis Layfield, Vol. V, Page 21, lines 1-2. The proposed finding utterly distorts the evidence. Trial Exhibit 6, as well as the testimony of Mr. Stroker, as well as the theory presented by Mr. Robbins, all confirm that he made sure that the forward bilge pump was properly functioning, actuated by the float switch. Mr. Vivenzio made clear that to shut off the midships bilge pump, the manual switch would be used, not the auto switch. Testimony of Don Vivenzio, Vol. II., Pages 104-105. This is completely consistent with Mr. Stroker having confirmed that the forward bilge pump was properly functioning on the float switch (Trial Exhibit 6; Testimony of Joseph Stroker, Tr. Vol. II, Pages 17, 51.), which was also the basis for Mr. Robbins' explanation of why the Vessel did not sink on Thursday, Friday, or Saturday, but was floating properly until Sunday night, and then sank in about 10 hours. Testimony of William Robbins, Tr. Vol. IV, Page 15.

**Plaintiffs' Proposed Finding No. 41:** This proposed finding is at odds with all the evidence. Mr. Picchione admitted that he was aboard on Saturday, and he also told the Coast Guard that he had been on board on Sunday and had checked the bilges. As noted above, there is no evidence that anyone from Pt. Judith was aboard after Friday, April 22nd, 2005.

**Plaintiffs' Proposed Finding Nos. 42-3:** There is no evidence that the midships bilge pump itself was malfunctioning — only that when its switch was thrown, it ran continuously. This makes sense in light of the fact — shown by the testimony of Mr. Robbins — that there was no float switch for it. Mr. Stroker himself made clear that no one determined whether the midships bilge pump itself was faulty.

**Plaintiffs' Proposed Finding No. 48-49:** These proposed findings utterly distort the testimony. The evidence is that Mr. Stroker left the Vessel with the forward bilge pump functioning properly on the float switch, and there is no evidence that anyone from Pt. Judith altered any switch positions after this. At the time of the sinking, there is no evidence that Mr. Vivenzio knew about

the content of Trial Exhibit 6. All the testimony made clear that Mr. Vivenzio gave all the surveyors and Harbormaster Ennis all the information and cooperation they asked for, and that no one had asked him anything about what work the yard had done.

**Plaintiffs' Proposed Finding No. 50:** Mr. Layfield gave no such testimony, for which reason — presumably — the plaintiffs have not even provided a page reference. In addition, this finding is at odds with Mr. Robbins admission that he assumed that the Vessel was floating as deeply on April 24th, 2005 as it was during the forensic test on May 3, 2005, after the Vessel had become heavier by reason of having been sunk. This incorrect assumption destroys the value of his testimony about flooding through the exhaust hose, because Mr. Robbins did not know and did not determine the Vessel's draft as of April 24th, 2005, which the evidence shows was much higher in the water than on May 3, 2005 because of the additional weight. The undisputed testimony of Mr. David Clarke shows that the exhaust ports were half-way out of the water on the evening of April 24th, 2005, completely at odds with Mr. Robbins' assumption.

**Plaintiffs' Proposed Finding No. 51:** This proposed finding is unsound, because there is no evidence that — at any time before the sinking — the Vessel floated as low in the water as on May 3, 2005, the date of the forensic test, at which time the Vessel only leaked water while rolled to starboard in the slings. Testimony of Don Vivenzio, Vol. II., Pages 84-85.

**Plaintiffs' Proposed Finding No. 53:** This is merely a repetition of Proposed Finding No. 14, and is unsound for the same reason. There was no testimony of what was standard in the industry as far as hose inspections was concerned, and all of the witnesses agreed that no one conducted disassembly to conduct routine inspection of hoses.

**Plaintiffs' Proposed Finding No. 54-57:** There was no evidence that there was any standard in the industry that obliged Pt. Judith pro-actively to modify conditions so as to differ from their "as-built" factory-installed conditions.

**Plaintiffs' Proposed Finding No. 58:** This is incorrect. Mr. Picchione admitted that he had custody of the Vessel, was free to have a party or spend the night aboard, to start up the engines and take the boat out or have it towed elsewhere, and was responsible for the Vessel at the slip just as he was while it was at sea. Testimony of Nicholas Picchione II, Tr. Vol. I, Pages 126-29, 140-42.

**Plaintiffs' Proposed Finding No. 59:** There is no evidence to support this contention, nor does it have any bearing on the responsibility of the owner, or of Pt. Judith.

**Plaintiffs' Proposed Finding No. 60:** This is incorrect. There is no evidence whatsoever that Mr. Picchione was charged for commissioning the engines. Mr. Vivenzio testified that this item was entered into the service history in error and then cancelled. Testimony of Don Vivenzio, Tr. Vol. II., Page 115.

**Plaintiffs' Proposed Finding No. 61:** This is incorrect. There was no agreement to sea-trial the Vessel. When Mr. Stroker left the Vessel on Friday, April 22, 2005, Pt. Judith had completed all the work that it had agreed to do that year. Testimony of Don Vivenzio, Tr. Vol. II., Page 189. The spring commissioning in 2005 did not include engine or seatrial work that had been done in past years, because of the outside engine work that Mr. Picchione had had performed. Testimony of Don Vivenzio, Tr. Vol. II., Page 106. Even Mr. Picchione admitted that Pt. Judith had never communicated agreement to perform — in 2005 — the engine-related work that Mr. Picchione had them do in past years. Testimony of Nicholas Picchione, Tr. Vol. I., Pages 69-70. The cited testimony of Mr. Vivenzio meant only that the yard would not even consider agreeing to a sea-trial in 2005 unless the engine start-up had first been performed by the outside mechanic. This is not evidence that there was such an agreement already in place — to the contrary, as noted, the only evidence is that Pt. Judith had finished all of the work it had agreed to do as of Friday, April 22, 2005.

**Plaintiffs' Proposed Finding Nos. 62-4:** There was no evidence that there was any standard in the industry that obliged Pt. Judith pro-actively to modify conditions so as to differ from their "as-built" factory-installed conditions.

**Plaintiffs' Proposed Finding No. 66:** This work never went beyond the first elbow, immediately adjoining the short section of hose attached to the engine. Testimony of Don Vivenzio, Tr. Vol. II., Page 153.

**Plaintiffs' Proposed Finding No. 67:** This work never went beyond the first elbow, immediately adjoining the short section of hose attached to the engine. Testimony of Don Vivenzio, Tr. Vol. II., Page 153.

**Plaintiffs' Proposed Finding No. 69:** This is a distortion. To the contrary, the testimony is that he "usually" did, and that Pt. Judith was not engaged to do "everything" on the Vessel. Testimony of Don Vivenzio, Tr. Vol. II., Pages 132, 137.

## III. GRANTING PLAINTIFFS' CLAIM FOR INTEREST WOULD AMOUNT TO OVERCOMPENSATION

The plaintiffs having introduced no evidence at trial as to the cost of borrowing, prevailing rates of interest, or otherwise as to the proper rate of interest, the Court is warranted in denying prejudgment interest. *Muratore v. M/S Scotia Prince*, 663 F.Supp. 484, 486 (D.Me. 1987). In any event, "an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred." *City of Milwaukee v. National Gypsum Company*, 515 U.S. 189, 196 (1995), but it is axiomatic that a plaintiff is not to be made "more than whole." An award of interest at the 12% rate urged by the plaintiffs would indeed make them "more than whole," especially inasmuch as current interest rates in the market in no way approximate 12%. A variable interest rate based on market rates is a far better approximation of a plaintiffs' loss of use of funds, if an award is made, and has been specifically endorsed by the First Circuit. *Pimentel v. Jacobsen Fishing Co., Inc.*, 102 F.3d 638, 640 (1st Cir. 1996). In light of the lack of evidence brought forward on the

applicable rate of interest at trial, *Muratore, supra*, a rate of interest exceeding the treasury bill rate endorsed in *Pimentel, supra*, would be unfair, especially in light of the use of just such a rate for calculation of *post*-judgment interest pursuant to 28 U.S.C. 1961(a), a rate determined by Congress to be proper compensation for the time-value of money when invested in a risk-free instrument.

## IV. CONCLUSION

At the time of the sinking, the Vessel had been delivered into Mr. Picchione's admitted custody and control, and Pt. Judith had no obligation to prevent it from sinking. It is undisputed that Mr. Vivenzio, Mr. Stroker, and even Mr. Picchione himself had checked the Vessel for leakage and found none. It is also undisputed that the forward bilge pump was confirmed to be functioning properly on the float switch. The midships bilge pump was only activated by a manual switch, and thus could not have helped discharge any water entering the Vessel unless someone had been present on board to activate it manually.

Pt. Judith never undertook to make inspections other than on the occasion of commissioning, and even then only as to conditions that were visible without disassembly. There was no defect with the exhaust hose visible at that time without disassembly. There was no legal duty on the part of Pt. Judith to seek out, correct, modify, or report conditions about the Vessel in the course of other work, and this applies to the hole in the exhaust hose, as well as the conditions relating to the anti-siphon loops and the chafing gear. Pt. Judith never did any work on bilge discharge hoses or on the exhaust hose in which the hole was eventually located.

Plaintiffs' case on causation fails, because it utterly depends on Mr. Robbins' assumption about the depth at which the Vessel was riding before the sinking — an assumption that is utterly contrary to the undisputed evidence that was given by Mr. Clarke. There is no evidence whatsoever that water was able to enter the Vessel while she was floating at the draft that was observed by Mr. Clarke on the evening before the sinking. Mr. Robbins erroneously assumed that the draft that night

was the same as on the occasion of the forensic test, on May 3, 2005, which is clearly wrong — the exhaust ports were fully submerged on May 3, 2005, so much so that they are not even visible below the surface, but on April 24, 2005, Mr. Clarke observed them halfway above the surface. And even on May 3, 2005, water did not enter the boat when she was launched and floating naturally, which lead to having her rolled to each side in the travellift slings, in an effort to diagnose a source of water entry. In light of these undisputed facts, it would be speculative to suppose that the Vessel was taking on water through the exhaust hose when she was floating considerably higher out of the water on the evening of April 24, 2005. Because Pt. Judith had never agreed to accept custody of the Vessel once she was placed in Mr. Picchione's summer slip, Pt. Judith does not bear the burden of explaining how the Vessel sank, nor is this a *res ipsa* case — by reason of both the pleadings and the facts.

As reflected in the ruling of *Goudy*, plaintiffs' are entitled to no presumption, and particularly not in light of the admissions by Mr. Picchione of the liberty that his friends enjoyed to use his boat in the slip in his absence. Just as in *Goudy*, an unexplained sinking means that the plaintiffs' case on causation fails, and cannot be saved by Mr. Robbins' fatally flawed conclusions, based as they are on his completely unfounded assumption that the Vessel sat as low in the water before she sank as when she was launched, much heavier, on May 3, 2005 for the forensic testing.

The notion that the hole in the exhaust hose led to the sinking is naturally attractive, because of the understandable tendency to wish to resolve what would otherwise be a mystery. But this understandable appeal cannot serve as a substitute for proper evidence, and Mr. Robbins' conclusions, with their numerous lapses in proper investigatory procedure, cannot support a finding of fact as to the cause of the sinking.

WHEREFORE, Point Judith respectfully requests that the Court enter the foregoing findings, rulings and adjudications, and enter judgment for the defendant.

Dated: June 23, 2008

**POINT JUDITH MARINA, INC.**
By its attorneys,
/s/ Carl E. Fumarola
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth (pro hac vice)
Carl E. Fumarola, Esq., R.I. Bar #6980
Cetrulo & Capone LLP
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com

**CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that on this 23rd day of June, 2008, I have served the above documents on the following counsel of record via ECF filing:

Frederick A. Lovejoy, Esq.
LOVEJOY & ASSOCIATES
276 Center Road
Easton, CT 06612-1604
LOVEJOYADM@aol.com

/s/ Carl E. Fumarola
Stephen T. Armato, R. I. Bar #6395
Michael Rauworth *(pro hac vice)*
Carl E. Fumarola, Esq., R.I. Bar #6980
**CETRULO & CAPONE LLP**
The Heritage Building
321 South Main Street
Providence, RI 02903
Tel: (401) 274-7850
Fax: (401) 274-9670
Email: sarmato@cetcap.com
Email: mrauworth@cetcap.com
Email: cfumarola@cetcap.com



02006-0045
1075778v1