UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTHERN INSURANCE COMPANY OF NEW YORK<br>Plaintiff, | : | C.A. 06-190S |
| v. | : | |
| ALBIN MANUFACTURING, INC., STANDISH BOAT YARD, INC., AND POINT JUDITH MARINA, LLC,<br>Defendants. | : | July 17, 2008 |

PLAINTIFF NORTHERN INSURANCE COMPANY OF NEW YORK'S
REPLY BRIEF TO DEFENDANT POINT JUDITH MARINA, LLC'S
NUMEROUS POST-TRIAL SUBMISSIONS

Plaintiff Northern Insurance Company of New York submits this memorandum in order to respond to the various inaccurate contentions and new arguments of defendant Point Judith Marina, LLC.

Simply put, most of the contentions of defendant Point Judith Marina, LLC are based on hyperbole and should be disregarded by this Court.

1. While defendant Point Judith Marina, LLC repeatedly attempts to discredit the expert findings of William Robbins; i.e., that water entered the severed/cut starboard exhaust hose on the M/V EVEREADY, then lowered the static water line of the vessel until it down/back-flooded through its bilge pump thru hull fittings and sank, it offers no evidence/explanation as to how the M/V EVEREADY sank. Moreover, defendant Point Judith Marina, LLC admitted that the vessel back flooded and sank, and both Mr. Robbins and Mr. Layfield eliminated all other possible causes for the M/V EVEREADY sinking.

Defendant Point Judith Marina, LLC's assertion that the plaintiff has not met its burden in respect to causation is, thus, meritless. (Trial Transcript 4/13/08, p. 72, ll. 1-17)

2. That the testimony of David Clarke, an elderly WWII veteran, that the M/V EVEREADY's exhaust ports were only half way submerged on the evening of April 24, 2005, is not reliable in light of testimony of Kenneth Hilton of Standish Boat Yard, Inc., who testified that when he sold the M/V EVEREADY to Nicholas Picchione in 1996, the water line/bottom paint lay above the vessel's exhaust port, i.e., the exhaust ports were 100% submerged. (Trial Transcript 5/12/08, p. 150, ll. 21-25; p. 151, ll. 10-15, 24-25; p. 152, ll. 13-16) (Trial Exhibit 58)

Additionally, Mr. Vivenzio and Mr. Picchione testified that the normal position of the water was at or above the top of the exhaust ports. Moreover, Mr. Robbins clearly demonstrated by calculating the position of the starboard exhaust hose, which ran parallel to the vessel's starboard chine, that the cut in the exhaust hose was the manner in which water initially entered the M/V EVEREADY. (Trial Transcript 5/12/08, p. 51, ll. 2-7)

3. The testimony/opinions of defendant Point Judith Marina, LLC's expert witness Dennis Layfield should be disregarded: 1) because he issued his opinion/report without having read the deposition transcripts of any witness; i.e., he issued his Fed.R.Civ.P., Rule 20 Report on April 30, 2008, then read the deposition transcripts of all witnesses on May 4, 2008 (Trial Transcript 5/22/08, p. 19, ll. 9-25; p. 20, ll. 1-14); 2) in June 2005, Mr. Layfield, knowing of all of the potential "pitfalls" concerning the M/V EVEREADY, i.e., previous grounding and repairs, core saturation, tuna tower, et cetera, wrote to One Beacon, defendant Point Judith Marina, LLC's underwriter, and stated the fair market value of the M/V EVEREADY was $135,000.00 (Trial Transcript 5/22/08, p. 16, ll. 16-25; p. 17, ll. 1-25, p. 18, ll. 1-2), then, at trial, with the input of Attorney Rauworth, claimed the M/V EVEREADY had only a fair market value of $93,417.00

(Trial Transcript 5/15/08, p. 150, ll. 14-15); and 3) his opinion was actually that of Attorney Rauworth, and not Mr. Layfield (Trial Transcript 5/22/08, p. 32, l. 25; ;. 33, ll. 1-25; p. 34, ll. 1-16).

Significantly, Mr. Layfield admitted/states that Mr. Stroker shut off the auto bilge switch. He testified:

> Q. Okay. And I'm going to read part of it to you. It's from page three, Mr. Layfield. You state – are you at page three, sir?
>
> A. Yes, I am.
>
> Q. Towards the bottom. Third from the last paragraph. (Reading:) I have learned that Mr. Joseph Stroker, an employee of Point Judith Marina, apparently found that one of the two electric bilge pumps in the engine compartment would not shut off when the automatic switch was switched on. That's what you wrote, correct?
>
> A. Yes.
>
> Q. Okay. And the automatic switch that you're referring to is the switch that turns on or off all the bilge pumps, correct?
>
> A. I don't know that.

(Trial Transcript 5/22/08, p. 15, ll. 7-21)

4. Defendant Point Judith Marina, LLC's assertion that the Court must now, after defendant Point Judith Marina, LLC offered no evidence at trial on this issue, and plaintiff Northern Insurance Company of New York will have no opportunity to offer rebuttal evidence, place a percentage on Standish Boat Yard, Inc. pursuant to AmClyde should be disregarded by this Court.

Moreover, had the Court actually received evidence on the issue, it might have concluded that defendant Standish Boat Yard, Inc. has no liability either factually or legally. (See Defendant Standish Boat Yard, Inc.'s Motion to Dismiss – Docket No. 71, dated May 1, 2008)

5. Throughout the trial and its post-trial submissions, defendant Point Judith Marina, LLC continues to assert/raise arguments/smoke screens that it knows have no basis in fact; e.g.:

a) The scum line found by Mr. Robbins at/near the vessel's water line (Trial Exhibit 59) was caused when the M/V EVEREADY was raised following her sinking.

b) That someone else at the marine, who might have known where Mr. Picchione hid his vessel key, came on board and shut off the bilge pump switches in April when there is virtually no one at the marina except a few "early birds" like Mr. Picchione.

c) That Mr. Picchione cut the air conditioning hose with a fish knife.

d) That defendant Point Judith Marina, LLC was not supposed to discover the fact that the M/V EVEREADY exhaust hoses sat directly on the rear engine room bulkhead, even though inspecting hoses was part of the commissioning process, and defendant Point Judith Marina, LLC had removed the engines on the vessel when it did the hull repairs in 1998-99.

6. Defendant Point Judith Marina, LLC's contention that Mr. Picchione should have inspected the bilge pump switches each time he was on board the vessel is baseless. Simply put, defendant Point Judith Marina, LLC introduced any evidence as to when an owner should inspect his vessel's bilge pump switches when the vessel has not left the dock.

It is clear from the trial evidence that Mr. Stroker was the only one who adjusted/changed the position of the auto bilge switch and he did so either on Friday or Saturday, May 22nd or 23rd, 2005.

7. Defendant Point Judith Marina, LLC's case law, which holds that a contractor is not responsible for finding and reporting defects, is not on point. Simply stated, defendant Point Judith Marina, LLC's cases are not maritime cases dealing with the warranty of workmanlike performance imposed pursuant to maritime law, and are distinguishable because hose inspections

are part of the standard spring commissioning procedure conducted by defendant Point Judith Marina, LLC, as well as being standard practice in the marina industry. (Trial Transcript 5/12/08, p. 156, ll. 2-8)

8. Defendant Point Judith Marina, LLC's contention that some of the work performed by Mr. Stroker was not performed on Saturday, April 23, 2005 is belied by Mr. Vivenzio's testimony. Page 32 of Trial Exhibit 1 contains entries for Work Order No. 9186 entered on April 23, 2005, and Work Order No. 9334 entered on April 26, 2005, which both cover the work that Mr. Stroker performed and is denoted in Trial Exhibit 6.

It is counter-intuitive and not logical that if all of Mr. Stroker's work had been completed as of Friday, April 22, 2005, that it would have been broken into two separate entries by defendant Point Judith Marina, LLC's personnel.

Simply stated, the two separate entries demonstrate that the 13.4 hours of work time indicated on Trial Exhibit 6 started on Friday, April 22, 2005 and continued over onto Saturday April 23, 2005.

9. That defendant Point Judith Marina, LLC did not advise Mr. Picchione it had not inspected his exhaust hoses, as was supposed to be part of its routine commissioning process. Although Mr. Vivenzio admitted a vessel's exhaust hoses should be inspected annually, he additionally admitted that Point Judith Marina, LLC had no system in place to advise an owner that this routine and critical inspection had not been performed. He testified:

> Q. My question to you is, how do you know that a technician has actually looked at the exhaust hoses on a vessel?
>
> A. We don't.
>
> Q. That's part of what they're supposed to do, correct?

A. They're supposed to give us some information related on things that they see.

Q. Well, one of the things they're supposed to examine on a vessel is exhaust hoses, correct?

A. Correct.

Q. And if they don't do it, or they can't see them, do you have – you don't have any mechanism in place on your commission list to indicate that, do you?

A. No.

Q. And if they can't see them, is that something that – strike that.

If they don't examine them or can't see them, is that something that would be important to make known to the owner?

A. If we can't see items, we can't do anything about them.

Q. That's not my question. Would you agree with me that if you haven't inspected an item that you do as a routine part of you commissioning, or can't see it, that it would be prudent to let the owner know that you weren't able to do it?

Mr. Rauworth: Objection. Assumes facts not in evidence.

The Court: Overruled.

A. It would be prudent.

Q. And it is not the practice of Point Judith to do that; is that correct?

A. We haven't done that.

Q. And it would be doubly or triply more important to notify an owner of a vessel that's ten years old or older, that you haven't examined the exhaust hoses on the vessel, correct?

A. It would be.

Q. Basically, the older the vessel gets, the more important it becomes to notify an owner as to problems, correct?

A. <u>Right</u>. If you see the problems.

Q. Well, the older the vessel gets, it becomes more important to notify the owner of problems that you are not able to look at, correct?

A. There's a lot of things on a vessel that you won't see.

Q. My question to you, sir, is if you can't see it, or the technician doesn't do it, it gets more and more important to let the owner know that it hasn't been done, the older the vessel gets, correct?

A. We're not saying that we're going to check all these things. <u>It's important for the owner to know that, yes</u>.

Q. And my question to you is, the older a vessel gets, the more important it becomes to either look at the object or, if you can't, to notify the owner that you've been unable to look at an exhaust hose, correct?

A. <u>It seems like it would be</u>.

Q. And during the seven-year work history that we have in Exhibit 1, <u>Point Judith never advised Mr. Picchione at anytime that it was unable to look at exhaust hoses, correct</u>?

A. <u>Correct</u>.

Q. And the purpose of examining exhaust hoses is for a number of reasons, correct?

A. Yes.

Q. To prevent a vessel from sinking, correct?

A. You can have water or exhaust coming into the boat, if you have an exhaust leak.

(Trial Transcript 5/13/08, pp. 71 72 and 73) (emphasis added)

Moreover, Mr. Stroker testified, "I can't be positive which one I turned off." (Trial Transcript 5/13/08, p. 13, l. 16)

"I can't be positive how this thing was wired and which switches controlled which pumps according to this panel."

## CONCLUSION

Based on the evidence introduced at trial, this Court should hold defendant Point Judith Marina, LLC 100% liable for the losses suffered by plaintiff Northern Insurance Company of New York.

Dated: Providence, Rhode Island
July 17, 2008

Lovejoy & Associates
Attorneys for Plaintiff
Northern Insurance Company of New York

By: /s/ Frederick A. Lovejoy

Frederick A. Lovejoy (Bar No. 5313)
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 telefax

PicchioneReplyBrief7-08.doc

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed on July 17, 2008, postage prepaid, to:

Robert E. Collins, Esq.
Clinton & Muzyka, P.C.
One Washington Mall
Suite 1400
Boston, Massachusetts 02108

Albin Manufacturing, Inc.,
Albin Marine, Inc.,
Fred W.A. Peters, Monica Peters
143 River Street
Cos Cob, Connecticut 06807

Michael J. Rauworth, Esq.
Cetrulo & Capone LLP
321 South Main Street
Providence, Rhode Island 02903

/s/ Frederick A. Lovejoy
FREDERICK A. LOVEJOY