UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTHERN INSURANCE CO. OF NEW YORK and NICHOLAS PICCHIONE, II, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 06-190-S |
| ALBIN MANUFACTURING, INC., and POINT JUDITH MARINA, LLC, | : | |
| Defendants. | : | |

**DECISION AND ORDER**

WILLIAM E. SMITH, District Judge.

This maritime dispute between Plaintiffs Northern Insurance Company and Nicholas Picchione[1] (collectively "Plaintiffs") and Defendants Pt. Judith Marina, LLC and Albin Manufacturing, Inc. (respectively, "Pt. Judith" and "Albin")[2] was tried to the Court

[1] At trial, counsel for Northern maintained that Picchione was no longer a party. Though counsel removed Picchione from the case caption in his filings, he did not file a motion to dismiss or withdraw Picchione. More importantly, both the Complaint and Amended Complaint, as well as Northern's post-trial Proposed Findings of Fact and Conclusions of Law, assert Picchione's party status. Furthermore, Pt. Judith maintains a cross-claim against Picchione, rendering him a live party to this action. Therefore, for all intents and purposes, Picchione shall be considered a party to this matter.

[2] According to the records of the Secretary of the State of Connecticut, Albin Manufacturing Corporation was dissolved on October 26, 2007. On or about March 26, 2008, the Court permitted counsel for Defendant Albin Manufacturing, Inc. ("Albin") to withdraw pursuant to LR Gen. 206(e)(2). Subsequently, Albin failed to participate in any way in the proceedings leading up to trial, and no representative for Albin appeared in court for trial. On

over five days, beginning on May 12, 2008. Northern, Picchione's insurance carrier and subrogee to his right of action, brought suit against Pt. Judith for various tort and contract claims relating to the sinking of Picchione's vessel. Specifically, Northern alleges that Pt. Judith is liable in negligence for failure to warn (Count VII) Picchione about chafed exhaust hoses, lack of anti-siphon loops on bilge discharge hoses, and the switched-off engine room bilge pump; negligence as a bailee (Count XII); and negligence in the performing of general maintenance and commissioning of Picchione's boat (Count XI). Northern also alleges breach of warranty of workmanlike performance (Count X) as well as breach of contract (Count XI). Pt. Judith cross claims against Picchione for indemnification.

Having considered the evidence presented at trial, and the post trial memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a).

---

day one of the trial, counsel for Northern admitted that he had not yet moved for default, but indicated that he would do so. However, as of yet, no motion has been filed. Thus, the Court allows Northern one week from the date of this Decision to move for entry of default against Albin. Should Northern fail to do so, pursuant to Fed. R. Civ. P. 41(b) and its inherent powers this Court will dismiss with prejudice sua sponte all claims alleged against Albin. See D'Onofrio v. Il Mattino, 430 F. Supp. 2d 431, 444 (E.D. Pa. 2006).

I. Findings of Fact

Nicholas Picchione is a life-long boater with a streak of bad luck, whose maritime life, like that of the characters in the popular children's series by Lemony Snicket, has been marked by a "series of unfortunate events."[3] In or around 1995, Picchione purchased a new 28-foot Albin motor boat, which he christened the M/V EVEREADY. After a good day of fishing some 65 miles off Point Judith, Rhode Island, the EVEREADY began taking on water at a rapid pace and sank, despite the bilge pumps being on and working. The reason for the sinking was never discovered. Soon after, in 1996, Picchione purchased another boat at the suggestion of Standish Boat Yard, Inc., Picchione's Albin dealer, this time a new 35-foot Albin which he also christened the M/V EVEREADY (the "EVEREADY"). In the years following, the EVEREADY was involved in several mishaps, having gone aground once on a shoal near Block Island, and again on the Pt. Judith breakwater. Finally, and, most unfortunately, on April 25, 2005, just days after its launch for the season, the EVEREADY sank at its slip in the Pt. Judith Marina. Northern paid a substantial insurance settlement to Picchione, who has since replaced the EVEREADY with a 48-foot Ocean yacht.

---

[3] See, e.g., Lemony Snicket (aka Daniel Handler), The Bad Beginning (A Series of Unfortunate Events, 1st in the series) (Harper Collins) (1999).

At issue here is how and why the (second) EVEREADY sank. During the entire time he owned the EVEREADY, Picchione docked his boat at a slip in the Pt. Judith Marina, and dry stored it there during the winter season. For the first several years, any maintenance or other work needed was performed by persons at the Standish Boat Yard. Thereafter, when his warranty was no longer in effect, Picchione employed Pt. Judith to perform necessary repairs, and for each of the boating seasons, Picchione contracted with Pt. Judith to do decommissioning (at the end of the season) and then commissioning (preparing the boat for launch). Aside from work that Pt. Judith contracts to perform specifically, it does not provide general preventative maintenance or care for the vessels in the Marina.

In late 2004 or early 2005, Picchione requested that Pt. Judith perform the standard commissioning that it had done in previous years in anticipation of the 2005 boating season. He also signed a Summer Dockage/Rack Storage Contract, which was to govern Picchione's rental of a slip at the Pt. Judith Marina from April 15, 2005 through October 31, 2005. The contract provided, in pertinent part:

> 4. Tenant acknowledges this agreement is not a bailment of Tenant's vessel but a lease of storage space or slip only and Marina's liability is limited solely to the maintenance and upkeep thereof.
>
> . . . .

> 11. [T]he Marina assumes no responsibility of the safety of any vessel docked in the marina and it is expressly agreed that the Marina will not be liable for any loss due to fire, theft, collision, accident, vandalism windstorm, high or low waters, hail, rain, ice or damage to said vessel, or any act of God, its equipment or any property in or on said vessel however arising including the negligence of an employee of the Marina or of another patron. Tenant waives any and all claims for such loss or damage against the Marina, agrees to hold the Marina harmless from and against any such claim and to seek compensation from his own insurance policy for any such loss. Tenant agrees to have his vessel insured by complete marine coverage including liability. Each tenant will be held responsible for damage caused by said Tenant or Tenant's vessel to other vessels in the Marina or to structures or facilities thereof.

At some time during the off-season, before Pt. Judith began commissioning the vessel, "Dan," an independent mechanic not affiliated with Pt. Judith and hired by Picchione, examined and worked on the EVEREADY's engine. Later in the spring, just prior to the EVEREADY's launch, Henry Smedberg, a Pt. Judith employee, painted the bottom of the vessel. At that time, Smedberg visually inspected the boat and saw no cracks or other damage, and no water, or evidence of water, weeping out of the hull.

On Thursday, April 21, 2005, Pt. Judith moved the EVEREADY from dry dock to its slip in the marina. That day, Picchione briefly visited the vessel and took a mental inventory of important features, noting that electrical power flowed, and that the lights and bilge pumps were on and working. The next day, Friday, Joseph

Stroker, a Pt. Judith employee, boarded the vessel and spent approximately thirteen hours commissioning it. That commissioning included general upkeep and inspection of batteries and other energy sources, lights, bilge pumps, visible hoses, generators, air conditioning units, and the water system, as well as replacement and inspection of filters and raycors. Because of Dan's earlier involvement, Pt. Judith, pursuant to its usual policy, refused to test, work on, or start the EVEREADY's engines as part of the commissioning. For the same reason, Pt. Judith also declined to perform a sea trial as a part of the commissioning process, whereby the engines would be started and the vessel's seaworthiness tested, because it was their policy not to start an engine that had been worked on by someone else. Therefore, Pt. Judith planned to hold off on a sea trial until Dan the mechanic tested the engine upon which he had worked during the off-season.

As a part of the commissioning, Stroker checked the functioning of the EVEREADY's three bilge pumps. Early in the day, he noticed approximately 6 - 8 inches of water in the engine room bilge. Stroker didn't consider the water to be anything out of the ordinary, and pumped it out. Soon after, Stroker noticed that the engine room bilge pump would not stop running. As a result, he turned off what he thought to be the engine room bilge pump by switching one of the three bilge switches to the off position, leaving (he believed) the automatic switch in the on position. The

bilge pump switches, located on the DC control panel along with the switches that controlled the cabin lights, were not labeled specifically. Instead, the three switches were arranged such that the top bilge switch, located three switches from the bottom of the panel, had black electric tape across it, printed faintly with the words "AUTO ON." Below that were two switches each labeled "Bilge Pump." There was no indication as to which pump was controlled by which switch.

When asked at trial, Stroker could not remember which switch controlled the engine room bilge, and thus which switch he turned off, though he maintained that he left the automatic switch on and tested to make sure that the forward pump would be activated by the float switch should water flood the area. While on the witness stand, Stroker relied largely on his notes taken on Friday April 22, 2005, because, as he put it, "I work on a lot of boats. It's been three years. I can't be positive about this panel you're showing me." Those notes provide: "*NOTE: Bilge switch on panel set to auto. Engine room pump will not stop running, set switch to off. (Forward pump will work on float switch)." Stroker also testified that he would not have left the vessel without verifying that it had at least one operational bilge pump, because that is the minimum needed to safely keep the vessel afloat. Finally, before leaving at the end of the day, Stroker verified that no

water had accumulated in the bilge over the several hours that had passed since he turned off the engine room pump.

At some point Friday, Picchione stopped by the EVEREADY for a short visit. He remembers checking the switch plate and seeing at least the automatic switch in the on position, and noting that there was no water in the bilge. Picchione returned to the vessel the following day for approximately one hour, accompanied by his girlfriend, in order to stock the vessel with supplies for the boating season. When asked at trial, Picchione maintained that he could not recall the position or arrangement of the bilge pump switches on Saturday, nor could he recall checking the bilges for

water. His deposition testimony,[4] however, on this critical issue was significantly different:

> Q. Did you do anything to check and see whether the bilge pumps were functional?
>
> A. I assumed that they were functional. What I would do -
>
> MR. LOVEJOY: You gotta turn towards her.

---

[4] At the close of trial, counsel for Pt. Judith moved for entry of portions of Picchione's deposition testimony into the record, and subsequently filed a supplemental brief on the issue. Though Northern's counsel objected in open court, he failed to file an opposition brief on the issue as directed by the Court. Regardless, the Court finds that pursuant to Fed. R. Civ. P. 32(a)(3), Picchione's deposition appropriately may be included as substantive evidence on the record.

Rule 32(a)(3) (formerly Rule 32(a)(2) until the 2007 amendments) provides broadly: "An adverse party may use <u>for any purpose</u> the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." (Emphasis added). The rule is to be liberally construed, and though the court "has discretion to exclude parts of the deposition that are unnecessarily repetitious in relation to the testimony of the party on the stand, [] it may not refuse to allow the deposition to be used merely because the party is available to testify in person." 8A Wright et al., <u>Federal Practice and Procedure</u> § 2145 (2d ed. 2008); <u>see also Superior Diving Co. v. Watts</u>, 2008 WL 533804, at *2 (E.D. La. Feb. 22, 2008) (Rule 32(a)(3) "allows a party's deposition to be used by an adverse party regardless of the presence or absence of the deponent at the hearing or trial and regardless of whether the deponent is available to testify or has testified there"); <u>Coughlin v. Capitol Cement Co.</u>, 571 F.2d 290, 308 (5th Cir. 1978) (Rule 32(a)(3) "permits a party to introduce the deposition of an adversary as part of his substantive proof regardless of the adversary's availability to testify at trial"); <u>Cmty. Counseling Serv., Inc. v. Reilly</u>, 317 F.2d 239, 243 (4th Cir. 1963) (deposition "statements of a party which are inconsistent with his claim in litigation are substantively admissible against him"); <u>Fenstermacher v. Philadelphia Nat'l Bank</u>, 493 F.2d 333, 338 (3rd Cir. 1973); <u>Zimmerman v. Safeway Stores, Inc.</u>, 410 F.2d 1041, 1044 n.5 (D.C. Cir. 1969); <u>Patsy's Italian Rest., Inc. v. Banas</u>, 508 F. Supp. 2d 194, 200 n.3 (E.D.N.Y. 2007).

A. Right. And I know Fred doesn't want me to volunteer information but, all I - - on that particular boat, there was a main switch. And then there are individual switches. So, I just always made sure that the main was on. How I checked the bilge, there's a hatch in the back of the boat, and I look up, and if there's no water down there, boom, everything's beautiful. That was it.

Q. Okay. Did you do that on Thursday?

A. I'm sure - - I do it every time I get on the boat.

Q. Okay. So that means you would have done it Thursday, Friday, and Saturday?

A. Correct.

. . . .

Q. Did you ever check to see the alignment of switches with regard to your bilge on that weekend?

A. I'm - - can't be sure. But I'm sure I did.

Q. Okay. So, you would have left them in the position such that the bilge pumps would operate?

A. I would have left the main on. Always the main, always on.

There is no evidence that anyone boarded the EVEREADY between Picchione's Saturday visit and the Monday morning sinking. Picchione has admitted that friends of his knew where he kept the keys to the EVEREADY and would, from time to time, board and spend time on the vessel without his knowledge or overt permission, but he (nor anyone else) could not say whether such a visit occurred between Saturday and Monday morning.

Late Sunday evening, David Clarke, whose own boat was docked close to the EVEREADY, happened to stop and take a look at

Picchione's vessel in its slip. At that time, Clarke specifically observed that the EVEREADY was riding in the water with no distress and that the water line was where it had been for the several years that Clarke had observed it. Clarke then retired to his own boat for the night, and awoke early in the morning to find the EVEREADY gone - sunk to the bottom and an oil slick spreading over the surrounding waters. Over the course of Monday morning, numerous persons attended to the EVEREADY and its oil slick, including Don Vivenzio and other Pt. Judith employees, the South Kingstown harbormaster, and representatives from U.S. Coast Guard and Rhode Island Department of Environmental Management. By mid-afternoon, after the EVEREADY had been hauled out of the water and brought onto land, the harbormaster, Barry Ennis, boarded and inspected the vessel. While surveying the interior of the vessel, Ennis noticed that all of the switches on the DC control panel, including the bilge pump switches, were in the off position. Ennis noted his observations in his report and informed Don Vivenzio of the same.

Over the course of the following years, surveyors and experts working on behalf of both Northern and Pt. Judith examined and tested the vessel looking for the source and cause of the EVEREADY's sinking. Initially, it was assumed that water had infiltrated the hull of the boat by virtue of the hull having been damaged in some way during the EVEREADY's previous groundings. However, in October 2007, after removing the fuel tanks, the

surveyors discovered a small hole in the starboard exhaust hose, something that both William Robbins, Northern's expert, and Dennis Layfield, Pt. Judith's expert, agreed would not be visible unless and until the fuel tanks were removed and the exhaust system disassembled. Results from testing conducted in the course of investigating the water source were inconsistent. The boat was relaunched once in May 2005, at which time a trickle of water running down the interior hull on the starboard side was observed. When relaunched in October 2007, there appeared to be no water leaking into the vessel. No evidence was presented to establish at what rate the water likely leaked into the EVEREADY on the weekend of its sinking.

Northern posits that the hole was caused by a lack of chafing gear on the exhaust hoses, and that the hole was the source of the water which eventually caused the EVEREADY to sink. Northern's expert, Mr. Robbins, testified, however, that he could not rule out hull damage as the source of the leak, whereas Mr. Layfield, Pt. Judith's expert, expressed his opinion that the exhaust hole, due to its location above the waterline, would not allow seawater to enter the vessel. Northern also cites to the lack of anti-siphon loops or check valves on two out of three bilge pump discharge hoses as a source of water that would have contributed to the sinking. Without anti-siphon loops or check valves, which are recommended by the American Boat and Yacht Council, water can

sometimes backflood into a vessel. Northern's expert, Robbins, testified that in his opinion, lack of anti-siphon loops hastened the sinking of the EVEREADY. Regardless of the source of water, both experts agreed that just one operational bilge pump would have been sufficient to prevent the EVEREADY from sinking.

What seems highly likely is that someone, at some point between Friday and Sunday night, turned off all of the switches on the DC control panel, where all of the cabin lights and bilge pump switches are located. As a result, regardless of its source, water which otherwise would have been pumped out of the vessel collected in the bilge, causing the EVEREADY to sink. More specifically, it appears that once the automatic switch was turned off, a chain reaction followed: the turned off switch prevented the bilge pumps from working automatically; water accumulated in the bilge; and because of the weight of the water, the vessel slowly sank until the exhaust portal became submerged allowing substantial quantities of water swiftly to backflood into vessel causing it suddenly to swamp. Stroker admittedly turned off <u>a</u> bilge pump switch on Friday, though he maintains that the automatic switch remained in the on position. This testimony, however, was not based on a clear memory but rather on what Stroker believed he certainly would have done, and on his own (somewhat self-serving) interpretation of his own notes. Northern's own expert, however, admitted at trial that as of his deposition taken three weeks earlier, on April 24, 2008,

he believed, based on the rapid sinking of the EVEREADY on Sunday night, that the vessel likely had some bilge pumping capability via the automatic pump until some point Sunday night. This belief though is more speculation than the considered opinion of an expert. Yet, when all is said and done, based on all of the evidence presented, the Court simply cannot conclude with any certainty who turned off the automatic bilge pump switch, and when.

II. Conclusions of Law

A. Northern's Claims Against Pt. Judith

This Court has subject matter jurisdiction of this admiralty action pursuant to 28 U.S.C. § 133, and thus will apply federal maritime rules to the facts of this case. See Fed. Marine Terminals, Inc., v. Worcester Peat Co., 262 F.3d 22, 26 (1st Cir. 2001); La Esperanza De P.R. Inc. v. Perez Y Cia De Puerto Rico, Inc., 124 F.3d 10, 16 (1st Cir. 1997). The first issue to be addressed must be the dispute between the parties as to which claims are viable here. Specifically, Pt. Judith maintains that pursuant to the so-called "economic loss" doctrine, only contract claims are viable in the marine services arena. See Isla Nena Air Servs., Inc., v. Cessna Aircraft Co., 449 F.3d 85, 87 (1st Cir. 2006) ("Under the economic loss rule, a party generally may not recover in tort when a defective product harms only the product itself (instead of a person or other property)."); see also E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 876

(1986). On the other hand, Northern maintains that both its contract and tort claims are viable here, citing to the First Circuit's decision in Esperanza, wherein the Court held that under maritime law, "a shipowner may sue in either tort or contract for negligent repairs to his vessel." 124 F.3d at 16.

Here, both parties are essentially right - and wrong. The doctrines articulated above are not at odds with each other. Instead, they address distinctly different factual scenarios, both of which are present here. Northern's primary claim is that Pt. Judith caused the sinking of the EVEREADY because Stroker turned off the automatic bilge pump during the process of commissioning the vessel. Thus, pursuant to Esperanza, Pt. Judith "potentially faces three sources of liability for repairs" allegedly improperly performed - breach of contract, breach of an implied warranty of workmanlike performance, and the maritime tort of negligence. Id. at 16-17. As to Northern's seemingly secondary claims stemming from Pt. Judith's failure to detect and/or warn about and remedy the allegedly defective exhaust hoses, the economic loss doctrine applies, barring all claims sounding in tort. Fireman's Fund Ins. Co. v. Childs, 52 F. Supp. 2d 139, 142 (D. Me. 1999) (the economic loss doctrine applies "where the injury suffered is merely the failure of the product to work properly rather than personal injury or resulting injury to other property"). This rule applies "even when the harm to the product itself occurs through an abrupt,

accident-like event." Isla Nena, 449 F.3d at 87 (applying the economic loss doctrine where defects in airplane's component parts caused it to crash) (quoting E. River, 476 U.S. at 870)).

Addressing first Northern's contract claims relating to Pt. Judith's failure to discover and repair the allegedly defective exhaust and discharge hoses, there is simply no evidence to support these allegations. First, there is no evidence that the parties ever specifically contracted for the inspection, general maintenance, and repair of all the vessel's component parts, including hoses, whether visible and accessible or not. Second, there is no evidence to support the proposition that such alleged defects should have been discovered and corrected as part of the general warranty of workmanlike performance that is a part of every maritime contract. Marcinowski v. McCormack Boys Corp., 160 F. Supp. 2d 708, 714 (S.D.N.Y. 2001); Muller Boat Works, Inc. v. Unnamed 52' House Barg, 464 F. Supp. 2d 127, 145 (E.D.N.Y. 2006) (the warranty includes an implicit agreement "to use the degree of diligence, attention and skill adequate to complete the task").

Nothing in the record supports Northern's theory that Pt. Judith should have inspected the entire vessel, discovered the absence of chafing gear and anti-siphon loops or damage to the exhaust hose, informed Picchione, and corrected such defects and other problems, when it performed work on the many service contracts it entered into with Picchione, or that the failure to do

so was due to lack of diligence, attention, or skill on its part. Northern maintains that because the American Boat & Yacht Council recommends both anti-siphon loops and chafing gear, their absence should have been evident to Pt. Judith and should have prompted remediation. However, these recommendations are not binding or mandatory. Instead, they are defined as "voluntary technical practices and engineering standards," and, as testified to by Don Vivenzio, some boat manufacturers adhere to them, and some do not.

Northern's attempt to assign liability through the warranty of workmanlike performance is likewise misplaced. Because these services were not implicit in any of the contracts entered into by the parties, and Pt. Judith denies ever agreeing to perform preventative maintenance, Northern cannot invoke the warranty of workmanlike performance as a means of creating obligations that go beyond the scope of the contract. In sum, there is no evidence that Pt. Judith breached any stand-alone contracts with Picchione or any implied warranty of workmanlike performance as they relate to the condition of exhaust and bilge discharge hoses.

As to the tort and contract claims relating to the proximate cause of the EVEREADY's sinking, namely the failure of the automatic bilge pump system, Northern failed to meet its burden of establishing by a preponderance of the evidence that Stroker turned off the automatic switch. Northern first maintains that Pt. Judith is negligent simply by virtue of its status as bailee. That

assertion is not supported by the facts. "[W]hen a bailor shows delivery to the bailee and the bailee's failure to return the thing bailed in an undamaged condition, the bailor has made out a prima facie case of negligence against the bailee." New Hampshire Ins. Co. v. Dagnone, No. CIVA 04-122, 2006 WL 1892703, at *2 (D.R.I. July 10, 2006). However, "no inference or presumption of negligence can arise against a bailee if its possession of the damaged bailed property was not exclusive of that of the bailor." Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 19 (1st Cir. 1991) (citation omitted).

A valid bailment was created when Picchione delivered the EVEREADY to Pt. Judith for the specific purpose of winter storage and spring commissioning. See Dagnone, 2006 WL 1892703, at *2. The relationship did not end upon Wednesday's launch of the vessel, but instead continued through the commissioning process, at a time when Picchione had unrestricted access to the EVEREADY and indeed boarded the vessel on several occasions. Although Northern maintains that Stroker was the last person to observe and touch the bilge switch panel, Picchione's deposition testimony makes clear that it was his custom and habit to check the bilge switches and the bilges themselves every time he boarded the vessel, and that he did so on Thursday, Friday, and Saturday before the sinking. As a result, Pt. Judith's control was not exclusive, and Northern is not entitled to an inference of negligence. The very same testimony

also points up Northern's failure to meet its burden of establishing that Pt. Judith acted negligently and that its negligence was the proximate cause of the damage.

Picchione's admission that he checked the switches and that the automatic switch was in the on position makes it impossible for this Court to find by a preponderance of the evidence that one day earlier, Stroker accidentally turned off the automatic switch, depriving the vessel of bilge pumping capacity, and causing the sinking of the EVEREADY. As such, Northern's claim of negligence in the general maintenance and commissioning of the EVEREADY fails along with its parallel claims for breach of contract and implied warranty of workmanlike performance. See Esperanza, 124 F.3d at 17. As to Northern's claim that Stroker breached the duty to warn about the malfunctioning engine room bilge pump, this claim too falls flat, as the evidence makes clear that only one bilge pump was needed to prevent the EVEREADY from sinking, and that only the automatic power was necessary to meet the vessel's bilge pumping needs. Northern's failure to establish that Stroker "more likely than not" turned off the automatic switch in the course of commissioning the EVEREADY frees Pt. Judith from liability for negligent repairs to the vessel. See Smith v. Reinauer Oil Transport. Inc., 256 F.2d 646, 651 (1st Cir. 1958).

B. Pt. Judith's Cross Claim for Indemnification

Pt. Judith has cross-claimed against Picchione for indemnification, including costs and attorneys' fees. Under maritime law, indemnification agreements routinely are enforced as long as the controlling clauses "are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability." Esperanza, 124 F.3d at 19. In this case, Pt. Judith relies on certain clauses contained in the 2005 Summer Dockage/Rack Storage Contract dated September 29, 2004, which provide:

> 18. Tenant hereby covenants, warrants, and agrees to indemnify and hold Marina harmless from any loss or injury, including death, to any person, including the Tenant, arising out of any incident occurring on or about the Tenant's vessel, a vessel of any patron of the Marina, or on the premises of the Marina.
>
> . . . .
>
> 39. In the event that the Marina engages the services of an attorney to enforce any provision of this agreement or to secure payment of delinquent charges then the Tenant shall pay in addition to the payment of all sums agreed to herein, the Tenant shall pay for all reasonable attorney fees, costs and expenses of suit in the enforcement/collection of all sums due pursuant hereto.

Whether the above indemnity clauses are enforceable is immaterial here. The Summer Dockage/Rack Storage Contract is a lease agreement, and nothing more, and its indemnity provisions do not extend to allegations of negligence or breach relating to other

service contracts between Picchione and Pt. Judith. Picchione separately contracted for the commissioning of his vessel, and likewise had contracted in previous years for the performance of specific repairs. Because Northern's allegations relate to the performance of those contracts, the terms of the Summer Dockage/Rack Storage Contract do not apply and Pt. Judith is not entitled to recover fees and costs associated with it.

III. Conclusion

Because Northern failed to meet its burden of establishing that Pt. Judith was responsible for the sinking of the EVEREADY, judgment is entered for Pt. Judith as to all claims against it. Pt. Judith's cross-claim is dismissed. The parties shall bear their own costs and attorneys' fees.

It is so ordered.

WSmith

William E. Smith
United States District Judge
Date: 8/8/08